# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

THOMAS EDWIN LODEN,

                Petitioner,

    v.

CHRISTOPHER EPPS, COMMISSIONER,
DEPARTMENT OF CORRECTIONS AND
JIM HOOD, ATTORNEY GENERAL,

                Respondents.

NO. 1:10-cv-00311-WAP

---

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

---

Stacy Ferraro
MS Bar #100263
P.O. Box 708
Flora, Mississippi  39071
Telephone:  (601) 853-8331
Facsimile:   (601) 853-8331


Charles E. Patterson (*appointed pro hac vice*)
Charles S. Barquist (*appointed pro hac vice*)
Mark R. McDonald (*appointed pro hac vice*)
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California  90013-1024
Telephone:  213.892.5200
Facsimile:   213.892-5454

Attorneys for Petitioner

la-1118427

# TABLE OF CONTENTS

**Page**

Question 1 ................................................................................................................ 1

Question 2 ................................................................................................................ 1

Question 3 ................................................................................................................ 1

Question 4 ................................................................................................................ 1

Question 5 ................................................................................................................ 1

Question 6 ................................................................................................................ 1

Question 7 ................................................................................................................ 1

Question 8 ................................................................................................................ 2

Question 9 ................................................................................................................ 2

Question 10 .............................................................................................................. 3

Question 11 .............................................................................................................. 3

Question 12 .............................................................................................................. 6

GROUND ONE:  TRIAL COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE
ASSISTANCE OF COUNSEL IN VIOLATION OF LODEN'S RIGHTS UNDER THE SIXTH
AMENDMENT ........................................................................................................ 6

I.       TRIAL COUNSEL FAILED TO INVESTIGATE MITIGATION EVIDENCE ............. 6

         A.       Loden's Attorneys Received Numerous Leads for a Strong Mitigation
                  Case, But Failed to Follow Up ............................................................... 6

                  1.       In Counsel's Initial Meeting With Loden, Loden Informed His
                           Counsel Of Numerous Facts That Competent Counsel Would Have
                           Pursued ................................................................................... 6

                  2.       Johnstone Did Not Conduct Or Direct Any Investigation ................. 8

                  3.       Attorney Johnstone Soon Passed Off Loden  To Attorney Daniels,
                           Who Also Did Not Conduct Or  Direct An Investigation .................. 9

                  4.       Loden's Trial Counsel Did Not Provide The Defense Psychiatric
                           Expert With Sufficient Background Information For A Proper
                           Evaluation of Loden ................................................................. 12

                  5.       In The Months Leading Up To Trial, Loden's Counsel Continued
                           To Ignore His Requests For Investigation, Updates And Advice ........... 13

                  6.       Attorney Daniels' Aspirations To Join The District Attorney's
                           Office Contributed To His Rendering Ineffective Assistance
                           During And After Loden's Plea ................................................. 15

**TABLE OF CONTENTS**

(continued)

B.    Had Trial Counsel Properly Conducted A Mitigation Investigation, They Would Have Uncovered Powerful Evidence That Would Have Impacted the Decision On Sentencing ................................................................... 16

    1.    Had Counsel Interviewed Loden's Relatives, Conducted In Depth Interviews Of Loden Or Requested Public Records, They Would Have Gathered Substantial And Powerful Evidence Regarding The Physical, Emotional And Sexual Abuse Suffered By Loden ................... 17

    2.    Counsel Failed To Seek Out And Present Evidence Demonstrating That Despite His Traumatic Childhood, Loden Thrived When Given A Supportive Environment ............................................................. 20

    3.    Counsel Failed To Investigate Loden's Gulf War Combat Experience and His Post Traumatic Stress Disorder ............................... 23

    4.    Counsel Failed To Obtain Evidence That Loden Was A Devoted Father Struggling With A Failing Marriage ............................................. 24

    5.    Counsel Failed To Investigate the Impact of Loden's Troubled Marriage and Drug and Alcohol Intoxication on Loden's Conduct the Night of the Crime ................................................................. 27

    6.    A Proper Mental Evaluation Would Have Revealed that Loden Suffered from a Number of Mental Impairments ..................................... 28

II.    LODEN WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO LITIGATE THE CASE adequately ........................................................... 31

A.    Trial Counsel's Litigation of the Motion for Funds for Expert Mitigation Assistance Was Wholly Inadequate ...................................................... 31

B.    Counsel Failed To Present Any Meaningful Challenge To the State's Evidence During the Suppression Hearing ............................................ 32

C.    Counsel Failed To Provide Loden with Discovery Prior To the Suppression Hearing and To Prepare Loden for His Testimony ......................... 36

D.    Loden's Trial Counsel Did Not Provide the Defense Psychiatric Expert with Sufficient Background Information for a Proper Evaluation of Loden ....... 37

III.    LODEN WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL PROVIDED ERRONEOUS ADVICE THAT CAUSED LODEN TO ENTER AN INVOLUNTARY GUILTY PLEA AND WAIVE JURY SENTENCING ............................................................. 39

A.    Counsel's Ineffective Assistance Forced Loden To Decide To Plead Guilty Without Fully Considering or Understanding His Defense or Mitigation Options ............................................................................ 39

-ii-

# TABLE OF CONTENTS

(continued)

Page

B. Trial Counsel's Erroneous Advice Caused Loden To Waive His Right To Jury Sentencing ............................................................... 40

IV. LODEN'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED AS A RESULT OF THE CUMULATIVE PREJUDICE ARISING FROM TRIAL COUNSEL'S MULTIPLE DEFICIENT ACTS AND OMISSIONS ................................................................................. 42

V. LODEN WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ..................................................................... 42

GROUND TWO: LODEN'S WAIVER OF JURY FOR SENTENCING WAS NOT VOLUNTARY, KNOWING AND INTELLIGENT IN VIOLATION OF LODEN'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS ................................................. 46

GROUND THREE: APART FROM THE INEFFECTIVENESS OF LODEN'S COUNSEL, HIS GUILTY PLEA WAS NOT KNOWING, VOLUNTARY OR INTELLIGENT IN VIOLATION OF LODEN'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS ................................................................................ 49

GROUND FOUR: THE STATE'S USE OF THE PSYCHIATRIC REPORT FROM DR. MCMICHAEL VIOLATES THE EIGHTH AMENDMENT'S RELIABILITY REQUIREMENT AND DUE PROCESS ....................................................... 53

GROUND FIVE: LODEN WAS IMPROPERLY DENIED FUNDS TO RETAIN THE ASSISTANCE OF A FORENSIC SOCIAL WORKER TO INVESTIGATE AND PRESENT RELEVANT MITIGATING FACTORS IN VIOLATION OF THE FOURTEENTH AMENDMENT ................................................................................. 55

GROUND SIX: THE INDICTMENT FAILED TO CHARGE A DEATH PENALTY ELIGIBLE OFFENSE IN VIOLATION OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND FAIR NOTICE GUARANTEES UNDER THE SIXTH AMENDMENT ................................................................................. 56

GROUND SEVEN: THE SUBMISSION OF THE "AVOIDING ARREST" AGGRAVATING CIRCUMSTANCE VIOLATED THE FOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUION ............................................ 58

GROUND EIGHT: THE SUBMISSION OF FELONY-MURDER AS AN AGGRAVATING CIRCUMSTANCE VIOLATED LODEN'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS ................................................................................. 59

GROUND NINE: THE SUBMISSION OF BOTH FELONY MURDER AND THE ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATORS IN THIS CASE VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS ............ 60

la-1118427

# TABLE OF CONTENTS
(continued)

**Page**

Question 13 ........................................................................................................... 62

Question 14 ........................................................................................................... 62

Question 15 ........................................................................................................... 62

Question 16 ........................................................................................................... 62

Question 17 ........................................................................................................... 63

Question 18 ........................................................................................................... 63

Prayer for Relief .................................................................................................... 63

la-1118427

1.   (a)   Name and location of court that entered the judgment of conviction you are challenging:

Petitioner, Thomas Edwin Loden, Jr., was convicted and sentenced in the Circuit Court for Itawamba County, Mississippi.

     (b)   Criminal docket or case number:

Cause number CR00-68.

2.   **(a)**   Date of judgment of conviction:

Loden was convicted on September 21, 2001.

     (b)   Date of sentencing:

Loden was sentenced on September 21, 2001.

3.   Length of sentence:

Loden was sentenced to death.

4.   In this case, were you convicted on more than one count or of more than one crime?

Yes.

5.   Identify all crimes of which you were convicted and sentenced in this case:

Capital murder, rape, and four counts of sexual battery.

6.   (a)   What was your plea?

Guilty as to all counts.

     (b)   If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

N/A

     (c)   If you went to trial, what kind of trial did you have?

N/A

7.   Did you testify at a pretrial hearing, trial, or post-trial hearing?

Loden did testify at a post-trial proceeding on his motion to vacate his guilty pleas.

8.      Did you appeal from the judgment of conviction?

        Yes.

9.      If you did appeal, answer the following:

     (a)     Name of court:

        Mississippi Supreme Court.

     (b)     Docket or case number:

        Mississippi Supreme Court case No. 2002-CA-00282-SCT.

     (c)     Result:

        The judgment was affirmed.

     (d)     Date of result:

        The Mississippi Supreme Court's decision affirming the judgment was issued on October 4, 2007. The Mississippi Supreme Court denied rehearing on January 17, 2008.

     (e)     Citation to the case :

        *Loden v. State*, 971 So.2d 548 (Miss. 2007).

     (f)     Grounds raised:

        (1)     Whether Mr. Loden was improperly denied funds to retain the assistance of a forensic social worker to investigate and present relevant mitigation factors.

        (2)     Whether the death sentence in this case must be vacated because the indictment failed to charge a death-penalty eligible offense.

        (3)     Whether the trial court erred in weighing the "avoiding arrest" aggravating circumstance.

        (4)     Whether the submission of the Mississippi Code section 99-19-101(5)(d) aggravating circumstance violated the state and federal constitutions.

        (5)     Whether the trial court erred in considering both the section 99-19-101(5)(d) aggravator and the "especially heinous, atrocious or cruel" aggravator where the latter wholly subsumed the former.

        (6)     Whether the statutorily-mandated proportionality review of Mississippi Code Annotated Section 99-19-105(3) was satisfied.

(g)     Did you seek further review by a higher state court?

        Not applicable, because Loden appealed directly to the Mississippi Supreme
        Court.

(h)     Did you file a petition for certiorari in the United States Supreme Court?

        Yes.

If yes, answer the following:

        (1)     Docket or case number :

                United States Supreme Court case number 07-10475.

        (2)     Result:

                The petition for writ of certiorari was denied.

        (3)     Date of result :

                October 6, 2008.

        (4)     Citation to the case :

                *Loden v. Mississippi*, 129 S. Ct. 45 (2008).

10.     Other than the direct appeals listed above, have you previously filed any other petitions,
        applications, or motions concerning this judgment of conviction in any state court?

        Yes.

11.     If your answer to Question 10 was "Yes," give the following information:

        (a)

                (1)     Name of court:

                        Circuit Court for Itawamba County, Mississippi.

                (2)     Docket or case number :

                        Cause number CV03-090(G)I.

                (3)     Date of filing :

                        July 16, 2003.

(4)     Nature of the proceeding:

Loden sought collateral relief through motion to vacate guilty plea pursuant to the Mississippi Code Annotated Sections 99-39-1, et seq.

(5)     Grounds raised:

Whether Mr. Loden was denied his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the federal constitution and analogous provisions of the Mississippi constitution where trial counsel provided erroneous advice that caused him to enter guilty pleas that were not knowingly, intelligently, and voluntarily given to all counts in his trial proceedings.

(6)     Did you receive a hearing where evidence was given on your petition, application, or motion?

Some evidence was given.

(7)     Result:

Loden's motion to vacate guilty plea was denied.

(8)     Date of result:

February 15, 2006.

(b)     If you filed a second petition, application, or motion, give the same information:

(1)     Name of court:

Loden sought collateral relief in the Mississippi Supreme Court.

(2)     Docket or case number :

Case number 2007-DR-01758-SCT.

(3)     Date of filing :

December 8, 2008.

(4)     Nature of the proceeding:

Loden sought collateral relief through petition for post-conviction relief.

(5)     Grounds raised:

    I.      Whether Mr. Loden was denied his constitutional right to effective assistance of counsel guaranteed by the United States and Mississippi constitutions.

    II.     Whether Mr. Loden's guilty plea was knowing, voluntary and intelligent.

    III.    Whether Mr. Loden was denied effective assistance of appellate counsel.

    IV.    Whether the state's use of expert psychiatric report from Dr. McMichael violated the Eighth Amendment's reliability requirement, the Sixth Amendment's confrontation clause and due process.

    V.     Whether Mr. Loden's waiver of jury for sentencing was knowing, voluntary and intelligent.

    VI.    Whether Mr. Loden was denied his Fourteenth Amendment due process right to fully develop and present the evidence in his case.

(6)     Did you receive a hearing where evidence was given on your petition, application, or motion?

No.  Loden requested, but did not receive, an evidentiary hearing on his application for post-conviction relief.

(7)     Result:

Loden's petition for post-conviction relief was denied.

(8)     Date of result :

Judgment denying post-conviction relief was entered on April 15, 2010, and rehearing was denied on September 23, 2010.  Mandate issued on September 30, 2010.

(c)     If you filed any third petition, application, or motion, give the same information.

N/A

(d)     Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

On his July 16, 2003 petition for post-conviction relief, Loden appealed the Circuit Court's denial of his motion to vacate guilty plea.  Loden's appeal of his first petition for post-conviction relief was consolidated with Loden's direct

appeal.  The Mississippi Supreme Court's decision denying post-conviction relief was entered on October 4, 2007, and rehearing was denied on January 17, 2008.

On his December 8, 2008 petition for post-conviction relief, Loden did appeal to the highest state court having jurisdiction since, pursuant to Miss. Code §§99-39-7 and 99-39-27, Loden was required to file his petitions for post-conviction relief with the Mississippi Supreme Court in the first instance.

(e)     If you did not appeal to the highest state court having jurisdiction, explain why you did not:

N/A

12.     For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the <u>facts</u> supporting each ground.

## GROUND ONE:  TRIAL COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF LODEN'S RIGHTS UNDER THE SIXTH AMENDMENT

(a)     Supporting Facts

### I.     TRIAL COUNSEL FAILED TO INVESTIGATE MITIGATION EVIDENCE

#### A.     Loden's Attorneys Received Numerous Leads for a Strong Mitigation Case, But Failed to Follow Up

##### 1.     In Counsel's Initial Meeting With Loden, Loden Informed His Counsel Of Numerous Facts That Competent Counsel Would Have Pursued

Thomas E. Loden, Jr. was arrested on June 23, 2000, on charges of capital murder, rape and four counts of sexual battery.  On or about July 5, 2000, Itawamba County Circuit Judge Thomas Gardner contacted Attorney James Johnstone of Pontotoc, Mississippi about representing Loden.  Johnstone agreed.  (Affidavit of James P. Johnstone ("Johnstone Aff."), Ex. 19.)

Attorney Johnstone first met with Loden on July 6, 2000 in the New Albany jail.  (See Johnstone's Itemized Statement for Compensation and Expenses, Itawamba County Trial Record

("TR")[1] 243-247.) During that meeting, which lasted less than one and a half hours,[2] Loden was not at all reluctant to discuss intimate details of his life that would have been instrumental to developing a mitigation case. Loden told Johnstone numerous facts which should have been followed up on to develop a mitigation case. (*Id.*; *see also* Johnstone's Hand Written Notes dated 7/6/00, Ex. 25(a).)

Loden told Attorney Johnstone that he: was 36 years old; was born in Tupelo; had been married to Katrina Andrews ("Kat") for 5 years; had a 2-1/2 year old daughter named Abby; had attended high school in the area; was and had been a Marine since 1982 and had performed well with many promotions over the years; had been married twice before, but those marriages ended because both wives had been unfaithful; was often on deployment with the Marines; fought in "Operation Desert Storm" from August 1990 to April 1991 where he was "first in and last out;" saw a friend of his burned to death in combat but could not do anything about it; was frequently transferred after Desert Storm from one unit to another where problems existed because he was known as a problem solver; was transferred in approximately 1995 to Virginia to serve as an instructor in the Marine Corps Fleet Anti-Terrorism Security Team, a prestigious and high pressure assignment; and recently had been assigned to recruiting in Vicksburg, a high pressure assignment with monthly recruiting goals. (*See* Handwritten Notes of Johnstone, Ex. 25(a); Loden Aff. ¶ 35, Ex. 1.)

Loden told Attorney Johnstone that: his parents were divorced when he was two; his mother thereafter abandoned him; his stepmother abused him as a boy; he had been sexually abused at his church at a young age; he was shuffled back and forth between his mother and

---

[1]    All references to the Itawamba County Trial Record are hereinafter referred to as "TR."
[2]    Johnstone's time records indicate 3 hours but that billing was "portal to portal" and therefore included driving time and the time to get in to see Loden.

father while growing up; his sister had attempted suicide as an adolescent; Loden himself had attempted suicide approximately five times; and his father died when he was 16. (*Id.*)

Regarding the night of the victim Leesa Marie Gray's death, Loden told Attorney Johnstone that he had been drinking heavily and that shortly before the crime he spoke to his wife, Kat, via cell phone. (*Id.*) At a later meeting, Loden told Johnstone the details of his conversation with his wife. (Affidavit of Thomas E. Loden, Jr. ("Loden Aff.") ¶ 10, Ex. 1.) During the call, Kat told him she had just had "telephone sex" with Jim Craig, a partner at a law firm where she worked as a paralegal, and planned to have intercourse with Mr. Craig over the upcoming weekend. (*Id.*; *see also* Affidavit of James W. Craig ("Craig Aff."), Ex. 5.)

The information that Loden provided in that brief, initial interview provided a wealth of information that competent attorneys handling a capital case clearly should have investigated further. Moreover, Loden did not do anything to thwart an investigation. To the contrary, Loden constantly begged his counsel to conduct an investigation.

### 2.     Johnstone Did Not Conduct Or Direct Any Investigation

Following his initial meeting with Loden, instead of launching a thorough investigation, Attorney Johnstone did almost nothing. Between July 2000 and January 2001, Johnstone performed no investigation into guilt and innocence issues or mitigation. His time records reflect that he only met with Loden three times,[3] made just two telephone calls on Loden's behalf – one to the Police Department and one to the Marines – and conducted a mere two and a half hours of legal research. (*See* Johnstone Itemized Statement for Compensation and Expenses, TR 243-247.)

---

[3]     Attorney Johnstone's time records indicate that he met with Loden again on July 7, 2000 in New Albany, but that might be an error since his notes indicate that he spoke only with law enforcement that day. (Johnstone Aff. ¶ 5, Ex. 19.)

On August 22, 2000, some of Loden's family members traveled to Pontotoc to meet with Johnstone at his office, but Johnstone primarily discussed Loden's treatment in jail. (*See* Johnstone Aff. ¶ 6, Ex. 19; Affidavit of Bobbie Christian ("Christian Aff.") ¶ 21, Ex. 4; *see also* Johnstone Handwritten Notes 8/22/00, Ex. 25 (b).) Johnstone did not ask about Loden's family life or youth. (Johnstone Aff. ¶ 6, Ex. 19.) This was Attorney Johnstone's only meeting with any member of the Loden family. (TR 243-247; Christian Aff. ¶ 21, Ex. 4.)

### 3. Attorney Johnstone Soon Passed Off Loden To Attorney Daniels, Who Also Did Not Conduct Or Direct An Investigation

Six months after having accomplished nothing himself, Attorney Johnstone asked Attorney David Daniels to work on the case. (Johnstone Aff. ¶ 8, Ex. 19.)

On January 19, 2001, Judge Gardner issued a scheduling order that set a motion deadline for March 2, 2001; set a hearing deadline for all motions on March 12, 2001; set a deadline of March 15, 2001 for concluding any plea negotiations; and set a trial date of August 13, 2001. (*See* Scheduling Order, 1/19/01, TR 24-26.) Thus, at the time these deadlines were set, Johnstone had met with Loden just three times in six months, Daniels had not met Loden at all, neither Johnstone nor Daniels had conducted any investigation, and they had not hired an investigator. (Daniels Time Records, TR 249-252; Johnstone Time Records, TR 243-247.)

Daniels and Johnstone met with Loden on January 31, 2001 for about one-and-a-half or two hours. (*Id.*; TR 244, 248.)

Daniels filed 14 motions by the March 2, 2001 deadline (all without consulting with his client about any of them), including motions (1) to hire an investigator (Herb Wells); (2) to hire a mitigation investigator (Gary Mooers); (3) to suppress Loden's statements to law enforcement; (4) for psychiatric examination; and (5) to change venue. (*See* TR 30-104 (Filed Motions); Daniels Time Records, TR 249.) In Loden's motion for funds to hire a mitigation investigator,

counsel argued that they needed to hire an expert in the field of mitigation due to the nature of the charges against Loden, that an "adequate investigation and preparation is an indispensable prerequisite to effective assistance" in capital murder cases, and that it was necessary "to present a competent defense at him [*sic*] sentencing trial." (TR 65-66.) Counsel included a declaration from a potential expert who was available.

On March 7, 2001, the Court granted the motion to hire an investigator, Herb Wells, and authorized $1,500 for pre-trial services and $1,000 for services during trial. (*See* TR 102 (Order).)

On April 25, 2001, Loden's motion for funds to hire a mitigation investigator came on for hearing. At the argument, Attorney Johnstone argued that the proposed mitigation expert, Gary Mooers, "is an extremely important expert in this case." Loden was present at the hearing and never objected or otherwise interfered with his counsel's request for mitigation assistance. Judge Gardner denied the motion, but invited Loden's counsel to provide authority for the idea that there is a "particular specialty within the law or a scientific basis for the kind of thing" that the mitigation expert proposed to do. Although Attorney Johnstone represented to the court that he would "look and provide that for" the court, he did neither. (Transcript of Hearing on Motion for Mitigation Expert, Ex. 27.) After the motion was denied, counsel did not ask Judge Gardner to reconsider his ruling or provide any additional authority to the Court.

Once the trial court denied the motion for funds to hire a mitigation investigator, Loden's counsel ignored the issue of mitigation. Attorneys Johnstone and Daniels did not personally conduct any mitigation investigation. Nor did they advise the criminal investigator, Herb Wells, that their motion to hire a mitigation specialist had been denied or ask him to conduct a mitigation investigation himself. Almost all of Mr. Wells' investigation before the June 26

Suppression Hearings related to the suppression issue. He did almost no work after the June 26 Suppression Hearing and never conducted an investigation related to the penalty phase. (*See* Wells Investigation Notes, Ex. 26(b); Affidavit of Herb Wells ("Wells Aff.") ¶ 8, Ex. 34.)

Throughout trial counsel's representation, Loden repeatedly urged his attorneys to conduct a mitigation investigation. For example, on June 6, 2001, Loden wrote a letter to Attorney Daniels asking whether military personnel and records could be subpoenaed. (6/6/01 Letter from Loden to Daniels, Ex. 30(e).) Loden also wrote at least two letters suggesting to counsel that they obtain telephone records of his wife's conversations with him and Mr. Craig, the man she had phone sex with on the night of the crime. (*See, e.g.*, 3/11/01 and 3/20/01 Letters from Loden to Daniels, Ex. 30(b), 30(c).) Loden also suggested Bill Dyas, Jim Craig, and Joe Hargett as individuals who might have been helpful to his defense. (Loden Aff. ¶ 9, Ex. 1.) Loden's wife and mother also offered their assistance. (*See* November 28, 2000 fax from Kat Loden to Johnstone, attaching an article entitled "Gulf War Symptoms Linked To Brain Damage" and stating that Johnstone should call if she can be of any assistance; letter from Loden to counsel that his mother wants to be of assistance, Exs. 30(i) and 31.) In fact, trial counsel never acted on these offers of assistance, never identified a single mitigation witness and never contacted the individuals suggested by Loden, his wife or mother with respect to mitigation. (*See, e.g.*, Johnstone Aff. ¶ 9, Ex. 19; Christian Aff. ¶ 21-22, Ex. 4.)

Moreover, Loden repeatedly communicated his requests to see records and to discuss his options with counsel. Rather than seeing their client on a regular basis and keeping him apprised of the legal and factual developments in the case, counsel let Loden languish in jail without any contact for weeks at a time. Loden had to resort to outright begging just to get some legal advice

from his counsel. (*See* Loden letter to Daniels, "Would you *please* take the time and speak with me just as soon as possible? *Please*." (emphasis in original), Ex. 30(i).)

### 4. Loden's Trial Counsel Did Not Provide The Defense Psychiatric Expert With Sufficient Background Information For A Proper Evaluation of Loden

At that same hearing on April 25, 2001, Judge Gardner authorized a mental evaluation of Loden. (*See* Order for Mental Examination, TR 119-122.) Loden's counsel retained Dr. C. Gerald O'Brien, a psychologist, to conduct the mental evaluation. (*See* Order on the Application for Funds Ex Parte for a Forensic Psychologist, TR 157-159.) Although Judge Gardner signed the order authorizing counsel to retain Dr. O'Brien on April 25, 2001, nothing happened for months. (*Id.* at TR 159.) In early July 2001, the assistant for Attorney Daniels contacted Dr. O'Brien for the first time to discuss the need to evaluate Loden. (Affidavit of Dr. Gerald O'Brien ("G. O'Brien Aff.") ¶ 2, Ex. 18.) Dr. O'Brien informed the assistant that he could not evaluate Loden until after July 30, about two weeks before trial. (*Id.*) On August 10, 2001, Judge Gardner issued an order authorizing Loden to be transported to Dr. O'Brien's office for evaluation. (*See* August 10, 2001 Order, TR 175.)

Attorney Daniels did not discuss Loden's defense case with Dr. O'Brien before the evaluation, nor did Daniels ask Dr. O'Brien to evaluate whether Loden was competent to plead guilty or direct his attorneys regarding legal strategy. (G. O'Brien Aff. ¶¶ 2, 3, Ex. 18.) Daniels provided only limited documents and background information to Dr. O'Brien prior to the evaluation. (G. O'Brien Aff. ¶ 5, Ex. 18; G. O'Brien Report, Ex. 29(a).)

Dr. O'Brien interviewed Loden on August 13, 2001 for two hours, and Loden told him many things that should have been further investigated in preparation of a mitigation case. Dr. O'Brien drafted his report on Saturday, September 14, 2001, and faxed it to Daniels' office on September 17, 2001. (G. O'Brien Report, Ex. 29(a).) Daniels did not thereafter contact

Dr. O'Brien to discuss the report, the opinions expressed therein, or whether Dr. O'Brien would testify. By the time Daniels received Dr. O'Brien's draft report, Daniels was already in discussions with Loden and the prosecution about pleading guilty. (G. O'Brien Aff. ¶¶ 13-15, Ex. 18.) Although Dr. O'Brien did find that Loden suffered from an emotional disturbance at the time of the crime, he did not link this finding to any diagnoses or provide sufficient context for the finding. (G. O'Brien Report, Ex. 29(a); Affidavit of Dr. James R. High ("High Aff.") p. 43, Ex. 16; G. O'Brien Aff. ¶ 17, Ex. 18.) Most importantly, Dr. O'Brien did not diagnose Loden with PTSD or test for disassociative symptoms that would have explained the significance of Loden's reported amnesia as a reflection of the extreme degree of emotional disturbance suffered by Loden. (G. O'Brien Report, Ex. 29(a); G. O'Brien Aff. ¶¶ 10, 17, Ex. 18; High Aff. pp. 43-44, Ex. 16.)

Since reviewing the mitigation evidence adduced during Loden's post-conviction proceedings, Dr. O'Brien has submitted an affidavit stating that his prior diagnosis of Loden was inaccurate and that he agreed with the later report of Dr. James R. High, who diagnosed Loden with chronic PTSD, Disassociative Amnesia and Borderline Personality Disorder. (High Aff. pp. 34-35, Ex. 16.)

> **5. In The Months Leading Up To Trial, Loden's Counsel Continued To Ignore His Requests For Investigation, Updates And Advice**

On June 26, 2001 and as detailed below in Ground II, counsel failed to present any meaningful challenge to the State's evidence during a suppression hearing and, as a result, key evidence that could have otherwise been excluded was not. After the suppression hearing and Judge Gardner's denial of that motion, Loden's trial counsel essentially gave up. Attorneys Daniels and Johnstone together recorded a total of only 36.5 hours preparing for trial between the suppression hearing on June 26, 2001 and Loden's plea hearing on September 21, 2001. (*See*

Time Records, TR 243-247; 249-252.) Thus, during the period of time when they should have been working tirelessly to prepare for Loden's capital murder trial, counsel merely devoted about 6 hours each per month leading up to the October 2001 trial date.

By this time, Loden expressed his desire to obtain new legal representation. Attorneys Johnstone and Daniels told him it was too late to obtain new counsel because Judge Gardner would not allow it. (Loden Aff. ¶ 16, Ex. 1.)

On about September 19, 2001, Daniels and Johnston came to Loden's cell and told him that Judge Gardner had contacted them and informed them that Loden had to decide whether or not to plead guilty by the next day, September 20. On September 20, Loden told his counsel that he would plead guilty. There was no discussion about the sentencing phase, much less a strategy for it. Nor did counsel discuss with Loden whether he wanted to put on a mitigation case, even though he was not contesting guilt, or the nature, purpose or importance of mitigating evidence. Nor was there discussion as to whether he should waive his right to jury sentencing. And trial counsel made no attempt to go over any of the questions that would be posed to Loden by Judge Gardner during the plea hearing. (*See* Loden Aff. ¶ 20, Ex. 1.)

Loden's plea hearing took place the next day, September 21, 2001, followed by the sentencing hearing. Trial counsel did not discuss with Loden the benefits of cross-examining the State's witnesses or objecting to the State's evidence during the sentencing phase, which trial counsel failed to do. (Loden Aff. ¶ 25, Ex. 1.) During that part of the hearing, trial counsel also waived Loden's right to present any mitigation evidence and the trial court never questioned Loden regarding that waiver. (TR 689-91, 698-700.)

6.     **Attorney Daniels' Aspirations To Join The District Attorney's Office Contributed To His Rendering Ineffective Assistance During And After Loden's Plea**

Attorney Daniels' conduct can perhaps be explained by the fact that he was more interested in serving his own interests than those of Loden. Daniels intimated during the sentencing hearing that he was prepared to offer mitigation evidence that he supposedly developed while preparing for trial. Daniels, of course, never came close to developing mitigation evidence that could rise to the level of constitutionally effective assistance of counsel. He along with Attorney Johnstone failed to conduct the most basic mitigation investigation, despite compelling leads, and even failed to instruct their investigator, Herb Wells, to assist them in performing such an investigation.

Following Loden's plea and sentencing, Attorney Daniels went to work for the District Attorney's Office for the County of Itawamba. (Daniels Depo. at p. 17:12-19, Ex. 46.) During the proceedings on Loden's second petition for post-conviction relief in the Mississippi Supreme Court that began in December 2008, Daniels served the interests of his new employer rather than his former client. As an Assistant District Attorney for the District Attorney's Office that prosecuted Loden, Daniels voluntarily submitted an affidavit dated January 23, 2009 in support of the State's Response to Loden's petition for post conviction relief. But previously on September 3, 2003, Daniels had submitted a sworn affidavit saying that he would not speak about this case. (Daniels 2003 Aff. ¶ 4, Ex. 41.) In the January 2009 affidavit, Daniels contended that he spoke with Loden's mother and sister regarding mitigation evidence, despite sworn statements from those witnesses to the contrary. He also claimed to speak with a single, unnamed Marine liaison about Loden's military background, even though Daniels did not provide the details of that discussion. Daniels obviously provided his January 2009 affidavit on

behalf of his new employer to suggest that he had conducted a mitigation investigation. Daniels clearly served his own interests at the expense of Loden.

Attorney Daniels also inexplicably destroyed all of his files associated with this case knowing full well that Loden was continuing to fight his death sentence. (Daniels Depo. at pp. 46:22-48:9, Ex. 46.) In October 2008, Daniels was well aware that Loden was challenging his death sentence through post conviction proceedings and had retained new counsel for that purpose. Post conviction counsel for Loden had telephoned Daniels and met him at the courthouse in August 2008. At that brief meeting, post conviction counsel attempted to speak with Daniels about Loden's case, but Daniels stated he "was done with this case and did not want to be involved in it." (Affidavit of Mark R. McDonald ¶ 4, Ex. 42.) Nevertheless, Daniels admitted at his deposition taken on July 9, 2009 that he willfully destroyed his Loden files in October 2008 without notice to Loden or Loden's post conviction counsel. (Daniels Depo. at pp. 46:22-49:23, Ex. 46.) The Mississippi Supreme Court acknowledged that Daniels "without question" exercised "poor judgment in destroying Loden's file, which is exacerbated by his present employment with the district attorney's office," but concluded that Loden must have had everything that was destroyed because there was a "good bit of duplication" between Daniels' file and Johnstone's records. Thus, Daniels' inexplicable act was excused based on an unsupported assumption that Loden had all of the originals of what had been destroyed.

> **B.** **Had Trial Counsel Properly Conducted A Mitigation Investigation, They Would Have Uncovered Powerful Evidence That Would Have Impacted the Decision On Sentencing**

Since Loden's pro bono counsel became involved in his case, they have followed up on the multiple leads previously available to Attorneys Daniels and Johnstone, and uncovered a plethora of helpful information for Loden's mitigation case. This information includes a proper mental diagnosis of PTSD-chronic and disassociate amnesia from which Loden suffers, and a

humanizing, complete picture of Loden's character and life that directly impacts his sentencing determination.

Given their failure to obtain the necessary information, trial counsel were unable to present or even consider presenting mitigation evidence on Loden's behalf.  As such, they failed to gather and present evidence that would have mitigated "the defendant's moral culpability (i.e. by demonstrating the 'good' in the client's character or the 'bad' that affected his upbringing and development) and evidence that may refute the prosecution's theory of legal culpability (e.g., by reducing culpable mental states or disproving purported, inflammatory facts)."  Consequently, they failed to advise Loden about the possibility and benefits of putting on a mitigation case.

1. **Had Counsel Interviewed Loden's Relatives, Conducted In Depth Interviews Of Loden Or Requested Public Records, They Would Have Gathered Substantial And Powerful Evidence Regarding The Physical, Emotional And Sexual Abuse Suffered By Loden**

The facts surrounding Loden's upbringing are powerful mitigating evidence.  Had Loden's mother, Bobbie Christian, been thoroughly interviewed, trial counsel would have learned many facts about Loden's childhood that were relevant to a proper diagnosis of Loden and an understanding of the emotional traumas that Loden suffered.  Bobbie was raised in an extremely strict household and married Loden's father, Thomas Edwin Loden, Sr. ("Tommy"), at age 17 to escape her own difficult home life.  (Christian Aff., Ex. 4.)  The marriage was short and marked by infidelity by both parents, and alcohol, physical and sexual abuse by Loden's father.  (*See* Christian Aff., Ex. 4; High Aff., Ex. 16.)  Tommy often drank and beat Bobbie. (Christian Aff., Ex. 4.)  Loden's father tied his mother up, placed various objects inside her vagina, and shocked her with extension cords and electrical wires.  (*Id.*)  Because his parents shared a single bedroom with their children, Loden witnessed his father sexually abusing his mother.  (*Id.*)

When Loden and his sister were small children, Loden's mother left them alone in the home while she went on dates with other men. (Affidavit of Stella Francis Renick ("Renick Aff."), Ex. 13.) At one point when Loden was two years old, his mother left him and his four year old sister alone at home for several days while she ran off with another man. (High Aff. p. 4, Ex. 16; *see also* Renick Aff., Ex. 13.) Public records confirm that Bobbie was shockingly promiscuous. (*See* Custody Hearing Record, Opinion of the Court, p. 155, Ex. 21 "*The defendant, Mrs. Bobbye [sic] Loden has a long history of numerous and flagrant acts of adultery with various men.*") Shortly thereafter, Loden's parents divorced. (Divorce Records, Ex. 20.)

The divorce proceedings were extraordinarily bitter — each side attempted to establish the other's infidelity. (Divorce Records, Ex. 20; Christian Aff., Ex. 4; Renick Aff., Ex. 13; Affidavit of Sylvia Epperly ("Epperly Aff."), Ex. 7.) A constitutionally adequate investigation would have also revealed that the bitterness and hostility between Loden's two families continued throughout their lives. (Affidavit of Sonia W. Brown ("Brown Aff."), Ex. 3; Christian Aff., Ex. 4; Renick Aff., Ex. 13.)

Loden also suffered from his step-mother, a fact essential to a reliable mental diagnosis of him. (*See* High Aff. p. 36, Ex. 16.) Loden's father met Sylvia Suttle while still married to Bobbie and married Sylvia shortly after the divorce was finalized. (Epperly Aff., Ex. 7.) Since Loden's father was granted custody of the children, Loden and his sister moved in with their father and new stepmother. (Divorce Records, Ex. 20.) Sylvia physically and emotionally abused Loden and his sister. (High Aff. pp. 4-5, Ex.16; *see also* Christian Aff., Ex. 4 ("Anita hated Sylvia and she still refuses to say Sylvia's name.") Sylvia beat Loden for no reason. (High Aff. p. 4, Ex. 16.) She regularly used hangers and belts to inflict the blows. (High Aff. p. 4, Ex. 16.) Moreover, she would constantly belittle Loden, calling him an "idiot," forcing him

out of the house and instructing him and his sister not to return until nightfall, not even to use the bathroom. (High Aff. p. 4, Ex. 16; Loden Aff. ¶ 31, Ex. 1.) Loden's father was regularly away from the home working long hours and did nothing to stop Sylvia's abuse, which contributed significantly to Loden's feeling of isolation and abandonment. (High Aff. pp. 4, 35-36, Ex. 16.)

Loden told his trial counsel that, while residing with his father and step-mother, he was sexually abused while attending the Calvary Vacation Bible School. (*See* Johnstone's Handwritten Notes 7/6/00 noting "sexual abuse young age at a church," Ex. 25(a); Loden Aff. ¶ 4, Ex. 1.) Trial counsel did nothing to follow up, not even bothering to interview Loden in depth about the abuse. (Loden Aff. ¶ 6, Ex. 1.) An in depth interview would have revealed that around age seven or eight, Loden was molested on approximately fifteen occasions over the course of two years by a church employee. A female classmate who was a few years older than Loden was also involved. The molester had sex with both Loden and Penny and encouraged them to have sex with each other. (High Aff. p. 5, Ex. 16.) The molestation included both giving and receiving oral and anal sex. (High Aff. p. 5, Ex. 16.) These incidents continued until Loden stopped attending the Bible School.

When Loden was about ten, he was handed back to his biological mother and her second husband Bill Brown, Sr. Loden was abused and neglected in that household as well. (*See* Brown Aff., Ex. 3.) Loden's stepfather was an alcoholic and would emotionally and physically abuse Loden, his mother and Loden's sister. (*See* Brown Aff., Ex. 3; Christian Aff., Ex. 4.) Loden witnessed his step-father beating his mother many times. (Brown Aff., Ex. 3.) At a young age, Loden was left alone to take care of his younger half siblings while his stepfather went out drinking and his mother took Loden's sister (approximate age 15-16) to bars and pretended they were sisters to try to meet men. (High Aff. p. 6, Ex. 16.) His step-father would beat Loden with

a leather horse strap or mule strap for inconsequential offenses. These beatings were worse when his step-father knew that Loden's mother was out at bars with other men. (High Aff. p. 6, Ex. 16.) Dr. James R. High reports that, in recounting Bill Brown's abuse even today, Loden presents as traumatized. (*See* High Aff. p. 6, Ex. 16.)

Growing up in such a highly dysfunctional household has caused Loden and his three siblings from his mother to suffer from substance abuse problems. (Criminal Records of Loden's Siblings, Ex. 23; Loden Aff. ¶¶ 32 & 33, Ex. 1; Brown Aff., Ex. 3.) Moreover, Loden and his sister have attempted suicide. (Loden Aff. ¶ 4, Ex. 1.) Loden has done so throughout his life, with a total of approximately five attempts. Although he disclosed this information to his counsel, they did nothing to follow up and did not provide this information to the psychologist evaluating Loden. (*See* Johnstone's Notes, Ex. 25(a) ("sister attempted suicide (pills) . . . he has attempted approximately 5 times"); G. O'Brien Aff. ¶ 9, Ex. 18.)

At age 12, Loden returned to live with his father and stepmother once again. (High Aff. p. 7, Ex. 16.) However, due to his step-mother's continued abuse, Loden ran away and moved back in with his mother. (*See* High Aff. pp. 7-8, Ex. 16.) By this point, Loden's mother was married to her third husband. (*See* Christian Aff., Ex. 4.) Feeling unwelcome, Loden soon left home again and moved in with his paternal grandparents on the Loden's family farm in Itawamba County. (High Aff., p. 8, Ex. 16.)

> **2.** **Counsel Failed To Seek Out And Present Evidence Demonstrating That Despite His Traumatic Childhood, Loden Thrived When Given A Supportive Environment**

Despite numerous leads, Attorneys Johnstone and Daniels failed to seek out and present evidence that showed Loden thrived personally and professionally given the proper structure and environment. During the time when Loden lived with his grandparents, he did well both socially and academically. (*See* Affidavit of Connie Graham Reynolds ("Reynolds Aff."), Ex. 14;

Affidavit of Jeff Mann ("Mann Aff."), Ex. 12; High Aff. p. 8, Ex. 16; School Records, Exs. 22(a), 22(b).) Loden's time in his grandparents' home was the only time he felt safe as a child. (High Aff. p. 8, Ex. 16.) Loden's grandparents were very loving and Loden was extremely close to both of them, especially his grandfather. (High Aff. pp. 8 & 18, Ex. 16; Epperly Aff., Ex. 7; Renick Aff., Ex. 13.) Loden thrived in this environment. He helped his grandfather run the farm, actively attended his grandparents' church and was well liked in the community. (High Aff. p. 8, Ex. 16; Mann Aff., Ex. 12.) He attended the local high school where he was well liked and had numerous friends, both male and female. (*See* Reynolds Aff., Ex. 14; Mann Aff., Ex. 12.) Loden was never a discipline problem and received solid grades throughout high school. (*See* Exs. 22(a), 22(b).) Upon graduation, Loden was ranked 41st out of a class of 159 students. (*See* Itawamba High School Records, Ex. 22(b).) Had this information been presented, it would have painted a picture of the well adjusted individual Loden could have been had it not been for his damaging early childhood and the trauma he would later sustain in the Gulf War.

Shortly after graduating from high school, Loden joined the United States Marine Corp, where he became a stellar Marine. He was selected an "Outstanding Recruit" and the "Honor Man" of his platoon. (*See* Military Records, Ex. 24.) His commanding officer described Loden as a "poster Marine" and the "hardest charging Marine I have ever had work for me." (Affidavit of David Houle ("Houle Aff."), Ex. 9.) His performance reviews consistently urged promotion and noted his unlimited growth potential in the Corps. (Review of P.R. Grasty, Ex. 24(e), "[Loden] is one of the most concerned, caring and involved leaders I have observed. . . He has all the skills, traits and experience to make an OUTSTANDING First Sergeant of Marines."; Review of K.L. Bradford, Ex. 24(f), "A superb young NCO [Non-Commissioned Officer] with superior skills. My most accomplished sergeant. His overall competence is extraordinary; he is

a dynamic individual with no apparent weaknesses in his MOS. … His level of maturity, moral courage, sense of justice and humor and concern for his Marines are those expected of a SNCO, which is what this young Marine should be at the earliest possible moment.  He is that good.")

In 1984, Loden was sent to Okinawa as an E-3 Lance Corporal and promoted to an E-4 Corporal while stationed in Hawaii.  In 1986, he was promoted to Staff Sergeant and by 1992 he was an E-7 Gunnery Sergeant.  During the course of his career, Loden received a number of awards and medals, including the Combat Action Ribbon and the Good Conduct Medal (five times).  (Ex. 24(b).)  He also received the Navy Achievement Medal (three times, once with Combat "V") (Ex. 24(c)), and the Navy and Marine Corps Commendation Medal (Ex. 24(d)).

Loden's trial counsel did not obtain any military records despite leads provided by Loden regarding his service.  Indeed, Loden specifically asked his counsel to subpoena military records. (Loden Aff. ¶ 11, Ex. 1; Loden Letter to Daniels, Ex. 30(e), "I also have questions of if [sic] the Marines are available for supeona's [sic], people and paper work.")

Moreover, counsel did not bother to interview any of Loden's military colleagues.  (*See* Affidavit of William Sanders ("Sanders Aff."), Ex. 15; Houle Aff., Ex. 9; Affidavit of William Ferrier III ("Ferrier Aff."), Ex. 8; Affidavit of Dustin Kittel ("Kittel Aff."), Ex. 10.)  Had counsel done so, they would have learned that Loden was well liked and respected by his colleagues and supervisors alike.  (Ferrier Aff., Ex. 8.)  As Loden grew more senior in the Marines, he mentored younger Marines and tried to help them make the adjustment to life in the military.  (*Id.*)  He always tried to set an example for other Marines and to act in a manner becoming of his position. (*Id.*)

### 3. Counsel Failed To Investigate Loden's Gulf War Combat Experience and His Post Traumatic Stress Disorder

Although trial counsel were aware that Loden had served in the Gulf War and exhibited symptoms of PTSD, they failed to conduct an extensive interview of Loden about the experience, interview any of his military friends or colleagues, or interview Loden's friends and family about any changes they noticed in Loden after the war. Had they done so, they would have been able to present this information to the psychologist examining Loden and to the Court as further mitigating evidence.

Loden's unit was one of the first ones deployed and were often fired upon and attacked. (High Aff. pp. 10-11, Ex. 16.) Loden repeatedly saw mangled war casualties. (*Id.*; Kittel Aff., Ex. 10; Ferrier Aff., Ex. 8.) One particularly traumatic event that profoundly shook Loden's psyche was whn he was the first to arrive at the scene and witnessed the death of his friend, Frank Allen. Allen's vehicle was hit by a U.S. aircraft in a "friendly fire" incident. Allen's sister had lived with Loden and his wife while Loden was stationed in Hawaii and Allen was part of a close knit group that socialized with Loden. (High Aff. p. 10, Ex. 16.) After Allen's vehicle was hit, Loden was sent to investigate the incident. When Loden arrived on the scene, he realized that it was his friend Allen who had been killed. (*Id.*) Loden felt tremendous guilt and shame because he was alive whereas Allen, who had just gotten married and had a baby, was killed. (*Id.*) Following the incident, Loden took on dangerous assignments, choosing to risk his own life rather than the lives of others in his unit. (High Aff. pp. 10-11, Ex. 16.)

Although both Loden and his wife reported to trial counsel that Loden was a completely different man after the war, counsel did nothing to investigate Loden's experience or seek out a psychiatrist experienced in working with war veterans. (*See* Attorney Johnstone's Handwritten Notes, Ex. 25(a) ("War fucked me up"); Facsimile from Katrina Loden to Attorney Johnstone,

Ex. 31; Loden Letter to Daniels, Ex. 30(k) ("does any of the 'Desert Storm Syndrom [sic]' stuff I wrote Mr. Johnstone about matter?").) Had they properly investigated the issue, they would have learned that Loden began drinking heavily after the war and using drugs like GHB, ecstasy and BRON (codeine laced cough syrup widely available in Okinawa). (Loden Aff. ¶ 32, Ex. 1.) After returning from Desert Storm, Loden for the first time began getting into fights with other soldiers. (High Aff. p. 11, Ex. 16.) He also began suffering from memory loss, nightmares and flashbacks. (High Aff. p. 12, Ex. 16.) His prior social and personable nature all but disappeared and Loden found it difficult to get close to others. Whereas previously he would describe certain people as friends, now they were just "associates." (*Id.*; Mann Aff. ¶¶ 13-14, Ex. 12.) He felt great anxiety in crowds and felt distant from his loved ones. (*Id.*) Several of his Marine colleagues and friends testified to these changes. (*See* High Aff. pp. 10-12, Ex. 16; Mann Aff., Ex. 12; Ferrier Aff. ¶ 21, Ex. 8; Houle Aff. ¶ 13, Ex. 9.) However, trial counsel never contacted any of Loden's friends or military colleagues. (*Id.*; *see also* Attorney Timenotes, TR 243-247, 248-252.)

Loden did not report these problems to his superiors in the military or to any doctors since he feared that would mean the end of his Marine career or at least hinder his advancement. (*See* Ferrier Aff. ¶ 21, Ex. 8; Houle Aff. ¶ 13, Ex. 9; Loden Aff. ¶ 35, Ex. 1.) However, he related his experience to family members, his best friend from home and some of his close friends in the military. (*See* Brown Aff. ¶ 14, Ex. 3; Mann Aff. ¶¶ 11-12, Ex. 12; Ferrier Aff. ¶ 17, Ex. 8; Epperly Aff. ¶ 12, Ex. 7.)

### 4. Counsel Failed To Obtain Evidence That Loden Was A Devoted Father Struggling With A Failing Marriage

Trial counsel also failed to conduct a meaningful investigation into his home life and whether and to what extent it contributed to his conduct. Loden's marriage was failing and in

ways that were demeaning and emasculating to Loden. Yet, Loden steadfastly remained a devoted father primarily responsible for the care of his young daughter.

Loden met his third wife, Kat, in approximately 1995 in Norfolk, Virginia, after Loden had returned from Desert Storm and was selected to serve as an instructor for the Fleet Anti-Terrorism Security Team ("FAST"). (High Aff. p. 14, Ex. 16.) He believes his elite job in the military is part of the reason Kat was attracted to him. (*Id.*) At the time, Kat was in the Navy. (*Id.*) The two married shortly after they met. (*Id.*) Although Loden was married twice before, he describes Kat as the only woman he ever loved. Despite his devotion, he believed that Kat never felt the same about him. (High Aff. pp. 14-16, Ex. 16; Renick Aff. ¶ 9, Ex. 13.) Throughout the marriage, Loden sensed that Kat was only interested in him because of his prestigious assignments in the military and for financial reasons. (High Aff. p. 14, Ex. 16; Brown Aff. ¶ 16, Ex. 3.) Loden spent above and beyond his disposable income on Kat, buying her luxury items such as a BMW, in an attempt to keep her happy. He also spent a lot of time with Kat's two sons, Zachary and Keaton Dyas. (Affidavit of William Mark Dyas ("Dyas Aff.") ¶¶ 4, 5, Ex. 6) Although Kat's former husband had custody of the children, Kat and Loden set aside rooms in their home for the boys and Loden showered them with attention whenever they visited. (Loden Aff. ¶ 34, Ex. 1.) On February 23, 1998, Loden and Kat had a daughter, Abby. Loden was an extremely devoted father and took on many, if not most, parental duties while Kat pursued her career. (*See id.*; Renick Aff. ¶ 10, Ex. 13.)

In 1998, the Marines assigned Loden to a recruiting post in Vicksburg, Mississippi. Although a recruiting post is highly selective, it also carries with it extreme stress. Whereas previously the structured environment of a military base or a combat operation kept Loden's symptoms somewhat in check, his assigned recruiting position deprived him of a military support

system. (*See* Loden Aff. ¶ 35, Ex. 1; High Aff. P. 18-19, Ex. 16.) Not only did the job lack typical military structure, the work was extremely demanding and Loden was under constant pressure from the Marines to meet recruiting quotas he found unattainable. (*See* Loden Aff. ¶ 35, Ex. 1; Sanders Aff. ¶ 8, Ex. 15 ("recruiters are carefully chosen and it is one of the most difficult and stressful jobs in the service"); Kittel Aff. ¶ 14, Ex. 10 ("Marine recruiters have a lot of pressure to deal with as they struggle to meet their quota every month.").) Again, trial counsel never considered presenting this evidence, attempted to explore it with a psychiatric expert or considered how it would have impacted Loden's mental state because they never spoke to Loden, or any of his military colleagues, about the pressures of his recruiting assignment.

Despite Loden's efforts to please his wife, Kat was involved in a number of extramarital relationships. On some occasions, Loden participated in threesomes with Kat, including Kat's ex-husband, to please her.

By the time Loden was transferred to Vicksburg to work as a Marine recruiter, Kat ended her service in the Navy and graduated from college with a degree in criminal justice. She planned to attend law school and upon moving to Vicksburg began working as a paralegal at a prestigious law firm, Phelps Dunbar LLP. During their time in Vicksburg, Loden continued to try very hard to please his wife. He did chores, cooked and took care of Abby and Zach, who had by that point moved in with Kat and Loden. Nonetheless, Kat's infidelity continued. At the time of the offense, Kat had just begun an affair with Jim Craig, a partner at the law firm where she worked as a paralegal. (*See* Craig Aff., Ex. 5.)

Approximately two weeks prior to the crime, Loden and Kat left for vacation in Virginia Beach, Virginia. Loden viewed this trip as an opportunity to reignite his relationship with Kat. Unfortunately, Loden's hopes did not materialize. Kat seemed to distance herself even further.

Instead of spending time with Loden, Kat went out drinking with her girlfriends and largely ignored Loden.  (*See* High Aff. pp. 18-19, Ex. 16.)

> **5. Counsel Failed To Investigate the Impact of Loden's Troubled Marriage and Drug and Alcohol Intoxication on Loden's Conduct the Night of the Crime**

In June 2000, a few days before the crime and deeply distressed about the state of his marriage, Loden travelled from Vicksburg to the Loden family farm and found that the farm had significantly deteriorated and his grandmother was extremely fragile.  The situation at the farm deeply disturbed Loden and reminded him of the recent death of his grandfather who had always been his "rock."  (High Aff. p. 18, Ex. 16.)  Loden's ever present frustration with his recruiting assignment and his inability to meet the recruiting quota also contributed to his unhealthy mental state. (Loden Aff., ¶ 35, Ex. 1.)  Throughout the day Loden drank a few beers, ¾ of a fifth of bourbon and, shortly before the crime, took some GHB.  (Loden Aff. ¶ 32, Ex. 1.)

His distressed state came to a peak shortly before he encountered Ms. Gray on the evening of June 23, 2000.  Just before the meeting, he spoke to his wife Kat from his cell phone. During that conversation, Kat taunted him that she just had "phone sex" with Jim Craig and that they had decided to have intercourse that Saturday while Loden would be away.  Mr. Craig would have corroborated this critical piece of mitigating evidence.  (Craig Aff., Ex. 5.)

The impact of Kat's taunt cannot be overstated.  Loden hung up the phone feeling completely helpless and extremely upset.  (High Aff. p. 20, Ex. 16.)  Loden's world was collapsing around him.  His grandfather, who was always his rock had died; the family farm was falling apart; his career progression in the Marines had come to a halt and he felt its imminent end.  And not only was his marriage falling apart, but his wife was moving on to a highly successful man with a more prestigious job and who could provide Kat with the stability and financial rewards he never could.  (*Id.*)

Although Loden told his attorneys about this extremely upsetting conversation with his wife shortly before the crime, trial counsel did not contact Mr. Craig. As his affidavit demonstrates, Mr. Craig would have confirmed Loden's testimony regarding his conversation with Kat that night and the fact that she had an extramarital relationship with Mr. Craig. (*See* Craig Aff., Ex. 5.) Mr. Craig would have told counsel that in mid-spring of 2000, he and Kat began a sexual relationship. (*Id.*) In June 2000, Kat told Mr. Craig that her husband would be away in Itawamba County for several days. Kat and Mr. Craig discussed consummating their relationship during Loden's absence. (*Id.*) On the night of June 22, 2000, Mr. Craig and Kat were exchanging emails regarding having sex that coming Saturday. (*Id.*) In one of these emails, Kat informed Mr. Craig that she was on the phone with her husband and telling him that she was going to have sex with Mr. Craig that Saturday. (*See* Craig Aff., Ex. 5.) Mr. Craig further notes that he would have testified to these facts if he had been subpoenaed. (*Id.*)

### 6. A Proper Mental Evaluation Would Have Revealed that Loden Suffered from a Number of Mental Impairments

Had trial counsel properly collected and shared the above described background information, a competent mental health professional would have recognized that Loden suffered from a number of mental health ailments that would provide him with potential defenses and powerful mitigation evidence. With a complete social history, a mental health professional would have been able to provide reliable diagnoses and relate Loden's ailments to his early development, sexual and physical abuse, and his experience in the Gulf.

After examining Loden for more than four hours and reviewing voluminous records and interviews of Loden's family members, friends and colleagues, Dr. High has concluded that from the time of his combat experience in 1991 to the present, Loden has suffered from Post Traumatic Stress Disorder – chronic (DSM-IV-TR, Code 309.81, P. 463-468). (High Aff., ¶ 34,

Ex. 16.) This disorder is signaled by intrusive recollections of traumatic events, emotional numbing and avoidance of triggers, and autonomic hyperarousal – irritability, insomnia, hypervigilance. Moreover, from childhood forward and to the present, Loden suffered from an additional Post Traumatic Stress Disorder usually referred to as "Complex PTSD." Individuals suffering from this disorder exhibit symptoms such as "[i]mpaired affect regulation; self-destructive and impulsive behavior; dissociative symptoms (emphasis added); somatic complaints; feelings of ineffectiveness, shame despair or hopelessness; feeling permanently damaged; a loss of previously sustained beliefs; hostility; social withdrawal; feeling constantly threatened; impaired relationships with others; . . . .". (*See* High Aff. pp. 34-35, Ex. 16, quoting the Diagnostic and Statistical Manual, p. 465.)

Dr. High further concluded that Loden suffered throughout his adult life, at the time of the crime, and up to the present from a Borderline Personality Disorder (DSM-IV-TR Diagnostic Code 301.83, P. 710). This disorder is characterized by "frantic efforts to avoid real or imagined abandonment," as well as by "a pattern of unstable or intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation; and identity disturbance: markedly and persistently unstable self-image or sense of self . . . . impulsivity in at least two areas that are potentially self-damaging . . . affective instability due to marked reactivity of mood, chronic feelings of emptiness and transient, stress-related, paranoid ideation or severe dissociative symptoms" (emphasis added; internal quotes omitted). (*See* High Aff. p. 35, Ex. 16.)

Based on his evaluation of Loden and the additional background information provided to him, Dr. High concluded that, from the time of the crime up until he awoke on the morning of June 23, 2000, Loden suffered from an acute, localized episode of disassociate amnesia (DMV-

IV-TR code 300.12), which is characterized by an episode of "inability to recall important personal information usually of a traumatic or stressful nature that is too extensive to be explained by ordinary forgetfulness." (High Aff. p. 34, Ex. 16, citing DSM-IV-TR, p. 523.) This diagnosis supports Loden's statements regarding the crime where, rather than providing facts, he offers suppositions of what must have happened. (*See id.* ¶ IX, 11.) Rather than stating what he truly remembers, Loden has consistently attempted to fill the gaps with others' inferences and suggestions. (*Id.*)

Dr. High further concludes that Loden's crime was committed while he was under the influence of extreme mental or emotional disturbance. (*Id.*) By providing his conclusion in the context of Loden's background and life history, Dr. High is able to support and explain this conclusion and link it to Loden's diagnosis of Complex PTSD. Moreover, Dr. High's analysis explains Loden's actions after the crime. For instance, Dr. High notes that rather than attempting to dispose of Ms. Gray's body after the offense or fleeing the area, Loden went to sleep. Even after discovering Ms. Gray's body, Loden drove around his farm aimlessly before slashing his own wrists. Moreover, the emergence of a Disassociative Amnesia of the crime validates the conclusion that Loden committed that crime in a severely altered mental state and while he was under the influence of extreme mental or emotional disturbance. (*Id.*)

Dr. High's diagnoses and expert conclusions highlight the deficiencies in Dr. O'Brien's earlier report. Although Dr. O'Brien included a conclusory statement in his report that Loden was under an emotional disturbance at the time of the crime, he did not explain or provide any support for the claim, nor did he tie his conclusion to any mental health disease or diagnosis. (*See* G. O'Brien's Report, Ex. 29(a).) In fact, despite this conclusory remark, Dr. O'Brien did not diagnose Loden with any disease or defect. (*Id.*) Whether Dr. O'Brien would have been able

at trial to provide a more detailed explanation of his conclusions was never discussed between

Dr. O'Brien and Loden's attorneys because they did not discuss his report or evaluation before

(or after) Loden's plea. (G. O'Brien Aff. ¶¶ 13, 15, Ex. 18.) Nor did counsel discuss

Dr. O'Brien's report with Loden. (Loden Aff. ¶ 18, Ex. 1.) In fact, as further explained below,

trial counsel did not receive Dr. O'Brien's report until just a few days before Loden was forced

to decide whether to go to trial. By that point, it was too little, too late to have done anything

else.

### II. LODEN WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO LITIGATE THE CASE ADEQUATELY

#### A. Trial Counsel's Litigation of the Motion for Funds for Expert Mitigation Assistance Was Wholly Inadequate

Trial counsel failed to provide effective assistance of counsel by their deficient

preparation, briefing and argument of the Ex Parte Motion For Funds For Expert Assistance, and

then completely failing to follow-up and provide the additional information requested by the trial

court. Trial counsel requested the Court to appoint Gary R. Mooers, Ph.D., as a mitigation

expert. (TR 61-68 & 69-76.) Dr. Mooers is a former Chair of the Department of Social Work at

the University of Mississippi. He served as mitigation specialist in approximately 20 capital

cases. The motion filed by his counsel simply followed the format of their standard motion for a

criminal investigator, set forth only generic reasons for appointing an additional expert, and

failed to support the specific need for a mitigation specialist. (TR 61-68.)

The trial court denied the motion on May 1, 2001, stating that it had already granted a

motion for an investigator. The court, however, left the door open for counsel to show additional

reasons for needing a mitigation expert: "I'll give you an opportunity to tell me if you can locate

any authority for this other than the fact that he's done it in the past. I would like to know what

the courts of this country have said about this before I authorize this expenditure." (*See* Transcript of Hearing on Motion for Mitigation Experts, p. 75, Ex. 27.) Mr. Johnstone responded: "We'll look and provide that for you, Your Honor." (*Id.* at 76.)

Loden's counsel, however, never provided any authorities to the court, despite the availability of case law, statutes and court rules supporting appointment of a mitigation specialist. (*See* ABA Guidelines, Guideline 4.1, cmt. at 959-60 & n.107 (describing importance of mitigation expert and listing numerous death penalty jurisdictions that by state statute, court rule or case law routinely authorize the payment of funds for mitigation experts pursuant to defense motion).) During Loden's direct appeal, the Mississippi Supreme Court found that the trial court had not abused its discretion in denying Loden's motion because it only set forth "unsubstantiated assertions," rather than "concrete reasons" for authorizing a mitigation expert. *Loden v. State*, 971 So. 2d 548, 563-64 (Miss. 2007).

Had counsel initiated their investigation into Loden's social, mental, military and employment history (as detailed in Ground One, above) from the moment they were appointed as Loden's counsel – as they were required to do by the prevailing norms – they would have been able to present "concrete reasons" for requiring assistance of Dr. Mooers. In addition, had counsel adequately researched the law on the need for a mitigation expert and provided any pertinent, compelling authority to the court, the court would have (and certainly should have) granted the motion. (*See* S. O'Brien Aff. ¶¶ 18-20, Ex. 17.) Because of counsel's lack of investigation and shoddy litigation of the motion, Loden was denied the assistance of Dr. Mooers.

### B. Counsel Failed To Present Any Meaningful Challenge To the State's Evidence During the Suppression Hearing

Counsel failed to challenge the state's evidence against Loden, to ferret out its shortcomings and expose its inconsistencies. There was ample evidence suggesting that the

police had conducted an unlawful search of Loden's van eight hours *before* obtaining the warrant they formally relied on for the search. Specifically, the police tagged and removed as evidence a video camera charger that they found in Loden's room in his grandmother's house, and did so eight hours before the van was "officially" searched and the video camera and video tape were discovered. (*See* Marlar Report, Ex. 28(a); Search Warrant Return noting that search yielding recovery of charger was conducted at approximately 12:00 P.M., Ex. 28(c); Mississippi Crime Laboratory Crime Scene Response Report noting recovery of camcorder on June 23, 2000 at approximately 8:10 p.m., Ex. 28(i).) The charger was the only item seized from an overnight bag in Loden's room, but its potential significance to the case would only have been apparent if the police had already entered the van and found the video depicting the crime, something they claimed to have done only later that day. (*See* Marlar Report, p. 009 (indicating that Marlar seized a video camera power supply from the overnight bag), Ex. 28(a); *see* Search Warrant Return (listing items taken pursuant to Warrant signed by Rick Marlar, not indicating the overnight bag or its other contents among the recovered items), Ex. 28(c); *see* Photo of overnight bag (showing that the overnight bag contained additional items), Ex. 28(e).) During the suppression hearing, counsel did not ask Officer Marlar a single question about the recovery of the video camera charger.

Moreover, counsel did not attempt to cross-examine Officer Marlar regarding the discrepancies in his and Officer Jones' chronologies of the search, specifically the timing of their recovery of the rope and blood-stained shorts that formed the basis for a search warrant and were specifically referenced in the warrant. (*See* Search Warrant, Ex. 28(b).) Officer Marlar's written report states that on June 23, 2000 at approximately 7:50 a.m., he and Officer Jones arrived at the residence of Loden's grandmother, Rena Loden. (*See* Marlar Report, Ex. 28(a).) After a brief

conversation, Rena Loden allegedly gave the officers permission to go to the pond located on her property to find and speak with Loden.  (*Id.*; Transcript of the Suppression hearing, p. 264, 3-7.) After being unable to locate Loden at the pond, the officers returned to the Loden home and asked Mrs. Loden for permission to search the property and the vehicles on the property. According to Officer Marlar, this consent was given in written form at 9:27 a.m. and it was the only form of consent the officers received to search the property and vehicles.  (*See* Marlar Report, Ex. 28(a); *see also* Transcript of the Suppression Hearing, p. 309, lines 10-14; Consent to Search signed by Rena Loden, dated 6/23/00, Ex. 28(f).)  According to Officer Marlar, it was only after this form was signed that the officers searched Rena Loden's residence, a black pickup truck, and an Oldsmobile, where they found the rope.  However, according to Officer Marlar's evidence submission form, the rope was recovered at 8:30 a.m.- prior to the written consent. (Evidence Submission Form, Ex. 28(d).)  With respect to the blood-stained shorts, days after the search, Officer Marlar wrote a report reflecting that Loden's room was not searched prior to the warrant being issued and that the shorts were recovered only after the officers obtained the search warrant.  (*See* Marlar Report, Ex. 28(a).)  During the hearing, however, Officer Marlar maintained that he saw the blood-stained shorts in Loden's room in plain view before the search warrant was issued to reflect the reference to the shorts in his Affidavit for a search warrant. (Transcript of the Suppression Hearing, p. 271, lines 7-14, Search Warrant, Ex. 28(b).)

Officer Jones provided two reports memorializing the chronology of the search.  The two reports were inconsistent and contradicted aspects of Officer Marlar's account.  According to Officer Jones, after Mrs. Loden stated that Loden was probably at the pond, the Officers obtained permission to search Mrs. Loden's Oldsmobile and only then went on to the pond.  (Case Report by Investigator Bryan Jones, dated 6/22/00, pp. 070-072 ("Jones  I"), Ex. 28(g).).  After returning

from the pond, the officers discussed obtaining a search warrant. (*Id.*) Officer Jones then left the property to obtain a search warrant and returned some time later with a signed warrant. (*Id.*) Officer Jones' first report omits any mention of the blood-stained shorts.

In his second report, Officer Jones revised his account of the search. (Case Report by Investigator Bryan Jones, dated 6/22/00, pp. 890-892 ("Jones II"), Ex. 28(h).) He maintained that the officers received permission to search the Oldsmobile before proceeding to the pond but added that upon returning from the pond they received additional consent to search Mrs. Loden's property "to include, but not limited to the home of Mrs. Loden and the room in which E. Loden was staying." (*Id.*, p. 892.) He went on to state that Officer Marlar called him into the room where Loden was staying and showed him a pair of shorts with what appeared to be blood on them. (*Id.*) According to Jones' second report, it was only at this point that the officers discussed obtaining a search warrant. (*Id.*) Officer Jones was not called to testify by the Prosecution during the suppression hearing. Attorneys Johnstone and Daniels did not subpoena Officer Jones for testimony and thus did not cross examine him regarding any of the above inconsistencies.

Moreover, trial counsel did not question Officer Marlar regarding the discrepancy between his testimony that he discovered Loden's room in a state of disarray, and the fact that police photos show Loden's room both with the bed made and the overnight bag packed *and* with the bed unmade and the bag unpacked, as if the room was just searched. (*See* Ex. 28(e); Suppression Hearing Transcript, p. 271, lines 7-14); Photographs of the search, Ex. 28(e).). This would have further demonstrated that an illegal search took place.

Following his arrest, when Loden's wife visited him in jail, Kat told Loden's attorneys' investigator, Herb Wells, that she convinced Loden to speak to the investigators at their request

and "strong encouragement." (*See* Herb Wells Report, Ex. 26(a).) In part due to this coercion, Loden provided a statement even though he did not recall most of the events described in his alleged confession. (*See* Loden Aff. ¶ 15, Ex. 1.) Since Loden's attorneys did not meet with Loden, discuss what would occur at the suppression hearing or prepare him for testimony, they failed to ensure that Loden would fully present his testimony and did not adequately cross examine witnesses regarding Loden's statement.

Finally, Loden's counsel failed to ask any questions on cross examination of Judge Bean who issued the search warrants in Loden's case. (Suppression Hearing Transcript, p. 326, lines 19-20.)

### C. Counsel Failed To Provide Loden with Discovery Prior To the Suppression Hearing and To Prepare Loden for His Testimony

Immediately after Loden's first visit from Attorney Daniels in January 2001, Loden wrote to Daniels asking for a complete copy of the discovery in the case. Daniels did not respond. Thereafter, Loden wrote to both Daniels and Wells at least 16 times asking that he be provided a copy of the discovery in the case so he could review, consider and comment on the evidence against him. (Loden Aff. ¶ 13, Ex. 1.) Loden did not receive a response to any of those requests and was not provided with the requested discovery until after his suppression hearing.

Loden's counsel did not consult with him about the grounds for the suppression motions, whether he would be asked to testify, or prepare him for such testimony. (Loden Aff. ¶ 14, Ex. 1.) This, despite Loden's numerous requests to meet with counsel prior to the hearing. (*Id.*; see Loden letter to Daniels 3/20/01, Ex. 30(c).) Instead, Attorney Daniels turned to Loden during the suppression hearing, asked him if he would like to testify, and then put Loden on the stand completely unprepared. (Loden Aff. ¶ 14, Ex. 1.)

The court denied Loden's motions to suppress. *After* Judge Gardner denied the suppression motions, Daniels spent 4.5 hours copying the discovery and delivering it to Loden in jail – when it was too late to be useful to Loden to in connection with his pre-trial motions and hearing. (*See* Daniels' Itemized Statement for Compensation and Expenses, TR 249.)

After Loden was able to examine the discovery relevant to the suppression hearing, he discovered a number of inconsistencies in the State's evidence suggesting police misconduct and a potentially illegal search of his van. (Loden Aff. ¶ 17, Ex. 1.) After realizing that none of these issues were addressed by his defense counsel, Loden detailed his findings in a letter to defense counsel and asked counsel to file a second suppression motion. (Loden Aff. ¶ 17, Ex. 1; *see also* Exs. 30(h) and 30(j).) Attorney Johnstone told Loden that he would file a second suppression motion. He never did so. In part due to counsel's performance at the suppression hearing, Loden began contemplating obtaining new counsel. (Loden Aff. ¶ 16, Ex. 1.)

### D. Loden's Trial Counsel Did Not Provide the Defense Psychiatric Expert with Sufficient Background Information for a Proper Evaluation of Loden

At a hearing on April 25, 2001, Judge Gardner authorized a mental evaluation of Loden. (*See* Order for Mental Examination, TR 119-122.) Loden's counsel retained Dr. C. Gerald O'Brien, a psychologist, to conduct the mental evaluation. (*See* Order on the Application for Funds Ex Parte for a Forensic Psychologist, TR 157-159.) Although Judge Gardner signed the order authorizing counsel to retain Dr. O'Brien on April 25, 2001, nothing happened for months. (*Id.* at TR 159.) In early July 2001, Daniels' assistant contacted Dr. O'Brien for the first time to discuss the need to evaluate Loden. (G. O'Brien Aff. ¶ 2, Ex. 18.) Dr. O'Brien informed the assistant that he could not evaluate Loden until after July 30. (*Id.*) On August 10, 2001, Judge Gardner issued an order authorizing Loden to be transported to Dr. O'Brien's office for evaluation. (*See* August 10, 2001 Order, TR 175.)

Attorney Daniels did not discuss Loden's defense case with Dr. O'Brien before the evaluation, nor did he ask him to evaluate whether Loden was competent to plead guilty. (G. O'Brien Aff. ¶¶ 2, 3, Ex. 18.) This was despite knowledge, at least by co-counsel Johnstone, that Loden's family members were concerned about his persistent suicidal state and that Loden had made numerous attempts to commit suicide throughout his life, including several attempts after his arrest. (*See* Johnstone's Handwritten Notes from 7/6/00 meeting, Ex. 25(a); 7/13/00 regarding call from M. Baker regarding Loden suicide attempt, Ex. 25(b); 8/22/00 meeting with Loden family noting their concerns regarding his psychological state, Ex. 25(b).)

Daniels provided only limited documents and background information to Dr. O'Brien. (G. O'Brien Aff. ¶ 5, Ex. 18; G. O'Brien Report, Ex. 29(a).) Dr. O'Brien interviewed Loden on August 13, 2001 for two hours, and Loden told him many things that should have been investigated in furtherance of a mitigation case. Dr. O'Brien drafted his report on Saturday, September 14, 2001, and faxed it to Daniels' office on September 17, 2001. (G. O'Brien Report, Ex. 29(a).) Daniels did not thereafter contact Dr. O'Brien to discuss the report, the opinions expressed in the report, or whether Dr. O'Brien would testify. By the time that Daniels received Dr. O'Brien's draft report, Daniels was already in discussions with Loden and the prosecution about pleading guilty. (G. O'Brien Aff. ¶¶ 13-15, Ex. 18.)

Although Dr. O'Brien did find that Loden suffered from an emotional disturbance at the time of the crime, he did not link this finding to any diagnoses or provide sufficient context for the finding. (G. O'Brien Report, Ex. 29(a); High Aff. p. 43, Ex. 16; G. O'Brien Aff. ¶ 17, Ex. 18.) Most importantly, Dr. O'Brien did not diagnose Loden with PTSD or test for disassociative symptoms, which would have explained the significance of Loden's reported amnesia as a

reflection of the extreme degree of emotional disturbance suffered by Loden. (G. O'Brien Report, Ex. 29(a); G. O'Brien Aff. ¶¶ 10, 17, Ex. 18; High Aff. pp. 43-44, Ex. 16.)

### III. LODEN WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL PROVIDED ERRONEOUS ADVICE THAT CAUSED LODEN TO ENTER AN INVOLUNTARY GUILTY PLEA AND WAIVE JURY SENTENCING

#### A. Counsel's Ineffective Assistance Forced Loden To Decide To Plead Guilty Without Fully Considering or Understanding His Defense or Mitigation Options

After having lost the suppression motion in June 2001, any competent counsel would have re-doubled their efforts to develop a mitigation case. Loden's counsel did not. They collectively spent a mere 36 hours between the suppression hearing in June and Loden's plea hearing in September. By September 18, 2001, with trial less than one month away, Loden's counsel had not obtained a mitigation expert, had not asked Judge Gardner to reconsider his ruling to deny funds to hire a mitigation expert, had not instructed their retained investigator to develop mitigation evidence, and had not conducted any mitigation investigation themselves.

On September 19, 2001, Loden's counsel travelled to where Loden was being held, told him that trial was less than 3 weeks away, and that Judge Gardner had contacted them to say that Loden had to decide now whether to plead guilty or he would not be able to do so later. (Loden Aff. ¶ 18, Ex. 1.) Counsel wanted to know whether Loden was going to plead guilty or insist on a trial. Loden's lawyers did not discuss with him what defenses or what mitigation case they would present if he refused to plead guilty or how mitigation evidence would help his case. They also did not discuss with Loden the psychiatric report of Dr. O'Brien, whether Dr. O'Brien would testify, or whether Dr. O'Brien's testimony would be helpful. (Loden Aff. ¶ 23, Ex. 1.)

Loden wanted to know whether the pre-trial rulings, particularly the rulings on the suppression motions, were reviewable by a higher court if he pled guilty. (Loden Aff. ¶ 19, Ex.

1.)  Loden's counsel erroneously told him that, if he was convicted and sentenced to death, the Mississippi Supreme Court would review the case and everything in the record.  (*See* Loden Aff. ¶ 19, Ex. 1; Johnstone Aff. ¶ 19; *see also* Loden letter to Daniels, 2/7/02, Ex. 30(l), "My only hope was re-presenting everything I had trouble with on appeal.  Glad to hear that I still can.")  Loden's counsel did not tell him that the Mississippi Supreme Court would not review Judge Gardner's pre-trial rulings if he pleaded guilty.  In fact, counsel told Loden that Judge Gardner's suppression rulings were one of several viable issues on appeal.  (Johnstone Aff. ¶ 12, Ex. 19.)

At no point during Loden's representation did his counsel make any effort to negotiate with the prosecution.  Even though a plea would spare the victim's family and the community the many burdens of a trial, Loden's lawyers failed to seek or obtain any concession or agreement of any kind from the prosecution with respect to the plea, or the sentencing phase.

On September 20, 2001, Loden told his counsel that he would plead guilty.  There was no discussion about whether Loden wanted to put on a mitigation case even though he was not contesting guilt.  Nor was there discussion as to whether Loden would waive a jury for sentencing.  Counsel made no attempt to go over any of the questions that would be posed to Loden by Judge Gardner during the plea allocution.  (*See* Loden Aff. ¶ 20, Ex. 1.)

Arrangements were made to take Loden's guilty plea and determine sentencing the next day, September 21, 2001.  Trial counsel did not discuss with Loden the benefits of cross-examining the State's witnesses or objecting to the State's evidence during the sentencing phase. (Loden Aff. ¶ 25, Ex. 1.)

### B.  Trial Counsel's Erroneous Advice Caused Loden To Waive His Right To Jury Sentencing

Loden's trial counsel were aware of the trial judge's record of sentencing defendants to death in capital cases despite the existence of strong mitigating evidence in other cases.  Despite

that knowledge, Attorneys Daniels and Johnstone did not advise Loden that if he pleaded guilty and waived jury sentencing, he would almost undoubtedly receive a death sentence from Judge Gardner and would be prevented from challenging Judge Gardner's rulings due to the guilty plea. They should have discussed with him his odds of convincing Judge Gardner to sentence him to life compared to convincing at least one of twelve jurors to make that decision.  (Loden Aff. ¶¶ 8, 21, Ex. 1.)  Given Judge Gardner's past decisions in capital murder cases and the much greater likelihood of convincing only one of twelve jurors to sentence Loden to life in prison instead, trial counsel provided constitutionally defective advice.  This is especially true where they had failed to conduct a mitigation investigation to properly advise Loden on jury sentencing.

At the sentencing phase of Loden's trial, the State offered into evidence the purportedly expert psychiatric report of Dr. R. McMichael.  Loden's trial counsel stipulated to admission of the report.  The report contains a number of biased, disparaging and unsupported allegations. Specifically, the report tries to tie Loden to prior purportedly similar murders in Louisiana and Mississippi, turns cattle slaughtering on his grandfather's farm into sadistic abuse of animals, and offers prejudicial and unsupported diagnoses of Malingering and Antisocial Personality Disorder.  (Whitfield Report, Ex. 28(j); High Aff., Ex. 16.)

Although trial counsel stated to the trial court that Loden instructed them not to object to any evidence, they had an obligation to review Dr. McMichael's report with Loden, and to discuss the downside of admission so that Loden could have made an informed decision.  (Plea and Sentencing Transcript, pp. 201-05.)  Loden was not shown Dr. McMichael's report or made aware of its contents.  (Loden Aff. ¶ 25, Ex. 1.)  If Loden had known what it contained, he would not have given his supposed instruction not to object to it.  (Loden Aff. ¶ 25, Ex. 1.)  Trial counsel offered the report of Dr. O'Brien into the record, which the prosecution sought to rebut

with the McMichael report. Loden had also not seen the O'Brien report before it was introduced in the sentencing hearing, and he certainly did not instruct counsel to present this report into evidence. (Loden Aff. ¶ 23, Ex. 1.)

Finally, trial counsel failed to present mitigating evidence during the sentencing hearing. Of course, trial counsel's failure to re-file Loden's motion for mitigation funds with additional authority (as requested by the trial court), instruct Herb Wells to conduct an investigation, or pursue and develop the numerous mitigation leads themselves prevented them presenting a mitigation case on Loden's behalf.

## IV. LODEN'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED AS A RESULT OF THE CUMULATIVE PREJUDICE ARISING FROM TRIAL COUNSEL'S MULTIPLE DEFICIENT ACTS AND OMISSIONS

As set forth above, Loden alleges a series of constitutionally deficient acts and omissions by trial counsel. While each individual act or omission was itself sufficient to undermine confidence in the outcome of the guilt-or-innocence and/or sentencing phase of Loden's trial, the aggregate prejudice of any two or more of those acts or omissions compels the conclusion that, but for counsel's deficient performance, there is a reasonable probability that the result of those proceedings would have been different.

## V. LODEN WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Loden asserts that appellate counsel was ineffective in the manner in which they developed and presented evidence to challenge the constitutionality of his guilty plea. The vast additional evidence presented in this petition regarding Loden's background, psychological history and his trial counsel's numerous instances of ineffectiveness, necessarily alters the totality of circumstances that were previously considered by the state court.

For instance, in connection with Loden's Motion to Vacate the Guilty Plea, Loden's appellate counsel did not present or develop evidence of the numerous attempts Loden made to meet with counsel to review the discovery materials and discuss the suppression issues in his case, to obtain advice on possible defense strategies and to suggest witnesses to testify on his behalf. As such, Loden's appellate counsel neglected to fully develop evidence that Loden pled guilty with the understanding that the issues he attempted to address with trial counsel, and that were so important to him, could still be reviewed by the Mississippi Supreme Court after Loden's entry of a guilty plea. As such, appellate counsel failed to demonstrate to the state trial court and the Mississippi Supreme Court that in pleading guilty, Loden, contrary to the State's repeated assertions, did not intend to waive his appeal rights and to acquiesce in the State's desire to put him to death. Moreover, Loden's appellate counsel did not develop or present evidence regarding Loden's mental state at the time of his plea. Counsel failed to present to the Mississippi Supreme Court psychiatric testimony that at the time when Loden relied on his counsel's questionable advice that, Loden had a long history of untreated depression, suicide attempts and was suffering from complex PTSD. (*See* High Aff. pp. 25, 26-28, 34-35, Ex. 16.)

Furthermore, appellate counsel did not present evidence that trial counsel's failure to advise Loden on the value of mitigation evidence or to present a potential defense strategy contributed to Loden's feelings of hopelessness and ultimately led to his decision to plead guilty and attempt to raise all issues on appeal with the Mississippi Supreme Court.

    (b)    **If you did not exhaust your state remedies on Ground One, explain why:**

Loden did exhaust his state remedies with respect to Ground One.

    (c)    **Direct Appeal of Ground One:**

        (1)    If you appealed from the judgment of conviction, did you raise this issue?

            Loden did not raise this issue on direct appeal.

(2)     If you did <u>not</u> raise this issue in your direct appeal, explain why:

Loden did not raise this issue on direct appeal because the evidence and legal principles upon which it rests were not available to him until the state post-conviction relief proceedings.

(d)     **Post-Conviction Proceedings:**

(1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Loden raised this issue through a post-conviction application filed directly with the Mississippi Supreme Court.

As to the ineffective assistance of counsel relating to Loden's guilty plea, Loden also raised that issue through another post-conviction application filed in the Circuit Court of Itawamba County, in addition to the post-conviction application filed directly with the Mississippi Supreme Court.

(2)     If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Loden raised this issue in a Petition for Post-Conviction Relief.  As to the ineffective assistance of counsel relating to Loden's guilty plea, Loden also filed a Motion to Vacate Guilty Plea.

Name and location of the court where the motion or petition was filed: Loden's petition was submitted to the Mississippi Supreme Court.  The Motion to Vacate Guilty Plea was filed in the Circuit Court.

Docket or case number:  For the petition filed with the Mississippi Supreme Court:  2007-DR-01758-SCT.  For the Motion to Vacate Guilty Plea filed in the Circuit Court of Itawamba County:  CV03-090(G).

Date of court's decision:  For the petition filed with the Mississippi Supreme Court:  April 15, 2010, rehearing was denied on September 23, 2010; mandate issued on September 30, 2010.

For the Motion to Vacate Guilty Plea filed in the Circuit Court of Itawamba County, February 15, 2006.

Result (attach a copy of the court's opinion or order, if available): Judgment denying post-conviction relief was entered on April 15, 2010, rehearing was denied on September 23, 2010, and mandate issued on September 30, 2010.  A copy of the April 15, 2010 opinion from the Mississippi Supreme Court is attached hereto as Exhibit A.

The trial court's order denying Loden's Motion to Vacate Guilty Plea was entered on February 15, 2006 by the Circuit Court of Itawamba County.

A copy of the February 15, 2006 ruling by the trial court on Loden's Motion to Vacate Guilty Plea is attached hereto as Exhibit B.

(3)    Did you receive a hearing on your motion or petition?

As to the Petition for Post-Conviction Relief filed with the Mississippi Supreme Court, Loden requested but did not receive a hearing.

As to the Motion to Vacate Guilty Plea, Loden received an evidentiary hearing in the trial court.

(4)    Did you appeal from the denial of your motion or petition?

Loden could not appeal the denial of his Petition for Post-Conviction Relief as the decision was rendered by the highest court in Mississippi.

As to the Motion to Vacate Guilty Plea, Loden appealed the Circuit Court's denial of his motion.

(5)    If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

N/A as to the Petition for Post-Conviction Relief.

As to the Motion to Vacate Guilty Plea, Loden raised this issue on his appeal of the Circuit Court's denial of his motion.

(6)    If your answer to Question (d)(4) is "Yes," state:

N/A as to the Petition for Post-Conviction Relief.

As to the Motion to Vacate Guilty Plea, Loden appealed the denial of his motion to the Mississippi Supreme Court, case number 2006-CA-00432-SCT.  Loden's appeal was eventually consolidated with a direct appeal to the Mississippi Supreme Court.  The Mississippi Supreme Court's decision denying Loden's appeal was entered on October 4, 2007, and rehearing was denied on January 17, 2008.

(7)    If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise the issue:

Loden did not appeal the denial of his Petition for Post-Conviction Relief because that action was filed directly in, and denied by, the highest court in the State of Mississippi.

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

N/A

## GROUND TWO:  LODEN'S WAIVER OF JURY FOR SENTENCING WAS NOT VOLUNTARY, KNOWING AND INTELLIGENT IN VIOLATION OF LODEN'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

(a)    Supporting Facts

Loden incorporates the facts from Ground I as if stated herein.

On September 20, 2001, Loden told his trial counsel that he would plead guilty.  There was no discussion as to whether Loden would waive a jury for sentencing.  Counsel made no attempt to go over any of the questions that would be posed to Loden by Judge Gardner during the plea allocution.  (*See* Loden Aff. ¶ 20, Ex. 1.)  Loden pled guilty and waived his right to jury sentencing on September 21, 2001.

Loden's waiver of his right to a jury for sentencing was not knowingly and intelligently made for several reasons.  First, trial counsel did not do a mitigation investigation, thus undermining the value of the right to a jury for sentencing.  If trial counsel had developed the strong mitigating evidence that existed and informed Loden of its value, Loden could have made an intelligent decision regarding whether to be sentenced by the trial court or a jury.  Instead, not only did trial counsel fail to develop a mitigation case, but they failed to explain to Loden the purpose and importance of mitigating evidence and that the sentencing phase presented another chance to fight against a death sentence.  (Loden Aff. ¶¶ 8, 21, Ex. 1.)  In fact, trial counsel never discussed any aspect of the sentencing phase with Loden or their proposed strategy for it.  Rather, they repeatedly told him that he had no viable defense and would get the death penalty no matter what they did.  (*Id.* ¶ 8.)  Trial counsel's erroneous advice engendered a feeling of hopelessness

within Loden and a mistaken belief that he had no viable options to avoid a death sentence. Thus, Loden's decision to waive jury sentencing was made in a complete vacuum.

Second, during Loden's plea, the state trial judge erroneously informed Loden that "by entering a plea of guilty to this charge, or the capital murder case, you are waiving the jury making those determinations, as to the guilt *and* as to the punishment to be imposed." (Plea and Sentencing Transcript, p. 18, ll. 4-8; emphasis added.) This was particularly confusing given that Loden received no information about the sentencing phase from his counsel. Trial counsel did not correct this on the record or try to clarify this with Loden.

Third, Loden's mental and emotional condition, as discussed below in Ground VI, barred an accurate understanding of the consequences of a decision to waive the right to a jury for sentencing. Despite being aware of these issues, neither Loden's counsel nor the Court took steps to address Loden's mental condition prior to allowing Loden to waive his right to a jury for sentencing. Moreover, counsel failed to advise the Court that Loden's mental state may adversely impact the voluntariness of his waiver.

Finally, Loden's decision in this case was based on the erroneous advice of defense counsel that, if Loden were sentenced to death, all of the Circuit Court's rulings would then be reviewed by the Mississippi Supreme Court notwithstanding his guilty plea. (*See* Loden Aff. ¶ 19, Ex. 1; Johnstone Aff. ¶ 12, Ex. 19; *see also* Loden letter to Daniels, 2/7/02, Ex. 30(l), "My only hope was re-presenting everything I had trouble with on appeal. Glad to hear that I still can.".) Such erroneous advice rendered the waiver involuntary.

The lack of information that should have been provided to Loden – due to trial counsel's failure to develop powerful mitigation evidence, to inform Loden of the advantages of a jury sentencing, and to advise Loden accurately of what would and would not be reviewable on

appeal – resulted in a waiver of Loden's right to jury sentencing that was neither knowing, intelligent nor voluntary.

      (b)     **If you did not exhaust your state remedies on Ground Two, explain why:**

Loden did exhaust his state remedies with respect to Ground Two.

      (c)     **Direct Appeal of Ground Two:**

          (1)     If you appealed from the judgment of conviction, did you raise this issue?

Loden did not raise this issue on direct appeal.

          (2)     If you did not raise this issue in your direct appeal, explain why:

Loden did not raise this issue on direct appeal because he could not as it is based on appellate counsel's conduct. Loden could first raise this issue in the state post-conviction relief proceedings.

      (d)     **Post-Conviction Proceedings:**

          (1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Loden raised this issue through a post-conviction application filed directly with the Mississippi Supreme Court.

          (2)     If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Loden raised this issue in a Petition for Post-Conviction Relief.

Name and location of the court where the motion or petition was filed: Loden's petition was submitted to the Mississippi Supreme Court.

Docket or case number:  2007-DR-01758-SCT

Date of court's decision:  April 15, 2010, rehearing was denied on September 23, 2010.  Mandate issued on September 30, 2010.

Result (attach a copy of the court's opinion or order, if available): Judgment denying post-conviction relief was entered on April 15, 2010, and rehearing was denied on September 23, 2010.  Mandate issued on September 30, 2010.  The Mississippi Supreme Court's opinion issued on April 15, 2010 is attached hereto as Exhibit A.

(3)     Did you receive a hearing on your motion or petition?

No.  Loden requested but did not receive a hearing on his Petition for Post-Conviction Relief.

(4)     Did you appeal from the denial of your motion or petition?

Loden could not appeal the denial of his Petition for Post-Conviction Relief as the decision was rendered by the highest court in Mississippi.

(5)     If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

N/A

(6)     If your answer to Question (d)(4) is "Yes," state:

N/A

(7)     If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise the issue:

Loden did not appeal the denial of his Petition for Post-Conviction Relief because that action was filed directly in, and denied by, the highest court in the State of Mississippi.

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two:

N/A

## GROUND THREE:  APART FROM THE INEFFECTIVENESS OF LODEN'S COUNSEL, HIS GUILTY PLEA WAS NOT KNOWING, VOLUNTARY OR INTELLIGENT IN VIOLATION OF LODEN'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

(a)     Supporting Facts

Loden incorporates the facts from Grounds I-II as if stated herein.

Aside from being forced to make a plea decision in a legal and factual vacuum imposed by defense counsel, Loden's psychiatric predisposition and his mental state around the time of the plea did not allow him to enter a knowing, intelligent and voluntary guilty plea.  From

childhood forward, at the time of his arrest, and to the present, Loden suffered from borderline personality disorder, depression, and complex PTSD.  (High Aff. pp. 34-35, Ex. 16.)  Loden's condition was exacerbated by his attorneys' failure to present him with any options and contributed to his feelings of depression and hopelessness.  (*See* Loden Aff. ¶¶ 36, 37, Ex. 1.)

Counsel knew that Loden attempted suicide on numerous occasions throughout his lifetime.  (Attorney Johnstone's Handwritten Notes, p. 4 Ex. 25(a).)  Both Counsel and the trial court knew that Loden was discovered the morning after the crime with his wrists slashed and that he attempted suicide while in jail awaiting trial.  (Attorney Johnstone's Handwritten Notes, Ex. 25(b).)  Counsel did not bother to obtain psychiatric counseling or medication for Loden despite knowledge of the suicide attempts.  (*Id.*)

Throughout the plea and sentencing itself, trial counsel did nothing to notify the court that Loden's plea may not be knowing, voluntary and intelligent.  In fact, in noting that they would not present mitigation evidence as supposedly instructed by Loden, counsel made no attempt to express their reservations to the court about Loden's competence and the voluntariness of his decision.  (*See generally*, Plea and Sentencing; *see also* S. O'Brien Aff. ¶ 30, Ex. 17, noting that "In more than twenty-five years of specializing in the representation of persons facing the death penalty, I have seen many situations in which clients attempted to waive constitutional rights and pursue a course of action contrary to his best interests.  However, this is the first such case I have seen in which trial counsel expressed no reservations about his client's competence or the voluntariness of the decision.")

Also, although the exchange between Judge Gardner, Loden, the prosecution and defense counsel takes up approximately 54 pages of the hearing transcript, the question of appeal is brought up only once—on pages 18-19.  In the context of questioning Loden regarding his

decision to waive a determination of his guilt and sentence by a jury, Judge Gardner asks Loden whether he understands that "the question of your guilt or innocence or imposition of the punishment determined by the jury would be something that you could appeal to the Supreme Court of this State?" (*See* Plea and Sentencing, p. 18, lines 10-20).  Judge Gardner then went on to ask whether Loden understood that if "the Court makes a determination of your guilt, you will have no right to appeal that?  Do you understand that?" (*See* Plea and Sentencing, p. 19, ll. 14-18.)  Although Loden replied that he understood, he explicitly noted that the questions he had were answered by his attorneys.  (*See* Plea and Sentencing, p. 61, ll. 22-23.)  This exchange did nothing to alter Loden's erroneous understanding of the law that was provided to him by his trial counsel.

After Loden replied to the colloquy questions, Judge Gardner did not go on to discuss the finer points of the appeals process with Loden.  The trial court, for instance, did not discuss the availability of post conviction or habeas relief with Loden, notwithstanding the fact that these are potential post conviction proceedings, an appeal of sorts, though not a direct one.  Thus, a Court's inquiry regarding the finality of an appeal as to guilt or innocence did not alter Loden's understanding, based on his trial counsel's erroneous advice, that certain pre-trial issues could still be reviewed.

> (b) **If you did not exhaust your state remedies on Ground Three, explain why:**
>
> Loden did exhaust his state remedies with respect to Ground Three.
>
> (c) **Direct Appeal of Ground Three:**
>
> > (1) If you appealed from the judgment of conviction, did you raise this issue?
> >
> > Loden did not raise this issue on direct appeal.

(2)     If you did not raise this issue in your direct appeal, explain why:

Loden did <u>not</u> raise this issue on direct appeal because he could not as it is based on appellate counsel's conduct.  Loden could first raise this issue in the state post-conviction relief proceedings.

(d)     **Post-Conviction Proceedings:**

(1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Loden raised this issue through a post-conviction application filed directly with the Mississippi Supreme Court.

(2)     If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Loden raised this issue in a Petition for Post-Conviction Relief.

Name and location of the court where the motion or petition was filed: Loden's petition was submitted to the Mississippi Supreme Court.

Docket or case number :  2007-DR-01758-SCT

Date of court's decision:  April 15, 2010, rehearing was denied on September 23, 2010; mandate issued on September 30, 2010.

Result (attach a copy of the court's opinion or order, if available): Judgment denying post-conviction relief was entered on April 15, 2010, and rehearing was denied on September 23, 2010.  A copy of the April 15, 2010 opinion from the Mississippi Supreme Court is attached hereto as Exhibit A.

(3)     Did you receive a hearing on your motion or petition?

No.  Loden requested but did not receive a hearing on his Petition for Post-Conviction Relief.

(4)     Did you appeal from the denial of your motion or petition?

Loden did not appeal the denial of his Petition for Post-Conviction Relief because that action was filed directly in, and denied by, the highest court in state of Mississippi.

(5)     If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

N/A

(6)  If your answer to Question (d)(4) is "Yes," state:

N/A

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise the issue:

Loden did not appeal the denial of his Petition for Post-Conviction Relief because that action was filed directly in, and denied by, the highest court in state of Mississippi.

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

N/A

## GROUND FOUR:  THE STATE'S USE OF THE PSYCHIATRIC REPORT FROM DR. MCMICHAEL VIOLATES THE EIGHTH AMENDMENT'S RELIABILITY REQUIREMENT AND DUE PROCESS

(a)  Supporting Facts

Loden incorporates the facts from Grounds I-III as if stated herein.

At the sentencing phase of Loden's trial, the State offered into evidence the purportedly expert psychiatric report of Dr. McMichael.  Loden's trial counsel stipulated to admission of the report.  The report contains a number of biased, disparaging and unsupported allegations.  Specifically, the report tries to tie Loden to prior purportedly similar murders in Louisiana and Mississippi, turns cattle slaughtering on his grandfather's farm into sadistic abuse of animals, and offers prejudicial and unsupported diagnosis of Malingering and Antisocial Personality Disorder.  (Whitfield Report, Ex. 28(j); High Aff., Ex. 16.)  Loden was not shown Dr. McMichael's report or made aware of its contents.  (Loden Aff. ¶ 25, Ex. 1.)  Second, trial counsel offered the report of Dr. O'Brien into the record, which the prosecution sought to rebut with the McMichael report.  Loden had also not seen the O'Brien report before it was introduced

in the sentencing hearing, and he certainly did not instruct counsel to present this report into evidence.  (Loden Aff. ¶ 23, Ex. 1.)

      (b)    **If you did not exhaust your state remedies on Ground Four, explain why:**

Loden did exhaust his state remedies with respect to Ground Four.

      (c)    **Direct Appeal of Ground Four:**

          (1)    If you appealed from the judgment of conviction, did you raise this issue?

Loden did not raise this issue on direct appeal.

          (2)    If you did not raise this issue in your direct appeal, explain why:

Loden did not raise this on direct appeal because the evidence and legal principles upon which it rests were not available to him until the state post-conviction relief proceedings.

      (d)    **Post-Conviction Proceedings:**

          (1)    Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Loden raised this issue through a post-conviction application filed directly with the Mississippi Supreme Court.

          (2)    If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Loden raised this issue in a Petition for Post-Conviction Relief.

Name and location of the court where the motion or petition was filed: Loden's petition was submitted to the Mississippi Supreme Court.

Docket or case number :  2007-DR-01758-SCT

Date of court's decision:  April 15, 2010.

Result (attach a copy of the court's opinion or order, if available): Judgment denying post-conviction relief was entered on April 15, 2010, and rehearing was denied on September 23, 2010.  Mandate issued on September 30, 2010.  A copy of the April 15, 2010 opinion from the Mississippi Supreme Court is attached hereto as Exhibit A.

(3)     Did you receive a hearing on your motion or petition?

No.  Loden requested but did not receive a hearing on his Petition for Post-Conviction Relief.

(4)     Did you appeal from the denial of your motion or petition?

Loden did not appeal the denial of his Petition for Post-Conviction Relief because it was denied by the highest state court.

(5)     If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

N/A

(6)     If your answer to Question (d)(4) is "Yes," state:

N/A

(7)     If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise the issue:

Loden did not appeal the denial of his Petition for Post-Conviction Relief because that action was filed directly in, and denied by, the highest court in the State of Mississippi.

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

N/A

## GROUND FIVE:  LODEN WAS IMPROPERLY DENIED FUNDS TO RETAIN THE ASSISTANCE OF A FORENSIC SOCIAL WORKER TO INVESTIGATE AND PRESENT RELEVANT MITIGATING FACTORS IN VIOLATION OF THE FOURTEENTH AMENDMENT

(a)     Supporting Facts

Loden incorporates the facts from Grounds I-IV as if stated herein.

Trial counsel made a proper request for funding for a forensic social worker, Dr. Gary Mooers, to perform a social history investigation to develop mitigation to be presented at sentencing.  (TR 64-75; C.P. 61-75; R.E. 30-44.)  In part, the State objected arguing that the

defense attorneys could conduct this investigation themselves. (TR 69.) A social history investigation is not within the expertise of a lawyer. Social workers are specially trained and have obtained expertise in conducting, compiling, and analyzing social histories. Nevertheless, the trial court denied Loden's motion. (TR 75.)

    (b)    **If you did not exhaust your state remedies on Ground Five, explain why:**

Loden did exhaust his state remedies with respect to Ground Five.

    (c)    **Direct Appeal of Ground Five:**

        (1)    If you appealed from the judgment of conviction, did you raise this issue?

                Loden raised this issue on direct appeal.

        (2)    If you did not raise this issue in your direct appeal, explain why:

                N/A

    (d)    **Post-Conviction Proceedings:**

        (1)    Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

                No. Loden did not need to raise this issue again in a petition for post-conviction relief as it was exhausted on direct appeal.

    (e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Five:

        N/A

**GROUND SIX: THE INDICTMENT FAILED TO CHARGE A DEATH PENALTY ELIGIBLE OFFENSE IN VIOLATION OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND FAIR NOTICE GUARANTEES UNDER THE SIXTH AMENDMENT**

    (a)    Supporting Facts

Loden incorporates the facts from Grounds I-V as if stated herein.

The indictment entered in the state trial court failed to charge all elements necessary to impose the death penalty under Mississippi law. (C.P. 9-11; R.E. 27-29.) Specifically, the indictment did not include a valid statutory aggravating factor nor a mens rea element of Miss. Code § 99-19-101(5) and (7), respectively. Under the Mississippi statutory scheme, without a sentencing hearing as mandated in Miss. Code § 99-19-101, the maximum penalty for capital murder is life imprisonment. If a sentencing hearing is conducted and the finder of facts fails to find at least one aggravating factor and a mens rea element, pursuant to Miss. Code § 99-19-101 (5) and (7) respectively, the statutory maximum is *life*.

(b)     **If you did not exhaust your state remedies on Ground Six, explain why:**

Loden did exhaust his state remedies with respect to Ground Six.

(c)     **Direct Appeal of Ground Six:**

(1)     If you appealed from the judgment of conviction, did you raise this issue?

Loden raised this issue on direct appeal.

(2)     If you did not raise this issue in your direct appeal, explain why:

N/A

(d)     **Post-Conviction Proceedings:**

(1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

No. Loden did not need to raise this issue again in a petition for post-conviction relief as it was exhausted on direct appeal.

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Six:

N/A

**GROUND SEVEN: THE SUBMISSION OF THE "AVOIDING ARREST" AGGRAVATING CIRCUMSTANCE VIOLATED THE FOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUTION**

(a)      Supporting Facts

Loden incorporates the facts from Grounds I-VI as if stated herein.

The state trial court found as an aggravating circumstance that the killing was committed by Loden "for the purpose of avoiding or preventing his lawful arrest" and weighed that circumstance in reaching the decision to sentence Loden to death. (TR 712; C.P. 229-30; R.E. 51-52.) But the only evidence offered in support of the aggravator was Loden's tentative response to interrogators as to why he killed the victim: "Looking back now, I wouldn't have released her because I would've lost the image of being the picture perfect Marine. . . . I guess the big question of this is do I know that I killed Ms. Gray? Yes, I know I did. I have many questions as far as exactly how and why, but the next morning when I woke up, I saw the body, I knew I had done it." (TR 535, 634.) In addition, Loden, a U.S. Marine of 18 years at the time of the offense, guessed he committed the killing "because [he] didn't want to tarnish [his] image as the perfect Marine." (TR 535, 634.)

(b)      **If you did not exhaust your state remedies on Ground Seven, explain why:**

Loden did exhaust his state remedies with respect to Ground Seven.

(c)      **Direct Appeal of Ground Seven:**

(1)      If you appealed from the judgment of conviction, did you raise this issue?

Loden raised this issue on direct appeal.

(2)      If you did not raise this issue in your direct appeal, explain why:

N/A

(d)      **Post-Conviction Proceedings:**

(1)      Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

No.  Loden did not need to raise this issue again in a petition for post-conviction relief as it was exhausted on direct appeal.

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Seven:

N/A

## GROUND EIGHT:  THE SUBMISSION OF FELONY-MURDER AS AN AGGRAVATING CIRCUMSTANCE VIOLATED LODEN'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS

(a)     Supporting Facts

Loden incorporates the facts from Grounds I-VII as if stated herein.

Loden was indicted in a six-count indictment alleging capital murder defined as killing during the commission of a kidnapping, rape and four counts of sexual battery against Leesa Marie Gray.  (C.P. 9-11; R.E. 27-29.)  On September 21, 2001, Loden pled guilty to all charges and the court accepted these pleas.  (TR 551-53.)  Loden then proceeded to the sentencing phase on the capital murder charge before the court without a jury.  (TR 555.)  As to Count I, capital murder, the trial court sentenced Loden to death.  (TR 714; C.P. 226-31.)

During the sentencing of Loden, the state trial court submitted the Mississippi Code § 99-19-101(5)(d) felony-murder aggravator in this case.  As applied to this case, the use of the § 99-19-101(5)(d) aggravating circumstance does not furnish a principled means of distinguishing defendants eligible for the death penalty because there is no rational or historical basis for treating simple felony murderers as more culpable than premeditated murderers for purposes of capital punishment.

Moreover, because this aggravator is based in part on Counts II-VI of the indictment and Loden was separately convicted and sentenced on those charges, (C.P. 9-11, 226-31; R.E. 27-29,

48-53; TR 552-53, 715-16), the Double Jeopardy Clause of the United States Constitution was violated.

        (b)     **If you did not exhaust your state remedies on Ground Eight, explain why:**

Loden did exhaust his state remedies with respect to Ground Eight.

        (c)     **Direct Appeal of Ground Eight:**

             (1)     If you appealed from the judgment of conviction, did you raise this issue?

                       Loden raised this issue on direct appeal.

             (2)     If you did not raise this issue in your direct appeal, explain why:

                       N/A

        (d)     **Post-Conviction Proceedings:**

             (1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

                       No.  Loden did not need to raise this issue again in a petition for post-conviction relief as it was exhausted on direct appeal.

        (e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Eight:

               N/A

**GROUND NINE:  THE SUBMISSION OF BOTH FELONY MURDER AND THE ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATORS IN THIS CASE VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS**

        (a)     Supporting Facts

Loden incorporates the facts from Grounds I-VIII as if stated herein.

In sentencing Petitioner to death, the state trial court found each of the three aggravating circumstances submitted by the State.  (TR 712.)  The State submitted the underlying felony, kidnapping, and the counts of rape and sexual battery as one aggravating factor.  (TR 702.)  The State submitted that the killing was to avoid arrest.  (TR 703.)  The State also submitted

the aggravator that the killing was "especially heinous, atrocious or cruel" based on the same facts supporting the underlying felony aggravator. (TR 704.)

The state trial court found as aggravating circumstances that the killing was committed while Loden "was engaged in the commission of the felony counts of kidnapping, rape and sexual battery" and that the capital offense "was especially heinous, atrocious or cruel." (TR 712; C.P. 229; R.E. 51.) The court weighed both of these factors against the mitigation in determining that Loden should be sentenced to death. (TR 714; C.P. 230; R.E. 52.) This was error in that these two aggravating circumstances cannot be submitted together under the facts of this case. The "especially heinous" aggravating factor was based on the kidnapping and "brutal attack . . . this whole scenario." (TR 704.) Thus the "especially heinous" aggravator wholly subsumed the underlying offense aggravator based on Miss. Code § 99-19-101(5)(d).

(b)    **If you did not exhaust your state remedies on Ground Nine, explain why:**

Loden did exhaust his state remedies with respect to Ground Nine.

(c)    **Direct Appeal of Ground Nine:**

(1)    If you appealed from the judgment of conviction, did you raise this issue?

Loden raised this issue on direct appeal.

(2)    If you did <u>not</u> raise this issue in your direct appeal, explain why:

N/A

(d)    **Post-Conviction Proceedings:**

(1)    Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

No. Loden did not need to raise this issue again in a petition for post-conviction relief as it was exhausted on direct appeal.

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Nine:

N/A

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

All grounds for relief being raised by Loden have previously been presented to the highest state court having jurisdiction.

14. Have you previously filed any type of petition, application, or motion in federal court regarding the conviction that you are challenging in this petition?

The only petition filed in federal court regarding the conviction challenged in this petition was a petition for writ of certiorari filed with the United States Supreme Court following the denial of the direct appeal and first petition for post-conviction relief, which were consolidated. The case number in the United States Supreme Court was 07-10475. Please refer to 9(f) and 11(a)(5), *supra*, for the grounds asserted in the petition for certiorari. The petition for writ of certiorari was denied on October 6, 2008. *See Loden v. Mississippi*, 129 S. Ct. 45 (2008).

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment that you are challenging?

Loden has no petitions or appeal concerning the judgment challenged here pending in any other court, state or federal.

16. Give the name and address, if you know, of each attorney who represented you in the following states of the judgment you are challenging:

(a) At preliminary hearing: Hon. James Johnstone, P.O. Box 418, Pontoc, MS 38863.

(b) At arraignment and plea: Hon. James Johnstone (address above).

(c) At trial: Hon. James Johnstone (address above); Hon. David Daniels, P.O. Box 212, Corinth, MS 38835.

(d) At sentencing: Hon. David Daniels (address above); Hon. James Johnstone (address above).

(e) On appeal: André de Gruy, Office of Capital Defense Counsel 510 George Street Suite 300, Jackson, MS 39202; Stacy Ferraro, P.O. Box 708, Flora, MS 39071.

(f)     In any state post-conviction proceeding: André de Gruy (address above); Stacy Ferraro (address above); Glenn S. Swartzfager, Office of Capital Post-Conviction Counsel, 510 George Street, Suite 403, Jackson MS 39202 Charles E. Patterson, Charles S. Barquist, Mark R. McDonald, Olga A. Tkachenko, Elina Kreditor, Morrison & Foerster LLP, 555 West Fifth Street, Los Angeles, CA 90013.

(g)     On appeal from any ruling against you in a state post-conviction proceeding: André de Gruy (address above); Stacy Ferraro (address above).

17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?

Loden has no future sentences to serve after the completion of the sentence imposed by judgment challenged in this petition.

18.     TIMELINESS OF PETITION:  If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.

The limitations period calculation applicable to this case is as follows:

Pursuant to 28 U.S.C. § 2244(d)(1)(A), the limitations period on this petition began to run on October 7, 2008, the day after Loden's conviction and sentence became final by conclusion of direct review.  However, pursuant to 28 U.S.C. § 2244(d)(2), the limitations period was tolled during the time that Loden's properly filed State post-conviction application was pending.  Loden filed his second petition for state post-conviction relief on December 8, 2008, and that petition was pending until the Mississippi Supreme Court issued its mandate on September 30, 2010.  *Watts v. Brewer*, No. 2:09cv122-KS-MTP, 2010 U.S. Dist. LEXIS 11648, at *7-8 (S.D. Miss. Feb. 10, 2010) (holding that, under Mississippi law, state post-conviction application was pending for purposes of 28 U.S.C. § 2244(d)(2) until the Mississippi Supreme Court issued its mandate); *see also Lawrence v. Florida*, 549 U.S. 327, 331-32 (2007) (noting that the parties were in agreement that state post-conviction petition was pending until state supreme court "issued its mandate affirming the denial of that petition").

On December 8, 2008, the date Loden filed his second post-conviction application, 63 days had elapsed from the date his conviction and sentence became final. Thus, on October 1, 2010, when the limitations period resumed after the conclusion of Loden's second post-conviction application, 302 days remained on his limitations period.

Accounting for 302 days remaining at the time the state post-conviction relief proceedings concluded, the limitations period on this petition expires on July 29, 2011.

Therefore, Loden asks that the Court grant the following relief:

(a)     issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint;

(b)     issue an order to have him brought before it, to the end that he may be relieved of his unconstitutional sentence;

(c)     conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in this petition; and

(d)     grant such other relief as may be necessary and appropriate.

Respectfully submitted,


By:  /s/ Stacy Ferraro
Stacy Ferraro
MS Bar #100263
P.O. Box 708
Flora, Mississippi  39071
Telephone:  (601) 853-8331
Facsimile:   (601) 853-8331


Charles E. Patterson (*appointed pro hac vice*)
Charles S. Barquist (*appointed pro hac vice*)
Mark R. McDonald (*appointed pro hac vice*)
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California  90013-1024
Telephone:  213.892.5200
Facsimile:  213.892-5454

Attorneys for Petitioner

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List for this case.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 18, 2011.


s/ Stacy Ferraro