# EXHIBIT A

IN THE SUPREME COURT OF MISSISSIPPI

NO. 2007-DR-01758-SCT

*THOMAS EDWIN LODEN, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/21/2001 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | ITAWAMBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL: |
| | BY: GLENN S. SWARTZFAGER |
| | CHARLES E. PATTERSON |
| | CHARLES S. BARQUIST |
| | MARK R. McDONALD |
| | OLGA A. TKACHENKO |
| | ELINA KREDITOR |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST-CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 04/15/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. On September 21, 2001, Thomas E. Loden, Jr., an eighteen-year veteran of the United States Marine Corps who had attained the rank of gunnery sergeant (E-7), waived his right to a jury at trial and sentencing, and pleaded guilty to capital murder, rape, and four counts

of sexual battery.[1] After conducting an extensive hearing on the knowing, intelligent, and voluntary nature of said waivers, the Circuit Court of Itawamba County accepted Loden's pleas and adjudged him guilty on each count. At sentencing, Loden:

> elected to waive cross-examination of all of the State's witnesses, to waive objection to all exhibits presented by the State, and not to offer any mitigation evidence on his own behalf. During the proceeding, Loden addressed the court and apologized to the friends and family of [Gray], by stating "I hope you may have some sense of justice when you leave here today."

*Loden*, 971 So. 2d at 552. The circuit court sentenced Loden to death.

¶2.     Subsequently, Loden filed a "Motion to Vacate Guilty Plea" only as to capital murder, and now asks this Court to disregard his sworn testimony and out-of-court declarations that he preferred death to life in prison. Loden neither sought to vacate his guilty pleas to rape and four counts of sexual battery, nor appealed the convictions or sentences which followed his guilty pleas. Loden alleged that his plea was involuntary because it "was based on inaccurate legal advice given by his trial attorneys." Specifically, Loden maintained that his guilty plea was based upon "trial counsel's erroneous advice that he could still appeal adverse rulings on pre-trial motions after entering the guilty plea." The circuit court dismissed Loden's motion for post-conviction relief, "finding that Loden knowingly and voluntarily entered his guilty plea, and that Loden cognizantly waived his right to appeal." *Id*.

---

[1]Details regarding the crime are provided in *Loden v. State*, 971 So. 2d 548 (Miss. 2007). Summarily, Loden kidnapped sixteen-year-old Leesa Marie Gray and, for more than four hours, "repeatedly raped and sexually abused [her], videotaping portions of the sadistic acts, before murdering her by way of suffocation and manual strangulation." *Id*. at 551.

¶3.    Loden's direct appeal of his conviction and sentence, and his appeal of denial of post-conviction relief ("PCR") regarding the denial of his "Motion to Vacate Guilty Plea" were consolidated by this Court.    Thereafter, this Court "affirm[ed] the conviction and death sentence imposed by the [circuit court], and subsequent denial of post-conviction relief." *Id*. at 575.  Following denial of his "Motion for Rehearing," Loden filed a "Petition for Writ of Certiorari" with the United States Supreme Court, which also was denied. *See Loden v. Mississippi*, 129 S. Ct. 45, 172 L. Ed. 2d 51 (2008).  Loden now proceeds before this Court with his second Petition for Post-Conviction Relief.[2]

## FACTS

¶4.    The following pertinent facts are contained in the record and previously were provided by this Court in *Loden*, 971 So. 2d at 552-61:

> Loden was indicted for capital murder, rape, and four counts of sexual battery. That same day, the circuit court entered an order appointing James P. Johnstone to represent Loden. . . . Subsequently, the circuit court entered an order appointing David Lee Daniels as additional counsel for Loden.
>
> . . .
>
> Loden filed a number of pretrial motions, including: . . . "Motion for Appointment of Investigator for the Defense"; "Motion for Psychiatric Examination"; "Ex Parte Motion for Funds for Expert Assistance in the Field of Mitigation Investigation" . . . .
>
> . . .
>
> Loden's "Motion for Appointment of Investigator for the Defense" . . . proposed Herb Wells as a qualified investigator.  The circuit court entered an

---

[2]In Loden's first PCR petition it was alleged that "erroneous advice of trial counsel prejudiced Loden by causing him to enter an involuntary guilty plea to capital murder." *Loden*, 971 So. 2d at 562.

order "authoriz[ing] the appointment of Herb Wells, as the Criminal Defense Investigator." Loden later filed a "Motion for Additional Funds for Investigator for the Defense." The circuit court likewise granted that motion. Loden then filed a nearly identical motion styled "Ex Parte Motion for Funds for Expert Assistance in the Field of Mitigation Investigation" [which] . . . proposed Dr. Gary Mooers as a mitigation specialist. . . . Prior to ruling, the circuit court noted that "I have already authorized your employing an investigator." . . . An order denying Loden's motion was entered by the circuit court.

Loden's "Motion for Psychiatric Examination" . . . pleaded that it was "necessary for the State to examine the capacity of [Loden] at the Mississippi State Hospital at Whitfield in order to properly try this cause." The circuit court found that "[a] psychological evaluation will be required by the [c]ourt at the Mississippi State Hospital." An order granting Loden's request was [entered] by the circuit court.

Later, Loden filed an "Ex Parte Motion for Funds to Secure Expert Assistance in the Field of Psychology." . . . Once more, the circuit court entered an order granting Loden the relief sought and making funds available for a psychological evaluation to be performed by Dr. C. Gerald O'Brien.

. . .

In August 2001, Loden wrote a letter to Johnstone and requested that Johnstone:

> make the motion for a re-visit of the original warrant. I'd like that at least for the record. Would you do your best at trying to convince the judge to hear this. Then immediately following his ruling on that, *if against, I'd like to speak to you of the appeal process, and go ahead and enter a plead* [sic].

(Emphasis added). Regarding the appeal process, Loden asked "(1) *I'm fairly confident I'd get the death penalty, but how does 'appeal' work either way?* (2) In your professional judgment, do I have good grounds for an appeal?" (Emphasis added).

After a forensic mental evaluation of Loden, the Mississippi State Hospital unanimously found that Loden:

> has the sufficient present ability to consult with his attorney with [a] reasonable degree of rational understanding in the

4

> preparation of his defense, and that he has a rational as well as factual understanding of the nature and object of the legal proceedings against him.
>
> We are unanimous in our opinion that [Loden] would have known the nature and quality of his alleged acts at the time of the alleged offense, and that he would have known at that time that those alleged acts would be wrong.
>
> *We are unanimous in our opinion that [Loden] has the capacity knowingly, intelligently, and voluntarily to waive or assert his constitutional rights.*
>
> We are unanimous in our opinion that [Loden] was not experiencing extreme mental or emotional disturbance at the time of the alleged offenses, and that *his capacity to appreciate the criminality of his alleged conduct, or to conform his conduct to the requirements of the law was not substantially impaired at that time.*

(Emphasis added). The report concluded that factors such as Loden's alleged physical and sexual abuse as a child, combat-related trauma, and job and life-related stresses at the time of the crimes did not "rise to the level of exculpation or even of statutory mitigation."

Loden's expert, Dr. O'Brien, opined that Loden was of average to above-average intelligence and, after extensively reviewing Loden's background, concluded that:

> . . . at the time of the incident with which he is charged, *[Loden] was under the influence of extreme mental and emotional disturbance and distress, although this probably did not rise to the level that he did not know the nature and quality of his acts or the difference between right and wrong in relation to those acts at that time. . . . He appears at the present time to be competent to stand trial and assist in his own defense.*

(Emphasis added). Significant to the issue raised in Loden's post-conviction relief appeal, Dr. O'Brien's report reveals the mindset of Loden within thirty days before his pleas of guilty, stating, in part, that:

> [Loden] makes a point of telling me "I don't want life," in prison, and that he would like to plead so that he will receive the

5

death penalty. This is not only because of his regret about the crime, but also because "I don't want to see my wife lie on the stand," referring to statements she has made which do not match up with his recollection of events and also because he has diminishing confidence in his lawyers' handling of his case.

Faced with a mountain of evidence (of Himalayan proportions) sufficient to overwhelmingly prove his guilt, on September 21, 2001, Loden expressly waived his right to a jury at trial and in sentencing, and pleaded guilty to all six counts in the indictment. The circuit court accepted the pleas and adjudged Loden guilty on each count. Prior to pleading guilty, Loden responded to a series of direct and simple questions from the court, reflecting a full understanding of the proceedings and a voluntariness to willingly enter his plea, including:

. . .

Q. . . . Do you understand that as to each of the charges . . . if you proceeded to trial before a jury and if the jury found you guilty of those charges and returned a verdict fixing the penalty at whatever they might fix it, in any event, the question of your guilt or innocence or imposition of the punishment determined by the jury *would be something that you could appeal to the Supreme Court of this state*?

A. *Yes*, sir, I understand.

Q. *Do you understand that by waiving a jury for the trial of this case and for the imposition or determination of an appropriate sentence to be imposed by this Court, you are giving up or waiving a valuable right?*

A. *Yes*, sir, I am.

. . .

Q. *Do you understand that if you proceed through the course of this and the Court makes a determination of your guilt, you will have no right to appeal that?* . . .

A. *Yes*, sir.

. . .

6

> Q. Mr. Loden, do you understand that on your plea of guilty to the charge of capital murder in Count I . . . the maximum penalty which this Court might impose would be death . . . ?
>
> A. Yes, sir, I understand that.
>
> . . .
>
> Q. Do you understand that on your plea of guilty to capital murder and the other charges in this indictment it is possible that I will, acting pursuant to the waiver, impose the death penalty in this case? Do you understand that?
>
> A. I understand that fully, sir.

(Emphasis added).[3] . . . [A]fter the State recommended that Loden receive the death penalty, Loden acknowledged that he was aware the State would make that recommendation.

In the subsequent sentencing hearing, Loden testified under oath:

> Q. *Are you satisfied with the legal services and the advice given you by your attorneys*?
>
> A. *Yes*, I am, sir.
>
> Q. Do you think that they have properly advised you concerning your constitutional rights, your legal rights, and properly advised you before pleading guilty to these charges?
>
> A. Yes, sir, I do.

(Emphasis added). Consistent with Loden's stated desire to Dr. O'Brien to concede guilt and accept the death penalty, *supra*, Johnstone advised the court that "[w]e have conferred with our client Mr. Loden . . . and he's advised us that he does not want us to cross-examine witnesses or object to the introduction of any exhibits that are being introduced through these witnesses

---

[3]"Additionally, Johnstone and Daniels testified that, in their respective opinions, Loden understood the nature of the proceedings and desired to enter guilty pleas to the charges." ***Loden***, 971 So. 2d at 556 n.6.

7

that the State intends to call." Furthermore, Loden's other attorney Daniels informed the Court that Loden "has elected to and instructed us that he desires to waive presentation of . . . mitigation evidence for reasons I feel he will explain to the Court when given an opportunity to make a statement."[4] According to Loden, "I'm just doing what I feel I need to do."

. . .

After having instructed counsel not to speak on his behalf, Loden asked to make a statement to the court, which was granted. Loden proceeded to apologize to the friends and family of [Gray] and admitted responsibility and culpability for "tak[ing] an irreplaceable element out of your world. . . . I hope you may have some sense of justice when you leave here today."

. . .

The sentencing order reveals that the learned trial judge:

> conducted an extensive, on the record, examination of the Defendant for the purpose of determining whether or not the pleas of guilty offered by him were to be entered by him knowingly, freely, understandingly, and voluntarily. The Court further made specific inquiry concerning the Defendant's understanding of his rights under the Constitution of the United States and the State of Mississippi and his right to have a jury hear the evidence offered by the State of Mississippi and himself on the issue of guilt or innocence on each of the charges against him and to decide those issues. The Court further examined Defendant concerning his understanding of his right to have a

---

[4] "Nonetheless, Daniels made a brief statement summarizing the mitigation evidence which would have been offered absent Loden's instruction otherwise. According to Daniels:

> through our investigation and our clinical psychologist's expert that's been appointed by the Court we've been able to develop that Mr. Loden has a childhood history of extreme sexual child abuse himself; that in spite of that he was an exemplary student, that he entered the marine corps, that he served in the United States Marines with distinction for eighteen years, that he attained the rank of E-7, that he was highly decorated and a combat veteran in Desert Storm. He has no criminal history prior to today."

*Loden*, 971 So. 2d at 557 n.8.

8

jury fix the punishment imposed (i.e. death, life without parole or life imprisonment) in the event he was found guilty of [c]apital [m]urder by a jury.

The circuit court further stated that it:

does hereby find that each of *the pleas of guilty entered by Defendant were knowingly, freely, understandingly and voluntarily made . . . and that the Defendant was fully advised by his attorneys and the Court of his [c]onstitutional and statutory rights with regards to each charge and more specifically with reference to the sentence to be imposed . . . .*

(Emphasis added). In imposing the sentence on the capital murder count, the circuit court:

considered all of the evidence previously introduced in the proceedings on entry of Defendants['] pleas of guilty, and the additional proof offered including photographs introduced by the State, a video tape recovered from the vehicle of the Defendant introduced by the State, the psychiatric reports of [Dr.] McMichael and members of the [s]taff at Mississippi State Hospital, and [Dr.] O'Brien, a clinical psychologist and forensic consultant who examined the Defendant at the request of the Defendant's attorney.

Finding each factor required by Mississippi Code Annotated Section 99-19-101(7) was satisfied, the circuit court considered whether sufficient aggravating circumstances existed . . . . Thereafter:

[t]he Court having considered and weighed the aggravating and mitigating circumstances *finds that the aggravating circumstances outweigh the mitigating circumstances and that the mitigating circumstances do not outweigh the aggravating circumstances and that the death penalty should be imposed.*

(Emphasis added).

. . .

In February 2002, Loden, then represented by Daniels, filed notice of appeal. A month later, Loden personally sent a letter to Circuit Judge [Thomas J.] Gardner[, III] stating "I'd just like the opportunity to assist myself and review

9

any motions before the court." Included with the letter was a pro se "Motion for Discovery of Evidence Presented to the Grand Jury[,]" which "may be needed for a pending motion, and certainly needed for appellate review."

Subsequently, the Office of Capital Defense Counsel assumed Loden's representation[5] and filed a "Motion to Vacate Guilty Plea and Incorporated Memorandum of Law" arguing that Loden's plea was involuntary because his "decision to plead guilty was based on inaccurate legal advice given by his trial attorneys."[6] Loden then claimed that his pre-plea August 2001 letter to Johnstone was indicative that he "[was] clearly interested in the appeal process and wants to appeal ruling in his case." Furthermore, he asserted that his March 2002 letter to Circuit Judge Gardner "specifically stated that the discovery will be needed for 'appellate review.'" Loden disingenuously complained that his guilty plea was made in reliance upon "trial counsel's erroneous advice that he could still appeal adverse rulings on pre-trial motions after entering the guilty plea." . . . Loden attached an affidavit asserting:

> 3. Prior to my decision to plead guilty, I discussed this decision with my attorneys, [Johnstone] and [Daniels]. [Johnstone] and [Daniels] advised me that by pleading guilty, I waived certain rights. [Johnstone] and [Daniels] also told me that if I received a sentence of death that the case would be subject to automatic

---

[5]Daniels withdrew as counsel for Loden when he accepted a position as an assistant district attorney.

[6]Some procedural background is helpful in the case *sub judice*. When Loden pleaded guilty in 2001, Mississippi Rule of Appellate Procedure 22(b) stated:

> [i]ssues which may be raised in post-conviction proceedings may also be raised on direct appeal. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.

Miss. R. App. P. 22(b) (2001). Effective February 10, 2005, the first sentence of Rule 22(b) was amended to state that "[i]ssues which may be raised in post-conviction proceedings may also be raised on direct appeal *if such issues are based on facts fully apparent from the record*." Miss. R. App. P. 22(b) (emphasis added). To ensure that Loden's claim was preserved under the old Rule 22(b), Andre De Gruy, Loden's new counsel, filed the petition for post-conviction relief "rais[ing] a challenge to the erroneous advice that trial counsel gave to [Loden]." This petition was filed in the circuit court, which had jurisdiction because of Loden's guilty plea.

review by the Mississippi Supreme Court. It was *my* understanding that I could appeal my case.

4. Prior to pleading guilty, I was very concerned about several pretrial motions and the decisions made on these motions. It was *my* understanding that I could appeal these decisions and raise these issues again.

5. I would not have plead guilty if I had known that I could not raise these issues in an appeal.

(Emphasis added).[7]

. . .

The circuit court held a hearing on Loden's "Motion to Vacate Guilty Plea." On direct examination, Loden testified as follows:

. . .

Q. Did you ever discuss with your attorneys appealing those rulings?

A. . . . I can't say a appeal in that sense of the word. After that meeting that I had with [Johnstone] when I thought that they could have done a better job, we sat down and *he said that as long as everything was in the record it would automatically be reviewed.* That's when [Daniels] told me that death penalty cases get looked at closer and it might be better . . . if I did get

_____

[7]An affidavit of Johnstone was also filed which provided:

4. Prior to [Loden's] entry of the guilty plea, *[Daniels] and I advised [Loden] that by pleading guilty he was waiving his right to direct appeal.* I also informed him that if he received a sentence of death that the case would be subject to an automatic review by the Mississippi Supreme Court.

5. I told [Loden] that this *automatic review would be some sort of appeal but that [it] was unclear to us which issues would be subject to review.*

(Emphasis added). ***Loden***, 971 So. 2d at 560 n.12.

11

the death penalty in order to get the better closer look and review.

. . .

A. . . . What I got told was the Supreme Court gets it, death penalty cases are looked at closer. We had stuff in the record, and the Supreme Court could rule off the record and grant a new trial . . . .

. . .

Q. *Did they ever tell you that if you pled guilty the only thing that would be reviewed by the Supreme Court was the sentence?*

A. *No,* definitively not.

. . .

Q. If you have been told that the only thing that would be reviewed was your sentence, *would you have pled guilty?*

A. *No.*

(Emphasis added).

On cross-examination, however, Loden clearly admitted that on September 21, 2001, *he freely and voluntarily waived his right to a jury at trial and in sentencing, pleaded guilty, and desired the death penalty for the sake of both [Gray's] family and his own family.* Furthermore, Loden clearly admitted that he stated in open court that he understood he would not be able to appeal his guilty pleas, but "fall[s] back to what Johnstone told [him], as long as it was in the record [he] didn't need an appeal, it was going to get looked at anyway."

. . .

The "Order and Opinion" of the circuit court filed on February 2, 2006, dismissed Loden's motion for post-conviction relief. The circuit court found that:

[Loden] was informed in his lengthy guilty plea hearing of the important constitutional rights that he was waiving by entering a plea of guilty . . . . In addition, [Loden] stated under oath at

12

the plea hearing that he had been fully advised of all aspects of
his case by his counsel, including the nature and elements of the
charge. Subsequently, at the guilty plea hearing, the Court
advised [Loden] of the charges against him and asked him if he
understood that charge, to which he replied in the affirmative. .
. . *The Court fully advised [Loden] that he was waiving his
right to appeal. The Court then found that [Loden] had entered
a knowing and voluntary plea.*

(Emphasis added).

Loden filed a notice of appeal on dismissal of his motion for post-conviction
relief. This Court entered an order consolidating this appeal with his earlier-
filed direct appeal.

*Loden*, 971 So. 2d at 552-61 (emphasis in original).

¶5.     The issues considered by this Court in that consolidated appeal were:

(1) Whether Loden was improperly denied funds to retain the assistance of a
forensic social worker to investigate and present relevant mitigating factors.
(2) Whether the indictment charged a death-penalty eligible offense.
(3) Whether the trial court erred in weighing the "avoiding arrest" aggravating
circumstance.
(4) Whether the submission of the Mississippi Code Annotated Section 99-19-
101(5)(d) aggravating circumstance violated the state and federal constitutions.
(5) Whether the trial court erred in considering both the Mississippi Code
Annotated Section 99-19-101(5)(d) aggravating circumstance and the
"especially heinous, atrocious or cruel" aggravating circumstance.
(6) Whether the statutorily-mandated proportionality review of Mississippi
Code Annotated Section 99-19-105(3) was satisfied.
. . .
(7) Whether alleged erroneous advice of trial counsel prejudiced Loden by
causing him to enter an involuntary guilty plea to capital murder.

*Id*. at 561-62. This Court "affirm[ed] the conviction and death sentence imposed by the

[circuit court], and subsequent denial of post-conviction relief." *Id*. at 575.

¶6.     Regarding the voluntariness of Loden's guilty plea, this Court concluded:

[t]he record clearly reflects that Judge Gardner expressly informed Loden of
the charges against him; the consequences of his guilty plea, including the

13

minimum and maximum penalties in sentencing; and the implications of waiving his right to trial by jury, right to confront adverse witnesses, and right to protection against self-incrimination. Furthermore, Loden affirmatively stated under oath that his guilty pleas were "free and voluntary." Thereafter, Loden pleaded guilty to all charges. As such, this Court finds that the circuit court was not "clearly erroneous" in finding that Loden's guilty plea was "knowing and voluntary." [*Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999)].

*Loden*, 971 So. 2d at 573. As to ineffective assistance of counsel, this Court did not address

the prejudice prong, concluding:

[t]he lower court rejected Loden's pretext and found no deficiency in counsel before Loden pleaded guilty and waived his right to appeal. This Court, accepting all evidence reasonably supporting that finding and the reasonable inferences therefrom,[8] *see* [*Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987)], finds no support for the proposition that the circuit court's conclusion that counsel's performance was not deficient was "clearly erroneous." *Brown*, 731 So. 2d at 598. This issue is without merit.

*Loden*, 971 So. 2d at 574.

¶7.     On January 17, 2008, this Court denied Loden's "Motion for Rehearing." On April

16, 2008, Loden filed a "Petition for Writ of Certiorari" with the United States Supreme

Court and presented the following issues:

(1) Are the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States violated where counsel erroneously advises a capital defendant that he can appeal a guilty plea if he is sentenced to death and the defendant enters a guilty plea based on that erroneous advice?

(2) Are the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States violated where a state court denied an indigent capital defendant funds to retain a forensic social worker to investigate mitigating factors?

---

[8]"For instance, a reasonable inference regarding Johnstone's affidavit on automatic review is that he was simply advising Loden to get all matters on the record because, while he was uncertain which specific issues this Court would address, he was certain that this Court would only address issues of record." *Loden*, 971 So. 2d at 574 n.20.

14

On October 6, 2008, the United States Supreme Court denied Loden's petition. *See Loden*,

129 S. Ct. at 45. Loden now proceeds before this Court with his second Petition for Post-

Conviction Relief.[9]

¶8.     This Court will consider the following grounds for post-conviction relief raised by

Loden:

> (1) Loden was denied his constitutional right to effective assistance of counsel
> guaranteed by the United States and Mississippi Constitutions.
> (2) Apart from the ineffectiveness of Loden's counsel, his guilty plea was not
> knowing, voluntary or intelligent.
> (3) Loden was denied effective assistance of appellate counsel.
> (4) The State's use of the expert psychiatric report from Dr. McMichael
> violates the Eighth Amendment's reliability requirement, the Sixth
> Amendment's confrontation clause, and due process.
> (5) Loden's waiver of jury for sentencing was not voluntary, knowing and
> intelligent.
> (6) Loden has been denied his Fourteenth Amendment due process right to
> fully develop and present the evidence in his case.

## STANDARD OF REVIEW

¶9.     The purpose of the Mississippi Uniform Post-Conviction Collateral Relief Act "is to

provide prisoners with a procedure, *limited in nature*, to review those objections, defenses,

claims, questions, issues or errors *which in practical reality could not be or should not have*

*been raised at trial or on direct appeal*." Miss. Code Ann. § 99-39-3(2) (Rev. 2007)

(emphasis added). Mississippi Code Section 99-39-27(5) provides that:

> [u]nless it appears from the face of the application, motion, exhibits and the
> prior record that the claims presented by those documents are *not procedurally*
> *barred* under Section 99-39-21[[10]] *and that they further present a substantial*

---

[9]*See* footnote 2, *supra*.

[10]Mississippi Code Section 99-39-21 provides that:

*showing of the denial of a state or federal right*, the court shall by appropriate order *deny* the application.

Miss. Code Ann. § 99-39-27(5) (Rev. 2007) (emphasis added). *See also* Miss. Code Ann.

§ 99-39-23(7) ("[n]o relief shall be granted under this article unless the petitioner proves by

a *preponderance of the evidence* that he is entitled to the relief") (emphasis added).

¶10.    Mississippi Code Section 99-39-27(7) states that:

---

(1) Failure by a prisoner to raise . . . *issues* . . . *either in fact or law which were capable of determination at trial and/or on direct appeal*, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a *waiver* thereof and shall be *procedurally barred*, but the court *may* upon a showing of cause *and* actual prejudice grant relief from the waiver.

(2) The *litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue*; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be *procedurally barred* absent a showing of cause *and* actual prejudice.

(3) The doctrine of *res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.*

(4) The term "*cause*" as used in this section shall be defined and limited to those cases where the *legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal.*

(5) The term "*actual prejudice*" as used in this section shall be defined and limited to those *errors which would have actually adversely affected the ultimate outcome of the conviction or sentence.*

(6) The *burden is upon the prisoner* to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section.

Miss. Code Ann. § 99-39-21 (Rev. 2007) (emphasis added).

16

the court, in its discretion, may:

(a) Where sufficient facts exist from the face of the application, motion, exhibits, the prior record and the state's response, together with any exhibits submitted with those documents, or upon stipulation of the parties, grant or deny any or all relief requested in the attached motion.

(b) Allow the filing of the motion in the trial court for further proceedings under Sections 99-39-13 through 99-39-23.[[11]]

Miss. Code Ann. § 99-39-27(7) (Rev. 2007).

## ANALYSIS

### I. Loden was denied his constitutional right to effective assistance of counsel guaranteed by the United States and Mississippi Constitutions.

¶11. Loden was represented at trial by Johnstone and Daniels. Prior to representing Loden, Johnstone had been a part-time public defender since 1994 and had represented defendants in two prior capital-murder cases, one of which resulted in a verdict of life without parole. Prior to representing Loden, Daniels had been a public defender since 1996 and had represented defendants in two prior capital-murder cases, one of which resulted in a directed verdict of acquittal. Regarding the representation of defendants in capital cases, Daniels stated "[i]t's what I did."

¶12. According to Daniels, as the trial date approached, the State made no plea offers to Loden, as "it was a situation where he was either going to have to plead guilty to the indictment in its entirety or go to trial on the indictment."[12] Daniels stated that:

---

[11]"[A] post-conviction collateral relief petition which meets basic requirements is sufficient to mandate an evidentiary hearing unless it appears beyond doubt that the petitioner can prove no set of facts in support of his claim which would entitle him to relief." *Marshall v. State*, 680 So. 2d 794, 794 (Miss. 1996).

[12]As Daniels stated, Loden "was up against it evidentiary wise."

> probably latter part of August, maybe end of September . . . [Loden] said before that . . . he didn't want the case to go to trial. We had prevailed upon him that we needed to prepare for trial and that we needed to try and get this case in the . . . most favorable posture we could. That's the reason we were filing these motions, but at some point he said, I'm not going to trial, I'm not going to. He didn't want to plead but he didn't want to go to trial.

Nonetheless, Daniels and Johnstone continued to prepare for trial.[13] Thereafter, according to Johnstone, "Loden came to us and . . . indicated that he didn't want to proceed anymore, *he wanted to plead guilty, he didn't want to put the family through a trial.*"[14] (Emphasis added.)

¶13. On September 21, 2001, seventeen days before the scheduled trial date of October 8, 2001, Loden formally waived his right to a jury at trial and in sentencing; pleaded guilty to all six counts in the indictment; waived presentation of mitigation evidence in sentencing, as well as any cross-examination of the State's witnesses[15] or objection to the introduction of evidence presented by the State;[16] admitted responsibility and culpability to the victim's family for "taking an irreplaceable element out of your world;" and made a brief statement

---

[13]According to Daniels, "I was going to be prepared for trial no matter what[,]" and "I wasn't going to wait for him to make up his mind."

[14]This comports with Dr. O'Brien's report which "reveals the mindset of Loden within thirty days before his pleas of guilty, stating, in part, that: ['][Loden] makes a point of telling me 'I don't want life,' in prison, and that he would like to plead so that he will receive the death penalty.[']" *Loden*, 971 So. 2d at 555.

[15]According to Johnstone, Loden was "[v]ery firm" and "adamant" in his request for no cross-examination of the State's witnesses and no presentation of mitigation evidence at sentencing.

[16]The evidence presented at sentencing included a summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital and the report of Loden's independent psychologist, Dr. O'Brien.

of apology.[17] Notwithstanding Loden's waiver, Daniels made a brief statement summarizing the mitigation evidence which would have been offered on behalf of Loden.[18] *See* footnote 4, *supra*. The circuit court subsequently found "that the aggravating circumstances outweigh the mitigating circumstances and that the mitigating circumstances do not outweigh the aggravating circumstances and that the death penalty should be imposed."

¶14.   Loden now claims that his trial counsel's "failure to perform any mitigation investigation, to litigate pre-trial motions competently, to assist the independent psychologist in his evaluation of Loden, to advise Loden competently regarding his guilty plea and sentencing, and to present any mitigation evidence resulted in a denial of Loden's Sixth Amendment right to competent counsel."

¶15.   This Court has stated that:

> [u]nder ***Strickland***[[19]] . . . the Court makes a *two-pronged inquiry*; *first*, a defendant must show that counsel's performance was *deficient* by identifying specific acts and omissions. *Counsel's conduct, viewed as of the time of the actions taken, must have fallen outside of a wide range of reasonable professional assistance.*[[20]] The *attorney's actions are strongly presumed to have fallen within that range*, and a court must examine counsel's conduct

---

[17]For details of the proceedings, *see* paragraph 4, *supra* (quoting ***Loden***, 971 So. 2d at 552-61).

[18]According to Daniels, "I wanted the [c]ourt to know . . . that there was some evidence that could be put on but that [Loden] elected not to do it[,]" and "I was hoping to impress the [j]udge with . . . some of the good things Loden had done and some of the bad things that may have prompted him doing what he did."

[19]*See* ***Strickland v. Washington***, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[20]"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." ***Strickland***, 466 U.S. at 688.

19

without the use of judicial hindsight.[21] *Secondly*, a defendant must show that the *deficient performance was prejudicial*, that is, that there is *a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.* A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Wiley v. State*, 517 So. 2d 1373, 1378 (Miss. 1987) (emphasis added).

> **(A) Trial counsel provided ineffective assistance by failing to investigate and present available mitigation evidence.**

¶16. Loden argues that:

> [t]he State attempts to blur an important distinction between Daniels and Johnstone's failure to *present* mitigation evidence at the sentencing hearing, and their failure to *investigate* mitigation evidence before the hearing. Defense counsel cannot "latch-on" to a client's instruction not to present mitigation evidence to justify their prior failure to investigate mitigating evidence.

(Emphasis in original.) We recognize that there is a distinction between the investigation and the presentation of mitigation evidence. *See Wood v. Quarterman*, 491 F.3d 196, 203 n.7 (5th Cir. 2007). However, this Court previously has found no ineffective assistance of counsel with respect to either the investigation *or* the presentation of mitigation evidence when counsel is specifically instructed not to present mitigation evidence. *See Bishop v. State*, 882 So. 2d 135, 143-46 (Miss. 2004).

¶17. In *Bishop*, the defendant expressly declined to offer any mitigating facts or circumstances in sentencing. *See id.* at 143-44. After being sentenced to death, Bishop argued on appeal that "there was an abundance of relevant, significant mitigating evidence

---

[21] A "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Byrom v. State*, 927 So. 2d 709, 714 (Miss. 2006) (quoting *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)).

which could have been obtained from his family members, but his counsel failed to interview them." *Id*. at 143. Regarding the *presentation* of mitigating evidence, this Court held that:

> Bishop has included the affidavits of his mother, other family members, and his ex-wife to support his argument. However, *the quantity and quality of possible mitigation evidence is irrelevant based on Bishop's instructions to his defense attorneys. Bishop's counsel did all that they could, within the limitations placed on them by Bishop. Witnesses were not called, and mitigation evidence was not presented pursuant to Bishop's specific instructions. Because defense counsel acted in accord with Bishop's instructions, their performance was not deficient.*

*Id*. at 144-45 (emphasis added). *See also Wood*, 491 F.3d at 203 ("[n]either the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence. In fact, this court has held on several occasions that a defendant cannot instruct his counsel not to present evidence at trial and then later claim that his lawyer performed deficiently by following those instructions."); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000); *Clark v. Johnson*, 227 F.3d 273, 283-84 (5th Cir. 2000). As to the *investigation* of mitigating evidence, this Court concluded that:

> Bishop "has not submitted sufficient evidence of a breach of the duty of counsel to investigate and present mitigation evidence as described by the United States Supreme Court in *Wiggins v. Smith*[, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)]." *Simmons v. State*, 869 So. 2d 995, 1004 (Miss. 2004). *Finally, even if additional mitigation evidence had been discovered, pursuant to Bishop's instructions, it could not be presented during the sentencing phase of the trial. Bishop cannot show that counsels' performance was deficient or that such deficiency prejudiced him.*

*Bishop*, 882 So. 2d at 146 (emphasis added). *See also Schriro v. Landrigan*, 550 U.S. 465, 478, 127 S. Ct. 1933, 1942, 167 L. Ed. 2d 836 (2007) ("[I]t was not objectively unreasonable for [the Arizona postconviction court] to conclude that a defendant who refused to allow the

presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.").

¶18.    As Loden waived presentation of mitigation evidence in sentencing, "defense counsel act[ing] in accord with Loden's instructions . . . was not deficient." *Bishop*, 882 So. 2d at 145. Likewise, Loden's investigation argument is without merit because "even if additional mitigation evidence had been discovered, pursuant to [Loden's] instructions, it could not be presented during the sentencing phase of the trial." *Id*. at 146. As such, Loden "cannot show that counsel's performance was deficient or that such deficiency prejudiced[22] him." *Id*. Accordingly, Loden fails to prove that he is entitled to any relief on this issue. However, even assuming *arguendo* that Loden's instruction not to present mitigating evidence is not case-dispositive for purposes of defense counsel's prior mitigation investigation, this Court further concludes that such mitigation investigation was not deficient.

¶19.    According to Loden's 2008 affidavit:

> [i]f my attorneys had conducted a thorough mitigation investigation and properly advised me about the mitigation case that could be presented, I would have instructed them to present mitigation evidence on my behalf.

> Had I been properly advised, I would have also instructed my attorneys to contact and ask my friends, family and military colleagues to testify on my behalf in the course of a mitigation presentation.

---

[22]With respect to mitigation evidence, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

By contrast, Daniels's 2003 affidavit states that "I conducted extensive investigation into the facts of the case, and into mitigation factors, which included interviews with my client, military personnel, his family and friends."

¶20.    In his present petition, Loden places great weight upon statements from Johnstone's 2008 affidavit.[23] That affidavit provides that after the circuit court's ruling on the "Ex Parte Motion for Funds for Expert Assistance in the Field of Mitigation Investigation," Johnstone "did not personally interview any mitigation witnesses, and . . . did not personally conduct a 'mitigation' investigation." Johnstone's affidavit further states that on September 19, 2001, *"we did not have a mitigation case to present because there had not been any mitigation investigation."*[24]  (Emphasis added.)  In response to Johnstone's 2008 affidavit,[25] Daniels filed a 2009 affidavit providing that:

> [r]egarding mitigation, our Motion for Funds to Hire a Mitigation Expert was denied by the [c]ourt, I believe, in lieu of our psychological expert.  However,

---

[23]This affidavit initially was prepared by Loden's present counsel, Mark R. McDonald.

[24]Subsequently, both Johnstone and Daniels expounded on the content of the affidavit. According to Johnstone, "I think the true meaning would have been *I did not do any mitigation . . . , Daniels was pretty much in charge of that*[;]" that "Daniels certainly could have talked to . . . people that I do not recall that he discussed with me[;]" and that "[e]ssentially *what I was talking about was an expert to testify in the field of mitigation* and . . . the real meaning of that statement is that in my opinion . . . the expert . . . was needed to flush out that mitigation . . . . *Certainly we had some evidence.*" (Emphasis added.) Daniels stated, "I'm guessing probably what [Johnstone] meant was that *there was no formal mitigation investigation done.* We requested a mitigation expert . . . that was denied by the [c]ourt, and so in that sense there was no formal mitigation presentation prepared." (Emphasis added.)

[25]According to Daniels, Johnstone "said there was no mitigation investigation done, . . . and I didn't feel like that was entirely correct.  And I didn't want the Court to be misled."

23

I personally interviewed [Loden's] mother and his sister regarding possible mitigation should we have needed it.

I also spoke personally with a Marine liason officer who traveled to my office in Tupelo, Mississippi to talk with me about [Loden's] military situation and background.

It was my opinion that *evidence of [Loden's] traumatic early childhood and his good military background would not have been insubstantial if offered in mitigation. However, [Loden] elected not to go to trial, and not to put on any mitigation evidence.*

(Emphasis added.)

¶21. Johnstone's 2008 affidavit states that:

I first met with Loden on July 6, 2000 for about one to one and a half hours . . . . [D]uring that initial meeting Loden told me that . . . he had been a Marine since 1982 and had performed well with many promotions over the years; he had been married twice before, but both those marriages ended because both wives had been unfaithful; . . . he fought in "Operation Desert Storm" from August 1990 to April 1991 where he was "first in and last out;" he saw a friend of his burned to death and couldn't do anything about it; . . . he was transferred in about 1995 to Virginia to serve as an instructor in the Marine Corps FAST ("Fleet Anti Terrorism Security Team") which Loden described as a prestigious and high pressure assignment; and more recently, he had been assigned to recruiting in Vicksburg, Mississippi, which also imposed pressures on Loden to make his recruiting goals every month. Loden told me that his parents were divorced when he was two; his mother thereafter abandoned him; his stepmother abused him as a boy; he had been sexually abused at church at a young age; he had been exposed to pornography at a young age; he was shuffled back and forth between his mother and father while growing up; his sister had attempted suicide as an adolescent; Loden himself had attempted suicide several times; and his father died when he was 16. Regarding the night of Ms. Gray's death, Loden told me that he had spoken to his wife that evening via cell phone, and that he had been drinking.

According to Johnstone, this initial interview gave him "a lot of leads to work with," and he subsequently shared this information with Daniels. Thereafter, however, while Loden did not expressly discourage mitigation investigation, he was reluctant to discuss either the

24

underlying facts of the case, the development of mitigation evidence (e.g., the alleged incident of sexual abuse), or the prospect of testifying.

¶22.    According to Daniels, court-appointed criminal defense investigator Herb Wells assisted him in the mitigation investigation.[26]  Daniels also gathered mitigation evidence regarding Loden's childhood, family background, claim of past sexual abuse,[27] military experience, and the possibility of psychological issues arising from that military experience,[28] through interviews with Loden's mother, grandmother, sister, and aunt.[29]  Daniels states that he intended to subpoena each of these individuals as witnesses if the matter had proceeded to trial.[30]  Furthermore, Daniels spoke with Loden and Major Gregory L. Chaney, a Marine liason officer, about Loden's "exemplary military service."  During his conversation with Major Chaney, Daniels "may have talked to him about the possibility of him testifying . . . ."  Additionally, Daniels states that "some of the mitigating evidence came by way of just a general talking to witnesses and people that knew anything about [Loden] or anything about

---

[26]Daniels stated that the investigation performed by Wells "was inclusive" of mitigation investigation.

[27]No one was able to provide Daniels with the name of the alleged offending individual.

[28]Regarding additional investigation into post-traumatic stress disorder, Daniels stated that Loden "said there aren't any records of . . . my seeking psychological help or anything else as the result of his Gulf War experiences.  So I mean, I took him at his word."

[29]However, Loden's mother and sister now maintain that they never had discussed such mitigation evidence with Daniels.

[30]Loden responds that "[a]t the time of [the] plea, trial was about three weeks away.  Daniels' claim that he would have subpoenaed witnesses if Loden had not pleaded guilty is not credible or competent."

the case." In Daniels's estimation, "Loden would be the best mitigation witness we had because he could relate his experiences in the military, his experience [of] traumatic sexual abuse as a small child, and his mother and sister could testify to those facts as well."

¶23. Loden now argues that:

> [i]f a lawyer does not conduct an adequate investigation into all potentially available areas of mitigation evidence that can be presented in the penalty phase, he will not have sufficient information to make informed decisions about trial strategy or how to advise his client; nor will the client have sufficient information "to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued."

*See* Miss. R. Prof'l Conduct 1.4 cmt. Loden now offers that if defense counsel had conducted an adequate investigation:

> the [c]ircuit [j]udge or the jury would have heard that (1) Loden was suffering from Complex Post Traumatic Stress Disorder . . . and Disassociative Disorder; (2) his childhood was characterized by abandonment, instability and ongoing physical and sexual abuse; (3) on the night of the crime, Loden's wife had tormented Loden by boasting about her plans to sleep with a successful and well known attorney and law partner at the firm where she worked as a legal assistant; (4) he had a long history of depression and suicide attempts; (5) he had suffered further trauma during his service in the Marines, including his combat experience in the Gulf War; (6) he was heavily intoxicated at the time of the crime; and (7) despite all these hardships, Loden was a loving and caring grandson and father, had an exemplary military career, was a highly decorated veteran, and served as a mentor to younger Marines.

Loden contends that "but for counsel's complete failure to prepare a mitigation case, Loden would not have been sentenced to death."

¶24. Loden's health and military-history assertions are contradicted by Loden's military records and an affidavit of Major Chaney which states, "[t]he only discussion which [Daniels] and I had concerning [Loden's] service in the United States Marine Corps was my

26

indicating to [Daniels] that I was surprised to see [Loden] charged with this crime because he had had a good record up to that time in the Marine Corps."

¶25.    Regarding Loden's parenting abilities, Daniels stated that he "thought it best, strategically, to leave it alone[,]" as "part of the discovery was a lot of web sites that had been logged on to . . . on Loden's computer. And a lot of them were about incest and having sex with little children and men reciting episodes of sex with their daughters."

¶26.    The State responds that:

> [t]he record shows . . . counsel had investigated the area of mitigation and was ready to present such evidence to the trial court had they been allowed to do so. This recorded colloquy appears to refute the affidavit of [Johnstone] . . . . Perhaps, Johnstone has forgotten what was stated to the trial court in the transcript or perhaps he did not personally do any mitigation investigation. It is clear from the transcript that [Daniels] had done an investigation into mitigation evidence and was ready to produce such evidence. Further, [Daniels] has furnished an affidavit regarding his representation of [Loden]. . . . Counsel was not ineffective because an investigation into mitigation was done. However, . . . this is not a question in this case because [Loden] instructed his attorneys that they were to put no case in mitigation on in his behalf. In addition[,] counsel were instructed they were not to cross-examine any of the state's witnesses or object to any exhibits.

¶27.    Defense counsel had an "obligation to conduct a thorough investigation of the defendant's background." ***Porter v. McCollum***, – U.S. –, 130 S. Ct. 447, 452-53 (Nov. 30, 2009) (quoting ***Williams v. Taylor***, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). However, there is a strong presumption that such investigation was within the "wide range of reasonable professional assistance." ***Wiley***, 517 So. 2d at 1378. Moreover, this assessment "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

from counsel's perspective at the time." *Byrom*, 927 So. 2d at 714 (quoting *Stringer*, 454 So. 2d at 477).

¶28.    Evaluating defense counsel's conduct from their perspective "at the time" is of particular import in the case *sub judice*. *Id*. This is because trial was scheduled for October 8, 2001, seventeen days *after* Loden pleaded guilty on September 21, 2001. No proof has been presented that defense counsel quit preparing for trial prior to Loden's pleading guilty and instructing his attorneys not to prepare for trial or present evidence on his behalf. Daniels testified that he intended to subpoena Loden's mother, grandmother, sister, and aunt as witnesses, had the matter proceeded to trial. Furthermore, the investigation conducted by Daniels up to that point had been significant. *See* paragraph 22, *supra*. Additionally, Wells was engaged in mitigation investigation on behalf of defense counsel, and separate psychiatric examinations of Loden had been conducted by the Mississippi State Hospital and Dr. O'Brien. In sum, the mitigation investigation already conducted by Loden's defense counsel until they were told to stand down, presents a stark contrast to the negligible mitigation investigation efforts by defense counsel in *Wiggins* and *Porter*.

¶29.    *Wiggins* and *Porter* are further distinguishable by the fact that they did not involve defendants who opposed the presentation of mitigation evidence. While Loden cites *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991), as an analogous case in which defense counsel was still found to have engaged in deficient mitigation investigation despite the defendant's instruction not to present mitigating evidence, that case is likewise distinguishable insofar as there was a jury verdict in the guilt phase, no statement by defense counsel of the evidence that would have been presented in mitigation, and no psychiatric examination of the

28

defendant at any point. *See id.* In *Wiggins*, the United States Supreme Court found defense counsel's mitigation investigation to constitute deficient performance, as it was limited to obtaining a presentence investigation report and Department of Social Services records "documenting petitioner's various placements in the State's foster care system." *Wiggins*, 539 U.S. at 523, 533. In *Porter*, defense counsel was for the first time "represent[ing] a defendant during a penalty-phase proceeding. At the postconviction hearing, he testified that he had only one short meeting with Porter regarding the penalty phase. He did not obtain any of Porter's school, medical, or military services records or interview any members of Porter's family." *Porter*, 130 S. Ct. at 453. Finally, the information which Loden asserts should have been presented, *see* paragraph 23, *supra*, is not significantly greater than that which was actually before the circuit judge despite Loden's insistence that no mitigation evidence be presented. Specifically, Daniels's brief summary of the mitigation evidence which would have been presented, *see* footnote 4, *supra*, the summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital, and Dr. O'Brien's report collectively addressed nearly every subject deemed pertinent by Loden. Accordingly, on this basis as well, Loden fails to prove that he is entitled to any relief on this issue.

### *(B) Trial counsel was ineffective in advising Loden to waive jury sentencing.*

¶30. The "Waiver of Jury for Trial and Sentencing" signed by Loden on September 21, 2001, provided that:

> I understand that I am entitled to have a sentencing hearing or proceeding on the Capital Murder Count of the Indictment . . . before a jury empaneled for the purpose of determining the sentence I shall receive, pursuant to Section 99-19-101 of the Mississippi Code of 1972, as amended. *I hereby expressly waive my right to a jury for sentencing in this cause* and hereby agree that [Circuit

29

Judge Gardner] may sentence me in this matter without a jury after a sentencing hearing without a jury pursuant to said Section 99-19-101.

(Emphasis added.)  The "Waiver of Sentencing Jury" signed by Loden on September 21, 2001, stated that "I understand the [c]ourt has the discretion to sentence me to the death penalty . . . ." The sentencing hearing reflects the following colloquy:

> Q.  Once again, *do you understand that you have a constitutional right and a statutory right under the law of the State of Mississippi to have a jury* decide first of all your guilt and innocence on the charge of capital murder and *in phase two to determine the punishment that is to be imposed*?
>
> A.  I understand I had it, and *I understand I waived it* . . . .
>
> . . .
>
> Q.  Do you understand that on your plea of guilty to capital murder and the other charges in this indictment it is possible that I will, acting pursuant to the waiver, impose the death penalty in this case?  Do you understand that?
>
> A.  I understand that fully . . . .

(Emphasis added.)  Finally, the "Sentencing Order" of the circuit court stated that "[t]he [c]ourt . . . examined [Loden] concerning his understanding of his right to have a jury fix the punishment to be imposed . . . in the event he was found guilty of Capital Murder . . . ."

¶31.  Loden argues "it was entirely unreasonable for [defense counsel] to advise Loden to waive jury sentencing . . . in light of Judge Gardner's capital sentencing record."  Loden's argument is dubious, for it lacks credibility when compared to his statements to his mental health expert, Dr. O'Brien, that he preferred death over life and that he would "like to plead so that he will receive the death penalty."  *See* paragraph 4, *supra*.  Now, Loden unpersuasively argues that defense counsel "should have advised [him] that if he . . . waived jury sentencing, he would almost undoubtedly receive a death sentence from Judge Gardner

30

. . . ." Loden now asks this Court to assume that "[i]t is reasonably probable that at least one juror would have concluded that the aggravating factors did not outweigh the mitigating factors if a full portrait of Loden's circumstances [had] been presented."

¶32. The State responds that "this claim is simply an extension and a replay of what [Loden] presented to this Court in the post-conviction appeal regarding the entry of the guilty plea." *See Loden*, 971 So. 2d at 572-74. Specifically, "[t]he circuit court found that petitioner's waiver of the sentencing jury was knowing, intelligent and voluntary. [Loden] has presented nothing to this Court that indicates that [Loden] did not knowingly, intelligently, voluntarily waive the sentencing jury in this case."

¶33. The record is replete with evidence beyond all doubt that Loden knowingly, intelligently, and voluntarily waived jury sentencing. *See* paragraph 30, *supra*. Moreover, in order to prove that the advice given to Loden constituted deficient performance, this Court first would have to determine the nature of that advice. Loden's affidavit fails to provide any details of his discussion with defense counsel regarding the waiver of jury sentencing. Absent the details of such advice, the deficiency thereof cannot be determined. Finally, Loden's statement to Dr. O'Brien, which has not been repudiated, contradicts this claim of error. Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

### (C) Trial counsel provided ineffective assistance of counsel by failing to object [to] and cross-examine witnesses during the sentencing phase and [by] stipulating to the State psychiatric report.

¶34. Loden "adamant[ly]" advised defense counsel that he did not want them to cross-examine witnesses for the State or object to the introduction of evidence presented by the State. As Loden stated, "I'm just doing what I feel I need to do."

31

¶35.   In spite of the clarity of his then-declared position, Loden now argues that the Mississippi State Hospital report contained "a number of biased, disparaging and unsupported allegations[,]"[31] upon which defense counsel had "an obligation . . . to discuss the downside of admission so that Loden could have made a somewhat informed decision." The State responds that "[o]n top of the fact that the [Mississippi State Hospital] examination was conducted at the behest of [Loden], . . . [Loden] instructed counsel not to object to exhibits offered by the State during the sentencing hearing [and] they cannot be held . . . ineffective in doing what he instructed them . . . ."

¶36.   The State's position is in accord with our law.  "Because defense counsel acted in accord with [Loden's] instructions, their performance was not deficient." *Bishop*, 882 So. 2d at 145.  *See also Strickland*, 466 U.S. at 691 ("[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").  Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

---

[31]According to Loden:

> [t]hese include an unsupported and extremely prejudicial allegation attributed to police officers that Loden may have committed prior similar murders in Louisiana and Mississippi, the tainted and unsupported diagnoses of Malingering and Antisocial Personality Disorder, and the attempt by the doctors and the social worker to turn cattle slaughtering on his grandfather's farm into sadistic abuse of animals.

We note that the record does not reveal that the circuit judge was ever presented with the full Mississippi State Hospital report at issue, as the record contains only a summary report which does not include the subject allegations.

**(D) Trial counsel provided ineffective assistance of counsel through their wholly inadequate litigation of the Motion for Funds for Expert Mitigation Assistance.**

¶37.   Issue I in Loden's direct appeal addressed "[w]hether Loden was improperly denied funds to retain the assistance of a forensic social worker to investigate and present relevant mitigating factors." *Loden*, 971 So. 2d at 562.  This Court concluded that:

> [w]hile "American Bar Association standards and the like . . . are guides to determining what is reasonable . . . *they are only guides*." *Strickland*[, 466 U.S. at 688] (emphasis added). *See also Wiggins*[, 539 U.S. at 524]. Furthermore, "[t]he State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand." [*Thorson v. State*, 895 So. 2d 85, 122 (Miss. 2004)]. The lower court did not err in concluding that [Mooers's] redundant services were not justified. This Court finds there is no evidence to support that the learned circuit judge abused his discretion in so finding.

*Loden*, 971 So. 2d at 564.   In an accompanying footnote, this Court added that "[a]lternatively, this Court agrees with the State that this issue is moot because Loden chose to present no mitigation evidence to the circuit court." *Id.* at 564 n.15.

¶38.   Notwithstanding this Court's earlier ruling, Loden now argues that:

> [h]ad counsel initiated their investigation into Loden's social, mental, military and employment history from the moment they were appointed as Loden's counsel – as they were required to do by the prevailing norms – they would have been able to present "concrete reasons" for requiring assistance of Dr. Mooers. In addition, had counsel adequately researched the law on the need for a mitigation expert and provided more compelling authority to the court, the court would have (and certainly should have) granted the motion.

The State responds that Loden:

> now wants to relitigate this as a claim of ineffective assistance of counsel for counsel's failure to better argue in the trial court for such an expert. Because this Court has found no error in the underlying substantive claim [Loden] cannot demonstrate prejudice and therefore cannot demonstrate ineffective assistance of counsel under *Strickland* . . . .

33

> This is simply . . . an extension of [Loden's] claim that counsel failed to properly investigate for mitigation evidence. Just as the substantive claim was held to be moot by the Court on direct appeal, the ineffective assistance of counsel claim is moot because [Loden] instructed counsel not to present any evidence in mitigation, not to cross-examine witnesses and not to object to any exhibits offered by the State.

¶39.   The substantive issue underlying this ineffective-assistance-of-counsel claim was fully addressed on direct appeal. "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*." *Bishop*, 882 So. 2d at 149 (quoting *Jackson v. State*, 860 So. 2d 653, 660-61 (Miss. 2003)). Moreover, as the underlying substantive issue was found both to be without merit and moot on account of Loden's decision not to present mitigation evidence (*see Loden*, 971 So. 2d at 564 n.15), Loden cannot establish the requisite prejudice under *Strickland* to prove ineffective assistance of counsel. Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

### (E) Trial counsel provided ineffective assistance by providing erroneous advice to Loden.

¶40.   Issue VII in Loden's first post-conviction-relief appeal addressed "[w]hether alleged erroneous advice of trial counsel prejudiced Loden by causing him to enter an involuntary guilty plea to capital murder." *Loden*, 971 So. 2d at 562. This Court concluded that Loden's guilty plea was "knowing and voluntary[,]" and that his claim of ineffective assistance of counsel was "without merit," as defense counsel's performance was not deficient. *See* paragraph 6, *supra* (quoting *Loden*, 971 So. 2d at 573-74).

¶41.   Notwithstanding this Court's earlier ruling, Loden urges that this ineffective-assistance-of-counsel argument is not procedurally barred because Johnstone's 2008 affidavit and Daniels's 2009 affidavit constitute "evidence, not reasonably discoverable at the time

of trial" (*see* Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9)) (Rev. 2007), which "provides

an exception to any claimed procedural bar.").

¶42.    Johnstone's 2008 affidavit provides, in pertinent part, that:

> Loden wanted to know whether, if he pleaded guilty, he could appeal, and in
> particular whether he could appeal from the [c]ircuit [c]ourt's adverse pre-trial
> rulings including the rulings on the suppression motions.  I told Loden that if
> he *pleaded guilty* and was sentenced to death, the Mississippi Supreme Court
> *would review his sentence*, and that they would review everything that was in
> the record.  I told Loden that I believed that (1) the rulings on the suppression
> motions, (2) the order denying the request for funds to hire a mitigation
> specialist, and (3) the use of Loden's wife Kat to induce Loden to talk with the
> police on June 30, 2000 *were issues that might be reviewed* that *were*
> *potentially viable.*

(Emphasis added.)  In his subsequent deposition, Johnstone explained this statement to

Loden's present counsel as follows:

> I believe the language reviewed that were potentially viable was language back
> and forth between you and I . . . on this affidavit. . . . *I told Loden that I did*
> *not know what the . . . Supreme Court or any other court . . . would review . .*
> *. in their automatic review should he get the death penalty.*
>
> . . .
>
> I knew the statute said that it would be an automatic review, and, therefore, I
> told him that rather than say they would review certain things or would not
> review certain things, I said, I do not know what they would review. . . .
> *[P]otentially viable is a term that I would say would mean I don't know*
> *whether they would review them or not.*
>
> *That meaning that they might review them or they might not, but that the direct*
> *appeal would not be available to him if he . . . plead guilty.  Specifically he*
> *would be told that he could not appeal a . . . guilty plea.  **That in order to . .***
> *. **preserve for sure** any of his appealable grounds, it's like Daniels said, **he had***
> ***to go to trial and have a jury verdict.***

(Emphasis added.)  Daniels's 2009 affidavit provides that:

Loden asked me whether if he pleaded guilty to Capital Murder he could appeal his case. *I told him there would be no direct appeal* by us, but that the Mississippi Supreme Court would automatically review a sentence of death. I told him that we could not guarantee him exactly what the Court might do, or not do upon such review. ***I told [Loden] if he wanted to directly appeal and assign particular grounds for reversal of his conviction, that would be best served by going to trial.***

(Emphasis added.) Daniels's subsequent deposition testimony adds that:

> A. . . . ***The answer was always the same and unequivocal,*** . . . *if he plead guilty, he could not appeal his case.* And ***that if he wanted to appeal those issues that he was unhappy with what had been decided by the [c]ourt, he would need to go to trial.***

> I did tell him that if the [j]udge gave him the death penalty or if a jury gave him the death penalty, that the Supreme Court would review his sentence. And *I'm aware that's one of the provisions that the Supreme Court makes is whether or not the evidence supports the [j]udge's findings.*

> . . .

> *[A]t no time did I ever tell him that he could appeal this or that the Supreme Court would reconsider those suppression issues or not.* Because I can't tell the Supreme Court what they're going to look at and not look at . . . ***he understood that there would be no appeal.***

> . . .

> Q. So what did you tell him that the Supreme Court was going to review?

> A. The [j]udge's finding, the [j]udge's sentence, whether or not evidence supported the sentence, whether or not there was a proper finding regarding the aggravators and mitigators, whether or not he killed, attempted to kill, whether legal [sic] force had been contemplated and those types of things. And he's a reasonably intelligent person. He understood all of that.

(Emphasis added.)

¶43.  In light of the circuit court's and this Court's earlier denial of post-conviction relief, *see* paragraph 40, *supra*, this Court finds that this issue is procedurally barred. *See* Miss.

36

Code Ann. § 99-39-23(6) (Rev. 2007) ([T]he circuit court "order dismissing the petitioner's motion or otherwise denying relief under this article is a final judgment and shall be conclusive until reversed. It shall be a *bar to a second or successive motion* under this article.") (emphasis added); Miss. Code Ann. § 99-39-27(9) (Rev. 2007) ("[t]he dismissal or denial of an application under this section is a final judgment and shall be a *bar to a second or successive application* under this article.") (emphasis added). Mississippi Code Sections 99-39-23(6) and 99-39-27(9) provide exceptions to their respective procedural bars for "cases in which the petitioner can demonstrate . . . that he has *evidence, not reasonably discoverable at the time of trial,* which is of such nature that it would be *practically conclusive* that, if it had been introduced at trial, *it would have caused a different result in the conviction or sentence.*" Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9) (Rev. 2007). As Loden was represented by new counsel when he filed his "Motion to Vacate Guilty Plea," he could have issued subpoenas for both Johnstone and Daniels and had them appear and testify at the post-conviction hearing. As such, the subject affidavits do not constitute "evidence, not reasonably discoverable at the time of trial . . . ." *Id.*

¶44. However, with respect only to Daniels's 2009 affidavit, Loden contends that this is "evidence, not reasonably discoverable at the time of trial," *id.*, because Daniels's 2003 affidavit stated "*I do not intend to ever disclose any information I gained during that representation to anyone.*" (Emphasis added.) Even assuming *arguendo* that Loden's contention is correct, this Court cannot conclude that such evidence "would be practically conclusive that . . . it would have caused a different result in the conviction and sentence." *Id.* This Court previously emphasized that Loden's plea was "knowing and voluntary"

37

because of his affirmative responses to Judge Gardner's queries regarding his guilty plea. *See Loden*, 971 So. 2d at 573. As to Johnstone's 2003 affidavit statement that "I told Loden that this automatic review would be some sort of appeal but that was unclear to us which issues would be subject to review[,]" which is remarkably similar to the contested statement in Daniels's 2009 affidavit that "I told him that we could not guarantee him exactly what the Court might do, or not do upon such review[,]" this Court determined "a reasonable inference regarding Johnstone's affidavit on automatic review is that he was simply advising Loden to get all matters on the record because, while he was uncertain which specific issues this Court would address, he was certain that this Court would only address issues of record." *Id.* at 574 n.20. Therefore, Daniels's 2009 affidavit, additionally explained by his subsequent deposition testimony, does not lead this Court to conclude that "a different result" would have been "practically conclusive." Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9) (Rev. 2007). In short, Daniels's 2009 affidavit is not "practically conclusive" for purposes of the circuit court's vacating Loden's guilty plea, and his deposition testimony is conclusive for the opposite, and is convincingly similar to Daniels's deposition testimony that erroneous advice was not given to Loden. Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

### (F) Trial counsel's delay in having Loden evaluated by an independent psychologist and failure to make adequate use of the psychologist amounted to ineffective assistance of counsel.

¶45.  Dr. O'Brien's 2008 affidavit provided that "[b]ased on my observations at the time and the limited history that was given to me, I concluded that [Loden] was competent to stand trial and assist in his own defense." However, Dr. O'Brien stated that this conclusion

and the remainder of his diagnosis would have been significantly different had he been provided with additional background information on Loden (e.g., "any military records, interviews of [Loden's] military colleagues, or even basic information about [Loden's] combat experience.").[32]

¶46.    According to Loden, the information sources provided to Dr. O'Brien "were in no way sufficient for [him] to form a reliable clinical picture of Loden's mental state at the time of the crime, or potential mitigating factors in Loden's background." Specifically, Loden emphasizes that Dr. O'Brien:

> was not able to put Loden's mental condition in proper focus because he did not diagnose Loden with PTSD, did not connect Loden's problems with his experiences in childhood and during the Gulf War, and did not take into account or explain the possible significance of amnesia as a reflection of the extreme degree of mental disturbance Loden was suffering. A diagnosis of PTSD, developed while Loden was serving his country in the Marines, would have provided especially powerful mitigating evidence.

¶47.    Loden's argument relates back to the lack of mitigation investigation argument in I(A), insofar as he claims that, because defense counsel failed to adequately investigate mitigation evidence, Dr. O'Brien failed to receive sufficient background material, and, as a result, Dr. O'Brien's report was prejudicially flawed. Fundamentally, Loden's argument is

---

[32]This Court has reviewed the military records exhibited in this appeal, which contain no evidence of mental-health issues or diagnosis of post-traumatic stress disorder ("PTSD"). Rather, those records are replete with positive comments regarding Loden's leadership, skills, abilities, intelligence, and insightfulness. For example, appraisals of Loden's professional character provided, *inter alia*, "[f]irst-rate leader, manager and organizer[;]" "[a] gifted leader he combines drive and patience to accomplish the mission with excellence[;]" "[d]etermined, loyal and aggressive! Initiative is strongest trait[;]" "the most intelligent staff noncommissioned officer I know[;]" "an imaginative and far-sighted thinker[;]" "[a]rchitect of the plan – then makes it happen with the desired results[;]" "[a] self-starter who[se] initiative is only surpassed by his imagination[;]" "INNOVATIVE and FLEXIBLE . . . .".

moot on account of his decision not to present mitigation evidence. As such, he cannot establish any prejudice resulting from defense counsel's alleged "failure to make adequate use of the psychologist . . . ." Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

¶48. But even considered solely from a deficient-performance perspective, Loden's argument is without merit. On March 5, 2001, Loden filed a "Motion for Psychiatric Examination," requesting examination of Loden's "capacity . . . at the Mississippi State Hospital . . . ." Following an "Order for Mental Examination," the summary report of the Mississippi State Hospital was completed in June 2001. On July 16, 2001, Loden filed an "Ex Parte Motion for Funds to Secure Expert Assistance in the Field of Psychology," stating that:

> [b]ecause the report [of the Mississippi State Hospital] confirms that several factors taken together may have influenced [Loden's] mental state at the time of the alleged offenses, and because such factors are mitigating in nature, [Loden] needs to have these factors evaluated, for possible defense, or for mitigation, during any sentencing trial.

The circuit court granted Loden's motion for a *second* evaluation, to be performed by Dr. O'Brien. In short, Loden's allegedly ineffective defense counsel was able to secure a discretionary, second evaluation by Dr. O'Brien from the circuit court. *See Byrom v. State*, 863 So. 2d 836, 852 (Miss. 2003) ("*Ake*[33] does not require that an indigent defendant be given funds to pay for the psychiatrist of his or her own choosing, even in cases where sanity is at issue."). Furthermore, a review of Dr. O'Brien's report reflects that he was acquainted

---

[33]*See Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

with Loden's family background and childhood, claim of sexual abuse, alleged history of substance abuse, military experience,[34] suicidal ideation, and personal experience on the evening of the crime. Possessing this information, Dr. O'Brien concluded, like the Mississippi State Hospital, that Loden "appears at the present time to be competent to stand trial and assist in his own defense." Under these circumstances, and given the strong presumption that defense counsel's actions fell within "a wide range of reasonable professional assistance[,]" *Wiley*, 517 So. 2d at 1378, this Court cannot conclude that defense counsel's performance was deficient. On this basis as well, Loden fails to prove that he is entitled to any relief on this issue.

### (G) Counsel provided constitutionally ineffective assistance of counsel by failing to effectively inspect the State's evidence and adequately cross-examine the State's witnesses during the suppression hearings.

¶49. Loden argues that "the police officers' account of the search was riddled with inconsistencies[,]" and that defense counsel's "failure to inquire into these issues at the suppression hearing was not a tactical or strategic choice – it was simply ineffective representation." According to Loden, defense counsel "did nothing before, during or after the suppression hearing other than placate Loden by telling him he had no chance in front of Judge Gardner anyway and he's better off raising these issues on appeal." Loden's 2008 affidavit provides that:

> [i]f my trial attorneys had properly advised me I would have testified during the suppression hearing that (i) I observed [p]olice [o]fficers inside my van

---

[34]For example, Dr. O'Brien's report provided that "'[a]t times he hears the voice of his friend, 'Frank,' who was killed in 1991 during a missile attack. He describes times when he can 'still see it, smell it.'"

41

sometime before 11 A.M. on the day of my arrest, which I now know was before a warrant was issued for a search of my van; (ii) when I was arrested a [p]olice [o]fficer told me that they had seen the videotape which showed that they had searched my van before obtaining a warrant; and (iii) I provided a statement to the police even though I did not recall most of the events I described in my alleged confession.

¶50.    Insofar as Loden raises this issue as a backdoor challenge to his purportedly "involuntary guilty plea," with no new evidence presented in support thereof, this Court concludes that it is a procedurally barred "second or successive motion . . . ." *See* paragraph 43, *supra* (citing Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9) (Rev. 2007)).  To the extent that this issue pertains directly to the performance of defense counsel at the suppression hearings, this Court likewise concludes that it is procedurally barred.  The purpose of the Mississippi Uniform Post-Conviction Collateral Relief Act "is to provide prisoners with a procedure, *limited in nature*, to review those objections, defenses, claims, questions, issues or errors *which in practical reality could not be or should not have been raised at trial or on direct appeal.*"  Miss. Code Ann. § 99-39-3(2) (Rev. 2007) (emphasis added).  Therefore:

> [i]ssues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record.  *Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceeding.*

Miss. R. App. P. 22(b) (emphasis added).  *See also* Miss. Code Ann. § 99-39-21(1) (Rev. 2007) ("[f]ailure by a prisoner to raise . . . issues . . . either in fact or law which were capable of determination at trial and/or on direct appeal . . . shall constitute a waiver thereof and shall be procedurally barred . . . ."); Miss. R. App. P. 22(b) cmt. ("[u]nder this provision, issues such as claims of ineffective assistance of counsel for failure to object to evidence offered

42

by the state or to argument by the state must be raised on direct appeal."). Loden was represented by new counsel on direct appeal and his first motion for post-conviction relief, and this issue was "based on facts fully apparent from the record[,]" Miss. R. App. P. 22(b), yet Loden failed to raise the suppression issue. As such, he is procedurally barred from raising it now. *See* Miss. R. App. P. 22(b); Miss. Code Ann. § 99-39-21(1) (Rev. 2007). While Loden may assert that his failure to raise the suppression issue on direct appeal was dictated by the waiver-of-guilt-phase issues arising from his purportedly involuntary guilty plea, such an argument merely returns this Court to the improper backdoor challenge to that plea as referenced *supra*.

¶51.    Additionally, Loden offers no explanation of how the suppression issues relate to sentencing, the requisite focal point of this Petition for Post-Conviction Relief. These suppression issues might have been pertinent during the guilt phase of trial had he not pleaded guilty, but Loden fails to explain how he was prejudiced in sentencing by defense counsel's performance during the suppression hearings. Accordingly, Loden fails to prove that he is entitled to any relief on this issue, as it is both procedurally barred and without merit.

> ### (H) The totality of the circumstances demonstrates that constitutionally ineffective assistance of counsel resulted in extreme prejudice to Loden.

¶52.    Loden, in "catch-all" form, argues that:

> [i]f Daniels and Johnstone had performed adequately, then Loden would have faced an entirely different situation. He would have had a line of fourteen witnesses in mitigation, ready, willing, and able to testify to Loden's tumultuous family history marred by physical, emotional, and sexual abuse, and to his honorable and outstanding service to the Nation as a Marine serving in Operation Desert Storm. He would have had a mitigation investigator to

43

provide experienced assistance to his trial counsel, who were in any case obliged to conduct a thorough mitigation investigation on their own. He would have had a properly-informed psychological expert in Dr. O'Brien, who could comment meaningfully on his suffering from PTSD and other combat-related trauma having been provided with his military records. He would have been properly advised on the consequences of pleading guilty and the inability to appeal the suppression rulings thereafter. He would have elected to try his mitigation case to a jury of twelve – knowing that he need only convince one of them to spare his life – instead of agreeing to be sentenced by a judge with a well-established record of handing down death sentences. Most importantly, he would have had legitimate hope that at least one of the twelve sentencing jurors would have found his life history sufficiently compelling to spare him the death penalty.[35]

¶53.  "In order for there to be a cumulative effect of errors, there must first be errors."

*Walker v. State*, 863 So. 2d 1, 23 (Miss. 2003).  *See also Miller v. Johnson*, 200 F.3d 274,

286 n.6 (5th Cir. 2000) ("Miller has not demonstrated error by trial counsel; thus, by

---

[35]In support of this ineffective-assistance-of-counsel argument, Loden includes the affidavit of attorney Sean D. O'Brien whose "primary area of criminal practice has involved the trial, appeal and post-conviction representation of individuals in capital cases." O'Brien concludes that:

> [i]t is my professional judgment that [Loden's] trial defense team failed to perform consistently with the ABA guidelines on the appointment and performance of counsel in capital cases as well as with the supplemental guidelines on the defense mitigation function in capital cases, and that their performance fell below the constitutional minimum standard of care.

This Court will not consider O'Brien's affidavit as:

> it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony. It is a question of law to be decided by the state courts, by the district court, and by this Court, each in its own turn.

*Johnson v. Quarterman*, 306 Fed. Appx. 116, 129 (5th Cir. 2009) (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998)).

definition, Miller has not demonstrated that cumulative error of counsel deprived him of a fair trial."). As this Court has concluded that Loden fails to prove that he is entitled to any relief on each of his ineffective-assistance-of-counsel claims individually, this Court likewise concludes that Loden fails to prove that he is entitled to any relief on such claims cumulatively.

### II. Apart from the ineffectiveness of Loden's counsel, his guilty plea was not knowing, voluntary or intelligent.

¶54.   Loden argues that his guilty plea:

> was neither knowing, nor intelligent nor voluntary for a number of reasons. First, counsel gave erroneous advice to Loden in telling him that he could appeal the denial of certain pre-trial motions and that all other issues in his case would remain subject to appeal after a plea of guilty if he was sentenced to death. Second, the numerous instances of counsel's ineffectiveness . . . contributed to Loden being uninformed and, as a result, unaware of the defense and mitigation options available to him. . . . Third, counsel, the court and the prosecution all ignored Loden's psychological state and its impact on the voluntariness of his plea.[36]

¶55.   Issue VII in Loden's first post-conviction appeal addressed "[w]hether alleged erroneous advice of trial counsel prejudiced Loden by causing him to enter an involuntary guilty plea to capital murder." *Loden*, 971 So. 2d at 562. This Court concluded that Loden's

---

[36]Regarding this third reason, Loden alleges that:

> Daniels and Johnstone did not ask Loden any questions about his motivation to plea[d] and waive mitigation, made no attempt either privately or on the record to dissuade Loden from waiving all his rights and made no attempt to explain to the [c]ourt or place on the record the rationale behind such an unusual decision. The [c]ourt, like counsel, was well aware of Loden's evaluation by two psychiatrists and of his repeated suicide attempts, yet did not question the competence of this radical action or feel the need to satisfy itself of its voluntariness.

guilty plea was "knowing and voluntary." *See* paragraph 6, *supra* (quoting *Loden*, 971 So. 2d at 573). Therefore, as discussed under I (E), *supra*, Loden's present claim regarding the voluntariness of his guilty plea is procedurally barred.[37] *See* paragraph 43, *supra* (citing Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9) (Rev. 2007)). Furthermore, even if Daniels's 2009 affidavit is deemed "evidence, not reasonably discoverable at the time of trial," *id.*, this Court previously has concluded that such evidence would not "be practically conclusive that . . . it would have caused a different result," i.e., the circuit court vacating Loden's guilty plea, especially when compared to his deposition testimony. *See* paragraph 44, *supra* (quoting Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9) (Rev. 2007)). Accordingly, Loden fails to prove that he is entitled to any relief on this ground.

### III. Loden was denied effective assistance of appellate counsel.

¶56. Loden relied upon De Gruy of the Mississippi Office of Capital Defense Counsel "to prepare a petition for post-conviction relief to challenge his guilty plea."[38] Loden argues that he "has presented extensive evidence to this Court in support of Loden's claims that his plea was not knowing, voluntary and intelligent, that was not investigated or presented by Loden's counsel in his direct appeal." Specifically, Loden refers to "[t]he vast additional evidence presented in this [P]etition regarding Loden's background, psychological history

---

[37]This Court would add that Loden's argument that "the court and the prosecution all ignored [his] psychological state and its impact on the voluntariness of his plea[,]" is also procedurally barred pursuant to Mississippi Code Section 99-39-21(2).

[38]According to De Gruy, he did not include information regarding Loden's mental state or social history in connection with this challenge to the guilty plea because he believed such claims "would probably have to be raised in a post-conviction petition challenging the sentence . . . ."

and his [c]ounsel's numerous instances of ineffectiveness . . . ." According to Loden, "appellate counsel [De Gruy] neglected to fully develop evidence that Loden pled guilty with the understanding that the issues he attempted to address with trial counsel . . . could still be reviewed by the Supreme Court after Loden's entry of a guilty plea." In Loden's estimation, "[h]ad appellate counsel presented the evidence contained in the instant Petition and informed the [c]ourt of all factors surrounding Loden's decision to plea," then "there is at least a reasonable probability that the [c]ourt would have altered its credibility ruling and [Loden's] Motion to Vacate his guilty plea would have been successful."

¶57. Throughout his argument on this ground, Loden ignores the circuit court's specific reasoning in finding that his guilty plea was voluntary. At the sentencing hearing, the circuit court was presented with the summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital and the report of Dr. O'Brien. The summary report of the Mississippi State Hospital provided that Loden has "the sufficient present ability to consult with his attorney with reasonable degree of rational understanding in the preparation of his defense" and "the capacity knowingly, intelligently, and voluntarily to waive or assert his constitutional rights . . . ." Dr. O'Brien's report provided that Loden "appears at the present time to be competent to stand trial and assist in his own defense." Thereafter, Loden pleaded guilty following extensive inquiry by the circuit judge into the nature of that plea. *See* paragraph 4, *supra*. In its "Order and Opinion" dismissing Loden's motion for post-conviction relief, the circuit court stated, in pertinent part, that:

> at the guilt plea hearing, the [c]ourt advised [Loden] of his rights. *[Loden] acknowledged that he was giving up his right to appeal by pleading guilty to the charge.*

47

. . .

> [Loden] was informed in his lengthy guilty plea hearing of the important
> constitutional rights that he was waiving by entering a plea of guilty. In
> addition, [Loden] stated under oath at the plea hearing that he had been fully
> advised of all aspects of his case by his counsel, including the nature and
> elements of the charge. Subsequently, at the guilty plea hearing, the [c]ourt
> advised [Loden] of the charges against him and asked him if he understood
> that charge, to which he replied in the affirmative. . . . *The [c]ourt fully
> advised [Loden] that he was waiving his right to appeal. The [c]ourt then
> found that [Loden] had entered a knowing and voluntary plea.*

(Emphasis added.) In short, the circuit court found that "[t]he record speaks for itself." There is "a strong presumption of validity of anyone's statement under oath." *Holt v. State*, 650 So. 2d 1267, 1270 (Miss. 1994). Moreover, this Court has held "that when the trial court questions the defendant and explains his rights and the effects and consequences of the plea on the record, the plea is rendered voluntary despite advice given to the defendant by his attorney." *Harris v. State*, 806 So. 2d 1127, 1130 (Miss. 2002).

¶58. On these bases, this Court concludes that the submissions by Loden are woefully insufficient to rise to the level necessary to invalidate his express plea-colloquy statements to the circuit judge, so as to create a "reasonable probability" that his "Motion to Vacate Guilty Plea" would have been granted. Accordingly, Loden fails to prove that he is entitled to any relief on this ground.

### IV. The State's use of the expert psychiatric report from Dr. McMichael violates the Eighth Amendment's reliability requirement, the Sixth Amendment's confrontation clause, and due process.

¶59.   Loden asserts that the "disparaging, unsupported allegations of criminal activity and general bad character" in the full Mississippi State Hospital report[39] "tainted the reliability and accuracy of the sentencing in violation of the Eighth Amendment[;]" violated the Confrontation Clause of the Sixth Amendment because he had "no opportunity to cross-examine the conclusions of the state doctors and the highly damaging hearsay statements in the report[;]" and generally deprived him of due process.

¶60.   This Court concludes that the flaws in Loden's argument are myriad. Addressing these flaws without assigning order of import, we first observe, as noted earlier, *see* footnote 31, *supra*, the record does not indicate that the circuit judge was presented with the full Mississippi State Hospital report at issue, but only with a summary report which does not include the complained-of allegations. Second, as Loden was represented by new counsel on appeal, and the issue of objection to evidence at the sentencing hearing is "based on facts fully apparent from the record[,]" he is procedurally barred from presenting it for the first time in this Petition for Post-Conviction Relief. *See* Miss. R. App. P. 22(b); Miss. Code Ann. § 99-39-21(1) (Rev. 2007). Third, Loden's claim is altogether duplicitous given his instruction to defense counsel not to cross-examine any of the State's witnesses or object to the introduction of evidence presented by the State at sentencing. Finally, this Court rejects the implication that these contextually benign statements within the full Mississippi State Hospital report led to his death sentence. The evidence considered by the circuit court in imposing that sentence included a graphic videotape of Loden's repeated brutal raping, taunting, and sexually abusing of a sixteen-year-old child before he murdered her. On any

---

[39]Regarding such allegations, *see* footnote 31, *supra*.

of the aforementioned bases, Loden fails to prove that he is entitled to any relief on this ground.

### V. Loden's waiver of jury for sentencing was not voluntary, knowing and intelligent.

¶61.    Loden argues:

> [f]irst, trial counsel did not do a mitigation investigation and did not inform Loden what kind of mitigation case they could present. By failing to prepare a mitigation case, they undermined the value of the right to a jury for sentencing. If Loden had no case, it did not matter before whom he would appear for sentencing.
>
> . . .
>
> Second, during Loden's plea, the [c]ircuit [c]ourt [j]udge erroneously informed Loden that "by entering a plea of guilty to this charge, or the capital murder case, you are waiving the jury making those determinations, as to the guilt *and* as to the punishment to be imposed." . . . This was particularly confusing given that Loden received no information about the sentencing phase from his counsel.
>
> . . .
>
> Third, Loden's mental and emotional condition . . . barred an accurate understanding of the consequences of a decision to waive the jury for sentencing.
>
> . . .
>
> Finally, Loden's decision . . . was based on the erroneous advice of defense counsel that, if Loden were sentenced to death, all of the [c]ircuit [c]ourt's rulings would be reviewed by the Mississippi Supreme Court notwithstanding his guilty plea. . . . Had he been properly advised . . . Loden would not have waived the jury for sentencing.

(Emphasis in original.)

¶62.    This Court notes that Loden's first argument regarding mitigation investigation was fully addressed in I (A), *supra,* and deemed to be without merit.  Likewise, Loden's fourth

argument regarding his guilty plea was fully addressed in I (E) and II, *supra*, and found to be without merit. Loden's third argument regarding his "mental and emotional condition" at the time of sentencing was addressed by this Court in paragraph 57, *supra*, noting that the summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital and the report of Dr. O'Brien both indicated he was capable of understanding the implications of his decision to waive jury sentencing.[40] Finally, Loden's second argument fails to take into account the repeated opportunities in which he was apprised of the implications of waiving jury sentencing, yet proceeded nonetheless. *See* paragraph 30, *supra*. For instance, the sentencing hearing reflects that, in response to a query regarding his constitutional and statutory right to jury sentencing, Loden responded "I understand I had it, and I understand I waived it . . . ." As with his guilty plea, the record clearly establishes that Loden knowingly, intelligently, and voluntarily waived jury sentencing. Accordingly, Loden fails to prove that he is entitled to any relief on this ground.

### VI. Loden has been denied his Fourteenth Amendment due process right to fully develop and present the evidence in his case.

*(A)*

¶63. On September 4, 2008, this Court entered a *sua sponte* Order directing that the following items in the direct-appeal case file be placed under seal: "State's [E]xhibit #7 (original video) and the envelope labeled "State v. Thomas E. Loden, Jr., . . . Original Photos." The Order added that defense counsel and the State could inspect such items in the

---

[40]Filings before this Court of Loden's military records contain rave reviews of his performance sufficient to satisfy this Court that, according to the United States Marine Corps, Loden was well-regarded mentally and emotionally.

manner outlined in an August 22, 2008, Order, so as "to preserve the integrity of the evidence." On September 29, 2008, Loden filed a "Motion to Compel" in the circuit court seeking:

> that the [c]ourt compel production of the complete files of the District Attorney and the Mississippi Bureau of Investigation, including but not limited to, clear color copies of all photographs including all autopsy photographs and other photographs depicting the deceased's body and a copy of [Loden's] statement to law enforcement.

Following a hearing, the circuit court denied Loden's motion. On November 25, 2008, Loden filed a "Petition for Writ of Mandamus" requesting that this Court:

> vacate the ruling of the Circuit Court of Itawamba County and grant [Loden's] experts access to inspect all the evidence from the District Attorney's files from *State of Mississippi v. Thomas Loden Jr.*, including autopsy photographs or any photographs depicting the deceased body and direct the State to provide defense counsel with color photocopies of the same.

The December 4, 2008, Order of this Court denied Loden's "Petition for Writ of Mandamus." On June 24, 2009, this Court entered an Order providing that Loden was "granted leave to take the oral depositions of [Johnstone] and [Daniels] on or before July 10, 2009." On July 9, 2009, Johnstone and Daniels were deposed.

¶64. Loden argues that "the State's *denial of access to the evidence* necessary to conduct a full and complete investigation of the facts of Loden's case has violated Loden's due process rights and prevented the presentation of all potentially meritorious claims in his Petition . . . ." (Emphasis added.) Specifically, Loden asserts that the "copies of color photographs taken in the course of the State's investigation and contained in the files of the District Attorney's office" are evidence "which the State is required to turn over under both M.R.A.P. 22(c)(4)(ii) and *Brady v. Maryland*, 373 U.S. 83 (1963)." According to Loden,

the circuit court's denial of his "Motion to Compel" and this Court's denial of his "Petition for Writ of Mandamus" led to Loden's experts being "*unable to view the photographic evidence* in the District Attorneys' files." (Emphasis added.) This has resulted in his present counsel being unable "to provide their experts with evidence that is central to the case and . . . conclusively determine how this evidence may be used to fully develop all possible claims in the Petition . . . ."

¶65.    The State responds that:

> [t]his appears to be an attempt to file a petition for rehearing from the denial of [Loden's] petition for writ of mandamus regarding the furnishing of color copies of the photographs in the State's file. These photographs were sealed . . . due to the graphic nature of the pictures. . . . What [Loden] does not mention is that *post-conviction counsel has been allowed to view every photograph in the State's file*. . . . We note that [Loden's] experts were able to come to Jackson and view the videotape of the murder under the strict guidelines set out by this Court.[41]

(Emphasis added.) As such, the State maintains that "[t]here is no *Brady* violation . . . ." More fundamentally, the State insists that such evidence relates back to the guilt phase,[42] is procedurally barred as a "successive petition" pursuant to Mississippi Code Sections 99-39-25(6) and 99-39-27(9), and that Loden "cannot demonstrate either an intervening decision of this Court or the United States Supreme Court that would adversely affect the conviction

_____

[41]Loden merely responds that "[r]equiring post-conviction counsel to return to Mississippi each time a color photograph is desired to advance an argument is both costly and burdensome."

[42]Loden replies that such evidence also is relevant "to the question of whether trial counsel were constitutionally ineffective[,]" insofar as "[a]bsent a complete review of the evidence, Loden cannot adequately advance an argument about where defense counsel failed to probe the weaknesses in the State's case and ensure that it was subjected to meaningful adversarial testing."

. . . nor can he demonstrate that he has new evidence that was not readily discoverable by the original post-conviction counsel . . . ."

¶66.    Even assuming *arguendo* that this ground is not procedurally barred pursuant to Mississippi Code Sections 99-39-25(6) and 99-39-27(9), this Court finds that Loden fails to prove that he is entitled to any relief on this ground. Mississippi Rule of Appellate Procedure 22(c)(4)(ii) provides, in pertinent part, that:

> [t]he State, to the extent allowed by law, shall make available to post-conviction counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed and the prosecution of the petitioner. If the State has a reasonable belief that allowing inspection of any portion of the files by post-conviction counsel for the petitioner would not be in the interest of justice, the State may submit for inspection by the convicting court those portions of the files so identified. *If upon examination of the files, the court finds that such portions of the files could not assist the capital petitioner in investigating, preparing, or presenting a motion for post-conviction relief, the court in its discretion may allow the State to withhold that portion of the files.*

Miss. R. App. P. 22(c)(4)(ii) (emphasis added). The circuit court's decision to deny Loden's "Motion to Compel," affirmed by this Court's denial of his "Petition for Writ of Mandamus," was hardly an abuse of discretion. In fact, contrary to Loden's assertions, he was not denied access to the subject evidence. Rather, his access was merely limited, which was perfectly permissible in light of the sensitive nature of said evidence. Loden has been well-afforded his constitutional protections by this Court.[43]  Accordingly, Loden fails to prove that he is entitled to any relief on this ground.

---

[43]For instance, this Court allowed Loden additional time to take the depositions of defense counsel in spite of the fact that he certainly could have obtained these years before the filing of this Petition.

*(B)*

¶67.   In Loden's Rebuttal, he asserts that Daniels destroyed his case file while "well aware that Loden's post-conviction proceedings were under way . . . ."  Given Daniels's present employment position, *see* footnote 5, *supra*, Loden asserts that:

> [w]e are left with a situation where a prosecutor for the State . . . has destroyed files which he knows are relevant to a pending capital post-conviction proceeding – a proceeding in which his former client is challenging his professional competence, no less.  This raises the *inescapable inference* that an agent of the State has destroyed *relevant evidence in bad faith.*

(Emphasis added.)

¶68.   Mississippi Rule of Appellate Procedure 22(c)(4)(ii) provides that "[u]pon appointment of counsel, or the determination that the petitioner is represented by private counsel the petitioner's prior trial and appellate counsel shall make available to the petitioner's post-conviction counsel their complete files relating to the conviction and sentence."  Miss. R. App. P. 22(c)(4)(ii).  According to the affidavit of Mark R. McDonald, Loden's present counsel, in a brief August 2008 conversation, Daniels informed him "that he was done with this case and did not want to be involved with it."  Thereafter, in October 2008, and without consulting Loden or his present counsel, Daniels destroyed his files on the Loden case.  According to Daniels, "after seven years, I just determined the best way to protect that would be to destroy it."  Elaborating further, Daniels stated that "if somebody had broken into my storage room and gotten that file, I feel like I would probably have been liable.  At any rate a lot of private and confidential information would fall into the hands of somebody else."  However, Daniels further stated that "I copied [Johnstone] on a lot of things

55

that I did, and I'm sure [Johnstone] copied me.  So I mean, *there would have been a good bit of duplication, I think, between his file and mine.*"  (Emphasis added.)

¶69.    Without question, Daniels exercised poor judgment in destroying Loden's case file, which is exacerbated by his present employment with the district attorney's office.  However, Daniels also states that there was "a good bit of duplication" between his file and Johnstone's original file, which Loden did receive (between two and five boxes);[44]  Daniels testified that "[e]verything I had was copies."  Moreover, Loden fails to allege or support by affidavit or otherwise any prejudice caused by failing to have Daniels's file of copies, when Loden had the originals of the very same material.  Thus, this Court is presented with a veritable "red herring."  Conclusorily stating that there is an "inescapable inference" that "relevant evidence" was destroyed "in bad faith," standing alone, is insufficient.  Under these circumstances, this Court cannot conclude that Loden presents "a substantial showing of the denial of a state or federal right . . . ."  Miss. Code Ann. § 99-39-27(5) (Rev. 2007).  Accordingly, Loden fails to prove that he is entitled to any relief on this ground.

## CONCLUSION

¶70.    For the aforementioned reasons, this Court finds that Loden is not entitled to seek post-conviction relief and, therefore, denies his "Petition for Post-Conviction Relief."

¶71.    **POST-CONVICTION RELIEF DENIED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**

---

[44]For instance, during Daniels's 2009 deposition, he was handed a folder by Loden's counsel and replied, "I see some of my handwritten notes in this folder here.  I don't recognize any of these folders as being mine, but I do see some of my work here."