# EXHIBIT 1

### IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

### AFFIDAVIT OF THOMAS E. LODEN, JR.

State of Mississippi
Sunflower County

I, Thomas E. Loden, Jr., declare as follows:

<u>Background</u>

1.  I am over 21 years of age, and otherwise competent to testify. I am
    incarcerated at Parchman Penitentiary.

2.  Prior to my guilty plea on September 21, 2001, my attorneys gave me legal
    advice which I have since learned is erroneous. Had I been properly advised,
    I would not have pled guilty or waived a jury for sentencing and I would have
    insisted that my attorneys present mitigation evidence on my behalf.

<u>Information Conveyed to Attorneys Johnstone and Daniels</u>

3.  During our first meeting, my attorney, Mr. Johnstone, interviewed me about
    my background, family and career prior to my arrest in this matter. This was
    the only background interview Mr. Johnstone conducted. After Attorney
    Daniels joined the case, I also told him the background information I provided
    to Mr. Johnstone.

4.  The information I provided to Mr. Johnstone during that initial interview
    included that: (i) my mother abandoned me when I was about 2 years old and
    I went back and forth between my mother's and father's households
    throughout my childhood; (ii) my stepmother physically abused me; (iii) I was
    sexually abused at church at a young age; (iv) my father died when I was 16

1

years old; (v) my sister attempted suicide and I had attempted suicide numerous times throughout my life; (vi) I was referred to a psychologist by a marriage counselor; (v) I served in the Marines for 18 years including during the Gulf War and I saw a friend burn to death in combat; and (vi) after the Gulf War I was deeply traumatized.

5.     With respect to the night of the offense, I told Mr. Johnstone that shortly before the crime I spoke to my wife from my cell phone.

6.     Although I disclosed this information to Mr. Johnstone during our very first meeting, neither he nor Mr. Daniels ever sat down with me again to talk about these issues, to ask follow up questions, or to explain whether anything I told them could aid in my defense and/or sentencing.

Attorney Neglect

7.     Throughout my representation by Messrs. Daniels and Johnstone, I was not advised of what was happening in my case or what efforts were made on my behalf. I had to write to my attorneys repeatedly to get an answer to a question or to have them meet with me. I wrote at least 38 letters to my attorneys between my arrest in June of 2000 and my plea in September of 2001.

8.     My attorneys never discussed potential defense strategies with me nor did they talk to me about what witnesses would testify during the trial and what they would say. Instead, they repeatedly told me that there were no viable defenses and that I would get the death penalty no matter what they did.

9.     I repeatedly asked my attorneys for a list of witnesses who would testify on my behalf and suggested witnesses myself. I was never provided with such a list or advised regarding who would be able to testify on my behalf. I wrote to my attorneys suggesting individuals who might be helpful in my defense, such as Bill Dyas, Joe Hargett, and Jim Craig. To my knowledge, my attorneys never contacted them despite my requests.

10.    I told my attorneys that when I spoke to my wife, shortly before the crime, she told me that she had just had phone sex with a partner at the law firm where she worked, Jim Craig, and planned to have sex with him that weekend. I asked my attorneys to seek out Jim Craig, interview him and ask him to testify. My attorneys never told me that they spoke to him and I believe that they did not contact him despite my requests. I also asked my attorneys to obtain telephone records of these conversations. They did not do so.

11.    I repeatedly asked my attorneys to obtain my military records. This was never done and ultimately, the only military records supplied were obtained by my mother.

12.     Whatever work my attorneys did on the case, I was rarely advised, let alone consulted.

13.     I repeatedly asked my attorneys, in writing and in person, for the discovery documents produced by the State. I wrote to both my attorneys and to the investigator they hired, Herb Wells, at least 16 times specifically inquiring about discovery documents. These documents were not provided to me by my attorneys until after the suppression hearing was conducted in my case.

14.     I requested, in writing, that my attorneys meet with me prior to the suppression hearing. In my letter, I told my attorneys about some of my concerns and even proposed areas of questioning for the witnesses during the suppression hearing. My attorneys did not meet with me and did not explain to me what would happen at the suppression hearing. They did not tell me the grounds for the suppression motion, who would be testifying at the suppression hearing or consult with me regarding the cross examination of witnesses. They did not discuss with me my right to testify at the hearing or prepare me to give testimony. The first time my testimony was mentioned was during the suppression hearing itself when Attorney Daniels turned to me during the hearing and asked me if I would like to testify. I then testified at the suppression hearing without any preparation or understanding as to the purpose of my testimony.

15.     If my trial attorneys had properly advised me I would have testified during the suppression hearing that (i) I observed Police Officers inside my van sometime before 11 A.M. on the day of my arrest, which I now know was before a warrant was issued for a search of my van; (ii) when I was arrested a Police Officer told me that they had seen the videotape which showed that they had searched my van before obtaining a warrant; and (iii) I provided a statement to the police even though I did not recall most of the events I described in my alleged confession.

16.     I was extremely disappointed with my attorneys' performance during the suppression hearing. I felt they did not adequately prepare themselves, me or the witnesses for the hearing and did not effectively advocate on my behalf. After the suppression hearing, I was contemplating obtaining new attorneys. Mr. Daniels and Mr. Johnstone told me that it was too late to obtain new counsel and that Judge Gardner would not allow it.

17.     Mr. Daniels finally provided the discovery in the case after the suppression hearing. I told my attorneys about a number of discrepancies I uncovered that they left unaddressed during the suppression hearing. I asked them to file another suppression motion. Mr. Johnstone told me he would file another suppression motion for the record. I wanted the suppression issues reviewed again, and Mr. Johnstone told me that as long as the motion was in the record

it would be reviewed. Mr. Johnstone never filed the second suppression motion.

### Erroneous Legal Advice

18.     On or about September 19, 2001, my attorneys met with me and told me that Judge Gardner had contacted them and told them that I had to decide whether or not I would plead guilty by Thursday, September 20, 2001. Again, my attorneys did not discuss possible defenses or a mitigation case. They also did not discuss the results of my psychiatric evaluation by Dr. Gerald O'Brien. I was asked to make a decision to plead in complete vacuum. The only thing I knew was that my attorneys insisted that I had no viable defense and no chance of succeeding in front of Judge Gardner. Moreover, my attorneys told me that I could raise all issues and rulings, including the suppression issues, on appeal and these issues would be looked upon in a more favorable light in front of another Court.

19.     Messrs. Daniels and Johnstone advised me that if I were to plead guilty and receive the death sentence, the pre-trial motions would be reviewed by the Supreme Court of Mississippi under a heightened scrutiny review which applies to all death sentences. They assured me that the rulings on the suppression motions were reviewable by the Supreme Court even if I pled guilty.

20.     Prior to my plea hearing, my attorneys did not discuss with me the questions that would be posed by Judge Gardner. There were points during the plea hearing when I did not fully understand the law as explained by Judge Gardner but I replied "Yes, Sir." I believed my attorneys had properly instructed me regarding my post-conviction rights so when Judge Gardner told me I could not appeal my guilt I did not understand that this contradicted my attorney's statement that all issues, including suppression, would be reviewed by the Supreme Court.

21.     The sentencing phase started the same day as the guilty plea, after an approximately 30-minute break. Messrs. Daniels and Johnstone did not discuss with me what would happen next. In fact, Messrs. Daniels and Johnstone never discussed with me the sentencing phase and their strategy for it. They never explained to me the nature, purpose or importance of mitigating evidence. At no time during their representation, including during the days leading up to the sentencing phase, did Messrs. Daniels and Johnstone ever tell me that I could or should present a mitigation case even if I pleaded guilty to the indictment. They did not tell me that they thought it was against my interests if mitigation evidence was not presented, what mitigation evidence they thought could be presented, or how presenting a mitigation case might benefit me.

4

22.     Messrs. Daniels and Johnstone never proposed contacting anyone to serve as mitigation witnesses. They never asked me for a list of mitigation witnesses, such as friends, military colleagues or family, who may be able to testify on my behalf during the sentencing phase. In fact, they never asked me to provide any information about anyone who may be willing to testify on my behalf in any capacity. At no time did I instruct counsel that I did not want them to fully investigate the case including a mitigation case. To the contrary, I constantly urged them to investigate the case fully, and I was extremely disappointed when they did not, so I told them of my disappointment in their representation on several occasions.

23.     My trial lawyers never explained to me that my military record, my family, and my life experiences could serve as mitigating evidence. Prior to the sentencing I did not see the report submitted by Dr. Gerald O'Brien. My attorneys did not discuss the contents of Dr. O'Brien's report or consult with me before introducing it into evidence.

24.     My trial lawyers never explained to me that mitigation evidence might include evidence about my own and my families' substance and drug abuse problems. I was not proud of these problems and did not see them as evidence that would be helpful in any way.

25.     Because my attorneys never discussed these issues with me, because they did not have any witnesses lined up and never presented me with the type of mitigation case we could have put on, I agreed to plead guilty and not to oppose the State's evidence during sentencing. I did not know how these actions could hurt my case, since my attorneys repeatedly told me I had no case. I had not seen the Whitfield report submitted by the State. If I had been aware of the contents of the Whitfield report I would have wanted my attorneys to object to its introduction. I did not understand that there were many things in my life that were considered mitigating under the law and that could have been presented on my behalf. Mr. Daniels told the Court that I had instructed counsel not to present any mitigation evidence, but I did not believe that counsel had developed a mitigation case to present.

26.     I have read the Petition for Post Conviction Relief and select affidavits filed in support of that Petition. Had I known at the time of my sentencing that this type of evidence was available, I would have wanted my attorneys to present it during the sentencing phase, and I would have wanted the jury to hear this evidence. Had Attorneys Johnstone and Daniels gathered this evidence and advised me that mitigation evidence might help me avoid a sentence of death, I would have asked them to present a mitigation case on my behalf.

## Course of Conduct if Properly Advised

27.    If my attorneys had properly advised me that I would not be able to appeal the pre-trial decisions of the Court, I would not have pled guilty and would have proceeded to trial.

28.    If my attorneys had conducted a thorough mitigation investigation and properly advised me about the mitigation case that could be presented, I would have instructed them to present mitigation evidence on my behalf.

29.    Had I been properly advised, I would have also instructed my attorneys to contact and ask my friends, family and military colleagues to testify on my behalf in the course of a mitigation presentation.

## Mitigation Evidence

30.    When I was evaluated by Dr. High, I told him many facts about my life. In addition to those facts that are referenced in Dr. High's affidavit, below are additional facts that I believe might be relevant to mitigation.

31.    When I was growing up, my stepmother Sylvia would regularly instruct me and my sister to leave the house in the mornings and not return until bed time—not even to use the bathroom or for any other purpose.

32.    After I returned from the Gulf War, I began to drink heavily and take drugs like GHB, ecstasy and BRON (codeine laced coffee syrup widely available in Okinawa).

33.    Between the late afternoon and evening of June 22, 2000, I drank approximately ¾ of a fifth of a gallon of bourbon and a beer or two. I also put some GHB into the bourbon and Coke I drank.

34.    My wife Kat had two sons from prior relationships, Zach and Keaton. I truly enjoyed spending time with them, and I believe we had a great relationship. Although Kat's former husband, Bill Dyas, had custody of the children, we had rooms set aside in our home for the boys and showered them with attention whenever they were with us. We did cookouts with the boys, and Bill and I went golfing with them. I never missed any of Zach and Keaton's baseball and football games. We had the boys and their friends stay overnight at our house. Kat and I had a daughter of our own, Abby, on February 23, 1998. Shortly after Abby's birth, Kat delegated many, if not most, parental duties, to me. While it was difficult to juggle these responsibilities with my demanding job as a recruiter, I was willing to do it because I love my daughter more than anything else in this world and I loved spending time with her.

6

35.     At the time of my crime, my recruiting assignment in Vicksburg had not been going well for some time. The assignment was very different from any assignment I that had before. I was no longer living or working in a structured military environment. I was not told specifically where to go or what to do with every hour of my day. Although some would find this liberating, I felt even more lost and depressed. Moreover, being away from the base, I did not have the military structure and supervision forcing me to control my depression, drinking or symptoms of what I now know to be Post Traumatic Stress Disorder. I no longer had to fear being found out by a colleague or supervisor on a daily basis. On top of the change in structure, the job was extremely stressful because I constantly had to report back regarding recruiting numbers and meet a certain quota every month. This constant pressure exacerbated my already unhealthy mental state. It was nearly impossible to meet the recruiting quota in Mississippi due to a lack of qualified candidates and I felt that the situation was hopeless. In June 2000, I was about to fall short of my recruiting quota for the third month in a row. On top of that, one of my subordinates was coming under investigation for recruiting fraud. I was certainly not going to receive any more promotions and I felt that my career with the Marines was coming to an end. I was used to being good at my job and all of a sudden I found myself failing at life, marriage and work.

State of Mind During the Plea

36.     I was extremely depressed and suicidal throughout the process leading up to my plea. I was not seeing a psychiatrist or receiving any medication before or at the time of the plea.

37.     My shame and remorse was reinforced by my attorneys telling me that I would get the death penalty no matter what, and thus failing to give me any hope that I might not be sentenced to death. I felt completely hopeless and I completely relied on my attorneys and, in my mental state, could not question their judgment. It was under these circumstances that I followed their advice that, since I did not have a chance in front of Judge Gardner, I was better off pleading guilty and raising all issues with the Mississippi Supreme Court. Only later did I learn that this Court would not review those issues because of my plea.

38.     I am currently taking anti-depression medication.  My mood has stabilized as a result of receiving this treatment and I have not had any suicide attempts since I began to receive this medication.

FURTHER AFFIANT SAYETH NOT.

_____
THOMAS EDWIN LODEN, JR.

Subscribed and sworn to before me on this _4th_ day of December, 2008, by _Thomas E. Loden, Jr,_____, who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _Pamela Hannah_____          (seal)



8

# EXHIBIT 2

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

AFFIDAVIT OF SUZAN AKAMINE

State of Hawai'i
Hawai'i County

Suzan Akamine, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Kailua, Hawai'i, where I work from home as a bookkeeper. I have been married to Brian Akamine since 2005, and I have a 22-month old son who suffers from a speech impediment and we fear he might be autistic.

3. Thomas Edwin Loden ("Tom") and I first met in 1985 at the Marine base in Okinawa, Japan. Tom was dating Joy Gibo at the time. My father, a retired Marine from Pennsylvania stationed in Okinawa, and my mother, a native of Okinawa, introduced us to Tom and Joy thinking we would be good friends considering that we are approximately the same age. I was 18 years old at the time and Tom and Joy were 21 years old.

4. I worked with Tom and Joy at a golf course in Okinawa. Tom, although a Marine and stationed at the base, was assigned a "Morale Welfare" position at the golf course, which was considered a very good assignment.

5. Approximately a year later, when I was 19 years old, I moved to Kailua, Hawai'i, with my now ex-husband, Johnnie Purvis.

6. I reestablished contact with Tom and Joy shortly after in Kaneohe, Hawai'i, where Tom and Joy were now living together at the Marine base to which Tom had been reassigned. Tom, Joy, and I reacquainted and spent a great deal of time together thereafter. Tom and Joy became incredible friends to Johnnie and me such that Joy was the Maid of Honor and Tom the Best Man at my wedding to Johnnie.

7. I had a very good relationship with Tom, who treated me like his little sister. Tom taught me many things, like how to open a bank account, and was always there to assist me with anything I needed. Tom was a very thoughtful, caring, and responsible person.

8. I lived with Tom and Joy while my former husband was away fulfilling his service in the Army. This was a great time in my life. I always enjoyed spending time with Tom and Joy.

9. I never observed Tom being abusive to Joy, physically or verbally, and I never heard them fight.

10. I know Tom really enjoyed being in the service. Tom seemed to me to be the model Marine. I regularly witnessed Tom reaching out and mentoring younger Marines, and teaching them how to be model Marines themselves.

11. I feel Tom changed a great deal upon his return from service in the Middle East. I talked to Tom on a few occasions after his return and I noticed that he did not communicate as effectively as he did before his deployment to the Middle East. During our conversations, Tom would pause at weird points throughout his sentences and his mind seemed to wander as his thoughts jumped from one unrelated idea to another.

12. My interaction with Tom lessened after he left Hawai'i to the point where I did not have additional contact with him until I heard about his conviction.

13. I was incredibly shocked by the allegations, to say the least. I never would have imagined Tom being part of such a crime.

14. Based on my extensive interaction with Tom, I feel he is a very nice person who was always very kind to me. I never felt intimidated by him, nor did he ever say or do anything inappropriate to me. In fact, I lived alone with Tom during a period when Joy returned to Okinawa to visit her parents, and there was never a point when I felt uncomfortable around him.

15. Tom's trial attorneys never contacted me to provide background information on him. I do not know of any investigation made on his behalf prior to his sentencing in this case. Had Tom's prior trial attorneys or an investigator contacted me prior to his sentencing, I would have gladly spoken to them and provided background information about Tom and this statement.


FURTHERMORE AFFIANT SAYETH NOT

SUZAN AKAMINE     10/21/08

Sworn to and subscribed before me
this 21st day of October 2008.

B Paio

NOTARY PUBLIC FOR THE
STATE OF HAWAI'I
My Commission expires: June 18, 2010

Doc Date: 10/21/2008   #Pages: 4
Notary Name: Brenda Paio   First Circuit
Doc Description: Affidavit of Suzan Akamine
B Paio     October 21, 2008

*(Notary seal: B. PAIO / NOTARY PUBLIC / Comm. No. 06-361 / STATE OF HAWAII)*

# EXHIBIT 3

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF SONIA W. BROWN

State of Mississippi
Lee County

Sonia W. Brown, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Tupelo, Mississippi. I am divorced. I have a three-year old son.

3. Thomas Edwin Loden ("Eddie") is my half-brother. My parents are Bill Brown, Sr., and Bobbie Christian, Eddie's mother. Anita Loden is my half sister and Bill Brown, Jr. is my brother. My parents married shortly after my mother divorced Eddie's father and her first husband, Thomas Loden, Sr. My parents were married for approximately eight years and are now divorced.

4. My family and the Lodens (Eddie's father and grandparents) did not get along. While Eddie and Anita visited us on a regular basis, I was not allowed to visit

1

Eddie at his grandparents' house. I was not welcome because I was not a "Loden" and because the Lodens disliked my mother.

5. Because of the conflict between our families and because Eddie's father had custody of Eddie, Eddie and our mother had a strained relationship for as long as I can remember. Eddie always felt that my mother was not involved with him and did not care about him.

6. Moreover, the Loden family disapproved of Eddie's relationship with our mother, myself and Bill, Jr. Eddie often felt like he had to communicate with us in secret because the Lodens did not approve of his relationship with his mother's family. For this reason, there were long periods where Eddie did not have regular contact with us.

7. Throughout his life, Eddie was closest with his paternal grandparents. He idolized them. When his grandfather died in January 1999, Eddie was devastated.

8. My childhood was not easy. When my father was drinking, which was often, he was physically abusive to my mother in front of me, Eddie and Bill, Jr. I saw my father severely beat my mother on more than one occasion. He hit her with any object he could get his hands on. On one occasion, my father was so angry at my mother he destroyed her car. I regularly heard our father call my mother names like "bitch" and "whore". My father regularly went to bed with a butcher knife under his pillow.

9. My father was also very rough with Eddie and Bill, Jr. when he was intoxicated, which was quite often. When he was drunk my father often cursed and called Eddie and Bill, Jr. names like "son of a bitch." When Eddie was about 12 years

2

old, I saw my father beating Eddie with a belt. As Eddie lay on the floor, my father kept hitting him with the belt over and over again. When Bill, Jr. was approximately 13 years old, our father was so angry at him that he tried to strangle him. My father's grip was so tight that it left marks on Bill, Jr.'s neck. When my father beat Bill it was usually because Bill did not do or say something to our father's liking. With Eddie, my father often beat him because he was mad once at our mother or experiencing a bout of jealousy.

10. When we were children, both Eddie and I, and Bill, Jr. and I, engaged in sexual experimentation with each other. When I was about thirteen years old, I told Eddie that I no longer wanted to participate in this sexual conduct and our sexual relationship came to an end.

11. For many years my family has had a lot of problems with substance abuse. My father and my brother, Bill Brown, Jr., have a long history of alcohol abuse which continues to this day. I and my half-sister Anita (Eddie's sister) have abused drugs in the past. I know that Eddie drank alcohol since high school. At first, he drank beer, and later switched to bourbon and scotch. I know that Eddie has used drugs and I have used drugs with him.

12. After his arrest, Eddie told me that he was sexually abused by a man at the Cavalry Baptist Church in Tupelo when he was a child. Based on the way he told me the story, I believed that Eddie was indeed sexually abused as a child.

13. When he was eighteen, Eddie joined the Marines. He came home on leave and we often went out to party together. During those outings, I have seen Eddie interacting with women on many occasions. Eddie had no problems attracting

3

women; they considered him very charming. I have never seen him acting

violently or aggressively toward any woman or anyone at all.  *other countries SB*

14. When he was away stationed in Hawaii or on a mission, Eddie frequently called

me to chat about what was going on with him. Based on our telephone and in-

person conversations, I believed that Eddie's service in the Marines was at times

very traumatic. He showed me scars from bullet wounds. He told me that he had

observed and participated in battles where women and children were killed. One

time he called me from the Philippines and told me that he feared for his life. He

asked me to tell everyone in the family that he loved them.

15. Following Eddie's arrest and before his guilty plea, I visited Eddie in jail

approximately once a week. At the time, Eddie could not remember anything that

happened on the night of the crime. After Eddie was told what the videotape and

other evidence showed, he became very remorseful. Also, during that time, Eddie

was experiencing a lot of mental issues. He had flashbacks to his war

experiences, crouching down in his cell and saying that "they" were coming for

him. My mother and I were very concerned about Eddie's mental health. We

discussed hiring a psychologist to evaluate Eddie and help him address these

mental issues.

16. I met all three of Eddie's wives. When Eddie and Kat (Eddie's third wife) got

married, I attended the wedding. Since the moment I met Kat, I had an

impression that Kat did not love Eddie, but instead married him for financial

reasons. Eddie felt that Kat was unfaithful to him prior to and at the time of the

crime. When they were first married, Kat's ex-husband came to live with Eddie

4

and Kat. Prior to his arrest, Eddie told me that he believed Kat was cheating on him with her ex-husband. After his arrest, Eddie told me that he had supported Kat, her ex-husband and her two children from prior marriages and that Kat cheated on him with her ex-husband, as well as numerous other individuals.

17. Eddie's trial attorneys and their investigator never asked me about Eddie's childhood or family background. If they did, I would have been happy to help in any way I could. I do not want Eddie to die.

FURTHERMORE AFFIANT SAYETH NOT

SONIA W. BROWN

Sworn to and subscribed before me this 31 day of December 2008.

NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI

5

# EXHIBIT 4

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF BOBBIE CHRISTIAN

State of Mississippi
Lee County

Bobbie Christian, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Tupelo, Mississippi. I am divorced and have four children.

3. I am Thomas Edwin Loden, Jr.'s mother. Like the rest of the family, I call him "Eddie."

4. I grew up in Lee County, Mississippi. My mother passed away when I was three years old. Shortly thereafter my father moved in with my maternal grandmother, and my sisters and I were raised in the household of my father and maternal grandmother. My grandmother and father were very strict. For example, I was not allowed to swim, wear shorts or engage in normal teenage activities.

5. I knew my first husband Thomas Edwin ("Tommy") Loden, Sr. for six months when I married him at seventeen. I married Tommy, in part, to escape from my

1

difficult and restrictive home life. I had two children with Tommy, Anita and Eddie.

6. My marriage to Tommy was not the escape I had hoped for. Tommy drank a lot and physically abused me. During sex, Tommy often tied me up, placed various objects inside my vagina and shocked me with extension cords and electrical wires. We shared the bedroom with our children and it is possible that Eddie witnessed these acts as a child. I was left alone for the majority of the day to take care of the children and received little help from Tommy. I do not believe that Tommy was faithful to me during our marriage.

7. Tommy and I had a bitter divorce. Tommy said many mean things about me. Tommy was awarded custody of the children. Shortly after our divorce, Tommy married Sylvia. There was a definite rift between our two families. There was never a good relationship between me and the Lodens. I believe Eddie felt like he had two separate families.

8. Anita hated Sylvia, and she still refuses to say Sylvia's name. When she was twelve years old, Anita came to live with me. After Anita came to live with me, the Lodens gave no financial support to Anita; they never even bought her Christmas or birthday presents. In fact, Anita had no contact with her father between the ages of twelve and seventeen.

9. When Anita learned her father had been diagnosed with cancer and had a short time to live, Anita made an effort to reconcile her relationship with him. My daughter from my second marriage, Sonia Brown, and I went with Anita to

2

Tommy's funeral for support, but we were asked to leave by Sylvia and Tommy's sister.

10. After the divorce, Eddie visited me on the weekends. As a small child, Eddie cried when he had to return to his father and stepmother's home. Eddie told me that he hated Sylvia. He told me that Sylvia was constantly mean to him and would whip him for minor things like losing the keys, not getting groceries, letting the cat out or not mowing the lawn the way Sylvia liked. When Eddie came to live with me at age 10 he told me it was because he could no longer tolerate Sylvia's abuse. At that time, Eddie's father was working as a trucker on cross country routes and was rarely home. As a result, Eddie was alone with Sylvia and had to deal with her abuse all by himself.

11. Not long after I divorced Tommy, I married Bill Brown. Bill was a hard worker, but he was also an alcoholic. Bill and I had two children, Sonia and Bill Jr. When Bill was drunk, which was often, Bill was physically and verbally abusive to me. He would hit me, knock me down and called me names like "bitch" and "whore." I was so afraid of him that at one point, for a period of about 18 months, I slept in a room together with all my children with a chain on the door to keep Bill out.

12. All my children, Bill Jr., Anita, Sonia and Eddie witnessed the abuse on multiple occasions. There came a point that I decided it was not in my children's best interest for me to remain with Bill, and so I divorced him.

13. I married Jerry Hendrix in the late 1970s. Jerry and I lived in Coffeeville, Mississippi. When Eddie was in ninth grade, he called me and said he was

unhappy and wanted to come live with me again. I made arrangements to come get him, and he came and lived with me and attended Coffeeville High School. After a while, Eddie moved back in with the Lodens.

14. I married Milton Tallent in 1989. That marriage ended after eighteen months when he went off with his secretary.

15. I married Kenneth Roberts in 1996. We were married for six years. Our marriage ended when I learned Kenneth was stepping out with his ex-wife in Tunica.

16. I tried to discourage Eddie from joining the Marines, but he was determined to join. He joined as soon as he turned eighteen. About two years after enlisting in the Marines, during his leave, Eddie came home with his first wife. I had not seen Eddie at all in the preceding two years. I believe Eddie's marriage to his first wife was later annulled.

17. While he was stationed in Hawaii, Eddie married his second wife Joy. Joy was petite and pretty, and she seemed to love Eddie. I visited with Eddie and Joy on more than one occasion. Eddie told me he divorced Joy because "she went with everyone" while he was overseas.

18. There were many times when Eddie came back to visit in Mississippi, and he did not contact me. There was a seven to eight year period where there was no contact at all between us. I was not invited to Eddie and Kat's wedding. I did not even know I had a granddaughter until Abbey was three months old. I do not know why Eddie treated me this way.

19. I started seeing Eddie again after he was arrested. I am still in contact with him through letters and phone calls.

4

20. I was not interviewed by Eddie's trial attorneys about Eddie's background or our family history.

21. I only met with Eddie's trial attorneys one time, shortly after Eddie's arrest. We met primarily to discuss Eddie's treatment in prison and the need for psychiatric treatment for Eddie due to his suicidal state. On September 6, 2000, I wrote Eddie's attorney a letter to follow up on our meeting and again expressed my concern for Eddie's mental and physical well being. I never heard back. I also wrote Eddie's attorneys a letter in May 2001 regarding his treatment in prison and regarding testimony by a police officer during one of Eddie's hearings which I believed to be false. I did not receive a verbal or written response from Eddie's attorneys addressing my concerns.

22. I would have been happy to tell Eddie's attorneys the things in this affidavit and to testify at the trial. I love Eddie very much and would have been happy to assist in any way I could. I do not want to lose my son.


FURTHERMORE AFFIANT SAYETH NOT


BOBBIE CHRISTIAN

Sworn to and subscribed before me this 3rd day of December 2008.

NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI



5

# EXHIBIT 5

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

### AFFIDAVIT OF JAMES W. CRAIG

State of Mississippi
Hinds County

James W. Craig, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I have been a member of The Mississippi Bar since 1985 and I practice law as a partner in the law firm of Phelps Dunbar LLP located in Jackson, Mississippi.

3. In the mid-spring of 2000 Katrina ("Kat Loden") Loden, the then wife of Thomas Edwin Loden ("Tom Loden"), was employed by the firm as a legal assistant.

4. In mid-spring of 2000 Kat Loden and I began a flirtatious relationship which involved some sexual contact, but not intercourse.

5. In June 2000, Kat Loden advised me that Tom Loden was going to Itawamba County for several days and we talked about consummating our relationship while he was away.

6.  On Thursday night, June 22, 2000, Kat Loden and I were exchanging emails regarding having sex that coming Saturday.

7.  During this exchange of emails Kat Loden told me that she was on the phone with Tom Loden and was telling him that she was going to have sex with me that Saturday.

8.  I was not contacted by any member of Tom Loden's defense team with regard to this conversation with Kat Loden. If I had been contacted, I would have told Loden's lawyers the truth about my relationship with Kat, and her communications with me the night of June 22, 2000. I would have testified to the foregoing facts if subpoenaed.

FURTHERMORE AFFIANT SAYETH NOT

JAMES W. CRAIG

Sworn to and subscribed before me
this 16 day of October 2008

NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI



la-997925

2

# EXHIBIT 6

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF WILLIAM MARK DYAS

State of Washington
Snohomish County

William Mark Dyas, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Bothell, Washington. I am married and have two sons, Zachari ("Zach") and Keaton Dyas, from a previous marriage with Katrina Andrews (formerly Katrina Loden). Zach is Kat's son from a previous relationship. I adopted Zach when I married Kat. Kat and I also had a second son, Keaton. I retained custody of Zach and Keaton after my divorce from Kat.

3. I am a retired Army Master Sergeant. I served in the Army for 24 years.

4. I met Thomas Edwin Loden, Jr. ("Tom") in Virginia Beach, Virginia, when he was dating Kat. After Kat and Tom married, we all tried to provide as much of a normal family life for our boys as was possible. Kat, Tom and I did cookouts with the boys. Tom and I also went golfing with the boys.

1

5. Keaton and Zach loved Tom very much. They looked up to him. And Tom was a very good stepfather to them. He seemed to genuinely enjoy spending time with them and having them stay over at his house.

6. I learned about Tom's crime shortly after it occurred. Kat called me to tell me that Tom was arrested. I was shocked and could not believe that Tom was capable of committing such a crime.

7. I was not contacted by Tom's trial attorneys. If they contacted me, I would have provided them with information in this affidavit.


FURTHERMORE AFFIANT SAYETH NOT


WILLIAM MARK DYAS

Sworn to and subscribed before me
this 3rd day of December 2008.

NOTARY PUBLIC FOR THE
STATE OF WASHINGTON

2

# EXHIBIT 7

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

## AFFIDAVIT OF SYLVIA EPPERLY

State of Mississippi
Lee County

Sylvia Epperly, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I am Tom Loden's former step mother. Like the rest of his family, I call Tom, "Eddie." I was married to Eddie's father Thomas "Tommy" Loden when Eddie was a child. Eddie lived with me and Tommy for many years.

3. I met Tommy Loden when he was separated from his first wife Bobbye. At the time, Bobbye and Tommy were having marital problems because of Bobbye's unfaithfulness and Bobbye's unwillingness to care for Eddie and his sister Anita. Tommy let me know within a very short time of our meeting that he was going to get a divorce from Bobbye and he wanted to marry me.

1

4. Bobbye and Tommy had a nasty, bitter divorce. At the divorce hearing, several men who had been having romantic relationships with Bobbye during her marriage to Tommy testified. Tommy was awarded custody of Eddie and Anita.

5. Eddie and Anita came to live with Tommy and me. I was tickled with having children. Tommy was a wonderful father. Eddie and Anita were good children and they were respectful and well mannered. We regularly attended the Calvary Baptist Church.

6. Tommy worked with his grand -ssE father on the farm. Tommy also worked as a draftsman at McGee's Funeral home. Then, he went to truck driving school and started driving a truck.
   *(handwritten: Pegues ssE)*

7. Anita did not enjoy living with Tommy and me. She felt we were too goody-goody and spent too much time at the Calvary Baptist Church. Anita chose to live with her mother. Eddie remained with Tommy and me. During his childhood, Eddie did not visit with his mother, sister, and half siblings very often. In fact, Bobbye never came to pick up Eddie for a visit. Tommy and I always had to deliver Eddie to her.

8. Eddie was very close to his paternal grandparents. He visited them frequently over the years. When Eddie was a teenager, Eddie's grandfather began to have frequent nosebleeds and needed help with taking care of the cows and other chores on the farm. Eddie went to live with his grandparents full-time. Around this same time, I began driving the truck and traveling with Tommy.

9. Tommy was not ill prior to his diagnosis with lung cancer. By the time he went to the doctor, the cancer had spread to his brain and he only lived six months
   *(handwritten: brain ē ssE)*

following the diagnosis. Bobbye came to the funeral out of respect for her children. However, her presence was so upsetting to me that a family friend asked Bobbye to leave.

10. I continued to see Eddie even after Tommy's death. We kept in touch over the years. I was proud to attend his graduation from boot camp. Eddie has sent me several gifts over the years. He even sent me presents from Okinawa, Japan.

11. I did not know Eddie's first wife. I did see his second wife Joy on several occasions. Joy was a very nice woman who loved Eddie very much. Unfortunately, Eddie's grandparents did not approve of Joy because she was not white. His grandparents' approval was very important to Eddie. I am afraid their disapproval hurt his marriage. I don't know Eddie's third wife, Kat. I had planned to attend their wedding, but I became ill and was unable to go.

12. I believe that Eddie's time serving in Desert Storm was traumatic. Eddie told me that he had seen a lot of people killed including civilian women and children.

13. I also know that Eddie did not enjoy being a Marine recruiter. He told me it was stressful and difficult to make the quota of recruits the Marines wanted.

14. None of Eddie's lawyers has ever spoken to me. I would have been more than happy to testify on Eddie's behalf if anyone had asked me to do so.

FURTHERMORE AFFIANT SAYETH NOT

*Sylvia Epperly*
SYLVIA EPPERLY

Sworn to and subscribed before me
this **22** day of October 2008.

*Pamela Hannah*
NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI

4

# EXHIBIT 8

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF WILLIAM FERRIER III

State of Colorado
County of El Paso

William Ferrier, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Colorado Springs, Colorado. I am employed as a Plumbing and Heating Technician at Universal Mechanical and Construction.

3. I met Thomas Edwin Loden ("Eddie") in approximately June 1988 when I was transferred to Hawaii as part of my service in the Marine Corps.

4. I first learned about Eddie's conviction when I was contacted and interviewed by John David Morledge of Inquisitor, Inc. on August 8, 2008. No one on Eddie's prior defense team contacted me or asked me to provide background information about Eddie. Had an attorney or investigator contacted me in advance of Eddie's

1

sentencing for capital murder, I would have been happy to answer any questions and help in any way I could.

5. When I first arrived in Hawaii in 1988, Eddie was my section leader. We were in the 1/12 1st Batallion 12th Marine Regiment, Headquarters Battery Naval Gunfire Platoon. The platoon was composed of four small teams consisting of three to five men and Eddie was the leader of one such small team. Soon after my arrival in Hawaii, I was promoted to sergeant and became a section leader of my own team. At that time, Eddie and I had the same rank.

6. I considered Eddie one of my very good friends and we would often spend time together outside of work. We would go out for beer and play darts or we would work on cars together. We were both from small towns and were both into drag racing when we were younger.

7. Eddie was very personable and took time to mentor and help the younger Marines with any problems they may be having. He acted as a counselor and a mentor to the younger troops and taught me and others a lot about leadership. Prior to joining the Marines I was a loner. Although I had some leadership skills, I credit Eddie's guidance and education by example in assisting me in becoming a better Marine and leader.

8. Eddie was loved and respected by all his supervisors in the Marine Corps. I was under the same commanding officers as Eddie, namely Lieutenant Mixson; Commander Buss; and Gunnery Sergeant Vasai – all of whom I know were extremely fond of him and viewed him as a very capable Marine. I never heard anyone make a negative remark about Eddie. He was extremely able and

2

professional and there was no limit as to how far Eddie could have gone in the Corps.

9. Our lives in Hawaii, and during the various times we were deployed as Marines, were extremely structured. This mode of life is very different from the work of a recruiter. Because of the recruiting quota which must be met each month, recruiting is difficult work and does not provide the same structure as a typical Marine assignment.

10. During the time that Eddie and I were stationed in Hawaii, Eddie was married to Joy Tommy Gibo. The two appeared to be very crazy about each other and very happy together. My wife and I attended dinners at Eddie and Joy's home and I occasionally visited Eddie's home alone to work on cars in his garage. I never witnessed Eddie being abusive or violent toward Joy or any other female in any manner.

11. Eddie was a very nice looking man and never had any problems attracting women.

12. During our social outings, Eddie never acted in a violent or aggressive manner and was never involved in fights.

13. Eddie and I participated in a number of training missions together. In 1989, we both went to Korea for a training exercise where the US military teams up with the South Korean forces in conducting combat drills and field exercises. We were also in Desert Shield and Desert Storm at the same time. We saw each other at an "R&R Camp" in Jubail, Saudi Arabia. When we were first deployed to Saudi Arabia, we lived in bunkers which were basically holes dug in the ground. Once

3

a month, we were allowed three (3) days off for rest and relaxation. The only place we could get showers, hot food, and air-conditioned rooms was at the "R&R Camps".

14. When Desert Storm started, I was stationed just south of Khafji in Saudi Arabia. I only had contact with Eddie at the R&R camp in Saudi Arabia before any of the combat started. We wished one another good luck and told one another to be careful. We were not in contact during combat.

15. Approximately 15 months after Desert Storm ended, I spoke with Eddie in Hawaii about the war. He told me that his unit was deployed toward Kuwait to conduct an observation at a police station and came under artillery fire and anti-tank fire. I am uncertain if it was friendly fire or enemy fire; however, I do know that friendly fire incidents were not uncommon at the time. In fact, I have reason to believe that my own unit may have fired on Eddie's unit. My unit was stationed on the Saudi Arabian side of a berm that separated Saudi Arabia and Kuwait. Several hundred yards from the berm was a small police station. One day my unit observed activity at the police station and, believing we were engaging the enemy, we fired TOW (Tube-Launched Optically Wire Guided) missiles and other artillery on the station. One of the missiles hit a vehicle. To this day I do not know if we fired on Eddie's unit or an enemy unit; however, after speaking with Eddie in Hawaii, I feel it is possible that we fired on Eddie's unit.

16. During my service in Desert Storm I witnessed a lot of traumatizing events. When I was in the field, I lived in holes dug in the ground with nets over them for months at a time. I witnessed a friend burn to death and there was nothing I could

4

do to help him. After the Battle of Khafji in 1991, I saw dead bodies on a regular basis. When my unit entered Kuwait, it was extremely common to see dead bodies of people who had been killed in the attacks.

17. When Eddie and I talked in Hawaii after Desert Storm, he talked about seeing dead bodies when his unit went into Kuwait. I talked to Eddie about the nightmares and headaches I was having. Eddie told me he was experiencing headaches as well and he told me he knew what I was going through.

18. When I first came back from Desert Storm, I dealt with the psychological problems I was experiencing by drinking excessively.

19. I first approached Military doctors because I was having difficulty sleeping. I requested something to help me sleep because I was experiencing horrific nightmares and would wake up in sweats that went through my mattress. The nightmares and the associated physical symptoms were so severe that I was afraid to sleep.

20. Upon disclosing my symptoms to the military doctors, I was immediately sent to the Navy Base and interviewed by a psychiatrist. I was diagnosed with PTSD (Post Traumatic Stress Disorder) in approximately 1993.

21. Based on my experience, I believe that if Eddie was experiencing similar symptoms, it would not have been wise to disclose these symptoms to anyone in the military as it would basically mean the end of your military career. Because of the way I was treated after my diagnosis, I regret to this day telling anyone in the military about my symptoms. I feel like I was used up and thrown away by the Marines when I needed the military's help the most. All I ever wanted to do in

5

life was be a career Marine and by seeking treatment for PTSD I have lost the ability to carry out my dream.

22. As a result of the PTSD, I have become extremely impulsive. Also, in situations where I feel threatened, it is not uncommon for me to react aggressively, fearing for my life and well being.

23. When I was drinking, I was spending a lot of time in bars and was involved in a number of fights. I truly feel that if I did not stop drinking in June of 1998, after Desert Storm, I would have killed someone due to my fear of being harmed.

24. There have also been two occasions where I injured women while I was asleep as a result of nightmares. On two occasions, I had woken up to find that the woman I was sleeping with had bruises. I have a scar on the bend of my left arm from a woman biting me because I had her in a chokehold in my sleep. When I would wake up after these incidents, I had no recollection of the event that had just transpired. I was not drinking during these two incidents. I always tell people when they need to wake me up to shake my feet. I would not be surprised if Eddie suffered from the same symptoms after returning from Iraq.


FURTHERMORE AFFIANT SAYETH NOT

WILLIAM FERRIER III

Sworn to and subscribed before me
this 9 day of October 2008.

NOTARY PUBLIC FOR THE
STATE OF COLORADO

CAROLYN FERRIER
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 6-2-2012

6

# EXHIBIT 9

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

### THOMAS EDWIN LODEN, Petitioner

*v.*

### STATE OF MISSISSIPPI, Respondent

---

AFFIDAVIT OF DAVID HOULE

CITY OF SUBIC BAY OLONGAPO CITY
PROVINCE OF ZAMBALES
PHILIPPINES

David Houle, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Subic Bay, Philippines. I served in the Marines for 30 years and retired as a Master Gunnery Sergeant. In the course of my career I have participated in military operations in both Vietnam and Iraq. While in the Marines I attained an E-9 ranking, the highest non-officer ranking attainable as a Marine.

3. I met Thomas Edwin Loden ("Tom") in approximately 1990 when Tom was transferred to my unit. At that time I was serving as a senior non-commissioned officer with the 3rd Battalion 12th Marines.

4. I first learned about Tom's conviction about six to eight months ago from Dustin Kittel, a fellow Marine. No one on Tom's prior defense team contacted me or

1

asked me to provide background information about Tom. Had an attorney or investigator contacted me in advance of Tom's sentencing for capital murder, I would have been happy to speak to them and help in any way I could.

5.   I oversaw an elite unit of forward observers within the 3rd Battalion 12th Marines. I headed up the unit for five years and Tom worked under me for three of those five years. Tom was one of the few Marines who were allowed to become part of this unit. The Marines in the unit were an extremely tight knit and elite group.

6.   Our unit served a combat role in Desert Storm in 1991 and was involved in the Battle of Khafji in Kuwait. During Desert Storm, the Marines in the unit were forward observers. This meant that the Marines were attached to infantry units in the field and would provide support to these units if they came under attack. The infantry units were equipped with M-16s but had limited larger weaponry. When the infantry units came under an attack they could not handle by themselves, it was our job to assist by providing artillery, gunfire and air support. Our unit also controlled weapon systems during Desert Storm. All of the Marines in my unit, including Tom, were trained in engaging targets by air, naval gunfire, or artillery.

7.   During Desert Storm, I held the rank of E-7 Gunnery Sergeant and I believe Tom was a Sergeant, E-5. Tom was the most outstanding Marine who ever worked for me. During Desert Storm he was my right hand man. I trusted Tom with extremely important tasks, I never had to ask him twice to do anything and he handled everything that needed to get done. Tom was the second in command of the unit but because he handled everything for me, I felt like Tom ran the unit.

2

Not only was Tom capable of handling everything on his own, he did an outstanding job at whatever task he took on.

8. On one occasion in Kuwait, our unit came under artillery fire. Tom volunteered to determine the origin of the artillery fire. He was accompanied by three other Marines. They determined the location of the artillery fire and eliminated the problem. If it was not for Tom's expertise, it is likely that Marines would have died during this incident. Tom was the hardest charging Marine I have ever had work for me. He put his life on the line as easily as I would.

9. Because we had satellite capability during Desert Storm, we were able to pinpoint our targets from great distances. On one occasion we fired on a base in Jubail and our unit then proceeded to the base to survey the damage. When our unit arrived on the scene, we saw approximately twenty to thirty bodies all of which were bloody and mangled. At least one of the decedents was decapitated.

10. In approximately 1992 I wrote a letter recommending Tom for the Navy commendation medal. Tom was someone who always put his country and his fellow soldiers first. I know that Tom would have died for me and any of his fellow Marines.

11. At the time I knew Tom he was married to Joy Tommy Gibo. I spent a lot of time with Tom and Joy and they often came to my house. They had a very good relationship and Tom was never aggressive, violent or abusive to Joy in any way.

12. I have worked as a Marine recruiter in the past. It is an extremely difficult and challenging job. In fact, I consider the job of a recruiter the most stressful job in the Marine Corps – more stressful than combat. It is difficult to meet the

recruiting quota every month and there is a lot of pressure to do so. Failing to meet the quota makes it difficult to be promoted.

13. Based on my thirty plus years of military experience, I know that if Tom, or any Marine for that matter, was experiencing symptoms that might be indicative of Post Traumatic Stress Disorder (PTSD), disclosure of these symptoms to a superior officer could have easily brought Tom's career to a halt. Moreover, in light of Marine culture, seeking help for a mental health problem would be perceived as a weakness. There is no way a Marine could seek this kind of help without his/her superior officers or other members of the unit finding out.

14. When I learned of Tom's situation I was completely shocked. Tom was a poster Marine and a fantastic leader. The events that were described to me were completely at odds with the person I knew. I believe Tom is a good man who must have snapped in some way. He does not belong on death row.


FURTHERMORE AFFIANT SAYETH NOT


DAVID HOULE

Sworn to and subscribed before me
this 22nd day of October 2008.


NOTARY PUBLIC FOR
CITY OF SUBIC BAY  or ONGAPO CITY
PROVINCE OF ZAMBALES
PHILIPPINES

DOC. NO. ____415____
PAGE NO. ____83____
BOOK NO. ____XH____ 4
SERIES OF ____2008____

LEOPOLDO C. LACAMBRA JR.
NOTARY PUBLIC
UNTIL DECEMBER 31, 2008
PTR NO. 1816-8778  01/24/08
IBP NO. 784394  05/06/08
ROLL NO. 44177
MCLE COMPLIANCE NO. 1-D004014

# EXHIBIT 10

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF DUSTIN KITTEL

State of Oregon
Lincoln County

Dustin Kittel, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Toledo, Oregon, and I am employed as a community service officer with the Newport Police Department in Newport, Oregon. I am married to Sandra Kittel who is employed with Windermere West Coast Properties in Newport Oregon.

3. I served in the United States Marines Corps for six (6) years from December 1988 to December 1994.

4. I first met Thomas Edwin Loden (Tom) approximately January 1990 when Tom arrived in Okinawa, Japan, to serve as the Sergeant of our Marine unit. I was a Lance Corporal at the time.

5. Tom and I served together in the Gulf War, Operation Desert Storm, starting in 1990. We were together throughout the majority of our deployment in the Gulf.

6. I recall seeing dead bodies on several occasions during my time in the Gulf war. I specifically recall a body that had been blown in half.

7. I also recall occasional incidents of friendly fire and the fact that several Marines were injured or killed as a result of misfired weapons. Our own Marine unit was hit by artillery fire one night approximately around 2:00 A.M. Artillery was fired on our Marine unit on that occasion that left a tracer track through the sky.

8. I also recall serving with Tom during a two-month float that involved stops in Singapore, Hong Kong, Malaysia, and the Philippines. Our unit members were a fairly rowdy group, and I recall Tom partying with us. Tom, however, was more reserved than the rest of the unit, possibly because he was several years older than most in the unit.

9. I had many deep conversations with Tom during our service in the Marines. These conversations generally took place in the holes we had to dig and live in during Operation Desert Storm. Among other things, Tom and I would sit and talk about all the things we were going to do when we got back home. These were very sincere conversations in which we opened up and shared many personal matters.

10. Despite having many deep, personal conversations with Tom related to sexual matters, I do not recall ever hearing him say anything that led me to believe that Tom had any form of deviant interests in the area.

11. I considered Tom my mentor in the Marine Corps. Tom was a very dependable person and we got along very well.

12. I recall that Tom was a fashionable individual with style. Tom was a genuinely nice person and I know women considered him to be attractive. Tom never had any difficulty finding a female companion.

13. I am familiar with Joy, Tom's ex-wife. Tom and Joy seemed to be very happy together. I know they had typical marital problems, but I never witnessed Tom being abusive in any way to Joy. In fact, I never saw Tom behave in a violent manner at all.

14. I know Tom worked as a Marine recruiter in Mississippi toward the end of his career and at the time of the offense. One has to work in a "B" billet such as a Marine recruiter or drill sergeant to be promoted. I have been told that serving as a Marine recruiter is a very stressful and difficult position. Marine recruiters have a lot of pressure to deal with as they struggle to meet their quota every month. In Tom's case, I know he could lose everything he had worked for in the Marines if he was not successful as a recruiter.

15. No one from Tom's initial defense team attempted to contact me for any form of statement or background information on Tom. If someone had contacted me, I would have provided this statement and any additional information I could have recalled.


FURTHERMORE AFFIANT SAYETH NOT



Dustin Kittel

Sworn to and subscribed before me
this 21 day of October 2008.

NOTARY PUBLIC FOR THE
STATE OF OREGON

```
OFFICIAL SEAL
WANDA M HANEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 426093
MY COMMISSION EXPIRES MAY 6, 2012
```

Affidavit of Dustin Kittel/lo 008403 v1                                    10/5/2008 09:50 AM

# EXHIBIT 11

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

### AFFIDAVIT OF THERESA LESLIE

State of Mississippi
Lee County

Theresa Leslie, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Nettleton, Mississippi, and I am employed as a sight leader for M. W. Manufacturers, Inc., located in Tupelo, Mississippi.

3. Thomas Edwin Loden ("Eddie") and I met during our 10th grade in high school and became very good friends.

4. At the time, Eddie was living with his grandparents, with whom he clearly had a very close relationship. It was also evident to me that Eddie's grandparents cared for him a great deal.

5. Eddie was an average teenager who enjoyed normal adolescent activities. We would often go out along with other friends as a group to the movies or partake in other fun activities.

6. There was a period where Eddie and I entertained the idea of developing a romantic relationship. We went out on a few dates, but there simply did not appear to be a romantic relationship between us. We determined we were better friends and did not pursue a romantic relationship further.

7. Eddie and I were part of a group of friends who attended high school together and lived in the Dorsey community area. We were a very tight knit group; in fact, in high school I dated and upon graduation married a member of the group, Jeff Mann, and Eddie was a groomsman at our wedding. Several members of our group, including Eddie and Jeff, also joined the military after graduation.

8. I was present at the funeral of Eddie's father and his paternal grandfather. The death of his grandfather was particularly difficult on Eddie because of the special bond they had.

9. My friendship with Eddie continues to this day. Eddie and I correspond with each other regularly. I consider him a very good person and friend. Eddie always speaks and writes about his love for and devotion to his daughter, Abby.

10. Based on my interactions with Eddie, I adamantly believe that the actions taken the night of the crime for which Eddie was convicted do not fall in line whatsoever with the Eddie I have known since high school. At no point during my friendship and interaction with Eddie did I perceive any red flags relative to his behavior, demeanor or actions. Eddie never exhibited any violent characteristics. I completely trusted him and never felt uncomfortable around him.

11. Like many others that knew Eddie, I was shocked upon learning of his arrest and at a complete loss by the thought that Eddie could commit such a crime. Such violent behavior was simply not in his character.

12. I gladly would have cooperated and provided this statement to any member of Eddie's prior defense team, but no one asked me to provide any information concerning Eddie.


FURTHERMORE AFFIANT SAYETH NOT


_Theresa Leslie_

THERESA LESLIE


Sworn to and subscribed before me this **22** day of October 2008.

_Pamela Hannah_

NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI

# EXHIBIT 12

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF JEFF MANN

State of Colorado
County of El Paso

Jeff Mann, first being sworn, testifies to the following under oath:

1.   I am over 21 years of age, and otherwise competent to testify.

2.   I currently reside in Colorado Springs, Colorado. I graduated from Nazarene Bible College in Colorado with a Bachelor of Biblical Studies and I am a pastor at Springs Full Gospel Church in Colorado Springs. I am also employed as a crew chief with ServPro of North Central Colorado Springs.

3.   Thomas Edwin Loden ("Eddie") and I became friends when he moved to the Fulton, Mississippi area in approximately the 9th or 10th grade. Eddie lived with Dick Loden and his wife. The Lodens lived near my family and were life time residents of Fulton. They are very well respected and they are good, honest and reliable people. All of them are hard working and God-fearing people and Eddie shares their faith and attended church regularly.

4.    Eddie and I attended the same high school in Fulton, Mississippi. We were both interested in cars and became very close friends shortly after his move to Fulton. He was a great person to be around and would have done anything for me and vice versa. My friendship with Eddie continued after high school, even after we both enlisted in the military, and he was a groomsman at my wedding.

5.    Eddie had the best sense of humor of anyone I knew. He was a lot of fun to be around because he was always making jokes and it was obvious to everyone that Eddie really enjoyed living life. Many people were naturally drawn to Eddie because he was so likeable and fun to be around. I never knew Eddie to have even one enemy. I considered Eddie a very close friend in and after school and I continue to consider him a very close friend to this very day.

6.    Eddie dated a number of girls in high school. Women were always attracted to Eddie and he never had trouble getting dates or girlfriends—either in high school or after we graduated. On one occasion in high school, I went on a double date with Eddie. I brought my future wife Theresa Leslie and Eddie brought Brenda Worthy. Brenda was very attractive and every guy I knew wanted to date her. I never witnessed Eddie being violent, abusive or disrespectful toward Brenda or any other female. Moreover, until after his arrest, I never knew Eddie to be interested in any deviant sexual practices and I still find it hard to believe.

7.    During high school, Eddie and I often drank beer together on the weekends. I never witnessed Eddie involved in any kind of fight or acting violent in any manner, even when Eddie was intoxicated.

8.  I never met Eddie's mother or father and it was my impression that they were never in the picture when Eddie was growing up in Fulton. Although Eddie may have mentioned his mother and sister in passing, we never had any conversations about them. I understood that Eddie came to live with Dick Loden because Eddie's mother had "some problems." Eddie never expressed any ill feelings towards his family. Eddie never talked about his father and I don't know anything about their relationship.

9.  After high school, Eddie and I both joined the military. I enlisted in the Army and Eddie enlisted in the Marines. I would see Eddie when we were both home in Fulton on leave, especially on holidays.

10. Eddie and I talked a lot about being involved in secret missions and special training. Eddie told me that he had trained with Black Water USA. Although I was extremely well trained, Eddie's military training was much more extreme. I understood Eddie to say that at one time, he was temporarily attached to the Special Forces. Eddie graduated from special schools that trained him to eliminate the enemy very aggressively, behind enemy lines, and mainly in "black ops" missions.

11. When Eddie and I both met back home, we talked about our combat tours. Eddie told me that he had watched several of his friends die in very hideous, ghastly ways during combat. Eddie told me that he had watched helplessly as one of his friends burned alive when an explosive of some sort blew up in close proximity to his friend. Eddie specifically discussed his frustration at not being able to do anything for his friend as he watched him die. Eddie also told me about another

occasion when another friend was blown up and blood and body parts actually fell on Eddie. Eddie also told me about an occasion when a fellow Marine was shot in the head while right next to Eddie. Eddie did not hear the bullet but just watched the Marine drop dead right next to him and then saw blood everywhere. As Eddie was recounting this incident to me and telling me how much blood there was, he began to weep.

12. Eddie told me on numerous occasions that these military experiences "really messed him up." He told me he had extreme nightmares and had such trouble sleeping that some nights he didn't sleep at all.

13. After his service during the Gulf War, Eddie became a very different person. He was no longer interested in going out to dinner with me and my wife even though we had gone out together on countless occasions. He also lost interest in his favorite pastimes such as working on his car. He told me that he planned to leave his car locked in the barn. This was extremely unusual because Eddie and I had been interested in and working on cars since a very young age. Even when we weren't working on the cars, we would talk about what we would do once we saved money for the modifications. I believe the changes I witnessed in Eddie were a result of the extremely evil and tragic events he witnessed during the Gulf War.

14. I saw Eddie about one year before his arrest. Eddie was assigned as a Marine recruiter at the time, but again, he seemed like a totally different person. The happy, lighthearted, easy-going and fun loving man I knew had changed dramatically.

15.     Eddie took his military service and serving his country very seriously. Eddie was very proud to be a Marine and he took tremendous pride in his service. Because of his dedication and commitment, Eddie advanced through the ranks quickly. Eddie would often say, "The Marine Corps is my life." His pride and commitment to the Corps was so engraved on his heart, a remark suggesting that "joining the Marines is the last thing that someone would want to do" would upset Eddie.

16.     At the time of Eddie's arrest I was visiting my family in Fulton. When I learned that Eddie had been arrested I went to see his wife Kat and she told me where I could go see Eddie. I met with Eddie at the jail and talked to him at length about spiritual matters because he was extremely burdened and repentant about the situation. However, we never discussed the alleged crime. Since that time, Eddie and I have written letters to each other.

17.     I was never contacted by Eddie's trial attorneys to provide background information about Eddie. I am completely unaware of any investigation made on his behalf prior to his sentencing in this case. Had I been contacted by Eddie's prior trial attorneys or an investigator in advance of his sentencing for capital murder, I would have gladly spoken to them and provided any information they requested.

FURTHERMORE AFFIANT SAYETH NOT

```
LINDA J. CASTLE
NOTARY PUBLIC
STATE OF COLORADO
```
My Commission Expires 07/02/2009

JEFF MANN

Sworn to and subscribed before me
this 22 day of October 2008.

NOTARY PUBLIC FOR THE
STATE OF COLORADO

# EXHIBIT 13

IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF STELLA FRANCIS RENICK

State of Mississippi
Itawamba County

Stella Francis Renick, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I am Tom Loden's Aunt. My parents were E.O. "Dick" Loden and Beatrice Mills Loden. Thomas "Tommy" Loden was my younger brother. Like the rest of the family, I call Tom Loden "Eddie."

3. Tommy and I grew up on the family farm. My parents had a very strong work ethic and worked hard throughout their lives. The family had very little in way of material goods. My mother made dresses for me and clothes for my brother out of feed and flour sacks on a regular basis. We never went hungry because we kept gardens and raised animals. Tommy and I both did chores on a daily basis. My parents were strict disciplinarians who used a plum switch to correct us. The

1

family recreation was attending the Greenwood Baptist Church on Sunday or visiting relatives after church.

4. My brother and I both graduated from Fulton High School. After graduation, I attended Junior College for a year and a half. After Junior College, I married. I was married to three different men between 1957 and 1989. During that time, I lived in Washington, Missouri, and Starkville, Mississippi. I returned to Tupelo in 1989 after I divorced my third husband.

5. My brother and Bobbye married young. Bobbye's family was not as reputable as our family. Bobbye and Tommy's marriage caused emotional and financial stress to my parents. My parents told me that by the time Eddie was six months old Bobbye would leave her home and her children for weeks at a time. Since Tommy was working, the care of the children fell to my mother Beatrice. Bobbye also lied and wrote bad checks that my parents paid off to avoid Bobbye facing criminal charges. It was well known in the community that Bobbye had numerous affairs.

6. Both of my parents were called to testify for Tommy in his divorce proceedings. There were also several people who were prepared to testify as to their knowledge of Bobbye's numerous affairs. Tommy was awarded custody of Anita and Eddie. During the divorce proceedings and following, there was constant fighting between Bobbye and Tommy and his new wife Sylvia.

7. Eddie and Anita had a difficult relationship with their step mother Sylvia. Anita went to live with Bobbye and her new husband Bill Brown. Eddie stayed with Tommy. However, my mother, Eddie's grandmother, remained his primary

2

caregiver. Eddie was very fond of his grandparents and he was a good and respectful child. Eddie was living with his grandparents when Tommy died from lung cancer in 1981.

8. Eddie joined the Marines when he was eighteen. After he joined the Marines, Eddie did not have the chance to visit home very often. I never met his first wife. I did meet his second wife Joy. Joy was a sweet girl. I know Eddie's third wife Kat well. I attended their wedding in Alabama.

9. Eddie was crazy about Kat. I don't think Kat felt the same way about him. Kat was a career woman. When Kat and Eddie visited my parents' home, Kat would sit and read a book and make no offers to help with cooking or cleaning. On the other hand, Eddie would be in the kitchen visiting and offering to help.

10. Eddie was also crazy about his daughter Abby and from the beginning acted as her primary care giver. I have continued to have a relationship with Abby. Kat wants Abby to know Eddie's family and they visit at least once a year.

11. For about six months prior to the crime, my mother had been telling me that something was wrong with Eddie. Eddie and my mother had always spoken on the telephone on a regular basis. In those last months, my mother said that Eddie was rushed and did not have time to talk with her or was too busy to call her back. Eddie told his grandmother that he was under stress at work and trying to balance work with caring for Abby.

12. I continued to visit Eddie after he was arrested. While he was in the County jail, Eddie revealed to me that he had been sexually abused by a man at the Calvary

3

Baptist Church in Tupelo during a time that he attended Bible school. His stepmother Sylvia had arranged for him to attend this Bible school.

13. I continue to be in contact with Eddie to this day.

14. Prior to Eddie's trial, I spoke to Dave Daniels and Herb Wells. I do not recall being asked about Eddie's childhood or family background. I would have been happy to help in any way I could.

FURTHERMORE AFFIANT SAYETH NOT

_Stella Frances Renick_
STELLA FRANCIS RENICK

Sworn to and subscribed before me
this **22** day of October 2008.

_Pamela Hannah_
NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI

PAMELA D. HANNAH, HINDS COUNTY, MS
NOTARY
My Commission Expires
April 29, 2011
PUBLIC

4

# EXHIBIT 14

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF CONNIE GRAHAM REYNOLDS

State of Tennessee
County of Shelby

Connie Graham Reynolds, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Memphis, Tennessee, I am married and have a seven year old daughter.

3. From 1972 to 1993 I lived in Fulton, Mississippi. During a portion of this time I attended high school with Thomas Edwin Loden.

4. I met Mr. Loden during study hall when I was a sophomore in high school. Mr. Loden was a senior at that time. We dated on a regular basis during my sophomore year.

5. During high school Mr. Loden was very social and had many friends. Some of my friends dated some of Mr. Loden's friends and we often spent time together as a group. Mr. Loden was very smart and funny and was constantly making jokes

1
Affidavit of Connie Graham Reynolds

and trying to get those around him to laugh. In my recollection Mr. Loden was a typical teenager. He was very interested in cars and knew a lot about them. In his spare time he enjoyed playing foosball, spending time with his friends and driving around in cars.

6. Although Tom was strongly drawn to women, it appeared to me that he was never able to get too close to a woman.

7. During the time I dated Mr. Loden I had been to his home and met his grandparents. Based on the time I spent in the Lodens' home, it was clear to me that Mr. Loden was very close to his grandparents.

8. I have never known Mr. Loden to act in a violent or aggressive manner toward anyone.

9. Mr. Loden and I stopped dating formally when Mr. Loden joined the Marines. However, until 1995 I continued to see Mr. Loden approximately every two years. Though we attempted to stay in touch by telephone this was difficult due to his postings in remote locations.

10. I learned of Mr. Loden's crime shortly after it occurred because I was visiting my mother in Fulton at the time. I was shocked about what I learned as I never viewed Mr. Loden as someone who would force himself on a woman or pursue a woman who was not interested in him.

11. No one on Tom's prior defense team contacted me or asked me to provide background information about Tom. Had an attorney or investigator contacted me in advance of Tom's sentencing for capital murder, I would have been happy to speak to them.

Affidavit of Connie Graham Reynolds

FURTHERMORE AFFIANT SAYETH NOT

_Connie Graham Reynolds_
CONNIE GRAHAM REYNOLDS

Sworn to and subscribed before me
this _17_ day of October 2008.

_Glori Shettles_
NOTARY PUBLIC FOR THE
STATE OF TENNESSEE

GLORI SHETTLES
STATE
OF
TENNESSEE
NOTARY
PUBLIC
COUNTY OF SHELBY

expires
2-19-12

# EXHIBIT 15

IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF WILLIAM SANDERS

State of Tennessee
County of Shelby

William Sanders, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I am married and have a daughter, age 19, from a prior marriage.

3. I am currently employed as an insurance agent. I was employed by the U.S. Navy for ten years. I retired in 2002.

4. From 1999 to 2001 I was employed as a Navy recruiter in Vicksburg, MS.

5. During a portion of this time Thomas Edwin Loden was employed as a marine recruiter. Our recruiting offices were located in the same strip mall in Vicksburg.

6. Between 1999 and June of 2000 I interacted with Mr. Loden on a daily basis. We often teamed up in speaking with potential recruits. In addition to work related interactions, Mr. Loden and I often worked out together.

1
Affidavit of William Sanders

7. I considered Mr. Loden a close acquaintance. I found him to be very likeable.

8. Based on my military and recruiting experience, I know that recruiters are carefully chosen and it is one of the most difficult and stressful jobs in the service. Moreover, in my experience, it is difficult to make recruiting quotas in the Mississippi area in light of the recruits available. Notwithstanding this difficulty, Mr. Loden was always very positive about the military and his service.

9. During our interactions, Mr. Loden and I occasionally talked about women in a manner I consider typical in the military. None of the remarks made by Mr. Loden during these conversations were out of the ordinary or inappropriate in any manner.

10. Based on my interactions with Mr. Loden and the time I spent observing his work as a marine recruiter, I would not have hesitated to allow my own daughter to spend time around Mr. Loden at his home or in another setting. I have never observed Mr. Loden acting in a violent or aggressive manner toward anyone, male or female. At the time of Mr. Loden's arrest I was stunned to learn the alleged details of the crime and I never thought that Mr. Loden was capable of such a crime.

11. No one on Mr. Loden's prior defense team contacted me or asked me to provide background information about Mr. Loden. Had an attorney or investigator contacted me in advance of Mr. Loden's sentencing for capital murder, I would have been happy to speak to them and help in any way I could.

Affidavit of William Sanders

FURTHERMORE AFFIANT SAYETH NOT

_____
WILLIAM SANDERS

Sworn to and subscribed before me
this **22** day of October 2008.

_____
NOTARY PUBLIC FOR THE
STATE OF TENNESSEE

MY COMMISSION EXPIRES
ON AUGUST 22, 2010

JOHN DAVID MORLEDGE
STATE
OF
TENNESSEE
NOTARY
PUBLIC
COUNTY OF SHELBY

# EXHIBIT 16

IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

**AFFIDAVIT OF JAMES R. HIGH, M.D.**

I, James R. High, M.D., do declare as follows:

I.   **INTRODUCTION**

1.   On September 18, 2008, I examined Thomas Loden in five hours of face-to-face diagnostic interviewing in the visiting room at the Mississippi Prison, Parchman, Mississippi. This examination was recorded. During the entire examination, Mr. Loden was shackled to a stool while I sat a short distance from him at a student desk. The purpose of my examination was to evaluate Mr. Loden's mental state at and around the time of the June 22-23, 2000 offense as fully as possible.

2.   Because of time constraints, the physical limitations of the interview area, and the fact that I could not allow him any written instruments, I could not directly administer or proctor psychological testing. Rather, I elected to rely on the test's internal validity scales to determine whether he had taken them as instructed. After giving him standard instructions, I left the test question and answer sheets with him to be filled out later in his cell. These

1

were returned to me within a few days. The tests administered include Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Millon Clinical Multiaxial Inventory-III (MCMI-III), Trauma Symptom Inventory (TSI), and Dissociative Experiences Scale (DES). The results of this testing is incorporated herein as forming a partial basis for my opinions.

3.  In preparation of my opinions, I have also reviewed the following medical, legal, and other records pertinent to my evaluation:

   a.  Mississippi State Hospital: R. McMichael M.D., Philip Merideth, M.D., Shirley M. Beall, Ph.D. (Psychiatric Evaluation, 6-22-01)

   b.  C. Gerald O'Brien, Ph.D. (Defense Psychological Report, 9-14-01)

   c.  North Mississippi Medical Center

   d.  Baptist Memorial Hospital, Union County

   e.  U.S. Marine Corp Personnel File and Medical Records

   f.  UMMC Division of Correctional Medicine – MSP

   g.  Post Mortem Examination of Leesa Gray, 6-24-00

   h.  Thomas Loden, Taped Interview (Recording and Transcript), 6-30-00

   i.  Offer of Proof, State of Mississippi v. Thomas Edwin Loden, Jr., 9-21-01, John R. Young, District Attorney

   j.  Trial Transcript, 9-21-01, Trial Judge: Thomas J. Gardner, III

   k.  Thomas Loden, Handwritten Letters to Katrina Loden

   l.  Thomas Loden, Handwritten Suicide Notes to Officer David Sheffield

m. Voluntary Eye Witness Statements by Lisa Sheffield, William R. Tallent, William Holcomb, William Marvin Hughes, Amy Joe Holcomb, Michael T. Comer – All Dated 6-28-00

n. Tupelo High School Transcript, Thomas Loden

o. Interview Statements

    1. Bobbye Christian (Loden's Mother)

    2. Sonja Brown (Loden's Half-sister)

    3. Sylvia Epperly (Loden's Ex-stepmother)

    4. Stella Frances Resnick (Loden's Aunt)

    5. Zachary Dyas (Stepson)

    6. Michael Hare

    7. Betty Jean Kelley

    8. Teresa Leslie

    9. Pastor Gary O'Neil

    10. Mike Nanney

    11. Thomas Clayton

    12. Dr. Daisy Howell

q) Background Investigations:

    1. Bobbye A. Roberts, AKA: Bobbye A. Christian (Loden's Mother)

    2. Sylvia Suttle Loden Eperly

    3. Billy M. Brown, Sr.

    4. Anita Gayle Loden Richie

5.  Thomas Edwin Loden Jr.

6.  Billy Murphy Brown, Jr.

II.  **DEVELOPMENTAL BACKGROUND**

1.  **Preadolescence**

Thomas Edwin Loden Jr. was born August 6, 1964 to Thomas Sr. and Bobbye Loden, their second child. His sister, Anita, is two years older. When Tom was approximately two years old, his mother "ran off" to be with another man, leaving him and his four year old sister locked alone in their house for several days. After their mother abandoned them they stayed with their paternal grandparents on the Loden family farm until his father married Sylvia Epperly approximately a year later. In the divorce from Bobbye, Tom's father was awarded full custody. Tom reports that his father worked a great deal and was inattentive, leaving Sylvia in charge. She was verbally and physically abusive to him and to Anita. She would spank him using a fly swatter, sometimes on bare bottom, or with a coat hanger, holding him by one arm as he ran in a circle. He says they were "hit bad" and that both were spanked if one did something wrong. They both lived in great fear of Sylvia. He reports that she was also belittling of them, calling them "idiots." He estimates that the abuse he suffered at the hands of Sylvia occurred with a frequency of approximately five times a month for the eight or nine years that he lived with her, i.e. on 4-500 occasions. Tom lived with Sylvia and Tom, Sr.

4

from approximately the age of four until ten. He says of his early childhood "Helplessness sucks. I vowed never to let it happen again."

Beginning at approximately age seven or eight, Tom Loden was molested by an adult male approximately 15 times, scattered over two years, while he was attending Summer Vacation Bible School at the local Baptist Church. He "vaguely" remembers a girl two years older than him named Penny who was also involved. The molester had sex with both of them and encouraged them to have sex with each other. Thus his first sexual intercourse experience occurred at age eight. The molestation included both giving and receiving oral and anal sex. Mr. Loden now feels that "what's so fucked up is, I know I was fucked up at the time, but I enjoyed it...I felt like somebody cared for me." He remembers that the perpetrator took Polaroid pictures of them. Though he says he and Anita were "a team" and very close during this period, he did not tell her about this molestation until after his arrest. He reports she said reflecting back, she knew something was different about him. Though he has since obtained a church roster, he is unable to identify the molester. He remembers only that he had a mustache. He reports once his sexual behaviors began, they never stopped. Some time during the two years of the molestation, he also began to have some homosexual experiences with three brothers approximately his age who lived nearby.

At the age of ten, he and Anita were sent to live with their mother and her new husband, Billy Brown. By this time, Bobbye had given birth to two

5

more children, Sonja Brown and Billy Brown, Jr. They lived with Bobbye and Billy for two years and then were returned to Sylvia and their father when Tom was 12 and Anita was 14. Billy Brown, Sr. apparently had a drinking problem and "he could be vicious." He says that Billy would take him to the back garden shed where he kept a shetland pony. He would then get a "horse strap," 3 ½ to 4 inches wide made of leather. (At this point in the narrative, Mr. Loden winces and stops talking momentarily.) Mr. Loden says, "I can still feel it." These episodes of "discipline" would be meted out over "something stupid." In the meantime, Anita, who was now 14, drew closer to her mother. He says of Anita and their mother that "they have a deeper bond" than he. He says to this day Anita will not talk about what happened with their mother. He says that Bobbye was "a flirt" and would take Anita with her, apparently to attract men, leaving Tom alone with Billy, Sr. who would become very angry at Bobbye. Tom saw Bill hit his mother several times. Billy also started going out and began paying Tom $10 a week to watch Sonja and Bill, Jr. He says that the conditions at Bill and Bobbye's house became "as ugly as Sylvia's if not more so" although the beatings were less frequent with Billy than Sylvia. During the ages 10 to 12 when he was left to babysit Sonja and Billy, he began engaging in sexual activity with Sonja which according to him did not involve intercourse.

2.    **Adolescence**

After two years, when Tom was 12, he and Anita were sent back to live with their father and Sylvia. He and Anita were close. "We were always a team. We did all right together." However, after a short period, Anita ran away back to Bobbye. He says, "She deserted me," because "she couldn't put up with Sylvia's shit." He reports the "crushing" part of this was that Anita didn't tell him beforehand. After she left, "I caught all the shit myself." He continued to live with Sylvia and his father from age 12 to 14. During this period, verbal and physical abuse from Sylvia continued, as did Mr. Loden's precocious sexual behaviors. The final episode of abuse occurred in a pantry when he was 14. At that age, she typically would slap him. On this occasion he shoved her and she never slapped him again. He recalls he later warned all three of his wives to never slap him.

At 12 he first performed oral sex on an 11 year old girl. He recalls that he was able to cause her to have an orgasm which he found very empowering. He first engaged in bondage at age 16 and experienced his first multiple partner sex at age 17. He observes, "With sex my learning curve was not normal." By the 10th grade, he was dating a college junior. He says that he was extremely promiscuous in high school. An ex-girlfriend sent him a copy of their yearbook and he reports that he had sex with 27 different girls pictured in that yearbook.

At 14, following his last encounter with Sylvia in the pantry, he ran away from her house and went to live with his mother, Bobbye, her new

7

husband, Jerry Hendricks, and his sister, Anita. He observes, however, that "I didn't fit in. I was not part of the family unit." He lived there for approximately eight months, during which time he attended the 10th grade. After this he went to live on the family farm in Itawamba County, Mississippi with his paternal grandparents. However, around this time his father died of cancer.

During all this time up to the moment when he went to live with his grandparents permanently, he had stayed with them every other weekend. His grandfather had been very protective of him and he reports that on one occasion his grandfather and his father got into a fist fight over Sylvia's treatment of him and Anita. He describes his grandparents as very loving and his paternal grandfather as "perfect." He describes him as "hard working, honest. He never lied or cussed. He was very loving and caring. That's why I loved going there." When I asked my standard question about childhood which is "when you were growing up, where did you feel safe?" He answered, "Nowhere." Then he amended it to say, "On the farm with my grandparents." He flourished in his last two years at high school. Transcripts from Tupelo High School confirmed that he graduated in or near the top quarter of his class. While in high school he began taking some college courses and after graduation took one semester of college. Tom became bored with school and decided to join the Marine Corp.

He recalls that his grandparents commented that at times he seemed to have boundless energy while at other times he would sleep for days while he was in high school. He denies, however, that he was ever diagnosed with Attention Deficit Hyperactivity Disorder or given treatments for it. He denies any difficulty conforming his behaviors to required standards in the classroom.

3. **United States Marine Corps Career**

He joined the Marine Corp in January of 1983 and was on active duty until his arrest. He notes that when he joined the Marine Corp it "changed my whole persona. I didn't want to be the hopeless person I was as a kid" when nearly every choice he made was to run away from problems. In the Marine Corp he found a "family of brothers."

In boot camp, he was selected the "honor man" and immediately promoted from Private to Private First Class. He then went to artillery forward observer school and graduated near the top of his class there. He attended amphibious training on Coronado Island in California and after training stayed on as an assistant instructor until late 1984. He was then sent to Okinawa as an E-3 (Lance Corporal). In Okinawa, he began playing golf with some higher ranking personnel and through this was transferred to Hawaii to be a course marshal at a military golf course where he made "connections with brass there." While in Hawaii he re-enlisted and was promoted to E-4 Corporal. He stayed in Hawaii for three years until he received orders to return to Okinawa as a sergeant. In 1990, he was

returned to Hawaii where he remained until the start of the Gulf War in Iraq.

When he went to war in the Persian Gulf he said, "I never expected to leave 'The Sandbox'." He adds that actually he never expected to live as long as he has since he has now outlived his father. He was in the combat theater from August 5, 1991 through April or May of 1992. Before the fighting started, an acquaintance named Frank was killed by fire from a U.S. airplane five kilometers inside "friendly" lines. Frank was not a close friend, however, they had several connections going back to 1982 or 1983 when they first met in Okinawa. Frank was part of a close knit group that played golf together. Frank's sister, Gina, lived with Tom and his second wife, Joy, in Hawaii. In addition, his friend Susan's brother dated Gina. He says that they were, in the Hawaiian terms, "Ohana-family." He was assigned with another Marine to go out and investigate the friendly fire incident. When he arrived he immediately realized that the deceased was Frank. He felt tremendous shame and guilt over this since "I'm not living right. I was a total derelict. He just got married and had a baby. Why him and not me." He says that Frank being "whacked by friendly fire" was a "fucked up situation."

After this he became reckless with dangerous assignments. He said that while he fired his M16 a few times, his main job was to be a scout and call in artillery fire. He describes some of the activities he was involved in and says that "killing was too easy." Entering areas where he had called in

10

artillery he saw many bodies lying around as he scouted for "armor killing teams." He says that a little known fact is that the Iraqis nearly succeeded with a counter attack and for a period of time things were highly dangerous. He was in charge of assigning scout teams. It was in this context that he volunteered to expose himself, finding it difficult to send others. He reports that one of the soldiers there, Dustin, was a Johavah's Witness, but he was able to talk Dustin into a combat role. He notes that he kept the dog tags of the first person he killed "to remind me how easy it is." He reports that the most helpless that he ever felt was during Desert Storm in combat.

I noted a scar on his nose. He said that after the war when he went back to Okinawa "we were loaded guns" and would get into fights with soldiers from other branches. His scar came from a fight when he was hit across the nose with an ashtray. He describes his first year back from Iraq as an "alcoholic haze." He has tattoos on his right leg saying, "Bad Company" and also "Lost Boy" signifying his membership in a group of 13 men. At least one is dead or an alcoholic. Another has died by suicide and, except for him, "the rest are cops." He says that they take up law enforcement "for the adrenaline rush."

After the Gulf War, "I didn't let anyone in." He says, "I don't have friends. I have associates." After the war he began having nightmares approximately once a week. He found that he had trouble around crowds and felt very distant from his wife, Joy.

11

During the war he was recommended for a combat promotion. He didn't get it at that time but was selected for staff sergeant E-6. He was sent to Hawaii for two more years and then back to Okinawa. He then returned to Hawaii. Following this he was sent to Virginia Security Forces as a "Chief Weapons Instructor." He was promoted to E-7, Gunnery Sergeant. Then in 1999, he was selected for a recruiting position. Because his grandfather was ill, he saw this as an opportunity to return to Mississippi to be nearer to him. He could not be assigned to Memphis or Tupelo but was assigned to Vicksburg, MS where he was in charge of recruiting until his incarceration in June of 2000. He was discharged from the Marine Corp May of 2001. He says his discharge was "not dishonorable," but he was demoted to E-3.

After the war he had trouble sleeping. He would have "occasional nightmares" at a rate of approximately once a week. After a nightmare, he would be afraid to return to sleep. He found it difficult to be around crowds. He still does. He says that his second wife, Joy, can describe his disturbed state of mind at that time. She would "ask stuff, but how do you explain what you've been through." He recalls trying to reveal his agitated, hypervigilant state of mind by telling Joy on at least one occasion, "Do you know I've killed more people in battle than there are in this bar?" Nevertheless for the most part he remained closed and distant from her and his loved ones.

12

4. **Social Sexual Adjustment**

The Marine Corp sent him to Coronado Island in San Diego after boot camp where he met his first wife, Linda Farron Reed. She was dating a friend of his when they first met but she and Tom rapidly "hooked up." Shortly after they were married, he was sent to Okinawa and she went home to Knoxville. She wrote him to say that she had run into her ex-boyfriend in a bar and had been unfaithful. He immediately divorced her or had the marriage annulled.

His second wife was Joy Tammi Gibo. They married in 1984 and divorced in 1995. When they first married he was deployed at Ko'olawe, Hawaii. During this marriage, she became pregnant twice and had elective abortions on each occasion. He says of this, "I wish we wouldn't have," (terminated the pregnancies). In addition to his emotional distance and changed mental state due to the Gulf War, he reports that following the Gulf War he was "over deployed." He was gone so frequently "the dog bit me when I came home." Thus, they grew apart. He reports that after the war he felt "at times like I was living in quicksand. I didn't feel. I lost interest." He says he quit playing golf, hunting. He felt like "this great pressure rained down on me." For years "I didn't feel" (he becomes tearful) and describes himself as "apathetic." He also says, "I was an ass, which I regret." When he came back from his last deployment, Joy had taken a lover and refused to stop seeing him and said she wanted a

13

divorce. Later she had second thoughts but by this time he had become involved with his third wife, Katrina (Kat).

When he met Kat both were married, he to Joy and she to William Dyas, another Marine. They were married from 1996 to 2000. Their daughter, Abby, was born ███████ 1998. William Dyas had adopted Kat's son, Zach, from a previous liaison and then he and Kat had a second son, Keaton. When Kat and William divorced and she married Tom, William retained custody of Zach and Keaton. Later Zach came to live with Tom and Kat, with Keaton joining during summers. Zach still refers to Tom as his "step dad" and reports that Tom was "a perfect father" and was "really good to me" all the time that he was with him. After they were married and while they were still living in Virginia Beach, he believes she began an affair with a Major Joe Harkett. He says, "I kind of knew she was seeing him but there were rules. You can't get involved."

He expressed the idea that when they first met in Virginia "I had an elite job," and that this was part of the reason she was attracted away from Bill and toward him. After his marriage to Joy failed because of his inattention, he decided that in his marriage to Kat he would do anything he could to please her. He had previously used toys and objects in his sexual behaviors, and he reports that Kat and he possessed at least four or five "sex toys" which they utilized and they enjoyed videotaping themselves during sex. He believes, "I did too much." Whereas he wouldn't let Joy in, "I internalized things with Kat. She'd scream and I'd say nothing." He

14

says that one of her favorite phrases to describe his emotionality was "fester, fester, fester." He reports that he would bring her flowers weekly for no special occasion and try to give her everything that she said she wanted and needed. Shortly after their marriage, at her insistence they bought a house in Virginia based on the premise that she would continue working to help pay the bills. However, she then became pregnant, stopped working, and started going to school. The financial strain was too much and they lost the house and had to move to a town home in a less desirable neighborhood. He reports that they were forced to undergo bankruptcy in 1997. He says, "I lost everything. I felt like someone ripped my manhood out from me. There was nothing I could do."

After she finished school and they moved to his next assignment in Vicksburg, Mississippi, she began working for a prestigious law firm and specifically for an attorney, Jim Craig, who was well respected in capital crime defense circles. In his view, he became essentially a "clerk" in his recruiting job while she began having lunch with powerful and well known people such as the Attorney General of Mississippi. They had already evolved a somewhat open marriage because "if she could do it, I could do it too." However he began to feel threatened by her new associations and particularly by Jim Craig about whom she admitted she had feelings, which he felt was against their "rules." He said that not only did this bother him but he also felt she began to ignore him. He felt that she "treated me like crap." He says that he "just got through with Joe

15

(Harkett). Now she's talking about Jim Craig." Mr. Loden in the meantime began sexual liaisons with at least four single women in Vicksburg named Amy, Brittany, Brandy and Sabrina. He said that he was trying to get through by ignoring what was happening in their marriage and "sectioning things off.". He continued to attempt to win her back and curry favor by buying her things, flowers and even a luxury vehicle to drive.

5. **Medical History**

He reports that he began drinking at an early age. He started using GHB (gamma-Hydroxybutyric acid) in 1994 as part of workout and body building. He says that at a dose of 2 cc. it is a body building aid. At a dose of 4 cc. it is a recreational drug and at a dose of 6 cc. it becomes a knock out drug. After he returned from Desert Storm and while he was in Okinawa, his drinking went out of control. He reports that the first year back from Desert Storm "most of us had alcohol problems." He began having occasional drinking blackouts at that time. He also began having memory problems. He recalls that his second wife, Joy, called him a procrastinator. He says, however, he was not procrastinating. Rather he was quite forgetful and had trouble paying attention. He says he use to make lists because the problem he was having was one of memory and concentration. In his work in order to pass tests he had to take, he would have to have a routine. He notes that he had no such trouble in high school or before Desert Storm. Despite his drinking and memory difficulties and

except for one occasion on an annual physical when he marked that he may be having trouble with his memory, he denies complaining or seeking any psychiatric help. He says to do so would be the "kiss of death" to the career of a Marine. Despite his problems with alcohol in the early 1990s, he denies that he has ever gone through an alcohol withdrawal and says that later on he found he could take alcohol or leave it. He has never had a Driving Under the Influence arrest. This also would be the "kiss of death" and he never wanted to "jeopardize my military career." His sole prior arrest was for an open container, public intoxication in Tupelo that occurred the year after the Gulf War.

He and Joy were in a motor vehicle accident in Northeast Mississippi where they were taken to the Northeast Mississippi Medical Center in Tupelo in 1987. He was knocked unconscious by mortar fire in training at 29 Palms, California. He says this accident and injury was deemed a "grade 3" inasmuch as he had to spend the night in the hospital. He had arthroscopic surgery on his right knee while in the Marine Corp and also had two procedures to replace the anterior cruciate and medial collateral ligaments in his left knee. He also at the age of 15 had a lymph node removed from the right side of his neck. He has had his tonsils and adenoids removed and had a vasectomy in 1999. He also reports that he has suffered from migraine headaches. He reports that late in his career in Virginia he was shot in the leg by a Navy Seal during a training exercise.

He reports that he drove himself to the hospital and that he has a scar on his right outer mid thigh.

III.  **PRE-OFFENSE MENTAL STATE**

1.  **Background**

As noted, he had taken the recruiter position in Vicksburg, Mississippi to be near his failing grandfather whom he describes as having been his "rock." At that point he was a year and a half from retirement from the Marine Corp and says he has no doubt he would have taken a retirement at 20 years. At the time he became a recruiter he had been selected for First Sergeant but not yet promoted. He says, "I shouldn't have been recruiting." In December, 1999, his grandfather died (he is tearful recounting this). He says, "He was my rock. He took care of me when no one else cared. When he got older I tried to do everything I could for him. That's why I got on recruiting. I didn't think he'd make it till I retired." He recalls that he was so distraught at his death that he was drunk at his grandfather's funeral and for three days after. He reports that, after his grandfather died, the farm, which had always been his refuge, changed. His grandmother had fractured her hip a couple of years before and was unable to take care of things. His Aunt Frances and her husband moved on to the farm and began changing things including neglecting parts of the property and padlocking and chaining gates. He complains that "They took over and it wasn't theirs." For the first six months of 2000, at the

18

same time the farm was deteriorating so was his marriage. This was the period when Kat was, in his view, becoming more attached to Jim Craig and less attentive to him. In the weeks leading up to the offense, he and his wife went to Virginia Beach, Virginia on leave to take a vacation. He hoped that this would bring them closer. Instead she went out drinking with her girlfriends while he was left babysitting.

In the meantime, his recruiting assignment was not going well. One of his subordinates was coming under investigation for recruiting fraud. In addition he was about to fall short of his "mission" for the third month in a row.

2.  **Day of the Offense**

Against this background of his grandfather's death, the take over of the farm by Frances and her husband, the deterioration of his marriage and the disappointing vacation to Virginia Beach, his perceived failings in his duty to the Marine Corp, and the approaching end of his Marine Corp career, he decided to take a few days to go to Itawamba County to work on the family farm and look after his grandmother. "Just before the crime I took my grandmother to the mall for the first time in years." He found that the grass around his grandfather's house which his grandfather had taken care of over the years, was now three feet deep. He moved it. He also had to repair some farm equipment that had been left out in the rain. He was scheduled to return home on that weekend.

On the day of the offense, Thursday, January 22, 2000, he was running errands and attempting to fix the farm implement. He also began drinking Wild Turkey Bourbon. He estimates that during that day and up to the time of the crime he drank approximately ¾ of a fifth. He says he may have also added a couple of beers to that. He notes that "at points I was a bad womanizer" and therefore he believes he was flirting with Leesa Gray and "met her on purpose that night." He says that when he came to the restaurant near closing time, he ordered a cheeseburger from one woman but Leesa intervened and said, "No, no. I've got him...he's mine." He says now had he known her age "she wouldn't have been on my radar."

He had spoken with Kat earlier on the phone. Then they spoke again at approximately 9:30. They talked a while about money and work and "day to day things" and then "we started having a little phone sex." He claims that at this point "the Jim (Craig) thing came up." She reported to him her intention to begin an affair with Mr. Craig and that she and Craig had had phone sex earlier. He says the point "where I was" was "close equal" to the helplessness he felt in combat during Desert Storm. He says that his "rock" had died. He was losing his refuge and, he felt, his family and perhaps career. He says he felt "total helplessness" which from his childhood he had "vowed never to let...happen again." He says, "I should have seen the signs of so much shit but I didn't."

## IV.  MENTAL STATE AT TIME OF OFFENSE

1.  **His Recollection**

To my first question, "Do you remember killing Leesa Gray?" he quickly responded, "No" as he has maintained from the time of his arrest. When I asked for his last "solid memory" from the night before, he said, "That's a trick question." He notes that since then "I recalled more than I could that morning." He describes his current memory for the crime a "blank cassette" which has now become a "corrupted hard drive" because of all the things that he has been told or lead to believe about what happened that night. He says that he knows that he and Leesa were talking but it's not clear what they said. It's also not clear what it is that he remembers versus that which he has come to believe or know otherwise. He says that the best he can do is to describe some "snapshots" that he believes to be memories. He believes that he and Leesa were talking and laughing at one point. He also believes that at one point they went to get gas and he bought a Coke for her and made a mixed drink for her. He also has some sort of a memory of her arm across his chest at one point. "I know I had sex with her," but wonders if it was "rough, consensual or erotic bondage or rape...I don't know."

2.  **Videotape**

In the videotape, he is seen committing some of the offenses for which he was convicted, including forced oral copulation, intercourse and penetration with a cucumber. She was also heard to say that he was

21

hurting her. Though it is difficult to be certain, neither appear to be intoxicated. In the few words that he speaks his speech is not slurred or otherwise dysarthric, nor is there any trembling or ataxia in his hand and arm movements. He is apparently holding the video camera with one hand while molesting her with the other. The camera is not particularly shaky.

The videotape containing the crime on the day before, June 21 shows Bill Dyas and Tom Loden apparently in the kitchen of Tom and Kat's house in Vicksburg. Kat is videotaping and is moving the camera back and forth between Bill and Tom in an attempt to be humorous, intoning "Before" when the camera is on Bill and "After" when the camera is on Tom. The men do not seem amused.

Family scenes on both Exhibit 7 videotape and Exhibit 8 videotape which records the crime includes a number of scenes of Tom and Kat and the children usually with friends. There was also a protracted scene of Kat on a small boat out on the water with Bill, Zach and Keaton Dyas and Abby Loden. At one point Abby vomits from seasickness and Kat laughs. At another point the boat has obviously broken down and they're being towed in and Kat is taunting Bill mildly about this. Tape 7 also contains videotape of Tom, Kat and Abby up on the alter at church while Abby is being christened. It also contains film of Zach being baptized the same day.

## V. POST OFFENSE MENTAL STATE

### 1. Immediate (2000)

He reports that on the morning of June 23, he woke up in his bed feeling "mostly normal." He reports that he wanted a cigarette and realized that the cigarettes were in his van. He also woke with a sense of something not being right. He went to the van and as he entered it something about the van, "I can't find words," gave him a sense of unreality which he tries to describe using the term "déjà vu." He says he was looking to his right for his cigarettes and then for the lighter when he saw Leesa's body. He said, "I totally freaked. I started noticing things." He believes that he saw her tennis shoes in the van and "then I knew I was with her last night. I knew something happened. I started deducing that it must be Leesa's." He says he "freaked out big time." I asked him to describe what he meant by "freaked out" and he said, "Disbelief, sheer panic, fear, pissed off." He says he didn't know what to do or really what had happened.

He says that he left the van and walked around it two or three times thinking "what the hell am I going to do." He says he then "did everything wrong in retrospect." I asked what under such circumstances would have been right. He said that, "I should have called someone." He reports thinking, "How did this happen? What am I going to tell my wife and Leesa's parents?" Instead of driving the van, he used the pick-up truck which had been his grandfather's and began driving around the farm, "the only place I ever felt home and comfortable." As he was driving he

kept thinking, "How I got to this and what the hell am I gonna do?" He says that the "embarrassing part" is that he was acting "like a two year old who broke a cookie jar" and was trying to hide it.

He walked over the hill and saw a police officer inside the van. "Then I knew my life's over." He walked off into the woods, found a beer bottle, broke it and slashed his wrists and forearms. He also carved the words "I'm sorry" in his chest. He remembers doing all these things and says that it hurt. He says he took off his wedding ring and crawled into a muddy ditch waiting to die. He felt that he had made peace. After a while, however, from the loss of blood, the drinking and perhaps drugs he took the night before began to make him feel very "parched." He got out of the ditch and stumbled into the road in front of a car driven by a woman. He doesn't recall whether they said anything. He next recalls begin handcuffed in the ditch and being read his rights. He was then put in an ambulance. His next solid memory was in the emergency room. He says, "It was all surreal. How could this be me? I was in total disbelief."

When Kat visited him within a few days of the crime, he told her that he could not remember anything that happened that night after their conversation. He still maintains that this was his mental state from the time he woke up on the morning of the crime through the time he spoke with Kat. While he was in the county jail, he says, "I couldn't believe it happened. I was not right in the head." After his initial wounds healed, he became repeatedly suicidal through the following months. His sutures

were removed from the cutting that he did on the day of the crime, on June 30, 2000. Then he came back to Baptist Memorial Hospital on July 6, 2000 with the wound reopened. He cut his wrists again on July 11, 2000. He was taken to the emergency room with extremely low hemoglobin at 7.76 and a hematocrit of 23.6 and was transfused with 2 units of packed cells having suffered "significant hemorrhage post injury." He was pale, dysphoric, and had lost 2000 cc's of blood. On November 1, 2000, he was again admitted to North Mississippi Medical Center where he had been treated immediately post crime. Again he had a 2 cm. laceration on his right forearm and was hypovolemic with hypotension. He was treated, became hypotensive again, and was this time admitted to the hospital overnight. He reported that he had used a piece of metal and a fingernail and perhaps his teeth to cause the laceration. This time there was 1,000 cc of blood lost at the scene. He reports that eventually he has been given some medications including antidepressants and these have been very helpful in evening out his moods and reducing his suicidality.

When he talked to his wife in jail, he told her that he didn't remember anything. Kat told him things that the police had told her about the crime and "that I should talk to them." (He notes at this point that his hands are sweaty talking about Kat.) He says that Kat told him that it would be in his best interest to talk to detectives. He notes that at the time she was telling him this she was Jim Craig's paralegal. Jim Craig was a well known defense attorney and was working with the Mississippi Attorney

General at the time. He adds, "Tell me they didn't talk." Despite all their problems, he still felt that "if she thought it's best to talk with them, then I'll do it." He says that he gave a statement at that time but the whole statement was a "regurgitation of what they told me." He said they would ask him hypothetical questions such as "how would you have killed her." He reports that at the time "I was in such disbelief. I was a blank cassette, still not sure I did it, blanking things out." He thought his memory problem might have been from alcohol or GHB but at any rate, "If it's me that did it, I don't want to confront that part of me." Therefore he went along with their hypothetical questions.

2. **2001 to Conviction**

He reports at one point he had wished to have a private attorney. Kat, however, talked him into quit claiming property so that he could qualify for a public defender. He said his attorneys told him "I had no chance in that court as long as I had an elected judge." Thus, he followed his attorney's advice. He said, "I trusted my lawyers." He said that they told him that he had heightened review and appeal rights after he was convicted of first degree murder. However he says, "Everything they told me was a lie."

3. **State of Mind at Time of Guilty Plea and Waiver of Right to Mitigation Trial**

From before the time Mr. Loden was apprehended to the time that he formally pled guilty before the Court and waived his right to trial on issues

26

of guilt and litigation, he has never wavered from an attitude of extreme remorse including not only carving "I'm Sorry" on his chest but also attempting suicide three times within the first six months of the crime including just a few hours after the crime. It was in that same state of mind, apparently, that Mr. Loden, reinforced by the questionable advice of his attorneys, waived his right to put on a defense against guilt or mitigation evidence before a jury (see Thomas Edwin Loden, Jr. statement, Itawamba Cause #CR00-078, P. 209 Line 24 to P. 211 Line 7). The pre-eminent motivating fear of Thomas Loden's life since he was two years old has been a fear of abandonment. This is in fact a recognized symptom of his Borderline Personality Disorder, i.e. "frantic efforts to avoid real or imagined abandonment..." as I noted earlier (VIII #4). In addition, consistent with this personality disorder, Mr. Loden has been acutely suicidal at several points in his life even before the post-offense period. That his behavior on the day of his sentencing was extraordinary was in fact noted even by the prosecutor, assistant district attorney Dennis Farris, who opined (P. 208 Line 26 through 29), "Your honor, this is not normal. It's not often that we have someone plead guilty to a capital murder and go into this type sentencing." Thus in even those prosecuting him took note of his extraordinary level of remorse, lack of self protectiveness, and attempts to make amends displayed that day, a state of mind that began almost immediately and certainly within hours of discovering what he apparently had done. This is not a state of mind that

would predict this crime nor that was displayed on the videotape. Thus his state of mind on September 21, 2001, at his sentencing and his apparent state of mind at the time of the offense are so starkly divergent and contrasting that one or the other or both must represent an "extreme mental or emotional disturbance" influencing Mr. Loden's actions and decisions.

VI.   **CURRENT MENTAL STATE**

Tom Loden is a slim, athletic looking Caucasian male appearing approximately his stated age. He is in arm and leg shackles and is shackled to a stool throughout the examination. Despite the discomfort of this arrangement, the examination was accomplished with only a brief 10 to 15 minute bathroom break in the middle. He has medium short hair that is turning salt and pepper, and is of course dressed in standard death row prison garb. His speech displays normal rate, rhythm and prosody. He is completely oriented and shows no signs or stigmata of brain damage or mental retardation. He began the interview by asking me several questions about myself. He was obviously nervous and was frequently looking side to side and rapidly tapping his right foot. He said at one point that his hands were sweaty. When I felt them they did not feel particularly sweaty. He stated more than once that "opening up" was extremely difficult for him and made him anxious. His mood was indeed anxious. His affect was somewhat constricted by the anxiety although he was able to at times portray an easy going way and to lightly joke and chuckle. There were occasional tears. His thought processes

28

appear to be intact without looseness, tangentiality or circumstantiality. There was no evidence of thought insertion or thought broadcasting. His content of thought revealed no prominent hallucinations or delusions. There was mild defensiveness which may indicate an underlying paranoia. He mentions dissociative phenomena including hearing Frank's voice inside of his head at times of great stress. During the exam, he appeared to experience a somatosensory flashback to being beaten with a horse strap. He, of course, has a circumscribed amnesia with some bleed through of faint memory beginning late in the evening of June 22, 2000 and continuing until he woke up the next morning at 7:00. He denies being currently suicidal and denies current homicidal thoughts. His judgment is not impaired within the confines of his current situation. Likewise, his impulse control appears to be good within the confines of death row. His insight is reasonably good though I doubt that he is fully aware of the degree of his anger or its role in his decision making.

VII.    **PSYCHOLOGICAL TESTING**

1.    **Minnesota Multiphasic Personality Inventory-2 (MMPI-2)**

On this test the infrequency scale (F=89) was elevated but not likely due to a pervasive attempt to look sick. Rather his pattern of validity scales has most often been associated with acute psychological disturbances that involve some degree of panic, intellectual confusion or impairment in concentration. Further it should be noted that he obtained a very high score on the control scale (CN=75) which suggest an unusual ability to

29

disguise or conceal psychopathology so that he might appear well put together or having his aggression under control. This appearance should not be taken at face value however. His profile (648) indicates a severely paranoid makeup with either an overtly psychotic state or a current borderline condition. He would be prone to become intense and agitated when he feels trapped or threatened. He also is shown to be suffering a moderately severe current level of depression and anxiety with nervousness, worry and guilt after acting out. Such patients are often shown to be vulnerable to difficulties managing any alcohol and drugs that give them an immediate relief from tension. He tests as resentful, irritable with overt or poorly disguised temper outbursts predicted. Demands on others for affection and sympathy and an oversensitivity to any demands on him are common problem areas with this pattern along with a past history of marital antagonism if not paranoid jealousy. He would be seen as overly quick to resent anything he interpreted as a personal rebuff. Conflicts around sexual demands and impulses would be typical. Typical diagnoses would center on paranoid states or borderline psychotic pictures with passive aggressiveness and chronic abuse of chemical agents of various kinds. The profile also suggests a moderate to severe suicide risk. Those who did make suicide attempt use drastic and dangerous methods that appear to dramatize the intensity of their unreleased anger.

2.  **Millon Clinical Multiaxial Inventory-III (MCMI-III)**

His response style on this test indicated a broad tendency to magnify his illnesses or an inclination to be self-pitying. On the other hand, he may be conveying feelings of extreme vulnerability associated with current episode of acute turmoil. Whatever the reason, the patient's scores, particularly on Axis I, may be somewhat exaggerated. Furthermore, the test results must be modified to account for psychic tension and dejection on the anxiety and dysthymia scales. Axis II personality patterns indicate a failure to develop adequate internal cohesion and a less than satisfactory hierarchy of coping strategies. His foundation for effective internal regulation of socially acceptable interpersonal conduct appears deficient or incompetent. His sense of psychic coherence is often precarious and he probably has a checkered history of disappointments in his personal and family relationships due to a tendency to self-defeating vicious cycles. Although he is able to function on a satisfactory basis, he may experience periods of marked emotional, cognitive or behavioral dysfunction. For much of his life, he has had to learn to guard against ridicule and derision. He is able to detect minute traces of annoyance expressed by others and to misinterpret minor slights as contempt and condemnation of him. His inability to communicate ideas and feelings in a relevant manner only serves to alienate him further from others. Axis I clinical syndromes suggest the strong possibility of a Schizoaffective Disorder and of

Posttraumatic Stress Disorder. His personality configuration is likely to include Borderline Personality Disorder.

3.   **Trauma Symptom Inventory (TSI)**

The Trauma Symptom Inventory is a test that has been available for general use since 1995 and is specifically designed to survey for symptoms and symptom groups known to be caused by traumatic life events including both those of childhood and of later life such as combat trauma. It is composed of three validity scales and ten clinical scales and three "summary scales." Mr. Loden's Trauma Symptom Inventory was completely valid with no distortions in response shown. The clinical scales that were significant included those of depression, anger and irritability, intrusive experiencing, defensive avoidance and, most significantly, Dissociation. The summary scales which combine the scores on the clinical scales into groupings showed elevation on the Trauma scale (TR) which is consistent with, and indicative of, current Posttraumatic Stress Disorder, and Dysphoria (DYS) which is consistent with, and indicative of, a current depression.

When he took this test under standard instructions, which are to report on symptoms in the last six months, these were the results. Mr. Loden, concerned about this being misleading in terms of his mental state at the time of the crime, took it upon himself to complete a second set of test answers, fearing that the fact that he was confined on death row drastically affected the accuracy of the test in indicating his true mental state. Thus he

attempted to complete an additional protocol, answering as best he recalls his mental state prior to being incarcerated. (Note that a number of questions have to do with drinking patterns and current patterns of sexual behavior. Thus, his incarceration would in fact artificially flatten these results.) While I cannot endorse this method as having true test validity, the results were interesting enough that I present them here. The primary difference between his standard test protocol and this self-prescribed protocol is that his validity scales were again completely normal without indication of distortion. Several of the clinical scales, notably anxious arousal, sexual concerns, dysfunctional sexual behaviors and impaired self-reference and tension reducing behaviors were elevated on this protocol where they were not on the other. The effect of this was to also elevate the summary scale called "Self" (SLF). This scale is usually elevated in the face of severe and damaging childhood abuse and neglect.

4. **Dissociative Experiences Scale (DES)**

The Dissociative Experiences Scale was designed by Drs. Frank Putnam and Eve Bernstein Carlson at the National Institute of Mental Health. Its purpose is to screen for the subtle symptoms of Dissociative Disorders, which are often missed by other testing and interviewing diagnostic modes. The average score in the United States population is in the 7-10 range, and a cut-off score of 30 gives a 95% degree of confidence in the existence of a Dissociative Disorder. His score on this was just under 20, slightly below the severity generally seen in PTSD.

33

VIII. **DIAGNOSES (CURRENT AND PAST)**

I hold the following diagnostic opinions to a reasonable medical certainty:

1.     At the time of the commission of this crime and up until Thomas Loden awoke on the morning of June 23, 2000, he was suffering from an acute, localized episode of dissociative amnesia (DSM-IV-TR code 300.12). This disorder is characterized by an episode of "inability to recall important personal information usually of a traumatic or stressful nature that is too extensive to be explained by ordinary forgetfulness." (DSM-IV-TR, P. 523)  To the extent he cannot recall that evening the disorder continues to present.

2.     From the time of his combat experience in 1991 to the present, Thomas Loden has suffered from Posttraumatic Stress Disorder – chronic. (DSM-IV-TR, Code 309.81, P. 463-468)  This disorder is signaled by intrusive recollections of traumatic events, emotional numbing and avoidance of triggers, and autonomic hyperarousal – irritability, insomnia, hypervigilance.

3.     From childhood forward and to the present, Thomas Loden has suffered from an additional Posttraumatic Stress Disorder usually referred to as "Complex PTSD." This disorder is recognized in the Diagnostic and Statistical Manual on page 465 under "Associated Features and Disorders" where the following passage is found:

"The following associated constellation of symptoms may occur and are more commonly seen in an association with an

34

interpersonal stressor, (e.g. childhood sexual and/or physical abuse, domestic battery): Impaired affect regulation; self-destructive and impulsive behavior; <u>dissociative symptoms</u>; (my emphasis) somatic complaints; feelings of ineffectiveness, shame despair or hopelessness; feeling permanently damaged; a loss of previously sustained beliefs; hostility; social withdrawal; feeling constantly threatened; impaired relationships with others;...."

4.  Thomas Loden has suffered throughout his adult life and at the time of the crime and up to the current from a Borderline Personality Disorder (DSM-IV-TR Diagnostic Code 301.83, P. 710). This disorder is characterized by "frantic efforts to avoid real or imagined abandonment." Also by "a pattern of unstable or intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation," and "identity disturbance: markedly and persistently unstable self-image or sense of self." Further, such individuals exhibit "impulsivity in at least two areas that are potentially self-damaging," and suffer "affective instability due to marked reactivity of mood," "chronic feelings of emptiness" and "transient, stress-related, paranoid ideation or severe <u>dissociative symptoms</u>." (my emphasis)

## IX.  **DISCUSSION**

1.  Mr. Loden's severe psychopathology, at its core, was caused by severely disrupted childhood attachment to both of his parents but particularly his

35

mother and abandonment by her. It was further exacerbated by physical and emotional abuse by his stepmother, Sylvia Loden and by physical abuse at the hands of his stepfather, Billy Brown.

2. He was further subjected to betrayal sexual abuse and exploitation while attending vacation Bible School during his "latency" years of approximately 8 to 10. This was damaging by perverting his normal psychosexual growth and development as evidenced by his early adolescent sexual behavior with his preadolescent half sister. (As he noted, "I did not have a normal learning curve where sex was concerned"). However it also provided a method of self-soothing which, at times of stress, he used to dampen the wild fluctuations in his self-image, self-esteem and emotions and behaviors through compulsive sexual activity.

3. Unlike many with complex PTSD Thomas Loden, perhaps through talent and chance, hit upon a military career as providing an "exoskeleton" of rigid rules, regulations, and expectations giving him, when combined with self-soothing through use of drugs and alcohol and tension reducing sexual behaviors, a chance for at least a normal appearing life within broadly defined emotional normalcy.

4. In 1991 at the age of 26, he was subjected to severe traumatic circumstances of combat related trauma in Operation Desert Storm in Iraq. The combination of intrusive recollection of disturbing and frightening combat related memories, the attempts to fight these off through emotional numbing, and avoidance of these subjects and the autonomic hyperarousal

36

caused by the PTSD, worsened his drinking and acting out behaviors. Along with the numbing-induced distancing from his wife, Joy, this destroyed that marriage and resulted in a prolonged period of substance abuse and increased violent (bar fights) and hypersexual acting out.

5. He was able to regain control to a degree by entering into a third marriage with Katlin, whom he felt chose him over her then current Marine Corp husband in part because of Thomas Loden's "prestigious" job as a weapon's instructor.

6. In the late 1990s, any sense of security in this marriage began to crumble, despite the birth of a daughter, when he received a less prestigious Marine Corp assignment coincident with his wife's perceived infidelity, finishing college and entering employment in a highly regarded law firm. This afforded her contact with people of great accomplishment which Mr. Loden found extremely threatening. Mr. Loden attempted to compensate in his usual manner through increased sexual acting out, at one point taking on four younger mistresses in Vicksburg, and through attempting to re-impress Kat with a luxury vehicle.

7. Unfortunately these, too, failed to restabilize him in 1999 when his paternal grandfather, who had been his "rock" and only refuge during his tumultuous childhood, died. In the weeks and months leading up to the offense, Mr. Loden and his wife took a vacation to Virginia Beach which Mr. Loden viewed as an opportunity to reignite their relationship. Unfortunately, he perceived her as even further distancing herself by

37

going out drinking with girlfriends, in his opinion, ignoring him. This led to further psychological instability.

8. On the date before the offense, Mr. Loden drove from Vicksburg to the family home in Itawamba County in order to attend to some restoration issues on the family farm which had fallen into disarray upon his grandfather's death. Thus he was isolated from his wife and cut off from his usual sexual outlets in Vicksburg at the same time he was confronted with the literal and symbolic deterioration of his "refuge," the family farm, stark evidence that he had lost this refuge and "rock" due to his grandfather's death.

9. Later that day he began drinking and by chance encountered the victim, Leesa Gray, at her family's restaurant. What then ensued is unclear to his memory. However, it includes a second contact with Miss Gray and a telephone call from his wife in which she informed him that she was having, or about to engage in, an extramarital affair with one of the partners in her prestigious law firm, Jim Craig.

10. Thus, the combination of crumbling of the external structure of his Marine Corp identity, crumbling of his marriage, loss of his "rock" and refuge, separation from his usual sexual outlets, and the extreme stress from his wife confirming his worse fears, that she might abandon him for a more prestigious male, precipitated an acute episode of Dissociative Amnesia within his Borderline Personality Disorder during which he raped and murdered Leesa Gray.

11.    Aside from the sudden emergence of sexually violent and murderous behaviors in a heretofore law abiding citizen, the most salient and outstanding feature of that entire day is the stark symptom of partial to complete memory loss for the episode during which his behaviors derailed drastically from the previous 36 years of his life. Further, careful reading of his "confession" and the Offer of Proof presented at trial reveal, not statements of fact by him as to major elements of the crimes, but rather suppositions in the subjunctive mood (e.g. "If there were videotape, I must have taped it. If I were to kill her, based on my training I would have used a choke hold.") This phrasing and use of the subjunctive mood is typical of one who has suffered dissociation and does not truly remember but is attempting to fill in gaps with inferences and suggestions from others.

12.    Mr. Loden's behaviors the following morning fully support the above opinions. In addition to maintaining all of these years that he did not remember commission of the acts, he did not immediately flee upon her death and attempt to dispose of her body or hide his connection to it. Rather he apparently parked his van with her body inside on his own property and went upstairs and went to sleep. The next morning upon discovering her body, he did not flee with the body in the van but rather, inexplicably, got in to his pick-up truck and drove rather aimlessly around the property in a confused panic state, while leaving a trail of evidence in his sleeping quarters, as well as leaving the van with the body in plain site. Further his state of mind that morning is demonstrated by re-emergence of

39

his chronic suicidal state to an acute level in which he slashed not only his wrists but up to elbows, his carved "I'M SORRY" on his chest, and then laid down in a muddy ditch to die or be discovered. These are the behaviors of a person in an extreme mentally and emotionally disturbed state, not those of a planful individual suffering only a "mild" emotional disturbance or acting out a paraphilia.

13. Therefore, I am of the opinion to a reasonable medical probability that the sudden emergence of sexually violent and murderous behaviors in a previously law abiding family man with a successful military career can only have been committed while under the influence of extreme mental or emotional disturbance. The factors cited above leading up to the crime make this somewhat explicable. His behaviors after the crime validate that he was not in anything like his normal frame of mind. The emergence of a Dissociative Amnesia for the crime validate that he was in a severely altered mental state at the time of the commission of the crime and committed it under the influence of extreme mental or emotional disturbance.

## X. REBUTTAL OPINIONS

1. Report and Opinions of Mississippi State Hospital Psychiatrist

    a. I am of the opinion to a reasonable degree of medical certainty that their primary diagnosis of malingering of amnesia is completely unsupported by any evidence put forward by them or existent, and

40

therefore can only be the result of their bias. I would point out that they have given no results of the testing done. Furthermore, they did not test for the most common forms of stress-induced amnesia, Dissociative Disorders and Posttraumatic Stress Disorder. Further, one of their personality disorders, Borderline Personality Disorder, explicitly has as one of its criteria "transient stress-related....severe dissociative symptoms" (DSM-IV-TR P. 710). Testing his immediate recall (e.g. "repeat these numbers back"), and finding it normal is in no way adequate to support a diagnosis of malingering of amnesia. Such testing is irrelevant to this diagnosis.

b.   Their diagnosis of Antisocial Personality Disorder is, in my opinion to a reasonable medical certainty, also unsupported by the evidence. By definition this diagnosis requires a "pervasive pattern of disregard for or violation of the rights of others" since the age of 15 as shown by three of the possible seven specific examples. While Mr. Loden certainly has struggled in life to maintain a stable home relationship, there is no pervasive pattern of disregarding the rights of others in any record of which I am aware. On the contrary there is evidence from his life, the videotape, and his stepson that, until the crime he was a family man and responsible parent. He has always conformed to social norms. He has no criminal record. There is no history of lying or conning. Except perhaps in the sexual sphere there is no record of dangerous impulsivity,

41

irresponsibility, lack of remorse, or reckless disregard for the safety of his own safety or that of others. Likewise, there is no evidence of a conduct disorder before the age of 15. Thus the data presented by the doctors at Mississippi State Hospital, as well as the data known to me, in no way support this diagnosis. Antisocial Personality Disorder is, of course, a favored diagnosis of prosecution psychiatrists. But affixing it to Mr. Loden is unsupported and therefore can only be a result of the examiners' biases toward him.

c.    The report of the Mississippi State Hospital doctors contains several biased and certainly tainting and unsupported statements which, through this report, were given to the sentencing judge. These include an unsupported allegation that he was a suspect in prior similar murders in Louisiana and Mississippi, the aforementioned tainting and unsupported diagnoses of Malingering and Antisocial Personality Disorder, and the attempt by the doctors and the social worker to turn cattle slaughtering on his grandfather's farm into sadistic abuse of animals.

d.    Given that a central characteristic of Mr. Loden's mental state at the time of the commission of the crime was amnesia, rather than pursuing this possibility through standard testing, they failed to administer any standard test or screening measures for PTSD or Dissociative Amnesia, instead choosing to administer only the

MMPI. Such additional testing should have included two tests I administered, the Trauma Symptom Inventory and the Dissociative Experiences Scale, or other recognized trauma and dissociative measures. Even so, the state doctors did not report on the tests that they did give. At this late date I have not seen the MMPI results and wouldn't know it existed but for Dr. O'Brien's mention of it in his report. For all of the above reasons, I am of the opinion that their diagnostic conclusions are unsupported, unsupportable and therefore most likely the result of examiner subjective bias based more in their assumptions about the state of mind of one who would commit such a crime than by the psychological data before them and the application of sound psychiatric principles. Therefore, their conclusions about his mental state at the time of the commission of the crime which they reported to the sentencing judge are suspect in the extreme.

2.    <u>C. Gerald O'Brien, Ph.D.</u>

a.    Dr. O'Brien, even though he was hired by the defendant's attorneys, also failed to administer appropriate tests for dissociative symptoms or Posttraumatic Stress Disorder in the face of an obvious possibility both of Posttraumatic Stress Disorder and Dissociation. Further he failed to take into account or explain the possible significance of amnesia as a reflection of the extreme degree of emotional disturbance Mr. Loden was suffering, or to

43

attempt to explain the extreme mental state change that occurred allowing or causing Mr. Loden to commit these crimes. Finally, he failed to give a diagnostic formulation from which he could support the conclusions he gave, though I agree with his opinion in that regard.

FURTHER AFFIANT SAYETH NOT.

JAMES R. HIGH, M.D.

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this _____ day of December 2008.

44

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1
2
3
4
5
6

_____  _____
Signature of Document Signer No. 1   Signature of Document Signer No. 2 (if any)

State of California

County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this

04 day of December, 2008, by
Date        Month        Year

(1) James Russell High
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and

(2)_____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _____
Signature of Notary Public

GLADYS BARILLAS
NOTARY PUBLIC – CALIFORNIA
LOS ANGELES COUNTY
COMMISSION # 1719643
MY COMM. EXPIRES JAN. 23, 2011

Place Notary Seal Above

## OPTIONAL

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: Affidavit of James R. High 4|4|.

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT 17

## AFFIDAVIT OF SEAN D. O'BRIEN

I, Sean D. O'Brien, declare under penalty of perjury as follows:

1. I am an attorney duly licensed to practice before state and federal courts in the State of Missouri, the Eighth and Tenth Circuit Courts of Appeals, and the United States Supreme Court. I have specialized in the representation of persons in criminal matters since 1981. Since 1985, my primary area of criminal practice has involved the trial, appeal and post-conviction representation of individuals in capital cases.

2. From 1985 till 1989 I served as the chief public defender in Kansas City, Missouri, where I provided and supervised the direct representation of indigent defendants in all felony and all capital cases in Kansas City, and in most capital trial cases in the western one-third of Missouri. During my tenure as Public Defender, no defendant represented by my office was sentenced to death.

3. In October, 1989, I was appointed Executive Director of the Missouri Capital Punishment Resource Center, currently called the Public Interest Litigation Clinic. I was responsible for recruiting and training attorneys in the representation of prisoners under sentence of death, and I also engaged in the direct representation of condemned prisoners in State and Federal courts, including the United States Supreme Court. Noteworthy cases I have litigated include *Schlup v. Delo*, 513 U.S. 298 (1995), which preserved federal habeas jurisdiction for prisoners who are actually innocent; *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), which preserved habeas jurisdiction over claims of incompetence for execution; and *Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003), creating the right to habeas corpus relief based on freestanding claims of innocence. I have been appointed *pro hac vice* to represent prisoners under sentence of death in federal and/or state courts in Arizona, Kansas, Wyoming, and Arkansas, and I have

1

qualified as an expert witness on the performance of counsel in capital cases in state and federal courts in Missouri, Kansas, Idaho and in United States Military Court. I have also testified as an expert on capital punishment issues before the Missouri and Kansas Legislatures.

4. In 1996, the state of Illinois retained me to conduct a study of its system for providing representation in post-conviction capital cases and to make recommendations for reform. I am currently retained by the Administrative Office of the United States Courts to provide training to assistant federal public defenders and counsel appointed under the Criminal Justice Act to represent indigent persons in capital cases.

5. In addition to more than 25 years of practice in capital defense litigation, I have researched and published scholarly articles on issues pertaining to the performance of defense counsel in death penalty cases, including *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Capital Defense Teams*, 36 HOFSTRA L. REV. 693 (Summer 2008); *Capital Defense Lawyers: The Good, the Bad and the Ugly*, 105 MICH. L. REV. 1 (March, 2007); *Presumed Guilty: Innocence and the Death Penalty*, Address to the Miscarriages of Justice Conference, Current Perspectives (February 20, 2007), *in* 7 J. INST. JUST. & INT'L STUD. 14 (2007); *Attorneys for the Damned*, 58 U.M.K.C. L. REV. 517 (Summer, 1990); and *A Step Toward Fairness in Capital Litigation*, 16 WM. MITCHELL L. REV. 633 (1990).

6. I have lectured nationally on issues relating to the performance of defense counsel and the mitigation function of capital defense teams, including the historical development and professional experiential foundation for the American Bar Association's Guidelines for the Performance of Counsel in Capital Cases; the necessity and protocols for working with interdisciplinary teams to investigate and develop unifying and consistent defense strategies for a guilt and penalty phase defense; the essential steps for effectively investigating and presenting

the narrative of a client's development and functioning, including strategies for overcoming barriers to disclosure of relevant social history information and effective methods for identifying and consulting with appropriate experts; the ethical considerations involved in representing and counseling clients who express a preference for execution over life imprisonment; and the duty to investigate the prosecution's guilt phase evidence and theories of culpability.

7. I have also directed a number of law school clinics providing legal services to indigent persons in criminal matters, including the Public Defender Appeals Clinic (1983-89), the Public Defender Trial Clinic (1985-89), and the Death Penalty Representation Clinic (1990-present) at UMKC School of Law, director of the Capital Defence Internships through Westminster School of Law, London, Amicus and Reprieve (1994-present), and the Death Penalty Representation Externship program through Washburn School of Law (2004-05); and I have taught courses in death penalty jurisprudence as an adjunct professor at UMKC School of Law (1995-2005) and Washburn School of Law (2004-05).

8. I am currently an associate professor at the University of Missouri-Kansas City School of Law, where I teach upper level graduate courses in criminal law, criminal procedure and capital punishment. I received a BA in English from Northwest Missouri State University in 1977, and in 2006 received the Distinguished Alumni Award. I earned a J.D. from the University of Missouri-Kansas City School of Law in 1980, and received the Alumni Achievement Award in 2002. In 2005 I received an Honorary Doctor of Humane Letters from Benedictine College. For my work in the field of capital punishment, I was recognized as Lawyer of the Year by the *Missouri Lawyer's Weekly* in 2003, and in 2005 I received the Kansas City Metropolitan Bar Association Lifetime Achievement Award.

9. Between 2004 and 2008, at the request of the American Bar Association's Death

3

Penalty Representation Project, I served as the principal investigator on studies examining national standards for the performance of capital defense attorneys and mitigation specialists in the preparation of a penalty phase case. Working with a core team that possessed strong legal and social science research skills, I participated in or supervised interviews with members of capital defense teams in every death penalty jurisdiction in the United States, including the federal capital defense counsel and the U.S. Military; circulated draft guidelines articulating the prevailing standards of performance for the mitigation function of capital defense teams; and conducted follow-up consultation with mitigation specialists, capital defense lawyers and mental health experts who participated in drafting Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases. The final version of the guidelines produced from the results of our studies are now published as *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 677 (Spring 2008). The process of researching and articulating standards of performance for the prevailing practices is described in more detail in my article, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Capital Defense Teams*, 36 HOFSTRA L. REV. 693 (Spring 2008).

10. Through my training, education, experience and independent research, I am very familiar with the practical skills, resources and prevailing practice standards necessary for the competent representation of prisoners in proceedings, including trials, in which the government seeks a judgment authorizing the taking of a human life. In particular, as a capital defense attorney who has qualified as an expert witness in multiple jurisdictions on the issue of the competent performance of counsel in capital cases, I am thoroughly familiar with federal constitutional standards governing the defense of capital cases.

4

11.  The attorneys who are representing Mr. Tom Loden in post-conviction proceedings in Mississippi have asked me to assess the performance of Mr. Loden's trial attorneys against prevailing standards and to provide an opinion on the adequacy of their efforts on their client's behalf.  The documents I have reviewed in connection with this request include the following:

- Transcript of proceedings in State of Mississippi v. Thomas Edwin Loden, Jr., Itawamba case No. CR00-068;
- Opinion, *State v. Loden*, 971 So. 2d 548 Miss. 2007);
- Briefs on appeal, *State v. Loden*, 971 So. 2d 548 Miss. 2007);
- Report of mental examination at Mississippi State Hospital, August 14, 2001;
- Report of mental examination by Dr. C. Gerald O'Brien, September 17, 2001;
- Motion to for funds for mitigation expert and related order;
- Time records of James P. Johnstone;
- Time records of David Lee Daniels;
- Investigative memoranda, incomplete chronology and partial list of life history records;
- Investigative notes of Mr. Herb Wells;
- Affidavit of Gary R. Mooers, Professor of Social Work;
- Affidavit of Dr. James High;
- Attorney-client correspondence between Mr. Loden, Mr. Daniels and Mr. Johnston.
- Mr. Loden's military records;
- Statements, interview memos or affidavits of David Houle, Jeff Mann, William Ferrier and Dustin Kittell, Sonia Brown, Francis Rennick, Bobbie Christian, Olive Merritt, and other witnesses.

12.  Based on my review of these documents, I can say without reservation that the performance by Mr. Johnston and Mr. Daniels was deficient under prevailing constitutional standards because they failed to conduct a reasonable investigation into their client's life history and mental health, failed to communicate sufficiently with their client, and failed to recognize, investigate or respond appropriately to numerous warning signs that their client's decision to abort his defense was not the product of a knowing, voluntary and intelligent choice.  Further, counsel's investigative shortcomings and their inadequate advice to Mr. Loden appear to have contributed to the sense of hopelessness that motivated him to act in a manner that was clearly

contrary to his own best interests. Counsel's failures undermined the voluntariness of Mr. Loden's plea and the reliability of his conviction and sentence.

13. The standards governing the performance of defense counsel in death penalty cases are derived from multiple sources. The Supreme Court's Eighth Amendment cases make it clear that the concept of mitigation is as broad as it can possibly be. In *Lockett v. Ohio*,[1] the Supreme Court ruled that modern standards of human decency embodied in the Eighth Amendment require a sentencer to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[2] Justice Kennedy recently referred to the scope of mitigation evidence as "potentially infinite."[3] It has long been well-accepted that "where sentencing discretion is granted, it generally has been agreed that the [sentencer's] 'possession of the fullest information possible concerning the defendant's life and characteristics' is '[h]ighly relevant—if not essential—[to the] selection of an appropriate sentence.'"[4] Thirty-two years ago the Supreme Court concluded that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."[5] The Court deemed the unrestricted scope of mitigating evidence necessary to "be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate

---

[1] 438 U.S. 586 (1978).
[2] *Id.* at 604.
[3] Ayers v. Belmontes, 127 S. Ct. 469, 478 (2006).
[4] Lockett v. Ohio, 438 U.S. 586, 602-03 (1977) (quoting Williams v. New York, 337 U.S. 241, 247 (1949)) (alterations in original).
[5] Woodson v. North Carolina, 428 U.S. 280, 304 (1976).

sentence."[6] The unfettered constitutional right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose the defense lawyer will unearth, develop, present and insist on consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"[7] Because defense counsel is the only figure in the criminal justice system charged with the responsibility of seeking out and presenting mitigating evidence on behalf of the accused, the broad scope of mitigation evidence mandated by the Eighth Amendment has a direct bearing on counsel's duty to investigate and present defense evidence.

14. In addition to the Eighth Amendment's requirement of individualized sentencing, counsel's performance standards are found in the Supreme Court's Sixth Amendment jurisprudence. "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results."[8] The Court has emphasized counsel's duty in a capital case "to conduct a thorough investigation of the defendant's background,"[9] and deference to counsel's strategic choices is only appropriate "*after* thorough investigation of law and facts relevant to plausible options."[10] The Sixth Amendment standard also includes counsel's duty of loyalty to the client and to communicate regularly and effectively with the client:

> Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. See *Cuyler v. Sullivan, supra,*

[6] Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 305 (1976)) (alteration in original). Justice O'Connor, the author of *Woodson*, emphasized that "'the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *Id.* (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)) (emphasis in original).
[7] *Comm. on Defender Servs., Judicial Conference of the U.S., Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation (1998),* http://www.uscourts.gov/dpenalty/4REPORT.htm [hereinafter Spencer Report]. 6 (quoting Louis D. Bilionis & Richard A. Rosen, *Lawyers, Arbitrariness and the Eighth Amendment*, 75 Tex. L. Rev. 1301, 1316-17 (1997) (citation omitted)).
[8] Strickland v. Washington, **Error! Main Document Only.**466 U.S. 668, 685 (1984).
[9] Wiggins v. Smith, **Error! Main Document Only.**539 U.S. 510, 522 (2003).
[10] Strickland v. Washington, 466 U.S. at 690.

*at 346.* From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.[11]

15. In addition to the constitutional provisions that create duties on the part of capital defense counsel, the Supreme Court has referred to the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases as "well-defined norms,"[12] and as "guides to determining what is reasonable."[13] The ABA Guidelines are simply a contextualized application of the principles articulated in *Strickland,* as are the Supplementary Guidelines for the Mitigation Function of Capital Defense Teams.

16. Under standards governing capital defense when Mr. Loden's charges were pending, it was universally accepted that competent mitigation investigation is critical to providing adequate representation in capital cases. Twenty-five years ago, Professor Gary Goodpaster described trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 New York University Law Review 299 (1983) at 323-324.)

---

[11] *Id.,* at 688.
[12] Wiggins v. Smith, 539 U.S. at 524.
[13] Strickland v. Washington, 466 U.S. at 688.

8

The essential importance of the mitigation investigation stems from the fact that it encompasses both evidence that affirmatively mitigates the defendant's moral culpability (i.e. by demonstrating the "good" in the client's character or the "bad" that affected his upbringing and development) and evidence that may refute the prosecution's theory of legal culpability (e.g., by reducing culpable mental states or disproving purported, inflammatory facts). Decisions regarding the presentation of such evidence require ongoing assessment throughout the substantial completion of the necessary investigation. "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guideline 10.7.

17. The duty to conduct such an investigation is unconditional in every capital case because it has always been understood that sentencers are moved by persuasive evidence that cruel or inhuman parental violence resulted in a defendant's cognitive or developmental disabilities; or that environmental factors such as poor nutrition, substandard education, other consequences of poverty and peer pressure to engage in substance abuse may have led to unlawful behaviors. Mental health and sociological research, including research sponsored and published by the National Institute of Mental Health has established a direct and undeniable correlation between such factors and contact with the criminal justice system in adulthood. Experienced capital trial lawyers, however, also know that such evidence often can play a crucial role in the jury's determination of guilt or innocence as well. It is therefore imperative that capital defense teams have the ability effectively to investigate and develop evidence of these and other issues that can provide the jury with evidence essential to understanding the defendant and the context for his or her actions.

18. Mitigation specialists are essential to counsel's fulfillment of their constitutional duty

9

to conduct a reasonable investigation into the client's background and mental health. The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases require that the capital defense team "should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 4.1.A.1 (rev. ed. 2003), in 31 Hofstra L. Rev. 913 (2003) [hereinafter Guidelines]. The Guidelines are also available online at http://www.abanet.org/legalservices/downloads/sclaid/indigentdefense/deathpenaltyguidelines2003.pdf. The Commentary to Guideline 4.1 describes the mitigation specialist as "an indispensable member of the defense team throughout all capital proceedings," and observes that "the use of mitigation specialists has become 'part of the existing "standard of care"' in capital cases." Guideline 4.1, commentary.

19. Competent counsel are aware that the investigation necessary to uncover such evidence involves a time-consuming, painstaking process to overcome substantial barriers to disclosure of some of the most compelling types of mitigating evidence. A social history cannot be completed in a matter of hours or days, and it requires the assistance of a mitigation specialist with skills and knowledge necessary to overcome powerful psychological barriers to disclosure. It is widely accepted among national mitigation experts that a minimal social history investigation requires hundreds of hours.[14] Recounting experiences of trauma can trigger powerful emotional reactions, including shame and embarrassment, so that individuals and families learn to avoid or minimize discussion of such matters. Victims and witnesses, as well as perpetrators of physical violence often initially deny or minimize such behavior. Very harmful

---

[14] Id., at pp. 43-45

10

interpersonal violence which has been inflicted on multiple generations by perpetrators within or external to the family and community may be regarded and described as "normal" by the families involved. In these and many other circumstances, the lack of appropriate skills can cause an investigator to overlook clinically significant developmental, genetic and cultural contexts, and fail to pursue crucial information.

20. To obtain the necessary funds, counsel must explain to the court the factors that exist in the particular case which affect the amount of work ahead. In any case, "[d]eveloping mitigation evidence through life-history investigation [will] involve[ ] hundreds of hours of work—with meticulous attention to detail, painstaking efforts to decode and decipher old records, patience and sensitivity in eliciting disclosures from both witnesses and the client."[15] Further, "[t]he broad range of information that may be relevant to the penalty phase requires defense counsel to cast a wide net in the investigation of any capital case."[16] The amount of time required to investigate a particular case will vary according to a number of factors, including:

> the need to develop client and lay witness trust; the need to overcome the reticence of witnesses because of the sensitive nature of the information sought; the need to triangulate date to ensure reliability; the time required to locate and retrieve records and to locate and interview witnesses; the impairments of both clients and lay witnesses; the need to investigate at least three generations within the client's family; and the need to integrate massive amounts of data into a concise and understandable form.[17]

Each of Mr. Loden's trial counsel devoted approximately 170 hours to his defense between 30 and 36 hours of which was spent in court. Mr. Daniels devoted less than eighteen hours in quasi-

---

[15] Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't be Delegated*, Champion, Mar. 2007, at 39.
[16] Spencer Report, *supra*, at 6. (citing ABA Guideline 11.8.3).
[17] Lee Norton, "Capital Cases: Mitigation Investigation," *The Champion* (May 1992), p. 45

investigative activities,[18] and Mr. Johnstone's records show that his only effort toward investigation was a single 90-minute meeting with unnamed members of the client's family on August 22, 2000, a half-hour telephone call with a Captain J. Goharing, and a two-hour meeting with highway patrol personnel in Albany, which, according to Google Maps, included at least an hour travel time. This amount of time is grossly inadequate to fulfill counsel's duty of competent representation in *any* capital case. It is inevitable that with such minimal investment of time and resources, significant duties under the Sixth and Eighth Amendment and relevant ABA Guidelines remained unfulfilled.

21. Even more pertinent to this case is the fact that thorough and competent investigation of such evidence is crucial for a reliable clinical assessment of a client by mental health experts, because such assessments require, at a minimum, consideration of detailed and verifiable information about the client's development. "The process of gathering, organizing, and analyzing life history data often leads to the identification of mental health issues requiring assessments by mental health experts who potentially will testify regarding their findings." Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment,* 36 HOFSTRA L. REV. 963 (Spring 2008). Many symptoms of mitigating cognitive and mental conditions are manifested by functioning and behaviors that occur during the developmental period, so it becomes important to inquire about significant developmental milestones in the client's life. Documentation, photographs, and eyewitness

---

[18] Daniels' quasi-investigative hours consist of a March 7, 2001, session reviewing police discover with investigator Herb Wells (5 hours), a March 28, 2001, inspection of evidence and meeting with prosecution investigator Marlar (2.5 hours), passing along unspecified documents to the government mental health examiners on April 6, 2001 (3.5 hours), conferring with military lawyer Greg Chaney for an hour and a half on May 17, 2001, meeting with Mr. Loden's mother and sister for two and a half hours on June 8, 2001, and interviewing Rena Loden and her housekeeper on June 18 (4 hours) and 19 (2.5 hours), 2001, which includes travel time for 110 miles on each day.

accounts from caretakers, teachers, ministers, healthcare providers and others are essential sources of potentially significant information that is required for a reliable assessment of the client's functioning and abilities. An unskilled or unduly hurried investigator will fail to appreciate or explore important areas of inquiry, and may fail to recognize significant evidence even if he or she stumbles upon it. The conclusions of the examiners at the Mississippi State Hospital about Mr. Loden's mental health are vulnerable to attack for these very reasons, and a thorough investigation by defense counsel would have enabled them to challenge those findings.

22. The hazards of failing to conduct a thorough and informed mitigation investigation are illustrated by the recent Supreme Court decision in *Rompilla v. Beard*,[19] in which trial counsel themselves attempted to conduct family interviews and obtain the background information for their three mental health experts. Counsel's truncated and unskilled investigation produced misleading information from the client's family, who claimed that the client had a normal childhood and otherwise were unable to say much about him. With such a bland historical background, defense experts, in the Court's words, could produce "nothing useful" for the defense. After the client was sentenced to death, a competent investigation conducted by post-conviction counsel with the assistance of a qualified mitigation specialist uncovered documents that Mr. Rompilla had been previously hospitalized in a psychiatric institution and diagnosed with schizophrenia and that he grew up in a household with alcoholic parents who were quick to resort to physical violence against their children. Just as in Mr. Loden's case, ill-informed pretrial examiners erroneously concluded that Mr. Rompilla was anti-social rather than mentally ill. In Mr. Loden's case, a thorough investigation would have shown serious mental impairments, including Post-Traumatic Stress Disorder related to both childhood

---

[19] 545 U.S. 374, 125 S.Ct. 2456 (2005),.

13

maltreatment and military combat experiences. The Supreme Court found Rompilla's lawyers ineffective for failing to conduct a reasonable investigation into the defendant's background. The *Rompilla* case thus reveals that defense teams who do not devote the time and professional services necessary to conduct an adequate mitigation investigation have a significant blind spot that may unconstitutionally undermine the effective representation demanded in a capital case. Even though the trial counsel in *Rompilla* did far more than Mr. Daniels and Mr. Johnstone in this case (they interviewed multiple members of Rompilla's nuclear family and hired three mental health experts), they were nevertheless found ineffective for failing to find life history information that was relevant to a clinical assessment.

23. The ABA Guidelines and Supplementary Guidelines addressing the mitigation function emphasize the importance of assembling an interdisciplinary defense team, which includes members possessing specialized expertise in working with mental health experts; and for members of the team to have early, frequent and ongoing access to the client. Extensive communication with the client is recognized as an essential component to building the rapport and relationship necessary to effective representation, including the exploration of sensitive matters and instilling a sense of trust and confidence necessary for the client to rely on counsel's advice in making decisions that have life or death consequences.

24. Competent capital lawyers who represent clients held in custody understand the importance of proceeding quickly to develop the working relationship necessary to reassure and guide the client through the unfamiliar and anxiety-producing stages and decision making involved in pre-trial and trial litigation. In this case, although counsel were appointed in early July of 2000, co-counsel was not assigned until January, 2001, and no effort was made to hire a mitigation specialist or investigator until March, 2001. Further, the psychological evaluation by

14

defense expert Dr. C. Gerald O'Brien was completed literally on the eve of Mr. Loden's scheduled trial, and was conducted without the benefit of a thorough life history investigation.

25. The representation of any capital defendant requires appreciation of and sensitivity to the cultural background and influences that shaped and continue to affect the individual's world view and functioning. The necessity to do so is particularly important with people who perceive their membership in a particular cultural group as an important defining characteristic. In this case, Mr. Loden viewed himself as first and foremost a good Marine, and was immersed in military culture. Understanding the Marine culture was important to understanding and communicating with Mr. Loden. The sociological barriers to appointed defense counsel's efforts to build trust and rapport with such defendants are monumentally increased where the client has mental health issues. Under such circumstances it is extremely difficult (and certainly not an instinctive reflex) for the defendant to feel a sense of trust in an attorney. The client's trust and confidence may be won only over a lengthy period of time during which the client's opportunity to compare counsel's words and deeds leads to the conclusion that counsel is truly committed to protecting the client's best interests. In this case, counsel did not attempt to become culturally competent in order to understand and communicate with Mr. Loden.

26. Such trust and confidence are generally regarded as a precondition that enables the client to endure and cooperate with the psychologically intrusive evaluations necessary to assess his or her mental state, including the lasting impacts of any physical abuse or trauma. Based on the information counsel have shared with me regarding this case, it is my professional judgment that no capital trial lawyer worth his or her own salt would feel anywhere near prepared for trial until they had obtained all the discovery and conducted all the investigation necessary to determine whether their client was tortured or subjected to coercive interrogation; learned every

15

significant fact and detail regarding such government misconduct; obtained reliable medical and clinical evaluations of the manner in which such abuse affected the client, including the voluntariness and reliability of any and all statements; and pursued all appropriate motions. Because lawyers are not typically trained or well-suited for performing this vital function, capital defense teams employ mitigation specialists who are "able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures."[20] No such individual was involved in Mr. Loden's defense. I note that although the trial court denied a boiler-plate motion for funding for a mitigation specialist, the denial was without prejudice. While the motion cited appropriate case law, it reflects a lack of understanding of the mitigation function. The motion confuses mitigation specialists with investigators and experts, and fails to explain to the court the reasons that neither an investigator nor a mental health expert is an adequate substitute for a mitigation specialist. Counsel failed to avail themselves of the option of returning to the court with a more detailed explanation for why the mitigation specialist function could not be fulfilled by a psychologist or a routine fact-investigator. As a result, no one with appropriate training and abilities was interviewing the client, his family and other significant people in his life.

27. The absence of a mitigation specialist on the defense team can be traced to counsel's failure to become familiar with basic standards governing the performance of counsel in death penalty cases. Counsel's motion for funding for a mitigation specialist reveals a fundamental lack of understanding about the function and abilities necessary for competent mitigation work.

---

[20] SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF CAPITAL DEFENSE TEAMS, 5.1.C, 36 HOFSTRA L. REV. 677, 682 (Spring, 2008).

While they cited case law on the right to funds for defense experts, they did nothing to explain to the court what mitigation specialists do, and why they are essential members of capital defense teams. Counsel could not articulate the distinction between a mitigation specialist and a forensic psychologist, nor could counsel articulate the distinction between a mitigation specialist and a generic criminal case investigator. They did nothing to educate the trial court about the specialized nature of mitigation investigation, the rapport-building and interview skills required to overcome substantial barriers to disclosure, the training necessary to recognize symptoms of mental and emotional disabilities, and the cultural competence to communicate effectively with clients and witnesses. Having reviewed the investigative notes of Mr. Herb Wells, it is clear that he had no clue about the nature and scope of a mental health investigation. He relied on the client's biological mother to obtain records of Mr. Loden's military service, and made only limited efforts to obtain other documentation. There was no effort to compile a thorough life history, or to identify and interview all family members and other individuals knowledgeable about Tom's life. Mr. Wells may be a competent criminal investigator, but his activities were quite limited in nature and scope, and his service in this case was not equivalent to that of a mitigation specialist. Similarly, Dr. O'Brien did not conduct the independent, thorough life history investigation necessary to explore fully the scope of developmental and disability issues relevant to Mr. Loden's circumstances. It is generally impractical to expect that mental health experts will be able to devote the many hours necessary to conduct a complete life history investigation; typically mental health examiners rely on the defense team to provide relevant life history information.

28. The ABA Guidelines specifically require counsel to "make every appropriate effort to establish a relationship of trust with the client, and [to] maintain close contact with the client."

17

Guideline 10.5.A. Often capital clients suffer severe impairments that interfere with effective communication, or that render them highly distrustful, intellectually and cognitively impaired, and unable to accurately perceive reality, and it is not unusual for a capital defendant to become suicidal while awaiting trial.[21] The Spencer Committee found that while client communication is important in every case, it is "vastly more time consuming and demanding in a death penalty case," in part because of "the enormous stress that the risk of a death sentence imposes on both the client and the lawyer."[22] The attorney-client correspondence reveals Mr. Loden's frustration from not being able to communicate with his lawyers or obtain satisfactory answers to his questions.[23] The few attorney-client visits that occurred are relatively short-typically less than a couple of hours. Mr. Loden would have been far less likely to surrender important rights had counsel kept him apprised of the facts and the law affecting his case. Further, given the failure to investigate, it was difficult for Mr. Loden to understand the nature and scope of the rights he was giving up by pleading guilty and not presenting any form of defense. In fact, counsel's letters to Mr. Loden and their affidavits confirm that Mr. Loden's understanding of the scope of the Mississippi Supreme Court's statutory review of his sentence of death was fundamentally

---

[21] ABA GUIDELINE 10.5, commentary.

[22] *Spencer Report*, at 7. The committee listed some of the reasons:

> First, the nature of the penalty phase inquiry requires a relationship which encourages the client to disclose his or her most closely guarded life history with the lawyer. Experiences of mental illness, substance abuse, emotional and physical abuse, social and academic failure, and other "family secrets" must be revealed, researched and analyzed for the insight they may provide into the underlying causes of the client's alleged conduct. The establishment of trust and confidence is also vitally important if the lawyer is to convince the defendant to consider an offer to plead guilty, especially because what is offered is likely to be life imprisonment without the possibility of parole. Accepting such a "deal" requires tremendous faith in counsel. *Id.*

[23] In reviewing counsel's time records, it appears that very little time was spent visiting with Mr. Loden, and he was allowed to languish in the jail for a month or more at a time without contact from his attorneys. Johnstone spent 35 hours speaking with Mr. Loden over the course of his representation, and Mr. Daniels spent 26 hours in client interviews, not including travel time to and from the jail. Both sets of time records mix conferences with co-counsel and the prosecution with entries reporting client interviews, so this represents the maximum amount of time that counsel would have spent with Mr. Loden.

flawed, and counsel did not adequately clarify the issue for him.

29. I am particularly concerned by counsel's behavior at the time of the plea. There are numerous "red flags" suggesting mental health problems and communication difficulties between counsel and the client. The plea colloquy consists of nothing but leading questions to which Mr. Loden answers only "yes" or "no" or some equivalent verbal response. He was never asked an open-ended question or to explain his motivation for waiving his rights, nor was he asked what he believed would happen as a result of his waivers.[24] It was incumbent upon counsel to advise and protect their client from the consequences of involuntary or unintelligent waivers of constitutional rights. There are many reasons known to counsel that militate against Mr. Loden's waiver. As counsel advised the trial court, there was evidence that Mr. Loden suffered from a mental disease. Counsel told the trial court:

> "The expert clinical psychologist that was appointed for the defense by the Court, Dr. Gerald O'Brien, would have been offered as an expert in the field of clinical psychology. Dr. O'Brien opines that at the time of the crimes Mr. Loden was not capable of appreciating the criminality of his conduct and that he also was incapable of conforming his conduct to the requirements of the law. And finally that at the time of the crimes he was suffering from extreme mental and emotional disturbances.

While this statement is not completely borne out by Dr. O'Brien's report, it does reflect a number of concerns about Mr. Loden's mental and emotional condition. Mr. Loden's statements about the offense consistently reflect a lack of memory, while not attempting to deny the charge. The details of the offense given by him during questioning were tentative and speculative, using words like "I think," or "I must have," or "I would have," as if he were trying to reconstruct

---

[24] See, e.g., Wilkins v. Bowersox, 145 F.3d 1006, 1012 (8th Cir. 1998), finding that the guilty plea colloquy was "not the kind of 'penetrating and comprehensive examination' required to ensure the validity of Wilkins' waivers because "[t]he court's colloquy with Wilkins . . . consisted predominantly of leading questions that failed to allow Wilkins to articulate his reasoning process."

events from the evidence, rather than recalling memories. This would be consistent with a dissociative state, which is consistent with Post-Traumatic Stress Disorder caused by Mr. Loden's history of extreme trauma. Mr. Loden had experienced sleep disturbances and insomnia for ten years. According to Dr. O'Brien, he was hallucinating the voice of another Marine whose death he witnessed in Desert Storm. He occasionally experiences the sights and smells of the rocket attack that took his friend's life. Mr. Loden's suicidal ideation and attempts began at age sixteen, following his father's death. Family members who visited him in the jail were distressed by the conditions of his confinement, and reported that he chain-smoked and was always tearful and agitated "like a caged animal" during their visits. His sister Sonia recalls visiting him in the jail and finding him under the bed in his holding cell, screaming. She had to call a jailer to calm him down. Mr. Loden's then-wife, Katrina, reported multiple suicide attempts predating the offense, and counsel were aware of at least three separate attempts between the time of the offense and his plea. Mr. Johnstone advised Stacy Ferraro that Mr. Loden waivered on whether he wanted to be put to death, just as he waivered on whether he wanted to commit suicide. If counsel were communicating with Mr. Loden, they would have known that his decision to plead guilty was based on a distorted understanding of the scope of appellate review of sentences of death, and that he harbored unrealistic expectations about what would happen as a result of his plea. Trial judges in situations such as these depend heavily upon the representations of counsel in assessing whether a defendant is making a knowing, voluntary and intelligent decision to enter a plea of guilty and waive fundamental constitutional rights, such as the right to a trial and sentencing by a jury, the right to confront and cross-examine witnesses, the right to present evidence, and the right to be vigorously defended by counsel. Because the trial court is bound by law to assess the voluntariness of such waivers based upon the totality of the evidence, including

20

the age, experience, mental condition of the accused and his understanding of the charge and possible defenses,[25] defense counsel are uniquely obligated to notify the court of factors weighing against such findings.[26] Nevertheless, in spite of what they knew or should have known, when asked by the trial court whether they believed that Mr. Loden's decisions were knowing, voluntary and intelligent, made with a full understanding of his rights and the consequences, both defense counsel responded in the affirmative, and neither advised the court of the many facts suggesting otherwise. This information was grossly misleading to the trial court, and a breach of counsel's duty of loyalty to the client. One hopes that it was not counsel's intent to mislead the trial court; counsel's responses may well have been based on ignorance of the facts and circumstances affecting their obligations with respect to Mr. Loden's ill-advised course of action.

30.  At the time of Mr. Daniels' representation of Mr. Loden, he was negotiating for employment as an attorney with the prosecutor's office. If true, he had an interest in maintaining a positive relationship with that office and with law enforcement generally. The record does not dispel the possibility that his desire to obtain employment with Mr. Loden's adversary motivated his decision to facilitate Mr. Loden's sentence of death. I also note that Mr. Johnstone told Stacy Ferraro that he attempted to decline the appointment; Johnstone has a daughter, and apparently Johnstone did not want to represent Loden. In more than twenty-five years of specializing in the representation of persons facing the death penalty, I have seen many situations in which clients attempted to waive constitutional rights and pursue a course of action contrary to his best

---

[25] Johnson v. Zerbst, 304 U.S. 458, 464 (1938); Young v. Lockhart, 892 F.2d 1348, 1351 (8th Cir. 1989) (a defendant's background and personal characteristics are highly relevant in determining the validity of such a waiver); United States v. Cash, 47 F.3d 1083, 1088 (11th Cir. 1995) (the mental health of a defendant is also relevant in assessing whether a waiver of counsel was knowing, voluntary and intelligent).
[26] See, e.g., Speedy v. Wyrick, 702 F.2d 723, 726 (8th Cir. 1983).

interests. However, this is the first such case I have seen in which trial counsel expressed no reservations about his client's competence or the voluntariness of the decision. Upon closer examination of Mr. Loden's condition and reasoning process, there is much that counsel should have done to influence him against acting in a manner so clearly contrary to his best interests.

31. A theme that persistently surfaces in this case is the misguided sense that death is an inevitable outcome no matter what defense counsel might have done. The prosecution made this argument to the court at the time of sentencing, and the Mississippi Supreme Court noted Mr. Loden's own fatalistic prognosis that he was "fairly confident" that he would get the death penalty. Referring to the "mountain of evidence of Himalayan proportions," the court simply assumed that any error in sentencing would be harmless. Mr. Loden's life history is rich with powerful mitigation evidence. Post-conviction counsel have done a more reasonable investigation that has produced persuasive evidence of multiple lines of mitigation and defense evidence. Without exception, every person who has known Mr. Loden is shocked to learn of his crime, and would have testified that violent behavior is out of character. Witnesses and documents establish that he was an exemplary Marine. A reasonable investigation into Mr. Loden's history also revealed evidence of childhood physical and sexual maltreatment, and those who knew him very well detected the disabling effects of severe trauma he experienced in military combat during the Desert Storm campaign. Although trial counsel was clearly aware of the existence of much of this evidence, their failure to investigate deprived Mr. Loden of persuasive defenses based on his good character and mental disabilities.

32. As noted above, defense counsel in a death penalty case must conduct a thorough investigation of the client's life history. Such an investigation in this case would have included interviews of every member of Mr. Loden's family, and others who knew him well as a child and

as an adult. Everyone who knows Mr. Loden considers him a good person of non-violent character. Jeff Mann went to high school and served in the military with Mr. Loden, and has never known him to be violent. Theresa Leslie has known him since high school, and continues to communicate with him. She thinks highly of Tom, and believes he is a devoted father. Tom never exhibited any violent behavior. She believes the crime is inconsistent with his character. Another high school friend, Connie Graham Reynolds, has similar memories of him. Mr. Loden's aunt, Francis Rennick, would have testified that Tom has always a "good and respectful child" who always tried to be helpful. He was attentive to his grandparents. No one has any recollection of violent behavior, and no one ever feared him.

33.     Although Mr. Loden's character is fundamentally good, and he has no criminal history whatsoever prior to this offense, his childhood was marred by sexual and physical trauma. Mr. Loden's mother, Bobbie Christian, reports that his father, Tom Loden, Sr., physically restrained her during sex, placed objects inside her vagina, shocked with extension cords and wires. She said the children shared the same bedroom with her and Tom, Sr., and may have witnessed their father's sexual behavior. Sonia Brown, Mr. Loden's half-sister, reports that Tom Loden, Sr., approached her sexually on multiple occasions, and confirms Bobbie's suspicion that Tom witnessed his father's sexual abuse of his mother. This is incredibly significant history in light of how closely Mr. Loden's father's sexual behaviors with his wife parallel the unusual sexual behaviors during the offense. In addition to witnessing his father sexually abuse his mother, Mr. Loden's half-siblings establish that his step father, Bill Brown, Sr., was physically abusive. Mr. Loden's father remarried Sylvia Epperson, and she treated him violently as well. Mr. Loden's sister Anita despises Sylvia so much she won't even say her name.

23

34. Mr. Loden's intrinsically good character and dedication enabled him to function at a very high level when he joined the military. His military service record is exemplary, as reflected by the documentary history. I found only one disciplinary entry in his military records involving a hazing incident Tom was involved in on December 12th, 1996. He "allowed certain actions to take place while in the presence of junior Marines, one of which was a female, that were considered inappropriate and offensive in nature." He was counseled to "exercise better judgment." His military record otherwise reflects no violations of the law or disciplinary incidents, and the reviews of his performance by his superior officers are uniformly stellar. In a review of March 31, 1989, Captain K.L. Bradford referred to Tom as "a superb young NCO, with superior skills," and "my most accomplished sergeant." Captain Bradford notes that Tom's "overall competence is extraordinary: he is a dynamic individual with no apparent weakness..." Captain Bradford praised Tom for his "maturity, moral courage, sense of justice and humor, and concern for his Marines." He recommended promotion "at the earliest possible moment." Another officer, whose signature is illegible, referred to Tom as a "quality Marine." Captain Bradford on July 1, 1989, said that Tom was "still my most accomplished NCO," who is "the driving force, a stalwart personality amidst a group of stellar performers." He concludes that "this section, and the Marine Corps, is a better place with him in our ranks." Bill Ferrier is among Mr. Loden's fellow soldiers listed in this report. Reports of this nature follow Tom throughout his military career. Notable entries include:

- "a Marine of many gifts, including a good mind and gift for expressing himself. If I go to war, I want him with me." P.B. Monet, July 14, 1990.
- "an inspiration to each member of the NGF liaison section." He is described as "highly effective in any situation, . . . . [Tom Loden] enjoys my complete trust and confidence in any assignment, regardless of difficulty or complexity. . . . [his] immense talents and driving enthusiasm will be greatly missed." Michael D.

24

Burr, January 3rd, 1990.

- Mr. Loden is a "dependable, poised, mature, extremely professional Marine, . . . one of the three best sergeants I have observed during my 15 years in the Marine Corps." Tactical and technical proficiency is described as "outstanding." He is "bright, articulate, and versatile." Tom "displays tireless energy, commendable motivation, and enthusiasm. . . . OUTSTANDING, OUTSTANDING, OUTSTANDING." (emphasis in original) Mr. Loden was recommended for promotion ahead of his contemporaries. P.R. Hunt, August 10, 1990.

- "[O]utstanding in all respects. The finest Sergeant I have worked with. Sgt. Loden should be promoted to Staff Sergeant now! He is that Sergeant that we all look for as the backbone of the Corps." Major Robert J. Grouse, August 20, 1992.

- "determined, loyal, and aggressive! Initiative is strongest trait, . . . a leader in every respect. . . . [Sgt. Loden is] courteous and continually strives to set the example for subordinates. . . . Sgt. Loden is one of the best. I would actively seek to serve with him again." Mark A. Smith , January 20, 1993.

- "[T]remendous potential, highly qualified for promotion. . . . Staff Sgt. Loden is a dedicated professional in every respect." Battalion Commander Thomas R. Kelley, January 20, 1993.

- "[R]emarkable, aggressive, truly superior. . . a superb instructor, [and] trustworthy, extremely reliable. . . a great mentor, . . . his loyalty to his Marines and the Corps is unsurpassed. . . . highly respected by subordinates, peers, and superiors, . . . a true asset in any command. . . . promote Tom and indefinitely retain." J.M. Watson, January 20, 1994.

- "[I]nvaluable leadership traits" and urges "PROMOTE NOW!" (emphasis in original). C. F. Bond, January 21, 1994.

- "expertise in his MOS is unparalleled in the 12th Marine Regiment. . . . Outstanding teaching skills." James M. Topping, August 27, 1994.

- "[T]he most intelligent Staff non-commissioned officer I know. . . . [Sgt. Loden's] outgoing personality, keen sense of humor, and ability to communicate easily is refreshing. . . . QUALIFIED FOR PROMOTION!" (emphasis in original) Captain C. F. Bond, August 28, 1994.

- "[I]maginative and farsighted thinker, . . . a jewel in the king of battle's crown. . . never in my year as CO have I seen this fine SNCO not give 110%. . . . PROMOTE NOW!" (emphasis in original)" Christopher D. Potts, November 25, 1994.

- Sgt. Loden is an "outstanding SNCO [and has] sincere concern for welfare, professional growth of subordinates." J.C. Becker, April 5, 1996.

- "the glue that holds the section together. . . . boundless energy . . . the clean-up hitter. . . among the most inspirational SNCO I have known. . . . a true example setter. The ultimate organizer and manager. . . . "a total team player [and] destined for increased responsibilities." L. Sanders, Range Officer.

- "one of the three best sergeants I have observed during my 15 years in the Marine Corps." T.R. Hunt, on August 10, 1990.

25

- "[T]he finest Sergeant I have worked with." Major R.J. Graus
- "a gifted leader [with] all the skills, traits, and experience to make an OUTSTANDING First Sergeant of Marines. Promote now!" Range Officer P.R. Grasty, on November 25th, 1997.
- "one of the hardest working Marines in this company" and "one of the finest SNCO's I have ever worked with-- easily within the top 10% in our corps. . . . a "**SUPERB** first Sergeant of Marines." (emphasis in original) Phil R. Grasty, July 21, 1998.

Mr. Loden's military records also verify his fellow Marines' accounts of his Desert Storm service, for which he received a number of decorations. A report by D.E. Graham, Fire Support Coordinator, reflects that Sgt. Loden saw combat with Task Force Grizzly during operation Desert Storm, which was "probably the toughest mission of the operation." Sgt. Loden performed "in an extraordinary manner."

35. Interviews of fellow Marines David Houle, Jeff Mann, William Ferrier and Dustin Kittell shed substantial light upon the impact of Sgt. Loden's combat experiences. All of them echo the praises of Sgt. Loden's superiors, and find his involvement in this crime unbelievable and totally inconsistent with his character. David Houle was Tom's immediate superior in Desert Storm with the 3rd Battalion, 12th Marines, which he described as a "very elite group." He recommended Tom for a Navy commendation medal when he was ordered into the field under artillery fire to determine where it was coming from. He said that "Tom would have died for me." Tom took out enemy artillery that saved many American lives in Desert Storm. He called Tom "the most outstanding marine who ever worked for me." He verifies that Tom had the kind of combat experiences associated with Post-Traumatic Stress disorder, but because of Marine culture, disclosure of PTSD symptoms would bring his career to a screeching halt. Houle told the interviewer, "[Tom's] a good man, I don't know what pushed him, snapped him…get him off death row, he doesn't belong there."

26

36. Jeff Mann knew Tom since high school, and served with him in the military. Tom confided in him about seeing his fellow soldier burned alive in a rocket attack. The explosion ripped his friend's body apart, and pieces landed on Sgt. Loden. On another occasion the Marine standing next to Sgt. Loden was shot in the head and killed. Loden told Mann there was blood everywhere. According to Mann, Sgt. Loden wept as he told about his experiences. He was "really messed up," had extreme nightmares, couldn't sleep, and lost interest in his favorite pastimes such as auto mechanics or having dinner with friends. He was changed; he was no longer happy, light-hearted, easy-going and loving. Even after his experience, the Marine Corps was his life.

37. Bill Ferrier remembers Tom as "the poster Marine" who would never do anything to tarnish his image. Bill is a particularly important witness who could have shed substantial light on the effects of Sgt. Loden's PTSD. Ferrier served with Tom in the 112th 1st Battalion, 1st Marine Regiment, Naval Gunfire Platoon. Tom was Bill's "spot team leader." They were in Desert Storm at the same time, although in different units. Tom was deployed to Desert Storm from Okinawa and Bill was deployed from Hawaii. They saw one another at R&R camp in Saudi Arabia. They were deployed in bunkers, which were basically holes in the ground so once a month they had R&R for 3 days with showers, hot food, and air conditioned rooms. Tom told Bill that he had been deployed forward to Kuwait to conduct observation and came under artillery fire and anti-tank fire. Bill thought his unit might have actually been firing the artillery because there were a lot of friendly fire incidents. Bill's unit used TOW Missiles that never missed their target. Bill's combat experiences were similar to Tom's, and he has been diagnosed with PTSD. Bill saw a friend burned to death and remarked there was nothing he could do to help. He and Tom saw dead bodies on a regular basis. Bill talked to Tom about his nightmares

27

and headaches, and Tom shared that he was having the same problems. Bill could have explained to a judge or a jury what it is like to experience the symptoms of PTSD. Bill is impulsive and quick to anger, sometimes fearing for his life for no reason. He drinks a lot to dull his senses. Bill believes that if he had not given up alcohol, he would have killed someone out of an irrational fear of being harmed. Bill has harmed women under such circumstances on at least two occasions, but has no memory of it. Even though he has received treatment as a result of his disclosure, Bill regrets telling the Marines about his PTSD experiences because it ruined his career; he felt like he was cast aside in spite of his sacrifices for his country.

38. The affidavit of Gary Mooers reflects additional avenues of investigation that are apparent from Tom Loden's history of military service. Mooers observed that a congressional research advisory committee on Gulf War veterans' illnesses found that combat soldiers were exposed to toxic chemicals from both the Iraqi's and their own military. Gulf War veterans who did not seek help had increasingly serious symptoms over time, a phenomena the panel called "longitudinally increased loss spiral." One of the symptoms identified by the panel was that of anger and accompanying violent behavior. Mooers noted that the Marine Corps has been the least receptive of the military branches to admitting problems and seeking help for post traumatic stress disorder. Tom Loden realized that his problems were getting worse, but was reluctant to admit to other Marines that he could not successfully deal with his personal troubles and was concerned that admitting his need for help would seriously hamper future career prospects. Mooers consulted a Marine Sergeant Major who described the Marine culture in which each Marine is expected to be "John Wayne" and personal problems are minimized or denied. Going through proper channels to seek assistance with a psychiatric problem would be "career suicide." This is certainly consistent with the culture described by Mr. Bill Ferrier. All of this information

28

is vital to a complete and reliable mental health assessment, and necessary to any successful attempt to address Tom's hopelessness and his impulses to act contrary to his best interests.

39. The above is simply a brief summary of parts of the defense evidence that was available to trial counsel and which could have been presented in support of a defense. Further, as the affidavits of Gary Mooers and Dr. High reflect, this information is critical to a complete and reliable assessment of Mr. Loden's background, character and mental impairments. A complete social history enabled Dr. High to make a reliable diagnosis of Post-Traumatic Stress Disorder, and relate that condition to the sexual and physical trauma Mr. Loden received as a youth, and also to his Desert Storm combat experience. A thorough investigation and regular communication with Mr. Loden would have enabled counsel to assuage Mr. Loden's sense of hopelessness and to help him make competent and adequately informed decisions.

40. It is my professional judgment that Mr. Loden's trial defense team failed to perform consistently with the ABA guidelines on the appointment and performance of counsel in capital cases as well as with the supplemental guidelines on the defense mitigation function in capital cases, and that their performance fell below the constitutional minimum standard of care. It is also my opinion that the failure of the defense team to meet the minimum standard of care resulted in their failure to uncover mitigating and mental health evidence essential to a fair and reliable outcome in this capital case.

I declare under penalty of perjury, under the laws of the United States of America and the State of Missouri, that the foregoing is true and correct.

Sean D. O'Brien

29

State of Missouri    )
                    ) ss
County of Clay     )

      Subscribed and sworn me, a notary public in and for the State of Missouri, on this 4th day of December, 2008.

_Mildred Porter_
Notary Public

My commission expires:

