# EXHIBIT 27

# Transcript of Mitigation Hearing

```
 1    IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT

 2              OF ITAWAMBA COUNTY, MISSISSIPPI

 3

 4

 5

 6

 7    STATE OF MISSISSIPPI

 8

 9    VS.              ITAWAMBA COUNTY CAUSE NO. CR00-068
                       RANKIN COUNTY CAUSE NO. CR-13440
10

11    THOMAS EDWIN LODEN, JR.

12

13

14    ***************************************************

15    TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE

16    ARRAIGNMENT, HEARINGS, GUILTY PLEA AND SENTENCING

17    HEARING OF THE ABOVE STYLED AND NUMBERED CAUSE,

18    BEFORE THE HONORABLE THOMAS J. GARDNER, III,

19    CIRCUIT JUDGE,

20    ***************************************************

21

22

23    APPEARANCES:

24        Present and Representing the State:

25            HONORABLE JOHN R. YOUNG
              District Attorney
26            P. O. Box 212
              Corinth, MS 38835-0212

27            HONORABLE CLAY JOYNER
              HONORABLE DENNIS FARRIS
28            Assistant District Attorneys
              P. O. Box 7237
29            Tupelo, MS 38802-7237
```

ii

1          Present and Representing the Defendant:

2              HONORABLE JAMES P. JOHNSTONE
               Public Defender
3              P. O. Box 337
               Pontotoc, MS 38863-0337
4
               HONORABLE DAVID LEE DANIELS
5              Public Defender
               P. O. Box 1309
6              Tupelo, MS 38802-1309

7

8

9

10     Court Reporter:   Mary Margaret Ferguson, CSR   #1042

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

1            T A B L E   O F   C O N T E N T S

2                                                    Page

3    Style, Number and Appearance                      i

4    Table of Contents                               iii

5    ARRAIGNMENT                                       1

6    Certificate of Court Reporter                     8

7    HEARING - January 11, 2001                        9

8    HEARING - April 25, 2001                         34

9    Motion - Change of Venue

10   WITNESSES: STATE

11   JOHN MARVIN SMITH

12         Direct Examination by Mr. Farris           43

13         Cross-Examination by Mr. Johnstone         46

14   JOEY SHEFFIELD

15         Direct Examination by Mr. Farris           48

16   DANNY HOLLEY

17         Direct Examination by Mr. Farris           51

18   JAMES K. WILEMON

19         Direct Examination by Mr. Farris           53

20   State Rests                                      56

21   Argument                                         58

22   Motion - Funds to Engage Expert                  63

23   Motion - Declare Code Section 97-3-19

24         Unconstitutional                           76

25   Court's Ruling on Motion to Declare Code

26         Section 97-3-19 Unconstitutional           84

27   Motion for Psychiatric Examination               86

28   Court's Ruling on Motion for Psychiatric

29         Examination                                90

iv

1  HEARING - June 26, 2001
                                                        96
2  Court's Ruling on Motion for Special
3       Venire and Change of Venue
                                                        103
4  Motion to Suppress Statement(s)
                                                        109
5  WITNESSES:  STATE
6  MICHAEL BETHAY
7       Direct Examination by Mr. Joyner
                                                        112
8       Cross-Examination by Mr. Johnstone
                                                        133
9       Redirect Examination by Mr. Joyner
                                                        146
10 State Rests
                                                        153
11 WITNESSES:  DEFENDANT
12 KATRINA LODEN
13      Direct Examination by Mr. Johnstone
                                                        154
14      Cross-Examination by Mr. Joyner
                                                        167
15 THOMAS E. LODEN, JR.
16      Direct Examination by Mr. Johnstone
                                                        182
17      Cross-Examination by Mr. Young
                                                        187
18      Redirect Examination by Mr. Johnstone
                                                        202
19 Defendant Rests
                                                        205
20 WITNESSES:  STATE (Rebuttal)
21 MICHAEL BETHAY
22      Direct Examination by Mr. Joyner
                                                        206
23      Cross-Examination by Mr. Johnstone
                                                        207
24      Redirect Examination by Mr. Joyner
                                                        209
25 MATT BULLWINKEL
26      Direct Examination by Mr. Joyner
                                                        211
27      Cross-Examination by Mr. Johnstone
                                                        224
28      Redirect Examination by Mr. Joyner
                                                        230
29 MICKEY BAKER

1    Direct Examination by Mr. Young                234

2    Cross-Examination by Mr. Johnstone            242

3    Redirect Examination by Mr. Young             253

4    State Rests                                   255

5    Motion to Suppress Search(es)                 255

6    WITNESSES: STATE

7    RICK MARLAR

8        Direct Examination by Mr. Joyner         260

9        Cross-Examination by Mr. Daniels         290

10       Redirect Examination by Mr. Joyner       315

11   LANCE BEAN

12       Direct Examination by Mr. Farris         324

13   State Rests                                   326

14   WITNESSES: DEFENDANT

15   STELLA RENICK

16       Direct Examination by Mr. Daniels        327

17       Cross-Examination by Mr. Joyner          333

18       Redirect Examination by Mr. Daniels      341

19   WITNESSES: STATE

20   FRANK A. RUSSELL

21       Direct Examination by Mr. Farris         347

22       Cross-Examination by Mr. Johnstone       351

23   WITNESSES: DEFENDANT

24   GARY O'NEAL

25       Direct Examination by Mr. Daniels        354

26       Cross-Examination by Mr. Joyner          357

27       Redirect Examination by Mr. Daniels      360

28   ANITA RICHEY

29       Direct Examination by Mr. Daniels        363

vi

1        Cross-Examination boy Mr. Joyner     368

2   THOMAS E. LODEN, JR.

3        Direct Examination by Mr. Daniels     376

4        Cross-Examination by Mr. Young     379

5   Defendant Rests     388

6   WITNESSES: STATE   (Rebuttal)

7   JOYCE ANN BREWER

8        Direct Examination by Mr. Joyner     388

9        Cross-Examination by Mr. Daniels     395

10        Redirect Examination by Mr. Joyner     396

11        Recross-Examination by Mr. Daniels     398

12   MARGARET ELLEN GASSAWAY

13        Direct Examination by Mr. Joyner     399

14        Cross-Examination by Mr. Daniels     404

15        Redirect Examination by Mr. Joyner     408

16   State Finally Rests     410

17   Motion in Limine - Photographs     411

18   Court's Ruling on Motions to Suppress     429

19   Motion in Limine - Photographs (Cont'd)     433

20   GUILTY PLEA - September 21, 2001     495

21   Sentencing Hearing     554

22   WITNESSES: STATE

23   WANDA FARRIS

24        Direct Examination by Mr. Young     559

25   WILLIAM TALLANT

26        Direct Examination by Mr. Farris     567

27   DAVID SHEFFIELD

28        Direct Examination by Mr. Farris     575

29   RICK MARLAR

vii

1        Direct Examination by Mr. Joyner          580
2   KEN GILL
3        Direct Examination by Mr. Farris          595
4   MICHAEL BETHAY
5        Direct Examination by Mr. Joyner          618
6   AMY WINTERS
7        Direct Examination by Mr. Young           642
8   KRIS WHITMAN
9        Direct Examination by Mr. Farris          657
10  JOE ANDREWS
11       Direct Examination by Mr. Young           666
12  STEVEN T. HAYNE, M.D.
13       Direct Examination by Mr. Young           672
14  Argument                                       693
15  Sentencing                                     706
16  Court Reporter's Certificate                   718

17
18                        EXHIBITS
19             Hearings - April 25 and June 26, 2001

| No. | Description | ID | REC'D |
|-----|-------------|-----|-------|
| C-1 | Questionnaire | | 38 |
| D-2A | Coverage - Itawamba County Times | | 57 |
| D-2B | NE MS Daily Journal (6) and Audit Report | | 57 |
| D-2C | WCBI Coverage/Videotape | | 57 |
| D-2D | WTVA Coverage/Videotape | | 57 |
| S-3 | Rights Waiver | | 132 |
| S-4 | Statement - T. Loden | | 132 |
| S-5 | Initial Appearance Form | | 190 |
| D-6 | Unsigned Rights Waiver | | 227 |

viii

1   S-7          Composite - Affidavit,
                 Search Warrant and Return
2                                                      275

3   S-8          Consent to Search                     284

    D-9          Report - R. Marlar                    299
4
    D-10         Photograph
5                                                      306

    D-11         Photograph
6                                                      306

    D-12         Photograph
7                                                      306

    D-13         Photograph
8                                                      306

9   S-14         Deed                                  383

    S-15
10  through
    S-41         Photographs                   426
11
    S-42
12  through
    S-78         Photographs                   429
13
    S-15         Photograph
14                                                     464

    S-18         Photograph
15                                                     464

    S-19         Photograph
16                                                     464

    S-20         Photograph
17                                                     464

    S-21         Photograph
18                                                     464

19  Guilty Plea/Sentencing Hearing - September 21, 2001

20  S-1              Photograph
                                                       562
21  S-2              Cargo Shorts
                                                       585
22  S-3       Tape box with disposable
              razor and pubic hair
23                                                     588

24  S-4              Photograph
                                                       591
25  S-5              Photograph
                                                       592
26  S-6           Camcorder
                                                       601
27  S-7           Videocassette
                                                       603
28  S-8           Copy of S-7
                                                       604
29  S-9       Evidence bag with
              Wal-Mart sack
                                            606   607

ix

| 1 | S-10 | Box Containing 5 Swabs | 610 | 611 |
|---|------|------------------------|-----|-----|
| 2 | S-11 | Photograph of cucumber | | 612 |
| 3 | S-12 | Photograph | | 614 |
| 4 | S-13 | Photograph | | 614 |
| 5 | S-14 | Photograph | 614 | 615 |
| 6 | S-15 | Photograph | 614 | 616 |
| 7 | S-16 | Photograph | 614 | 617 |
| 8 | S-17 | Microcassette Tape | 618 | 620 |
| 9 | S-18 | Transcript of Statement | 618 | 622 |
| 10, 11 | S-19 | Sexual Assault Kit - L. Gray | | 645 |
| 12 | S-20 | Sexual Assault Evidence - T. Loden | | 646 |
| 13, 14 | S-21 | 3 Plastic Packages - Blood Sample, Fingernail scrapings | | 646 |
| 15 | S-22 | Cuttings from Shorts | | 651 |
| 16 | S-23 | Swabbing from Camcorder | | 652 |
| 17 | S-24 | Swabbing from razor blade | | 653 |
| 18 | S-25 | Report - K. Whitman | | 661 |
| 19 | S-26 | Report - K. Whitman | | 663 |
| 20 | S-27 | Report - K. Whitman | | 664 |
| 21 | S-28 | Photograph | | 679 |
| 22 | S-29 | Photograph | | 680 |
| 23 | S-30 | Photograph | | 681 |
| 24 | S-31 | Photograph | | 682 |
| 25 | S-32 | Photograph | | 683 |
| 26 | S-33 | Photograph | | 684 |
| 27 | S-34 | Photograph | | 685 |
| 28 | S-35 | Photograph | | 686 |
| | S-36 | Death Certificate | | 688 |
| 29 | S-37 | Autopsy Report | | 689 |

```
                                                              x
 1    S-38       Report - Dr. O'Brien                      692
 2    S-39       Report - MS State Hosp.                    694
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
```

Pretrial Hearings

63

```
 1          Court said the lower court was correct in
 2          its ruling even though there was pretrial
 3          publicity and three defense witnesses
 4          that testified.  There were also eleven
 5          witnesses that testified for the state in
 6          that case.  So I would ask the Court in
 7          looking at what I've cited and all the
 8          evidence that you have here that you also
 9          consider that case of Berry v. State.
10              THE COURT:  All right, sir.  I want
11          to watch these tapes and look at the
12          publications before I rule on this
13          motion.
14              The next item has to do with a
15          request of the defense asking this court
16          to provide funds for engaging an expert
17          in mitigation.  I would ask the defense,
18          without being specific, to advise the
19          Court and the State in some general way
20          what we're talking about here.  Let me
21          look at the motions.
22              MR. JOHNSTONE:  If it please the
23          Court, Your Honor, specifically we are
24          asking the Court to allow funds for a
25          mitigation expert whose name is Gary
26          Mooers.  Of course we cite in the body of
27          the motion the authorities beginning with
28          Ake on through Harrison and those cases
29          as far as the authority for the Court to
```

Pretrial Hearings

64

1    enter into an order allowing those expert
2    witnesses to be appointed. Your Honor,
3    we feel like specifically that Mr. Mooers
4    is an extremely important expert in this
5    case. Mr. Mooers is a professor at the
6    University of Ole Miss. I have attached
7    to the motion his affidavit. And he has
8    done this extensively in several capital
9    cases and, as I stated, has an expertise
10   in this matter. He sets forth in his
11   affidavit the various factors that he
12   does and that he considers, and we would
13   state to the Court, Your Honor, that this
14   is extremely important in this case as
15   would be in most capital cases, but this
16   one, Your Honor, is especially important
17   given our factual circumstances.
18        Mr. Mooers has been qualified as a
19   mitigation expert in prior cases. I
20   believe this court has approved
21   Mr. Mooers as a mitigating expert in a
22   previous capital murder case in Pontotoc
23   County, and he has also been approved in
24   various other counties and various other
25   jurisdictions. I believe his, like I
26   said, Your Honor, his affidavit is pretty
27   much self-explanatory as to what he would
28   be doing, his approximate cost that he
29   thinks he could complete the study for.

Pretrial Hearings

65

1          MR. FARRIS:  Your Honor, the State

2     has not received the affidavit from

3     Mr. Mooers, has not heard his name

4     mentioned until just a moment ago.  We

5     would also point out that the Ake case as

6     counsel opposite cites is an Oklahoma

7     case and the line of cases that lead up

8     to the Ake case out of Mississippi

9     stating the defendant must outline the

10    specific cost, value and purpose of an

11    expert or investigator to the court.  The

12    defendant must show a substantial need

13    for the expert or investigator.

14          Looking at the other line of cases

15    that have come out talking about experts

16    and mitigating factors, is that the state

17    hospital, which has already agreed is

18    going to be examining the defendant, is

19    going to provide the psychological

20    information that could be used by both

21    sides.  We don't know how it's going to

22    turn out.  It appears that Mr. Mooers may

23    already have some type of opinion.  And

24    if he's just one of these people that's

25    going to come in and say, "We don't like

26    the death penalty," it's always

27    mitigating for whatever the reason

28    without any type of examination or

29    qualification, it's a waste of the money

Pretrial Hearings

66

1    of the court.  It's a waste of our time.

2    And we have no idea how much this is

3    going to cost

4         THE COURT:  The affidavit, I think,

5    will answer some of those questions,

6    counsel.

7         MR. JOHNSTONE:  May I approach and

8    give them a copy of the affidavit, Your

9    Honor?

10        (BRIEF PAUSE IN PROCEEDINGS)

11        MR. FARRIS:  Your Honor, the Court

12   has already appointed an investigator for

13   this individual, and it appears that the

14   factors that this guy is going -- what

15   this gentleman is going to do is assist

16   them in getting more experts to give

17   other opinions.  I don't think this meets

18   the requirements of Butler v. State that

19   requires them to specifically tell what

20   they're -- okay.

21        Your Honor, also the State would ask

22   that the Court voir dire him on his own

23   financial situation since we understand

24   he has an attorney retained in a divorce

25   matter as well as a private investigator

26   obtained in a divorce matter.  We would

27   ask that you voir dire him about that.

28   He may very well be able to afford some

29   of this on his own instead of the state

Pretrial Hearings

67

1   picking up all the costs.

2       MR. DANIELS:  Your Honor, Mr. Loden

3   has already been appointed his attorneys

4   in this case.  He has already, I

5   understand, made affidavit of indigency.

6   At any rate, the court has determined

7   that he is indigent and has appointed him

8   counsel in this case.

9       It's our understanding that

10  Mr. Loden's family has retained an

11  attorney and an investigator for his

12  pending divorce matter and other civil

13  matters.

14      THE COURT:  Counsel, are you

15  representing that there has been no

16  change in his financial circumstance

17  since the beginning of this?

18      MR. DANIELS:  I'm aware of none,

19  Your Honor, and my client tells me he has

20  no -- he has no earnings and he has no

21  substantive property other than a

22  remainder interest in some real estate,

23  and I understand that was conveyed away.

24      MR. FARRIS:  Your Honor, I would ask

25  at what time that interest was conveyed

26  away.

27      MR. DANIELS:  It's not a vested

28  interested anyway, Your Honor.

29      MR. FARRIS:  He had a remainder

Pretrial Hearings

1   interest in a large amount of property in

2   Itawamba County which his grandmother

3   held a life estate.

4       MR. DANIELS:  Your Honor, that

5   Hornbook law, that interest doesn't vest

6   until the death of the life estate, and a

7   remainder interest is not vested in

8   Mr. Loden.  He has no property to sell.

9       MR. FARRIS:  Your Honor, if he had

10  no property to sell, what was conveyed?

11      THE COURT:  Well, I think that's

12  fair inquiry, counsel.  If I understand

13  what you have said, he did have a

14  remainder interest in a parcel of land in

15  Itawamba County that has been conveyed;

16  is that correct?

17      MR. DANIELS:  I understand that he

18  did have a remainder interest.  I've not

19  seen any conveyance.  I'm not privy to

20  one.  But the only thing I can tell the

21  Court is that I don't know what evidence

22  Mr. Farris may have that circumstances

23  have changed other than simply an

24  allegation.

25      MR. FARRIS:  Your Honor, counsel is

26  the individual that said he had a

27  remainder interest which was conveyed.

28  It wasn't me that said that; it was him.

29      MR. YOUNG:  Your Honor, could I say

Pretrial Hearings

69

1    one thing?

2         THE COURT:  Yes, sir.

3         MR. YOUNG:  I'd like the Court to, I

4    know you already have, but I just want to

5    point out what they're asking for this --

6    in this affidavit for this expert witness

7    to do, and it's things that appear to me

8    that the attorneys will be doing anyway.

9    They have an investigator to do this, but

10   they're asking the Court to appoint them

11   an expert witness to investigate the case

12   to them, to help prepare the case for

13   trial, to go out and interview witnesses,

14   and to go out and see if he can find

15   other experts that will test to -- that

16   will testify to what, we do not know.

17        In "B" it says assist in locating

18   appropriate experts, providing background

19   materials to experts, to obtaining

20   records from the client and his family,

21   identifying and interviewing penalty

22   phase witnesses.  That's what we as

23   attorneys do.  Develop additional

24   witnesses who would not previously have

25   been interviewed.  I don't believe that

26   they need additional expert witnesses to

27   go out and investigate the case for

28   them.  It's my understanding that they

29   have or will have an investigator to do

Pretrial Hearings

70

these things.  So I do not believe that
the Itawamba County citizens should be
taxed with the cost of an additional
expert that at this point appears to be
unnecessary.  And the rule specifically
requires that they must outline the cost
value and purpose of an expert to the
court.  And the purposes shown in this
affidavit which we have just received are
really, it appears to me, to investigate
and help prepare a case for them which
can be done by the attorneys and the
investigator they have.

MR. JOHNSTONE:  Your Honor,
Mr. Mooers also by his affidavit shows
his particular expertise above and beyond
an investigator by being appointed in
approximately twenty capital murder cases
in the -- specifically for the penalty
phase and to assist in locating and
determining and possibly testifying about
any mitigating factors that would become
extremely important in the guilt -- in
the penalty phase of this cause.

I would agree that some of the
language seems to indicate it would be
some of the same as a typical
investigator, but we would submit that
his expertise and his Ph.D. from the

Pretrial Hearings

71

1    University of Pittsburgh would make him

2    an additional expert that would be

3    necessary and vital to Mr. Loden and

4    especially in the penalty phase of this

5    trial and would submit that Mr. Mooer's

6    prior record of being accepted and doing

7    work in this area shows that he is very

8    necessary and accepted by other courts.

9    And we think he would be very necessary

10   for the defense of this matter.

11       MR. YOUNG: Your Honor, we'd like to

12   ask exactly what he is an expert in. He

13   cites in the affidavit that he is a

14   professor at the University of

15   Mississippi and teaches in the social

16   work department. That's all I see as to

17   his background.

18       THE COURT: Counsel, do you want to

19   address that?

20       MR. JOHNSTONE: Your Honor, I would

21   just reiterate that the affidavit speaks

22   for itself that Mr. Mooers presents

23   himself as a mitigation expert; that he

24   has been accepted. It's vital to the

25   defense in this matter and we need him,

26   Your Honor.

27       MR. YOUNG: Of course, Your Honor,

28   testifying as a witness is one thing if

29   he is an expert, but going out and

Pretrial Hearings

1    developing a case and working on the case

2    as an attorney and an investigator is

3    going to do -- I submit is not necessary

4    in this case.

5        THE COURT:  In reading the affidavit

6    that he has filed or you have filed as

7    part of the motion in this case, in

8    reading that it seems to me we're talking

9    about the self-same services that would

10   be in my opinion a psychiatrist,

11   psychologist or other person who was

12   attempting to determine facts and

13   circumstances that might explain or be

14   given in mitigation.

15       In paragraph Roman four it goes into

16   a detailed list of everything from

17   prenatal down to present, including, I

18   would assume, the results of mental

19   health examinations or psychiatric or

20   psychologist reports, etc., which appear

21   to me to be awfully akin to what they're

22   charged with doing in the course of

23   examining and forming opinions about his

24   circumstance.

25       MR. JOHNSTONE:  I think what we have

26   here, Your Honor, is a field that

27   basically pulls all of those other fields

28   together into a cohesive type of a report

29   that can blend all of those other

Pretrial Hearings

1              witnesses or experts together into a

2              cohesive report that is basically a field

3              of mitigation expertise. And I realize

4              it may be something that's foreign at

5              this point to the prosecution, but I

6              again say, Your Honor, if he's been

7              accepted in twenty capital murder cases,

8              it's certainly something that is

9              acceptable within the courts.

10          MR. FARRIS: Really the fact he's

11              been accepted in other courts does not

12              make it good law in this court. This is

13              like a canned package that he's going to

14              put together, and it sounds as if they

15              already know the results and not the

16              first lick of work that's been done.

17              They're arguing that he's going to come

18              in here and mitigate this case and has

19              had no association with the case. It

20              sounds like he a professional, "I'm going

21              going to go in there and mitigate against

22              capital murder," without any specifics

23              about this case at all.

24          THE COURT: Has this matter been

25              taken up by the Supreme Court?

26          MR. JOHNSTONE: I don't know that,

27              Your Honor.

28          THE COURT: I don't either.

29          MR. FARRIS: Your Honor, I ran a

Pretrial Hearings

74

1   search yesterday on the wording
2   mitigation expert.  Didn't come up with
3   anything on that in particular.  What I
4   did come up with is that the failure to
5   present a case in mitigation, being the
6   sentencing phase of a capital trial, is
7   not per se ineffective assistance of
8   counsel.  That's <u>Williams v. Cain</u> in a
9   case that was taken forward, 125 F.2d 269
10  out of the Fifth Circuit.  I did not find
11  anything particularly on mitigation
12  expert, and I did try to run those
13  yesterday.
14          THE COURT:  Mr. Johnstone and
15  Mr. Daniels, is there any body of
16  material that demonstrates that this is
17  in fact a speciality or is there any --
18  first of all, do you expect him to
19  testify during the course of the trial?
20  He mentions that if it became necessary
21  or appropriate or however he says it.
22          MR. JOHNSTONE:  His report would be
23  available, Your Honor, and he would be
24  available for testimony is what my
25  understanding would be.  His report would
26  be available to the prosecution as well
27  as the defense.  And it's difficult for
28  us to say at this point just exactly --
29  we do not know what he would say or what

Pretrial Hearings

75

1    type of report he would have obviously

2    until he could do his investigation and

3    make his report, so we really don't know

4    at this point whether he would testify or

5    not. But if -- he would be there and be

6    available should it become necessary at a

7    later point.

8        THE COURT: I have already

9    authorized your employing an

10   investigator. I believe I have.

11       MR. JOHNSTONE: Yes, sir.

12       THE COURT: And in looking at what

13   he proposes to do to the tune of about

14   fourteen thousand dollars is to

15   investigate, develop information, which

16   all seems to be either something that the

17   investigator, the attorneys or

18   psychiatrists, psychologists would be

19   involved in in developing the case. I

20   don't know of any particular specialty

21   within the law or a scientific basis for

22   the kind of thing he proposes to do.

23       I'll give you an opportunity to tell

24   me if you can locate any authority for

25   this other than the fact that he's done

26   it in the past. I would like to know

27   what the courts of this country have said

28   about this before I authorize this

29   expenditure.

Pretrial Hearings

76

1               I understand --

2               MR. JOHNSTONE:  We'll look and

3   provide that for you, Your Honor.

4               THE COURT:  All right, sir.  The

5   exclusion of jurors based on race,

6   gender, religion.  I take it that these

7   would be for cause or could be taken up

8   during the course of the actual tendering

9   process along with any Batson-related

10  matters.  I think it is impossible for me

11  to anticipate what challenges the State

12  might exercise during the course of the

13  actual selection process.  For that

14  reason, I'm going to pass that matter

15  until we get into that.

16              The next matter, asking the Court to

17  declare the Code Section 97-3-19

18  unconstitutional.  I'll be interested in

19  your argument, counsel.

20              MR. DANIELS: The underlying offense

21  in this case, Your Honor, is kidnapping.

22  The State has announced it intends to

23  seek the death penalty.  The basis of my

24  motion is Eighth and Fourteenth Amendment

25  jurisprudence.  The U. S. Supreme Court

26  requires that capital murder statute and

27  any capital murder sentencing scheme must

28  prevent arbitrary and capricious

29  imposition of the death penalty.  That is

# EXHIBIT 28

# State Discovery

# EXHIBIT 28-A

# MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY
## CRIMINAL INVESTIGATION BUREAU
### POST OFFICE BOX 958
### JACKSON, MISSISSIPPI 39205

## STATEMENT OF FACTS

PAGE: 01
CASE NO.: B-0835-2000

On Friday, June 23, 2000, at approximately 0555 hours, this writer was contacted by MHP/Troop F dispatch and advised that the Itawamba County Sheriff's Office was requesting assistance with a missing person, a white female, 16 years of age, in the Dorsey Community on MS Hwy. 178, which is east of the US Hwy. 78 and MS Hwy. 178 intersection.

This writer arrived at the Comer's Restaurant at approximately 0715 hours and was met by Itawamba County Sheriff's Office Deputies, Narcotics Investigator David Sheffield and Investigator Bryan Jones. This writer was advised that the missing person was a Leesa Marie Gray, a white female, DOB███████ SSN███████, of ████ ████ Mississippi, 38843. Leesa Gray had been missing since Thursday, June 22, 2000, at approximately 2235 hours. Leesa Gray worked as a waitress for Comer's Restaurant. Leesa was last seen when she left work heading straight home in a 1992 Honda Accord, four door, green in color.

This writer was advised of the names of people that had been in the restaurant on Thursday, June 22, 2000, which were Hugh Mitchem, Patsy Mitchem, Richard Talent, Sheila Goines, Rush Holcomb, Marilyn Comer, William Hughes, Amy Jo Holcomb, Mike Comer, William Cooley, Carrie Hitt, and Eddie Loden. Eddie Loden had been in on several occasions and had inquired at what time the restaurant closed. Eddie Loden, also came back just after quitting time and made a take-out order. Leesa Gray was his waitress. Eddie Loden was the last customer to speak and see Leesa Gray. Eddie Loden later identified as Thomas Edwin Loden, Jr., a white male, DOB███████ SSN███████ of ███ ███████ Vicksburg, Mississippi, 39180.

Eddie Loden had been seen at the restaurant in two different vehicles. One was an Oldsmobile passenger car, beige in color, later identified as a 1992 Oldsmobile 88 Regency, four door, beige/other in color, bearing MS tag MME 014, VIN 1G3HN53L9NH61663, which is registered to Eddie Loden's grandmother, Rena B. Loden, of ████████ Fulton, Mississippi, 38843. The second vehicle was a large Ford customized van, green in color, later identified as a 1994 Ford 15V IC van, green/other in color, bearing MS tag BHF 161, VIN 1FDEE14H0RHB26818, which is registered to Eddie Loden's wife, Katrina G.

007

PAGE: 02
CASE NO.: B-0835-2000

Loden, of ████████████████, Mississippi, 39180. This writer was advised that Eddie Loden was visiting and staying with his grandmother, Rena Loden. This writer was advised that Eddie Loden had not yet been interviewed as the other customers were and employees of the restaurant. This writer was advised that Leesa Gray was driving a Honda, green in color, later identified as a 1992 Honda Accord, four door, green in color, bearing MS tag MMK 128, VIN 1HGCB7651NA115101, which is registered to Leesa Gray's mother, Wanda Farris.

This writer was advised that Leesa Gray's vehicle was located at approximately 2300 hours, by a co-employee, Richard Tallent. The vehicle had a left front flat tire. The tire had what appeared to be a utility knife blade in the thread of the tire. This blade appeared to have been placed under the tire purposely so when Leesa Gray moved her vehicle the tire would have been punctured by this blade. Leesa's vehicle was secured by the Itawamba County Sheriff's Office and towed by Orears Wrecker Service with an Itawamba County Sheriff's escort, Deputy Jerry Wheeler, I-16. Leesa Gray's cellular phone, clothing, cosmetic bag, and purse, which contained over $300.00 in cash and Leesa Gray's Mississippi Driver's License were still in Leesa Gray's vehicle.

This writer was also advised that the restaurant normally stops cooking at 2100 hours. Eddie Loden came to the restaurant at approximately 2110 hours, Thursday, June 22, 2000, to make a take-out order. This writer decided to interview Eddie Loden in order to ascertain if Eddie Loden could relate to this writer if he remembers anything he saw or heard that would help in locating Leesa Gray.

This writer followed Deputy Jones to the Rena Loden residence and arrived at approximately 0750 hours, Friday, June 23, 2000. Deputy Jones knocked at the back door and we were let in by a white female who is a caretaker for Rena Loden, who is elderly and in a wheel chair. Deputy Jones and this writer identified ourselves and explained why we were there. This writer stated to Rena Loden that we needed to talk to Eddie. Rena Loden stated that Eddie had gone fishing behind the house just a couple of hundred yards in the pasture. This writer requested permission from Rena Loden to attempt to locate Eddie and talk to him. Rena Loden granted Deputy Jones and this writer permission to do this.

Deputy Jones and this writer located the pond, but could not locate Eddie Loden or any signs of fishing equipment. Deputy Jones and this writer then called out to Eddie Loden, but received no response. Deputy Jones and this writer then returned to the residence. This writer informed Rena Loden that we could not locate Eddie. Rena Loden advised us that Eddie could not have gone far because he is requested to stay within hearing distance of a vehicle horn, which this writer later utilized approximately 20 times in an attempt to locate Eddie. Rena Loden also advised this writer that Eddie was supposed to take her car to a repair shop to have her air conditioner repaired. This writer then asked for permission to search for all the common areas of the property and Rena Loden's vehicle.

008

PAGE: 03
CASE NO.: B-0835-2000

Rena Loden then complied with this request. Deputy Jones and this writer then searched the residence, excluding the room that Eddie Loden slept in. Deputy Jones and this writer then went outside and searched a 1986 GMC C10 pickup, black in color, bearing MS tag MM2 546, VIN 1GTDC14H4GF711643, which is registered to Rena Loden's deceased husband, E.O. Loden. Rena Loden's Oldsmobile passenger car was also searched and this writer located at the driver's side door rocker panel area a military-style general purpose rope, green in color, which appeared to be in a handcuff design. This writer took this rope into evidence. This writer then advised Deputy Jones to contact his department to request more officers assist us. This writer then contacted Captain Mike Berthay, B-2, MHP/CIB. Captain Berthay advised this writer to secure the scene until he arrived. Deputy Jones left to secure a search warrant for the Rena Loden property, out buildings, and all vehicles on the property. Captain Berthay arrived and Criminal Investigation Bureau took control of the scene. Captain Stanley Sisk, B-3, MHP/CIB, also arrived to assist in this case. The Itawamba County Sheriff's Office had also utilized a helicopter to assist. This helicopter was circling the Rena Loden property and the adjacent properties, but still Eddie Loden was not located. Captain Berthay sent this writer to assist Deputy Jones with the search warrant.

This writer located Deputy Jones and assisted Deputy Jones in completing the task of securing a search warrant. Once this search warrant was issued, this writer and Deputy Jones returned to the scene to start the search. Eddie Loden's van was locked and had poor visibility through the windows due to curtains and blinds. This van was placed on a West Wrecker Service rollback wrecker and taken to MHP/Troop F shop to be searched by forensic evidence examiner Ken Gill of the Mississippi Crime Laboratory. This van was escorted by Deputy Charles Justice, I-12.

This writer conducted a search of Eddie Loden's bedroom and recovered a pair of gray shorts at the right side of the bed on the floor. These shorts had what appeared to be blood stains on the left front pocket. This writer also located an overnight bag, red in color, at the foot of the bed which contained a JVC video camera power supply. This writer located two pornographic magazines in a lady's dresser in the top right drawer. These two magazines were not seized in this search warrant. Several other articles were recovered which are listed on the search warrant return. Most of these items were in plain view and were observed when Deputy Jones and this writer had asked for permission to search.

Captain Berthay had also requested a K9 Unit, Search Dog South, to assist in this case. The K9 officers were Bob Weibler, K9/1, and Paulette Weibler, K9/2. During this property search, Lt. Randy Ginn, B-15, MHP/CIB, Troop G, and Lt. Mickey Baker, B-14, MHP/CIB, Troop F, had arrived at the Rena Loden residence. The K9 Unit was given the bed linen, pillow case, and sheets that Eddie Loden had slept on. Rena Loden's pickup was located in front of a garage behind the residence. Rena Loden's car was in this garage. Eddie Loden's van was parked under a large tree behind Rena Loden's residence just past the garage.

009

PAGE: 04
CASE NO.: B-0835-2000

The Rena Loden residence was a crime scene and the following officers were assisting this writer:

Itawamba Sheriff's Office

1. Sheriff Leon Hayes
2. Narcotics Investigator David Sheffield
3. Investigator Bryan Jones
4. Deputy Chris Loden
5. Deputy Heath Moore

MHP/CIB:

1. Captain Mike Berthay
2. Captain Stanley Sisk
3. Lt. Mickey Baker
4. Lt. Randy Ginn

FBI:

1. Special Agent Bullwinkel

Tremont, MS P.D.:

1. Chris Umfress

Search Dog South:

1. Bob Weibler
2. Paulette Weibler

At approximately 1439 hours on Friday, June 23, 2000, Eddie Loden's aunt, Stella F. Renick, who had arrived to take care of Rena Loden, advised this writer that Rena Loden had made a mistake about no firearms missing in her residence. Stella Renick stated that a handgun, possibly a .22 cal revolver, was missing. This writer also went to check the scene where Leesa Gray's vehicle was located, at the intersection of MS Hwy. 178 and Dorsey School Rd., which is 6/10 of a mile east of Comer's Restaurant. Leesa Gray's residence is 9/10 of a mile east of Comer's Restaurant. These measurements were made by Deputy Sheffield and this writer. At 1540 hours, Friday, June 23, 2000, the night care person for Rena Loden was identified as Joyce Brewer and the day care person was identified as Margaret Gasaway. Joyce Brewer drives a 1998 Ford Ranger pickup, green in color, bearing

010

PAGE: 05
CASE NO.: B-0835-2000

MS tag MM4 862, VIN 1FTYR14U2WPA52578. This pickup was seen early on the morning of June 23, 2000, at Rena Loden's residence.

The search for Eddie Loden continued until this writer and the other officers were notified at approximately 1745 hours that a white male was found in a ditch on Charlie Donnell Rd. This white male was located by Mary Ann Brown, Dave Loage, and Vern Caygle. The first officers on the seen with this white male was Chief Chris Umfress, Tremont, Mississippi, PD-1, and Itawamba County Sheriff's Deputy Heath Moore, I-19. Chief Umfress identified this white male as Eddie Loden, handcuffed Loden, and read Loden his Miranda rights warning. Eddie Loden had what appeared to be lacerations to both wrists and elbows. The words "I'm sorry" were scratched into his chest. An ambulance was requested and North Mississippi Medical Center Ambulance Medic #6 arrived with Paramedics Lindsey Sparks, driving, and Micki Brown, administering medical treatment. While at this scene, this writer collected evidence while Eddie Loden was being treated. Captain Berthay was with Eddie Loden in the ambulance en route to North Mississippi Medical Center. This writer read Eddie Loden his Miranda rights warning again with Agent Bullwinkel and Paramedic Brown as witnesses. Eddie Loden could not sign this rights waiver due to his injuries. This writer asked Eddie Loden if he remembered Leesa Gray, his waitress at Comer's Restaurant. Eddie Loden replied, "Yes." This writer asked Eddie Loden if he knew where Leesa Gray was and if she was alright. Eddie Loden replied, "I don't know where she is." This writer asked Eddie Loden if he remembered talking to Leesa Gray at the restaurant and he replied, "Yes, I talked to her. I ordered a cheeseburger from her." This writer asked Eddie Loden how he received his injuries and he said, "I did it." This writer asked Eddie Loden why he scratched "I'm sorry" into his chest and he replied, "I wanted to kill myself and I wanted to let my wife know that I was sorry." This writer again asked Eddie Loden where Leesa Gray was and if she was alright or needed medical help and he replied, "I don't know. I'm too tired to talk." This writer then stopped asking Eddie Loden questions. Once at the North Mississippi Medical Center emergency room, Eddie Loden was treated by Dr. Robert Dale with Dale Jones, RN, Rebecca Fish, RN, Sharon Estes, RN, and Debbie Harris, EMT/Board Coordinator assisting in emergency room #5. During this treatment, a search warrant for Eddie Loden's person was being requested by Lt. Baker. This writer retained all discarded medical supplies, blankets, and sheets used on Eddie Loden, before it could be contaminated by being placed in the waste bin or dirty linen hamper.

Eddie Loden was taken to surgery with Special Agent Bullwinkel as an escort. Once surgery was completed, this writer relieved Special Agent Bullwinkel. Special Agent Bullwinkel gave this writer discarded linen that was used on Eddie Loden in surgery before it could be contaminated by being placed in the waste disposal bin or dirty linen hamper. This writer kept Eddie Loden under observation in the surgery recovery unit with Dr. Homer Horton. During this observation time, this writer was notified by Captain Berthay that the body of Leesa Gray was located in the back of Eddie Loden's van.

011

Once Eddie Loden was released from the surgery department, he was readmitted to the emergency room #5 with the same doctor and nurses that were there when he first arrived. Eddie Loden was served with a search warrant of his person for the purpose of retrieving the following: human blood, saliva, pubic hair, head hair, body hair, pubic comings, genital swabbings, fingernail scrapings, and discarded medical bandages/supplies from the person of Thomas Edwin Loden, Jr., AKA Eddie Loden. This search warrant was served on June 24, 2000, at approximately 0100 hours.

Once completed with the search warrant of Eddie Loden's person, Eddie Loden was placed into investigative custody and transported to the Union County jail. Eddie Loden was transported by Itawamba County Sheriff's Deputy Roy White, I-6, with this writer as a passenger. Lt. Baker followed in his patrol unit. Upon arrival, Eddie Loden was received by a Union County jailer and advised that Eddie Loden had cut his wrist and that a suicide watch was necessary.

On June 24, 2000, at approximately 1700 h ours, this writer swore to an affidavit, before First Judicial District Circuit Judge Frank Russell at the New Albany MHP/Troop F substation, charging Thomas Edwin Loden, Jr., with capital murder. Judge Russell then issued an arrest warrant on Thomas Edwin Loden, Jr., Judge Russell, Captain Berthay, Lt. Baker, Itawamba County Sheriff's Deputies Sheffield and Jones then traveled to the Union County Sheriff's Office/Jail where this writer served Thomas Edwin Loden, Jr., with the warrant for his arrest on capital murder. Judge Russell gave Thomas Edwin Loden, Jr., his initial appearance advising him what he was charged with and his rights. This writer then processed and photographed Eddie Loden. Deputy Jones fingerprinted Eddie Loden. Captain Berthay had Eddie Loden to change from his hospital clothing to an inmate uniform and this writer collected the hospital clothing.

On June 27, 2000, this writer was advised by Captain Berthay and Lt. Baker that they had made contact with Eddie Loden's wife and his USMC commanding officer. This writer was also advised that there was an incident with pornographic material that Eddie Loden was viewing on a home personal computer, which was detected by his wife. This writer advised Captain Berthay and Lt. Baker that there was at least two pornographic magazines that was not collected at the residence of Rena Loden, ███████████████, Fulton, Mississippi, 38843. A search warrant was then requested and received to recover the following: magazines/books, documents, receipts, keys, cord and/or rope, tape, bags, video/audio tapes, photographs, computer discs, pictures, film, knives, and guns, from the Rena Loden residence of ███████████████, Fulton, Mississippi, 38843. This search did retrieve two pornographic magazines among other items. One of these two pornographic magazines depicted what appeared to be an abduction, bondage, and rape of a white female.

This writer left the state on June 28, 2000, and was not back on this case until July 11, 2000. Captain Berthay and Lt. Baker were now completing this investigation. This

012

PAGE: 07
CASE NO.: B-0835-2000

writer returned and was informed that some search warrants and consent to search were completed at Eddie Loden's residence and his work place. M/Sgt. Gaylon Owens, B-71, of MHP/CIB, Troop C, was handling these searches. There was also another search of the Rena Loden property.

On July 11, 2000, Eddie Loden again cut his wrist and was taken to the Union County Hospital. M/Sgt. Ralph Mitchell, B-24, MHP/CIB, Troop F, was assigned to him for observation. Eddie Loden was treated and released from the Union County Hospital on July 11, 2000. Eddie Loden was transported from the Union County Hospital to the Itawamba County Sheriff's Office/Jail and placed under a suicide watch.

On July 12, 2000, Captain Berthay, Lt. Baker, and this writer traveled to Jackson, Mississippi, where this writer placed collected evidence into the Mississippi Crime Lab. Lt. Baker requested and received another search warrant for the residence of Eddie Loden at 1022 Markham Street, Vicksburg, Mississippi, 39180. This search was conducted by Captain Berthay, Lt. Baker, M/Sgt. Owens, and this writer, MHP/CIB; Special Agent Bullwinkel, FBI; and Detective Fran Jeffers, Vicksburg, MS P.D.

REPORTING OFFICER, BADGE NUMBER
M/Sgt. Rick Marlar, B-44/314

This document contains neither recommendations nor conclusions of the CIB. It is the property of the CIB

013

# EXHIBIT 28-B

# AFFIDAVIT FOR SEARCH WARRANT

**STATE OF MISSISSIPPI**
**COUNTY OF ITAWAMBA**

This day personally appeared before me, the undersigned judicial officer of said County, __Investigator Bryan Jones__ and _____ known to me to be credible persons, who, after having been first duly sworn, depose and say:

1. That affiants have good reason to believe and do believe that certain things hereafter described are now being concealed in or about the following place in this county: Leaving Itawamba Co. Sheriff Office on So Cummings St. Go to Hwy 78.

   is Peppertown Exit. Go to 178 W. Go to Ballardsville Rd. take left. Then take right go approx 4 miles to 2000 _____ House is on the left This residence and any and all vehicles andbuildings on this property

together with all approaches and appurtenances thereto.

2. That the place described above is occupied and controlled by: __EO Dick Loden__

3. That said things are particularly described as follows: Evidence pertaining to a potential crime. IE: Work Boots, Work Gloves, rope, Girt soiled napkins and all other items pertaing to alleged said crime

4. That possession of the above described things is in itself unlawful (or the public has a primary interest in, or primary right to possession of, the above described things), in that said things are:
   Soiled Boots, Soiled gloves, wet and soiled sandals, military type clothing belonging to Eddie Loden and all items related to the investigation to a potential crime.

5. The underlying facts and circumstances tending to establish the foregoing grounds for issuance of a search warrant are as follows:

   On 6-23-00, I was dispatced to an abanded vehicle on the corner of Hwy 178 W and Dorsey School Rd. When I arrived I discovered the vehicle and the persona belonging to Leesa Gray. When I interviewed several subjects, it was stated to me Eddie Loden had been in the restaurant where Gray was last seen (Comers Restaurant). Loden had been to the restaurant on two (2) separate occasions, being extremely flirtatious. It was then brough to my attention there was a suspicious Ford family van also in the parking lot, at about the time Gray was leaving work. When I went to talk with Gray as a possibility I noticed a Ford van fitting the description of the one described to me. I could not contact owner (Eddie Loden), but a walk around the van revealed gloves, soiled boots. Also, inside the van Loden was operating earlier, found was military type rope. It was also discovered, while obtaining permission to search the residence, on the pants belonging to Loden.

6. WHEREFORE, affiants request that a search warrant issue directing a search of the above described place and seizure of the above described things.

Affiant: _____    Affiant: _____

Affiant: _____    Affiant: _____

Sworn to and subscribed before me, the 23rd day of June 2000.

_____ J. P.
(Official Title)

184

Affadavit for search warrant contior Pg #1, paragraph 5.

was dark red stains believed to be blood

WITNESS: _Dirk Mafer, BH_    _[signature]_

Signature of person giving statement

WITNESS: _____

185

## SEARCH WARRANT

STATE OF MISSISSIPPI
COUNTY OF ITAWAMBA

TO ANY LAWFUL OFFICER OF ITAWAMBA COUNTY, MISSISSIPPI:

WHEREAS, Inv Bryan Jones + W/SGT Rick Mashed, 944
known to me to be credible persons, have this day made complaint on oath before me as
follows:

1. That affiants have good reason to believe and do believe that certain things
hereafter described are now being concealed in or about the following place in this
aity:   Leaving Itawamba Co Sherriffs office, go w on Hwy 78. Take
Peppertown exit, go west on hwy 178. turn left on Ballardville church
rd and then immediate right. go approximatley 4 mile to ▮▮▮▮▮▮▮▮▮▮
rd.. Fulton, Ms. House is on the left. This residence and any and all
vehicles and buildingson this property

together with all approaches and appurtenances thereto.

2. That the place described above is occupied and controlled by:  Mr and Mrs
E.O. Dick Loden

3. That said things are particularly described as follows:
Any and all evidence pertaining to a potential crime. IE: Soiled work gloves,
soiled work boots, wet and soiled sandals, military rope, clothing
belonging, andall other items pertaing to a potential crime.

4. That possession of the above described things is: In itself unlawful (or the
public has a primary interest in, or primary right to possession of, the above described
things), in that said things are:
Soiled boots, soiled gloves, wet and soiled sandals, clothing military
ropesoiled napkins and any and all items pertaing to a potential
crime investigation.

5. The underlying facts and circumstances tending to establish the foregoing grounds
for issuance of a Search Warrant are as follows:
On 6-23-00, I was dispatched to an abandoned vehicle and a possible  abduction
on the corners of Hwy 178W.. and Dorsey School Rd. When I arrived, observed
the vehicle Gray was operating and the purse and cell phone also belonging
to Gray. I then went to interview possible witnesses who noted Loden was
one of the "last" to see Gray. It was also stated  by several persons there
was a suspicious looking family van at Comers parking lot. I went to speak
with Loden as a possible witness. I went to his house and noticed the van
fitting the possible description. I conducted a walk around the van and noticed
soiled boots, soiled gloves, and other potential peices of evidence. We were
also given permission to search the veicle belonging to Mrs. EO Loden
in this vehicle  we found gerrentype military rope  approximately 3ft in
length. It was also discovered  while searching the residence, clothing
believed to be worn by Loden the following night had dark red stains on
the pants  belied to be bllod.

6. This Court, having examined and considered said affidavit, and also having heard
and considered evidence in support thereof from the affiants named therein does find that
probable cause for the issuance of a search warrant does exist.  THEREFORE you are hereby
commanded to proceed at any time in the day or night to the place described above and to
search forthwith said place for the things specified above, making known to the persons
: pying or controlling said place, if any, your purpose and authority for so doing, and
if the things specified above be found there to seize them, leaving a copy of this warrant
and a receipt for the things taken; and bring the things seized before this Court Instanter;
and prepare a written inventory of the items seized, and have then and there this writ
with your proceedings noted thereon.

(1)

186

# EXHIBIT 28-C

 

## RETURN

I received this warrant on the 23rd day of June, 2000, and have executed it as follows:

On the 23rd day of June, 2000, at 12:00 P.M., I searched the place described in said warrant and I left a copy of the warrant with Mrs. Beatrice Loden, the person occupying and controlling said place, together with a receipt for the items seized.

The following inventory of the things taken pursuant to the warrant are attached to this document:
1. One pair of grey shorts containing a wallet and a lighter
2. One pair of brown sandals (from living room)
3. One blue and grey flower print short sleeve shirt
4. 1 JVC power adapter
5. One set military dog tags for Thomas E. Loden Jr.

Items removed from a green Ford Econoline van V.I.N. 1FDEE14HORHB26818, found parked in the driveway of the Beatrice Loden residence:

The body of Leesa Marie Gray, a white female, DOB: ███████; SSN: ████████

For other items removed from above mentioned van, see attachments A, B, C and D.

The inventory was made in the presence of Master Sergeant R.D. Marlar, Capt. Michael Berthay and Itawamba County Sheriff's Deputy Bryan Jones.

I swear that this inventory is a true and detailed account of all things taken by me on the warrant.

_Dick Marlar_

Subscribed and sworn to and returned before me this ___16___ day of ___August___, 2000.

_Dianne Elmpress_     Justice Court Clerk
Official Title

187

# EXHIBIT 28-D

# MISSISSIPPI CRIME LABORATORY
## EVIDENCE SUBMISSION FORM

| Main Laboratory |
|---|
| 1700 E. Woodrow Wilson Ave. |
| Jackson, MS 39216 |
| 987-1672 |

Crime Lab Case # 00-009203        Agency Case # B 0835 2000
10 of 13

Requesting Officer  R.D. MARLAR
Requesting Agency  MHP – New Albany
Address        MHP – District 4              Phone #
               P. O. Box 886
               New Albany, MS 38652

## Evidence Submitted (Continued)

0027    ONE (1) SEALED BROWN PAPER BAG  LABELED  "MHP/CIB ROPE TRN IN COLOR
        THOMAS E. LODEN JR., SUSPECT, LEESA GRAY VICTIM, 06 23 2000 / 0830
        RECOVERED BY R. MARLAR B-44 L/FRT. DRIVER'S SIDE DOOR ROCKER PANEL
        OF A 1992 OLDS BEIGE IN COLOR 88R VIN: 1G3 HN 53L 9NH361663, MS TAG MME
        014, EXP. 03/01."

| Sections | Service |
|---|---|
| MICROANALYSIS | End/Fracture Examination/Comparison |

*Notes-*
*PLEASE COMPARE SUBMISSION 27  WITH SUBMISSIONS 15 AND 16 FOR
POSSIBLE MATCH.*

248

Del. By Initials: RDM                    Rec. By Initials: R

# EXHIBIT 28-E












# EXHIBIT 28-F

## PERMISSION TO SEARCH

I, _RENA B. LODEN_ , have been informed by
_Rick Mixon, 344_ and _BRYAN JONES, I7_
who made proper identification as (an) authorized law enforcement officer(s) of the
_MHP/CIB & ITAWAMBA Co. S.O._
of my CONSTITUTIONAL RIGHT not to have a search made of the premises and property
owned by me and/or under my care, custody and control, without a search warrant.

Knowing of my lawful right to refuse to consent to such a search, I willingly give my
permission to the above named officer(s) to conduct a complete search of the premises
and property, including all buildings and vehicles, both inside and outside of the property
located at ████████████████████████
_Fulton, MS. 38843_

The above said officer(s) further have my permission to take from my premises and
property, any letters, papers, materials or any other property or things which they
desire as evidence for criminal prosecution in the case or cases under investigation.

TIME

This written permission to search without a search warrant is given by me to the above
officer(s) voluntarily and without any threats or promises of any kind, at _7:27_ A.M.
on this _23_ day of _June_ 19 _2000_ , at _Fulton, MS. 38843_ .

Signed _Rena B. Loden_

Witness: _Rick Mixon, 344_  Witness: _Bryan_
Address _MHP/CIB_   Address _OF_
Phone (H)_____ (B)_____   Phone (H) _OF_ (B)_____

181

# EXHIBIT 28-G

# CASE REPORT

*Pages 01 0f 03*

*By: Investigator Bryan Jones*

*Date: 06 22 00*

*RE: Thomas Edward Loden/Capital Murder*

## PREDICATION

*On 06 23 00, at approximately 0015 hrs., I was telephoned by dispatch at ICSO, regarding an alleged missing person, and was requested by Narcotics Investigator David Sheffield to respond to the corners of Dorsey School Rd., and Hwy 178 W., to where the vehicle of the alleged missing person was sited.*

## SYNOPSIS

*When I arrived at the scene, at approximately 0033 hrs., I was advised by Inv. Sheffield he was dispatched to the scene to look for Leesa Gray, a 16 yo w/f. Sheffield further related he was advised by Gray's parents, Mike and Wanda Ferris, she had worked at Comers restaurant, the previous evening. Leesa left the restaurant between 2230 hrs., and 2245 hrs., en route home. At approximately 2300 hrs., Comers restaurant employee, cook Richard Tallant, was driving E. On hwy 178 and noticed Leesa's car parked at the intersection. He notified Leesa's father, Mike, who went to the scene, noticed the vehicle had had a flat tire on the front drivers side and proceeded to change the tire. Both subjects stayed at the scene, thinking Leesa would come back to retrieve the vehicle. After approximately 1 hour, when Leesa did not arrived back, Farris became worried and telephoned Itawamba Co. Sheriffs Dept., who, in turn, notified Inv. Sheffield. I was also advised by Inv. Sheffield, Leesa's purse, containing approximately $300.00 in cash and her cell phone had not been disturbed and was in the front passenger seat. At approximately the same time Sheffield notified me, he also had Dorsey-Friendship Volunteer Fire Dept. paged out to assist with search and rescue. I spoke with the parents, Farris' and they confirmed Sheffield's story.*

070

_Pages_  02 _Of 03_

I then spoke with Tallant, who stated at approximately 2105 hrs., the previous night, a suspicious man came into the restaurant and asked if it was too late to order a cheeseburger to go. After the man ordered the cheeseburger he went outside and pretended to go out the door to his right to use the phone, but the man actually went to the left. The man did this two or three times, then finally came back in, went towards the bathroom, came out of the bathroom paid for his food and left. Tallant further stated he knew the man as "Eddy Loden". Tallant stated he had went to High School with Loden and also, Loden had came into the restaurant earlier in the day and had ordered a cheeseburger then and attempted to "flirt" with Leesa.

After interviewing several persons who were in or around the restaurant, that night, it was also brought to my attention there was a suspicious looking dark with tan stripes family van also in the area.

After a thorough search of Gray's vehicle, I notified ICSO and advised them to send ORears Wrecker Service to secure the vehicle, in their storage, for possible further processing. The vehicle was marked, in the position it was in, and transported by ORears, to ORears.
 After approximately 4 hrs., and an intense search of the area conducted, It was decided by Sheriff Hayes to notify Ms Hwy Patrol Criminal Investigation Bureau.  ICSO dispatch notified B44/Ricky Marlar and he stated he would be responding. At approximately 0530 hrs, the same day, Sheffield later stated he had an address for Loden and we proceeded to ███████ Rd. When we arrived at the above address, we discovered a dark colored family van with tan stripes. When myself and Sheffield turned into the driveway, we were met by Adult sitter Joyce Brewer, who stated the van belonged to Loden, and he was inside the house asleep. Myself and Sheffield left the house and returned to Comers restaurant. It was decided I would take two witnesses to attempt to identify the van as beingthe one that was concidered "suspicious". I first transported Comers employee Sheila Gainer who stated she thought that was the suspicious van from the following night, but she was not positive. I transported her back to Comers and then transported Carrie Hitt to the house, where the same statement by her. I also transported her back to Comers.

When Inv. Marlar arrived at Comers restaurant, at approximately 0600 he was briefed myself and Sheffield./ Myself and

071

<u>Page 03 of 03</u>

Marlar proceeded back to ███████████, where we contacted the owner of the house, Beatrice Loden. We spoke with Ms. Loden and briefed her on the situation. We then asked to speak with Eddy. Ms. Loden stated Loden was at the pond, approximately 200 yards away, fishing. We then asked and were able to obtain a consent to search on Ms. Loden's Buick, by Ms. Ms Loden. I then conducted a "walk around the van and found several suspicious items in the van. Myself and Marlar then proceeded to the pond to talk with Loden, with no results. At that time it was discussed of a Search Warrant of the property. I contacted Sheffield, Dept. Dep C Loden, Dep Donnie Johnson, and Tremont Ms., Police Chief Chris Umfress to respond and secure the area while I drew up and had signed by Justice Court Judge Lance Bean..

When I arrived back to ███████████ with a copy of the signed search warrant, it was explained and a copy was given to Ms Loden and an intense search of the property was conducted by several Law Enforcement agencies. The van, belonging to Loden, was seized and transported to New Albany, Ms., where it was processed for any and all evidence. The property was also searched for evidence as well as Loden.

At 1844 hrs., it was given by ICSO there was a reported subject in a ditch on Charlie Donald Rd., approximately 1 mile from the residence. Chief C Umfress was the 1st Law Enforcement agent to arrive,, identified the injured subject as Thomas E Loden, secured Loden and advised him of his Miranda rights. When I arrived at the scene, I attempted to speak with Loden, but he appeared dehydrated. Loden was transported to NMMC/Tupelo where he was treated and released. At the time of Loden's release, he was charged with Capital Murder.

## <u>Evidence</u>

See MHP Case file and search warrant, dated 06 23 00

# EXHIBIT 28-H

# CASE REPORT

*Pages: 01 0f 03*

*By: Investigator Bryan Jones*

*Date: 06 22 00*

*RE: Thomas Edward Loden/Capital Murder*

## PREDICATION

On 06 23 00, at approximately 0015 hrs., I was telephoned by dispatch at ICSO, regarding an alleged missing person, and was requested by Narcotics Investigator David Sheffield to respond to the corners of Dorsey School Rd., and Hwy 178 W., to where the vehicle of the alleged missing person was sited.

## SYNOPSIS

When I arrived at the scene, at approximately 0033 hrs., I was advised by Inv. Sheffield he was dispatched to the scene to look for Leesa Gray, a 16 yo w/f. Sheffield further related he was advised by Gray's parents, Mike and Wanda Ferris, she had worked at Comers restaurant, the previous evening. Leesa left the restaurant between 2230 hrs., and 2245 hrs., en route home. At approximately 2300 hrs., Comers restaurant employee, cook Richard Tallant, was driving E. On hwy 178 and noticed Leesa's car parked at the intersection. He notified Leesa's father, Mike, who went to the scene, noticed the vehicle had had a flat tire on the front drivers side and proceeded to change the tire. Both subjects stayed at the scene, thinking Leesa would come back to retrieve the vehicle. After approximately 1 hour, when Leesa did not arrived back, Ferris became worried and telephoned Itawamba Co. Sheriffs Dept., who, in turn, notified Inv. Sheffield. I was also advised by Inv. Sheffield, Leesa's purse, containing approximately $300.00 in cash and her cell phone had not been disturbed and was in the front passenger seat. At approximately the same time Sheffield notified me, he also had Dorsey-Friendship Volunteer Fire Dept. paged out to assist with search and rescue. I spoke with the parents, Ferris' and they confirmed Sheffield's story.

890

I then spoke with Tallant, who stated at approximately 2105 hrs., the previous night, a suspicious man came into the restaurant and asked if it was too late to order a cheeseburger to go. After the man ordered the cheeseburger he went outside and pretended to go out the door to his right to use the phone, but the man actually went to the left. The man did this two or three times, then finally came back in, went towards the bathroom, came out of the bathroom paid for his food and left. Tallant further stated he knew the man as "Eddy Loden". Tallant stated he had went to High School with Loden and also, Loden had came into the restaurant earlier in the day and had ordered a cheeseburger then and attempted to "flirt" with Leesa.

After interviewing several persons who were in or around the restaurant, that night, it was also brought to my attention there was a suspicious looking dark with tan stripes family van also in the area.

After a thorough search of Gray's vehicle, I notified ICSO and advised them to send ORears Wrecker Service to secure the vehicle, in their storage, for possible further processing. The vehicle was marked, in the position it was in, and transported by ORears, to ORears.
After approximately 4 hrs., and an intense search of the area conducted, it was decided by Sheriff Hayes to notify Ms Hwy Patrol Criminal Investigation Bureau. ICSO dispatch notified B44/Ricky Marlar and he stated he would be responding. At approximately 0530 hrs. the same day, Sheffield later stated he had an address for Loden and we proceeded to 2000 Ballardsville Rd. When we arrived at the above address, we discovered a dark colored family van with tan stripes. When myself and Sheffield turned into the driveway, we were met by Adult sister Joan Brewer, who stated the van belonged to Loden, and he was inside the house asleep. Myself and Sheffield left the house and returned to Comers restaurant. It was decided I would take two witnesses to attempt to identify the van as being the one that was considered "suspicious". I first transported Comers employee Sheila Gainer who stated she thought that was the suspicious van from the following night, but she was not positive. I transported her back to Comers and then transported Carrie Hitt to the house, where the same statement by her. I also transported her back to Comers.

When Inv. Marlar arrived at Comers restaurant, at approximately 0600 he was briefed myself and Sheffield / Myself and

Page 03 of 03

Marler proceeded back to ███████████, where we contacted the owner of the house, Beatrice Loden. We spoke with Ms. Loden and briefed her on the situation. We then asked to speak with Eddy. Ms. Loden stated Loden was at the pond, approximately 200 yards away fishing. We then asked and were able to obtain a consent to search on Ms. Loden's Buick by Ms. Loden. Among other items found inside of Ms. Loden's vehicle was a green military type rope, placed in a handcuff tie knot. After a search of the vehicle, Marler and I then conducted a "walk around" the van and found several suspicious items in the van. Myself and Marler then proceeded to the pond to talk with Loden, with no results. Marler obtained permission to search all of Ms. Loden's property to include, but not limited to the home of Ms. Loden and the room in which E. Loden was staying. Marler called me into the room where Loden was staying and related he had found a pair of shorts that appeared to have blood stains on them. At that time it was also discussed of a Search Warrant of the property. I contacted Sheffield, Dep C Loden, Dep Donnie Johnson, and Tremont Ms., Police Chief Chris Umfress to respond and secure the area while I drew up and had signed by Justice Court Judge Lance Bean.

When I arrived back to ███████████ with a copy of the signed search warrant, it was explained and a copy was given to Ms Loden and an intense search of the property was conducted by several Law Enforcement agencies. The van, belonging to Loden, was seized and transported to New Albany, Ms., where it was processed for any and all evidence. The property was also searched for evidence as well as Loden.

At 1844 hrs., it was given by ICSO there was a reported subject in a ditch on Charlie Donald Rd., approximately 1 mile from the residence. Chief C Umfress was the 1st Law Enforcement agent to arrive,, identified the injured subject as Thomas E Loden, secured Loden and advised him of his Miranda rights. When I arrived at the scene, I attempted to speak with Loden, but he appeared dehydrated. Loden was transported to NMMC/Tupelo where he was treated and released. At the time of Loden's release, he was charged with Capital Murder.

## Evidence

See MHP Case file and search warrant, dated 06 23 00

892

On several occasions, I have talked with Loden regarding the night of Leesa Gray's disappearance. Loden has repeatedly stated to me he did not remember torturing and killing Gray, but knows he did it.

At one time, Loden stated to me on the morning of June 23, 2000, Loden was digging a "grave" for himself as Inv. R. Marler and I were looking to talk with him at the pond. Loden states he heard us call his name, but refused to answer, because he was "scared".

Bryan Jones
Criminal Investigator
Itawamba Co. Sheriffs Dept

89<u>3</u>

# STATEMENT OF FACTS

Date: 04-23-2001

I was notified by Sheriff Leon Hayes that I needed to go to the Baptist Hospital in New Albany Ms. The Sheriff said that Thomas Loden had try to commit suicide and that I needed to go and relieve the state investigators staying with Tom. When I arrived at the Hospital I met Mike Durfey, Mickey Baker and Ralph Mitchell, Ralph and I stayed the night. The next day Tom was discharge from the hospital. I transported Tom to the Itawamba County Jail with Ralph following us in her car on the way to the jail Tom said that he was sorry for what he had done, I told Tom that I could not talk with him about his case Tom said that he understood but all he wanted to do was die. In the weeks following Tom would tell the jailers that he would like to talk to me I would tell Tom that I could not talk to him about his case with out his lawyer present, Tom would said that all he wanted to do was talk about anything. Tom would mostly talk about his time in the Marines and his wife, daughter and how must he love them. Tom would said that he knew what he did and all he wanted to do was die. On more that one occasion Tom has ask me if he pled guilty would the judge still give him death because he did not want to go to prison for the rest of his life I would tell Tom that was something that he need to talk with his lawyer and not me. That if he wanted me to talk with him that he did not need to talk about his case. The second time Tom cut his wrist Tom told the prison next to him what he had done and that he needed to call a Jailer when Tom was transported to the Hospital in Tupelo Inv. Brian Jones went with him. About 1800 hrs Officer Chris Loden an I went to relieve Brian when we enter Toms room he stated that the was sorry for what he had done. Over the past months Tom has stated that the only reason that he had pleaded not guilty was so that he could have time to get his affairs with the military completed so that his daughter would get his retirement and benefits.

THIS STATEMENT WAS MADE BY: _David Sheffield_

Inv. David Sheffield

894

# EXHIBIT 28-I

5348

# Mississippi Crime Laboratory
Crime Scene Response Report

Page 1 of 6

| | |
|---|---|
| MCL # | 00-009203 |
| Agency(s) | Mississippi Highway Patrol, Itawamba County Sheriffs Office |
| Victim(s) | Eddie Loden |
| Suspect(s) | Leesa Gray |

On Friday, June 23, 2000, Ken Winter, Director of the Mississippi Crime Laboratory called Ken Gill of the Mississippi Crime Laboratory, Batesville Branch, to advise that Mike Berthay of the Mississippi Highway Patrol would be calling me to give details concerning processing a van for evidence.

Mike Berthay called at approximately 11:30 a.m. and advised that the van was being towed to the Mississippi Highway Patrol Substation, New Albany.

I departed the Crime Laboratory in Batesville at approximately 12:30 p.m. and arrived at the MHP Substation at approximately 1:45 p.m.

The van arrived at approximately 2:35 p.m. on a flatbed tow truck and was placed in the garage behind the MHP Substation. Paul Jackson of West Towing & Recovery, Tupelo, MS was the driver of the wrecker and he was escorted by Itawamba 12.

The vehicle to be examined is a Ford Econoline 150. Tag # Mississippi BHF161. Tag decal #BHF 161. Mississippi Vehicle Inspection 7/2000. Inspection decal # 1479753. Vehicle serial # 1FDEE14H0RHB26818.

The victims car arrived at approximately 3:50 p.m. by tow truck and was parked outside the MHP Substation garage. Kevin O'Rear of O'Rear's Fulton, MS Wrecker Service was the driver of the wrecker and he was escorted by Jerry wheeler of the Itawamba Sheriffs Office.

Photos exterior of the vehicle were taken and a visual examination of the exterior of the vehicle was conducted and a visual examination using alternate light.

Processing of the vehicle for latent prints yielded only smudged and partial prints none of which could be used for an identification.

The doors of the van were locked. A New Albany Police Department (officers name unknown) opened the front passenger door with a door shim.

103

5349

MCL Case #00-009203

Page 2 of 6

Once entry into the van was made possible by opening the door with a shim photographing and processing the van for evidence was carried out from front to the rear of the van.

At approximately 8:10 p.m. I opened the back doors of the van to photograph and process the van for evidence and found the body of a white female on the floor of the van under the rear seat/bed. Immediately Mike Berthay was called to advise him of my findings.

While waiting for Mike Berthay and the Coroner to arrive other evidence was collected from the van. A camcorder was collected from the floor of the van under the right middle seat. There appeared to be blood on the camcorder. I turned the camcorder on and observed the victim in the view finder. I immediately turned it off and advised Mike Berthay when he arrived.

When the Coroner arrived the body was taken out of the van along with the towels she was lying on and placed in a body bag. The body of was picked up by John Hopkins of Mississippi Mortuary Services.

The following items were collected from the van and taken to the Mississippi Crime Laboratory on the morning of June 24, 2000:

1. One (1) JVC Compact VHS Camcorder, model GR-AX730U, serial number 14381210, recovered from the floor, under the right middle seat.

2. One (1) JVC, EHG, VHS, compact video cassette, removed from the JVC Compact VHS Camcorder, model GR-AX730U, serial number 14381210.

3. One (1) TDK,EHG,TC-30, video cassette recovered from the console compartment on the dash of the van.

4. One (1) TDK, EHG, TC-30, video cassette recovered from the overhead compartment above the back seat/bed.

5. One (1) key ring containing a Honda Key # 6552, Schlage Key # 78456, Kroger Card # 425126322469, Pink plastic shoe, white and red beads with Six Flags printed on it, recovered from the door pocket, drivers door.

6. One (1) box of Winchester Super X 22 Long Rifle Hollowpoint High Velocity Cartridges, recovered from the door pocket, drivers door.

7. One (1) H & R Sportsman 22 cal revolver, serial # A15401, recovered from under the drivers seat.

5350

MCL Case #00-009203

Page 3 of 6

8. One (1) pair of Elk Woods leather boots recovered from the floor between the front and middle seats on the right side.

9. One (1) white paper sack containing two (2) white paper napkins, two (2) packages of Heinz Ketchup, three (3) packages of Sysco Salt, one (1) cheeseburger covered with wax paper, recovered from the floor behind the front passenger seat. (The cheeseburger was not kept due to spoilage.)

10. One (1) ShurFine plastic bag that contains paper towels and a Dorsey Food Mart Sale Paper recovered from the floor behind the drivers seat. (The sack contained bananas that were taken out due to spoilage.)

11. One (1) Wal Mart plastic sack with tape on it and hair stuck to the tape, recovered from the wood cup holder on the left side of the van, middle seat area.

12. Hair and fibers recovered from the drivers seat.

13. Hair and fibers recovered from the front passenger seat.

14. Hair and fibers recovered from the right center door area on the floor where it says "Champion Vans".

15. Hair and fibers recovered from the right middle seat.

16. Hair and fibers recovered from the left middle seat.

17. One (1) pair of brown cotton gloves recovered from the floor beside the right front seat.

18. One (1) pair of "GAP" Flare blue jeans, size 1, brown belt with a chrome belt buckle, recovered from under the middle right seat.

19. One (1) pair of men's boxer type underwear, size 30/32, Fruit Of The Loom", recovered from under the center left seat.

20. One (1) pair of New Balance Shoes, size 6.5, recovered from under the left middle seat.

21. One (1) white shirt, American Eagle, size XS, recovered from the floor, left side of van under the rear seat/bed.

22. Two (2) white socks, ankle length, recovered from the floor behind the two (2) middle seats,

5351

MCL Case #00-009203

Page 4 of 6

under the front of the rear seat/bed.

23. One (1) white bra recovered from the floor under the rear seat/bed on the left side of the van.

24. One (1) pair of ladies underwear, Vanity Fair, size 5, recovered from the floor between the two (2) middle seats.

25. One (1) roll of mailing tape, Scotch 3M, in a red dispenser, recovered from the left middle seat rear pocket.

26. One (1) white sock with lace, child's size, recovered from the floor under the right front corner of the rear seat/bed.

27. One (1) white towel recovered form the overhead compartment above the rear seat/bed.

28. One (1) pair of Hurley International shorts, flowers and multi-colored, white drawstring on the front, recovered from the overhead compartment above the rear seat/bed.

29. Green cord recovered from the rear seat pocket behind the drivers seat.

30. Three pieces of green cord recovered from the floor under the left middle seat.

31. Green cord recovered from the floor left side of the van behind the middle seat.

32. One (1) roll of Kodak 35 mm film recovered from the front console on the dash of the van.

33. One (1) cucumber recovered from the rear cloth seat pocket on the left middle seat.

34. Five cotton tip swabs from the cucumber recovered from rear cloth seat pocket on the left middle seat.

35. Green cord recovered from the floor behind the right middle seat.

36. One (1) Fieldcrest wash cloth recovered from the inside floor beside the right front door.

37. One (1) pair of Gold Seal scissors recovered form the floor by the right middle seat.

38. One (1) box cutter blade recovered from the back right cup holder.

39. One (1) box cutter blade recovered from the floor under the front right corner of the rear seat/bed.

5352

MCL Case #00-009203

Page 5 of

On June 28, 2000 the items listed above as 1, 2 and 3 (video cassettes) were carried to the Federal Bureau of Investigation (FBI) to be copied and the originals to be sent the FBI Laboratory. Gayland Owen, Mississippi Highway Patrol, signed for the original tapes. Ken Gill, Gayland Owen, Sara McRainey (FBI) and Willie Covington (FBI) viewed the tapes while they were being copied at the FBI office in Jackson, Mississippi.

The following evidence was collected on June 29, 2000 from the van located in the garage of The Mississippi Highway Patrol, New Albany, Mississippi by Ken Gill of the Mississippi Crime Laboratory;

40. One (1) Sirchie Trace Evidence Collection Filter containing vacuumed material from the front seats and front floor area of the van.

41. One (1) trace evidence collection filter containing vacuumed material from the middle seat area and floor of the van.

42. One (1) trace evidence collection filter containing vacuumed material from the back seat/bed and floor area of the van.

The following evidence was collected on June 30, 2000 from the van located in the garage of The Mississippi Highway Patrol, New Albany, Mississippi by Ken Gill of the Mississippi Crime Laboratory

43. One (1) box cutter blade recovered from the floor under the rear seat/bed.

44. Front section cushion recovered from the rear seat/bed.

45. Middle section cushion recovered from the rear seat/bed.

46. Middle section cushion recovered from the cup holder/arm rest of the rear seat/bed.

47. Rear section cushion recovered from the rear seat/bed.

Photographs taken by Ken Gill of the Mississippi Crime Laboratory.

48. Three (3) rolls of 35 mm film taken of the van and victim.

The exterior of the victims car a Honda Accord, 1992, Green 4 Door, Mississippi Tag # MMK 128. The vehicle was examined for latent prints on the exterior of the car and the tires were checked.

107

5353

@007

MCL Case #00-009203

Page 6 of 6

Respectfully submitted

Kenneth W. Gill, Forensic Scientist V
Mississippi Crime Laboratory

108

# EXHIBIT 28-J



# Mississippi State Hospital

Whitfield, Mississippi 39193   (601) 939-1221

James G. Chastain
Director

**DATE:** AUGUST 14, 2001

**TO:** DAVID LEE DANIELS
ATTORNEY AT LAW
P. O. BOX 1309
TUPELO, MS  38802

**FROM:** DONNA GOOCH

Medico-Legal Aspects Coordinator
Health Record Management Department

**RE:** THOMAS EDWIN LODEN, JR.

**We are attaching photostatic copies of the following:**

OUTPATIENT ADMISSION

OUTPATIENT EVALUATION                06-21-01

Approved: *Mary B. Crossman, RHIA*
Mary B. Crossman, RHIA
Director, Health Record Management Department

---

Mississippi Department of Mental Health

MSH – 5



# Mississippi State Hospital
## CASE NOTES

Case No. *OP- Eval*
Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations [prohibit] you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or [prosecute] any alcohol or drug patient (42 CFR Part 2)

OUTPATIENT EVALUATION                          THOMAS EDWIN LODEN, JR.
21 JUNE 2001

**IDENTIFICATION**:   This was the first Mississippi State Hospital contact, the first known forensic mental evaluation regarding the current charges, and the first known mental health contact for this 36-year-old, divorced, Caucasian man from Warren County.

**PURPOSE OF EVALUATION**:   Mr. Loden was sent to this facility on a Circuit Court Order, #CR00-068, from Itawamba County, on motion of the defendant, by and through his attorney, the Honorable David Lee Daniels, for a forensic mental evaluation to assist the Court in determining:

"1. Whether the Defendant has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding on the preparation of his defense, and whether he has a rational as well as factual understanding of the nature and object of the legal proceedings against him;

2. The Defendant's mental state at the time of the alleged offense with respect to his ability to know the nature and quality of his alleged acts and to know the difference between right and wrong in relation to his alleged acts at that time;

3. The Defendant's capacity to understand and to knowingly, intelligently, and voluntarily waive or assert his constitutional rights;

4. Whether the offense with which the Defendant is charged was committed while he was under the influence of extreme mental or emotional disturbance or a lesser degree of mental or emotional disturbance;

5. Whether the offense with which the Defendant is charged was committed while his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired or impaired to a lesser degree. ..."

The Order directed that a written report be furnished to David Lee Daniels, P.O. Box 1309, Tupelo, MS 38802 and to Honorable Thomas J. Gardner, III, P.O. Drawer 1100, Tupelo, MS

MSH – 5

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

# Mississippi State Hospital
## CASE NOTES

Case No. *OP Eval*

Name *Thomas Edwin Loden, Jr.*   Addressograph

2

38802, and to Honorable John Young, District Attorney, P.O. Box 7237, Tupelo, MS 38802.

The Order did not authorize treatment of the defendant.

**CHARGES:**   Mr. Loden is charged with one count of capital murder with an underlying offense of kidnapping, one count of rape, and four counts of sexual battery in crimes allegedly occurring on or about 22 June 00 and/or 23 June 00. He is accused of kidnaping the alleged victim and raping her, forcing her to perform fellatio on him, inserting his finger into her vagina, inserting his finger into her anus, and inserting an inanimate object into her vagina.

**INFORMATION REVIEWED:**   Prior to evaluating Mr. Loden, we reviewed a copy of the following:

1. Circuit Court Order, #CR00-068, Itawamba Co., Judge Thomas J. Gardner, III, 25 April 01;
2. Letter to Dr. McMichael from David Lee Daniels, 20 April 01;
3. Circuit Court Order, #CR00-068, Itawamba Co., unsigned, undated;
4. Index;
5. Indictment, #CR00-068, Itawamba Co., vacation term, 2000;
6. Motion for psychiatric exam, #CR00-068, Itawamba Co., David Lee Daniels, 2 March 01;
7. Certificate of Service, David Lee Daniels, 2 March 01;
8. Synopsis, Criminal Investigative Division MS Dept of Public Safety, Sgt. Rick Marlar, 28 June 00;
9. Statement of facts, Criminal Investigation Bureau - MS Dept of Public Safety, Sgt. Rick Marlar, undated;
10. Offense report, Inv. Brian Jones, 22 June 00;
11. Criminal case report, CIB - MS Dept of Public Safety, Capt. Michael Berthay, undated;
12. Criminal case report, CIB - MS Dept of Public Safety, Ofc. Mickey Baker, undated;
13. Transcript of interview with the defendant, 30 June 00;
14. Voluntary statement of Ted Wallace, 28 June 00;
15. Voluntary statement of William Richard Tallent, 28 June 00;
16. Voluntary statement of Lisa Sheffield, 28 June 00;
17. Statement of facts, Ofc. David Sheffield, 5 July 00;
18. Voluntary statement of Joyce Ann Brewer, 26 June 00;
19. Voluntary statement of Jimmie L. Johnson, 28 June 00;
20. Voluntary statement of Wanda M. Farris, 28 June 00;

MSH – 5

# Mississippi State Hospital
## CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Pt. 2)

Case No. *OP Cval*

Name *Thomas Edwin Loden, Jr.*

3

21. Personal history information sheet for the defendant, undated;
22. Letter from Inv. Brian Jones, Itawamba Co. S/O, 17 April 01;
23. Statement of Ofc. David Sheffield re: defendant's behavior in jail, undated;
24. List of family member contacts for the defendant;
25. NCIC report;
26. Report of post-mortem exam, Steven T. Hayne, M.D., 24 June 00;
27. Letter to Lou Ann Cox from David Lee Daniels, 7 May 01;
28. Letter to Dr. McMichael from David Lee Daniels, 27 April 01;
29. Letter to Dr. McMichael from David Lee Daniels, 25 April 01;
30. Records from North MS Medical Center;
31. Records from Baptist Memorial Hospital;
32. Letter to Lou Ann Cox from David Lee Daniels, 1 June 01;
33. Transcript of the audio portion of a video tape allegedly made by the defendant at the time of the alleged offenses;
34. Ms. Dept. of Public Safety, Bureau of Criminal Investigation, Criminal Case Report Supplement, unsigned, undated (concerning discovery of pubic hair and razor);
35. Supplemental Report, regarding statements made by defendant's third ex-wife, Katrina,;
36. Handwritten document from defendant to his third ex-wife, dated 21 October 2000, (58 pages);
37. Faxed authorization for serum testosterone level;
38. Video tape reportedly made by the defendant at the time of the alleged offenses.

Our social worker, Betty Bullock, was able to obtain additional information from the following:

* John R. Young, District Attorney;
* Clay Joiner, Asst. District Attorney;
* Bobbie Christian, the defendant's mother;
* Katrina (Andrews) Loden, the defendant's ex-wife;
* Inv. David Sheffield with Itawamba Co. S/O.

Dr. McMichael also spoke with Assistant District Attorney Clay Joiner and Lt. Mickey Baker, to obtain further information concerning the alleged offenses and the defendant.

**CHIEF COMPLAINT:** "I'm scared I'm gonna have to face a lot of stuff I've put behind me ... scared I'm gonna turn into a basket case."

MSH - 5

## Mississippi State Hospital
### CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

Case No. *OP Eval*

Name *Thomas Edwin Loden Jr.*  Addendum

4

**HISTORY OF PRESENT ILLNESS:**  According to information we received, Mr. Loden was arrested on 24 June 00, and was incarcerated initially in the Union County Jail. According to Inv. Brian Jones with the Itawamba Co. S/O,

> "He has cut himself twice in the jail and has asked for help after each event. The wounds have been superficial. One time he was sent to the emergency room and released back to the jail and one time he was sent to the emergency room and treated and held overnight for observation. He stays busy working on trying to secure military benefits for his daughter. He also stays busy working on his case. He's usually in a good mood. He writes a lot of letters to his mother and friends."

Inv. Brian Jones indicated that the defendant received medication for infections. He added, "I have spoken several times with Loden about several personal matters. On all these matters, Loden was coherent, responsible and rational of these obstacles pertaining to his mother, wife, daughter, and the possible results of his future."

On 13 June 01, Inv. David Sheffield with the Itawamba Co. S/O reported,

> "Mr. Loden has not appeared to have been hearing any voices or seeing any visions since he's been in our jail since last summer. And he's never mentioned either of these to staff at jail. Mr. Loden has not talked about wanting to harm himself nor attempted again to harm himself in the jail since November, 2000. He has not talked about wanting to hurt anyone else since his arrest in June, 2000. He has only cut his wrists two times since his arrest. He is still housed alone in one of our seven holding cells since he has been a suicide risk. He is eating and sleeping okay, but seems to have his days and nights mixed up. He has been up during the night and has been sleeping during the day. The jail has a lot of noise. This sleeping pattern is common among inmates. He gets plenty of noise as we bring in and take out new inmates. His only regularly requested medicine is Ibuprofen for his 'stiff knees.' He kind of wobbles some when he first gets up and starts walking because of his prior knee injuries and surgeries. Once he gets moving, he doesn't appear to be wobbling. He chain smokes cigarettes. Sheriff Hayes allows him and all inmates who are smokers to smoke while in the

MSH – 5

# Mississippi State Hospital
## CASE NOTES

Case No. *OP Eval*

Name *Thomas Edwin Loden, Jr.* Addressograph

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

5

jail...keeps them from getting on edge and agitated. In the jail he has not
verbalized any remorse for the crimes committed against Leesa Marie Gray. On
the way to the courthouse, he's usually been laughing, talking and smoking, but
once inside the courtroom or in front of the victim's family, he really turns on the
sad look. He can turn his feeling on and off just like that."

A letter from Inv. David Sheffield, undated, reads:

"I have talked with Tom several times while he has been in the jail. Tom likes to
talk about his time in the Marines and about his wife. Tom has a problem when
he thinks of his wife and child he is afraid that he will never see his daughter
again. On the two times that he has tried to commit suicide, Tom would cut his
wrist then call for some help. He would state that he was sorry and that he did not
mean to do it. The suicides always came after he got a letter from his wife or
when she came to see him. Most of the time he is in a good mood and he likes to
write a lot and writes several letters to his mother and friends. Tom spends a lot
of time working on his case and working on keeping his Marine benefits for his
daughter. As of any meds, the only one I know Tom was taking is for infection
for the cuts on his wrist."

Records we received from North MS Health Services indicate that Mr. Loden was admitted to
the emergency room on 1 Nov 00 with a chief complaint of laceration of the right wrist. His
wound site was "approximated with skin staples." Mr. Loden was given the diagnoses of

1. Suicidal gesture
2. Two centimeter laceration right wrist
3. Mild anemia secondary to above
4. Hypovolemia

His attending physician was William W. Beazley, D.O. A note dated 1 Nov 00 by Dr. Beazley
reads: "We had given the patient two liters of fluid, got him up to go, his blood pressure dropped
to 70/40 and his heart rate went up in the 120's. I re-established an IV, typed and crossed the
patient with two units of packed cells. The case was reviewed and discussed with Dr. Gilliland.
We will admit him into his service." Dr. Beazley prescribed Augmentin, 875 mg one p.o. b.i.d.

MSH – 5

**Mississippi State Hospital**
**CASE NOTES**

Case No. *OP Eval*
Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2).

Addressograph

6

According to a discharge summary by David Gilliland, M.D. dated 2 Nov 00, "This is a man who was an inmate and slashed his wrist and bled and had some hypotension and was brought to the emergency room and was resuscitated. However, when he got ready to leave he had hypotension again. His pulse was intact in his wrist. He was admitted and hydrated. His hemoglobin has dropped to 8.2 but this is with hydration and now he is doing fine and will be discharged to see me in a week."

Records we received from Baptist Memorial Hospital dated 11 July, 2000, indicate Mr. Loden was admitted to the emergency room with admitting and discharge diagnoses of:

1. Suicide gesture manifested by cutting his wrists
2. Significant blood loss with associated anemia

After a large amount of blood was found on the floor, he was taken to the emergency department for evaluation. According to Dale L. Wing, M.D.,

"In the emergency department, a CBC was obtained which showed a hemoglobin of 7.76 and a hematocrit of 23.6. His wrists were sutured in the emergency department and he was admitted for further evaluation. The patient denies any significant past medical history and he is an ex-Marine. His laboratory, other than being anemic, was unremarkable. ...He was admitted to the unit under close observation and surveillance. I transfused him with two units of packed red blood cells and he said he was feeling a lot better post-transfusion. I did not repeat another hemogram since he was no longer actively bleeding. He will be discharged back to the Union County Jail in the custody of the police department."

On 15 July 00, Mr. Loden was seen by North MS Medical Center for follow-up care of his wounds. A note by J. Parchman, R.N., reads: "Culture taken - wounds cleaned with peroxide. Neosporin and large band applied."

On 6 July 00, Mr. Loden was admitted to Baptist Memorial Hospital for "suture removal bilateral forearms." This admission occurred at 12:30 p.m. At 1:37 p.m. on 6 July 00, according to BMH records, Mr. Loden was treated again for "Dehiscence in old suture line, mild erythema, without wound discharge." Discharge instructions were "dry dressing changes t.i.d. Keep clean and

MSH – 5

**Mississippi State Hospital**
**CASE NOTES**

Case No. *OP Eval*
Name *Thomas Edwin Loden, Jr.* <span>Addressograph</span>

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

7

dry."

On 30 June 00, Mr. Loden was seen at BMH emergency department for a wound check. Notes indicate that the dressing was removed and the wound cleaned with peroxide and covered with Neosporin and bandages. A physician's record indicates "mild weeping of upper wound on right, minimal erythema."

On 23 June 00, according to the incoming patient communication form from North MS Medical Center, Mr. Loden was admitted to the emergency room with a chief complaint of "...laceration to both wrists up arms. Two lacerations left elbow. Laceration back of head, bandages in place."

A note by Robert Dale, M.D., dated 24 June 00 reads:

> "I am dictating after seeing this gentleman just a couple of hours ago in the emergency room where he had extensive dirty lacerations on his forearms and elbows. He was discharged from the emergency department and taken into surgery by Alan Pritchard, M.D., where these wounds were debrided and repaired under general anesthesia. He was discharged from surgery and technically discharged from the hospital. In the meantime, the FBI, local District Attorney's office, and highway patrol have obtained Circuit Court Judge Frank Russell's subpoena to have evidence collected from his body, his person, from us. Therefore, he was checked back into the emergency department. He was informed that the subpoena had been obtained and he wilfully submitted to a search which included a direction to obtain the following: human blood, saliva, pubic hair, dead hair, body hair, pubic combing, and genital swabbing, fingernail scrapings, and discarded medical bandages and supplies from his person. Suffice it to say that all of these materials were collected as per directed by the evidence collection kit, and they were turned over to the chain of command to the law enforcement officials here with this man. He was fully awake, alert, and cooperative. You may refer to my history and physical from just a few hours ago for more details. The papers with the evidence collection kit were filled out."

See **Attachment 1** for an emergency room note by Robert Dale, M.D., dated 23 June 00.



MSH – 5

# Mississippi State Hospital
## CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

Case No. _OP Eval_
Name _Thomas Edwin Loden_

8

See **Attachment 2** for an EMT's report by Micki Brown, REMT dated 23 June 00.

Asked about suicidal ideation while in that jail, Mr. Loden said, "I think it every day." However, he also said that he had promised Officer David Sheffield that he would not act on this ideation; and that his fear of what might happen to him in the next life if he committed suicide, and his hope that he might see his daughter again, also helped prevent him from acting on his reported suicidal ideation. He then denied experiencing suicidal ideation at the time of this evaluation.

Mr. Loden reported sleeping poorly and experiencing nightmares while incarcerated. He also reported occasionally seeing "Frank," (a friend who was killed in Desert Storm), "...out of the corner of my eye," and said, "Sometimes I think I hear Frank saying, 'Come on. It's better here.'"

Mr. Loden also reported experiencing paranoid ideation while incarcerated and stated, "I'm paranoid ...the military's hiding something."

**PAST PSYCHIATRIC HISTORY:**   According to the defendant's ex-wife, Katrina, and the defendant's mother, Bobbie Christian, the defendant has had no prior psychiatric treatment. However, the defendant's mother advised our social worker that the defendant and his wife had gone to a marriage counselor a number of times when they still lived in Virginia. Mrs. Christian stated that she did not know why they were seeing a marriage counselor. His ex-wife, Katrina, stated, "When we married in 1995, we lived in Virginia until he was transferred to Mississippi a couple of years before 2000. We did go to a marriage counselor in regards to our relationship, sex, etc. involved in marriage. The marriage counselor advised Tom (the defendant) that he(?) (the counselor) thought Tom had a 'sex addiction problem' and could possibly get some help with this addiction through a certain psychiatrist or clinic. Tom would not go see the psychiatrist because he would lose Marine benefits if any psychiatric treatment records showed up in his Marine records."

When we asked Mr. Loden when he first believed that he was experiencing mental health problems, he said that he first noticed this when he was 6 or 7 years old. He described himself at that age as experiencing, "...feeling of rejection, abandonment ... anger, hostility ... wanting attention, affection; not getting it, getting mad ... ."

Mr. Loden said that the next time he felt that he was experiencing mental health problems was

MSH – 5

# Mississippi State Hospital
## CASE NOTES

Case No. *O P Eval*

Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

Addressograph

9

after witnessing the death of a friend in the Gulf War.

Mr. Loden said that he and his third ex-wife, Katrina saw a marriage counselor, Jane Hollingsworth, on several occasions in Virginia. He said that Ms. Hollingsworth made a referral for him to another therapist for his sexual problems. He said that he saw that other therapist, whose name he could not recall, on one or two occasions, and then did not return because of his concern that this treatment might eventually be reported to the military.

Mr. Loden reported that he believed that his sexual problems began when was abused by a local Baptist "priest" between the ages of 6 and 8 years. He also acknowledged sexually "fondling" his younger half sister at about that same time.

Mr. Loden reported that he made his first suicide attempt when he, "...ate a bunch of pills," at age 15. He said that he subsequently has overdosed on at least two other occasions, seriously considered shooting himself on two occasions, and cut his wrists on at least three occasions. Several of these latter suicide attempts or gestures reportedly followed his learning of the infidelity of his past wives.

Mr. Loden said that he did not know whether the individual he was referred to by Ms. Hollingsworth was a psychiatrist or not, but denied any other history of psychiatric treatment.

**ALCOHOL & OTHER DRUG USE HISTORY**: Mrs. Christian denied any known drug and alcohol treatment for the defendant. However, she stated that Mr. Loden began drinking beer as a teenager, and began drinking hard liquor after joining the Marines. The defendant's ex-wife stated, "He can handle his liquor."

Mr. Loden said that he first drank beer at age 10 and that he was drinking beer regularly by age 15. He reported being arrested at age 18 for "outrunning the police," while drinking. He said that he felt that he had, "a self controlled drinking problem," at times. He said that he was drinking up to a fifth a day of tequila in 1991 following the Persian Gulf War. He said that he drank approximately a fifth of bourbon at the time of the alleged offense.

Mr. Loden said that he first smoked marijuana at age 12 and that he did not particularly care for this substance. He said that he had smoked marijuana approximately 15 times in his life, and last used it in 1983.

MSH – 5

**Mississippi State Hospital**
**CASE NOTES**

Case No. *OP Eval*
Name *Thomas Edwin Loden*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations ___ from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or ___ the ___ of a drug patient (42 CFR Part 2)

10

Mr. Loden reported that he began using cocaine approximately once a month while in high school. He said that in his earlier years in the military he used, "an eight ball, or two eight balls," per weekend.

Mr. Loden also reported using, "two or three hits," of LSD while in high school and, "another couple in the Marines." He said that he had used LSD, "maybe 15," times total.

Mr. Loden reported using heroin by injection on two occasions in the past.

Mr. Loden reported using "speed," starting when he was in the 10th grade. He said that he used this, "...on and off for the rest of my life." He said that he last used some form of psychostimulant on the morning of the day of the alleged offenses.

Mr. Loden reported that he used crystal methamphetamine while in San Diego, and that he last used this in 1985.

Mr. Loden reported that he used hashish and mushrooms, "a couple of times," while in high school.

Asked to name his drug of choice, Mr. Loden asked, "Can I name two?" and then identified both cocaine and heroin as his drugs of choice.

Mr. Loden denied any treatment for substance abuse, but volunteered that he had referred others for substance abuse treatment while he was in the military.

**FAMILY HISTORY:** The defendant's mother, Bobbie Christian, is 57 years old. She denied any medical, psychiatric, or substance abuse problems. She stated that she is not employed, but owns some rental properties. The defendant's ex-wife stated that the defendant's mother attempted suicide in 2000 after his arrest. The defendant's father, Thomas Edwin Loden, Sr., is deceased. He died in 1980 when the defendant was 16 years old. He is reported to have died from some type of brain cancer in his late 30's to early 40's. The defendant's mother stated, "He drank beer, but he did not have any problems with this." The defendant's parents divorced when he was approximately 2 years old. His father subsequently remarried. His mother remarried when the defendant was approximately 6 years old, but divorced her second husband when the defendant was around 13 or 14. She took back her maiden name (Christian), and has not

MSH – 5

**Mississippi State Hospital**
### CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

Case No. *O P Eval*

Name *Thomas Edwin Loden, Jr.*     Addressograph

11

remarried. She reported that the defendant decided at age 13 or 14 that he wanted to live with his paternal grandparents "out on the farm (in the country)." Mrs. Christian further reported, "His grandparents adored him, more or less let him do as he pleased." She said that around the age of 16 or 18, the defendant would "...kill cows and calves on his grandfather's farm. Well, actually he killed his grandparents' cows and calves until he was about 21 years old. He did come home to visit from time to time after he joined the Marines when he was 18 years old." When our social worker asked how the defendant killed the cattle, his mother replied, "I don't know." When our social worker asked if he grandparents did anything to him about the killings or punished/disciplined him in any way, she replied, "Nothing." Mr. Loden is the second born of two children. He has one older living sister who is 39 years old and is reported by the mother to have "no problems." Mr. Loden also has one half-brother who is 32 years old and has "no problems," and one half-sister who is 30 years and also reported to have "no problems." The defendant's ex-wife stated that the defendant's older sister has had a lot of emotional and drug problems and has had more than one felony arrest involving drugs. She further stated that there were indications that the defendant had sex with his younger half-sister in the past. Mrs. Christian reported no known history of mental illness on either side of the family. However, she reported some problems with alcohol on the defendant's paternal side of the family. She reported that she visits him in jail regularly. His ex-wife has visited him in jail approximately three to four times since his arrest on 23 June 00. His ex-wife filed for divorce in January, 2001 and a divorce was granted on 11 June 01.

Mr. Loden, in his handwritten document to his third wife, described his mother abandoning him when he was an infant for approximately three days while she pursued a relationship with another man. He reported that his paternal grandmother found him and his sister locked in his mother's home.

Mr. Loden also reported that his sister attempted suicide at age 15, allegedly because their biological father had made some sexual overture to her. In this same document, Mr. Loden described his father as being frequently intoxicated.

In his interview with us, Mr. Loden described his older sister as an "addict." He also acknowledged "fondling" his younger half-sister.

He described his father's second wife and his mother's second husband as both physically abusing him. He said that the only place that he ever safe as a child and adolescent was in the

MSH - 5

# Mississippi State Hospital
## CASE NOTES

Case No. *OP Eval*

Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

12

home of his paternal grandparents.

**SOCIAL HISTORY:**   According to Mrs. Christian, the defendant completed the 12th grade in regular classes. She added, "He was an excellent student...never repeated a grade." When asked if the defendant had ever taken any college courses, she replied, "Attended Itawamba Junior College maybe two weeks. He got excited about the Marine Corps and quit school. He joined the Marines for his 18th birthday. I wish I'd never signed parental consent form for him to join the Marines." Mrs. Christian denied the following for the defendant: suspensions/expulsions, truancy, fighting, use of weapons, stealing, firesetting, Youth Court involvement, and training school contact. She did endorse a history of cruelty to animals as noted in the Family History section. The defendant's ex-wife stated that the defendant did not kill the cattle out of cruelty, but would butcher them for food or to kill one that was suffering. She further added, "I do know of one other cow that he killed. He thought I was running around on him. He got his grandfather's gun and killed the cow. He told me he then had sex with the dead cow." Inv. David Sheffield reported to our social worker that he grew up on a farm adjacent to the defendant's grandparents' farm. He stated, "If there was any cow killing on that place, it was done for food. This is a small, close-knit community. If he'd been just killing cows from time to time, we'd all have heard about it." When asked how the defendant related to his parents and siblings as a child, Mrs. Christian stated he got along with his siblings and parents okay. She said his father was a truck driver and was away from home a lot.

According to Inv. David Sheffield, "There are two unsolved criminal cases (one in South MS and one in Louisiana) that are very similar to this Itawamba Co. case against Mr. Loden. He was a military recruiter and traveled a lot with his job. We can place him in each location at the times of the other crimes against two teenager girls; but, unless he also confesses to those, there's no way he can be charged for these crimes."

The defendant's ex-wife reported that his current marital status is divorced. She reported his first divorce was in 1995, and his second divorce was granted on 11 June 01. Our social worker reported, "He did not want to lose contact with Katrina and their one child, 3 year old Abby." The defendant and his second wife were not separated at the time of the alleged offenses. Mr. Loden's first marriage lasted approximately nine years from around 1986 until 1995. He did not have any children from this marriage. His ex-wife, Katrina, stated, "He married me after having been only divorced two weeks from his first wife." He was married to Katrina for almost six years from 1995 until 11 June 01. She described the defendant's relationship with family

MSH – 5

## Mississippi State Hospital
### CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2).

Case No. _OPEval_
Name _Thomas Edwin Loden, Jr._          Addressograph

13

members as, "Strained...no real contact with his mother for six years or longer until after his arrest."

Mr. Loden's employment prior to his incarceration was with the U.S. Marine Corps as a gunnery sergeant. His ex-wife reported that he served 18 years until his "other than honorable" discharge on 4 April 01. When asked about his employment skills, she said, "Military." His termination of employment was due to the "crimes/arrest in June, 2000." His longest period of employment was with the U.S. Marine Corps for 18 years. He was last stationed in Vicksburg, MS, but prior to that, he was stationed in Virginia and various other locations. When asked about his religious affiliation, his ex-wife stated, "grew up in Baptist." She further stated that he is a member of a church, but was not attending. She stated he is a licensed driver.

Mr. Loden reported that had been married three times. He reported that all three of his wives had been unfaithful to him. He reported being especially emotionally traumatized by his second wife, whom he reported had made "skin flicks" while he was away on duty assignment.

Mr. Loden reported that he was the leader of a Fleet Anti-terrorist Strike Team, and that his highest grade in service was E-7. He reported that he killed "35 to 40" enemy soldiers, many of these in close combat. He report witnessing the death of his "best friend, Frank" by friendly fire.

**FORENSIC HISTORY:** The NCIC report we received indicated "No identifiable record" for the defendant.

**SIGNIFICANT MEDICAL/SURGICAL HISTORY:** According to the defendant's ex-wife, he had a tonsillectomy as a child and has had a vasectomy since 1995. She further reported, "He's had two knee replacement surgeries that I know of. One from an accident in November, 1998 while he was away for military camp, and one knee replacement surgery before I married him in 1995... probably a military accident. I never heard that he got shot in the knee during Desert Storm." The jail reported that the defendant is a "chain smoker." She stated that the defendant smoked approximately two packs of cigarettes a day prior to his arrest. Asked if the defendant has any allergies, she stated, "Sour cream." When asked about the defendant's present medications, she indicated the defendant was taking Motrin for "stiff knees." She denied any use of psychotropic medications in the past.

Mr. Loden said that his only overnight hospitalizations were for his knee surgeries. He initially

MSH - 5

# Mississippi State Hospital
## CASE NOTES

Case No. *O P Eval*

Name *Thomas Edwin Loden, Jr.* Addressograph

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

14

stated that he had a left knee "replacement," and then acknowledged that this joint had not been replaced, but that he had had several surgical procedures on it. He said that he had had orthoscopic procedures on his right knee on two occasions following injuries. He reported that he had rhinoplasty for a deviated septum sustained in a "bar fight." Mr. Loden reported that he had his vasectomy, "...about a year and a half ago," rather than in 1995, as reported by his third ex-wife. He had a lymph node removed from his right neck.

Mr. Loden denied being allergic to any medications.

**CURRENT MEDICATIONS:** According to Inv. David Sheffield, Mr. Loden currently only receives Ibuprofen prn knee pain.

Mr. Loden also reported that he was receiving over the counter "Tylenol PM" while incarcerated.

**REVIEW OF SYSTEMS:** Mr. Loden stated, "My knees are messed up. I have a laser burn on my right eye. My hearing is going bad. My back hurts." He also reported sleeping poorly for the past ten years, and added, "I haven't slept in two days."

**NOTIFICATION:** Prior to being interviewed, Mr. Loden was informed of the limited confidentiality of this evaluation and of the fact that a copy of our report would be sent to the Court, to the District Attorney, and to his defense attorney. He was reminded again of his right not to say anything that he thought might be used against him in a court of law. Asked to restate this right in his own words, he replied, "... the right not to say anything ... I can stop at anytime."

Mr. Loden appeared to understand this notification and his right not to say anything which he thought might incriminate him during this evaluation.

**INTERVIEW/OBSERVATIONS:** Mr. Loden presented as a well developed, well nourished, thin, tall, Caucasian man who appeared somewhat older than his stated age of 36 years. He had graying hair. He was neatly groomed. He had a surgical scar on his right neck and a small scar on the bridge of his nose. He had several tattoos. No abnormal motor movements were noted.

Mr. Loden was precisely oriented in all spheres, including the precise date. He appeared to understand the nature of this evaluation and its relation to his legal situation.



MSH - 5

# Mississippi State Hospital
## CASE NOTES

Case No. *OP Eval*

Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules Federal of this information to criminally investigate or any alcohol or drug patient (42 CFR Part 2)

15

On several occasions he stated that he did not want to, "...spill my guts, go over all my old problems, then get sent back out the door to deal with it alone." At one point in this lengthy interview, he acknowledged that he had not answered previous questions factually.

Although Mr. Loden reported subjective memory problems, especially for periods of time when he reported experiencing emotional distress, his memory did not objectively appear grossly impaired. He could recall two of three unrelated items at 5 minutes without prompting, and all three items at 5 minutes with only minimal prompting.

Mr. Loden's intelligence was estimated clinically to be at least in the average range. He used words such as, "dalliance, radius, demi-god, and attest," appropriately when responding to our questions.

His judgement, while poor by history, was fair to hypothetical situations. Proverb interpretation and abstraction were adequate.

Mr. Loden's speech was of a normal rate and prosedy. His responses to our questions were relevant and well organized. There was no loosening of associations or flight of ideas.

Mr. Loden described his mood spontaneously as, "I'm scared ...and embarrassed." Later in the interview, when asked to describe his mood, he described it as, "sober, somber, pretty good." His objective expression of emotion initially appeared somewhat anxious. He became tearful on several occasions during this extended interview. On one occasion, while asking Dr. Merideth, "Do you know how difficult this is?" Mr. Loden briefly appeared quite angry. His affect covered a broad range and was unrestricted.

Mr. Loden reported occasionally seeing his deceased friend, Frank, "...out of the corner of my eye." He also said, "...sometimes I hear Frank saying 'Come on. It's better here.'" Mr. Loden also reported experiencing nightmares approximately every three to four months about the death of Frank.

Mr. Loden described himself as "paranoid," and "suspicious." He said that he believed that the military was "hiding something," but refused to elaborate on this, saying that it may affect some proceeding he currently was engaged in with the service.

MSH - 5

# Mississippi State Hospital
## CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

Case No. _OP Eval_

Name _Thomas Edwin Loden, Jr._

16

No delusional ideation was elicited.

Mr. Loden reported several suicide attempts or gestures in the past. He reported thinking about suicide "every day" while incarcerated. He said that he had promised Officer David Sheffield that he would not act on this. He also said that his fear that committing suicide might condemn him in the next life as well, and his hope of again seeing his daughter, prevented him from acting on his suicidal ideation.

He denied any homicidal ideation at the time of this evaluation.

Mr. Loden described his personality as being whatever people around him wanted him to be. He said that he cooked meals and did child care duties because that is what his third ex-wife wanted him to do. He also said that it was her "fantasy" to act out being abducted and raped.

Asked if he thought that he had any emotional problems, he said that he did. Asked if he thought that he had "sex addiction," Mr. Loden replied, "Yeah, I know something's wrong."

**KNOWLEDGE OF COURT**: Mr. Loden said that he believed that he was charged with, "capital murder, kidnap, rape, and murder." We advised him that it was our understanding that he also was charged with four counts of sexual battery. Mr. Loden said that he was aware that the maximum penalty that he was facing should he be convicted on these charges would be the death penalty. He acknowledged that this was a serious legal situation.

Mr. Loden described a criminal trial as, "...both sides are gonna present evidence back and forth to determine the outcome of it ...the verdict."

He identified his defense attorneys as, "David Daniels and Johnstone." He said that they were "court appointed." He said that they would be trying to do, "...whatever they can ...present some kind of case to assist me."

He identified the opposing attorneys as, "the D.A. and the assistant D.A." He said that they would be trying, "...to put me away ...put me away for a long time ...prosecute me."

He correctly identified that "the jury" likely would determine the verdict should he have a trial. Asked what he knew about a jury, he said, "...12 people ...peers ...they hear both sides ...all the



MSH – 5

# Mississippi State Hospital
## CASE NOTES

Case No. *OP Eval*

Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

17

evidence ...and vote on it." He initially guessed incorrectly that it would require only a majority of the jury to reach a verdict, but appeared to understand it when we explained to him that it would require a unanimous vote of the jury to reach a verdict. Asked what he thought might happen if the jury could not unanimously agree on a verdict, Mr. Loden said, "...deadlock ...mistrial... ."

Mr. Loden was aware that "the Judge" would determine the verdict should he be found guilty.

He correctly identified the verdicts of Guilty and Not Guilty and their likely consequences. Asked about a possible verdict of Not Guilty by Reason of Insanity, Mr. Loden said, "I've been told it happens very little ... McNaughten ... snowball's chance in hell ... ."

Mr. Loden said that an eye witness would be someone who would testify to, "...something they saw with their eyes." Asked the possible role of a character witness, he initially replied, "lies, lies, lie," and then said that such a witness would, "...describe how your character was, what you stood for ... ." He said that an expert witness would be, "...somebody who has a specialized field that they are going to come in and attest to." Mr. Loden said that he understood that one should, "tell your lawyer," if a witness were testifying untruthfully, but then he added, "...and then they don't do anything." He acknowledged that, "it would be bad," if he began shouting at a witness in the courtroom. Asked why it might be bad if he behaved disruptively at his own trial, Mr. Loden said, "Everyone is judged by their appearance."

Mr. Loden appeared to understand that he could not be compelled to testify at his own trial, and that he could not legally be prevented from testifying at his own trial, should he so choose.

Asked how he could best assist his attorney in the preparation of his defense, Mr. Loden laughed and then replied, "Do what he says." Asked might happen if he were not truthful with his defense attorney, Mr. Loden said, "...if I was him, I'd be pissed off ... might come back to get you." Asked if he thought he would be able to work with his defense attorneys, Mr. Loden said, "I'm trying." Asked if he trusted his defense attorneys, he replied, "No," and then apparently quoting from a movie, Mr. Loden said, "There's two people in the world I trust. I'm one. You don't happen to be the other one." He then added, "Trust for me is hard." Asked if there were any particular reason why he would not trust his defense attorneys he said, "They don't come when I've asked to talk to them."

MSH – 5

# Mississippi State Hospital
## CASE NOTES

Case No. _OP Eval_

Name _Thomas Edwin Loden, Jr._

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient. (42 CFR Part 2)

18

Asked if he thought that he could get a fair trial Mr. Loden said, "I've got a lot of problems with it. Some of it I can't talk about ...because there are motions pending." He said that he understood that his trial would be moved, possibly to Rankin County, but that he would continue to have the same judge.

Asked what he knew about plea bargains, Mr. Loden replied, "...where somebody offers you something, so you don't go to trial." He said that he understood that one would plead "Guilty," in order to accept a plea bargain. He said that he understood that the potential advantage to a defendant of such an agreement would be, "a lesser sentence." He said that he understood that he could not be compelled to accept such an arrangement. He said that he had been advised that he would not be offered a plea bargain.

He appeared to understand that if he were offered a plea bargain and accepted it, he would be waiving his right to a trial and to an appeal. Asked what he would be risking if he turned down a plea agreement, if one were offered, he replied, "...life, my life."

Mr. Loden appeared to understand that the D.A. usually makes a sentencing recommendation. He also appeared to understand that the Judge would not be bound by such a recommendation.

Asked what one should do if he did not understand something in a legal proceeding, Mr. Loden replied, "...ask your lawyer."

**MENTAL STATE AT THE TIME OF THE ALLEGED OFFENSES:**   According to the defendant's ex-wife, around the time of the alleged offenses,

"We lived in Vicksburg. He was a marine recruiter there. I commuted to work in Jackson. About two to two and a half weeks prior to his arrest, he told me that he wanted a divorce because I would not agree to some of the things that he wanted when having sex with me. We went to Virginia for a week's vacation that had already been planned...we made up on the trip to Virginia...no divorce and no unusual sex that I could not agree to. We had Monday and Tuesday back home before he went to his grandmother's on June 21. We made love Monday and Tuesday night. He said he'd be back home Saturday afternoon (6-24-00). ...He was not hearing voices or seeing visions before his arrest. I talked with him on the phone about 30 minutes before the crimes started occurring. He did not sound

MSH – 5

# Mississippi State Hospital
## CASE NOTES

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general is not sufficient for the release of medical or other information for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

Case No. *OP Eval*

Name *Thomas Edwin Loden, Jr.*   Addressograph

19

drunk or out-of-it in any way.  He could handle his liquor. ...He'd never talked about suicidal or homicidal ideas around me the five years I'd known him."

Prior to proceeding with this part of the evaluation, Mr. Loden asked to speak with one of his defense attorneys.  He was allowed to do this and spoke with Mr. Daniels before continuing with this evaluation.

Mr. Loden said that he believed that the alleged offense occurred, "...last year, June, the end of the month."  Asked how he was doing around that time, he said, "I felt like my world was coming crashing in ...I had asked for a transfer ...asked for time off... I was ignored ...the wife and I were having some problems ... lack of affection and attention ... gone on vacation to Virginia to pick up her son for the summer ... one of my recruiters was in trouble for fraudulent recruiting practices ... I was about to have the third month of not making 'mission' ...my wife was with somebody else ...a couple of somebody elses ... my aunt and her husband were using the farm machinery ...left my pickup truck out in the rain for two months ... checked on their animals but did not check on my grandmother ... ."

Mr. Loden also said that his third x-wife, Katrina, had called him on his cell phone and told him that she was "fooling around with somebody else" approximately forty-five minutes before the "...incident started ...flirting around with a guy at work, had phone sex with him that night and was planning to have actual sex with him the next Saturday night ... and that's about the last I really remember."

Mr. Loden said, "I think I just blew up."  He also said, "I think I finally had so much wrong going on in my life, so much pain, I think I snapped."  He added, "I was hurt ...I was hurt... (she) just got through with one (affair) and here's another... ."

Mr. Loden said that he recalled the alleged victim saying, "...something about the Marines ...I got really upset ... I remember getting mad."

Mr. Loden reported feeling, "...depressed, suicidal, angry ... ." at the time of the alleged offenses.

He stated, "I do recall a little bit, but the part I recall is a part of me I don't want to recall."

Asked specifically if he were experiencing any auditory hallucinations at the time of the alleged

MSH – 5

# Mississippi State Hospital
## CASE NOTES

Case No. *O P Eval*
Name *Thomas Edwin Loden, Jr.*

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)
Addressograph

20

offenses, Mr. Loden replied, "Yes, when I get depressed, stressed out, I talk to Frank. I don't know if it's Frank or my own head ...trying to convince Frank or myself that I deserve to live." Asked if he were experiencing any visual hallucinations at that time, he replied, "I don't know."

Mr. Loden said that he was drinking bourbon and beer at the time of the alleged offenses. He said at one point that he had consumed, "about a half a fifth," of bourbon and at another point, said that he had consumed, "at least a fifth," of bourbon on the day of the alleged offenses. He said that he had also drunk "a couple of beers." Asked the size of the beers, he said that at least one of them was, "a 20 oz." He described himself subjectively as "pretty toasted," at the time of the alleged offenses.

Asked if he would have known at the time of the alleged offenses that it would be wrong to kill someone, Mr. Loden replied, "...that's what I did best, what I got medals for, what I got paid for .... ." When this question was repeated, he replied, "I don't know." Asked if he would have known at the time of the alleged offenses that rape or sexual battery would be wrong, he replied, "I can't answer."

**SUMMARY OF OFFENSES**: See **Attachment 3** for a 10-page MS Department of Public Safety criminal case report by Ofc. Mickey Baker dated 12 Sept 00. See **Attachment 4** for a transcript of an interview with the defendant on 30 June 00.

**PROVISIONAL DIAGNOSES**:

AXIS I:    (1) Malingering (exaggerating symptoms of amnesia at the time of the alleged
           offenses)
          (2) Sexual Sadism
          (3) Sexual Masochism
          (4) Voyeurism
          (5) Paraphilia, Not Otherwise Specified
          (6) Alcohol Abuse
          (7) Other, Unspecified Substance Abuse
          (8) Sexual Abuse of child as victim and perpetrator
          (9) Physical Abuse of child, as victim
AXIS II:   (1) Borderline Personality Disorder
          (2) Antisocial Personality Disorder

MSH - 5

**Mississippi State Hospital**
CASE NOTES

Case No. _Thomas Edwin Loden_

Name _____

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient. (42 CFR Part 2)

21

| | |
|---|---|
| AXIS III: | No Diagnosis |
| AXIS IV: | Psychosocial Stressors: Problems related to interaction with the legal system |
| AXIS V: | GAF Currently: 15 |

**NATURE OF EVALUATION:** After reviewing the information provided to us, we interviewed Mr. Loden for approximately four hours and forty-five minutes. He also received urine drug testing, a serum testosterone level, and psychological testing.

**FORENSIC OPINIONS:** We are unanimous in our opinion that Mr. Loden has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in the preparation of his defense, and that he has a rational as well as factual understanding of the nature and object of the legal proceedings against him.

We are unanimous in our opinion that Mr. Loden would have known the nature and quality of his alleged acts at the time of the alleged offenses, and that he would have known at that time that those alleged acts would be wrong.

We are unanimous in our opinion that Mr. Loden has the capacity knowingly, intelligently, and voluntarily to waive or assert his constitutional rights.

We are unanimous in our opinion that Mr. Loden was not experiencing extreme mental or emotional disturbance at the time of the alleged offenses, and that his capacity to appreciate the criminality of his alleged conduct, or to conform his conduct to the requirements of the law was not substantially impaired at that time.

The following factors may have contributed to Mr. Loden's experiencing a lesser degree of mental or emotional disturbance at the time of the alleged offenses and/or may have contributed to impairing, to a lesser degree, his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at that time:

1. Mr. Loden reported to us a history of being sexually abused as a child;
2. Mr. Loden reported to us a history of being physically abused as a child;
3. Mr. Loden reported to us a history of combat experiences, including witnessing the death of a close friend and killing "35 to 40" others;
4. Mr. Loden reported to us a history of experiencing and acting upon various paraphilic

MSH - 5

# Mississippi State Hospital
## CASE NOTES

Case No. _OP Eval._

Name _Thomas Edwin Loden, Jr._  Addressograph

22

urges, including deriving sexual pleasure from the suffering of others;

5. Mr. Loden reported to us being intoxicated on beverage alcohol at the time of the alleged offenses;

6. Mr. Loden reported to us experiencing suicidal ideation at the time of the alleged offenses;

7. Mr. Loden reported to us experiencing distress at the time of the alleged offenses stemming from his relationship with his then wife, from his work situation, and from his concern about the physical and mental condition of his paternal grandmother, and the condition of his family farm;

8. Mr. Loden reported to us experiencing intense anger at some anti-Marine remark reportedly made by the alleged victim a short time before the alleged offenses.

**DISCUSSION**: Although, in our opinion, none of these factors rise to the level of exculpation, or even of statutory mitigation, it is our opinion that all of these historical and situational factors taken together may have influenced Mr. Loden's mental state at the time of the alleged offenses to some lesser degree.

**DISPOSITION**: Mr. Loden was returned to the custody of the Sheriff of Itawamba County.

Dr. McMichael wrote a letter to the Sheriff of Itawamba County informing him that the stresses of this evaluation may increase the likelihood that Mr. Loden will again attempt to harm himself.

R. McMichael, M.D.
R.McMichael, M.D.
Director, Forensic Services

Date: _26 June 01_

This information has been disclosed to you from records whose confidentiality is protected. Statutes / regulations prohibit you from making further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of this information to criminally investigate or prosecute any alcohol or drug patient (42 CFR Part 2)

# EXHIBIT 29

**Documents from Forensic
Psychologist C. Gerald O'Brien**

# EXHIBIT 29-A

SEP-17-01 11:48 AM    DR. C. GERALD O'BRIEN    601 664 6732    P.02

## C. GERALD O'BRIEN, PhD
### CLINICAL PSYCHOLOGY
### FORENSIC CONSULTATION
640 Lakeland East Drive, Suite E
Jackson, Mississippi 39208-9778
(601) 664-6730

September 14, 2001

David Lee Daniels, Esq.
204 North Spring Street
P. O. Box 1309
Tupelo, MS  38802-1309

RE:   State v. Thomas Edwin Loden, Jr.
       Cause No. CR00-068

Dear Mr. Daniels:

The following is a report of the results of my examination of Thomas Edwin
Loden, Jr., a 37 year old defendant charged with capitol murder, including
kidnapping, rape, and four counts of sexual battery. These results are based on:
psychological test results and interviews of the defendant completed on August 13,
2001; review of police reports, interviews, videotape supplied by the District
Attorney's Office, and other records supplied by your office, including the
evaluation performed at Mississippi State Hospital (MSH) Forensic Unit on June
21, 2001. The MSH psychological test results, in summary form only, sent
directly to me were not received until September 6, 2001.

Mr. Loden is charged based on an incident which occurred June 22 and 23, 2000
in Itawamba County, in which Leesa Gray, a 16 year old female, was abducted,
raped, and murdered.

TEST RESULTS:

Mr. Loden was delivered by the Itawamba County Sheriff's Department and seen
at my office in Jackson. I first explained to him the reason for the current
evaluation, gave standard cautions about the potential lack of confidentiality of the
information gathered, and encouraged him to cooperate. Test results are presented
below, including, where possible, comparison with previous results obtained at
MSH. Unfortunately, copies of the actual test scores and test protocols – which
would allow more detailed comparison – have not been made available to my
office despite previous requests.

Thomas Loden, Jr.                    *September 14, 2001*                         *Page 2*

## Ability/neuropsychological tests:

On the **Shipley**, he obtained an estimated (WAIS-R) IQ of 109, which falls within the average to high average range. This is comparable to the estimated IQ of 112 obtained at MSH. There were no significant differences between vocabulary and abstraction scores on the current administration; these scores are not reported in the MSH evaluation.

On the **Wide Range Achievement Test-Revision 3**, his scores were as follows: reading standard score 93, grade score high school; Spelling standard score 100, grade score high school; Arithmetic standard score 106, grade score high school. The same form (Tan) administered at MSH resulted in the following scores; Reading 104; Spelling 90; Arithmetic 98. His current scores actually decreased on reading, but increased on spelling and arithmetic.

On the **Screening Test for the Luria-Nebraska Neuropsychological Battery (STLNB)**, he finished with three errors. This result is considered to fall within the normal (non-impaired) range.

On the **Trailmaking Tests** he completed Part A in 19 seconds with no errors, and part B in 50 seconds with no errors. Both scores fall within the normal range.

On the **Stroop Neuropsychological Screening Test**, his performance was perfect (no errors) falling at the 100th percentile for his age group. This equates to a probability score (for impairment) of .20.

In summary, this is a 36 year old whose current intellectual functioning falls within the average to high average range, with somewhat variable achievement scores. Screening tests for neuropsychological impairment are negative.

## Psychological/personality tests:

On the **MMPI-2** he produced a consistent but somewhat exaggerated validity profile, with generally consistent responses but some exaggeration in admitting to psychological difficulties.

The clinical profile (8-4-6) indicates moderate to severe distress including dysphoria, anxiety, agitation, and anhedonia. He often feels resentful or angry, and has difficulty expressing his anger appropriately. He does not easily fit in to usual family or occupational roles. He separates himself from others by withdrawing into a world of his own thoughts and daydreams. He feels insecure, isolated and rejected. The world is viewed as hostile and dangerous. He may maintain an attitude of spite against society and think of acting out his fantasies of dominating or demeaning others. He may also seek refuge through substance abuse. He may show strong impulsive needs for attention and affection.

*Thomas Loden, Jr.*                *September 14, 2001*                      *Page 3*

He probably exhibits poor judgment and is often unpredictable and impulsive. He may seem erratic or have a history of sabotaging his own chances for achievement or personal satisfaction. He is hypervigilant and suspicious of the motives of others. He may misread social situations, or allow unrelated thoughts and fantasies to complicate practical matters.

He is introverted and tends to be socially isolated. He has difficulty with close, intimate relationships. He feels lonely, and believes no one else understands him and his difficulties. His family background and continuing family relationships seem characterized by conflicts, arguments, and hostilities. There may be major issues with one or both parents, including the possibility of harsh treatment or abuse as a child.

He probably has suicidal ideas, which should be evaluated carefully. His isolation, hopelessness, and proneness to act out impulsively toward himself or others may increase the potential for suicidal behavior. If he commits a crime it is likely to be poorly planned and executed and may involve bizarre or violent behavior. His problems may frequently involve inappropriate sexual behavior.

A previous MMPI-2 was administered at MSH but no scores are available, only a narrative report. The validity profile reportedly suggests "an exaggerated response set." The clinical profile (3-6) is said to indicate an "angry, hostile" individual who strongly denies such feelings, who is "tense, anxious, and hypersensitive to criticism," with "needs for power and control," a "narcissistic and egocentric" self-concept, and interpersonal relationships "characterized by conflicts."

On the MCMI-III he also produced a somewhat exaggerated validity profile, similar to that seen on the MMPI-2. The clinical profile indicates significant problems with adjustment to traumatic experiences, depression, and anxiety. This suggests difficulties overcoming fear, helplessness, or horror associated with an unusually distressing event or events, with intrusive thoughts, memories, dreams along with a sense of estrangement from others, diminished affect, and a sense of hopelessness. Significant distress also may take the form of sadness, discouragement, nervousness, restlessness, worry, and apprehension.

The personality profile is not well-defined but suggests borderline and passive-aggressive characteristics. He is typically dissatisfied with many aspects of his life, with frequent doubts and inner turmoil. Others may find it difficult to "read" his changing moods or needs. He may complain about others not treating him with sufficient caring or support, but also criticize their best efforts to do so. This pattern may also include other self-defeating behavior, including substance abuse, suicidal gestures, and recurrent accidents. He may be easily offended, with seemingly minor events eliciting feelings of hurt or anger. Despite difficulties in maintaining stable relationships, he may feel uneasy and uncomfortable *if alone*

SEP-17-01 11:49 AM   DR. C. GERALD O'BRIEN     601 664 6732          P.05

*Thomas Loden, Jr.*               *September 14, 2001*                    *Page 4*

and react intensely to separation from significant others. He may resort to obvious manipulation or other extreme measures to maintain an important attachment.

On the **Carlson Psychological Survey**, which is normed on incarcerated offenders, he also produced an exaggerated profile. His scores on two scales – thought disturbance and self-depreciation – showed extreme elevations. Score on the chemical abuse and antisocial tendencies scales was also elevated to a lesser degree. This pattern does not match any known offender profiles, but does suggest significant distress, comparable to the levels seen on the MMPI-2 and MCMI-III.

On the **Suicide Probability Scale** he obtained a T score of 85 and a probability score of 99. This indicates there is a 99 percent chance that he belongs in the normative group of lethal suicide attempters. Hopelessness, suicide ideation and negative self-evaluation scales showed extreme elevations; his lowest score was on the hostility scale. Even allowing for a degree of exaggeration (as seen on other tests above) the level of expected risk falls in the severe range, and continued suicide precautions are recommended.

On the **Sentence Completion** task he completed all items. He regrets "to[sic] much to list" and wants to know "WHY" the incident happened. He admits his nerves "are shot," he feels "depressed/hopless[sic]," and at bedtime 'I fear sleep." His future is "hopless[sic]." His greatest fear is "being alone;" he wants "to feel ·loved" and is annoyed most by "being ignored/unappreciated." His earliest memory is "fear of my step-mother." His most unpleasant memories are "being without my daughter," and "what happened to Frank."

On the **M-FAST**, a structured interview measure of possible exaggeration and malingering of psychological difficulties, he obtained a total score of 8 (of 25). Scores of 6 or more are considered suggestive of malingering. However, his scores on individual scales were instructive. All scales fell within the normal range, with the exception of rare combinations (of symptoms). This particular scale accounted for most (5) of the total score (of 8). Of these, 3 items were directly related to reported "flashbacks" of military experiences.

## MENTAL STATUS EXAMINATION:

Mr. Loden was dressed in orange jail scrubs and wearing shackles. He was generally alert and cooperative. His mood was generally dysphoric and his affective range varied widely, from business-like and controlled to tearful and sad. He was able to perform simple mental arithmetic. He could recall six digits forward and four digits backward. He recalled three or four objects after a brief delay. Thinking and speech were generally coherent and organized.

*Thomas Loden, Jr.*                    *September 14, 2001*                    *Page 5*

He described long-term sleep problems, both falling asleep and waking in the middle of the night. At times he hears the voice of his friend, "Frank," who was killed in 1991 during a missile attack. He describes times when he can "still see it, smell it." He described recent suicidal thinking, and also suicidal behavior in the past. His first recollection is when his father died, when he was 16 years of age, and he thought of shooting himself. He also described previous overdoses when he was separated from his second wife, and also when his grandfather died approximately two years ago. The record also reflects suicidal behavior following the incident in June of 2000 and on several occasions at the jail since that time.

He admits a long history of substance use and abuse, including alcohol, cocaine, and other stimulants, but he tends to minimize their effects on him. Stimulants are described as the kinds of drugs he has used most often -- he describes himself as a "speed freak" in the past.

He gives no history of psychological or psychiatric treatment, but did go with his third wife to see a marriage counselor for marital difficulties approximately six years ago, and during that time he also admits, "I attempted suicide," by slashing his wrists after discovering "she was screwing around." They eventually stopped these sessions in part because of financial difficulties, and he reports he eventually had to file bankruptcy. The records reflect he was thought to have problems with "sexual addiction" at that time.

He takes no medication regularly except for over-the-counter analgesics for knee pain. He apparently has had two procedures on his right knee and also at least one procedure on his left knee as recently as three years ago in Vicksburg. He reports he had a lymph node removed from his neck at age 16. Also he has had a skin cancer removed from his lip, and repair of a "broken nose." He again gives a history of "insomnia," for approximately ten years. While he has been in jail he has sometimes taken Tylenol PM or Sominex to help him sleep.

He is the second of two children, with a sister who is two years older. His parents divorced when he was very young and both eventually remarried. He lived primarily with his father until he was approximately age ten, then later with his mother. When he was a young teenager he went to live with his paternal grandparents and stayed in that home until he joined the Marines at age 18. He has one half-brother and one half-sister, from his mother's remarriage. His mother reportedly abandoned him when he was just an infant, and the relationship has been quite distant since that time. His mother is described at one point as a "pathological liar."

He completed high school education, and reportedly graduated in the top quarter of his class. His school performance apparently was quite good -- "A's and B's" -- and although he does not remember having to study a lot, he wanted to "prove I could do it," and gain "respect." The family apparently moved frequently, and he

*Thomas Loden, Jr.*                    *September 14, 2001*                              *Page 6*

remembers "twenty different schools." He did not make many close friends, but was able to get along with "just about everybody." He was apparently not a discipline problem in school, although he was apparently late for one class a number of times and as a result had to talk with the principal on one occasion.

He has been married three times. His first marriage was in approximately 1985 and ended in "annulment." He married again in approximately 1987, stayed married for seven or eight years, then divorced. This was described as an amicable parting, and the relationship as one of "best friends" rather than romantic partners. He remarried for the third time in approximately 1995, to "the only woman I really ever loved." He has a daughter, now age three, from this marriage.

In 1982, at age 18, he enlisted in the Marines. He felt he was promised a new beginning, and this was "everything I was looking for." He has had various assignments as a forward observer, scout, weapons instructor, and others. Most recently he was assigned as a recruiter in Vicksburg, a job which he "hated." Previously he described his performance as excellent, as "an exceptional Marine," in which he took pride.

## LEGAL SITUATION:

Mr. Loden is able to tell me he is charged with capital murder, including rape and sexual battery, and that he may face the death penalty. His trial date is "October 8" in Rankin County. He is able to name both his attorneys and describe his working relationship with them. He makes a point of telling me "I don't want life," in prison, and that he would like to plead so that he will receive the death penalty. This is not only because of his regret about the crime, but also because "I don't want to see my wife lie on the stand," referring to statements she has made which do not match up with his recollection of events, and also because he has diminishing confidence in his lawyers' handling of his case.

At the time of the crime, he reportedly had been asking for a transfer from his recruiting position – described as a "nightmare" assignment – for approximately three months. His first month in Vicksburg he injured his knee and was apparently rushed back to work before his doctor wanted him to do so. He subsequently discovered his wife's most recent "fling" and then "felt like a fool," in particular because he had been doing a lot of the housework, picking up his daughter from daycare, and performing other caretaking chores. He was finally able to obtain some vacation time and wanted to go to "the farm," indicating his grandparents place in the country. However, his wife wanted to go to Virginia Beach to pick up one of her sons by a previous marriage. After their return, he made arrangements to go to the farm in Fulton, planning to attend to a pickup truck that had been left out in the weather, with "ruined tools" in the back, as well as a tractor which had been left out in the field. On arrival he found his grandmother ill and "covered in shit," because her caretakers were *not doing a*

*Thomas Loden, Jr.*              *September 14, 2001*                    *Page 7*

good job. He called his wife the night before the crime, described here as "curt" to him on the phone and discovered later that she was having "phone sex" with another guy. Subsequently, he got "drunk." The next day a cousin visited and asked him to talk to a potential female recruit, and he subsequently had a "three hour conversation" with her despite his feeling she was not an appropriate Marine candidate. He continued to drink through the day and evening. Later that night he returned to a restaurant he had visited previously and ordered a "burger" at approximately 9:00 PM. He described himself as "still drunk," and called his wife at approximately 9:30 PM on his cell phone. At that point she reportedly admitted to "screwing around." The rest of the night of the night is described as "like snapshots." He indicated he remembers a car with flashers turned on with a flat tire, and talking to Leesa Gray. He believes his original intent was to help her with the flat tire, but "a lot of this stuff doesn't make sense" to him now. At one point he recalls returning to his grandparents home, possibly to fix the flat tire. He seems convinced that he committed the crimes, although he does not specifically remember all of the events, and feels that he apparently "took out all of my anger, hate, from Cat (his wife) and the Marines." He has been told there is a video, but "I don't want to see it," apparently for the same reasons that he does not want a trial or further reminders of the things that happened.

Mr. Loden believes there are "three reasons I'm sitting here today." He names "the military," "Cat," and his "childhood." In addition to his divorce and his feelings about his mother, he reports being "raped by a preacher" at age six or seven, then subsequently abused sexually multiple times over several years. His sister reportedly knew of this abuse. After his father remarried, he was beaten periodically by his stepfather.

## CONCLUSIONS:

Thomas Loden is a 37 year old former marine whose current intellectual functioning is the average to high average range, and who shows no evidence of neuropsychological difficulties. His performance and approach to all tasks reflected a satisfactory level of motivation and cooperation. There was no evidence of malingering or dissimulation on ability tests. On some of the psychological inventories, he showed a tendency to exaggerate his psychological difficulties, but the tests results are still considered interpretable, as noted above.

Based on the information available to me, it is my opinion that, at the time of the incident with which he is charged, Mr. Loden was under the influence of extreme mental and emotional disturbance and distress, although this probably did not rise to the level that he did not know the nature and quality of his acts or the difference between right and wrong in relation to those acts at that time. However, his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired. In addition, there is no history of prior criminal activity reported or found in the records reviewed.

Thomas Loden, Jr.                    September 14, 2001                    Page 8

He appears at the present time to be competent to stand trial and assist in his own defense.

I hope this information is helpful to you in your work with Mr. Loden.

Sincerely,

C. Gerald O'Brien, PhD

# EXHIBIT 29-B

**Dr. C. Gerald O'Brien, LTD**
**640 Lakeland East Drive, Suite E**
**Jackson, MS  39208-9778**
**601-664-6730**
**Fax 601-664-6731**

Tuesday, December 04, 2001

Submitted to:

David Daniels
P. O. Box 1309
Tupelo, MS 38802

| Date | Matter | Activity | T | Hours | Subtotal |
|------|--------|----------|---|-------|----------|
| 7/26/2001 | State v. Loden | Payment | P | | ($2,500.00) |
| 8/3/2001 | State v. Loden | Review videotape (Mr. Joiner) | B | 1.00 | $200.00 |
| 8/8/2001 | State v. Loden | Evaluation rescheduled (Sheriff's Dept.): fee for blocked time | B | 4.00 | $800.00 |
| 8/13/2001 | State v. Loden | Psychological test administration, scoring | B | 8.00 | $1,600.00 |
| 8/13/2001 | State v. Loden | Interview defendant | B | 2.00 | $400.00 |
| 8/15/2001 | State v. Loden | Review test results | B | 2.00 | $400.00 |
| 8/28/2001 | State v. Loden | TC (Jenny; Mr. Daniels) | B | 0.25 | $50.00 |
| 9/14/2001 | State v. Loden | Review materials | B | 4.00 | $800.00 |
| 9/15/2001 | State v. Loden | Review materials/report preparation | B | 4.00 | $800.00 |
| 9/17/2001 | State v. Loden | Prepare report; fax to Mr. Daniels | B | 2.00 | $400.00 |
| | | | | 27.25 | Total $2950.00 |

**Dr. C. Gerald O'Brien, LTD**
640 Lakeland East Drive
Suite E
Jackson, MS 39208-9778

(601) 664-6730
Fax (601) 664-6732

**David Lee Daniels**
**Attorney at Law**
P. O. Box 1309
Tupelo, MS 38802-1309

# INVOICE

**SERVICE FOR:**

**David Lee Daniels**
**Attorney at Law**
P. O. Box 1309
Tupelo, MS 38802-1309

| Contact: | | Date: | 12/3/2001 |
|---|---|---|---|
| Invoice number: | | Service number: | |
| Other: | TAX ID # 64-0839570 | | |

| REFERENCE | DATE | DESCRIPTION | FEE | AMOUNT |
|---|---|---|---|---|
| State v. Loden | 9/18/2001 | Services July 26 through September 17, 2001 (See attached itemization) | 2,950.00 | 2,950.00 |
| | | Total | | 2,950.00 |
| | | Amount due: | | $2,950.00 |

| COMMENTS |
|---|
| Statements are sent monthly and are due upon receipt. |
| Payment for expected court or depostion time is due in advance. |
| PLEASE MAKE PAYMENT AS SOON AS POSSIBLE. THANK YOU> |

# EXHIBIT 30

**Loden's Letters to Counsel and Investigator**

# EXHIBIT 30-A

Mr. Daniels,                                    25 Feb 2001

Just wanted to follow up from our last visit.
I'll try to keep this short.

Have you a chance yet to check on the
paperwork from the other judge? I'm really curious
of that, hope you can understand this.

I still have a few questions, like have you
had any luck with the names you needed? Or
have you requested the phone records I spoke of
(I heard they are only kept on file for just so long
and the "call" from & to Kat by both me & Jim
Craig could be important), theres more, but can't write.

If you've the time, I'd still appreciate a copy of
the interviews in the discovery if you could mail
them.

I do appreciate your time and effort, I do not
mean to be a bother to you.

Thank you again.

                                    Tom Ladem

—Oh, a copy of the "schedule" would help.
I forget what happens just when.

—Additionally, my mother has the tape and
copies of it will assist, it may help, as Kat's
kind of specific in it

TOM LOREN

FULTON MS 38843

Mr. David Daniels
204 N. Spring St
Tupelo MS 38801





# EXHIBIT 30-B

Mr. Davids,                                    Mar 11, 2001

    I hate to constantly be a bother to you sir, but once again there is something that I have questions over. I'll attempt to have my mother leave a message of it at your office, then if time permits, I'd love to be able to discuss this with you.

    I am still curious as to the time line of the trial and would greatly appreciate a copy of the schedule, as well as the discovery material I asked of.

    I am also wondering if you had any luck in obtaining the two names & signatures you asked of me, and also if you have checked on the orders of the previous judge.

    I do appreciate your efforts, and I'm thankful for your services.

    Please inform me of anything you are able to find out. Oh, all the phone records, any luck in obtaining them?

    Again, sorry for the bother, and thank you.


                        Sincerely,

Tom Loden

Fulton MS 38843

 

Mr David L Daniels
204 N. Spring St
Tupelo MS 38801

38804X3924 05

# EXHIBIT 30-C

Mr. Daniels,                                    20 Mar 2001

    Sorry to be a bother yet again, but I still have several questions I'd like to ask. I know that you are really busy and I'm sorry to impose on your time, yet again.

    I'm just curious as to if there has been a place decided on for the trial, if you got the 2 names you needed and if there were any luck in that.

    I still would like the copy of discovery I asked of, as soon as you can get it to me.

    Also I wonder of the phone records I spoke to you of.

    I asked for a schedule, and I wonder what's next, especially when motions are due and which ones you are working on.

    I'd like to talk to you about this, and there is alot I'd like to discuss with you if possible.

    I'm sorry to impose, and thank you for your effort.

Sincerly

Tom Loden

Fulton MS 38843

Mr. David Daniels
204 N. Spring St
Tupelo MS 38801

# EXHIBIT 30-D

Mr. Wells,                        Wed 28 May 2001

     I do so hope you haven't forgotten me, or that you said you'd visit me before you travel to see my wife.

     There are several things I want to speak to you about.

     Theres also a few specific questions I'd like you to cover with her when you do go. So please, as your interview with her will influence me and what I decide to do, come see me as you said.

     Also, I need those interviews of her that are contained in the discovery.

     Actually I'm requesting a complete copy of all the discovery be granted to me. I plan on asking Mr. Daniels for it, but I'm unsure of him, I've written twice and haven't gotten a reply or a visit. Maybe its just in my head, I'm so confused.

     I still trust you though, I know theres persons out there hiding things, even the Marines. Oh, have you heard anything from them?

     Please do this for me, I beg.

     I look forward to your visit soon.

     Thank you, I do mean this.

— I'd also like the discovery material to help me determine if there might be someone I want to testify, as you spoke of last visit.

     Thanks

Sincerely,

Tom Loden



Herb Wells and Associates
Attn: Herb Wells

Tupelo MS 38802-1012

Tom Loden

Fulton MS 388443

Rec
5/31/04

# EXHIBIT 30-E

Mr. Daniels,

Am Wed 6 June

Sir, I thank you kindly for the visit, I hated to impose on you and your schedule, I do appologize for this, I just wish it could have been avoided, my wife had other ways available to get the papers to me. Sorry.

I am really looking forward to your next visit, there are so many questions I have, and several new things I'd like to speak to you of, that could prove important.

I hope you are able to squeeze me in between now and Monday, and we have more time for discussion, your schedule permitting.

I have gotten in touch with the Marines, this alone I have many questions about. They are hiding things.

Sir, I appologize yet again for something, its the trust issue. It has always been a problem for me, the paranoia and all. If you did some things I have seen what I've seen and heard, I just hope you'll understand.

I will say this, I do give you mine. Along with this is my word, that all I have, and will tell you is the truth.

I hope some things you and Mr Wells are finding will show this. Like the way I told you I was "interviewed". It was coached, I was told things to say, and there was a threat, a "deal". I see Mr Wells found the 2 hour gap I told you of, and the missing 12 minutes on the tape.

I admit, if roles were reversed, I doubt I'd believe my story either. But it is the truth.

I'd like the discovery material, I'm sorry for asking, but it may not help, other than just to ease my mind. Sorry, but thank you.

I also have questions of if the Marines are available for supeona's, people and paper work. A big question for me, I'll go in depth more in person. Also of some things about the V.A. (Veterian Ad)

I am so sorry to be a trouble, a burden, I do thank you for your assistance.

Looking forward to the next visit.

Sincerely,

Thomas E. S.f



Mr. David Daniels
204 North Spring St
Tupelo MS 38801

# EXHIBIT 30-F

Mr. Daniels,

Sorry to bother, I'll be brief.

I'd hoped you'd have come by now, and after you told me you would, I get nervous.

But I have many questions to ask of you. Some about the Marines and just what we could ask for from them and expect.

Its important to me to know this before I write them or persue anything.

The discovery material would assist me in this area as well. I'm looking forward to going through it all.

Again, sorry to bother, looking toward your next visit, Soon I hope.

Thank you so.

Sincerely,

Tom Loden

Mr. David Daniels
204 N. Spring St
Tupelo MS 38801





# EXHIBIT 30-G

Mr. Daniels,                                    am Thurs 14 June

Sorry to write again, but I just recieved my discharge papers from the Marines. It wasn't as bad as it could have been, I'll fill you in next meeting, but things are wrong.

But there are mistakes in it that I need to address and attempt to fix as soon as possible with the Marines or the VA. In order to try for any benefits for my wife and daughter, I have to correct this.

I'd like to ask, sorry to impose more than already, for copies of all my military records. As I understand from my mother, she gave you the only copies she had, and I need a copy now for the VA. Sorry, really.

Sir, I really hate to bother you for this, but its for my daughter's benefit I ask.

If you or Ms Wells could drop these with the other discovery it'd be appreciated.

Can any other military documents or even personell be supena'd, this is a question I have before I "step on some toes".

I do look forward to a visit.

Thank you.

                                        Sincerely,
                                        Jon Loden

Tom Loden
Fulton MS 38843

MR. David Daniels
204 N. Spring St.
Tupelo MS 38801





# EXHIBIT 30-H

Mr. Daniels,

Sorry for yet another letter, or for the sloppy writing. I've been going over the things you dropped off for me.

It was long, but I think fruitful.

I think I found the "smoking gun". Its about the shorts specifically.

Actually I found out alot of smaller problems, but I'll just try to walk you through the larger ones.

I'll reference the things I found by their "discovery" page #. Like (D-#)

The shorts were not found until after the warrant, I am for sure now, and have the proof.

According to Bryan Jones' case report (D# 072) theres no mention of shorts at all. Only a "walk around of the van", then the warrant and an "intensive search".

Marlar's case report (D# 009) speaks of the rope before the warrant. Shorts after the warrant was obtained.

According to both reports, the rope was found and taken into custody, Ref (D# 009) aslo (D# 248 - evidence submission form, it states a time/date of 06 23 2000 / 0830).

Now look at (D# 244) the shorts "time" is 06 23 2000 / 1205) The reports are from the only investigators on the scene, no shorts.

─ali─

Also note some other evidence submissions,
(D# 249, shut, also at 1205 ), (D# 248, sandles,
also 1205 ).
Remember this as well, the sheets to the bed
( D# 241 ) were taken at 11:50. - More on this later.
All evidence from Marlar has a date/time.

Now, according to the dispatcher's log, (D# 342)
the warrant was obtained/signed at 11:13 am.

Look at the ~~search~~ affidavit for search warrant
(D# 184). This is Judge Beans. Look very
closely at the last sentence of #5. It does
not line up with the other sentences. Also I
question why D# 185 doesn't have judges signature
like D# 184. Why was Search Warrant D# 888/889
not turned over until a year later? FUNNY!
Still more.
The photos reveal alot. Mrs. Garaway
said the bed wasn't made, yet in photos, it
is ( D# 790, 803, 802 (top right w/ books & twine),
799, 811 & 804).
Just more about the pictures, my bag
suddenly moves, there is no power charger
visible either. # 802 top right, compare to the
# 831. Room is not messed up. " plain view " stuff.
Also for " time " purpose, # 831 shows that
the sheets are removed already & the pillow cases,
Taken into evidence at 11:50 am.
Before shorts were! There's more on the
shorts I can talk of in person.
Here's a few more interesting points.

My initial apperance was (D# 208) on 24 June 2000 at 17:41.

Remember I told you I did not check a box because I didn't know, well, look at D# 296, release from hospital.

I was released 24TH at 0215, with notes under "regarding anesthesia, # 3, Do not — make any important decisions or sign important papers for 24 hours.

I was medically unable to do anything.

Back to the consent Mama signed, D# 181, signed 23RD at 9:27, yet the rope was taken and labeled as evidence at 0830.

The preacher was right! Gasaway doesn't know when or what. Was it the Search Warrant Marraw was read around noon, instead of the consent? I think so.

Finally, to show how they are covering up, look at D# 144 advice of rights, timed at 1817/1823. I wasn't even in custody, Dispatchers log D# 345 states Miranda at 1852.

I do need to talk again about what to do about all this. I think I should have a new motions hearing with all this new stuff.

Please let me know, time is so short.

There's a few more things I found also I'll ask of then, warrants & the van itself.

Oh, missing # 555 — 625 of          Tom Foden
the discovery material. I'd like any "we" have also.





Mr. David Daniels
204 N. Spring St
Tupelo MS 38801

=URGENT=

LAWYER - Client · MAil

# EXHIBIT 30-I

Mr Daniels,                                          Sun 8 July 2001

I hate to continue to impose, but the more I dig into the discovery, the more apparent it becomes to me that major mistakes in the proper procedures occured, as well as an attempt to cover-up this.

I hope the information I sent to you in the previous two letters show this, or at minimum prompts you to look over these issues in detail. I continue to find smaller things every time I pick the discovery up.

Sir, I've so many questions. You've been very good at answering them thus far, I do hope you'll provide advice on this now.

I just can't understand so much, how can they get away with these violation?

As I understood you, you said that without the shorts, there was no probable cause. Now with the "evidence submission", the different reports from the investigators, and the biggest, the photo's. Its apparent to me at least, they weren't presented or found until later, after warrant.

The "aff. for search warrant", its been "doctored" with, and its quite obvious.

I wonder just who all is involved in and with this. Its not just paranoia I know now.

The 4 day old "underlying facts" for the search warrant for my "person", it alone leads me to think either Judge Russell is assisting (thats terrible) or that he just doesn't look at what is presented to him. Which is worse? I think either is bad and

would enjoy hearing an explination of just this.

Now with all this, I can prove at least some of what was said by them on the stand is a lie, a cover-up, and protecting their butts.

My biggest question, if I can show and prove this in some areas, how do I or anyone not know they "doctored" in other areas as well? Thats what I'd like to come out.

I personally don't care if it actually helps my case or not, well, honestly I'd like it to, but if they can and do get away with this with me, whats next? Who is safe?

Our country was founded on certain rights, is it not true, if we allow just one instance of these to be violated, it takes away all that we have stood for and protected since then?

Are Ghestapo tactics the next step for us, a state in which the police can and do get away with anything? If not with me, others?

Sorry, got going there, I appologize.

But I do have some personal feelings. I get called a "lier" by the DA in public, at the hearings, yet who is lying more? Not me!!

The copies I spoke of have went out, I don't know what to do with these yet, if it goes public will it help or hurt, I await to hear your opinion on this. Yet I'm so tempted to have it "leaked" already. (I even made a tape recording explaining in detail each problem, the different reports, the "doctored" thing, and just how Judge Russell could sign these things).

Sorry, guess I'm just upset. The treatment from the police thus far, and the DA. As for the DA, if he wants to gain politically in this, let him also have to explain these problems in public as well.

Again, I'm sorry for the trouble.

I didn't mean to draw you into something this messed up.

After all I've told you, I'm not quite sure you'd want to represent me or pursue this any more. I know that you would have to continue to go before the judges, work with the police, and live in this area.

Please, be totally honest with me, if you don't desire to bring these issues up, I would understand, I just need to really know.

You'd be in a tough spot I know, especially if this case got thrown out, or even if all the cover-up were presented in public even.

I need to see you, discuss all this, hear your advice and decide just what I should do now;

I hate it, but I'm so short on time now, Would you please, take the time and speak with me just as soon as possible? Please.

— I've asked to phone you since Thursday, have been denied so far, I'll keep asking at least until I can leave a message at least. Has the Judge issued an "order" yet? (phone)

Sorry again, I hate imposing and placing you in a sticky situation.

Looking forward to seeing you soon, I <u>have</u> too.

Respectfully,

[signature]

— Doesn't just the stuff I've written of so far change some things at least?

I need to see you, please.

Added:

Sorry, this just came to me now.

The one photo that I say is so important, page 831 middle shot, that very photo was gone over at the last hearing. It was Marlar I think, need to check the court record. Do you recall the testimony, asked if that was the "shorts" in the lower left. He said yes, then went on to explain about how the camera was "a cheap one". As I said, it removes all doubt as for when it was taken.

The sheets & pillowcase in that photo are removed! The evidence submission form states these were labeled at 11:50 am. I also see in the dog handlers report, they "scented" at 12:08. It adds up. Previous photos show a clean, neat room, just as I said, with the closet door closed, just as I said also.

If this doesn't prove a cover-up, I don't know what it'd take then.

Matlock would be all over it! HA HA. Sorry, I have to try to keep a sense of humor.

But put this together with all the other things. I know it blows all their credibility completely.

I've found a few more instances and really would like the court report from the last hearing, just to look over for eras.

- over -

I just hope you'll see. I have told you alot of things that are being proven true.

I just need to have your advice on all this.

— later —

Just found another "questionable" search warrant, page # 199.

It, unlike most others has a hand written date, and has a pen change from JULY to JUNE. With all I've seen so far, I question everything now.

Could it be a screw-up or not, don't know.

Also, have you noticed, some of the warrants say "controlled and owned by" my grand-mother. Others say "controlled by" her, owned by my aunt, my sister and I

Seems funny, like they're really trying to cover all bases.

Please come as soon as possible.

— later —

Mrs Gasaway can neither read or write. Look at her statement, an X for signature. Aunt told me about the reading part.

And there's still more.

Think they came in and got a copy of stuff with my notes! Come FAST!!! PLEASE

Mr. David Daniels
204 North Spring St.
Tupelo MS 38801

=URGENT=

Priviledged
Lawyer-Client
Mail

# EXHIBIT 30-J

Mr. Johnstone,                                        Friday 20 July 01

Sorry, just thought of something additional I've questions of. I hate to impose again, I apologize.

The more I think about things, the more what I just spoke of and wrote you about bothers me.

I really desire another motion on suppression of the original warrant.

Does not the "new evidence" I wrote you of justify this.

Shoot, I'd even use the fact the judge was dozing off or napping (remember when I brought this up to you) during the last hearing even.

I sent you in the last letter just a small portion of questionable things I've noted in the discovery. It's so obvious if its looked at in depth.

I still pose the question about the other lawyer my mother is speaking with, would it have to, or at least a good possibility, if he came aboard with us it'd (the motion) be re-addressed? Would it help?

At minimum, as you informed me, for the record I'd like another motion for this. At least during an appeal it'd be noted maybe.

Sorry for the trouble, really.

I do appreciate all your efforts so far. Thank you so!

                                        Sincerely,
                                        Tom Loden

Privileged
Attorney - Client Mail



Mr. James P Johnstone
P.O. Box 331
101 South Main St.
Pontotoc MS 38863

# EXHIBIT 30-K

Mr. Daniels,

Thanks for the visit. I do apologize for the trouble, I only hope you can understand.

I believe all of what you told (well some it) came from Kat, to the DA. She's mad at me over the money I feel. I've a friend of both of us I trust who I have asked to visit me, I'll find out then. If I do, I'll let you know.

✱ Please, would you send this letter out as soon as possible. I'd like it to reach my sister by Friday.

I'd really appreciate also, the answer to the Social Sec question I asked, if you've the time.

Also, for myself, a copy of the last hearing's transcript when available. Its actually (on Kat's part) is for Abby one day.

I know its not enough, but thanks.

─Oh, does any of the "Desert Storm Syndrom" stuff I wrote Mr Johnstone about matter?

Sincerely,
Tom Loden



Mr. David L. Daniels
204 North Spring St
Tupelo MS 38801

T. Loden
Fulton MS 38843

Privileged
Attorney-Client Mail

# EXHIBIT 30-L

Mr. Daniels,

Thank you for taking my call, and for the information, it eased my mind some. I'm sorry to admit, but I am somewhat paranoid, maybe after this letter you understand this feeling. (Forgive me if I ramble).

After the suppression hearing, I felt that I had no chance for a favorable ruling, no matter what I had or could prove. My only hope was re-presenting everything I had trouble with on appeal. Glad to hear that I still can.

May I present a few things, try to place yourself in my shoes, then maybe you can understand.

One big issue I have is the "shorts", and warrant:

A. Marlar's report, discovery pg #9, states he found them <u>after</u> the warrant.

B. Jones' original report, pg #072, doesn't even mention them.

C. Marlar's report states rope from Grand-mothers car "taken" as evidence.... "Jones left to secure a search warrant" Marlar's evidence tag for rope, pg #248, says 0830. Marlar's evidence tag for the shorts, pg #244, is 1205.

D. Photo, pg #810 top right, shows bag, mostly packed, corner of bag is shut under razor package, this shirt labeled for evidence at 1205.

Now go back to Marlar's report, pg #9. Marlar in 3rd paragraph says "...overnight bag..... which contained a JVC camera power supply"...

If this is the case, how could he have seen it if bag wasn't un-packed yet? (Next will add to this and clarify more) -1-

E. Photo, pg # 831, middle and bottom pictures.
Notice, sheet & pillow case from pillow on bed are now removed, pg # 241 states taken for evidence (per dogs, can't remember pg #, but in "dog handlers report") at 1150. Bag now moved, un-packed.

Therefore, photo <u>had</u> to be after 1150, which is <u>after</u> warrant issued. Shirt on quilt rack by bed is same one in top of bag in photo on pg # 810. The shorts are (Berthay attested to this in supp. hearing) barely visible in foreground of center photo pg # 831.

Now, would Marlar have labeled items differently? IE: rope at 0830 when found, but "waited" on shorts until 1205? Would police have left valuable, key evidence for DNA testing, just laying around for 4 hours?

F. Add Jones' second report now, pg # 892. Suddenly the shorts are mentioned. Funny

G. The "funny" sentences in the Aff. for Search Warr. pg # 184. <u>Notice</u>: in #1. last sentence "This residence and any and all vehicles...... doesn't line up with previous sentence, vertically or horizontally. Also, in #5. last sentence, "It was also...." doesn't line up either.

Now add what I told you on the phone.
Wouldn't you be paranoid too?

-2-

I typed up an official Request for Court Documents, attached a notarized poverty statement even, and had it taken to Justice Court Clerks office. It is public information, yet in 3 trips its not been provided. My mom was told "you'll have to, personally see the judge" for it. FUNNY?

I even worry now about the copy you have, <u>Sorry</u>, but I'm being honest.

I'm afraid this will get lost, or replaced with a sub. copy (Sorry, really, but when Frances asked for it for some time, then got copies of "discovery", with all else I've explained, it makes you wonder).

\* Please, if you have it and you are worried, <u>don't</u>, I would say you just was given it. If its messed up, I need <u>every</u> copy I can get hold of, please, I'll talk more of this with you later.

Thats part of the issues, I'd like to feel the water before I plunge in. The other couple of things I'll keep to myself until I get a reply. I truely hope you understand.

For questions, I've several:

What exactly is the "motion" to Judge Garner? <u>What</u> can be presented / <u>how</u> will it help me? If he made a bad ruling in the suppresion hearing, do I get a new trial?

\* Here, as for 1 area, the confession, doesn't

Minnick v Mississippi 498 US 146, (1990)

-3-

apply? They did come to me, not me to them. Thats in the record. (Also violated by not allowing me phone access)
Anyway, what happens if he did err?

I've a question on the warrant also, since they did know it was mine, not my grandmothers, shouldn't the warrant have been seperate?

I'll try to phone again this Friday, even if its just to Jenny, to check on the warrant you have in my file, then I'll try to set up a call to you.

Forgive me for not throwing everything out just yet, please try to look at it from my point of view, hope you understand.

Sincerely,

Kevin Goolsby

— I hate to impose, but I would like a copy of my entire file. I may have to do alot on my own after the direct appeal. Any transcripts, also, could we try to get Grand Jury ones too?
Opps, one more question, how far along in the appeal process will it be before I can have "all" of this looked on and represent stuff and get a new ruling?



GRENADA MS 38901
PM
7 FEB
'02

Mr. David Daniels
204 North Spring St
Tupelo MS 38801

38804#3924

Tom Loden K8126
Parchman MS 38738



# EXHIBIT 31

Facsimile from Katrina Loden to
Attorney Johnstone, dated Oct. 28, 2000

# PHELPS DUNBAR LLP
## ——— COUNSELORS AT LAW ———

Suite 500 • SkyTel Centre
200 S. Lamar Street
P. O. Box 23066
Jackson, Mississippi 39225-3066
(601) 352-2300
FAX: (601) 360-9777

## TELECOPY COVER SHEET

November 28, 2000

**TO:**  **James Johnstone**

Telecopier No.:   662-489-4789

Telephone No.:

FROM:   Kat Loden

RE:   Gulf War Symptoms

TOTAL PAGES (including this page): 3

MESSAGE:   If I can be of any assistance, please let me know.
R/ Kat Loden

### CONFIDENTIALITY NOTICE

This facsimile transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone to arrange for return of the documents.

We are transmitting from a Xerox Telecopier 7021

IF THERE IS ANY PROBLEM RECEIVING THIS MESSAGE,
PLEASE CALL (601) 352-2300 AND ASK FOR Kat Loden

XEROX 7021 TELECOPIER - (601) 360-9777

NEW ORLEANS • BATON ROUGE • JACKSON • TUPELO • HOUSTON • LONDON

 **YAHOO! NEWS** Home - Yahoo! - My Yahoo - News Alerts - Help **REUTERS**

weather.com
travel weather



Home Top Stories Business Tech Politics World Local Entertainment Sports Science Health Full Coverage

**Health News** - updated 6:21 PM ET Nov 27          Add to My Yahoo!

Reuters | HealthSCOUT | AP | Yahoo Health | ▸Videos

Monday November 27 6:15 PM ET

# Gulf War Symptoms Linked to Brain Damage

CHICAGO (Reuters) - Symptoms such as memory loss and dizziness suffered by US veterans with Gulf War syndrome can be correlated to specific areas of the brain where cells have died, probably from chemical exposure, researchers said on Monday.

In 1999, doctors from the University of Texas Southwestern Medical Center in Dallas reported that brain scans performed on people with symptoms of Gulf War syndrome showed depleted cells in three areas of their brains.

"This year we show that brain cell losses from specific areas of the brain correlate with different symptoms and abnormalities," lead researcher Robert Haley said in a report released at the annual meeting of the Radiological Society of North America.

The scans performed on 12 veterans with severe cases of the syndrome found brain cell losses of between 10% and 25% in three regions deep inside the brain--the basal ganglia in each hemisphere and the brain stem. Scans performed on healthy veterans of the 1990-1991 Gulf War were normal.

The Texas researchers have found the amount of brain cell loss in the Gulf War veterans to be comparable to that of patients with brain diseases like amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease), multiple sclerosis, dementia and other degenerative neurological disorders, although the brain areas affected are different.

Veterans with damage to the right basal ganglia appeared to share symptoms such as impaired sense of direction, memory lapses and depression.

Brain cell losses on the left side appeared to cause more general confusion, including difficulty in understanding instructions, reading, solving problems and making decisions. Left side damage also appeared



Research thousands of health terms, drugs, and diseases

**Full Coverage**
In-depth coverage about
**Gulf War Syndrome**
**Related News Stories**
- Iraqis and former GIs to sue in US over depleted uranium – The Independent (UK) (Nov 14, 2000)
- Rank Is Main Occupational Factor In Gulf War Syndrome - UniSci (Oct 19, 2000)
- Gulf War illness 'rank related' - BBC (Oct 18, 2000)
- Officials clash over Gulf War illnesses - Dallas Morning News (Oct 13, 2000)
- Gulf War Mystery Remains - Washington Post (Sep 8, 2000)

More...

**Related Web Sites**
- National Academies - private organization created by the federal government to be an adviser on scientific and technological matters; consists of the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council.

Pyridostigmine Bromide - RAND
11/28/2000

Gulf War Symptoms Linked to Brain Damage

to correlate with elevated levels of dopamine, a neurotransmitter involved in movement and emotion.

## Different Symptoms Experienced

Damage to the brain stem appeared to account at least in part for loss of balance and dizzy spells in the veterans.

``This helps explain why not all patients have the same exact symptoms. Depending on which brain regions were damaged by chemicals in the war, veterans may have more or different types of symptoms," Haley said.

In past research the Texas team has identified three primary Gulf War syndromes, and tried to link sets of symptoms with different combinations of chemicals toxic to brain cells.

Syndrome 1, commonly found in veterans who wore pesticide-containing flea collars, is marked by impaired cognition.

Syndrome 2, called confusion ataxia, is the most severe and debilitating. It was found among veterans who said they were exposed to low-level nerve gas and experienced side effects from anti-nerve gas pyridostigmine (PB), tablets.

``It may have been the combination of low-level nerve gas exposure and anti-gas tablets that caused the brain damage underlying (the most severe form of the) syndrome," Haley said.

Syndrome 3, characterized by central pain, is found in veterans who wore insect repellent with high concentrations of DEET, a repellent chemical, and who experienced side effects from the anti-nerve gas tablets.

The researchers noted that brain scans performed on veterans suffering from combat stress and post-traumatic stress symptoms did not correlate significantly with damage in any of the three brain regions.

As many as 100,000 of the 700,000 US soldiers who served in the Gulf War complain of symptoms, which many attribute to exposure to chemicals.

Email this story - View most popular | Printer-friendly format

Archived Stories by Date: [ Nov 24 ] 

## News Resources

⌂ **Message Boards:** Post and read messages about this story
Requires a Yahoo ID to post messages.

⌂ **Conversations:** View | Start a live discussion
Requires Yahoo! Messenger

- Pyridostigmine Bromide - RAND study released by the Pentagon 10/19/99 which concludes that anti-nerve agents given to troops during the Gulf War cannot be ruled out as a possible cause for some of the illnesses veterans of the war have reported.

- GulfLINK - Dept. of Defense Office of the Special Assistant for Gulf War Illnesses. News, medical information for Gulf War veterans, and reports on continuing suspicions about Iraqi biological weapons.

- Health Impact of Chemical Exposures during the Gulf War - research planning conference sponsored by the CDC: Feb 28-Mar 2, 1999.

- National Gulf War Resource Center - international coalition of advocates and organizations providing a resource for information, support, and referrals regarding the Persian Gulf War.

**More...**

**Opinion & Editorials**

- Gulf war vets get raw deal - Baltimore Sun (Nov 13, 2000)

- Shameful Treatment of Gulf War Vets - San Francisco Chronicle (Nov 10, 2000)

- Gulf War syndrome: Defense Department should expand Dallas study - Dallas Morning News (Nov 3, 2000)

**More...**

**Audio**

- Pentagon's classified medical records and Gulf War syndrome - Pacifica (Sep 8, 2000)

**More...**

**Video**

- Tony Flint of the Gulf War Veterans Association on the death rate study: It's "seriously flawed" - ITN (Jun 30, 2000)

- Gulf War Syndrome report - ITN (Oct 20, 1999)

**Related Full Coverage**

- US Armed Forces News

- Iraq

**Yahoo! Categories**

Dept Veterans Affairs

11/28/2000