# EXHIBIT 32

# Docket of Michelle Byrom

06/28/2001  10:16   6014231667              CIRCUIT CLERK OFFICE              PAGE  05

     1    General Docket, Circuit Court, Circuit Clerk
=================================================================================
No. CR99-065                                              CFN    355

STATE OF MISSISSIPPI                        COUNSEL FOR PLAINTIFF
                    VS.            Archibald Bullard
                                            COUNSEL FOR DEFENDANT
MICHELLE BYROM                    Sunny C. Phillips + Terry Wood
CAPITAL MURDER
=================================================================================
         DATE                   ORDERS, JUDGMENTS, ETC.
---------------------------------------------------------------------------------
    10/21/1999    Indictment Filed and Capias Issued
    11/04/1999    Capias Returned Served by Bobby Flynt on 10/22/99
    12/06/1999    Order Setting Arraignment signed by Judge Gardner on
                  12/3/99.  50/297
    12/07/1999    Arraignment Order signed by Judge Gardner on 12/6/99.
                  50/314
    12/07/1999    Affidavit of Indigence signed 12/6/99 by defendant and
                  Judge Gardner.  50/315
    12/07/1999    Petition to Appoint Counsel signed 12/6/99 by defendant
                  and Judge Gardner.
    12/07/1999    Order Appointing Attorney signed by Judge Garndner on
                  12/6/99.  Attorneys appointed:  Terry Wood & Sunny Phillips.
                  50/317
    12/13/1999    Motion for Discovery submitted by Terry L. Wood.
    12/14/1999    Discovery submitted by Ralph Dance, DA's Office.
    12/29/1999    Order Setting Deadlines and Trial Dates signed by Judge
                  Gardner on 12/28/99.  50/360.  All motions by 3/17/00; all
                  matters for hearing 4/6/00;  trial set for 05/08/00 at
                  Tishomingo Co. Courthouse, 9 a.m.
    02/04/2000    Motion to Set Bond submitted by Terry L. Wood.
    02/04/2000    Subpoena Duces Tecum issued to T. Wood for Dr. Ben Kitchens
                  on 02/04/00.
    02/04/2000    Subpoena Duces Tecum issued to T. Wood for Custodian of
                  Records of Victorina Inn on 02/04/00.
    02/04/2000    Subpoena Duces Tecum issued to T. Wood for Jane Morgan,
                  Custodian of Medical Records of Iuka Hospital, on 02/04/00
    02/10/2000    Subpoena Duces Tecus issued to T. Wood on Joel G. Byrom,
                  Administrator of the Estate of Edward Byrom, Jr. on 02/04/00
    02/10/2000    Subpoena Duces  Tecum returned served by Renee Bullard on
                  Dr. Ben Kitchens on 2/4/00.
    02/10/2000    Subpoena Duces Tecum returned served by Renee Bullard on
                  Linda Massa - Victoria Inn - on 2/7/00.
    02/10/2000    Subpoena Duces Tecum returned served by Renee Bullard on
                  Jane Morgan, Iuka Hospital, on 2/7/00.
    02/10/2000    Subpoena Duces Tecum returned served by Renee Bullard on
                  James E. Price, Jr., for Joel G. Byrom, on 2/7/00.
    02/10/2000    Subpoena Duces Tecum issued to T. Wood for Gennie Estes,
                  Holiday Inn, Express, on 2/10/00.
    02/10/2000    Subpoena Duces Tecum issued to T. Wood for Joyce Price,
                  Manager, Video Plex & Tanning on 2/10/00.
    02/10/2000    Subpoena Duces Tecum issued to T. Wood for Todd Gurley,
                  Manager, Movie Gallery, on 2/10/00.
    02/10/2000    Subpoena Duces Tecum issued to T. Wood for Mansukh Patel,
                  Manager, Village Inn, on 2/10/00.

              ** CONTINUED ON NEXT PAGE **

06/28/2001  10:16   6014231667          CIRCUIT CLERK OFFICE              PAGE  06

2   General Docket, Circuit Court, Circuit Clerk
=============================================================================
No. CR99-065                                              CFN      355

STATE OF MISSISSIPPI                         COUNSEL FOR PLAINTIFF
                 VS.                 Archibald Bullard
                                             COUNSEL FOR DEFENDANT
MICHELLE BYROM                       Sunny C. Phillips + Terry Wood
CAPITAL MURDER
=============================================================================
        DATE                      ORDERS, JUDGMENTS, ETC.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                  ** CONTINUED FROM PREVIOUS PAGE **

    02/10/2000    Subpoena Duces Tecum issued to T. Wood for Bob Sweeney,
                  Bob's One Stop, on 2/10/00.
    02/10/2000    Subpoena Duces Tecum issued to T. Wood for Ricky Marecle,
                  Manager, Comfort Inn, on 2/10/00.
    02/18/2000    Motion for Appointment of a Private Investigator submitted
                  by T. Wood on 2/17/00.
    02/23/2000    Motion submitted by Sunny Phillips on 2/22/00.
    02/24/2000    Subpoena Duces Tecum returned served on 2/11/00 by Donna
                  Knight on Gennie Estes.
    02/24/2000    Subpoena Duces Tecum returned served on 2/11/00 by Donna
                  Knight on Joyce Price.
    02/24/2000    Subpoena Duces Tecum returned served on 2/11/00 by Donna
                  Knight on Todd Gurley
    02/24/2000    Subpoena Duces Tecum returned served on 2/11/00 by Donna
                  Knight on Mansukh Patel
    02/24/2000    Subpoena Duces Tecum returned served on 2/11/00 by Donna
                  Knight on Bob Sweeney
    02/24/2000    Subpoena Duces Tecum returned served on 2/18/00 by Donna
                  Knight on Ricky Marecle
    03/17/2000    Discovery submitted by Ralph Dance, DA's Office on 01/04/00,
                  To Thomas Comer.
    03/31/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
                  to Terry Wood on 3/27/00.
    04/06/2000    Notice of Motions submitted by Sunny C. Phillips on 4/6/00.
    04/06/2000    Motion submitted 4/5/00 by Sunny Phillips.
    04/06/2000    Motion submitted 4/5/00 by Sunny Phillips.
    04/06/2000    Motion submitted on 4/5/00 by Sunny Phillips.
    04/06/2000    Motion submitted on 4/5/00 by Sunny Phillips.
    04/07/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
                  to Terry Wood on 4/4/00.
    04/07/2000    Motion to Pay Expense (Sir Speedy, 115 North Spring St.,
                  Tupelo, MS) submitted by Arch Bullard.
    04/07/2000    Order to Pay Expense (Sir Speedy, 115 North Spring St.,
                  Tupelo) signed by Judge Barry Ford on 4/6/00.
    04/13/2000    Motion for Continuance submitted by Terry Wood.
    04/24/2000    Order signed by Judge Gardner on 4/13/00.  51/212
    04/24/2000    Order for Funds to Hire An Investigator signed by Judge
                  Gardner on 4/13/00 ($1000.00)  51/213
    06/19/2000    Order Setting Omnibus Hearing - Tishomingo County Courthouse
                  on 6/22/00 at 1:30 p.m.  Signed by Judge Gardner on 6/19/00
                  51/624    (copy)

                     ** CONTINUED ON NEXT PAGE **

06/28/2001  10:16    6014231667          CIRCUIT CLERK OFFICE          PAGE  07

4    General Docket, Circuit Court, Circuit Clerk
===================================================================
  CR99-065                                           CFN    355

.TE OF MISSISSIPPI                          COUNSEL FOR PLAINTIFF
          VS.                      Archibald Bullard
                                            COUNSEL FOR DEFENDANT
HELLE BYROM                        Sunny C. Phillips & Jerry Wood
'ITAL MURDER
'TIAL MURDER                       97-3-19(2)
===================================================================
      DATE                    ORDERS, JUDGMENTS, ETC.
-------------------------------------------------------------------
              ** CONTINUED FROM PREVIOUS PAGE **

   09/21/2000    Subpoena Duces Tecum returned served on 9/19/00 by Renee
                 Bullard on Ann Bishop, Tishomingo County School Board of
                 Education.
   09/27/2000    Order of Continuance signed by Judge Gardner on 9/14/00
   09/27/2000    Letter to District Attorney from Terry Wood dated 9/26/00.
   09/28/2000    Letter to District Attorney from Terry Wood dated 9/27/00.
   09/28/2000    Subpoena Duces Tecum issued to T. Wood for Dr. Ben Kitchens
   09/29/2000    Subpoena Duces Tecum returned served on 9/29/00 by Renee
                 Bullard on Dr. Ben Kitchens.
   10/02/2000    Order to Draw Venire signed by Judge Gardner on 9/29/00.
                 52/324   (450 names to be drawn on 10/23/2000, 8:30 a.m.)
   10/04/2000    Motion for Continuance or Appropriate Orders submitted by
                 Terry Wood on 10/2/2000.
   10/05/2000    Request to Subpoena Witnesses for 10/23/00 at 8:30 a.m. to
                 give evidence in behalf of the State of Mississippi.  (For
                 list of 29 people see case file)
   10/05/2000    Summons issued to 9 people for 10/23/00 at 8:30 a.m. on
                 10/5/00 on behalf of State. (For list of people, see case
                 file).
   10/05/2000    Criminal Subpoena issued on behalf of State of Mississippi
                 to Casey Wayne Anglin.
   10/05/2000    Criminal Subpoenas issued on behalf of State on 10/5/00
                 to 3 people.   (For list, see case file)
   10/06/2000    Letter to District Attorney from Terry L. Wood dated 10/5/00
   10/11/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
                 to Sunny Phillips on 10/9/2000.
   10/11/2000    Letter to District Attorney from Terry Wood dated 10/11/00
   10/12/2000    Subpoena issued for Terry Wood on 13 people.
                 (For list of people, see case file.)
   10/12/2000    Subpoena Duces Tecum issued to T. Wood for Custodian of
                 Records, Victorian Inn 10/12/00.
   10/12/2000    Subpoenas issued for T. Wood on behalf of defendant to
                 8 people on 10/12/00.  For list, see case file.
   10/12/2000    Subpoenas issued for Sunny Phillips and Terry Wood on
                 10/12/00, 10/13/00, and 10/20/00.  For list, see case file.
   10/13/2000    Motion to Require State to Share Evidence submitted by
                 Terry Wood by Sunny Phillips on 10/12/00.
   10/13/2000    Order signed by Judge Gardner on 10/12/00.  52/345
   10/13/2000    Order signed by Judge Gardner on 10/12/00.  52/346
   10/13/2000    Defendant's Ex Parte Motion for Witness Costs submitted by
                 Sunny Phillips on 10/12/2000 for $1689.90.

              ** CONTINUED ON NEXT PAGE **

3    General Docket, Circuit Court, Circuit Clerk
==============================================================================

CR99-065                                              CFN      355

TE OF MISSISSIPPI                       COUNSEL FOR PLAINTIFF
              VS.               Archibald Bullard
                                        COUNSEL FOR DEFENDANT
HELLE BYROM                     Sunny C. Phillips + Terry Wood
'TAL MURDER
'TIAL MURDER                    97-3-19(2)
==============================================================================
     DATE                    ORDERS, JUDGMENTS, ETC.
------------------------------------------------------------------------------

              ** CONTINUED FROM PREVIOUS PAGE **

06/20/2000    Order Setting Omnibus Hearing - Tishomingo County Courthouse
              6/22/2000, at 1:30 p.m.  Signed by Judge Gardner 6/19/00
              51/625  (Original)
06/22/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Terry Wood on 6/22/00.
06/22/2000    Estimate by Court Reporter of Cost to Prepare Transcript for
              Appeal to Mississippi Supreme Court submitted by Melody
              Powell on 6/22/00.
06/22/2000    Transcript of Omnibus Hearing  on 6/22/00 filed by
              Court Reporter, Melody Powell.
06/26/2000    Motion to Pay Expense (Map Sound & Video) submitted by
              Jim Pounds, DA's Office.
06/26/2000    Order to Pay Expense (Map Sound & Video) signed by Judge
              Frank A. Russell on 6/23/00.
06/30/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Terry Wood on 6/23/00.
06/30/2000    Scheduling Order signed by Judge Gardner on 6/30/00.
              51/656 -657
07/05/2000    Order signed by Judge Gardner on 6/29/00.  51/686 - 689
07/11/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              on 7/10/00 to Terry Wood.
07/28/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Terry Wood on 7/27/00.
08/09/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Terry Wood on 8/7/00.
08/11/2000    Motion for Continuance submitted by Sunny Phillips on
              8/10/00.
08/11/2000    Motion for Continuance of Hearing on Final Motions submitted
              by Sunny Phillips on 8/10/00
08/24/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Sunny Phillips on 8/22/00.
08/31/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Terry Wood.
09/01/2000    Order Authorizing Employment of Psychiatrist signed by
              Judge Gardner on 8/28/00.
09/15/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
              to Sunny Phillips on 9/13/00.
09/19/2000    Subpoena Duces Tecum issued to T. Wood for Tishomingo County
              Board of Education on 9/19/00

              ** CONTINUED ON NEXT PAGE **

06/28/2001  10:16  6014231667          CIRCUIT CLERK OFFICE          PAGE  09

5    General Docket, Circuit Court, Circuit Clerk
=========================================================================
). CR99-065                                          CFN     355

[ATE OF MISSISSIPPI                          COUNSEL FOR PLAINTIFF
                VS.                     Archibald Bullard
                                             COUNSEL FOR DEFENDANT
[ICHELLE BYROM                         Sunny C. Phillips  ← Terry Wood
APITAL MURDER
APITAL MURDER                          97-3-19(2)
=========================================================================
        DATE                    ORDERS, JUDGMENTS, ETC.
-------------------------------------------------------------------------
                    ** CONTINUED FROM PREVIOUS PAGE **

  10/13/2000    Order Allowing for Witness Costs signed by Judge Gardner
                on 10/12/00 (Amount allowed $1689.90.)  52/347
  10/13/2000    Defendant's Ex Parte Motion for Order Compelling Witness
                Attendance at Trial submitted by Sunny Phillips on 10/12/00.
  10/13/2000    Order Compelling Witness Attendnace at Trial signed by
                Judge Gardneron 10/12/00.  52/348.
  10/13/2000    Summons returned served on all 9 people.  (See case file
                for list)
  10/13/2000    Subpoena Duces Tecum issued to T. Wood for Todd Gurley,
                Manager, Movie Gallery.
  10/16/2000    Subpoena Duces Tecum returned served on 10/16/00 by Sunny
                Phillips on Todd Gurley.
  10/16/2000    Defendant's Response to State's Motion in Limine to Exclude
                the Guilt Phase of the Trial Evidence of the Decedent,
                Edward Byrom, Sr.'s Abuse of the Defendant, Michelle Byrom
                submitted by Terry Wood.
  10/16/2000    Response to State's Motion in Limine as to Edwrad Byrom,
                Sr.'s Pornographic Material submitted by Terry Wood.
  10/17/2000    Subpoena returned served on 13 people.  (For list see case
                file)
  10/17/2000    Subpoena returned served on C. Anglin
  10/17/2000    Supplemental Discovery submitted by Ralph Dance, DA's Office
                to Sunny Phillips on 10/13/00.
  10/17/2000    Letter to District Attorney from Terry Wood dated 10/16/00.
  10/17/2000    Letter to Ralph Dance from Victorian Inn regarding
                reserations for jurors.
  10/18/2000    Subpoena Duces Tecum returned served on 10/18/00 by Sunny
                Phillips on Victorian Inn Manager.
  10/18/2000    Discovery submitted by Sunny Phillips to Arch Bullard
                on 10/17/00.
  10/18/2000    Motion in Limine to Strike Letters of Defendant submitted
                by T. Wood on 10/17/00.
  10/18/2000    Motion in Limine to Strike Hopsital Statements of Defendant
                submitted by T. Wood on 10/17/00.
  10/18/2000    Estimate by Court Reporter of Cost to Prepare Transcript
                for Appeal to Mississippi Supreme Court by Melody Powell on
                10/18/00.
  10/18/2000    Motion for Continuance submitted by Sunny Phillips on
                10/18/00.
  10/18/2000    Motion for Disclosure of Plea Agreement submitted by
                Sunny Phillips on 10/18/00.

                    ** CONTINUED ON NEXT PAGE **

06/28/2001  10:16    6014231667    CIRCUIT CLERK OFFICE    PAGE  10

6    General Docket, Circuit Court, Circuit Clerk
==========================================================================
>. CR99-065                                              CFN    355

TATE OF MISSISSIPPI                        COUNSEL FOR PLAINTIFF
            VS.                       Archibald Bullard
                                          COUNSEL FOR DEFENDANT
ICHELLE BYROM                        Sunny C. Phillips + Terry Wood
APITAL MURDER
APTIAL MURDER                        97-3-19(2)
==========================================================================
      DATE                  ORDERS, JUDGMENTS, ETC.
--------------------------------------------------------------------------
              ** CONTINUED FROM PREVIOUS PAGE **

  10/19/2000    Subpoenas issued on behalf of State of Mississippi
                (for list of people, see case file) at request
                of DA's Office on 10/18/00.
  10/19/2000    Subpoenas issued by state (see case file for list) on
                10/19/00.
  10/23/2000    Subpoenas issued at request of State returned served.
  10/23/2000    Subpoenas issued for T. Wood on behalf of defendant returned
                served.  (For list of people, see case file.)
  10/24/2000    Letter to DA's Office from Terry Wood daterd 10/20/00.
  10/24/2000    Letter to DA's Office from Terry Wood dated 10/23/00.
  10/24/2000    Notice of Aggravating Circumstances submitted by Jim Pounds
                on 10/23/00.
  10/24/2000    Notice of Intent to Offer Self-Authenticating Documents
                submitted by Arch Bullard on 10/23/00.
  10/24/2000    Order Granting Defendant's Motion for Continuance  -
                Trial is continued from 10/23/00 until 11/13/00 at 9 a.m. -
                Signed by Judge Gardner on 10/24/00.  52/375
  10/25/2000    Order to Draw Venire signed by Judge Gardner on 10/24/00  -
                Clerk will draw 450 names on 10/25/00.  52/378
  10/26/2000    Letter from Terry Wood to DA's Office dated 10/25/00.
  10/31/2000    Subpoenas issued for State on 10/5/00 returned served.  For
                list, see court file.
  10/31/2000    Subpoenas issued for defendant on 10/12/00, 10/13/00, and
                10/20/00 returned served.  For list, see case file.
  10/31/2000    Subpoenas issued on 10/19/00 for state returned served.
  11/01/2000    Letter to Judge Thomas J. Gardner, III from Terry Wood dated
                11/01/00.
  11/01/2000    Amended Motion to Suppress and to Compel Discovery submitted
                by Terry Wood on 11/1/00 with exhibits.
  11/02/2000    Order to Reduce Video Still signed by Judge Gardner on
                10/30/00.    52/423
  11/06/2000    Order Granting Motion to Release Mental Evaluation and
                Allowing Psychologists to Talk with the State signed by
                Judge Gardner on 11/2/00.  52/429 - 430
  11/07/2000    Subpoena issued by State to Mary S. Till, Ben Kitchens,
                and Anna Southward for 9 a.m. on 11/8/00.
  11/07/2000    Subpoenas issued for state on 11/7/00 returned served on
                11/7/00.
  11/07/2000    Defendant's Objection to State's Offer of Self
                Authenticating Documents submitted by Terry Wood on 11/7/00.

              ** CONTINUED ON NEXT PAGE **

06/28/2001  10:16   6014231667          CIRCUIT CLERK OFFICE          PAGE  11

    7    General Docket, Circuit Court, Circuit Clerk
=========================================================================
o. CR99-065                                        CFN      355

TATE OF MISSISSIPPI                          COUNSEL FOR PLAINTIFF
                VS.                      Archibald Bullard
                                             COUNSEL FOR DEFENDANT
ICHELLE BYROM                            Sunny C. Phillips + Terry Wood
APITAL MURDER
APITAL MURDER                            97-3-19(2)
=========================================================================
     DATE                    ORDERS, JUDGMENTS, ETC.
-------------------------------------------------------------------------
               ** CONTINUED FROM PREVIOUS PAGE **

  11/08/2000   Supplemental Discovery submitted by Ralph Dance, DA's Office
               to Terry Wood on 11/3/00, 11/6/00, and 11/7/00.
  11/08/2000   Subpoena Duces Tecum issued to T. Wood on 10/20/00.  For
               list, see case file.  Returned filed on 11/8/00.
  11/08/2000   Notice of Mitigators to be Offered in Sentencing Phase
               submitted by Sunny Phillips on 11/8/00.
  11/08/2000   Motion to Pay Expense submitted by Jim Pounds on 11/8/00
               (To Reliagene Technologies, Inc in the amount of $3500.00)
  11/08/2000   Order to Pay expense signed by Judge Gardner on 11/8/00 to
               Reliagene Technologies, Inc.     52/432
  11/08/2000   Motion to Pay Expense submitted by Jim Pounds on 11/8/00
               for $100.00 to AVS.
  11/08/2000   Order to Pay Expense signed by Judge Gardner on 11/8/00 to
               AVS.     52/433
  11/08/2000   Subpoenas issued to Terry Wood on 10/20/00.  For list,
               see case file.  Returned served on 11/8/00.
  11/08/2000   Subpoenas issued for State on 10/19/00.  For list, see case
               file.  Returned served on 11/8/00.
  11/09/2000   Subpoenas issued for state on 11/9/00.  For list, see case
               file.  Returned served on 11/9/00.
  11/10/2000   Subpoenas issued to Terry Wood on 10/19/00.  For list, see
               case file.  Returned served on 11/10/00.
  11/13/2000   Supplemental Discovery submitted by Ralph Dance, DA's Office
               to Sunny Phillips on 11/10/00.
  11/14/2000   Motion in Limine and To Suppress submitted by Terry Wood on
               11/14/00.
  11/15/2000   Motion to Pay Expense submitted by Jim Pounds in amount of
               $175.00 to Office Pro on 11/15/00.
  11/15/2000   Order to Pay Expense signed by Judge Gardner on 11/15/00 to
               Office Pro in amount of $175.00. 52/467
  11/15/2000   Motion to Pay Expense submitted by Jim Pounds on 11/13/00
               for $50.00 to Office Pro.
  11/15/2000   Order to Pay Expense signed by Judge Gardner on 11/15/00 to
               Office Pro for $50.00.     52/468
  11/16/2000   Jury Instructions filed
  11/17/2000   Jury Instructions filed.
  11/17/2000   Verdict:  "We, the Jury, find the defendant, Michelle Byrom,
               guilty of Capital Murder."
  11/17/2000   Letter to Judge Gardner  from Thomas H. Comer dated 11/14/00
  11/18/2000   Waiver of Sentencing Jury submitted by Arch Bullard,
               Assistant DA, submitted on 11/18/00.

               ** CONTINUED ON NEXT PAGE **

06/28/2001  10:16    6014231667          CIRCUIT CLERK OFFICE          PAGE  12

8    General Docket, Circuit Court, Circuit Clerk
=====================================================================
o. CR99-065                                          CFN    355

ƖATE OF MISSISSIPPI                    COUNSEL FOR PLAINTIFF
           VS.                Archibald Bullard
                                       COUNSEL FOR DEFENDANT
ICHELLE BYROM                 Sunny C. Phillips + Terry Wood
APITAL MURDER
APTIAL MURDER                          97-3-19(2)
=====================================================================
      DATE                    ORDERS, JUDGMENTS, ETC.
-------------------------------------------------------------------
           ** CONTINUED FROM PREVIOUS PAGE **

11/18/2000    Certificate of Counsel submitted by Terry Wood and Sunny
              Phillips, Counsel for Defendant, on 11/18/00.
11/18/2000    Petition for Sentencing Without a Jury submitted by
              Michelle Byrom, Terry Wood, and Sunny Phillips on 11/18/00.
11/18/2000    List of exhibits and exhibits received by Circuit Clerk from
              Court Reporter, Melody Powell, on 11/18/00
11/18/2000    Estimate by Court Reporter of Cost to Prepare Transcript for
              Appeal to MS Supreme Court (Melody Powell) submitted on
              11/18/00.
11/18/2000    Certificate of Mileage submitted by Melody Powell, Court
              Reporter, on 11/18/00.  Signed by Judge Gardner on 11/18/00.
              52/474.
11/18/2000    Motion to Pay Expense submitted by Jim Pounds on 11/18/00
              for $2250.00 to W. Criss Lott, Ph.D.
11/18/2000    Order to Pay Expense signed by Judge Gardner on 11/18/00
              for Dr. Criss Lott.
11/18/2000    Judgment signed by Judge Gardner on 11/18/00.  Found Guilty
              of Capital Murder by Jury.  Defendant remanded to custody
              of Tishomingo County Sheriff to await  the sentencing phase
              of trial.   52/476 -477
11/18/2000    Sentencing Order signed by Judge Gardner on 11/18/00.
11/18/2000    Notice of Criminal Disposition
11/27/2000    Subpoenas issued for  Terry Wood for 11/13/00 at 9 a.m.
              For list of people, see case file.  Returned on 11/27/00.
11/27/2000    Subpoenas issued for State on 10/19/00.  For list of
              people, see case file.  Returned on 11/27/00.
11/27/2000    Subpoenas issued for state on 11/10/00.  For list, see
              case file.  Returned on 11/27/00
11/27/2000    Motion for Judgment of Acquittal Notwithstanding the
              Verdict of the Jury and for New Trial submitted by Terry
              Wood on 11/27/00.
12/19/2000    Motion to Pay Expense submitted by Arch Bullard on 12/15/00
              for $1135.80 to Steven Hayne, M. D.
12/19/2000    Order to Pay Expense signed by Judge Gardner on 12/15/2000
              for Dr. Steven Hayne.    52/547
01/08/2001    Subpoenas issued to Terry Wood for 11/13/00 at 9 a.m. on
              10/20/00.  Returned on 01/08/2001.
01/08/2001    Subpoenas issued for state on 10/19/00 for 11/13/00 at 8:30
              a.m.  For list, see case file.  Returned on 01/08/2001.
01/23/2001    Motion for Approval for Expenses for Psychiarist, Dr. Keith
              Caruso submitted by Terry Wood on 01/23/01.

           ** CONTINUED ON NEXT PAGE **

9    General Docket, Circuit Court, Circuit Clerk
===========================================================================
⊃. CR99-065                                          CFN     355

IATE OF MISSISSIPPI                          COUNSEL FOR PLAINTIFF
             VS.                           Archibald Bullard
                                             COUNSEL FOR DEFENDANT
ICHELLE BYROM                              Sunny C. Phillips + Terry Wood
APITAL MURDER
APTIAL MURDER                                97-3-19(2)
===========================================================================
    DATE                        ORDERS, JUDGMENTS, ETC.
---------------------------------------------------------------------------
               ** CONTINUED FROM PREVIOUS PAGE **

01/24/2001     Petition for Approval of Attorney's Fees for Representation
               of Indigent Defendant submitted by Terry Wood on 01/23/01.
02/01/2001     Order Allowing Attorney Fee For Counsel Appointed to
               Represent Indigent Defendant signed by Judge Gardner on
               01/31/2000 for $18,123.68.   53/46
02/05/2001     Order Allowing Substitution of Copies for Exhibits signed by
               Judge Gardner on 01/31/01.   53/51
02/08/2001     Order Denying Defendant's Motion for Judgment of Acquittal
               Notwithstanding the Verdict of the Jury and For New Trial
               signed by Judge Gardner on 02/07/01.   53/60
02/08/2001     Motion to Pay Expense submitted by Jim Pounds on 02-05-01
               for Mary Margaret Ferguson, Official Circuit Court, Reporter
               for $415.00.
02/08/2001     Order to Pay Expense signed by RIchard D. Bowen on 2/5/01
               for Mary M. Ferguson.   53/59
02/09/2001     Motion to Pay Expense submitted by Arch Bullard on 2/9/01
               for Melody Powell, Official Court Reporter, for $1005.00.
02/12/2001     Order to Pay Expense signed by Richard D. Bowen on 2/9/01
               for Melody Powell.   53/97
02/15/2001     Subpoenas issued for defendant to Sunny Phillips and Terry
               Wood on 10/20/00.  For list, see case file.  Returned on
               2/15/01.
02/15/2001     Acknowledge receipts of allowances for hotel, meals, and
               travel for week of trial, November 13 - 18, 2000.  For list,
               see case file.
03/21/2001     Motion to Re-Open Time for Appeal submitted by Terry Wood
               on 03/20/01  with Exhibits.
03/22/2001     Order Approving Payment for Psychiatrist Services signed by
               Judge Gardner on 3/21/01 to Dr. Keith Caruso.   53/228
03/22/2001     Order Re-Opening Time for Appeal singed by Judge Gardner on
               3/21/01.   53/229
03/22/2001     Notice of Appeal submitted by Terry Wood on 3/22/01.
03/26/2001     Notice of Appeal, letter, docket fee, and other papers
               mailed to Supreme Court Clerk.
03/26/2001     Letter and certified copy of Notice of Appeal to all
               attorneys of record, Judge Gardner, and Court Reporters,
               M. Powell and Mary M. Ferguson.
03/27/2001     Clerk's Estimate for Cost of Appeal
04/04/2001     Designation of the Record submitted by Terry Wood on 4/3/01.
04/16/2001     Letter from Supreme Court Clerk dated 4/10/01 to Terry L.
               Wood, Attorney for defendant.

               ** CONTINUED ON NEXT PAGE **

```
  06/28/2001  10:16   6014231667          CIRCUIT CLERK OFFICE           PAGE  14
```

General Docket, Circuit Court, Circuit Clerk
================================================================================
-065                                                    CFN      355

MISSISSIPPI                          COUNSEL FOR PLAINTIFF
          VS.                  Archibald Bullard
                                     COUNSEL FOR DEFENDANT
BYROM                          Sunny C. Phillips  + Terry Wood
MURDER
MURDER                         97-3-19(2)
================================================================================
DATE                          ORDERS, JUDGMENTS, ETC.
--------------------------------------------------------------------------------
           ** CONTINUED FROM PREVIOUS PAGE **

'20/2001    Court Reporter's Acknowledgment submitted by Melody Powell
            on 4/14/01.
'23/2001    Motion for Leave to Appeal in Forma Pauperis submitted by
            Sunny Phillips on 4/23/01.
'23/2001    Affidavit to Accompany Motion for leave to Appeal in Forma
            Pauperis signed by defendant on 4/12/01.
'24/2001    Court Reporter's Acknowledgement submitted by Mary M.
            Ferguson on 4/23/01.
'15/2001    Order for Leave to Appeal in Forma Pauperis signed by
            Judge Gardner on 5/8/01.   53/553
'18/2001    Invoice for cost of appeal from Court Report Mary Margaret
            Ferguson dated 5/18/01.
'18/2001    Invoice for cost of appeal from Court Reporter Melody Powell
            dated 5/18/01.
'18/2001    Notice of Completion of Appeal from Court Reporter.
'31/2001    Motion to Pay Expenses
'31/2001    Order to Pay Expenses
            53 578
'31/2001    Itemized Statement for Compensation & Expenses of Court-
            Appointed Counsel
            53/579-580
'12/2001    Circuit Clerk's Notice of Completion of Appeal to Attorneys
            and Supreme Court.
12/2001     Clerk's Cost Bill
12/2001     Clerk's Final Cost of Appeal.
12/2001     Clerk's Certificate.
```

# EXHIBIT 33

**Mark McDonald Authentication of Records**

### IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

### AUTHENTICATION OF TRIAL COUNSEL'S RECORDS

I, Mark R. McDonald, do declare as follows:

1.  I am a member of the State Bar of California (Bar No. 137001) and a partner of the law firm of Morrison & Foerster, LLP, counsel of record for Petitioner Thomas Edwin Loden. I make this declaration on personal knowledge. If called as a witness herein, I could and would testify competently to the matters set forth below. I file this declaration in support of Mr. Loden's Petition for Post Conviction Relief.

2.  In connection with the above matter, Loden's prior counsel sent me Loden's case files containing attorney work product, discovery materials, court documents and other records kept by Attorneys David Daniels and James Johnstone in the course of their representation of Loden.

3.  These records include the Handwritten Notes of Attorneys Johnstone and Daniels, a fax from Katrina Loden dated 10/28/00, and the docket of Michelle Byrom attached hereto as Exhibits 25, 31 and 32 respectively.

4.  These records also contained the investigation notes and a report of an interview of Katrina Loden conducted by Herb Wells attached hereto as Exhibit 26.

5. These records also contained the Report and Expense Report and Invoice of Dr. Gerald O'Brien attached hereto as Exhibit 29.

6. The records contained the discovery materials provided by the State to Attorneys Johnstone and Daniels, attached hereto as Exhibit 28.

7. The records contained letters writeen by Loden to his attorneys and Herb Wells, attached hereto as Exhibit 30.

8. In the course of conducting a mitigation investigation of this case, I have been provided with Criminal Background records for Bill Brown, Jr., Sonia Brown, Anita Ritchey, attached hereto as Exhibit 23.

FURTHER AFFIANT SAYETH NOT.

MARK R. MCDONALD

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

Subscribed and sworn to before me on this 5th day of December, 2008, by ___Mark R. McDonald___, who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _Melissa M. Mendoza_ (seal)



# EXHIBIT 34

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF HERB WELLS

State of Mississippi
Lee County

I, Herb Wells, do declare as follows:

1.      I am a former police officer and have performed a number of investigations into

issues of guilt or innocence in connection with criminal defense matters.

2.      On or about March 7, 2001, I learned that the trial court had authorized funds for

Thomas Loden's attorneys to retain an investigator and that attorney David Daniels

wanted to hire me as an investigator.

3.      The primary focus of my investigation was to gather facts and information related to

Mr. Loden's crime.  Pursuant to this task, I was to review the discovery provided to

me by counsel and follow up on any requests made of me by attorney David Daniels.

4.      Attached hereto is a true and correct copy of my investigation notes that show the

time I incurred on this matter and the witnesses I interviewed in connection to Mr.

Loden's case.

5.  The above referenced investigation notes accurately set out the witnesses I interviewed in connection with this matter. I frequently discussed the location and identity of any potential witnesses with Attorney Daniels.

6.  In the course of my investigation, Mr. Loden contacted me several times in writing, requesting that I provide him with certain discovery documents and copies of my investigation interview notes. I contacted attorney Daniels and informed him of Mr. Loden's requests. Mr. Loden was concerned about the lack of lack of security in Itawamba County Jail so, at his request, I did not personally provide Mr. Loden with my investigation notes or copies of any discovery material in my possession.

7.  I was not aware that Attorneys Daniels and Johnstone had filed a motion for funds to hire a mitigation expert, or that the Circuit Court denied that motion. Daniels and Johnstone never asked me to conduct a "mitigation" investigation. I have never conducted a purely mitigation investigation, however, I obtained information in this case about Mr. Loden's family background, his childhood and youth, that he had been physically and sexually abused, the problems he had in his personal life and his military experiences. I discussed this information with Attorney Daniels.

8.  The penalty phase of my investigation had not begun prior to Mr. Loden's plea and the penalty phase was not discussed at that stage with Attorney Daniels.

9.  I served subpoenas on several witnesses in this matter on June 18, 2001 but I do not recall if this was in connection to trial or the suppression hearing in the case.

10. After the suppression motions were decided on or about June 27, 2001, I spoke to Attorney Daniels three additional times. I do not recall the content of our conversations.

11.     On September 20, 2001, I received a call from Mr. Loden's mother who told me that

she learned there was a hearing scheduled for the next day at which Mr. Loden would

plead guilty.  That is the first I have heard that Mr. Loden was considering pleading

guilty.


FURTHER AFFIANT SAYETH NOT.

_____
HERB WELLS

Subscribed and sworn to before me on this __3rd__ day of December, 2008,
by _____Herb Wells_____, who proved to me on the basis of
satisfactory evidence to be the person(s) who appeared before me.
Joyce  R  Loftin,  Circuit Clerk, Lee Co, MS
Signature: by: Darla F. Moses, d.c.    (seal)

- 3 -

ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

### INVESTIGATION CASE REFERENCE

INVESTIGATOR <u>Herb Wells</u>                OUR #<u> 21049</u>
RE:<u> State of Mississippi vs. Thomas Edwin Loden, Jr.</u>
<u>    Itawamba County Circuit Court No.:CR00-068    </u>

### CONFIDENTIAL INVESTIGATION NOTES

**March 8, 2001 Thursday:**
04:30 PM   Picked up copy of the order from Attorney David Daniels.

**March 28, 2001 Wednesday:**
02:30 PM   Departed in route to the Highway Patrol station, New
           Albany, Mississippi.  With Attorney James Johnston and
           David Daniels in New Albany and the Highway Patrol
           Investigator Rick Marr re: viewing Loden file.  We then
           adjourned to Attorney James Johnston's office in Pontotoc
           re: trial preparation.
05:45 PM   Secured.  Miles 71.

**March 29, 2001 Thursday:**
07:00 AM   Information investigation re: trial preparation re:
           Thomas E. Loden.
07:30 AM   Trial preparation.
08:30 AM   Secured.

09:35 AM   Departed in route to meet with Attorney David Daniels.
12:45 PM   Secured.  Miles 18.

**April 4, 2001 Wednesday:**
09:00 AM   Telephone call to Stella Renick at ███████████ set up
           meeting at this time.  I then departed in route to meet
           with her.  Met with Stella Renick.
01:30 PM   Secured.  Miles 62.

**April 9, 2001 Monday:**
09:00 AM   Telephone call to Bobby Christian re: trial preparation.

11:15 AM   By telephone with David Daniels, trial preparation
           seeking information on second wife.  After talking with
           David I stopped in his office, met with Jeannie, picked
           up some documents requested and left off documents
           concerning my interview with Stella.
11:55 AM   Left David Daniels office.
12:35 PM   Received a call from Bobby Christian requesting we change
           the appointment to Friday in order for her to have an
           opportunity to get some more documents in.

---

**April 10, 2001 Tuesday:**
09:00 AM   Trial preparation re: discovery evaluation.
12:00 PM   Secured.

---

**April 12, 2001 Thursday:**
10:00 AM   Talked with Bobby Christian, ███████████  set up meeting
           for 1:00 p.m. on 04/13/2001.

---

**April 13, 2001 Friday:**
12:40 PM   Departed in route to ████████████  re: Bobby Christian.
           Met with Bobby Christian, ███████████, Tupelo, MS
           38801, telephone number ████████████. Picked up
           information she had concerning Eddie in the Marines.
           Delivered them to Attorney David Daniels office.
02:45 PM   Secured. Miles 18.

---

**April 16, 2001 Monday:**
11:00 AM   Telephone call to Attorney David Daniels office, not
           available at this time, left message for him to call me
           back.

---

**April 17, 2001 Tuesday:**
09:45 AM   Returned a call to Bobby Christian, 662-844-3970.
           Advised she had received certain documents in concerning
           Eddie and requested I call her back in the morning and
           set up appointment.

---

**April 18, 2001 Wednesday:**
10:40 AM   Met with David Daniels re: trial preparation. Requested
           subpoenas for venue, interview housekeepers and time
           table.
11:50 AM   Secured.

---

**April 19, 2001 Thursday:**
08:00 AM   Met with Bobby Christian, picked up documents, also
           information on Joy Gibo. Delivered documents to Jeannie
           at David Daniels office.
10:45 AM   Secured.

01:15 PM   Departed in route to Attorney David Daniels office re:
           venue investigation. Met with Jeannie, talked with David
           by phone re: subpoenas. In route to Itawamba County
           Circuit Clerk's office. Subpoenas issued, Itawamba
           County.
02:50 PM   Served Sandra Newton, Itawamba County Times.
03:25 PM   Served Judy Campbell, Northeast Mississippi Daily
           Journal.
03:50 PM   Served Terry Abernathy, Channel 4, WCBI.

```
04:45 PM   Served Terry Smith, WTVA Channel 9.
05:00 PM   Secured.  Miles 72.
```

**April 20, 2001 Friday:**
```
09:00 AM   Trial preparation re: time table.
12:00 PM   Secured.

01:30 PM   Departed in route to Attorney David Daniels office.  Met
           with Attorney David Daniels.  Proceeded with Attorney
           David Daniels to Fulton, met with Thomas Loden.
05:10 PM   Secured.  Miles 18.
```

**April 23, 2001 Monday:**
```
10:30 AM   Departed in route to the Daily Journal re: subpoena.
           Picked up newspaper articles from the Daily Journal.
           Cost of copies $5.00.  Checked TV4, Terry Abernathy not
           in at this time.  Picked up subpoenaed information from
           WTVA Channel 9.
01:15 PM   Secured.  Miles 27.
```

**April 24, 2001 Tuesday:**
```
10:25 AM   Received a call from Attorney David Daniels re: status of
           venue and medical authorization re: Rena Loden, advised
           of same.  Departed in route to Rena Loden residence.
           Medical authorization release X'ed and witnessed by her
           daughter, and by myself.  Served Melissa Shackleford at
           IMA, Custodian of Records for Dr. Flowers.  Picked up
           subpoenaed information from Channel 4.  Delivered all
           venue information along with a copy of the medical
           release to Attorney David Daniels.  David not in at this
           time, left off information with Jeannie.  Departed to
           copy video tapes.  Met with Attorney David Daniels re:
           trial preparation.
04:10 PM   Secured.  Miles 79.
```

**April 25, 2001 Wednesday:**
```
12:00 PM   Departed in route to Itawamba County Circuit Clerk's
           office.  Delivered return for subpoena duces tecum for
           Dr. Alan Flowers.
01:45 PM   Secured.
```

**April 26, 2001 Thursday:**
```
12:00 PM   Picked up requested copies.
```

**April 30, 2001 Monday:**
```
12:30 PM   Trial preparation re: time table.
03:20 PM   Called David Daniels office, not in, left message.
           Secured.
```

---

**May 1, 2001 Tuesday:**
01:00 PM   Met with David Daniels.
01:45 PM   Secured.

---

**May 2, 2001 Wednesday:**
10:45 AM   Left off the invoice for the WTVA Channel 9 tape with
           Jeannie at Attorney David Daniels office.

03:00 PM   Departed in route to Joyce Brewer's residence.
           Information provided from Stella as Joyce Brewer's
           residence ███████ ████████, Fulton, Itawamba County,
           Mississippi.
03:50 PM   At█████████████.
05:00 PM   Called Margaret Gassaway at ██████████, a lady answered
           the phone and identified herself as her daughter Marsha,
           advised that Margaret was at the doctor's office and did
           not know for sure what time she would be in this date.
           I told her that I would call back later.
05:05 PM   Secured my interview with Joyce Brewer, tag number MM4
           016 in drive.  Advised that she is putting the house up
           for sale, going to be moving to Hamilton, Alabama,
           getting married to someone in Alabama.
06:00 PM   Secured.  Miles 71.

---

**May 3, 2001 Thursday:**
09:15 AM   Telephone call to Margaret Gassaway, ███████████████
           advised she would meet with me at this time.  Departed in
           route to her address, ████████ ███████ Itawamba
           County.  Written statement by Margaret Gassaway.
11:15 AM   Gary and Lynn O'Neal, Pastor at Greenwood Baptist Church,
           no one home at this time. ████████████████████████████
           1st house on the left off of Dorsey.
11:45 AM   Secured.  Miles 47.

---

**May 4, 2001 Friday:**
08:30 AM   Commenced trial preparation re: time table interview
           reports.
10:30 AM   Secured.

---

**May 10, 2001 Thursday:**
02:15 PM   Met with Attorney David Daniels at the Lee County Justice
           Center re: trial preparation.

---

**May 13, 2001 Sunday:**
08:30 AM   Received a letter from Tom Loden.

---

**May 14, 2001 Monday:**
10:30 AM   Called David Daniels re: this letter at ██████████.

David not in at this time, left message for him to return my call....

**May 15, 2001 Tuesday:**
08:50 AM  Called Attorney David Daniels office, not in, left message on the answering machine.

11:45 AM  Met with Attorneys Jim Johnston and David Daniels re: trial preparation. Set up meeting 2:00 p.m. this date with Attorney David Daniels.

01:45 PM  Departed in route to Attorney David Daniels office re: trial preparation. Met with Attorney David Daniels re: trial preparation. Also David Daniels called Katrina Loden, ██████████, requested I call her Monday or Tuesday afternoon to go to Jackson and meet with her. Departed to Fulton to meet with Tom Loden. Met with Tom Loden, Itawamba County Jail.
05:50 PM  Secured. Miles 59.

**May 16, 2001 Wednesday:**
09:20 AM  At Attorney David Daniels office, David not in, left message for him to call me.

11:15 AM  Received a call from David Daniels re: status and trial preparation. Requested I attempt to locate Joy.

**May 22, 2001 Tuesday:**
11:15 AM  Met with Attorney David Daniels re: witness list. Requested I attempt to locate and interview the second wife.

03:35 PM  Attorney David Daniels office. Met with Attorney David Daniels re: trial preparation. Received a subpoena for Katrina Loden.
04:50 PM  Secured. Miles 18.

08:00 PM  Information investigation on Joy Loden. $95.00.

**May 24, 2001 Thursday:**
03:10 PM  Telephone call to Katrina Loden, set up appointment May 30th at 2:00 p.m. her office. Called Attorney David Daniels office and advised Jeannie of meeting.

**May 25, 2001 Friday:**
11:20 AM  Telephone call to Attorney David Daniels office re: scheduled trip for Jackson. Also advised of the requested additional funds.

**May 29, 2001 Tuesday:**
12:30 PM  Met with Attorney David Daniels re: trial preparation, re: Katrina Loden and re: Tom Loden's request.

04:30 PM  Received a call from Attorney David Daniels authorizing additional funds for investigation re: this matter.

**May 30, 2001 Wednesday:**
09:00 AM  Departed in route to meet with Tom Loden, Itawamba County. Met with Tom Loden. Then to Jackson to meet with Katrina Loden.
02:00 PM  Met with Kat Loden and Jim Craig. Also served subpoena and picked up copy of records for the Marines information. Copies $58.00 paid by cash.
03:30 PM  Secured meeting.
07:25 PM  Secured. Miles 443.

**June 5, 2001 Tuesday:**
09:45 AM  Met with Attorney David Daniels, delivered all correspondence, medical records and report.
11:00 AM  Secured.

**June 15, 2001 Friday:**
03:45 PM  Telephone call with Attorney David Daniels re: trial preparation and subpoenas.

**June 18, 2001 Monday:**
11:15 AM  Attorney David Daniels office re: trial preparation and picked up subpoenas to be issued in Itawamba County. In Itawamba County Circuit Clerk's Office, Subpoenas issued for Kat Loden, Joyce Brewer, Margaret Gasaway, Gary O'Neal, Stella Renick, and Rena Loden. I then met with Tom Loden at the Itawamba County Sheriff's Department, delivered discovery requested from Attorney David Daniels office. All of the noted above were served personally except for Rena Loden, due to health, Stella Renick accepted on her behalf. Kat Loden lives in Jackson.
06:30 PM  Arrived at my office, called Bobby Christian and Anita Ritchey re: trial preparation.
07:00 PM  Secured. Miles 71.

**June 19, 2001 Tuesday:**
09:30 AM  Attorney David Daniels, trial preparation meeting, requested cancel Kat's subpoena and to issue and serve subpoena to Anita Ritchey.
11:30 AM  Secured. Miles 18.

**June 20, 2001 Wednesday:**
10:00 AM   Departed in route to Attorney David Daniels office.  With
           Attorney David Daniels, re: interviewing witnesses and
           also issuing and serving subpoena to Anita Richey.  Also
           served Rena Loden personally.

**June 21, 2001 Thursday:**
11:25 AM   Received a call from Attorney David Daniels' office
           advising to send subpoena to Katrina Loden.  Check to
           process server Cynthia Longino $50.00 for rush serve and
           sent Fed-Ex.

03:00 PM   Called Margaret Gassaway, ███████████, requested she
           contact Stella and have her help with taking care of Ms.
           Loden while she testifies in the motions on the 26th.
           She was very cooperative and insinuated she would call
           Stella to work something out.  I then departed in route
           to Fed-Ex re: sending subpoena to process server in
           Jackson.  Fed-Ex to Ridgeland and back, $36.00.
04:00 PM   Secured.  Miles 20.

**June 22, 2001 Friday:**
11:20 AM   Telephone call to ███████████ spoke to Mr. Gassaway.
           Advised that Stella and Margaret had something worked out
           to where she could stay with Ms. Loden while Stella
           testified Tuesday morning for the hearing.

**June 25, 2001 Monday:**
10:30 AM   Telephone call to David Daniels' office, re: motions for
           06/26 hearing.

**June 26, 2001 Tuesday:**
10:00 AM   Received process return from Katrina Loden process.

01:00 PM   Delivered return to Attorney David Daniels' office.

**July 9, 2001 Monday:**
09:50 AM   Received a call from Bobby Christian requesting I meet
           with her concerning some issues involving this matter.

11:00 AM   Talked with Bobby Christian at her residence.  Her
           granddaughter Charlie was home.  Talked with her re: her
           concerns of legal representation.  I suggest that with
           the legal area of concern she had that she contact her
           Attorney for assistance and she advised me she would
           contact Ed DePriest.
11:55 AM   Secured.

03:10 PM  Called Attorney David Daniels, not available at this time, left message.

**July 28, 2001 Saturday:**

02:00 PM  Spoke by phone with David Daniels.  This trial has been continued until October 8, 2001.

Herb Wells, CLI, LCI, MCI
*Certified Legal Investigator*
Herb Wells & Associates, Inc.

# EXHIBIT 35-A

Mr. Johnstone,                                    Thursday 2 Feb 2001

     I just wanted to write a quick letter and tell you how much that I do appreciate you taking the time out of your schedule to come and to speak with me. I know or can imagine just how busy that you must be. Thank-you.

     I hope that I'm not bothering you or asking to many questions, for I do not desire to burden you any more than you are already. It is just that I desire or need to know a few things to be better able to make a decession on a few things, including my up-coming divorce.

     I've a lawyer, on stand-by only, for the divorce if needed. I do hope it will not cause any problems for me, with your services.

     What I really need to know, if you can provide me a copy of all the interviews that are contain in the "discovery" material. Some might be useful to me in divorce proceedings. If you could do this at the earliest possible time, would be greatly appreciated, as Kat has informed me in letter that she already has a temporary hearing scheduled. She did not inform me as to when it is.

     I ask this only for the impact

that it could have on me for my daughter. She is all I have left. Please.

If you could mail it to me, or even I could have my mother pick it up for me (if allowed), I do not want to ask you to take time out of your schedule to drop it by for me.

Our next visit, as something has occured to me, I'd like to speak to you of the "interview" with the state police. It might or might not be of assistance, I just question a few things the more I think about it.

Thank you for you assistance in this matter, I again am sorry to be a burden to you, but the divorce and what is in it about my daughter is truely important to me. I hope you can understand.

Sincerely,

P.S. - If you would, or do contact my military lawyer, would you inform me of what is going on with this. Thank you.

Mr. Johnstone,

Sorry to bother you any farther, its just that something is on my mind, and I can't stop thinking about it. I've written Ms. Daniels of it as well.

Its the fact that the DA has released information to Jim Craig. I never have had him as a lawyer retained by me.

Additionaly, is the fact that he is deeply involved in the case itself. He has a vested interest in the case, what is said, and its outcome. (The fact that he doesn't want it to be known he was fooling around with my wife, or of the impact the phone conversation about him the night this happened with the wife, I had) It'd cause him and the firm alot of major embarassment.

I'll not say I know a great deal of law, or the legal system, I don't.

But this seems a major in-justance to me.

It compromised my entire case. It has even had or is going to have an effect on my divorce. He just "happens" to be Kat's lawyer for this, as you already know.

I just don't think it was very ethical for the DA to do this, and is a gross neglance for telling or speaking of anything to him. Sorry, I'm upset.

But am I right?

Would you check over this for me? I'd really like to know why the DA did this and what he has to say of it.

As I said, I'm sorry I'm upset. Its just that the information given to Craig has had an impact on me, my relationship with my wife, and in the divorce, might cost me my only daughter. Can you blame me for being upset?

If you feel this isn't right, or if it could have any impact on my case, I have a couple of people who know Craig has spoken to the DA and gotten information. I've also a letter or two somewhere from Kat that tells of this as well.

Its just not right to me.

Please, let me know about this, if I'm right about it, or just "loosing it". Would you call me or visit (if possible) to let me know.

Thank-you.

# EXHIBIT 35-B

Mr Daniels,                                    (pm) Wed 7 Feb

I'm again sorry to be a bother, but I'm afraid the previous three letters I've sent to you went to a wrong address.

I was told originally it was ████████████ now I hear its ███████████ I've asked my mother to confirm the correct address, as well as leave a message that I really need to speak to you at the earliest time you are available.

I'll not make this a long letter, but there is something we need to discuss I covered it in the 3 previous letters, and I'm awful worried if the letters are returned to me here, they will be read (all mine is, I know this for a fact), and they were very private and if read, time sensitive.

Thank you, I do appreciate your effort. I look forward to our meeting, as soon as you are available.

                                    Sincerely,

T. Loden
███████████████████
Fulton MS 38843



TUPELO MS 38801
PM
08 FEB
2008

Mr. Davud J. Daniels
214 North Spring St
Tupelo MS 38801

38801043924

# EXHIBIT 35-C

Sir,                                    17 Feb 2001

I really do not mean to impose on you, I do really understand just how busy you must be.

I was just wondering if it would be possible to speak with you when you do become available. Even a phone conversation would be a great assistance. I just have a few questions that are important to me I'd like to ask of you if possible.

Some questions I do have could play a role in the divorce I am currently going through. Your input and guidance on the questions I do have, would allow me to make a better informed decision on some aspects contained in the divorce itself.

I thank you for your time, and any assistance you may provide.

Sincerely,



Thomas Cedar
fulton MS 38843

TUPELO MS
PM
20 FEB
2001

Mr. David Daniels
204 North Spring St
Tupelo MS 38801

38804/3924

# EXHIBIT 35-D

RECEIV
BY ___ DATE 4/7/01

Mr. Wells,                                          1 April 2001

    Thank you for your time and effort. I hope
you have been able to contact the people you
needed, I have sent word, but haven't heard
back myself yet.

    Oh, as for the "gas station" thing (sorry, I
can't be very specific, as I know all my in-coming
and out-going mail is read), it is in the papers
Mr. Daniels left me. Sorry, we just went over
things several times before the tape was made,
I was just confused. I do see in the statement,
there is at least one part that was omitted.
Could be in the "time-gap" on the tape.

    If you need anything from me, feel free to
ask, I'll cooperate in any way I can.

    Again, thank-you.

                                Shaun E. Jolp



# EXHIBIT 35-E

RECEIVED

Mr. Wells,                                                    Thurs (am)

Sir, I'm sorry to bother you, I know you must be busy, but there is something or actually several things I'd like to discuss with you.

These could be important, as I feel they are, and need to be addressed as soon as possible, as they could effect the discovery deadline that has been set, or even for some motions Mr. Daniels & Johnstone may be working on.

I've attempted but have had no luck in getting to the phone for you, again I'm sorry to be a burden, forgive me please.

Thank you for your assistance thus far.

Also I'm sorry if at the last meeting I rambled or made little sense, I'm just having trouble sleeping for days, and find myself being very paranoid. I'll try to do better, sorry.

But please, if you could, schedule a visit over for these issues.

Thank you,

Sincerely,

Mark Gelp



Herb Wells & Associates
Attn: Herb Wells

Tupelo MS 38802-1012

Tom Loden

Fulton MS 38843

# EXHIBIT 35-F


RECEIVED
5/17/01

Mr. Wells,                                    Wed 15 May 2001

I can't thank you enough for your visit. I have really been struggling lately, the isolation and games had gotten to me so badly. You can't believe the effects of these mind games or the pure isolation has had, my paranoia ran wild.

I'd really appreciate it if you would stop by prior to the trip to see Kat.

If you speak to her before, or if you'd call her just for this, could you try to explain things to her. I'm so worried that my paranoia has effected our relationship (I know I've written some strange letters to her, I regret this so now).

When I spoke to her last time, I got caught totally off guard when she told me the DA had said she'd be called as a "rebuttal witness". I reacted poorly. I'm affraid I didn't understand exactly what it was about or why they asked her "if he's admitted any thing more" to her.

I see now the games being played, pitting her against me, and then trying to get me to become angry at her. It's quite clear to me now it nearly worked.

I humbly beg you to please try to express all of this to her. I've written again, but worried yet. You speaking to her could go a long way for me, please. I hate to ask, but it is this important to me, she is the love of my life, and I hate what this has done.

Also if you'd pass along my appologies to Mr Daniels & Johnstone as well, sorry also for this.

I just haven't handled things very well, sorry.

If I could remind you, could I have a copy

# EXHIBIT 35-G

Mr. Daniels,                                    (am) Wed 23 May 2001

    I know you must be really busy, I'm sorry to bother you again.

    Its just I haven't heard from you in a little while and I understand either Herb Wells or you will be going to speak to my wife, I heard this week, from her.

    I need to see which ever of you that is planning on going before you speak to her.

    There are several specific questions I'd like of you to ask. Her answers will have a major influence on what I decide to do.

    I also request a copy of all the discovery material be given to me, on your next visit here.

    I know there are several hiding things, and lying about some things. My paranoia is getting the best of me now, I'd just like to see in the discovery who has said and done what. The Manner will not even answer my letter or calls now either.

    Have you heard from them, specifically Capt. Chaney? I've no idea as to my status.

    Herb in his last visit here spoke of you having to turn in a list of people to testify, I'd like to speak of this to you, and the discovery might help me determine a few.

    Hope your holiday was nice, I thank you for your time & effort.

    Looking forward to your visit.

                    Sincerely,

                    Tom Loden





TUPELO MS 38801
PM
30 MAY
2001

Mr. David L. Daniels
204 N. Spring St.
Tupelo MS 38801

Tom Loden
Fulton MS 38843

# EXHIBIT 35-H

REC·VED
BY [illegible] DATE 6/11/01

Mr. Webb,

am thurs 7 June

Thanks for speaking to Kat, I'd love to discuss it and some more with you when ever you are available.

I spoke to Mr. Daniels briefly, he's to try to come back he said Sat or Monday, I've so much to question & say. While here, he provided me a copy of your interview with Kat. I just wish it told "how" she reacted, I hope when you come you'll fill me in, its important.

In that I saw and read your comments and have some to expand on this, a little now, more in person. Hope you follow.

Page 2 - 1st notes: both of us and more, I was honest when I told you what they'd be on it, but several used it. I had an "automatic" sign on, anyone could have. More on this in person.

Page 2 - note 2: More in person, but hidden.

Page 2 - note 3: This is what I've said all along, its the truth, I question the dates, not req't. Also "ending" of mine not in the transcript at all, Erased? Then the person I told you about.

Page 2 - last sentence: I still question his involvement and intent.

Divorce papers are being mailed off today to her. She withdrew the original "grounds".

Theres several issues I'd like to speak of if you could come, and a few people you may want to speak with soon, before next motions.

Thanks, I mean it,

Oh, I got Captain Chaney from the Marines more in person on this as well,

Tom Soden





Herb Wells and Associates
Attn: Herb Wells

Tupelo MS 38802-1012

Tom Loden
Fulton MS 38843

# EXHIBIT 35-I

Mr. Daniels,                                    am Thurs 14 June

    Sorry to write again, but I just recieved
my discharge papers from the Marines. It
wasn't as bad as it could have been, I'll fill
you in next meeting, but things are wrong.
    But there are mistakes in it that I need
to address and attempt to fix as soon as
possible with the Marines or the VA. In
order to try for any benefits for my wife
and daughter, I have to correct this.
    I'd like to ask, sorry to impose more than
already, for copies of all my military
records. As I understand from my mother,
she gave you the only copies she had, and
I need a copy now for the VA. Sorry, really.
    Sir, I really hate to bother you for this,
but its for my daughter's benefit I ask.
    If you or Mr Wells could drop these
with the other discovery it'd be appreciated.
    Can any other military documents or even
personell be supeona'd, this is a question I
have before I "step on some toes".
    I do look forward to a visit.
    Thank you.

                                        Sincerely,
                                        Tom Loden

# EXHIBIT 35-J

Mr. Daniels,                                                    Friday 27 July

I do so hope you have gotten my appology
letter, and you can understand a little of how I
feel. I do hate to intrude or impose on you or
Mr Johnstone, truely I do.

Yet there so much I continue to ponder over. I
do profess to be a lawyer, far from it, I just see
things and question. Forgive me this...

The latest is dealing of an issue I've mentioned
already, but diffent as to how it may apply.
Its of my "initial apperance", and a possible
case point of law with it.

As I've written, and as detailed in the
discovery, at the time of the initial apperance, I
was under doctor's orders. These orders said that
due to effects of medication, I shouldn't make
important decisions, and many other things.

My question and legal point is this.

If I wasn't fully in control mentally at the
time, how could I have understood all aspects
of what I was charged with and the possible ram-
afacation?

Point being, if I didn't understand the nature
of the charges, how could I later fully judge
the total effect of the statement I was tricked/
forced into giving?

# EXHIBIT 35-K

Mr. Daniels,                                   pm Sunday.
     There is little else I can say, just
that I need to speak with you or Mr
Johnstone as soon as possible.
     Please.
     I must request this, I am so sorry to
impose, but I must ask.
     I have new information, important news
that I must speak in person to you of.
     I beg you this.
     Thanks.

                              Sincerely,

                              Tom Loden

     - I'll ask to phone you, or for a message
be left that I'm trying to contact you.
               Thank-you

     Either you or Mr Johnstone would be
alright, but I really need to see one of
you if at all possible, please.
          - Thank-you

          -over-

# EXHIBIT 35-L

RECEIVED
BY ____ DATE 8/18/01

Mr. Wells,                                          17. August

Thought I'd drop a few lines to you, as I haven't written in a while. Also I just found a stamp, I'd thought I were out.

I guess you heard about the mess up last week as for the doctor's visit. I fell through the crack, got forgotten. But it went this past Monday.

I'm wondering if you have heard anything back of what you spoke to me of last visit. I'm just curious, and would really like to know of it.

Also, I'm rather concerned about my mother. I've not been given any letters since Tuesday. She writes me everyday, and yesterday was my birth-day. Its not like her. Either that or someone is just purposely holding my mail. I'll ask today, and for a shower, maybe a phone call as well.

If you're not over-loaded with work, I'd appreciate it if you could visit again, if possible.

There is one additional thing I desire to inquire to you about.

Also, I'm afraid I've offered my lawyer's. More on this and the other in person, if you can visit

Thanks for everything, looking forward to a visit.

Sincerely,

Tom Loden



TUPELO, MS 38801
PM
17 JUN 2001

Herb Wells and Associates

Attn: Herb Wells

Tupelo MS 38802-1012

T. Loden

# EXHIBIT 36

## IN THE CIRCUIT COURT OF LEE COUNTY, MISSISSIPPI

STATE OF MISSISSIPPI

VS.                                             CAUSE NO. <u>CR00-068</u>

**THOMAS EDWIN LODEN, JR.**
**DEFENDANT**

<u>ITEMIZED STATEMENT FOR COMPENSATION AND EXPENSES</u>

Pursuant to statutory authority and Wilson v. State, 574 So. 2d 1338 (Miss. 1990), the

undersigned attorney does hereby make a claim for compensation and expenses for representation

in the total amount of Twelve Thousand, Nine Hundred, Seven Dollars and fifty-five cents

($12,907.55), itemized as follows:

**I.     TIME SPENT IN PREPARATION (OUT OF COURT)**

| <u>DATE</u> | <u>DESCRIPTION OF ACTIVITY</u> | <u>HOURS</u> |
|------|-------------------------------|-------|
| 01-09-01 | Conference with Jim Johnstone and<br>Travel time round trip to Pontotoc - 30 miles | 4.0 hrs. |
| 01-11-01 | Conference with Jim Johnstone and Court Administrator | 2.5 hrs. |
| 01-25-01 | Reviewed discovery | 3.0 hrs. |
| 01-29-01 | Reviewed discovery | 3.0 hrs. |
| 01-31-01 | Conference with Court Administrator RE: venue | 1.0 hr. |
| 01-31-01 | Conference with Jim Johnstone and Tom Loden<br>Travel time round trip to Fulton - 60 miles | 2.5 hrs. |
| 02-05-01 | Conference with Jim Johnstone, Drafted Venue Request | 2.5 hrs. |
| 02-14-01 | Located and conferenced with Affiant RE: Venue change | 6.0 hrs. |
| 02-15-01 | Research and review RE: Pretrial Motions | 3.0 hrs. |
| 01-19-01 | Research and review RE: Pretrial Motions | 4.0 hrs. |

| | | |
|---|---|---|
| 02-19-01 | Located and interviewed second affiant RE: venue change; Executed affidavit and Travel time round trip to Fulton - 60 miles | 4.5 hrs. |
| 02-28-01 | Conference with Jim Johnstone RE: Pretrial Motions | 5.0 hrs. |
| 03-01-01 | Motion Research and Preparation | 5.0 hrs. |
| 03-07-01 | Conference with Herb Wells, review of discovery, copied discovery for Herb Wells | 5.0 hrs. |
| 03-14-01 | Conference with Herb Wells and Tom Loden Travel time round trip to Fulton - 60 miles | 3.5 hrs. |
| 03-20-01 | Conference with Clay Joyner and Jim Johnstone | 2.5 hrs |
| 03-21-01 | Inspection/tangible evidence | 4.0 hrs. |
| 03-28-01 | Inspected van, interview with Investigator Marlar Travel time round trip to New Albany - 80 miles | 2.5 hrs. |
| 04-04-01 | Conference with Tom Loden Travel time round trip to Fulton - 60 miles | 2.5 hrs. |
| 04-20-01 | Conference with Tom Loden Travel time round trip to Fulton - 60 miles | 1.5 hrs. |
| 04-06-01 - 04-20-01 | Acquired documents for psychological examination; forwarded to Whitfield | 3.5 hrs. |
| 04-24-01 | Conference with District Attorney, Judge Gardner, and Jim Johnstone; Motion Hearing Preparation | 5.0 hrs. |
| 05-16-01 | Conference with Tom Loden Travel time round trip to Fulton - 60 miles | 1.5 hrs. |
| 05-17-01 | Conference with Military Lawyer, Gregory L. Chaney | 1.5 hrs. |
| 06-05-01 | Conference with Herb Wells RE: Suppression of Evidence | 2.0 hrs. |
| 06-08-01 | Conference with Tom Loden's mother and sister, RE: Suppression of Evidence Travel - 20 miles | 2.5 hrs. |
| 06-18-01 | Conference with Rena Loden, surveyed house and surrounding | 4.0 hrs. |

# EXHIBIT 37

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF THOMAS E. LODEN, JR.

State of Mississippi
Sunflower County

Thomas E. Loden, Jr., first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify. I am incarcerated at Parchman Penitentiary.

2. I have reviewed the State's Response brief where the State argues that it would not have mattered even if Daniels and Johnstone had conducted an adequate mitigation investigation because I would have prevented the introduction of any mitigation investigation. That is not true. I never instructed David Daniels or James Johnstone not to investigate mitigation evidence. To the contrary, I constantly urged them to investigate the case fully, and wrote them dozens of letters to pleading with them to do more work on the case. If Daniels and Johnstone had told me that they had developed mitigation evidence that they were

1

prepared to present, I would definitely have wanted it presented. Counsel did not develop any mitigation evidence as far as they told me.

3. I have read the January 23, 2009 affidavit of David Daniels in which he claims that he conducted a mitigation investigation and, as part of his investigation, he interviewed my mother and sister regarding mitigation evidence.

4. I asked my mother and my sister to speak with Daniels about my living conditions in the jail before trial. They said that they would try to contact Daniels to discuss the jail conditions. My mother then told me that she had spoken to Daniels about the jail conditions, but she did not say that she and Daniels discussed mitigation evidence, or my background. Daniels never told me that he spoke to my mother, my sister, the military or anyone else in an effort to obtain mitigation evidence that could be presented in the penalty phase of trial.

FURTHERMORE AFFIANT SAYETH NOT

THOMAS E. LODEN, JR.

Sworn to and subscribed before me
this 5th day of June 2009.

NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI

2

# EXHIBIT 38

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF BOBBIE CHRISTIAN

State of Mississippi
Lee County

Bobbie Christian, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in Tupelo, Mississippi.

3. I am Thomas Edwin Loden, Jr.'s mother. Like the rest of the family, I call him "Eddie."

4. My meeting with Eddie's attorney, David Daniels, lasted only about 15 to 20 minutes. My daughter Anita was present at this meeting. Mr. Daniels did not meet with me again and did not call with further questions.

5. I never had a meeting with Mr. Daniels in which Sonia Brown, my daughter and Eddie's half-sister, was present.

6. During my meeting with Mr. Daniels, he asked if I thought Eddie was guilty and if I had any information about the crime. I told him that I did not know anything

about the crime and did not know what to say. Mr. Daniels also asked if I was able to visit Eddie in prison.

7. Mr. Daniels never asked about Eddie's family history. Mr. Daniels never asked about Eddie's wives or his daughter, Abby. Mr. Daniels never asked about Eddie's father, stepmother, or grandparents.

8. Mr. Daniels never asked about Eddie's military experience or if I was aware of any psychological problems Eddie had due to his military service.

9. Mr. Daniels never asked me about other witnesses that might be helpful, or for their contact information.

10. Since I submitted my affidavit in support of Eddie's Petition for Post Conviction Relief, I have learned that Mr. Daniels submitted an affidavit declaring that he discussed Eddie's family history and background with Eddie's sister and me. This is not true. I have never had such a conversation with Mr. Daniels.

FURTHERMORE AFFIANT SAYETH NOT



BOBBIE CHRISTIAN

Sworn to and subscribed before me
this 19 day of May 2009.

NOTARY PUBLIC FOR THE
STATE OF MISSISSIPPI

2

# EXHIBIT 39

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF SONIA W. BROWN

State of Mississippi
Lee County

Sonia W. Brown, first being sworn, testifies to the following under oath:

1. I am over 21 years of age, and otherwise competent to testify.

2. I currently reside in ~~Tupelo~~, Mississippi. *Belden*

3. Thomas Edwin Loden ("Eddie") is my half-brother. My parents are Billy Brown, Sr., and Bobbie Christian, Eddie's mother.

4. Eddie's trial attorney, David Daniels, never contacted me to discuss Eddie's family history or background.

5. The only time I came close to speaking with Mr. Daniels was once in court, but Mr. Daniels would not speak with me.

6. Since I submitted my affidavit in support of Eddie's Petition for Post-Conviction Relief, I have learned that Mr. Daniels submitted an affidavit declaring that he

1

# EXHIBIT 40

# IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AUTHENTICATION OF TRIAL COUNSEL'S RECORDS

I, Mark R. McDonald, do declare as follows:

1.  I am a member of the State Bar of California (Bar No. 137001) and a partner of the law firm of Morrison & Foerster, LLP, counsel of record for Petitioner Thomas Edwin Loden. I make this declaration on personal knowledge. If called as a witness herein, I could and would testify competently to the matters set forth below. I file this declaration in support of Mr. Loden's Petition for Post Conviction Relief.

2.  In connection with the above matter, Loden's prior counsel sent me Loden's case files containing attorney work product, discovery materials, court documents and other records kept by Attorneys David Daniels and James Johnstone in the course of their representation of Loden.

3. These records include the letters written by Loden to his trial attorneys and Herb Wells, attached hereto as Exhibit 35.

4. These records also include the timenotes of attorney David Daniels, attached hereto as Exhibit 36.

   Executed this 22nd day of June 2009 at Los Angeles, California.

FURTHER AFFIANT SAYETH NOT.

MARK R. MCDONALD

STATE OF CALIFORNIA                    )
COUNTY OF LOS ANGELES                  )

Subscribed and sworn to before me on this 22nd day of June, 2009, by
_____MARK R. McDONALD_____ who proved to me on the basis of
satisfactory evidence to be the person(s) who appeared before me.

Signature: _Marita Molina Jones_        (seal)



MARITA MOLINA JONES
Commission # 1703063
Notary Public - California
Los Angeles County
My Comm. Expires Nov 4, 2010

# EXHIBIT 41

STATE OF MISSISSIPPI

COUNTY OF LEE

## AFFIDAVIT

Personally appeared before me, the undersigned authority, in and for the State and
County aforesaid, **David Daniels,** who by me first being duly sworn, states under oath the
following:

1.  That I represented the defendant, Thomas Edwin Loden, Jr., on a charge of
    Capital Murder, prior to my becoming employed with the District Attorney's
    Office, which prosecuted the case.

2.  I conducted extensive investigation into the facts of the case, and into mitigation
    factors, which included interviews with my client, military personnel, his family and
    friends.

3.  Much of the factual information about the case I gained through discovery from
    the State.

4.  At no time have I disclosed any of the information I acquired during my
    representation of the defendant, to anyone, including any employees of the Office
    of the District Attorney. Further, I do not intend to ever disclose any information I
    gained during that representation to anyone.

5.  Further, affiant saith not.

Dated, this the 24 day of September, 2003.

DAVID LEE DANIELS,
Assistant District Attorney

Exhibit A1
41

**FILED**

SEP 3 0 2003

Carol Gates, Circuit Clerk
DC

STATE OF MISSISSIPPI

COUNTY OF LEE

        Personally appeared before me, the undersigned authority, in and for the State and

County aforesaid, the above signed **David Daniels**, who, by me first being sworn, did state on his

oath that the facts and circumstances recited in the above **Affidavit** are true and correct to the best

of his belief and knowledge, and that he signed the document on the day and date therein

mentioned.

        This 3rd day of September, 2003.

_Marilyn S Reed_
NOTARY PUBLIC

My Commission Expires:

12-22-06

Exhibit A2

42

FILED

SEP 3 0 2003

Carol Gates, Circuit Clerk
DC

# EXHIBIT 42

IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Case No. 03-090(G)1*

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

## AFFIDAVIT OF MARK R. MCDONALD

I, Mark R. McDonald, do declare as follows:

1. I am a member of the State Bar of California (Bar No. 137001) and a partner of the law firm of Morrison & Foerster LLP, counsel of record for Petitioner Thomas Edwin Loden. I make this declaration on personal knowledge. If called as a witness herein, I could and would testify competently to the matters set forth below. I file this declaration in support of Mr. Loden's Motion for Leave to File Reply to State's Response to Motion for Stay of Post-Conviction Proceedings.

2. I traveled to Mississippi in August 2008 to attempt to meet with attorneys James Johnstone and David Daniels, among others, and to conduct investigation. I was aware of attorney Daniels' prior declaration wherein he stated that he would not speak about this case further but I wanted to at least let him know of our representation of Mr. Loden.

3. I met with attorney Johnstone in his office for approximately an hour on about August 6, 2008. I asked him if he would be willing to execute an affidavit that we could use

la-1016170

1

in support of Mr. Loden's petition for post-conviction relief. Attorney Johnstone said that he would review a draft declaration and execute it if it was accurate.

4. On that same trip to Mississippi in August 2008, I telephoned attorney Daniels to see if he would speak to me. Attorney Daniels did not take the call or return my call. However, while I was in the courthouse reviewing evidence, I walked to the District Attorney's office and asked if attorney Daniels was there. I was told he was not. Later that afternoon while I was reviewing evidence, attorney Daniels came into the room and said that he heard that I was looking for him. I asked attorney Daniels if we could speak privately but he was unwilling to do so. We spoke for approximately 10 minutes in the presence of Lieutenant Mickey Baker, one of the investigating officers, and Stacy Ferraro, our co-counsel. Assistant District Attorney Farris may also have been present. Given that many of the subjects I wanted to discuss with attorney Daniels involved communications between Loden and Daniels, I did not want to discuss those matters in the presence of Mr. Baker and Mr. Farris. Therefore, not only was the conversation very short, it was necessarily narrowly confined in scope. During my conversation with attorney Daniels, he did not indicate in any way that he would be willing to execute an affidavit or do anything that might assist Loden. To the contrary, attorney Daniels told me that he was done with this case and did not want to be involved in it.

5. In about October 23, 2008, our co-counsel, Stacy Ferraro, provided attorney Johnstone with the draft of his affidavit. Attorney Johnstone said that he would review it and get back to Ms. Ferraro or me.

la-1016170

2

6. Thereafter, I made repeated calls to Mr. Johnstone's office but Mr. Johnstone was never available to take my call. Although I left my telephone number on numerous occasions, Mr. Johnstone never called me back.

7. Based on that history, I concluded that attorney Johnstone was not going to execute an affidavit. Attorney Daniels had already indicated he would not execute an affidavit. We therefore prepared and filed a motion seeking to take the deposition of attorneys Johnstone and Daniels, which was filed on December 4, 2008. Loden's Petition was due on December 8, 2008.

8. On Friday, December 5, 2008, attorney Johnstone telephoned me. He said that he had reviewed the draft affidavit. We went over the affidavit, I made a few changes he requested, and I sent the revised affidavit to him later that afternoon.

9. On Monday, December 8, 2008, attorney Johnstone returned the executed affidavit to me and we were able to file his affidavit that day with Mr. Loden's Petition.

FURTHER AFFIANT SAYETH NOT.

MARK R. MCDONALD

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

Subscribed and sworn to before me on this _12th_ day of February, 2009, by _Mark R. McDonald_, who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _Melissa M. Mendoza_ (seal)

MELISSA M. MENDOZA
Commission # 1706887
Notary Public - California
Los Angeles County
My Comm. Expires Nov 21, 2010

la-1016170

3

# EXHIBIT 43

1    IN THE CIRCUIT COURT OF ITAWAMBA COUNTY, MISSISSIPPI

2

3   THOMAS LODEN                                    PLAINTIFF

4   VERSUS                              CAUSE NO. CV03-090

5   STATE OF MISSISSIPPI                            DEFENDANT

6   _____

7   TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE HEARING

8   IN THE ABOVE-STYLED AND NUMBERED CAUSE, BEFORE THE

9   HONORABLE THOMAS J. GARDNER III, CIRCUIT JUDGE, FIRST

10  JUDICIAL DISTRICT OF MISSISSIPPI, IN THE LEE COUNTY

11  COURTHOUSE ON THE 20TH DAY OF APRIL, 2009.

12  _____

13  _____

14  APPEARANCES:

15

16       Present and Representing the Defendant:

17            HONORABLE GLENN S. SWARTZFAGER
              HONORABLE STACY FERRARO
18            The Mississippi Office of
                 Capital Post-Conviction Counsel
19            Post Office Box 23786
              Jackson, Mississippi  39225
20

21       Present and Representing the State of Mississippi:

22            HONORABLE DENNIS H. FARRIS
              District Attorney
23            Post Office Box 7237
              Tupelo, Mississippi  38802
24

25            HONORABLE (SONNY) MARVIN WHITE
              Office of the Attorney General
26            Post Office Box 220
              Jackson, Mississippi  39205-0220
27

28

29

1      **THE COURT:** So I'll understand exactly what

2      we're going to do here about the Loden matter --

3      first of all, Mr. Loden is not with us. And

4      I'll read to you what my docket says, and you

5      tell me what that means: Hearing on motion to

6      protect petitioner's right to due process of law

7      and to a full, fair, and effective

8      post-conviction process, number one; for

9      discovery of all communications between the

10     Court or Court personnel and State officials or

11     attorneys; and for a protective order regarding

12     Mr. Loden's private mental health information;

13     and production of the complete State hospital

14     file to you, counsel for the petitioner, and

15     other relief.

16        What does this first thing mean, due

17     process, full, fair, and effective -- I don't

18     know that there is any intent to deprive him of

19     that, but what specifically do you want me to

20     do?

21      **MR. SWARTZFAGER:** Well, Your Honor, there's

22     two things. Do you want me to approach?

23      **THE COURT:** You can stand right there will

24     be fine.

25      **MR. SWARTZFAGER:** Thank you, Your Honor.

26     On that one, what we're seeking are two things.

27     Is there was some kind of communication between

28     Mr. White and the Court, and we don't know

29     exactly how that took place, what it is. We'd

like to know how that came about.

And the other thing is some of this has been mooted out since it's been filed, is there were, we feel, records obtained by the State, and we believe due process requires that we be allowed to see exactly what the State did get from Whitfield in that sense.

THE COURT: What does that have to do with his having been convicted and sentenced?

MR. WHITE: I have no problem, Your Honor, with letting them see what I got from Whitfield.

THE COURT: That's fine.

MR. WHITE: It's Exhibit No. -- exhibit to their post-conviction petition.

THE COURT: Well, is that an extra copy they can have?

MR. WHITE: Well, no, this is the only copy I have. I have not made any copies of it. After I discovered --

THE COURT: Why don't we, here in just a minute, you can look at it. While we're doing something else, you can look at that and see what that is.

MR. SWARTZFAGER: Yes, sir.

THE COURT: And as far as communication goes, we'll make that -- I will tell you exactly what the circumstance is.

Protective order having to do with private mental health information. I assume you are

1    asking that I enjoin everyone from looking at

2    it, using it, or talking about it.

3         MR. SWARTZFAGER:  Well, Your Honor, I

4    believe at this point the State has gotten ahold

5    of it, and it was filed prior to that.  And we

6    wanted to ensure that it was obtained in a fair

7    and proper manner, according to due process, so

8    we could see what happened.

9         But in any event, it appears Mr. White has

10   got it.  If we can inspect that, it may resolve

11   all that, with the exception of the ex parte

12   communication.

13        THE COURT:  I've got another case ahead of

14   you, and I'm going to -- at least we're getting

15   a starting point here.

16        And for you to receive the complete State

17   hospital file.  Of course, I have no objection.

18   There's not a problem with me with that.  I

19   assume they would turn it over to you.  Maybe

20   they will require something, but that's between

21   you and them, as far as I'm concerned.  Or I'll

22   order it if you wish me to.

23        MR. SWARTZFAGER:  Yes, sir.

24        THE COURT:  And other relief.

25        MR. SWARTZFAGER:  I think we've covered

26   everything, Your Honor.

27        THE COURT:  All right.  Well, why don't

28   you -- I was trying to think what's available.

29   There are some witness rooms.  If you want to

5

1     just step out and find one of these witness

2     rooms and look at that, I'll be -- I don't think

3     this is going to take very long, the other

4     matter I'm talking about that is before you on

5     the docket.

6         MR. SWARTZFAGER:  Yes, sir.

7         THE COURT:  I don't think that's going to

8     take long.

9         (BRIEF RECESS.)

10        MR. SWARTZFAGER:  I'm giving you everything

11     back.

12        THE COURT:  Now, let's -- I think that you

13     have now seen and examined what was obtained by

14     the attorney general's office from the --

15        MR. SWARTZFAGER:  That's correct, Your

16     Honor.

17        THE COURT:  -- from the State hospital.

18        Now, I suppose that the other part of that

19     question is, how did that come to be?

20        MR. SWARTZFAGER:  Yes, sir.

21        THE COURT:  All right.  I'll tell you.

22        MR. SWARTZFAGER:  Thank you, sir.

23        THE COURT:  At the request of Mr. White,

24     who asked me if he could have access to those, I

25     wrote a letter to the Mississippi State Hospital

26     asking them to provide him with that.  And

27     that's how it happened.

28        MR. SWARTZFAGER:  Yes, sir.  And part of

29     the motion is, what we would ask is that on

1   anything like -- I don't think there is going to

2   be anything in the future in this case, but

3   should there be, that we're entitled to notice

4   of those sorts of things, Your Honor.

5       THE COURT:  Well, and my candor may be --

6   I'm not sure.  But my opinion about this is,

7   with the history of this case -- and bear in

8   mind, I've been with it from pretty early on.

9   And I'm aware that your client underwent an

10  evaluation, and that at that point there was a

11  considerable amount of information flowing

12  around about his then and present mental state,

13  all of which were in the hands of the State and

14  the defendant, I thought.

15      In any event, there is authority in this

16  state for the waiving of any privilege that

17  might exist in matters of that nature based on

18  the commission of a heinous offense.

19      And I, for the life of me, cannot

20  understand how you could stand on two feet with

21  a straight face and argue that this somehow has

22  any bad result as to your client.  He has

23  been -- he waived the trial, pled guilty, and at

24  a sentencing hearing was sentenced.  And I knew

25  all about him.  I had had the benefit of all of

26  the information you've probably seen.

27      MR. SWARTZFAGER:  Yes, sir.

28      THE COURT:  I would think you had.  So do

29  you have any specific questions for me or

7

Mr. White, I assume?

    MR. SWARTZFAGER:  Well, I think it's --
again, I think that's -- you know, maybe put on
the record as to what happened.  And again is,
what we're saying is, you know, when someone
asks the Court for relief, the other side is
entitled to notice, to respond or not, Your
Honor.  That's all we're asking is if in the
future there is anything, we be given any sort
of notice on that.

    THE COURT:  Tell me, did you not have this
information?

    MR. SWARTZFAGER:  Yes, sir, we did.  But
there was a communication between Mr. White and
the Court.

    THE COURT:  Oh, I understand that.  I
understand you are trying to make a mountain out
of a mole hill.

    MR. SWARTZFAGER:  No, sir, I'm not trying
to make a mountain out of a mole hill, but I
think we're entitled to notice under the
constitution and the rules of the court.

    THE COURT:  I quite candidly told you.  You
now know.

    MR. SWARTZFAGER:  Yes, sir.  And all we're
asking is in the future that we be given notice
on anything.

    THE COURT:  As a matter of fact, as
evidence of the fact that I didn't consider it

to be of any great significance, the very day
that I signed it, I had a copy of it sent to
you.  If I was trying to conceal anything from
you or act in any derogation of any right your
client had, I would, don't you think, have not
done that?

MR. SWARTZFAGER:  We're not suggesting that
the Court was trying to conceal anything, Your
Honor.  All we're asking is that the rules be
followed.

THE COURT:  I am amazed that the State
didn't have all that.  I felt that they did have
it, because all of that was kind of freely
available during all of the discovery going on,
and I really thought that it might be in the
DA's office here.  But nevertheless, you now
know.

Yes, sir?

MR. WHITE:  If I just may add this:  I
apologize to the Court for putting you in this
position.  I'm -- of course, I was making the
request based on this Court's order sending him
for a mental examination, which instructed that
the report be sent to the district attorney, to
you, and to defense counsel.

When I called, because we are the successor
in interest of the district attorney in this
case, I called Whitfield and asked for the
report.  Dr. McMichael said he did not feel

1   comfortable since I was not specifically listed

2   in the order.  And I probably could have called

3   Johnny, and he could have made the call because

4   he is the district attorney.

5       I called you, and you sent the letter.

6   That's all that happened.  And I don't think

7   this is a matter of discovery because it was

8   already -- the State was already entitled to it

9   by your original order.

10      THE COURT:  And this is what I was saying

11   while ago.  I thought this was information

12   everybody had, and I was kind of amazed that the

13   attorney general's office didn't have a copy of

14   it.  You know, I did not in any way feel that I

15   was violating any confidence or any right that

16   the defendant had.  I try to be very careful

17   about that, Counsel.

18      So any -- do you have any other questions

19   about it?  While we're here, let's --

20      MR. SWARTZFAGER:  No, sir.  I think it's

21   resolved.

22      THE COURT:  You know.

23      Now, protective order regarding Mr. Loden's

24   private mental health information.  Tell me

25   what -- specifically, what do you intend by

26   this?

27      MR. SWARTZFAGER:  Well, Your Honor, let me

28   say this:  I think what we've done by seeing

29   what the State has gotten -- because the

1   information was disclosed.  We filed it before

2   the information -- Whitfield gave the

3   information to Mr. White.  It's been given.  I

4   think that's moot.

5           I think any relief that we were asking for

6   in the motion, the Court has addressed in that

7   motion.  And I don't believe there is

8   anything -- any other issues in that motion that

9   we wish to present to the Court.

10          **THE COURT:**  All right.  Very well, then.

11          And production of the complete State

12  hospital file.  You don't have that?

13          **MR. SWARTZFAGER:**  There is some raw data,

14  or should be, correct me if I'm wrong, on the

15  psychological testing.  I don't believe the

16  State has it either.

17          **MR. WHITE:**  No, they won't give you the raw

18  data.  It's unethical for them to provide an

19  attorney with the raw data, although some

20  psychologists, some of the people they've hired,

21  have done so, which we'll bring up at the proper

22  time.

23          **THE COURT:**  Well, I would assume that, like

24  lots of things that might have some initial

25  impressions, provisional diagnoses, et cetera,

26  et cetera, that they don't really care to share

27  with anyone.  So I don't know what their

28  attitude is.  By apparently what you say, I'm

29  satisfied with that.

1    And so I guess -- have you talked with

2  Dr. McMichael about that?

3       MS. FERRARO:  Not recently, no.  I haven't.

4       THE COURT:  What is his attitude about it?

5  I think he's -- well, he would probably go to

6  Sonny White and ask for advice on the matter.

7       MS. FERRARO:  I don't think Whitfield will

8  release raw data unless you're a doctor.  So I

9  think that if that's all the file they got, our

10  concern was that there was additional notes or

11  something that we didn't get from the original

12  order.  And that -- your letter said the

13  complete Whitfield file, and so just making sure

14  that we all have the -- are on the same page, I

15  think, is what we're doing.

16       THE COURT:  Well, again, you know, I

17  couldn't understand why Sonny White didn't have

18  it.  It had been --

19       MS. FERRARO:  I didn't either.  I didn't

20  either.

21       MR. SWARTZFAGER:  We didn't either, Your

22  Honor.

23       THE COURT:  It had been bantered about.  At

24  that point there was no privilege attached to it

25  in any event, but because everybody had it.

26       MR. WHITE:  Just -- I'll say this:  After I

27  had done this or had gotten this, this is the

28  second stack of their exhibits to their

29  post-conviction, which I hadn't gotten to that

1    point yet, it appears as Exhibit 28-J to their

2    post-conviction petition.

3        So, you know, I had it, but didn't know I

4    had it at the time that I asked, because they

5    were making allegations about the report.  And

6    the report that was sent to the Court, the

7    summary report that was sent to the Court, does

8    not contain that information.

9        THE COURT:  Okay.

10       MR. WHITE:  And I just wanted the full

11   report and then discovered I had it after all.

12       THE COURT:  All right.  So --

13       MR. SWARTZFAGER:  Yes, sir.  And again, the

14   State didn't get anything we didn't get, after

15   we examined the information that Mr. White

16   kindly provided us this morning -- or this

17   afternoon.

18       THE COURT:  All right.  So, Counsel, I

19   cannot say that I would not under any

20   circumstances order the State hospital to

21   produce their entire diagnostic records, but

22   absent some necessity -- you've got the reports,

23   two versions or more, I don't know how many -- I

24   do not feel that I'm warranted in just wading

25   into their circumstance and telling them, yeah,

26   they're going to get it.  Now, I choose not to

27   do that, absent some showing of great need and

28   necessity.

29       Now, if you feel aggrieved at that

1    position, you certainly may ask the Supreme

2    Court if they will order that, but I don't

3    intend to do that unless you --

4         MR. SWARTZFAGER:  Yes, sir.

5         THE COURT:  I'm not saying you can't

6    convince me, but I don't know of any

7    circumstance that would require it.

8         So *and other relief*.

9         MR. SWARTZFAGER:  Again, I think the Court

10   has thoroughly covered it in the relief that we

11   have sought.  And again, I think -- I believe

12   we've-- that covers everything we've asked in

13   motion.  We've been over everything.  There is

14   no further relief we're seeking from this

15   motion.

16        THE COURT:  Mr. White, do you have

17   anything?

18        MR. WHITE:  Other than our position, of

19   course, is that the Court no longer has

20   jurisdiction over this case because the

21   post-conviction petition has been filed and our

22   response has been filed.  And, you know, all

23   that's left is to file a reply.

24        THE COURT:  Well, I think you're absolutely

25   right, though the Supreme Court not only

26   permits, but spurns out these little

27   circumstances like this, including bonds and

28   some other matters.  I would like to -- you

29   know, I don't intend to exercise my jurisdiction

1   further than I am directed by them.  And so as

2   far as I'm concerned, I just -- one reason that

3   I wanted to bring this thing on out is to kind

4   of be sure that I've done all I needed to do.

5        You got a record of everything that needs

6   to be handled and -- but I'm not impeding

7   whatever process is going on in the Supreme

8   Court, which ultimately is going on.

9        **MR. SWARTZFAGER:**  Yes, sir.  And to bring

10  to the Court's attention, there is another

11  motion that's set on the docket regarding the

12  authority to depose Mr. Daniels.  And I think

13  that goes along with the Court's jurisdiction

14  and so forth.

15       There was an order signed on -- I didn't

16  bring a copy of the order with me setting it,

17  but we do have that motion to present that we

18  feel like that we're entitled to depose

19  Mr. Daniels under Rule 22.

20       And the reason being is Mr. Daniels gave an

21  affidavit way back when saying -- when he

22  became -- when he became employed with the

23  district attorney's office that he would not

24  discuss the matter with anyone.  He refused to

25  discuss the matter in private with us.  And

26  then, lo and behold, when the State files their

27  reply, their response, there is an affidavit

28  from Mr. Daniels in there talking about the

29  merits of the case, after Mr. Daniels had stated

1    under oath he would not discuss the case with

2    anybody. Clearly he did.

3        The affidavit contradicts the affidavit of

4    his co-counsel that we supplied with the

5    petition. The affidavit contradicts affidavits

6    of the family members as to what was discussed

7    during their meetings. And we're entitled to be

8    able -- this classic reply, that we're entitled

9    to reply to the State's case.

10    You know, it would have been, you know, let

11    a sleeping dog lie, but then the State brought

12    it up by filing his affidavit with their

13    response. And now we're entitled to see when he

14    began talking to the State, what he discussed

15    with the State, as well as what he discussed

16    with family members and co-counsel.

17    And we believe the Court does have

18    jurisdiction, and we've attached a couple of

19    Supreme Court orders in *Jordan versus State* and

20    two from -- both of Willie Manning's cases where

21    the Supreme Court, after a petition was filed --

22    and we sought to depose him. We filed this

23    motion before the petition was filed, then we

24    filed a supplement to it.

25    And in *Jordan* and in both Mannings, that

26    was similar to -- it was not a motion to depose,

27    but it was other motions pending. And the

28    Supreme Court remanded it to the circuit court

29    for the Court to rule on. So we believe that

1    the Court does have jurisdiction since we filed

2    them before the petition was filed in order to

3    rule on this outstanding motion.

4          **THE COURT:** Well, I would assume we can get

5    the Supreme Court to tell me to or not to, and

6    that would be preferable, simply because I'm not

7    anxious to expand my jurisdiction. My thought

8    is, it would be a simple matter to get them to

9    tell me to do it, and I'll be happy to do it.

10         **MR. WHITE:** Your Honor, we think they have

11    already ruled on it. On December the 8$^{th}$, the

12    day they filed their petition, they filed a

13    motion for leave to proceed in the trial court

14    with a petition for post-conviction relief;

15    motion to stay proceedings and supplement and

16    amend petition; notice of pending motion in the

17    trial court.

18        And they go through, and what they're

19    talking about is the motions to depose, the ex

20    parte motion at that time. And, of course, as

21    we said, there is no such thing as an ex parte

22    deposition.

23        Anyway, on the 17$^{th}$ of March, the

24    Mississippi Supreme Court entered an order that

25    says, *This matter came before the undersigned*

26    *justice on the motion to stay proceedings and*

27    *supplement and amend petition that was filed by*

28    *petitioner and styled as the motion for leave to*

29    *proceed in the trial court with a petition for*

1　　　*post-conviction relief; motion to stay*

2　　　*proceedings and supplement and amend petition;*

3　　　*notice of pending motion in the trial court.*

4　　　*After due consideration, this justice finds that*

5　　　*the motion should be denied.*

6　　　　　　And then they -- *the motion to stay*

7　　　*proceedings and supplement and amend petition is*

8　　　*hereby denied.*

9　　　　　　Then they filed a motion to reply, and the

10　　　Supreme Court on the 23$^{rd}$ of March said, *This*

11　　　*matter came before the undersigned justice on*

12　　　*motion for leave to file a reply that was filed*

13　　　*by Loden.  This justice finds the motion to stay*

14　　　*has been denied, and this motion should be*

15　　　*dismissed as moot.*

16　　　　　　Therefore, *the motion for leave to file a*

17　　　*reply is dismissed as moot.*

18　　　　　　You know, the relief they're asking, which

19　　　we contend they have to ask the Supreme Court

20　　　for, they cite **Jordan** and **Manning**.  I was there.

21　　　The trial court said, *No, I don't have*

22　　　*jurisdiction.*  They went to the Mississippi

23　　　Supreme Court.  The Mississippi Supreme Court

24　　　said you had -- did not say you had jurisdiction

25　　　all the time.  They remanded it.  And you don't

26　　　remand for a case that the Court already has

27　　　jurisdiction of.  They remanded it for further

28　　　proceedings in both of those cases.

29　　　　　　And, of course, in both of those cases,

```
1    that was before the State had filed its
2    response.  The State has filed its response in
3    this case already, filed it on the 16th, was
4    it, of March.  Maybe the -- and so we assert
5    that the Court has no jurisdiction.
6         If they want to try to go to the Court --
7    the Supreme Court again, they are free to do so,
8    but I think at this point the Court has already
9    said, We're not going to do it.  So we consider
10   that the Court is without jurisdiction, and this
11   motion should be dismissed as without
12   jurisdiction.
13        THE COURT:  While it may be an easy matter
14   to get them to do that, Counsel, I do not
15   presume that's what they would ask me or tell me
16   to do.  Approach them with the proposition.  If
17   they say yes, I'll be pleased to do it.
18        MR. SWARTZFAGER:  Yes, sir.
19        THE COURT:  All right.  Now, anything
20   further?
21        MR. SWARTZFAGER:  Not from us, Your Honor.
22   Not from Mr. Loden.
23        THE COURT:  I'm going to ask the court
24   reporter to transcribe and certify this and to
25   provide an original to the Supreme Court.
26        MR. SWARTZFAGER:  Yes, sir.
27        THE COURT:  Unless you want to do that.
28        MR. SWARTZFAGER:  The Court -- that's
29   perfectly acceptable with us, Your Honor.
```

1    THE COURT:  Well, I'm acting as kind of an

2    extension, adjunct, or whatever or possibly, as

3    suggested by Mr. White, without any jurisdiction

4    at all, but I'll give them the benefit of

5    whatever we have.  All right?

6    MR. SWARTZFAGER:  Yes, sir.  I believe that

7    will make things easier.

8    THE COURT:  All right.  Anything further?

9    MR. WHITE:  No, Your Honor.

10   THE COURT:  Always a pleasure to see you on

11   Monday.

12   (END OF PROCEEDING.)

***COURT REPORTER'S CERTIFICATE***

STATE OF MISSISSIPPI

COUNTY OF ITAWAMBA

I, Melanie S. Owen, Official Court Reporter for the First Judicial District of Mississippi, do hereby certify that to the best of my skill and ability, I have reported the proceedings had and done in the Hearing in **STATE OF MISSISSIPPI VERSUS STATE OF MISSISSIPPI**, being Cause No. CV03-090 on the docket of the Circuit Court of the First Judicial District of Itawamba County, Mississippi.

I further certify that this proceeding was stenographically reported by me and later reduced to print through Computer-Aided Transcription, and the foregoing 19 pages contain a full and true transcript of said proceedings, as transcribed by me to the best of my ability.

I do further certify that my certificate annexed hereto applies only to the original and certified transcript. The undersigned assumes no responsibility for the accuracy of any reproduced copies not made under my control or direction.

This the 14th day of May, 2009.

Melanie S. Owen, RPR, CSR No. 1262
Official Court Reporter
First Judicial District of Mississippi
300 Bass Lane
Pontotoc, Mississippi  38863
Telephone:  (662)844-7320

# EXHIBIT 44

## IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

AFFIDAVIT OF GREGORY L. CHANEY

District of Columbia

Gregory L. Chaney, first being sworn, testifies to the following under oath:

1.    I am over 21 years of age, and otherwise competent to testify.

2.    I am an attorney and am admitted to the bar in the state of Illinois. However, I am
      currently in an inactive status. I am presently Legislative Counsel to United
      States Senator Jay Rockefeller.

3. .  From April 1997 to October 2006 I was on active duty as an officer with the
      United States Marine Corps.

4.    In the spring of 2001 I was serving as a Judge Advocate (military attorney) aboard
      Marine Corps Recruit Depot in San Diego, California.

5.    I was detailed as legal counsel for Gunnery Sergeant Thomas E. Loden, Jr. in
      connection with the proceedings for his administrative separation from the United
      States Marine Corps.

la-1025714                             1

6.  In connection with that assignment, I spoke personally with Mr. David Daniels, whom I understood was defense counsel for Gunnery Sergeant Loden, at Mr. Daniels' office in Tupelo, Mississippi.

7.  My meeting with Mr. Daniels lasted between five and fifteen minutes. During the course of that discussion Mr. Daniels did not ask for any of the military records of Gunnery Sergeant Loden.

8.  At the conclusion of our discussion, I left Mr. Daniels my card and told him that I would provide any assistance that I could in connection with Gunnery Sergeant. Loden's defense. I was never contacted by Mr. Daniels after the meeting noted above.

9.  The only discussion which Mr. Daniels and I had concerning Gunnery Sergeant. Loden's service in the United States Marine Corps was my indicating to Mr. Daniels that I was surprised to see Gunnery Sergeant Loden charged with this crime because he had had a good record up to that time in the Marine Corps. No specific details of his military record or of his service were discussed with Mr. Daniels.

10. If I had been asked to do so by Mr. Daniels, I could have provided him with Gunnery Sergeant Loden's military records both at the time of my conversation with him in Tupelo, Mississippi and upon later request. However, Mr. Daniels never requested them.

11. I was not contacted by any other member of Gunnery Sergeant Loden's defense team with respect to his military service. If I had been contacted I would have supplied them with Gunnery Sergeant Loden's military records and my

interpretation of those records regarding the quality of his service with the United States Marine Corps.

FURTHERMORE AFFIANT SAYETH NOT

_____
GREGORY L. CHANEY

Sworn to and subscribed before me
this **23rd** day of **June** 2009.

_____
NOTARY PUBLIC FOR THE
DISTRICT OF COLUMBIA

**SHEILA A. DOMBO**
District of Columbia
My Commission Expires
May 14, 2011

# EXHIBIT 45

# IN THE SUPREME COURT OF MISSISSIPPI

*Mississippi Supreme Court Case No. 2007-DR-01758-SCT*
*Itawamba County Cause No. 03-090(G)1*

---

*THOMAS EDWIN LODEN, Petitioner*

*v.*

*STATE OF MISSISSIPPI, Respondent*

---

## AFFIDAVIT OF ANDRE DE GRUY

I, Andre de Gruy, after being duly sworn, depose and state as follows:

1. I have been a lawyer licensed to practice law in the State of Mississippi since 1990. I am currently the Director of the Office of Capital Defense Counsel. I have held this position since 2001. I supervise a staff of three attorneys and four investigators. Our office represents indigents in capital cases at the trial and direct appeal stages of litigation.

2. Prior to being appointed as the Director of that Office, I was an assistant Public Defender with the Hinds County Public Defender's Office. I represented indigents charged with major felonies at the trial stage. I also consulted with attorneys around the State who were handling capital cases. Before working with the Public Defender, I was director of the Mississippi Capital Defense Resource Center. My practice was devoted exclusively to handling capital cases at the trial, direct appeal, and post-conviction stages of litigation.

3. I regularly speak on subjects pertaining to capital litigation at CLE conferences and have conferred and/or trained lawyers in over one hundred capital cases in Mississippi.

4. In 2001, I learned that Thomas Loden had been sentenced to death after he pled guilty. Pursuant to Miss. Code Ann. § 99-19-105, he was entitled to a mandatory appellate review of his death sentence and an appeal of the proceedings leading to his death sentence, and I was appointed to represent him on that direct appeal. Ordinarily, when I represent a client on direct appeal, I raise issues that were raised below. If I did not represent the client at trial, I also raise post-conviction issues pursuant to Rule 22(b) of the Mississippi Rules of Appellate Procedure.

5. I had not represented Mr. Loden in the Circuit Court, and thus I had an obligation to raise post-conviction issues. At the time, an older version of Rule 22(b) was in effect. Currently, the only type of post-conviction claim that can be raised on direct appeal is one that is apparent from the trial record. The older version of the Rule, however, was not so limited. Moreover, I represented Mr. Loden before the Court clarified that "post-conviction" claims under Rule 22(b) included only claims of ineffective assistance of

1

counsel or claims arising under *Atkins v. Virginia.* Not until the Court decided *Branch v. State,* 882 So. 2d 36 (Miss. 2004), *Hodges v. State,* 912 So. 2d 730 (Miss. 2005), and *Havard v. State,* 928 So. 2d 771 (Miss. 2006), did it clear up what was expected of appellate counsel who had to raise post-conviction claims. Because the law was uncertain at the time, I was not sure what types of issues I had to raise on Mr. Loden's behalf.

6. Mr. Loden's case was also complicated because he pled guilty. At the time, I was not sure if the time to file a post-conviction challenge began to run when he pled guilty. The statute setting the statute of limitations provided that in cases of guilty pleas, the time to file a post-conviction challenge began to run from the time of conviction. However, the legislature had recently modified the post-conviction statute, and the Court amended Rule 22, M.R.A.P. to cover capital cases. Under Rule 22(c), indigent death-sentenced inmates had the right to have post-conviction counsel appointed following the conclusion of direct appeal, but the Rule had no provision for a capital case with a guilty plea.

7. It was unclear whether Mr. Loden's case would be governed by the statute or the rule. Furthermore, since the Court did not appoint qualified post-conviction counsel to challenge the guilty plea, I thought that I may have to take some steps at least to preserve Mr. Loden's right to challenge his guilty plea. There was no precedent to follow, and I thought it odd that someone who pled guilty would not receive the same benefit of qualified counsel that other death-sentenced inmates received.

8. Because of the uncertainty at the time I began representing Mr. Loden, I did not know whether my obligation under Rule 22(b) included challenges to the guilty plea. Furthermore, I was not certain what types of post-conviction claims I had to raise or whether I had to raise them with the trial judge or with the Supreme Court, as required under Rule 22(c). Ultimately, I filed a petition for post-conviction relief in the Circuit Court and raised a challenge to the erroneous advice that trial counsel gave to Mr. Loden. I believed that any other claim that involved Mr. Loden's mental state or social history would probably have to be raised in a post-conviction petition challenging the sentence and did not consider raising that in connection with a challenge to the guilty plea.

9. In the post-conviction challenge to Mr. Loden's guilty plea, I learned that Mr. Loden had been interested in appealing certain suppression issues. He learned from his lawyers that he would have a right to an appeal. I obtained an affidavit from James Johnstone, one of Mr. Loden's lawyers, and I also relied on correspondence that Mr. Loden wrote before and after his guilty plea regarding his right to an appeal. I wanted to discuss this matter with David Daniels, Mr. Loden's other attorney, but Mr. Daniels, who had gone to work for the District Attorney, did not cooperate. I filed a motion to recuse the District Attorney's office from the case and to bar Mr. Daniels from assisting the District Attorney. In response, Mr. Daniels submitted an affidavit in which he swore that he would not discuss the case with anyone. Ultimately, the Circuit Court did not find Mr. Loden credible, and the Mississippi Supreme Court affirmed its decision. *Loden v. State,*

2

971 So. 2d 548 (Miss. 2007).

10. Recently, I learned that Mr. Daniels provided an affidavit on behalf of the State to rebut allegations of his ineffectiveness in preparing for the mitigation phase of Mr. Loden's case. In that affidavit, Mr. Daniels also acknowledged that Mr. Loden asked about his right to an appeal and that he told Mr. Loden that he, Daniels, would not do the appeal but the "Mississippi Supreme Court would automatically review a sentence of death. I told him that we could not guarantee him exactly what the Court might do, or not do upon such review."

11. Mr. Daniels' affidavit would have corroborated the evidence that we presented to the Circuit Court. Unfortunately, it was unavailable to Mr. Loden at the time of the evidentiary hearing. Because the statement comes from someone who now works for the prosecutor and who has been unwilling to assist Mr. Loden, I feel that it would have been important for the Circuit Court to have learned of Mr. Daniels' admission that he had advised Mr. Loden about his right to an appeal.

ANDRE DE GRUY

Sworn to and subscribed before me
this the _11th_ day of June 2009.

NOTARY PUBLIC

My commission expires 11/14/2009.

3

# EXHIBIT 46

Page 1

IN THE CIRCUIT COURT OF ITAWAMBA COUNTY, MISSISSIPPI


THOMAS EDWIN LODEN,          )

                             )

          Petitioner,        )

                             )

VS.                          )     NO. 2007-DR-01758-SCT

                             )         03-090(G)1

                             )

STATE OF MISSISSIPPI,        )

                             )

          Respondent.        )



DEPOSITION

OF

DAVID DANIELS

JULY 9, 2009



ALPHA REPORTING CORPORATION

Heather L. Deloach

236 Adams Avenue

Memphis, Tennessee 38103

(901) 523-8974

Page 2

1                    The deposition of DAVID DANIELS is

2    taken on, this, the 9th day of July, 2009, on behalf of

3    the Petitioner, pursuant to notice and consent of

4    counsel, beginning at approximately 9:57 in the offices

5    of Alpha Reporting in Tupelo, Mississippi.

6                    This deposition is taken pursuant to

7    the terms and provisions of the Mississippi Rules of

8    Civil Procedure.

9                    All forms and formalities, excluding

10   the signature of the witness, are waived, and objections

11   alone as to matters of competency, irrelevancy and

12   immateriality of the testimony are reserved to be

13   presented and disposed of at or before the hearing.

14

15

16

17

18

19

20

21

22

23

24

Page 3

```
1                    A P P E A R A N C E S

2

3

4

5    ON BEHALF OF THE PETITIONER:

6

7              MR. MARK MCDONALD

8              Morrison Foerster

9              555 West Fifth Street

10             Los Angeles, California   90013-1024

11             Phone:   (213) 892-5810

12

13             MR. GLENN S. SWARTZFAGER

14             State of Mississippi

15             Office of Capital Post-Conviction Counsel

16             510 George Street

17             Suite 403

18             Jackson, Mississippi   39202

19             Phone:   (601) 359-5733

20

21

22

23

24
```

Page 4

```
 1    ON BEHALF OF THE RESPONDENT:

 2

 3                MR. MARVIN L. WHITE, JR.

 4                Office of the Attorney General

 5                550 High Street, Suite 1200

 6                Jackson, Mississippi  38201

 7                Phone:  (601) 359-3813

 8

 9                MR. DENNIS FARRIS

10                State of Mississippi

11                District Attorney Office

12                200 West Jefferson Street

13                Tupelo, Mississippi  38802

14

15

16    COURT REPORTING FIRM:

17

18                ALPHA REPORTING CORPORATION

19                Heather L. Deloach

20                236 Adams Avenue

21                Memphis, Tennessee 38103

22                Phone: (901) 523-8974

23

24
```

1                    I N D E X

2

3   DEPONENT:                                    PAGE

4        Examination

5           By Mr. McDonald                        06

6

7

8                  E X H I B I T S

9   NO.                    DESCRIPTION            PAGE

10   EXHIBIT NO. 1   (Subpoena)                    16

11   EXHIBIT NO. 2   (Time Records of Daniels)     39

12   EXHIBIT NO. 3   (Ex Parte Motion)             61

13   EXHIBIT NO. 4   (Order Appointing Investigator)  65

14   EXHIBIT NO. 5   (Time Records of Johnstone)   70

15   EXHIBIT NO. 7   (Order for Additional Funds)  72

16   EXHIBIT NO. 8   (Sentencing Hearing Excerpt)  80

17   EXHIBIT NO. 9   (Affidavit of Daniels)        102

18   EXHIBIT NO. 10  (Dr. O'Brien's Report)        120

19   EXHIBIT NO. 11  (Time Records of Herb Wells)  127

20   EXHIBIT NO. 12-A (Mitigation Hearing Excerpt) 136

21   EXHIBIT NO. 12-B (2003 Affidavit of Daniels)  169

22   EXHIBIT NO. 13   (Affidavit of Dr. O'Brien)   171

23

24   Court Reporter's Certificate ...............  183

1    Q    You have no documents responsive to that

2  subpoena?

3    A    To this subpoena?

4    Q    Yeah.

5    A    Not other than the one I just showed you.

6    Q    Okay.  One of the things it asked for was

7  all documents that concern your applications to or

8  communications with the district attorney's office

9  concerning how you came to be employed by them.  You

10  don't have any documents about that application?

11    A    I do not.

12    Q    When did you start with the attorney

13  general -- sorry -- when did you start with the district

14  attorney's office?

15    A    I believe it was, to the best of my

16  recollection, it was July 1 or 2, 2002.

17    Q    And that was when you actually walked in the

18  door and started working there?

19    A    Yes.

20    Q    And did you have to go through some sort of

21  background check before you actually started work?

22    A    No, I don't think so.  No formal -- no

23  formal one.

24    Q    When do you believe you were first con --

Page 46

1      Q     And so you had the extra capacity to take on

2  a capital case at that point?

3      A     Yes.

4      Q     Okay.  So do you remember anything about

5  this meeting with Mr. Johnstone on January 9?

6      A     I remember going to his office.  I believe

7  it's on that date, and we talked.  I believe

8  Mr. Johnstone was preparing copies or was having copies

9  prepared of certain things, certain discovery that he

10  had and we were -- he was just filling me in on the

11  facts of the case, and there were a lot of facts.  We

12  talked at length.  I think I got some copies of some

13  things.  And I came back, I believe, I came back to

14  Tupelo and he may have -- it was either that day or the

15  next day, I think, he may have come back over to Tupelo

16  and brought some more stuff that I didn't get.

17      Q     On that first day?

18      A     Yeah.

19      Q     Now, you've turned over your files on the

20  Loden case to post-conviction office; is that right?

21      A     I don't think I did.

22      Q     What did you do with your files on the Loden

23  case?

24      A     I destroyed my file last year.

Page 47

1     Q     The originals?

2     A     I destroyed everything I had.

3     Q     The originals?

4     A     The original what?  Everything I had was

5  copies.

6     Q     When did you do that?

7     A     I believe it was in October of last year.

8     Q     Of 2008?

9     A     If I turned over anything -- whatever --

10  whatever I had left, I had in a box in a gated storage

11  room.  And I never was easy about it, so after seven

12  years, I just determined the best way to protect that

13  would be to destroy it.

14     Q     That's October of 2008?

15     A     Yeah.

16     Q     What do you mean, you weren't easy about the

17  fact that you had --

18     A     Well, I mean, if somebody had broken into my

19  storage room and gotten that file, I feel like I would

20  probably have been liable.  At any rate a lot of private

21  and confidential information would fall into the hands

22  of somebody else.

23     Q     About the Loden case?

24     A     Yes.

Page 48

1       Q       Did you consult with anybody before you

2   destroyed that box?

3       A       No.

4       Q       Did it dawn on you that given Mr. Loden was

5   still involved in post-conviction proceedings that

6   perhaps that that evidence -- that document -- that box

7   might contain relevant evidence?

8       A       Well, it had been seven years, as I said,

9   and I'd been hanging on to it.

10      Q       What was in the box as best you can

11  recall?

12      A       I just -- no, I can't tell you.  It was

13  whatever I had on Mr. Loden's case.

14      Q       Well, did you turn over any files related to

15  the case?

16      A       I can't remember.  I don't think I did.

17      Q       Can you unhook yourself for a second and

18  take a look?  I've got a couple of boxes over here.

19  There's a box that says Loden 2 of 5 and right next to

20  it is a box that says Loden 3 of 5 and see if those look

21  like those might be files from your office.

22      A       Did you say 3 and 5?

23      Q       The two -- I put them in here in the front.

24  This box and that box.  Now, some of those may be copies

Page 49

1    that we've made, but do those look like things that came

2    from you?

3         A     I see some of my handwritten notes in this

4    folder here.  I don't recognize any of these folders as

5    being mine, but I do see some of my work here.

6         Q     In either one of those two boxes I pointed

7    out to you, do you see anything that you believe did not

8    come from you or your files?

9         A     It would be impossible for me to say because

10   I copied Jim Johnstone on a lot of the things that I

11   did, and I'm sure Jim copied me.  So I mean, there would

12   have been a good bit of duplication, I think, between

13   his file and mine.  But certainly some of my handwritten

14   notes are in there --

15        Q     Okay.

16        A     -- so -- can you hear me?

17              VIDEO SPECIALIST:  Yes, sir.

18        Q     Did you ask -- I know the answer to this

19   question, but you didn't ask either Loden or his current

20   counsel, namely, me, whether you were -- whether we

21   wanted the files that you destroyed last year,

22   correct?

23        A     No.

24        Q     When you and Mr. Johnstone met on January 9,

Page 75

1    motion to hire the investigator.  And the table of

2    contents of the reporter's transcript shows that the

3    hearing on that motion was on April 25, 2001.  If you'll

4    look at the table of contents, it shows the hearing on

5    April 25, 2001, starts on page 34 of the transcript, and

6    the argument concerning mitigation starts on page 63 of

7    that transcript.  You want to just look at that and see

8    if, in fact, that is the argument on the motion for a

9    mitigation investigator to be appointed?

10        A       (Witness complies).

11        Q       And you see that it was Mr. Johnstone that

12   argued that motion?

13        A       Yes.

14        Q       Okay.  Does that help you remember that the

15   argument didn't occur until March -- April 25 of 2001?

16        A       Well, it just tells me that Mr. Johnstone is

17   talking to the Court.  I don't know what date it

18   occurred, but I don't even remember specifically

19   Mr. Johnstone making that argument.

20        Q       Okay.  Well, I mean, do you agree with me

21   that you're still looking to get a mitigation

22   investigator appointed as of March 7?  You didn't ask

23   Herb Wells to do the same investigation, that you were

24   hoping to get the money to have Mr. Mooers do the

1    investigation?

2        A    Well, you know, it's my understanding that a

3    duty -- that lawyer has a duty to investigate the facts

4    of any case, and in a capital murder case, that means

5    evidence for the guilt phase trial and evidence in the

6    sentencing trial.  Although, there is a formal

7    distinction in the two.

8            I'm always looking in a capital murder case

9    at mitigation evidence, and so Herb Wells would have

10   been working toward that end.  He would have been

11   looking for anything for us to use at -- to gain any

12   sort of a -- an advantage in the case, and he would have

13   been looking for witnesses to use in our change of

14   venue.  He is a professional retired police detective

15   from Miami, Florida, and I had every faith that he knew

16   what he was doing and he knew what we wanted.

17       Q    My question to you, it's your deposition, so

18   I want to know your answer.  Did you tell Mr. Wells in

19   March of 2001 that you wanted him to conduct a

20   mitigation investigation?

21       A    I didn't make a distinction between a

22   mitigation investigation and.  Investigation it was

23   inclusive --

24       Q    You just told --

Page 77

1      A       -- in my mind.

2      Q       Okay.  In your mind, but you didn't tell

3    Mr. Wells that?

4      A       I'm not sure what I told Mr. Wells eight

5    years ago.

6      Q       Did you just tell him you wanted him to

7    investigate the case?

8      A       I told you.  I don't recall exactly what I

9    told him.

10     Q       Did you tell him any witnesses you wanted

11   him to interview?

12     A       I'm sure I did, and I'm sure I asked him to

13   find any witnesses that might have any information.

14     Q       Did you give any more direction than just

15   that?

16     A       And I'm not sure -- I'm not sure, you know,

17   how we learned of Mr. Loden's sexual abuse in the past

18   but that -- I considered that to be mitigation.  I spoke

19   with his sister.  I spoke with his mother.  I spoke with

20   his aunt.  I spoke with his grandmother, and I went out

21   with Mr. Wells.  We located witnesses who would say they

22   didn't believe Mr. Loden would get a fair trial in

23   Itawamba County, which was no small task.  We were

24   successful in getting venue changed.

Page 97

1   theory of the case or it was going to have to be kind of

2   a heat of passion and mentally out of control defense.

3        Q     You say -- you say Loden didn't want to talk

4   with you about the case?

5        A     He didn't -- he didn't want to talk about

6   the facts of the rape, the murder or any of that, no.

7        Q     Did he ask you to look for witnesses?

8        A     No, I don't think so.

9        Q     Did he ask you to contact any witnesses?

10        A     I don't recall.

11        Q     Do you remember him telling you that on the

12   night of the crime his wife had called him on the cell

13   phone shortly before he met Ms. Gray?

14        A     I don't believe he told me that.

15        Q     Did you ever hear it?

16        A     I don't recall if I did or not.

17        Q     Did he ever tell you he tried to contact Jim

18   Craig?

19        A     No.

20        Q     Do you know who Jim Craig is?

21        A     Yes.

22        Q     Do you know now that Craig has submitted an

23   affidavit corroborating that he spoke to Loden's wife

24   shortly before the crime and she had essentially taunted

Page 98

1    Loden by saying she was going to sleep with Craig?

2        A    I didn't know that until this morning.

3    Mr. White told me that.

4        Q    Do you feel like that was something perhaps

5    if you'd done further investigation you might have

6    uncovered on my own?

7        A    I don't know.  I'd have to go back to that

8    time and have that information and then go from there in

9    retrospect.  At this point I don't -- that's -- that's

10   not what he told Bethay.

11       Q    What about what he told you?

12       A    He didn't tell me.

13       Q    He didn't tell you that he had spoken with

14   Mrs. Loden, his wife, that night?

15       A    He may have told me he spoke with her, but I

16   mean, other than that, I don't know if I would have

17   known anything --

18       Q    Well, did you ask him --

19       A    -- there that would.

20       Q    Go ahead.

21       A    -- that would create a defense.

22       Q    Did you ask him if he spoke to her that

23   night and what they spoke about?

24       A    I don't recall.  I don't think -- I don't

1    recall him telling me at all about his wife --

2          Q      The question was --

3          A      -- except that -- about divorce and this

4    sort of thing.

5          Q      The question was, did you ask Mr. Loden what

6    he spoke with his wife about that night?

7          A      I don't recall.

8          Q      Now, Mr. White is not your attorney,

9    right?

10         A      Right.

11         Q      Was there anything else that you and he

12   discussed this morning before the deposition other than

13   that there's an affidavit from Jim Craig admitting that

14   he and Mrs. Loden had spoken on the night of the crime

15   about them having sexual relations?

16         A      No.

17         Q      That was it, only thing that you and

18   Mr. White talked about?

19         A      He said that he was having some documents

20   faxed up here, and he was trying to get that done.  I

21   believe he got it done.  I don't know what the documents

22   are.  He said in his opinion this was about -- about the

23   sentencing of Eddie Loden would be the subject matter of

24   the deposition, in his opinion, and that's pretty much

1    it.

2         Q      What's your understanding of who it was that

3    sexually abused Loden when he was a child?

4         A      I believe she told me -- I thought she had

5    told me it was an uncle or a -- someone, maybe a family

6    member or a friend of a family member, when he was a

7    small child.  And that was different from what I gleaned

8    from Dr. O'Brien's report, that it was a preacher of some

9    kind.

10        Q      Okay.  So when you say she, are you

11   referring to the sister now?

12        A      Yeah, I think the sister and/or the aunt,

13   Ms. Renick.

14        Q      So what investigation did you do about the

15   identity of this uncle?

16        A      I don't believe she could give me a name.

17        Q      What investigation did you do?  You asked

18   her for the name?

19        A      Yeah.  I asked her all about it.  She gave

20   me what she had, and I didn't have any specifics

21   about -- about exactly where it occurred or who it was.

22   She couldn't -- she didn't know a name to give me.

23        Q      I take it you didn't contact any of Loden's

24   uncles, true?

Page 101

1    A    I think there was some discussion about who

2    his uncles were or something to that effect but --

3    Q    The question was, did you contact any --

4    A    Did not.

5    Q    Do you think personally there would be any

6    adverse consequences to you if it were ultimately

7    determined that Loden did not get effective

8    representation back at trial?

9    A    Well, I don't know because I've never been

10   held ineffective before.

11   Q    I take it you -- you believe you were not

12   ineffective, and you are clearly hostile to Loden's

13   claims in this case, right?

14   A    I'm not so much hostile to Loden's claims.

15   I understand that this sort of thing is going to come at

16   you when you represent criminal defendants in important

17   cases like this.  The next thing is going to happen is

18   the lawyer that represented him is going to be claimed

19   to be ineffective.  So I'm not hostile toward Mr. Loden.

20   I do feel like I have every right to defend myself.

21   Q    And that's why you submitted the affidavit

22   on January 23, 2009, right?

23   A    That's right.

24   Q    Let me show you Exhibit 9.  Do you recognize

Page 116

1   write down every phone call. You'll notice I didn't

2   write down any phone calls.

3       Q    If Major Chaney swore that the only time he

4   had contact with you was when he came to your office

5   because he wanted to talk to you, you wouldn't disagree

6   with that, would you?

7       A    No. That was the only contact we had.

8       Q    And if he swore that the meeting that took

9   place was no more than 15 minutes, you wouldn't disagree

10   with that, would you?

11       A    It wasn't very long.

12       Q    And during that meeting you didn't ask Major

13   Chaney for any military records of Mr. Loden --

14       A    I'm not sure if I did or not.

15       Q    You don't remember doing so?

16       A    I don't.

17       Q    You didn't ask Major Chaney if he was

18   willing to be a mitigation expert -- a mitigation

19   witness for Mr. Loden?

20       A    No.

21       Q    You didn't talk to him about the possibility

22   of him testifying?

23       A    I think I may have talked to him about the

24   possibility of him testifying, yes.

1      Q     You do?

2      A     I think I did.

3      Q     If he swore that you didn't, would you

4 disagree with that?

5      A     I cannot swear that I asked him if he would

6 be a witness, but I think that I did tell him that we

7 might need him as a witness.

8      Q     Did Major Chaney tell you that he personally

9 didn't know Loden?  That he was just an attorney who had

10 been appointed by the marine corps to represent him?

11     A     I don't recall that sort of specific

12 conversation.

13     Q     Did you ask Major Chaney if you knew of any

14 people who did serve with Loden and who knew Loden

15 personally who might be witnesses?

16     A     I don't believe I did.

17     Q     So you think it's possible that you spoke to

18 him about him being a witness for you?

19     A     I think it's possible.

20     Q     Do you know where Mr. Chaney -- Major Chaney

21 was located?

22     A     I do not know.

23     Q     He wasn't in Mississippi, was he?

24     A     No, he was not.

Page 118

1     Q     So he was outside of the subpoena power?

2     A     He was.

3     Q     And what exactly did you think Major Chaney

4   might testify to, given that he didn't know Mr. Loden?

5     A     Well, I don't know.  I would assume he had

6   -- since he was appointed to represent Mr. Loden or he

7   was serving in some capacity involving Mr. Loden and/or

8   his discharge from the Marines, I would assume that he

9   had access to Mr. Loden's records.  And I did acquire

10  some military records.  I just can't remember where I

11  got them from.

12    Q     Do you think that perhaps you have sort of

13  overstated your -- the extent to which your contact with

14  Major Chaney was part of a mitigation investigation in

15  this affidavit?

16          MR. WHITE:  Objection.

17    A     No.

18          MR. WHITE:  Asked and answered.

19    A     No, I don't.  I don't recall a great deal

20  about it other than I had contact information for him.

21  I met with him.  He did, in fact, initialize the

22  contact.

23    Q     Okay.

24    A     And that's all I remember.

1    Q    And in paragraph 5 of your affidavit you

2  say, it was my opinion that evidence of Mr. Loden's

3  traumatic early childhood and his good military

4  background would not have been insubstantial if offered

5  in mitigation.  Do you see that?

6    A    Yes.

7    Q    Other than what you've testified to about

8  somebody saying that he had been sexually abused as a

9  child, were you referring to anything else there when

10  you talk about his traumatic early childhood?

11    A    No, I was not referring to anything else.

12    Q    Do you know who Loden was raised by?

13    A    I believe that he -- I think after his

14  parents divorced or separated, I think he lived with his

15  father for a while.  And then after these incidents

16  according to his, I think, his mother and his aunt,

17  that's what caused him to come and live with his

18  grandparents in Itawamba County.  And after that time,

19  he did very well.

20    Q    Okay.  Do you know if there was any evidence

21  of Loden being abused by his stepmother?

22    A    I'm not sure there was any evidence of that

23  unless Dr. O'Brien -- unless he related it to

24  Dr. O'Brien.  He might have.

1      A      I'm not sure I made a -- the specific facts

2    of everything I talked to her about made known to

3    Mr. Johnstone.

4      Q      Okay.  So today it's your testimony that

5    this evidence, which you refer to at the sentencing

6    hearing about Loden being an exemplary student, came

7    from Stella Renick, right?

8      A      I was just referring to my billing records

9    about when I had a conference with Rena Loden and

10   surveyed the house and the surrounding land and

11   attempted to interview the two housekeepers.  I believe

12   that is the time, or either on the 19th when I spoke to

13   the housekeeper, at one of those meetings I met Stella

14   Renick.  I believe that was her name, and I believe she

15   was an aunt, and I believe she related that information

16   to me.

17     Q      Okay.  So did you talk to her about possibly

18   providing testimony at sentencing about his exemplary --

19     A      No.  I don't think I talked to her about

20   coming in to testify.  I was just prepared to subpoena

21   her again if I needed her.

22     Q      Okay.

23     A      I also spoke with the grandmother, I

24   believe.  Yes, Ms. Rena Loden.

1      Q    Okay.  What exactly do you remember the aunt

2  telling you about Loden being an exemplary student?

3      A    I just think that that's what she -- excuse

4  me -- what she told me.  That's about it.

5      Q    So did you follow up on that?  Did you

6  subpoena any records of that?

7      A    I don't recall if I did or not.

8      Q    Did you talk to any teachers?

9      A    No.

10      Q    Did you talk to any coaches?

11      A    No.

12      Q    Classmates?

13      A    No, huh-uh.

14      Q    Okay.  The next thing you referenced on

15  that -- at the sentencing hearing is that he entered the

16  marine corps, that he served with distinction for 18

17  years, that he attained the rank of E-7, that he was

18  highly decorated and a combat veteran in Desert Storm.

19  Who would have offered that testimony if you proceeded

20  to trial or sentencing hearing?

21      A    Loden himself, his family members and, I

22  believe, I could have called on the officer that

23  represented him to come and testify.

24      Q    Major Chaney?

1     A     Yes.

2     Q     So what personal knowledge did any of his

3  family members have about the fact that he had attained

4  the rank of E-7, had served with distinction for 18

5  years?

6     A     I'm not sure where I gain that information.

7  I simply -- I had that information, obviously.  I

8  couldn't have recited it.  I got it from witnesses

9  and/or documents that I gathered.  And since Loden

10  wouldn't allow us to put on any evidence in mitigation,

11  I was hoping to impress the Judge with -- with some of

12  the good things Loden had done and some of the bad

13  things that may have prompted him doing what he did.  So

14  that's what that's all about, and I can't tell you

15  specifically where I got each one of those pieces of

16  information.

17     Q     Okay.  My question, though, was different.

18  Who did you anticipate calling to testify to those --

19  that piece of information?

20     A     I was not anticipating calling any

21  witnesses.

22     Q     Well, who would you have called?

23     A     Well, you're asking me to speculate now.

24     Q     Oh, really.  You're -- you're the lawyer.

Page 143

1       A       Well --

2       Q       You were going to have to call witnesses to

3    put this evidence on, right?

4       A       Yes.

5       Q       So who would you have called to testify to

6    that?

7       A       I would have called his mother, his sister,

8    his aunt.  And I had some military records from

9    somewhere.  I would have attempted to enter those into

10   evidence.

11      Q       How would have gotten those --

12      A       Eddie Loden, as I said, would have been the

13   best witness of all.

14      Q       Have you ever put on a mitigation case in

15   any death sentence case before?

16      A       No, I don't believe I did.  I know

17   Mr. Johnstone had, but I don't believe I ever had.

18      Q       Did you ever talk to Mr. Johnstone that your

19   strategy in a mitigation case would have been to put

20   Mr. Loden on himself as the primary witness?

21      A       No.  He would have been found guilty by that

22   time, and I don't think that he could have done anything

23   but help himself.

24      Q       Did you talk to Mr. Johnstone about that

1    any trouble talking about his childhood, did he?

2         A     Yes.

3         Q     He did, Even about his childhood?

4         A     Yes.

5         Q     And he had trouble talking about his

6    military experience?

7         A     He didn't talk very much about it.  He -- he

8    related some of it to me, you know.  That he had had a

9    good friend killed there and that he was -- you know, he

10   had some problems with it.  I said, well, you know,

11   let's -- let's talk about that.  Let's see if we can

12   document some of this.  Some of what you've gone through

13   as a result of that.  And he said he didn't seek any

14   counseling, and he never told anybody he had any

15   problems with it because it would hurt his military

16   career.  So he said there aren't any records of my -- of

17   my seeking psychological help or anything as the result

18   of his Gulf War experiences.  So I mean, I took him at

19   his word.

20        Q     And you concluded there was no more

21   investigation to be done about his Gulf War experiences

22   because he hadn't reported to the marine corps that he

23   was having psychological problems; is that right?

24        A     Well --

Page 151

1      Q     Is that right?

2      A     I concluded that there was no evidence to

3 substantiate his claims. So, thereby, again, making

4 Eddie Loden the best witness about all of that.

5      Q     You said that he told you that he had seen a

6 friend killed?

7      A     I believe that's what he said.

8      Q     Did you -- did you tell Dr. O'Brien about

9 that instance?

10     A     I don't know what I -- what I told

11 Dr. O'Brien, and I don't know what I provided to

12 Dr. O'Brien. I know I would have provided whatever he

13 wanted, and I'm sure that Eddie Loden could tell him all

14 about it.

15     Q     What evidence did you have that Loden was

16 highly decorated?

17     A     I'm not sure.

18     Q     And what evidence did you have --

19     A     I may have asked him what declarations he

20 had -- he had acquired or I may have gleaned it from the

21 documents I had.

22     Q     Did you have any witnesses to testify to

23 that other than Loden?

24     A     No. His military officer.

Page 156

1   those issues.  Have you stated in this affidavit the

2   best of your recollection of those conversations?  This

3   is accurate, correct, your affidavit?

4          A     Yes.

5                MR. WHITE:  Which -- where are we now?

6                MR. MCDONALD:  Paragraph 6 of the affidavit.

7   BY MR. MCDONALD:

8          Q     Okay.  In paragraph 6 you write, I told him

9   that we could not guarantee him exactly what the Court

10  might do or not do upon such review.  Do you see that?

11         A     Yes.

12         Q     Did you do any research in an attempt to try

13  to figure out what issues could or could not be reviewed

14  by the Supreme Court if he pleaded guilty?

15         A     Well --

16         Q     Did you do any research?

17         A     Yes, I did.

18         Q     You looked at case law?

19         A     I looked to the statute for the most part.

20         Q     What statute?

21         A     And it sets out the -- I can't tell you the

22  section number, but the section that states that there's

23  an automatic review of death penalty cases.  So, yes, I

24  looked at the law.  And basically knew if Mr. Loden got

Page 157

1    the death penalty, it was my hope that he wouldn't, but

2    if he did, there would be a review by the Supreme Court.

3    Now, Mr. Loden was very precise -- I remember this above

4    all --

5         Q    Do -- okay.  Hold on.  Let me -- before

6    you -- let me go back to the -- let me ask the

7    questions.  So you say you looked at the statute; is

8    that right?

9         A    I either looked at it or I'd already looked

10   at it, yes.

11        Q    It was a statute that talked about the

12   Mississippi Supreme Court's review of death sentence

13   cases; is that right?

14        A    Yes.

15        Q    Did you do any legal research specifically

16   on what, if any, issues would be foreclosed by pleading

17   guilty?

18        A    I don't recall if I did.  I don't recall

19   what the law was.

20        Q    Okay.  Did you consult with anybody about

21   that?

22        A    No, I didn't.

23        Q    Had you done appeals before?

24        A    Yes.

Page 158

1    Q    Had you done any post-conviction work

2  before?

3    A    No.

4    Q    Okay.  Let me keep looking through my notes

5  here.  I may not need as much time as I indicated.  Just

6  a second ago you said you hoped that he wouldn't be

7  sentenced to death.  Did you have any doubt in your mind

8  that if Loden plead guilty and you all didn't put on any

9  mitigation evidence that he was going to be sentenced to

10  death by Gardner?

11    A    Well, I thought that he would, yes.

12    Q    And you had cases with Gardner before,

13  right?

14    A    Yes.

15    Q    So you knew he was a tough sentencer,

16  right?

17    A    Well, you know, Gardner sometimes is tough,

18  sometimes I've seen him just go exactly -- exactly the

19  opposite way.  But in this case I thought he would

20  impose the death penalty, and I thought that any jury in

21  Itawamba, Lee or Rankin county would as well.  But it

22  was certainly what -- you know, we were trying to

23  represent Loden the best we could.  I was hopeful to

24  move the Judge in some way, but I wasn't that

Page 165

1    Q    But you yourself weren't sure what issues

2    the Supreme Court would review if he plead guilty,

3    right?  I mean, that's what you swore to in your

4    statement.  Quote, I told him that we couldn't guarantee

5    him exactly what the Court might do or not do upon such

6    review, right?

7    A    That's true.

8    Q    You didn't -- and you're not -- you didn't

9    do post-conviction work, right?

10   A    No.

11   Q    So you personally didn't really know exactly

12   what issues would or would not be reviewed by the

13   Supreme Court?

14        MR. WHITE:  Objection.  Whether or not

15   someone does post-conviction work doesn't have nothing

16   to do with direct appeal.

17   A    I thought that I would be misadvising him

18   .and misinforming him if I tried to tell him what the

19   Supreme Court would look at or what they would decide

20   on, regarding any issue.

21   Q    Including the suppression issues?

22   A    Including that.

23   Q    All right.

24   A    I told him that -- that those issues would

# EXHIBIT 47

1    IN THE CIRCUIT COURT OF ITAWAMBA COUNTY, MISSISSIPPI

2

3

4   THOMAS EDWIN LODEN,      )

5                           )

6        Petitioner,   )

7                           )

8   VS.                 )    NO. 2007-DR-01758-SCT

9                         )      03-090(G)1

10                         )

11  STATE OF MISSISSIPPI,   )

12                         )

13       Respondent.   )

14

15                DEPOSITION

16                   OF

17             JIM JOHNSTONE

18             JULY 9, 2009

19

20        ALPHA REPORTING CORPORATION

21          Heather L. Deloach

22           236 Adams Avenue

23        Memphis, Tennessee 38103

24          (901) 523-8974

2

1              The deposition of JIM JOHNSTONE is

2    taken on, this, the 9th day of July, 2009, on behalf of

3    the Petitioner, pursuant to notice and consent of

4    counsel, beginning at approximately 8:54 in the offices

5    of Alpha Reporting in Tupelo, Mississippi.

6              This deposition is taken pursuant to

7    the terms and provisions of the Mississippi Rules of

8    Civil Procedure.

9              All forms and formalities, excluding

10   the signature of the witness, are waived, and objections

11   alone as to matters of competency, irrelevancy and

12   immateriality of the testimony are reserved to be

13   presented and disposed of at or before the hearing.

14

15

16

17

18

19

20

21

22

23

24

3

1        A P P E A R A N C E S

2

3

4

5    ON BEHALF OF THE PETITIONER:

6

7            MR. MARK MCDONALD

8            Morrison Foerster

9            555 West Fifth Street

10           Los Angeles, California  90013-1024

11           Phone:  (213) 892-5810

12

13           MR. GLENN S. SWARTZFAGER

14           State of Mississippi

15           Office of Capital Post-Conviction Counsel

16           510 George Street

17           Suite 403

18           Jackson, Mississippi  39202

19           Phone:  (601) 359-5733

20

21

22

23

24

4

1    ON BEHALF OF THE RESPONDENT:

2

3            MR. MARVIN L. WHITE, JR.

4            Office of the Attorney General

5            550 High Street, Suite 1200

6            Jackson, Mississippi  38201

7            Phone:  (601) 359-3813

8

9            MR. DENNIS FARRIS

10           State of Mississippi

11           District Attorney Office

12           200 West Jefferson Street

13           Tupelo, Mississippi  38802

14

15

16   COURT REPORTING FIRM:

17

18           ALPHA REPORTING CORPORATION

19           Heather L. Deloach

20           236 Adams Avenue

21           Memphis, Tennessee 38103

22           Phone: (901) 523-8974

23

24

5

1                          I N D E X

2

3    DEPONENT:                                      PAGE

4          Examination

5                By Mr. McDonald                      06

6          Examination

7                By Mr. White                         90

8          Re-Examination

9                By Mr. McDonald                      99

10

11                       E X H I B I T S

12   NO.              DESCRIPTION               PAGE

13   EXHIBIT NO. 1   (Time Records)              22

14   EXHIBIT NO. 2   (Affidavit of Mr. Johnstone)  22

15   EXHIBIT NO. 3   (Handwritten Notes)         32

16   EXHIBIT NO. 4   (Ex Parte Motion)           45

17   EXHIBIT NO. 5   (Mitigation Hearing Excerpt)  53

18   EXHIBIT NO. 6   (Sentencing Hearing Excerpt)  71

19   EXHIBIT NO. 7   (Affidavit of Mr. Daniels)  80

20

21

22

23                                             PAGE

24   Court Reporter's Certificate ...............  110

82

1      A      That's Daniels'.  I don't know if you

2  actually --

3      Q      I think it's Exhibit 2.

4      A      There it is.  I'm sorry.

5      Q      That's okay.  In paragraph 12 of Exhibit 2,

6  you said, quote, Loden wanted to know whether, if he

7  pleaded guilty, he could appeal, and in particular

8  whether he could appeal from the Circuit Court's adverse

9  pretrial rulings including the rulings on the

10 suppression motions.  I told Loden that if he pleaded

11 guilty and was sentenced to death, the Mississippi

12 Supreme Court would review his sentence, and that they

13 would review everything that was in the record.

14          I told Loden that I believed that the

15 rulings on the suppression motions, the order denying

16 the request for funds to hire a mitigation specialist,

17 and the use of Loden's wife Kat to induce Loden to talk

18 with the police on June 30, 2000, were issues that might

19 be reviewed that were potentially viable.  Did you tell

20 Loden that?

21     A      I believe the language reviewed that were

22 potentially viable was language back and forth between

23 you and I on this -- on this affidavit.  And as I

24 recall, again, I -- I told Loden that I did not know

83

1   what the Mississippi -- the Supreme Court or any other

2   court would -- would review in -- in their automatic

3   review should he get the death penalty.

4       Q     Is that something you researched at all?

5       A     No.   I knew the statute said that it would

6   be an automatic review, and, therefore, I told him that

7   rather than say they would review certain things or

8   would not review certain things, I said, I do not know

9   what they would review.   If these items were -- were

10  potentially viable is a term that I would say would mean

11  I don't know whether they would review them or not.

12          That meaning that they might review them or

13  they might not, but that the direct appeal would not be

14  available to him if he -- if he plead guilty.

15  Specifically he would be told that he could not appeal a

16  guilty -- a guilty plea.   That in order to preserve any

17  of his -- to preserve for sure any of his appealable

18  grounds, it's like Daniels said, he had to go to trial

19  and have a jury verdict.

20      Q     But you personally didn't even know

21  whether --

22      A     No.

23      Q     Hold on.   Let me finish.

24      A     Oh, I'm sorry.

84

1       Q     You personally didn't know whether the

2 Mississippi Supreme Court would review those issues if

3 he got the death penalty, right?

4       A     I didn't.

5       Q     And so you didn't tell him one way or the

6 other because you didn't know, true?

7       A     True.

8       Q     Okay.  Let me -- let me look over -- oh,

9 here's a question for you.  Do you know Sam Ready?

10      A     I do.

11      Q     Who is he?

12      A     He's an attorney that at one point in time

13 was assistant DA.  Now is in private practice.

14      Q     Do you know when he retired?

15      A     I don't recall.

16      Q     Even the year?

17      A     No.  It's been a few years ago.

18      Q     Okay.  Loden did not ever discourage you

19 from doing an investigation, did he?

20      A     Discourage.  Well, after he indicated that

21 he wanted to enter a plea of guilty, he discouraged us

22 and -- and advised us that he did not want us to cross

23 examine any witnesses or present any witnesses or proof

24 in mitigation.  I mean, that was a discouragement, I

ORIGINAL

AMENDMENT SHEET

I, the undersigned, _James P. Johnstone_ , do hereby certify that I have read the foregoing examination and that to the best of my knowledge said deposition is true and accurate with the exception of the following corrections listed below:

| PAGE: | LINE: | CORRECTION: |
|---|---|---|
| 1 | 18 | July 10th 2009 |
| 95 | 20 | flesh not Flush |
| 89 | 21 | continuance |
| 90 | 7 | continuance |

_July 14, 2009_
Date

_Jan P. Joh_
Signature of Witness

Sworn to and Subscribed before me this __14th__ day of __July__ , 200_9_

_Tracy Taylor_
Notary Public

My commission expires

STATE OF MISSISSIPPI
TRACY TAYLOR
ID NO. 72515
Commission Expires
01-21-2012
NOTARY PUBLIC
TOTOC CO.