# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

THOMAS EDWIN LODEN,

                Petitioner,                      NO. 1:10-cv-00311-NBB

v.

CHRISTOPHER EPPS, COMMISSIONER,
DEPARTMENT OF CORRECTIONS AND
JIM HOOD, ATTORNEY GENERAL.

                Respondents.

---

## MERITS BRIEF IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS
## BY THOMAS EDWIN LODEN,
## A PERSON IN STATE CUSTODY

---

Charles E. Patterson
Charles S. Barquist
Mark R. McDonald
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California 90013-1024
Telephone:     213.892.5200
Facsimile:     213.892.5454

Stacy Ferraro
MS Bar #100263
P.O. Box 708
Flora, Mississippi 39071
Telephone: (601) 853-8331

ATTORNEYS FOR PETITIONER
THOMAS EDWIN LODEN

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... XII

INTRODUCTION ....................................................................................... 1

FACTUAL BACKGROUND ....................................................................... 4

I.    TRIAL COUNSEL FAILED TO ADVISE LODEN REGARDING
      THE PROS AND CONS OF FOREGOING TRIAL, WAIVING
      JURY SENTENCING, AND PRESENTING A MITIGATION
      CASE; THIS CAUSED LODEN TO PLEAD GUILTY AND
      WAIVE JURY SENTENCING UNKNOWINGLY,
      INVOLUNTARILY, AND UNINTELLIGENTLY ................................. 4

      A.    Counsel's Ineffective Assistance Forced Loden To Decide
            To Plead Guilty Without Fully Considering Or
            Understanding His Defense Or Mitigation Options...................... 4

      B.    Trial Counsel's Erroneous Advice Caused Loden To Waive
            His Right To Jury Sentencing ....................................................... 6

II.   TRIAL COUNSEL FAILED TO CONDUCT AN ADEQUATE
      MITIGATION INVESTIGATION ........................................................... 8

      A.    Loden's Attorneys Received Numerous Leads For A
            Strong Mitigation Case, But Failed To Follow Up ...................... 8

            1.    In Counsel's Initial Meeting With Loden, Loden
                  Informed Them Of Numerous Facts That
                  Competent Counsel Would Have Pursued......................... 8

            2.    Johnstone Did Not Conduct Or Direct Any
                  Investigation.................................................................... 10

            3.    Attorney Johnstone Soon Passed Off Loden  To
                  Attorney Daniels, Who Also Did Not Conduct Or
                  Direct An Investigation................................................... 11

            4.    Loden's Trial Counsel Did Not Provide The
                  Defense Psychiatric Expert With Sufficient
                  Background Information For A Proper Evaluation
                  of Loden .......................................................................... 14

            5.    In The Months Leading Up To Trial, Loden's
                  Counsel Continued To Ignore His Requests For
                  Investigation, Updates And Advice ................................ 16

            6.    Attorney Daniels' Aspirations To Join The District
                  Attorney's Office Contributed To His Rendering
                  Ineffective Assistance During And After Loden's
                  Plea.................................................................................. 17

B. Had Trial Counsel Properly Conducted A Mitigation Investigation, They Would Have Uncovered Powerful Evidence That Would Have Impacted Loden's Decision To Plead Guilty, Waive Jury Sentencing, And Present A Mitigation Case ........................................................................... 19

1. Had Counsel Interviewed Loden's Relatives, Conducted In Depth Interviews Of Loden Or Requested Public Records, They Would Have Gathered Substantial And Powerful Evidence Regarding The Physical, Emotional And Sexual Abuse Suffered By Loden ................................................. 20

2. Counsel Failed To Seek Out And Present Evidence Demonstrating That Despite His Traumatic Childhood, Loden Thrived When Given A Supportive Environment ..................................................... 23

3. Counsel Failed To Investigate Loden's Gulf War Combat Experience And His Post Traumatic Stress Disorder ........................................................................ 26

4. Counsel Failed To Obtain Evidence That Loden Was A Devoted Father Struggling With A Failing Marriage ....................................................................... 28

5. Counsel Failed To Investigate The Impact Of Loden's Troubled Marriage And Drug And Alcohol Intoxication On Loden's Conduct The Night Of The Crime ............................................................................. 30

6. A Proper Mental Evaluation Would Have Revealed That Loden Suffered From A Number Of Mental Impairments ................................................................... 31

III. TRIAL COUNSEL FAILED TO LITIGATE THE CASE ADEQUATELY ....................................................................... 34

A. Trial Counsel's Litigation Of The Motion For Funds For Expert Mitigation Assistance Was Wholly Inadequate ............... 34

B. Counsel Failed To Present Any Meaningful Challenge To The State's Evidence During The Suppression Hearing .............. 36

C. Counsel Failed To Provide Loden With Discovery Prior To The Suppression Hearing And To Prepare Loden For His Testimony .................................................................................. 39

D. Loden's Trial Counsel Did Not Provide The Defense Psychiatric Expert With Sufficient Background Information For A Proper Evaluation Of Loden ............................................. 41

IV.     LODEN'S PLEA WAS NOT KNOWING, VOLUNTARY, OR
        INTELLIGENT.............................................................................. 42

V.      LODEN'S APPELLATE COUNSEL INADEQUATELY
        LITIGATED HIS MOTION TO VACATE GUILTY PLEA.................. 44

VI.     LODEN'S DIRECT APPEAL OF THE MOTION TO VACATE
        GUILTY PLEA AND PETITION FOR DENIAL OF POST-
        CONVICTION RELIEF ........................................................... 46

VII.    THE MISSISSIPPI SUPREME COURT REFUSED TO GRANT
        LODEN RELIEF ON LODEN'S PETITION FOR POST-
        CONVICTION RELIEF ........................................................... 46

        A.      The Mississippi Supreme Court Denied Loden's Claims Of
                Ineffective Assistance Of Trial Counsel ..................................... 46

                1.      The Court Found That Loden's Trial Counsel Were
                        Not Ineffective And That Loden Was Not
                        Prejudiced In Any Event .................................................. 46

                2.      The Court Found That Ineffective Assistance Did
                        Not Result In A Jury Waiver ........................................... 48

                3.      The Court Rejected The Ineffective Assistance
                        Claim By Trial Counsel's Failure To Object To
                        State Evidence................................................................. 48

                4.      The Court Rejected The Ineffective Assistance
                        Claim By Trial Counsel's Failure To Litigate The
                        Motion For Funds For Expert Mitigation Assistance ...... 49

                5.      The Court Found That The Claim That Trial
                        Counsel Rendered Ineffective Advice Was
                        Procedurally Barred And That Loden's Affidavits
                        Were Not Credible ........................................................... 49

                6.      The Court Found That Loden's Trial Counsel Had
                        Adequately Made Use Of The Psychologist.................... 50

                7.      The Court Rejected Loden's Ineffective Assistance
                        Claim That His Trial Counsel By Failed To
                        Challenge The State's Evidence At The Suppression
                        Hearing............................................................................ 50

                8.      The Court Rejected Loden's Ineffective Assistance
                        Claim Based On The Totality Of Circumstances ............ 51

        B.      The Court Rejected Loden's Claim That His Plea Was Not
                Knowing, Voluntary, or Intelligent............................................. 51

        C.      The Court Rejected Loden's Claim That His Appellate
                Counsel Was Ineffective ............................................................. 51

D.     The Court Rejected Loden's Argument That The Psychiatric Report of Dr. McMichael Violated The Reliability Standard ...................................................... 52

E.     The Court Denied Loden's Claim That His Right to Develop And Present Evidence Was Violated............................ 52

LEGAL STANDARD................................................................ 53

ARGUMENT .......................................................................... 54

I.     LODEN IS ENTITLED TO HABEAS RELEIF BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AND CAUSED HIM TO ENTER A GUILTY PLEA AND WAIVE JURY SENTENCING UNKNOWINGLY, INVOLUNTARiLY, AND UNINTELLIGENTLY IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS .......................................... 54

A.     Clearly Established Federal Law Guarantees Competent Advice From Counsel During All Critical Stages Of The Criminal Proceedings.................................................... 54

1.     Clearly Established Supreme Court Precedent Guarantees Effective Assistance Of Counsel In Connection With Advice Given Whether To Forego Trial And Waive Jury Sentencing.................................... 54

2.     To Render Effective Assistance, Counsel Must Advise The Client About The Pros And Cons Of Important Decisions, Such As Whether To Plead Guilty Or Waive Jury Sentencing ................................... 56

3.     To Competently Advise The Client, Counsel Must Thoroughly Investigate The Law And The Facts, Including Facts Related To Mitigation ........................... 59

B.     Trial Counsel's Erroneous and Incompetent Advice Violated Loden's Sixth Amendment Right to Effective Assistance and  Caused Loden To Enter A Guilty Plea And Waive Jury Sentencing In Violation Of The Fourteenth Amendment................................................................. 61

1.     Loden's Right To Effective Assistance Was Violated By Trial Counsel's Erroneous Advice On the Law.......................................................................... 61

(i)     Trail counsel's unfounded advice to Loden that he could appeal pre-trial rulings if he pled guilty violated Loden's right to effective assistance............................................... 61

(ii)    Trial counsel's failure to know and advise Loden that a mitigation case was still available with a guilty plea amounted to ineffective assistance ........................................... 64

2.    Loden's Right To Effective Assistance Was Violated Because Trial Counsel Failed To Advise Loden About The Pros And Cons Of Pleading Guilty And Waiving Jury Sentencing ............................. 65

(i)    Trial counsel failed to advise Loden about the potential downside of pleading guilty and forgoing jury sentencing ............................... 65

(ii)    Trial counsel failed to explain the potential upside of presenting a mitigation case because they did not come close to conducting a reasonable mitigation investigation ........................................................ 66

(1)    Because trial counsel did not properly investigate the case, they could not have competently advised Loden of his plea and sentencing options in violation of Loden's rights to effective assistance .............................. 66

(2)    Prevailing professional norms require trial counsel to conduct an expansive mitigation investigation .......... 67

(3)    Trial counsel's failure to conduct an expansive mitigation investigation fell below the standards required by prevailing professional norms.................. 70

(4)    Trial counsel's failure to investigate mitigating circumstances was not part of a concerted trial strategy, but the result of incompetence and conflicts of interest................................... 74

(a)    The decision not to conduct a mitigation investigation was not the product of a reasonable professional judgment ...................................... 74

(b)    Trial counsel's ineffective assistance is explained by a clear conflict of interest .............. 78

3.      Loden's Right To Effective Assistance Was
Violated When Trial Counsel Failed To Maintain
Sufficient Contact With Him .............................................. 79

4.      Because Loden Received Erroneous and Ineffective
Advice Whether To Forgo Trial, His Guilty Plea
And Waiver Of Jury Sentencing Was Not Knowing,
Voluntary, And Intelligent ................................................ 82

C.     Trial Counsel's Constitutionally Defective Assistance
Prejudiced Loden .......................................................................... 84

1.      Because Loden Was Not Advised Of His
Sentencing Options, He Was Necessarily Prejudiced...... 84

2.      Loden Was Prejudiced Because Compelling
Mitigation Evidence Would Have Been Presented
To The Judge Or Jury Had His Attorneys
Conducted A Reasonable Mitigation Investigation ......... 85

3.      Unlike Counsel In Landrigan, Trial Counsel Cannot
Blame Loden For Their Failure To Conduct A
Mitigation Investigation And Competently Advise
Loden Regarding A Mitigation Case ............................... 89

(i)     Landrigan is inapposite ....................................... 89

(ii)    Trial counsel cannot blame their failure to
investigate on Loden ........................................... 94

(a)     Loden did not preclude his
trial counsel from conducting
an investigation ........................... 94

(b)     The ABA Guidelines and
relevant case law make clear
that trial counsel's failure to
investigate cannot be excused
by any purported wish of
their client .................................... 97

D.     The Mississippi Supreme Court's Rulings On Loden's
Claims Under The Sixth And Fourteenth Amendments
Were Unreasonable In Light Of Clearly Established
Federal Law ................................................................................. 102

1.      The Mississippi Supreme Court Ruling That Loden
Was Not Prejudiced By His Counsel's Ineffective
Assistance Was Contrary To And An Unreasonable
Applications Of Clearly Established Supreme Court
Precedent ....................................................................... 102

2.      The Mississippi Supreme Court's Denial Of
        Loden's Sixth Amendment Claim That His Counsel
        Was Ineffective By Failing To Conduct A
        Mitigation Investigation Was An Unreasonable
        Application Of Clearly Established Federal Law,
        And Was Based Upon An Unreasonable
        Determination Of The Facts............................................ 103

        (i)     The Mississippi Supreme Court's finding
                that trial counsel was not ineffective as a
                matter of law was an unreasonable
                application of clearly established Supreme
                Court precedent..................................................... 103

        (ii)    The Mississippi Supreme Court's conclusion
                that Loden was not prejudiced because he
                wanted to plead guilty and be put to death
                was unreasonable in light of the evidence ......... 104

        (iii)   The Mississippi Supreme Court's conclusion
                that counsel's investigation was adequate
                was unreasonable in light of federal law and
                the evidence ...................................................... 107

3.      The Mississippi Supreme Court's Denial Of
        Loden's Sixth Amendment Claim That His Counsel
        Was Ineffective By Advising Loden To Waive Jury
        Sentencing Was An Unreasonable Application Of
        Clearly Established Federal Law, And Was Based
        Upon An Unreasonable Determination Of The Facts.... 111

4.      The Mississippi Supreme Court's Denial Of
        Loden's Sixth Amendment Claim That His Counsel
        Was Ineffective By Providing Erroneous Advice To
        Loden Was An Unreasonable Application Of
        Clearly Established Federal Law .................................. 115

5.      The Mississippi Supreme Court's Denial Of
        Loden's Sixth Amendment Claim That His Counsel
        Was Ineffective By Failing To Make Adequate Use
        Of The Psychologist Was An Unreasonable
        Application Of Clearly Established Federal Law,
        And Was Based Upon An Unreasonable
        Determination Of The Facts........................................... 115

(i)     The Mississippi Supreme Court's denial of Loden's ineffective assistance of counsel claim, as it relates to trial counsel's failure to investigate and develop expert mental health testimony, was contrary to, and an unreasonable application of clearly established Supreme Court precedent ............... 115

(ii)    The Mississippi Supreme Court's finding that trial counsel's use of the psychologist was constitutionally effective was unreasonable in light of the evidence ................. 116

6.    The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claims That His Counsel Was Ineffective By Failing To Object To And Cross Examine Witnesses Was Based Upon An Unreasonable Determination Of The Facts .............. 118

7.    The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That His Trial Counsel Was Ineffective By Failing to Litigate The Expert Mitigation Motion Adequately Was Based Upon An Unreasonable Determination Of The Facts .... 119

8.    The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment and Fourteenth Amendment Claims That His Guilty Plea and Waiver of Jury Sentencing Was Not Knowing, Voluntary, Or Intelligent Was An Unreasonable Application Of Clearly Established Federal Law, And Was Based Upon An Unreasonable Determination Of The Facts ........................................... 120

(i)     The Opinion disregarded Loden's credible, competing evidence that his waiver of jury sentencing was not knowing, intelligent or voluntary ............................................................ 120

(ii)    Loden presented reliable evidence that his waiver was not knowingly, intelligently or voluntarily made ................................................. 120

(iii)   Loden's evidence undermines the claim that he preferred death over life ................................ 123

9.      The Mississippi Supreme Court's Denial Of Loden's Claim  That He Was Denied His Fourteenth Amendment Due Process Right To Fully Develop Evidence In His Case Was Based Upon An Unreasonable Determination Of The Facts And Was Contrary To Clearly Established Law............................. 123

E.      Loden Requests An Evidentiary Hearing .................................. 125

1.      Loden Is Entitled To An Evidentiary Hearing On His Claims Where The Mississippi Supreme Court's Ruling Was Unreasonable In Light Of Clearly Established Law Or Was Based On An Unreasonable Determination Of The Facts.................... 125

2.      The Mississippi Supreme Court Resolved Many Factual Disputes Without An Evidentiary Hearing In Contravention Of Federal Law And Its Own Standards...................................................................... 129

3.      To The Extent The Factual Record Was Not Developed In The State court Proceedings, That Was Not The Fault Of Loden; Section 2254(e)(2) Therefore Does Not Apply............................................. 134

(i)      Certain portions of the factual record were undeveloped because the Mississippi Supreme Court incorrectly ruled that such evidence was procedurally barred...................... 134

(1)      Loden's challenge to his guilty plea is not barred because of newly discovered evidence ............................... 136

(2)      Consideration of trial counsel's failure to provide effective assistance at the suppression hearing and of Loden's inability to obtain color photographs from the state are not procedurally barred because they are relevant to the sentencing phase ............ 137

(3)      Loden's ineffective assistance of counsel claim based on trial counsel's inadequate litigation of the mitigation funds motion does not rephrase an issue from the consolidated direct appeal and first post-conviction petition ......................... 138

(4)    Trial counsel's failure to object to the McMichael report was not fully apparent from the record ....................... 139

II.    LODEN IS ENTITLED TO HABEAS RELEIF BECAUSE HE WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ......................................................................... 140

A.    Loden Was Denied Effective Assistance Of Appellate Counsel .................................................................... 140

B.    The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That He Was Denied Effective Assistance Of Appellate Counsel Was An Unreasonable Application Of Clearly Established Federal Law, And Was Based Upon An Unreasonable Determination Of The Facts ..... 141

III.   LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE STATE'S USE OF THE PSYCHIATRIC REPORT FROM DR. MCMICHAEL VIOLATED THE EIGHTH AMENDMENT'S RELIABILITY REQUIREMENT, THE SIXTH AMENDMENT'S CONFRONTATION CLAUSE, AND DUE PROCESS ...................... 143

A.    The Use Of The McMichael Report During The Sentencing Hearing Violated Numerous Constitutional Rights That Prejudiced Loden ...................................................... 143

B.    By Weighing The Evidence Against Loden Without An Evidentiary Hearing, The Mississippi Supreme Court Made An Unreasonable Determination Of The Facts ......................... 146

IV.   LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE—IN VIOLATION OF THE FOURTEENTH AMENDMENT—HE WAS IMPROPOERLY DENIED FUNDS TO RETAIN THE ASSISTANCE OF A FORENSIC SOCIAL WORKER TO INVESTIGATE AND PRESENT RELEVANT MITIGATING FACTORS ............................................................................. 148

A.    Trial Counsel's Inaction Following The Denial Of His Motion For Funds To Hire A Mitigation Investigator Was Constitutionally Deficient ........................................... 148

B.    The Mississippi Supreme Court Made An Unreasonable Application Of The Facts When Assessing The Prejudice Loden Suffered ......................................................... 150

V.     LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE
       INDICTMENT FAILED TO CHARGE A DEATH-ELIGIBLE
       OFFENSE, AND FAILED TO GIVE NOTICE OF THE
       ELEMENTS SOUGHT TO BE USED TO ELEVATE THE
       POTENTIAL SENTENCE FROM LIFE IMPRISONMENT TO
       THE DEATH PENALTY, IN VIOLATION OF DUE PROCESS
       UNDER THE FIFTH AND FOURTEENTH AMENDMENTS
       AND FAIR NOTICE GUARANTEES UNDER THE SIXTH
       AMENDMENT ................................................................................. 151

       A.     Facts Necessary To The Adjudication Of This Claim ............... 151

       B.     The State Court's Adjudication Of The Claim .......................... 152

       C.     The State Court's Adjudication Was Contrary To, And An
              Unreasonable Application Of, Apprendi, Ring, Blakely,
              And Jones ................................................................................. 153

VI.    LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE
       SUBMISSION OF THE "AVOIDING ARREST"
       AGGRAVATING CIRCUMSTANCE VIOLATED THE
       FOURTEENTH AMENDMENT OF THE FEDERAL
       CONSTITUTION ............................................................................. 157

       A.     Facts Necessary To The Adjudication Of This Claim ............... 157

       B.     The State Court's Adjudication Of The Claim .......................... 160

       C.     The State Court's Adjudication Was An Unreasonable
              Application Of Fact And Was Unreasonable In Light Of
              The Evidence ............................................................................ 160

VII.   LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE
       SUBMISSION OF FELONY-MURDER AS AN
       AGGRAVATING CIRCUMSTANCE VIOLATED HIS RIGHTS
       UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
       AMENDMENTS ............................................................................... 163

       A.     Facts Necessary To The Adjudication Of This Claim ............... 163

       B.     The State Court's Adjudication Of The Claim .......................... 164

       C.     The State Court's Adjudication Is An Unreasonable
              Application Of Clearly Established Federal Law As
              Established In Apprendi And Ring ............................................ 164

CONCLUSION ............................................................................................ 168

## TABLE OF AUTHORITIES

Page(s)

Cases

*Adams v. Quarterman*,
324 Fed. Appx. 340 (5th Cir. 2009)............................................................91

*Ainsworth v. Woodford*,
268 F.3d 868 (9th Cir. 2001) .....................................................................73

*Alexander v. State*,
226 So. 2d 905 (Miss. 1969)......................................................................58

*Allen v. Fl. Dept. of Corrections*,
611 F.3d 740 (11th Cir. 2010) ..................................................................91

*Allen v. United States*,
536 U.S. 953 (2002).................................................................................157

*Anderson v. Johnson*,
338 F.3d 382 (5th Cir. 2003) ...............................................................63, 77

*Anderson v. Sirmons*,
476 F.3d 1131 (10th Cir. 2007) ................................................................60

*Antwine v. Delo*,
54 F.3d 1357 (8th Cir. 1995) ....................................................................87

*Apprendi v. New Jersey*,
530 U.S. 466 (2000)...........................................................................passim

*Archer v. State*,
986 So. 2d 951 (Miss. 2008)....................................................................140

*Barefoot v. Estelle*,
463 U.S. 880 (1983) (Blackmun, J. dissenting)......................................144

*Barrientes v. Johnson*,
221 F.3d 741 (5th Cir. 2000) ...................................................................128

*Battenfield v. Gibson*,
236 F.3d 1215 (10th Cir. 2001) ...............................................56, 62, 65, 85

*Bean v. Calderon*,
163 F.3d 1073 (9th Cir. 1998) ..................................................................88

*Beck v. Bowersox,*
  257 F.3d 900 (8th Cir. 2001) .......................................................................111

*Beckham v. Wainwright,*
  639 F.2d 262 (5th Cir. 1981) ........................................................................57

*Bell v. Cone,*
  535 U.S. 685 (2002)......................................................................................53

*Berry v. State,*
  703 So. 2d 269 (Miss. 1997).......................................................................154

*Billiot v. Puckett,*
  135 F.3d 311 (5th Cir. 1998) ........................................................................87

*Blackledge v. Perry,*
  17 U.S. 6321 (1974).......................................................................................59

*Blakely v. Washington,*
  542 U.S. 296 (2004)...................................................................152, 156, 157

*Blanco v. Singletary,*
  943 F.2d 1477 (11th Cir. 1991) ...........................................................99, 100

*Blystone v. Horn,*
  664 F.3d 397 (3d. Cir. 2011)................................................................ passim

*Bond v. Beard,*
  539 F.3d 256 (3d Cir. 2008)..........................................................................78

*Bouchillon v. Collins,*
  907 F.2d 589 (5th Cir. 1990) ........................................................................77

*Boyd v. Johnson,*
  167 F.3d 907 (5th Cir. 1999) ......................................................................127

*Boykin v. Alabama,*
  395 U.S. 238 (1969).......................................................................................58

*Brady v. United States,*
  397 U.S. 742 (1970)...............................................................................59, 141

*Brawner v. Epps,*
  No. 2:07-cv-16-MPM, 2010 U.S. Dist. LEXIS 7487 (N.D. Miss. Jan. 27,
  2010) .....................................................................................................92, 105

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993)....................................................................................164

*Bryant v. Scott*,
    28 F.3d 1411 (5th Cir. 1994) ........................................................60

*Bullington v. Missouri*,
    451 U.S. 430 (1981).............................................................167, 168

*Burchfield v. State*,
    277 So. 2d 623 (Miss. 1973) ....................................................157

*C.f. Valdez v. Cockrell*,
    274 F.3d 941 (5th Cir. 2001) ....................................................128

*Caldwell v. Mississippi*,
    472 U.S. 320 (1985).......................................................................56

*California v. Ramos*,
    463 U.S. 992 (1983).......................................................................56

*Caro v. Woodford*,
    280 F.3d 1247 (9th Cir. 2002), *cert. denied*, 536 U.S. 951 (2002).......................................117

*Carter v. Bell*,
    218 F.3d 581 (6th Cir. 2000) .................................................88, 99

*Chappell v. State*,
    No. 2011-CA-00336-COA, 2012 Miss. App. LEXIS 366 (Miss App. June 19,
    2012) ...............................................................................................122

*Chase v. State*.
    645 So. 2d 829 (Miss. 1994)...............................................160, 163

*Coker v. Quarterman*,
    270 Fed. Appx. 305 (5th Cir. 2008)........................................126

*Cullen v. Pinholster*,
    131 S. Ct. 1388 (2011) (Breyer, J., concurring in part) ...............126, 127

*Cummings v. Dept. of Corrections*,
    588 F.3d 1331 (11th Cir. 2009) .........................................91, 105

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980)......................................................................79

*Daniels v. United States*,
    54 F.3d 290 (7th Cir. 1995) .....................................................107

*Daniels v. Woodford*,
    428 F.3d 1181 ...................................................................61, 82, 86

*Dickerson v. Badley,*
  453 F.3d 690 ...............................................................................................61, 86

*Dickerson v. Vaughn,*
  90 F.3d 87 (3d Cir. 1996)..........................................................................59

*Dixon v. Snyder,*
  266 F.3d 693 (7th Cir. 2001) ....................................................................63

*Doyle v. State,*
  460 So. 2d 353 (Fla. 1984).......................................................................160

*Draughon v. Dretke,*
  427 F.3d 286 (5th Cir. 2005) ....................................................................88

*Eddings v. Oklahoma,*
  455 U.S. 104 (1982)..................................................................................87

*Edwards v. State,*
  737 So. 2d 275 (Miss. 1999).................................................160, 163, 167

*Evans-Smith v. Taylor,*
  19 F.3d 899 (4th Cir. 1994) ....................................................................162

*Evitts v. Lucey,*
  469 U.S. 387 (1985)................................................................................141

*Ex Parte Dunham,*
  650 S.W. 2d 825 (Tex. Crim. App. 1983)...........................................58, 123

*Fields v. Gibson,*
  277 F.3d 1203 (10th Cir. 2002) ...............................................................59

*Fisher v. Lee,*
  215 F.3d 438 (4th Cir. 2000) ..................................................................135

*Florida v. Nixon,*
  543 U.S. 175 (2004)...................................................................58, 79, 101

*Ford v. Wainwright,*
  477 U.S. 399 (1986)................................................................................128

*Furman v. Georgia,*
  408 U.S. 238 (1972)................................................................................160

*Fuselier v. State,*
  654 So. 2d 519 (Miss.1995).....................................................................166

*Goodwin v. Johnson*,
224 F.3d 450 (5th Cir. 2000) ....................................................................129

*Graves v. State*,
969 So.2d 845 (Miss.2007) ......................................................................166

*Gray v. Branker*,
529 F.3d 220 (4th Cir. 2008) ......................................................................90

*Gray v. Lucas*.
677 F.2d 1086 (5th Cir. 1982) ..................................................................160

*Gray v. State*,
351 So. 2d 1342 (Miss. 1977) ...................................................................154

*Guidry v. Dretke*,
397 F.3d 306 (5th Cir. 2005) ............................................................. passim

*Guy v. Cockrell*,
343 F.3d 348 (5th Cir. 2003) .............................................................108, 119

*Hall v. Quarterman*,
534 F.3d 365 (5th Cir. 2008) .............................................................128, 134

*Hall v. Washington*,
106 F.3d 742 (7th Cir. 1997) ......................................................56, 73, 131, 134

*Hamblin v. Mitchell*,
354 F.3d 482 (6th Cir. 2003) .....................................................57, 69, 98, 99

*Hamilton v. Ayers*,
583 F.3d 1100 (9th Cir. 2009) .....................................................................91

*Hardwick v. Crosby*,
320 F.3d 1127 (11th Cir. 2003) ..............................................................88, 99

*Harris v. Reed*,
489 U.S. 255 (1989) ................................................................................166

*Harris v. United States*,
536 U.S. 545 (2002) ................................................................................156

*Hatch v. Oklahoma*,
58 F.3d 1447 (10th Cir. 1995) ....................................................................65

*Havard v. State*,
928 So. 2d 771 (Miss. 2006) ...............................................................131, 133

*Herrera v. Collins*,
   506 U.S. 390 (1993)......................................................................................................56

*Hicks v. Oklahoma*,
   447 U.S. 343 (1980)....................................................................................................157

*Hill v. Lockhart*,
   474 U.S. 52 (1985).........................................................................................59, 60, 142

*Hodges v. State*,
   912 So. 2d 730 (Miss. 2005)................................................................................153, 163

*Holland v. State*,
   705 So. 2d 307 (Miss. 1997)...............................................................................160

*Holly v. State,*
   671 So. 2d 32 (Miss.1996)..................................................................................167

*Irving v. State*,
   361 So. 2d 1360 (Miss. 1978).............................................................................131

*Jackson v. Virginia*,
   443 U.S. 307 (1979)......................................................................158, 159, 164

*Johnson v. Mississippi*,
   486 U.S. 578 (1988)................................................................................144, 145

*Johnson v. State*,
   29 So. 3d 738 ................................................................................................136, 140

*Johnson v. State*,
   No. 2008-CA-01359-COA, 2010 Miss. App. LEXIS 327 (Miss. App. Jun. 22,
   2010) (en banc) ...............................................................................................122

*Johnson v. Zerbst*,
   304 U.S. 458 (1938)............................................................................................59, 145

*Jones v. Barnes*,
   463 U.S. 745 (1983)............................................................................................101

*Jones v. United States*,
   526 U.S. 227 (1999)...................................................................................153, 156

*Jones v. United States*,
   527 U.S. 373 (1999).........................................................................56, 154, 155

*Jordan v. State*,
   918 So. 2d 636 (Miss. 2005).............................................................................153

*Juan H v. Allen,*
    408 F.3d 1262 (9th Cir. 2005) .................................................................162

*Karis v. Calderon,*
    283 F.3d 1117 (9th Cir. 2002) ...................................................................99

*Kayer v. Ryan,*
    CV07-2120-PHX-DGC, 2009 U.S. Dist. LEXIS 96671 (D. Az. Oct. 19, 2009) ...................92

*Kennedy v. Maggio,*
    725 F.2d 269 (5th Cir. 1984) ....................................................................59

*Kennedy v. State,*
    732 So. 2d 184 (Miss.1999) ....................................................................166

*Knighton v. Maggio,*
    740 F.2d 1344 (5th Cir. 1984) ...................................................................99

*Knox v. State,*
    901 So. 2d 1257 (Miss. 2005) ..................................................................153

*Ladd v. Cockrell,*
    311 F.3d 349 (5th Cir. 2002) ....................................................................73

*Ladner v. State,*
    584 So. 2d 743 (Miss. 1991) ...................................................................161

*Lafler v. Cooper,*
    132 S. Ct. 1376 (2012) ..................................................................... passim

*Lanier v. State,*
    533 So.2d 473 (Miss. 1988) ....................................................................146

*Lavernia v. Lynaugh,*
    845 F.2d 493 (5th Cir. 1988) ....................................................................57

*Leatherwood v. State,*
    435 So. 2d 645 (Miss. 1983) ..............................................................159, 163

*Lewis v. Jeffers,*
    497 U.S. 764 (1990) .................................................................158, 159, 164

*Lewis v. Lane,*
    832 F.2d 1446 (7th Cir. 1987) .............................................................137, 147

*Lewyellyn v. Wainwright,*
    593 F.2d 15 (5th Cir. 1979) (per curiam)...................................................113, 122

*Lin v. Ashcroft,*
    377 F. 3d 1014 (9th Cir. 2004) ....................................................................82

*Loden v. Mississippi,*
    No. 07-10475, 129 S. Ct. 45 (Oct. 6, 2008)................................................46

*Loden v. State,*
    2007 DR-01758-SCT, Slip op. (Miss. 2010) (*en banc*), 2010 Miss LEXIS 194..................148

*Loyd v. Whitley,*
    977 F.2d 149 (5th Cir. 1992) .....................................................................77

*Magana v. Hofbauer,*
    263 F.3d 542 (6th Cir. 2001) .....................................................................63

*McDonald v. Johnson,*
    139 F.3d 1056 (5th Cir. 1998) .................................................................135

*Meeks v. State,*
    604 So. 2d 748 (Miss. 1992).....................................................................167

*Miller-El v. Dretke,*
    545 U.S. 231 (2005)...........................................................................54, 115

*Missouri v. Frye,*
    132 S. Ct. 1399 (2012)....................................................................... passim

*Mitchell v. Esparza,*
    540 U.S. 12 (2003)....................................................................................53

*Mitchener v. State,*
    964 So. 2d 1188 (Miss. App. 2007)..........................................................122

*Montejo v. Louisiana,*
    556 U.S. 778 (2009)..................................................................................54

*Moore v. Johnson,*
    194 F.3d 586 (5th Cir. 1999) .........................................................60, 72, 73

*Morris v. Beard,*
    2007 WL 1795689 (E.D. Pa. June 20, 2007) .............................................92

*Morris v. Thaler,*
    425 Fed. Appx. (5th Cir. 2011)................................................................128

*Morris v. Thaler,*
    425 Fed. Appx. 415 (5th Cir. Tex. 2011).................................................. passim

*Murphy v. Johnson,*
    205 F.3d 809 (5th Cir. 2000) ............................................................129, 135

*Neal v. Puckett,*
    286 F.3d 230 (5th Cir. 2002) ............................................................72, 74, 77

*New York v. Hill,*
    528 U.S. 110 (2000)..........................................................................101

*Newman v. Metrish,*
    543 F.3d 793 (6th Cir. 2008) ............................................................163

*Newton v. Avoyelle's Women's Correction Center, Warden,*
    423 Fed. Appx. 419 (5th Cir. 2011)..................................................155, 156

*North Carolina v. Alford,*
    400 U.S. 25 (1970)............................................................................58

*Novarro-Orozco v. Gonzales,*
    152 Fed. Appx. 687 (9th Cir. 2005)..................................................82

*O'Laughlin v. O'Brien,*
    568 F.3d 287 (1st Cir. 2009) ............................................................162

*on Ivy v. State,*
    589 So. 2d 1263 (Miss. 1991)...........................................................160

*Owens v. Guida,*
    549 F.3d 399 (6th Cir. 2008) ............................................................91

*Padilla v. Kentucky,*
    130 S. Ct. 1473 (2010)......................................................54, 62, 65, 85

*Paris v. Turner,*
    187 F.3d 637 (6th Cir. 1999) ............................................................82

*Parker v. Dugger,*
    498 U.S. 308 (1991)..........................................................................56

*Penry v. Lynaugh,*
    492 U.S. 302 (1989)..........................................................................87

*Pham v. State,*
    716 So. 2d 1100 (Miss. 1998)...........................................................154

*Porter v. McCollum,*
    130 S. Ct. 447 (2009)........................................................... passim

*Porter v. State*,
    732 So. 2d 899 (Miss. 1999) ................................................................159

*Richards v. Quarterman*,
    566 F.3d 553 (5th Cir. 2009) ....................................................106, 126

*Ring v. Arizona*,
    536 U.S. 584 (2002).............................................................. passim

*Roland v. State*,
    666 So. 2d 747 (Miss. 1995) ................................................................144

*Rompilla v. Beard*,
    545 U.S. 374 (2005)..............................................................57, 77, 129

*Rose v. Mitchell*,
    443 U.S. 545 (1979)................................................................157

*Rowland v. State*,
    42 So. 3d 503, 508 P.14 (Miss. 2010) ......................................166, 167

*Rubin v. Gee*,
    292 F.3d 396 (4th Cir. 2002) ................................................................79

*Sanders v. State*,
    846 So. 2d 230 (Miss. App. 2002) ................................................................131

*Schriro v. Landrigan*,
    550 U.S. 465 (2007)............................................................. passim

*Scott v. State*,
    878 So. 2d 933(Miss. 2004) ................................................................163

*Siler v. Storey*,
    587 F. Supp. 986 (N.D. Tex. 1984) ................................................................127

*Simmons v. State*,
    805 So. 2d 452 (Miss. 2001) ................................................................161

*Singh v. DeMore*,
    150 Fed. Appx. 639 (9th Cir 2005)................................................................82

*Singleton v. Johnson*,
    178 F.3d 381 (5th Cir. 1999) ................................................................127

*Smith v. Dretke*,
    417 F.3d 438 (5th Cir. 2005) ................................................................63

*Smith v. Dretke*,
    422 F.3d 269 (5th Cir. 2005) ...........................................................................67

*Smith v. Estelle*,
    602 F.2d 694 (5th Cir. 1979), *aff'd on other grounds*, 451 U.S. 454 (1981)........................144

*Sochor v. Florida*,
    504 U.S. 527 (1992)........................................................................164

*Soffar v. Dretke*,
    368 F.3d 441 (5th Cir. 2004) ................................................................56, 57

*State v. Bass*,
    4 So. 3d 353 ...............................................................................136

*State v. Berryhill*,
    703 So. 2d 250 (Miss. 1997)...............................................................153

*Stouffer v. Reynolds*,
    214 F.3d 1231 (10th Cir. 2000) ............................................................88

*Strickland v. Washington*
    466 U.S. 668 (1984).................................................................. passim

*Summerlin v. Schriro*,
    427 F.3d 623 (9th Cir. 2005) ................................................................58

*Summers v. United States*,
    538 F.2d 1208 (5th Cir. 1976) (per curiam)..............................................64

*Taylor v. Horn*,
    504 F.3d 416 (3d Cir. 2007).................................................................91

*Taylor v. Maddox*,
    366 F.3d 992 (9th Cir. 2004) ...........................................................128, 134

*Taylor v. State*,
    672 So. 2d 1246 (Miss. 1996)...........................................................160, 161

*Teague v. Scott*,
    60 F.3d 1167 (5th Cir. 1995) ................................................................84

*Tenny v. Cockrell*,
    420 F. Supp. 2d 617 (W.D. Tex. 2004), *aff'd sub nom., Tenny v. Dretke*, 416
    F.3d 404 (5th Cir. 2005) .....................................................................63

*Thomas v. Gonzales*,
    409 F.3d 1177 (9th Cir. 2005) ............................................................82, 93

*Thomas v. Horn,*
   570 F.3d 105 (3d Cir. 2009)................................................................93

*Thompson v. Wainwright,*
   787 F.2d 1447 (11th Cir. 1986) ........................................................101

*Titsworth v. Cockrell,*
   No. 2:99-CV-0061-J, 2003 U.S. Dist. LEXIS 15941 (N.D. Tex. Sept. 11,
   2003) ...............................................................................................127

*Townsend v. Burke,*
   334 U.S. 736 (1948)................................................................146, 147

*Townsend v. Sain,*
   372 U.S. 293 (1963)................................................................129, 147

*Turner v. Calderon,*
   281 F.3d 851 (9th Cir. 2002) ...........................................................58

*U.S. v. Blaylock,*
   20 F.3d 1458 (9th Cir. 1994) ...........................................................82

*U.S. v. Day,*
   969 F.2d 39 (3rd Cir. 1992) .............................................................64

*United States v. Allen,*
   357 F.3d 745 (8th Cir. 2004) .........................................................157

*United States v. Cook,*
   45 F.3d 388 (10th Cir. 1995) ..........................................................79

*United States v. Cotton,*
   535 U.S. 625 (2002).......................................................................155

*United States v. Grammas,*
   376 F.3d 433 (5th Cir. 2004) ......................................................55, 84

*United States v. Gray,*
   878 F.2d 702 (3d Cir. 1989)............................................................77

*United States v. Herrera,*
   412 F.3d 577 (5th Cir. 2005) ......................................................55, 84

*United States v. Lincks,*
   447 Fed. Appx. 943 (11th Cir. 2011)..............................................155

*Vuong v. Collins*,
  867 F. Supp. 1268 (E.D. Tex. 1994), *aff'd sub. nom.* 62 F.3d 673 (5th Cir.),
  *cert denied*, 64 U.S.L.W. 3395 (1995)...................................................................144

*Walker v. Epps*,
  1:97CV29KS, 2012 U.S. Dist. LEXIS 41604 (S.D. Miss., Mar. 27, 2012) .........................166

*Ward v. Dretke*,
  420 F.3d 479 (5th Cir. 2005) ...................................................................................63

*Weaver v. Warden, Nev. State Prison*,
  822 P.2d 112 (1991)...............................................................................................72

*West v. State*,
  725 So. 2d 872 (Miss. 1998)....................................................................................163

*White v. Clemmons*,
  241 F. Supp. 121 (E.D. La. 1965) .............................................................................127

*White v. State*,
  532 So. 2d 1207 (Miss. 1988)...........................................................................154, 160

*Wiggins v. Smith*,
  539 U.S. 510 (2003)....................................................................................... passim

*Wilcher v. Hargett*,
  978 F.2d 872 (5th Cir. 1992) ...................................................................................167

*Wiley v. Epps*,
  625 F.3d 199 (5th Cir. 2010) .............................................................................106, 126, 128

*Williams v. Quarterman*,
  551 F.3d 352 (5th Cir. 2008) Reversed...............................................................93, 126

*Williams v. Taylor*,
  529 U.S. .............................................................................................................129

*Williams v. Taylor*,
  529 U.S. 362 (2000) ...................................................................................... passim

*Williams v. Taylor*,
  529 U.S. 420 (2000)..............................................................................................135

*Wilson v. Butler*,
  813 F.2d 664 (5th Cir. 1987) ....................................................................................77

*Wilson v. Sirmons*,
  536 F.3d 1064 (10th Cir. 2008) ...............................................................................117

*Wilson v. Sirmons*,
  536 F3d 1064 (10th Cir 2008) ..................................................................77

*Wilson v. State*,
  81 So. 3d 1067 ................................................................................65, 115

*Wingo v. Blackburn*,
  786 F.2d 654 (5th Cir. 1986) .................................................................159

*Wood v. Georgia*,
  450 U.S. 261 (1981)...............................................................................79

*Woodson v. North Carolina*,
  428 U.S. 280 (1976)..............................................................................154

*Xanthull v. Beto*,
  307 F. Supp. 903 (S.D Tex. 1970) .........................................................127

*Young v. State*,
  731 So. 2d 1120 (Miss. 1999)...........................................................93, 132

**STATUTES**

28 U.S.C. section 2254 ...........................................................53, 106, 111, 129, 158

Miss. Code Ann.
  § 99-19-101(1) .....................................................................................119
  §99-19-101(5) and (7)....................................................................184, 186
  §§ 99-39-23(6), 99-39-27(9).................................................................168
  § 99-19-101 ..........................................................................................186
  sections 99-39-21, 99-39-23(6), and 99-39-27(9)..................................167
  § 99-19-101(5)(d)..................................................................................197
  § 99-39-27.............................................................................................78
  § 99-39-27(7)(a).....................................................................................78
  § 99-39-27(7)(b).....................................................................................79

Petitioner Thomas E. Loden, Jr. respectfully submits this Memorandum of Law in support of his Petition for Writ of Habeas Corpus by a Person in State Custody (the "Petition," Docket No. 4).

## INTRODUCTION

The United States Supreme Court has recently confirmed that the Sixth Amendment guarantees the effective assistance of counsel "at *all* stages of the criminal proceedings." *See Missouri v. Frye*, 132 S. Ct. 1399, 1402 (2012) (emphasis supplied). The Supreme Court specifically recognized that a defendant is entitled to effective assistance in connection with the critical decision to forego trial in favor of a plea. In order effectively to assist a defendant in making a reasoned decision about how to plead, counsel must be able to advise the defendant competently about the pros and cons of each of the possible alternatives available to the defendant. And, in order to provide competent advice about those potential benefits and risks of each course of action, counsel must have performed the necessary work on the facts and the law so that they can provide informed and correct information to the client. Merely telling the client that he has a choice to make, and telling the client that he has to make the decision himself, is not providing *effective* assistance of counsel.

The performance of the court appointed lawyers who represented Petitioner Thomas E. Loden in his capital case in Tupelo, Mississippi fell far short of providing the effective assistance of counsel that the Sixth Amendment guarantees. For all intents and purposes, Loden's counsel provided no assistance to Loden as he tried to determine his best course of action, and important aspects of what they did tell him were incorrect.

On September 17, 2001, after months of almost no communication with their client, and less than one month before his capital trial, Loden's counsel went to his jail cell and advised him that the time had come for him to make a decision whether to proceed to trial or plead guilty. Counsel did not provide any help to Loden as he made that monumental decision. Indeed, counsel *could not* offer competent advice about the

potential benefits and risks of his options because their woefully inadequate preparation left them incapable of seeing any benefits to proceeding to trial on either guilt or penalty issues.

Counsel's only strategy had been to seek the suppression of all the evidence that tied Loden to the killing, and when the trial court denied their various suppression motions in April 2001, Loden's counsel essentially stopped work on the case. In particular, counsel performed no investigation into matters that would have explained his mental state at the time of the killing and that would have provided mitigation evidence in a penalty phase. Not only did counsel not urge Loden to contest guilt or the imposition of the death sentence, they advised him that he was almost certainly going to be found guilty and sentenced to death regardless whether he pled guilty or insisted on going to trial. They did not discuss with him what his possible defense might be if he went to trial because they did not have any ideas for a possible defense. Counsel did not discuss with Loden the possibility that even one juror might not vote in favor of death based on the mitigation evidence that they had developed because they had not developed any mitigation evidence or conducted any mitigation investigation whatsoever. Counsel did not explain to Loden that he could plead guilty but still offer mitigation evidence in a sentencing phase. Instead of telling Loden that, if he were to plead guilty, he would waive certain issues for appeal that they knew Loden wanted to challenge, they incorrectly told him that the Mississippi Supreme Court would review everything in the record if he pled guilty and was sentenced to death because death cases get heightened scrutiny. Although a court appointed psychiatrist had evaluated Loden for competency to stand trial, counsel did not inform Loden of the psychiatrist's conclusions because counsel did not know the psychiatrist's conclusions themselves. Instead of urging Loden to take his time and speak with his family before making this critical decision, counsel told him that the trial judge needed to know Loden's answer right away. Counsel offered

no assistance to Loden in making the decision how to plead, much less the effective assistance guaranteed by the Sixth Amendment.

Almost immediately after Loden's sentence, one of Loden's counsel—David Daniels—went to work as a prosecutor in the same office that prosecuted Loden. Since then Daniels has submitted affidavits for the State of Mississippi in opposition to Loden's various attempts to challenge the verdict. And, shortly before his deposition in Loden's state court post-conviction proceedings, Daniels destroyed all of his files pertaining to Loden's case although Daniels was well aware that Loden's case was still pending.

In defending the conviction and sentence, the State of Mississippi sought to sweep all of counsels' errors and lapses under the rug by arguing that Loden wanted to die, chose to plead guilty, and instructed counsel not to present any mitigation evidence. The cases that have found no prejudice caused by counsel's failure to perform any mitigation investigation under the theory that the defendant would have prevented the presentation of mitigation evidence in all events are far afield from this case. In those cases, the defendant told the trial judge in open court and on the record that he did not want any mitigation evidence presented and wanted to be sentenced to death. That did not happen in this case. Loden did not state on the record that he wanted to be sentenced to death, and did not state that he did not want counsel to present any mitigation evidence. Rather, attorney Daniels has stated that Loden instructed him not to present mitigation evidence. Loden denies it. Notwithstanding this obvious credibility issue, the Mississippi Supreme Court determined that Loden would not have allowed mitigation evidence to be presented no matter what counsel would have uncovered had they done their job, and the Mississippi Supreme Court denied Loden's request for an evidentiary hearing.

Loden was denied effective assistance of counsel, and it is reasonably probable that, but for counsel's ineffective assistance, Loden would have not elected to plead guilty, waive jury sentencing, and not present a mitigation case. Loden's Petition should

therefore be granted. At minimum, an evidentiary hearing should be ordered, especially in light of the deficiencies in the state court process.

Finally, there are numerous other grounds, discussed below, that warrant the issuance of a writ of habeas corpus.

## FACTUAL BACKGROUND

I.  **TRIAL COUNSEL FAILED TO ADVISE LODEN REGARDING THE PROS AND CONS OF FOREGOING TRIAL, WAIVING JURY SENTENCING, AND PRESENTING A MITIGATION CASE; THIS CAUSED LODEN TO PLEAD GUILTY AND WAIVE JURY SENTENCING UNKNOWINGLY, INVOLUNTARILY, AND UNINTELLIGENTLY**

A.  **Counsel's Ineffective Assistance Forced Loden To Decide To Plead Guilty Without Fully Considering Or Understanding His Defense Or Mitigation Options**

On September 21, 2001, Thomas E. Loden, Jr., an eighteen-year veteran of the United States Marine Corps, entered a plea of guilty to capital murder charges on the erroneous and incompetent advice of his trial counsel. Judge Thomas J. Gardner, III accepted Loden's plea and sentenced Loden to death by lethal injection.

Trial counsel failed to advise their client competently during the most critical stage of the criminal proceedings—the plea and sentencing process. Two days before, on September 19, 2001, Loden's counsel met with Loden in jail and told him that trial was less than 3 weeks away and that Judge Gardner was insisting that Loden must decide on any guilty plea immediately or he would lose his right to plead later. ((Affidavit of Thomas E. Loden, Jr. ("Loden Aff." Pet., Ex. 1, Notice of Lodging Exhibit ("NOLEX") ECF 5-1, 2, 5, ¶ 18.) Knowing that they were unprepared either to go to trial or to present a mitigation case, Loden's lawyers willingly delivered the trial judge's ultimatum. Without advising Loden about the rights he would lose by foregoing trial or the risks of waiving jury sentencing, Loden's counsel pressured him to make a decision about a guilty plea. Loden's lawyers did not discuss with him the defenses he could present at trial, or the appellate rights he would lose by a plea. They failed to advise him

that, even with a plea of guilty, he had the right to present mitigating evidence in the sentencing phase, or that failing to do so would certainly result in a death sentence. Indeed, as shown in the Petition and below, Loden's lawyers had not even conducted a mitigation investigation. (Affidavit of James P. Johnstone ("Johnstone Aff.") Pet., Ex. 19, NOLEX ECF 5-2, 9, 11, ¶ 11 (testifying that they "did not have a mitigation case to present because there had not been any mitigation investigation" (emphasis added).) Trial counsel also did not discuss with Loden the psychiatric report of their expert, psychologist Dr. C. Gerald O'Brien, whether Dr. O'Brien would testify, or whether Dr. O'Brien's testimony would be helpful. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2, 6, ¶ 23.)

Before he pled guilty, Loden wanted to know from his counsel whether the pre-trial rulings, particularly the rulings on suppression motions, were reviewable by a higher court if he pled guilty. (*Id*. at ECF 5-1, 5, ¶ 19.) Loden's counsel erroneously told him that, if he was convicted and sentenced to death, the Mississippi Supreme Court would review the case and everything in the record. (*See* Loden Aff., *Id.*; Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 9; *see also* Loden letter to Daniels, 2/7/02, Pet. Ex. 30(l), "My only hope was re-presenting everything I had trouble with on appeal. Glad to hear that I still can.") Loden's counsel did not tell him that the Mississippi Supreme Court would not review Judge Gardner's pre-trial rulings if he pled guilty. In fact, counsel told Loden that Judge Gardner's suppression rulings were one of several viable issues on appeal. (Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 9, ¶ 12.)

At no point during Loden's representation did his counsel make any effort to negotiate with the prosecution. Even though a plea would spare the victim's family and the community the many burdens of a trial, Loden's lawyers failed to seek or obtain any concession or agreement of any kind from the prosecution with respect to the plea, or the sentencing phase.

On September 20, 2001, Loden told his counsel that he would plead guilty. There was no discussion whether Loden wanted to put on a mitigation case even though he was not contesting guilt. Nor was there discussion as to whether Loden would waive a jury for sentencing. Counsel made no attempt to go over any of the questions that would be posed to Loden by Judge Gardner during the plea allocution. (*See Id*. at ECF 5-1, 5, ¶ 20.)

Arrangements were made to take Loden's guilty plea and determine sentencing the next day, September 21, 2001. Trial counsel did not discuss with Loden the benefits of cross-examining the State's witnesses or objecting to the State's evidence during the sentencing phase. (*Id*. at ECF 5-1, 6, ¶ 25.)

### B. Trial Counsel's Erroneous Advice Caused Loden To Waive His Right To Jury Sentencing

Loden's counsel did not advise him that if he pled guilty and waived jury sentencing, he would almost undoubtedly receive a death sentence from Judge Gardner. In fact, just ten months before Loden was sentenced, in November 2000, Judge Gardner sentenced another defendant, Michelle Byrom, to death after a 20-minute deliberation. Ms. Byrom's case involved a significant amount of mitigating evidence of physical and sexual abuse of Ms. Byrom by the victim, her husband. In addition, another person confessed to the murder. Attorneys Daniels and Johnstone had Byrom's docket sheet in their files. (*See* Docket of Michelle Byrom, Pet. Ex. 32, NOLEX ECF 5-4, 3-12.)

Well aware of the trial judge's record of sentencing defendants to death in capital cases despite the existence of strong mitigating evidence in other cases, Loden's lawyers should have discussed with him his odds of convincing Judge Gardner to sentence him to life compared to convincing at least one of twelve jurors to make that decision. (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 3, 5, ¶¶ 8, 21.) This is especially true where counsel had failed to conduct a mitigation investigation to properly advise Loden on jury sentencing.

-6-

Trial counsel failed to explain to Loden the purpose and importance of mitigating evidence and that the sentencing phase presented another chance to fight against a death sentence. (*Id*. at ECF 5-1, 3, 5, ¶¶ 8, 21.) They never explained him that his military record and his life experiences could serve as mitigating evidence. (*Id.* at 5-1, 5, ¶ 23.) Rather, they repeatedly told him that he had no viable defense and would get the death penalty no matter what they did. (*Id.* at ECF 5-1, 3, ¶ 8.) Trial counsel's erroneous advice engendered a feeling of hopelessness within Loden and a mistaken belief that he had no viable options to avoid a death sentence. Thus, Loden's decision to waive jury sentencing was made in a complete vacuum.

Nor could trial counsel effectively advise Loden on the value of his right to jury sentencing—they had no mitigation cause because again, "there had not been any mitigation investigation." (Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 9, 11, ¶ 11. Without such advice, it was impossible for Loden to make intelligent decisions whether to plead guilty, waive jury sentencing, and present a mitigation case.

Compounding the errors of Loden's counsel, the state trial judge erroneously informed Loden that "by entering a plea of guilty to this charge, or the capital murder case, you are waiving the jury making those determinations, as to the guilt *and* as to the punishment to be imposed." (Plea and Sentencing Transcript, p. 18, ll. 4-8; emphasis added.) This was particularly confusing given that Loden received no information about the sentencing phase from his counsel. Trial counsel did not correct this on the record or try to clarify this with Loden.

At the sentencing, the State offered into evidence the purportedly expert psychiatric report of Dr. R. McMichael. Incredibly, Loden's trial counsel stipulated to admission of the report. The report contains a number of biased, disparaging and unsupported allegations. Specifically, the report tries to tie Loden to prior purportedly similar murders in Louisiana and Mississippi, turns cattle slaughtering on his grandfather's farm into sadistic abuse of animals, and offers prejudicial and unsupported

diagnoses of Malingering and Antisocial Personality Disorder. (Whitfield Report, Pet. Ex. 28(j), NOLEX ECF 5-3, 68-90; Affidavit of Dr. James R. High ("High Aff.") Pet. Ex. 16, NOLEX ECF 5-1, 80-123.)

Although trial counsel stated to the trial court that Loden instructed them not to object to any evidence, they had an obligation to review Dr. McMichael's report with Loden, and to discuss the downside of its admission so that Loden could have made an informed decision. (Plea and Sentencing Transcript, pp. 201–05.) Loden was not shown Dr. McMichael's report or made aware of its contents. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 6, ¶ 25.) If Loden had known what it contained, he would not have given his supposed instruction not to object to it. (*Id.* at ECF 5-1, 6, ¶ 25.) Trial counsel offered the report of Dr. O'Brien into the record, which the prosecution sought to rebut with the McMichael report. Loden had also not seen the O'Brien report before it was introduced in the sentencing hearing, and he certainly did not instruct counsel to offer this report into evidence. (*Id*. at ECF 5-1, 6, ¶ 23.)

Trial counsel then failed to present mitigating evidence during the sentencing hearing. As discussed below, trial counsel's failure to pursue and develop the numerous mitigation leads themselves, to re-file Loden's motion for mitigation funds with additional authority (as requested by the trial court), or to instruct Herb Wells to conduct a mitigation investigation prevented them presenting a mitigation case on Loden's behalf. There is no question trial counsel was ineffective.

## II.     TRIAL COUNSEL FAILED TO CONDUCT AN ADEQUATE MITIGATION INVESTIGATION

### A.     Loden's Attorneys Received Numerous Leads For A Strong Mitigation Case, But Failed To Follow Up

#### 1.     In Counsel's Initial Meeting With Loden, Loden Informed Them Of Numerous Facts That Competent Counsel Would Have Pursued

Loden was arrested on June 23, 2000, on charges of capital murder, rape and four counts of sexual battery. On or about July 5, 2000, Itawamba County Circuit Judge

Thomas Gardner contacted Attorney James Johnstone of Pontotoc, Mississippi about representing Loden. Johnstone agreed. (Johnstone Aff., Pet. Ex. 19, NOLEX ECF 5-2, 9 at ¶2.)

Attorney Johnstone first met with Loden on July 6, 2000 in the New Albany jail. (See Johnstone's Itemized Statement for Compensation and Expenses, NOLEX EX 5-2, 13-16, (see also Itawamba County Trial Record ("TR")[1] 243–247.))  During that meeting, which lasted less than one and a half hours,[2] Loden was not at all reluctant to discuss intimate details of his life that would have been instrumental to developing a mitigation case.  Loden told Johnstone numerous facts which should have been followed up on to develop a mitigation case.  (*Id.*; *see also* Johnstone's Hand Written Notes dated 7/6/00, Pet. Ex. 25(a), NOLEX ECF 5-2, 116-120.)

Loden told Attorney Johnstone that he:  was 36 years old; was born in Tupelo; had been married to Katrina Andrews ("Kat") for 5 years; had a 2-1/2 year old daughter named Abby; had attended high school in the area; was and had been a Marine since 1982 and had performed well with many promotions over the years; had been married twice before, but those marriages ended because both wives had been unfaithful; was often on deployment with the Marines; fought in "Operation Desert Storm" from August 1990 to April 1991 where he was "first in and last out;" saw a friend of his burned to death in combat but could not do anything about it; was frequently transferred after Desert Storm from one unit to another where problems existed because he was known as a problem solver; was transferred in approximately 1995 to Virginia to serve as an instructor in the Marine Corps Fleet Anti-Terrorism Security Team, a prestigious and high pressure assignment; and recently had been assigned to recruiting in Vicksburg, a

---

[1]    All references to the Itawamba County Trial Record are hereinafter referred to as "TR."

[2]    Johnstone's time records indicate 3 hours but that billing was "portal to portal" and therefore included driving time and the time to get in to see Loden.

*high pressure assignment with monthly recruiting goals.* (*See* Handwritten Notes of Johnstone, Pet. Ex. 25(a), *Id.*; Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 8, ¶ 35.)

Loden told Attorney Johnstone that: his parents were divorced when he was two; his mother thereafter abandoned him; his stepmother abused him as a boy; he had been sexually abused at his church at a young age; he was shuffled back and forth between his mother and father while growing up; his sister had attempted suicide as an adolescent; Loden himself had attempted suicide approximately five times; and his father died when he was 16. (*Id.*)

Regarding the night of the victim Leesa Marie Gray's death, Loden told Attorney Johnstone that he had been drinking heavily and that shortly before the crime he spoke to his wife, Kat, via cell phone. (*Id.*) At a later meeting, Loden told Johnstone the details of this conversation with his wife. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 3, ¶ 10.) During the call, Kat told him she had just had "telephone sex" with Jim Craig, a partner at a law firm where she worked as a paralegal, and planned to have intercourse with Mr. Craig over the upcoming weekend. (*Id.*; *see also* Affidavit of James W. Craig ("Craig Aff."), Pet. Ex. 5, NOLEX ECF, 5-1, 28-29.)

The information that Loden provided in that brief, initial interview provided a wealth of information that competent attorneys handling a capital case clearly should have investigated further. Moreover, Loden did not do anything to thwart an investigation. To the contrary, Loden constantly begged his counsel to conduct an investigation.

### 2. Johnstone Did Not Conduct Or Direct Any Investigation

Following his initial meeting with Loden, instead of launching a thorough investigation, Attorney Johnstone did almost nothing. Between July 2000 and January 2001, Johnstone performed no investigation into guilt and innocence issues or mitigation.

-10-

His time records reflect that he only met with Loden three times,[3] made just two telephone calls on Loden's behalf—one to the Police Department and one to the Marines—and conducted a mere two and a half hours of legal research. (*See* Johnstone Itemized Statement for Compensation and Expenses, NOLEX ECF 5-2, 13-16, (TR 243-247.))

On August 22, 2000, some of Loden's family members traveled to Pontotoc to meet with Johnstone at his office, but Johnstone primarily discussed Loden's treatment in jail. (*See* Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 10, ¶ 6; Affidavit of Bobbie Christian ("Christian Aff.") Pet. Ex. 4, NOLEX ECF 5-1, 22, 26, ¶ 21; *see also* Johnstone Handwritten Notes 8/22/00, Pet. Ex. 25 (b), NOLEX ECF 5-2, 116-120.) Johnstone did not ask about Loden's family life or youth. (Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 10-11, ¶ 6.) This was Attorney Johnstone's only meeting with any member of the Loden family. (TR 243-247; Christian Aff., Pet. Ex. 4, NOLEX ECF 5-1, 22, 26, ¶ 21.)

**3.    Attorney Johnstone Soon Passed Off Loden To Attorney Daniels, Who Also Did Not Conduct Or Direct An Investigation**

Six months after having accomplished nothing himself, Attorney Johnstone asked Attorney David Daniels to work on the case in January 2001. (Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 11, ¶ 8.)

On January 19, 2001, Judge Gardner issued a scheduling order that set a motion deadline for March 2, 2001; set a hearing deadline for all motions on March 12, 2001; set a deadline of March 15, 2001 for concluding any plea negotiations; and set a trial date of August 13, 2001. (*See* Scheduling Order, 1/19/01, TR 24-26.)[4] Thus, at the time these

---

[3]    Attorney Johnstone's time records indicate that he met with Loden again on July 7, 2000 in New Albany, but that might be an error since his notes indicate that he spoke only with law enforcement that day. (Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2, 13-16, ¶ 5,)

[4] In July 2001, Loden's counsel moved to continue the trial date, and the court set trial for October 8, 2001.

deadlines were set, Johnstone had met with Loden just three times in six months, Daniels had not met Loden at all, neither Johnstone nor Daniels had conducted any investigation, and they had not hired an investigator.  (Daniels Time Records, Pet. Ex. 36, NOLEX ECF 5-4, 64-65 (TR 249-252); Johnstone Time Records, NOLEX ECF 5-2, 13-16 (TR 243-247.)

Daniels and Johnstone met with Loden on January 31, 2001 for about one-and-a-half or two hours.  (*Id.*; TR 244, 248.)

Daniels filed 14 motions by the March 2, 2001 deadline (all without consulting with his client about any of them), including motions (1) to hire an investigator (Herb Wells); (2) to hire a mitigation investigator (Gary Mooers); (3) to suppress Loden's statements to law enforcement; (4) for psychiatric examination; and (5) to change venue.  (*See* TR 30-104 (Filed Motions); Daniels Time Records, TR 249.)  In Loden's motion for funds to hire a mitigation investigator, counsel argued that they needed to hire an expert in the field of mitigation due to the nature of the charges against Loden, that an "adequate investigation and preparation is an indispensable prerequisite to effective assistance" in capital murder cases, and that it was necessary "to present a competent defense at him [*sic*] sentencing trial." (TR 65–66.)  Counsel included a declaration from a potential expert who was available.

On March 7, 2001, the Court granted the motion to hire an investigator, Herb Wells, and authorized $1,500 for pre-trial services and $1,000 for services during trial.  (*See* TR 102 (Order).)

On April 25, 2001, Loden's motion for funds to hire a mitigation investigator came on for hearing.  At the argument, Attorney Johnstone argued that the proposed mitigation expert, Gary Mooers, "is an extremely important expert in this case."  Loden was present at the hearing and never objected or otherwise interfered with his counsel's request for mitigation assistance.  Judge Gardner denied the motion, but invited Loden's counsel to provide authority for the idea that there is a "particular specialty within the law

or a scientific basis for the kind of thing" that the mitigation expert proposed to do.
Although Attorney Johnstone represented to the court that he would "look and provide
that for" the court, he did neither. (Transcript of Hearing on Motion for Mitigation
Expert, Pet. Ex. 27, NOLEX ECF 5-3, 3-26.) After the motion was denied, counsel did
not ask Judge Gardner to reconsider his ruling or provide any additional authority to the
Court.

     Once the trial court denied the motion for funds to hire a mitigation investigator,
Loden's counsel ignored the issue of mitigation. Attorneys Johnstone and Daniels did
not personally conduct any mitigation investigation. Nor did they advise the criminal
investigator, Herb Wells, that their motion to hire a mitigation specialist had been denied
or ask him to conduct a mitigation investigation himself. Almost all of Mr. Wells'
investigation before the June 26 Suppression Hearings related to suppression issues. He
did almost no work after the June 26 Suppression Hearing and never conducted an
investigation related to the penalty phase. (*See* Wells Investigation Notes, Pet. Ex. 26(b),
NOLEX ECF 5-2, 131-138; Affidavit of Herb Wells ("Wells Aff.")Pet. Ex. 34, NOLEX
ECF 5-4, 18-19, ¶ 8.)

     Throughout trial counsel's representation, Loden repeatedly urged his attorneys to
conduct a mitigation investigation. For example, on June 6, 2001, Loden wrote a letter to
Attorney Daniels asking whether military personnel and records could be subpoenaed.
(6/6/01 Letter from Loden to Daniels, Ex. 30(e), NOLEX ECF 5-3, 120-121.) Loden also
wrote at least two letters suggesting to counsel that they obtain telephone records of his
wife's conversations with him and Mr. Craig, the man she had phone sex with on the
night of the crime. (*See*, *e.g.*, 3/11/01 and 3/20/01 Letters from Loden to Daniels, Ex.
30(b), 30(c), NOLEX ECF 5-3, 111, 114.) Loden also suggested Bill Dyas, Jim Craig,
and Joe Hargett as individuals who might have been helpful to his defense. (Loden Aff.,
Pet. Ex. 1, NOLEX ECF 5-1, 3, ¶ 9.) Loden's wife and mother also offered their
assistance. (*See* November 28, 2000 fax from Kat Loden to Johnstone, attaching an

article entitled "Gulf War Symptoms Linked To Brain Damage" and stating that Johnstone should call if she can be of any assistance (Pet. Ex. 31, NOLEX ECF 5-3, 161; letter from Loden to counsel that his mother wants to be of assistance, Exs. 30(i), (NOLEX ECF 5-3 136-139) and 31 (NOLEX ECF 5-3, 161-163).)  In fact, trial counsel never acted on these offers of assistance, never identified a single mitigation witness and never contacted the individuals suggested by Loden, his wife or mother with respect to mitigation.  (*See, e.g.*, Johnstone Aff., Pet. Ex. 19, NOLEX ECF 5-2, 11, ¶ 9; Christian Aff., Pet. Ex. 4, NOLEX ECF  5-1, 26, ¶¶ 21-22.)

Moreover, Loden repeatedly communicated his requests to see records and to discuss his options with counsel.  Rather than seeing their client on a regular basis and keeping him apprised of the legal and factual developments in the case, counsel let Loden languish in jail without any contact for weeks at a time.  Loden had to resort to outright begging just to get some legal advice from his counsel.  (*See* Loden letter to Daniels, "Would you *please* take the time and speak with me just as soon as possible?  *Please*." (emphasis in original), Ex. 30(i) NOLEX ECF 5-3, 138.)

### 4. Loden's Trial Counsel Did Not Provide The Defense Psychiatric Expert With Sufficient Background Information For A Proper Evaluation of Loden

At that same hearing on April 25, 2001, Judge Gardner authorized a mental evaluation of Loden.  (*See* Order for Mental Examination, TR 119-122.)  Loden's counsel retained Dr. C. Gerald O'Brien, a psychologist, to conduct the mental evaluation.  (*See* Order on the Application for Funds Ex Parte for a Forensic Psychologist, TR 157-159.)  Although Judge Gardner signed the order authorizing counsel to retain Dr. O'Brien on April 25, 2001, nothing happened for months.  (*Id.* at TR 159.)  In early July 2001, the assistant for Attorney Daniels contacted Dr. O'Brien for the first time to discuss the need to evaluate Loden.  (Affidavit of Dr. Gerald O'Brien ("G. O'Brien Aff.") Pet. Ex. 18, NOLEX ECF 5-2, 2, ¶ 2.)  Dr. O'Brien informed the assistant that he could not evaluate Loden until after July 30, about two weeks before trial.  (*Id.*)  On August 10, 2001, Judge

Gardner issued an order authorizing Loden to be transported to Dr. O'Brien's office for evaluation.  (*See* August 10, 2001 Order, TR 175.)

Attorney Daniels did not discuss Loden's defense case with Dr. O'Brien before the evaluation, nor did Daniels ask Dr. O'Brien to evaluate whether Loden was competent to plead guilty or direct his attorneys regarding legal strategy.  (G. O'Brien Aff., Pet Ex. 18, NOLEX ECF 5-2, 3, ¶¶ 2, 3.)  Daniels provided only limited documents and background information to Dr. O'Brien prior to the evaluation.  (G. O'Brien Aff., Pet. Ex. 18, *Id*. at 5-2, 3, ¶ 5; G. O'Brien Report, Pet. Ex. 29(a), NOLEX ECF 5-3, 94.)

Dr. O'Brien interviewed Loden on August 13, 2001 for two hours, and Loden told him many things that should have been further investigated in preparation of a mitigation case.  Dr. O'Brien drafted his report on Saturday, September 14, 2001, and faxed it to Daniels' office on September 17, 2001.  (G. O'Brien Report, Ex. 29(a), *Id*. at ECF 5-3, 94.)  Daniels did not thereafter contact Dr. O'Brien to discuss the report, the opinions expressed therein, or whether Dr. O'Brien would testify.  By the time Daniels received Dr. O'Brien's draft report, Daniels was already in discussions with Loden and the prosecution about pleading guilty.  (G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 5-6, ¶¶ 13-15.)  Although Dr. O'Brien did find that Loden suffered from an emotional disturbance at the time of the crime, he did not link this finding to any diagnoses or provide sufficient context for the finding.  (G. O'Brien Report, Ex. 29(a), NOLEX ECF 5-3, 2-7; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 80-123, (p. 43); G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 6, ¶ 17.)  Most importantly, Dr. O'Brien did not diagnose Loden with PTSD or test for disassociative symptoms that would have explained the significance of Loden's reported amnesia as a reflection of the extreme degree of emotional disturbance suffered by Loden.  (G. O'Brien Report, Ex. 29(a) NOLEX ECF 5-3, 94-101; G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 5-6, ¶¶ 10, 17; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 122, 123 (pp. 43-44).)

Since reviewing the mitigation evidence adduced during Loden's post-conviction proceedings, Dr. O'Brien has submitted an affidavit stating that his prior diagnosis of Loden was inaccurate and that he agreed with the later report of Dr. James R. High, who diagnosed Loden with chronic PTSD, Disassociative Amnesia and Borderline Personality Disorder. (High Aff., Pet. Ex. 16, *Id*. at ECF 5-1, 113, 114 (pp. 34-35).)

5.       **In The Months Leading Up To Trial, Loden's Counsel Continued To Ignore His Requests For Investigation, Updates And Advice**

On June 26, 2001 and as detailed below in Ground II, counsel failed to present any meaningful challenge to the State's evidence during the suppression hearing and, as a result, key evidence that could have otherwise been excluded was not. After the suppression hearing and Judge Gardner's denial of their motions, Loden's trial counsel essentially gave up. Attorneys Daniels and Johnstone together recorded a total of only 36.5 hours preparing for trial between the suppression hearing on June 26, 2001 and Loden's plea hearing on September 21, 2001. (*See* Time Records, NOLEX ECF 5-2, 13-16; ECF 5-4, 64-64 (Pet. Ex. 36) (TR 243-247; 249-252).) Thus, during the period of time when they should have been working tirelessly to prepare for Loden's capital murder trial, counsel merely devoted about 6 hours each per month leading up to the October 2001 trial date.

After the suppression hearing in June 2001, Loden expressed his desire to obtain new legal representation. Attorneys Johnstone and Daniels told him it was too late to obtain new counsel because Judge Gardner would not allow it. (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 4, ¶ 16.)

On about September 19, 2001, Daniels and Johnstone came to Loden's cell and told him that Judge Gardner had contacted them and informed them that Loden had to decide whether or not to plead guilty by the next day, September 20. On September 20, Loden told his counsel that he would plead guilty. There was no discussion about the sentencing phase, much less a strategy for it. Nor did counsel discuss with Loden

whether he wanted to put on a mitigation case, even though he was not contesting guilt, or the nature, purpose or importance of mitigating evidence. Nor was there discussion as to whether he should waive his right to jury sentencing. And trial counsel made no attempt to go over any of the questions that would be posed to Loden by Judge Gardner during the plea hearing. (*See Id.* at ECF 5-1, 5, ¶ 20.)

Loden's plea hearing took place the next day, September 21, 2001, followed by the sentencing hearing. Trial counsel did not discuss with Loden the benefits of cross-examining the State's witnesses or objecting to the State's evidence during the sentencing phase, which trial counsel failed to do. (*Id.* at ECF 5-1, 6, ¶ 25.) During that part of the hearing, trial counsel also waived Loden's right to present any mitigation evidence and the trial court never questioned Loden regarding that waiver. (TR 689-91, 698-700.)

### 6. Attorney Daniels' Aspirations To Join The District Attorney's Office Contributed To His Rendering Ineffective Assistance During And After Loden's Plea

Attorney Daniels' conduct can perhaps be explained by the fact that he was more interested in serving his own interests than those of Loden. Daniels intimated during the sentencing hearing that he was prepared to offer mitigation evidence that he supposedly developed while preparing for trial. Daniels, of course, never came close to developing mitigation evidence that could rise to the level of constitutionally effective assistance of counsel. He along with Attorney Johnstone failed to conduct the most basic mitigation investigation, despite compelling leads, and even failed to instruct their investigator, Herb Wells, to assist them in performing such an investigation.

Following Loden's plea and sentencing, Attorney Daniels went to work for the District Attorney's Office for the County of Itawamba. (Daniels Depo., Pet. Ex. 46, NOLEX ECF 5-4, 199 (p. 17:12-19).) During the proceedings on Loden's second petition for post-conviction relief in the Mississippi Supreme Court that began in December 2008, Daniels served the interests of his new employer rather than his former client. As an Assistant District Attorney for the District Attorney's Office that

-17-

prosecuted Loden, Daniels voluntarily submitted an affidavit dated January 23, 2009 in

support of the State's Response to Loden's petition for post-conviction relief.  But

previously on September 3, 2003, Daniels had submitted a sworn affidavit saying that he

would not speak about this case.  (Daniels 2003 Aff. Pet. Ex. 41, NOLEX ECF 5-4, 78, ¶

4.)  In the January 2009 affidavit, Daniels contended that he spoke with Loden's mother

and sister regarding mitigation evidence, despite sworn statements from those witnesses

to the contrary.  He also claimed to speak with a single, unnamed Marine liaison about

Loden's military background, even though Daniels did not provide the details of that

discussion.  Daniels obviously provided his January 2009 affidavit on behalf of his new

employer to suggest that he had conducted a mitigation investigation.  Daniels clearly

served his own interests at the expense of Loden.

Attorney Daniels also inexplicably destroyed all of his files associated with this

case knowing full well that Loden was continuing to fight his death sentence.  (Daniels

Depo., Pet. Ex. 46, NOLEX ECF 5-4, 120-122 (pp. 46:22-48:9.)  In October 2008,

Daniels was well aware that Loden was challenging his death sentence through post-

conviction proceedings and had retained new counsel for that purpose.  Post-conviction

counsel for Loden had telephoned Daniels and met him at the courthouse in August 2008.

At that brief meeting, post-conviction counsel attempted to speak with Daniels about

Loden's case, but Daniels stated he "was done with this case and did not want to be

involved in it."  (Affidavit of Mark R. McDonald, Pet. Ex. 42, NOLEX ECF 5-4, 81-83,

¶ 4.)  Nevertheless, Daniels admitted at his deposition taken on July 9, 2009 that he

thereafter willfully destroyed his Loden files in October 2008 without notice to Loden or

Loden's post-conviction counsel.  (Daniels Depo., Pet. Ex. 46, NOLEX ECF 5-4, 120-

122, (at pp. 46:22-49:23).)  The Mississippi Supreme Court acknowledged that Daniels

"without question" exercised "poor judgment in destroying Loden's file, which is

exacerbated by his present employment with the district attorney's office," but concluded

that Loden must have had everything that was destroyed because there was a "good bit of

duplication" between Daniels' file and Johnstone's records. Thus, Daniels' inexplicable act was excused based on unsupported speculation that Loden had all of the originals of what had been destroyed.

**B.** **Had Trial Counsel Properly Conducted A Mitigation Investigation, They Would Have Uncovered Powerful Evidence That Would Have Impacted Loden's Decision To Plead Guilty, Waive Jury Sentencing, And Present A Mitigation Case**

Since Loden's pro bono counsel became involved in his case, they have followed up on the multiple leads previously available to Attorneys Daniels and Johnstone, and uncovered a plethora of helpful information for Loden's mitigation case. This information includes a proper mental diagnosis of PTSD-chronic and disassociate amnesia from which Loden suffers, and a humanizing, complete picture of Loden's character and life that directly impacts his sentencing determination.

Given their failure to obtain the necessary information, trial counsel were unable to present or even consider presenting mitigation evidence on Loden's behalf. As such, they failed to gather and present evidence that would have mitigated "the defendant's moral culpability (i.e., by demonstrating the 'good' in the client's character or the 'bad' that affected his upbringing and development) and evidence that may refute the prosecution's theory of legal culpability (e.g., by reducing culpable mental states or disproving purported, inflammatory facts)." (S. O'Brien Aff., Ex. 17.) Consequently, they failed to advise Loden about the possibility and benefits of putting on a mitigation case. Had Loden been properly advised, he would not have pled guilty or waived a jury for sentencing, and he would have insisted that his attorneys present mitigation evidence on his behalf. (Loden's Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,¶ 2.)

1. **Had Counsel Interviewed Loden's Relatives, Conducted In Depth Interviews Of Loden Or Requested Public Records, They Would Have Gathered Substantial And Powerful Evidence Regarding The Physical, Emotional And Sexual Abuse Suffered By Loden**

The facts surrounding Loden's upbringing are powerful mitigating evidence. Had Loden's mother, Bobbie Christian, been thoroughly interviewed, trial counsel would have learned many facts about Loden's childhood that were relevant to a proper diagnosis of Loden and an understanding of the emotional traumas that Loden suffered. Bobbie was raised in an extremely strict household and married Loden's father, Thomas Edwin Loden, Sr. ("Tommy"), at age 17 to escape her own difficult home life. (Christian Aff. Ex. 4, NOLEX ECF 5-1, 22-23, ¶ 5.) The marriage was short and marked by infidelity by both parents, and alcohol, physical and sexual abuse by Loden's father. (*See* Christian Aff., *Id.* at ECF 5-1, 23; High Aff. Ex. 16, NOLEX ECF 5-1, 83.) Tommy often drank and beat Bobbie. (Christian Aff. Ex. 4, NOLEX ECF 5-1, 23, ¶ 6.) Loden's father tied his mother up, placed various objects inside her vagina, and shocked her with extension cords and electrical wires. (*Id.*) Because his parents shared a single bedroom with their children, Loden witnessed his father sexually abusing his mother. (*Id.*)

When Loden and his sister were small children, Loden's mother left them alone in the home while she went on dates with other men. (Affidavit of Stella Francis Renick ("Renick Aff."), Pet. Ex. 13, NOLEX ECF 5-1, 68.) At one point when Loden was two years old, his mother left him and his four year old sister alone at home for several days while she ran off with another man. (High Aff. Pet. Ex. 16, ECF 5-1, 83, p. 4; *see also* Renick Aff., Ex. 13, NOLEX ECF 5-1, 68, ¶5.) Public records confirm that Bobbie was shockingly promiscuous. (*See* Custody Hearing Record, Opinion of the Court, Pet. Ex. 21, NOLEX ECF 5-2, 53 (p. 155). "*The defendant, Mrs. Bobbye [sic] Loden has a long history of numerous and flagrant acts of adultery with various men.*") Shortly thereafter, Loden's parents divorced. (Divorce Records, Pet. Ex. 20, NOLEX ECF 5-2, 23-50.)

The divorce proceedings were extraordinarily bitter — each side attempted to establish the other's infidelity.  (Divorce Records, Ex. 20. *Id*. at ECF 5-2, 23-50; Christian Aff., Pet. Ex. 4, NOLEX ECF 5-1, 23, ¶7; Renick Aff., Pet. Ex. 13, NOLEX ECF 5-1, 68, ¶5; Affidavit of Sylvia Epperly ("Epperly Aff."), Pet. Ex. 7, NOLEX ECF 5-1, 34-36.)  A constitutionally adequate investigation would have also revealed that the bitterness and hostility between Loden's two families continued throughout their lives. (Affidavit of Sonia W. Brown ("Brown Aff.") Pet. Ex. 3, NOLEX ECF 5-1, 16-20, Christian Aff., Pet. Ex. 4, NOLEX ECF 5-1, 22-26 ; Renick Aff., Pet. Ex. 13, NOLEX ECF 5-1, 67-70.)

Loden also suffered from his stepmother, a fact essential to a reliable mental diagnosis of him.  (*See* High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 115 (p. 36).)  Loden's father met Sylvia Suttle while still married to Bobbie and married Sylvia shortly after the divorce was finalized.  (Epperly Aff., Pet. Ex. 7, NOLEX ECF 5-1, 34.)  Since Loden's father was granted custody of the children, Loden and his sister moved in with their father and new stepmother.  (Divorce Records, Pet. Ex. 20, NOLEX ECF 5-2, 23-50.) Sylvia physically and emotionally abused Loden and his sister.  (High Aff., Ex.16, NOLEX ECF 5-1, 83-84 (pp. 4-5); *see also* Christian Aff., Pet. Ex. 4, NOLEX ECF 5-1, 23, ¶8 ("Anita hated Sylvia and she still refuses to say Sylvia's name.")  Sylvia beat Loden for no reason.  (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 83-84 (pp. 4-5).)  She regularly used hangers and belts to inflict the blows.  (*Id*. at ECF 5-1, 83 (p. 4).) Moreover, she would constantly belittle Loden, calling him an "idiot," forcing him out of the house and instructing him and his sister not to return until nightfall, not even to use the bathroom.  (High Aff., *Id*. at ECF 5-1, 83( p. 4); Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 7, ¶ 31.)  Loden's father was regularly away from the home working long hours and did nothing to stop Sylvia's abuse, which contributed significantly to Loden's feeling of isolation and abandonment.  (High Aff. Pet. Ex. 16, NOLEX ECF 5-1, 83 (pp. 4, 35-36).)

Loden told his trial counsel that, while residing with his father and stepmother, he was sexually abused while attending the Calvary Vacation Bible School. (*See* Johnstone's Handwritten Notes 7/6/00 noting "sexual abuse young age at a church," Pet. Ex. 25(a), NOLEX ECF 5-2, 120; Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 2-3, ¶ 4.) Trial counsel did nothing to follow up, not even bothering to interview Loden in depth about the abuse. (*Id.* at ECF 5-1, 3, ¶ 6.) An in depth interview would have revealed that around age seven or eight, Loden was molested on approximately fifteen occasions over the course of two years by a church employee. A female classmate who was a few years older than Loden was also involved. The molester had sex with both Loden and Penny and encouraged them to have sex with each other. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 84 (p. 5).) The molestation included both giving and receiving oral and anal sex. (*Id.* (p. 5).) These incidents continued until Loden stopped attending the Bible School.

When Loden was about ten, he was handed back to his biological mother and her second husband Bill Brown, Sr. Loden was abused and neglected in that household as well. (*See* Brown Aff., Pet. Ex. 3, NOLEX ECF 5-1, 17.) Loden's stepfather was an alcoholic and would emotionally and physically abuse Loden, his mother and Loden's sister. (*See* Brown Aff., *Id.*; Christian Aff., Ex. 4, NOLEX ECF 5-1, 24.) Loden witnessed his step-father beating his mother many times. (Brown Aff., Ex. 3, NOLEX ECF 5-1, 17.) At a young age, Loden was left alone to take care of his younger half siblings while his stepfather went out drinking and his mother took Loden's sister (approximate age 15-16) to bars and pretended they were sisters to try to meet men. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 85 (p. 6).) His step-father would beat Loden with a leather horse strap or mule strap for inconsequential offenses. These beatings were worse when his step-father knew that Loden's mother was out at bars with other men. (High Aff., *Id.*) Dr. James R. High reports that, in recounting Bill Brown's abuse even today, Loden presents as traumatized. (*See Id.*)

Growing up in such a highly dysfunctional household has caused Loden and his three siblings to suffer from substance abuse problems. (Criminal Records of Loden's Siblings, Pet. Ex. 23, NOLEX ECF 5-2, 66-78; Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1,7, ¶¶ 32 & 33; Brown Aff., Pet. Ex. 3, NOLEX ECF 5-1, 18 at ¶11.) Moreover, Loden and his sister have attempted suicide. (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 3 ¶ 4.) Loden has done so throughout his life, with a total of approximately five attempts. Although he disclosed this information to his counsel, they did nothing to follow up and did not provide this information to the psychologist evaluating Loden. (*See* Johnstone's Notes, Pet. Ex. 25(a), NOLEX ECF 5-2, 120 ("sister attempted suicide (pills) . . . he has attempted approximately 5 times"); G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 4, 5, ¶ 9.)

At age 12, Loden returned to live with his father and stepmother once again. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 86 (p. 7).) However, due to his stepmother's continued abuse, Loden ran away and moved back in with his mother. (*See*, *Id*. at 5-1, 86, 87 (pp. 7-8).) By this point, Loden's mother was married to her third husband. (*See* Christian Aff., Pet. Ex. 4, NOLEX ECF 5-1, 24.) Feeling unwelcome, Loden soon left home again and moved in with his paternal grandparents on the Loden family farm in Itawamba County. (High Aff. Pet. Ex. 16, NOLEX ECF 5-1, 87, p. 8.)

> **2.    Counsel Failed To Seek Out And Present Evidence Demonstrating That Despite His Traumatic Childhood, Loden Thrived When Given A Supportive Environment**

Despite numerous leads, Attorneys Johnstone and Daniels failed to seek out and present evidence that showed Loden thrived personally and professionally given the proper structure and environment. During the time when Loden lived with his grandparents, he did well both socially and academically. (*See* Affidavit of Connie Graham Reynolds ("Reynolds Aff."), Pet. Ex. 14, NOLEX ECF 5-1, 72-72; Affidavit of Jeff Mann ("Mann Aff."), Pet. Ex. 12, NOLEX ECF 5-1, 60-64; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 87 (p. 8); School Records, Exs. 22(a), 22(b), NOLEX ECF 5-2, 58-

65.)  Loden's time in his grandparents' home was the only time he felt safe as a child. (High Aff. Pet. Ex. 16 NOLEX ECF 5-1, 87 (p. 8).)  Loden's grandparents were very loving and Loden was extremely close to both of them, especially his grandfather.  (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 87-134-135 (pp. 8 & 18); Epperly Aff., Pet, Ex. 7, NOLEX 5-1, 34-36; Renick Aff., Pet. Ex. 13, NOLEX ECF 5-1, 68-69.)  Loden thrived in this environment.  He helped his grandfather run the farm, actively attended his grandparents' church and was well liked in the community.  (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 87 (p. 8); Mann Aff., Pet. Ex. 12, NOLEX ECF 5-1, 60-64.)  He attended the local high school where he was well liked and had numerous friends, both male and female.  (*See* Reynolds Aff., Pet. Ex. 14, NOLEX ECF 5-1, 72; Mann Aff., Pet. Ex. 12, NOLEX ECF 5-1, 60-64.)  Loden was never a discipline problem and received solid grades throughout high school.  (*See* Pet. Exs. 22(a), 22(b) (NOLEX ECF 5-2, 58-65.)  Upon graduation, Loden was ranked 41st out of a class of 159 students.  (*See* Itawamba High School Records, Pet. Ex. 22(b) (NOLEX ECF 5-2, 63, 64).)  Had this information been presented, it would have painted a picture of the well-adjusted individual Loden could have been had it not been for his damaging early childhood and the trauma he would later sustain in the Gulf War.

Shortly after graduating from high school, Loden joined the United States Marine Corps, where he became a stellar Marine.  He was selected an "Outstanding Recruit" and the "Honor Man" of his platoon.  (*See* Military Records, Pet. Ex. 24, NOLEX ECF 5-2, 80-113.)  His commanding officer described Loden as a "poster Marine" and the "hardest charging Marine I have ever had work for me."  (Affidavit of David Houle ("Houle Aff."), Pet. Ex. 9. NOLEX ECF 5-1, 46-49.)  His performance reviews consistently urged promotion and noted his unlimited growth potential in the Corps.  (Review of P.R. Grasty, Pet. Ex. 24(e), NOLEX ECF 5-2, 93, "[Loden] is one of the most concerned, caring and involved leaders I have observed. . . He has all the skills, traits and experience to make an OUTSTANDING First Sergeant of Marines."; Review of K.L. Bradford, Pet.

Ex. 24(f), NOLEX ECF 5-2, 95, "A superb young NCO with superior skills. My most accomplished sergeant. His overall competence is extraordinary; he is a dynamic individual with no apparent weaknesses in his MOS. … His level of maturity, moral courage, sense of justice and humor and concern for his Marines are those expected of a SNCO, which is what this young Marine should be at the earliest possible moment. He is that good.")

In 1984, Loden was sent to Okinawa as an E-3 Lance Corporal and promoted to an E-4 Corporal while stationed in Hawaii. In 1986, he was promoted to Staff Sergeant and by 1992 he was an E-7 Gunnery Sergeant. During the course of his career, Loden received a number of awards and medals, including the Combat Action Ribbon and the Good Conduct Medal (five times). (Pet., Ex. 24(b), NOLEX ECF 5-2, 84.) He also received the Navy Achievement Medal (three times, once with Combat "V") (Pet. Ex. 24(c), NOLEX ECF 5-2, 86-88), and the Navy and Marine Corps Commendation Medal (Ex. 24(d), NOLEX ECF 5-2, 90).

Loden's trial counsel did not obtain any military records despite leads provided by Loden regarding his service. Indeed, Loden specifically asked his counsel to subpoena military records. (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 3, ¶ 11; Loden Letter to Daniels, Pet. Ex. 30(e), NOLEX ECF 5-3, 120-121, "I also have questions of if [sic] the Marines are available for supeona's [sic], people and paper work.")

Moreover, counsel did not bother to interview any of Loden's military colleagues. (*See* Affidavit of William Sanders ("Sanders Aff."), Pet. Ex. 15, NOLEX ECF 5-1, 77; Houle Aff.., Pet. Ex. 9, NOLEX ECF 5-1, 46-47; Affidavit of William Ferrier III ("Ferrier Aff."), Pet. Ex. 8, NOLEX ECF 5-1, 39; Affidavit of Dustin Kittel ("Kittel Aff."), Pet. Ex. 10, NOLEX ECF 5-1, 53.) Had counsel done so, they would have learned that Loden was well liked and respected by his colleagues and supervisors alike. (Ferrier Aff., Pet. Ex. 8, NOLEX ECF 5-1, 40.) As Loden grew more senior in the Marines, he mentored younger Marines and tried to help them make the adjustment to life

in the military. (*Id.*) He always tried to set an example for other Marines and to act in a manner becoming of his position. (*Id.*)

### 3. Counsel Failed To Investigate Loden's Gulf War Combat Experience And His Post Traumatic Stress Disorder

Although trial counsel were aware that Loden had served in the Gulf War and exhibited symptoms of PTSD, they failed to conduct an extensive interview of Loden about the experience, interview any of his military friends or colleagues, or interview Loden's friends and family about any changes they noticed in Loden after the war. Had they done so, they would have been able to present this information to the psychologist examining Loden and to the Court as further mitigating evidence.

Loden's unit was one of the first ones deployed and was often fired upon and attacked. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 89-90 (pp. 10-11).) Loden repeatedly saw mangled war casualties. (*Id.*; Kittel Aff., Pet. Ex. 10, NOLEX ECF 5-1, 52; Ferrier Aff., Pet. Ex. 8, NOLEX ECF 5-1, 42, 43.) One particularly traumatic event that profoundly shook Loden's psyche was when he was the first to arrive at the scene and witnessed the death of his friend, Frank Allen. Allen's vehicle was hit by a U.S. aircraft in a "friendly fire" incident. Allen's sister had lived with Loden and his wife while Loden was stationed in Hawaii, and Allen was part of a close knit group that socialized with Loden. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 89 (p. 10).) After Allen's vehicle was hit, Loden was sent to investigate the incident. When Loden arrived on the scene, he realized that it was his friend Allen who had been killed. (*Id.*) Loden felt tremendous guilt and shame because he was alive whereas Allen, who had just gotten married and had a baby, was killed. (*Id.*) Following the incident, Loden took on dangerous assignments, choosing to risk his own life rather than the lives of others in his unit. (High Aff., Ex. 16, NOLEX ECF 5-1, 89-90 (pp. 10-11).)

Although both Loden and his wife reported to trial counsel that Loden was a completely different man after the war, counsel did nothing to investigate Loden's

experience or seek out a psychiatrist experienced in working with war veterans. (*See* Attorney Johnstone's Handwritten Notes, Pet. Ex. 25(a), NOLEX ECF 5-2, 120 ("War fucked me up"); Facsimile from Katrina Loden to Attorney Johnstone, Pet. Ex. 31, NOLEX ECF 5-3, 162-163; Loden Letter to Daniels, Pet. Ex. 30(k), NOLEX ECF 5-3, 149 ("does any of the 'Desert Storm Syndrom [sic]' stuff I wrote Mr. Johnstone about matter?").) Had they properly investigated the issue, they would have learned that Loden began drinking heavily after the war and using drugs like GHB, ecstasy and BRON (codeine laced cough syrup widely available in Okinawa). (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 7, ¶ 32.) After returning from Desert Storm, Loden for the first time began getting into fights with other soldiers. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 90 (p. 11).) He also began suffering from memory loss, nightmares and flashbacks. (Id. at 5-1, 91 (p. 12).) His prior social and personable nature all but disappeared and Loden found it difficult to get close to others. Whereas previously he would describe certain people as friends, now they were just "associates." (*Id.*; Mann Aff., Pet. Ex. 12, NOLEX ECF 5-1, 60-64, ¶¶ 13-14.) He felt great anxiety in crowds and felt distant from his loved ones. (*Id.*) Several of his Marine colleagues and friends testified to these changes. (*See* High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 89-91, pp. 10-12; Mann Aff., Ex. 12, NOLEX ECF 5-1, 60-64; Ferrier Aff. Pet. Ex. 8, NOLEX ECF 5-1, 43, ¶ 21; Houle Aff., Ex. 9, NOLEX ECF 5-1, 49, ¶ 13.) However, trial counsel never contacted any of Loden's friends or military colleagues. (*Id.*; *see also* Attorney Timenotes, NOLEX ECF 5-4, 64-64 (TR 243-247, 248-252.))

Loden did not report these problems to his superiors in the military or to any doctors since he feared that would mean the end of his Marine career or at least hinder his advancement. (*See* Ferrier Aff., Pet. Ex. 8, NOLEX ECF 5-1, 43, ¶ 21; Houle Aff., Pet. Ex. 9, NOLEX ECF 5-1, 43, ¶ 13; Loden Aff., Pet. Ex. 1. NOLEX ECF 5-1, 8, ¶ 35) However, he related his experience to family members, his best friend from home and some of his close friends in the military. (*See* Brown Aff. Pet. Ex. 3, NOLEX ECF 5-1,

19, ¶ 14; Mann Aff. Pet. Ex. 12, NOLEX ECF 5-1, 62, 63, ¶¶ 11-12; Ferrier Aff. Pet.

Ex. 8, NOLEX ECF 5-1, 43, ¶ 17; Epperly Aff. Pet. Ex. 7, NOLEX ECF 5-1, 36, ¶ 12,.)

### 4. Counsel Failed To Obtain Evidence That Loden Was A Devoted Father Struggling With A Failing Marriage

Trial counsel also failed to conduct a meaningful investigation into his home life

and whether and to what extent it contributed to his conduct.  Loden's marriage was

failing and in ways that were demeaning and emasculating to Loden.  Yet, Loden

steadfastly remained a devoted father primarily responsible for the care of his young

daughter.

Loden met his third wife, Kat, in approximately 1995 in Norfolk, Virginia, after

Loden had returned from Desert Storm and was selected to serve as an instructor for the

Fleet Anti-Terrorism Security Team ("FAST").  (High Aff. Pet. Ex. 16, NOLEX ECF 5-

1, 93, p. 14.)  He believes his elite job in the military is part of the reason Kat was

attracted to him.  (*Id.*)  At the time, Kat was in the Navy.  (*Id.*)  The two married shortly

after they met.  (*Id.*)  Although Loden was married twice before, he describes Kat as the

only woman he ever loved.  Despite his devotion, he believed that Kat never felt the same

about him.  (*Id.* at ECF 5-1, 93-95, (pp. 14-16); Renick Aff., Pet. Ex. 13, NOLEX 5-1,

69, ¶ 9.)  Throughout the marriage, Loden sensed that Kat was only interested in him

because of his prestigious assignments in the military and for financial reasons.  (High

Aff., Pet. Ex. 16, NOLEX ECF 5-1, 93, p. 14; Brown Aff., Pet. Ex. 3, NOLEX ECF 5-1,

19,20, ¶ 16.)  Loden spent above and beyond his disposable income on Kat, buying her

luxury items such as a BMW, in an attempt to keep her happy.  He also spent a lot of time

with Kat's two sons, Zachary and Keaton Dyas.  (Affidavit of William Mark Dyas

("Dyas Aff.") Pet. Ex. 6, NOLEX ECF 5-1, 31-32, ¶¶ 4, 5,)  Although Kat's former

husband had custody of the children, Kat and Loden set aside rooms in their home for the

boys and Loden showered them with attention whenever they visited.  (Loden Aff., Ex. 1

NOLEX ECF 5-1, 7, ¶ 34.)  On February 23, 1998, Loden and Kat had a daughter, Abby.

Loden was an extremely devoted father and took on many, if not most, parental duties while Kat pursued her career. (*See id.*; Renick Aff., Pet. Ex. 13, NOLEX ECF 5-1, 69, ¶ 10.)

In 1998, the Marines assigned Loden to a recruiting post in Vicksburg, Mississippi. Although a recruiting post is highly selective, it also carries with it extreme stress. Whereas previously the structured environment of a military base or a combat operation kept Loden's symptoms somewhat in check, his assigned recruiting position deprived him of a military support system. (*See* Loden Aff., Ex. 1, NOLEX ECF 5-1, 7, ¶ 35,; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 97-98, (pp.18-19).) Not only did the job lack typical military structure, the work was extremely demanding and Loden was under constant pressure from the Marines to meet recruiting quotas he found unattainable. (*See* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 7, ¶ 35; Sanders Aff, NOLEX-ECF 5-1, 77, Pet. Ex. 15  ¶ 8 ("recruiters are carefully chosen and it is one of the most difficult and stressful jobs in the service"); Kittel Aff., Pet. Ex. 10, NOLEX ECF 5-1, 53, ¶ 14 ("Marine recruiters have a lot of pressure to deal with as they struggle to meet their quota every month.").) Again, trial counsel never considered presenting this evidence, attempted to explore it with a psychiatric expert or considered how it would have impacted Loden's mental state because they never spoke to Loden, or any of his military colleagues, about the pressures of his recruiting assignment.

Despite Loden's efforts to please his wife, Kat was involved in a number of extramarital relationships. On some occasions, Loden participated in threesomes with Kat, including Kat's ex-husband, to please her.

By the time Loden was transferred to Vicksburg to work as a Marine recruiter, Kat ended her service in the Navy and graduated from college with a degree in criminal justice. She planned to attend law school and upon moving to Vicksburg began working as a paralegal at a prestigious law firm, Phelps Dunbar LLP. During their time in Vicksburg, Loden continued to try very hard to please his wife. He did chores, cooked

and took care of Abby and Zach, who had by that point moved in with Kat and Loden. Nonetheless, Kat's infidelity continued. At the time of the offense, Kat had just begun an affair with Jim Craig, a partner at the law firm where she worked as a paralegal. (*See* Craig Aff., Pet. Ex. 5, NOLEX ECF .)

Approximately two weeks prior to the crime, Loden and Kat left for vacation in Virginia Beach, Virginia. Loden viewed this trip as an opportunity to reignite his relationship with Kat. Unfortunately, Loden's hopes did not materialize. Kat seemed to distance herself even further. Instead of spending time with Loden, Kat went out drinking with her girlfriends and largely ignored Loden. (*See* High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 97-98 (pp. 18-19).)

> ### 5. Counsel Failed To Investigate The Impact Of Loden's Troubled Marriage And Drug And Alcohol Intoxication On Loden's Conduct The Night Of The Crime

In June 2000, a few days before the crime and deeply distressed about the state of his marriage, Loden travelled from Vicksburg to the Loden family farm and found that the farm had significantly deteriorated and his grandmother was extremely frail. The situation at the farm deeply disturbed Loden and reminded him of the recent death of his grandfather who had always been his "rock." ( *Id*. at ECF 5-1, 97.) Loden's ever present frustration with his recruiting assignment and his inability to meet the recruiting quota also contributed to his unhealthy mental state. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 7, ¶ 35.) Throughout the day Loden drank a few beers, ¾ of a fifth of bourbon and, shortly before the crime, took some GHB. (*Id*. at ECF 5-1, 7.)

His distressed state came to a peak shortly before he encountered Ms. Gray on the evening of June 23, 2000. Just before the meeting, he spoke to his wife Kat from his cell phone. During that conversation, Kat taunted him that she just had "phone sex" with Jim Craig and that they had decided to have intercourse that Saturday while Loden would be away. Mr. Craig would have corroborated this critical piece of mitigating evidence. (Craig Aff., Pet. Ex. 5, NOLEX ECF 5-1, 29.)

The impact of Kat's taunt cannot be overstated. Loden hung up the phone feeling completely helpless and extremely upset. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 99 (p. 20).) Loden's world was collapsing around him. His grandfather, who was always his rock had died; the family farm was falling apart; his career progression in the Marines had come to a halt and he felt its imminent end. And not only was his marriage falling apart, but his wife was moving on to a highly successful man with a more prestigious job and who could provide Kat with the stability and financial rewards he never could. (*Id.*)

Although Loden told his attorneys about this extremely upsetting conversation with his wife shortly before the crime, trial counsel did not contact Mr. Craig. As his affidavit demonstrates, Mr. Craig would have confirmed Loden's testimony regarding his conversation with Kat that night and the fact that she had an extramarital relationship with Mr. Craig. (*See* Craig Aff., Pet. Ex. 5, NOLEX ECF 5-1, 29.) Mr. Craig would have told counsel that in mid-spring of 2000, he and Kat began a sexual relationship. (*Id.*) In June 2000, Kat told Mr. Craig that her husband would be away in Itawamba County for several days. Kat and Mr. Craig discussed consummating their relationship during Loden's absence. (*Id.*) On the night of June 22, 2000, Mr. Craig and Kat were exchanging emails regarding having sex that coming Saturday. (*Id.*) In one of these emails, Kat informed Mr. Craig that she was on the phone with her husband and telling him that she was going to have sex with Mr. Craig that Saturday. (*See Id.* at ECF 5-1, 29.) Mr. Craig further notes that he would have testified to these facts if he had been subpoenaed. (*Id.*)

### 6. A Proper Mental Evaluation Would Have Revealed That Loden Suffered From A Number Of Mental Impairments

Had trial counsel properly collected and shared the above described background information, a competent mental health professional would have recognized that Loden suffered from a number of mental health ailments that would provide him with potential defenses and powerful mitigation evidence. With a complete social history, a mental

health professional would have been able to provide reliable diagnoses and relate Loden's ailments to his early development, sexual and physical abuse, and his experience in the Gulf.

After examining Loden for more than four hours and reviewing voluminous records and interviews of Loden's family members, friends and colleagues, Dr. High has concluded that from the time of his combat experience in 1991 to the present, Loden has suffered from Post Traumatic Stress Disorder—chronic (DSM-IV-TR, Code 309.81, P. 463-468). (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 113, ¶ 34.) This disorder is signaled by intrusive recollections of traumatic events, emotional numbing and avoidance of triggers, and autonomic hyperarousal—irritability, insomnia, hypervigilance. Moreover, from childhood forward and to the present, Loden suffered from an additional Post Traumatic Stress Disorder usually referred to as "Complex PTSD." Individuals suffering from this disorder exhibit symptoms such as "[i]mpaired affect regulation; self-destructive and impulsive behavior; <u>dissociative symptoms</u> (emphasis added); somatic complaints; feelings of ineffectiveness, shame despair or hopelessness; feeling permanently damaged; a loss of previously sustained beliefs; hostility; social withdrawal; feeling constantly threatened; impaired relationships with others. . . ." (*See Id*. at ECF 5-1, 113-114, quoting the Diagnostic and Statistical Manual, p. 465.)

Dr. High further concluded that Loden suffered throughout his adult life, at the time of the crime, and up to the present from a Borderline Personality Disorder (DSM-IV-TR Diagnostic Code 301.83, P. 710). This disorder is characterized by "frantic efforts to avoid real or imagined abandonment," as well as by "a pattern of unstable or intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation; and identity disturbance: markedly and persistently unstable self-image or sense of self . . . impulsivity in at least two areas that are potentially self-damaging . . . affective instability due to marked reactivity of mood, chronic feelings of emptiness and

transient, stress-related, paranoid ideation or severe <u>dissociative symptoms</u>" (emphasis added; internal quotes omitted).  (*See Id*. at ECF 5-1, 114.)

Based on his evaluation of Loden and the additional background information provided to him, Dr. High concluded that, from the time of the crime up until he awoke on the morning of June 23, 2000, Loden suffered from an acute, localized episode of disassociate amnesia (DMV-IV-TR code 300.12), which is characterized by an episode of "inability to recall important personal information usually of a traumatic or stressful nature that is too extensive to be explained by ordinary forgetfulness."  (*Id*. at ECF 5-1, 113, citing DSM-IV-TR, p. 523.)  This diagnosis supports Loden's statements regarding the crime where, rather than providing facts, he offers suppositions of what must have happened.  (*See id.* ¶ IX, 11.)  Rather than stating what he truly remembers, Loden has consistently attempted to fill the gaps with others' inferences and suggestions.  (*Id.*)

Dr. High further concludes that Loden's crime was committed while he was under the influence of extreme mental or emotional disturbance.  (*Id.*)  By providing his conclusion in the context of Loden's background and life history, Dr. High is able to support and explain this conclusion and link it to Loden's diagnosis of Complex PTSD. Moreover, Dr. High's analysis explains Loden's actions after the crime.  For instance, Dr. High notes that rather than attempting to dispose of Ms. Gray's body after the offense or fleeing the area, Loden went to sleep.  Even after discovering Ms. Gray's body, Loden drove around his farm aimlessly before slashing his own wrists.  Moreover, the emergence of a Disassociative Amnesia of the crime validates the conclusion that Loden committed that crime in a severely altered mental state and while he was under the influence of extreme mental or emotional disturbance.  (*Id.*)

Dr. High's diagnoses and expert conclusions highlight the deficiencies in Dr. O'Brien's earlier report.  Although Dr. O'Brien included a conclusory statement in his report that Loden was under an emotional disturbance at the time of the crime, he did not explain or provide any support for the claim, nor did he tie his conclusion to any

mental health disease or diagnosis.  (*See* G. O'Brien's Report, Pet. Ex. 29(a), NOLEX

ECF 5-3, 100.)  In fact, despite this conclusory remark, Dr. O'Brien did not diagnose

Loden with any disease or defect.  (*Id.*)  Whether Dr. O'Brien would have been able at

trial to provide a more detailed explanation of his conclusions was never discussed

between Dr. O'Brien and Loden's attorneys because they did not discuss his report or

evaluation before (or after) Loden's plea.  (G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-

2, 5, 6, ¶¶ 13, 15.)  Nor did counsel discuss Dr. O'Brien's report with Loden.  (Loden

Aff., Pet. Ex. 1, NOLEX ECF 5-1, 5, ¶ 18.)  In fact, as further explained below, trial

counsel did not receive Dr. O'Brien's report until just a few days before Loden was

forced to decide whether to go to trial.  By that point, it was too little, too late to have

done anything else.

## III.    TRIAL COUNSEL FAILED TO LITIGATE THE CASE ADEQUATELY

### A.    Trial Counsel's Litigation Of The Motion For Funds For Expert Mitigation Assistance Was Wholly Inadequate

Trial counsel made a request for funding for a forensic social worker, Dr. Gary

Mooers, to perform a social history investigation to develop mitigation to be presented at

sentencing.  (TR 64-75; C.P. 61-75; R.E. 30-44.)  In part, the State objected, arguing that

the defense attorneys could conduct this investigation themselves.  (TR 69.)  A social

history investigation is not within the expertise of a lawyer.  Social workers are specially

trained and have obtained expertise in conducting, compiling, and analyzing social

histories.  Nevertheless, the trial court denied Loden's motion.  (TR 75.)

Although trial counsel filed the Ex Parte Motion For Funds For Expert

Assistance, they failed to provide effective assistance of counsel by their deficient

preparation, briefing and argument of the motion, and then completely failing to follow-

up and provide the additional information requested by the trial court.  Trial counsel

requested the Court to appoint Gary R. Mooers, Ph.D., as a mitigation expert.  (TR 61-68

& 69-76.)  Dr. Mooers is a former Chair of the Department of Social Work at the

University of Mississippi.  He served as mitigation specialist in approximately 20 capital cases.  The motion filed by his counsel simply followed the format of their standard motion for a criminal investigator, set forth only generic reasons for appointing an additional expert, and failed to support the specific need for a mitigation specialist. (TR 61-68.)

Although the trial court denied the motion on May 1, 2001, stating that it had already granted a motion for an investigator, the court left the door open for counsel to show additional reasons for needing a mitigation expert:  "I'll give you an opportunity to tell me if you can locate any authority for this other than the fact that he's done it in the past.  I would like to know what the courts of this country have said about this before I authorize this expenditure."  (*See* Transcript of Hearing on Motion for Mitigation Experts, Pet. Ex. 27, NOLEX ECF 5-3, 25, (p. 75).)  Mr. Johnstone responded:  "We'll look and provide that for you, Your Honor."  (*Id.* at 26.)

Loden's counsel, however, never provided any authorities to the court, despite the availability of case law, statutes and court rules supporting appointment of a mitigation specialist.  (*See* ABA Guidelines, Guideline 4.1, cmt. at 959-60 & n.107 (describing importance of mitigation expert and listing numerous death penalty jurisdictions that by state statute, court rule or case law routinely authorize the payment of funds for mitigation experts pursuant to defense motion).)  During Loden's direct appeal, the Mississippi Supreme Court found that the trial court had not abused its discretion in denying Loden's motion because it only set forth "unsubstantiated assertions," rather than "concrete reasons" for authorizing a mitigation expert.  *Loden v. State*, 971 So. 2d 548, 563-64 (Miss. 2007).

Had counsel initiated their investigation into Loden's social, mental, military and employment history (as detailed in Ground One, above) from the moment they were appointed as Loden's counsel—as they were required to do by the prevailing norms— they would have been able to present "concrete reasons" for requiring assistance of Dr.

Mooers. In addition, had counsel adequately researched the law on the need for a mitigation expert and provided any pertinent, compelling authority to the court, the court would have (and certainly should have) granted the motion. (*See* S. O'Brien Aff., Pet. Ex. 17, NOLEX ECF 5-1, 134-136, ¶¶ 18-20.) Because of counsel's lack of investigation and shoddy litigation of the motion, Loden was denied the assistance of Dr. Mooers.

> **B.     Counsel Failed To Present Any Meaningful Challenge To The State's Evidence During The Suppression Hearing**

Counsel failed to challenge the state's evidence against Loden, to ferret out its shortcomings and expose its inconsistencies. There was ample evidence suggesting that the police had conducted an unlawful search of Loden's van eight hours *before* obtaining the warrant they formally relied on for the search. Specifically, the police tagged and removed as evidence a video camera charger that they found in Loden's room in his grandmother's house, and did so eight hours before the van was "officially" searched and the video camera and video tape were discovered. (*See* Marlar Report, Pet. Ex. 28(a), NOLEX ECF 5-3, 32; Search Warrant Return noting that search yielding recovery of charger was conducted at approximately 12:00 P.M., Pet. Ex. 28(c), NOLEX ECF 5-3, 42; Mississippi Crime Laboratory Crime Scene Response Report noting recovery of camcorder on June 23, 2000 at approximately 8:10 p.m., Pet. Ex. 28(i), NOLEX ECF 5-3, 62.) The charger was the only item seized from an overnight bag in Loden's room, but its potential significance to the case would only have been apparent if the police had already entered the van and found the video depicting the crime, something they claimed to have done only later that day. (*See* Marlar Report, (indicating that Marlar seized a video camera power supply from the overnight bag), Pet. Ex. 28(a), NOLEX ECF 5-3, 32 (p. 009); *see* Search Warrant Return (listing items taken pursuant to Warrant signed by Rick Marlar, not indicating the overnight bag or its other contents among the recovered items), Pet. Ex. 28(c), NOLEX ECF 5-3, 42; *see* Photo of overnight bag (showing that the overnight bag contained additional items), Ex. 28(e), NOLEX ECF 5-3, 46-47,.)

During the suppression hearing, counsel did not ask Officer Marlar a single question about the recovery of the video camera charger.

Moreover, counsel did not attempt to cross-examine Officer Marlar regarding the discrepancies in his and Officer Jones' chronologies of the search, specifically the timing of their recovery of the rope and blood-stained shorts that formed the basis for a search warrant and were specifically referenced in the warrant. (*See* Search Warrant, Pet. Ex. 28(b), NOLEX ECF 5-3, 38.) Officer Marlar's written report states that on June 23, 2000 at approximately 7:50 a.m., he and Officer Jones arrived at the residence of Loden's grandmother, Rena Loden. (*See* Marlar Report, Ex. 28(a), NOLEX ECF 5-3,31.) After a brief conversation, Rena Loden allegedly gave the officers permission to go to the pond located on her property to find and speak with Loden. (*Id.*; Transcript of the Suppression hearing, p. 264, 3-7.) After being unable to locate Loden at the pond, the officers returned to the Loden home and asked Mrs. Loden for permission to search the property and the vehicles on the property. According to Officer Marlar, this consent was given in written form at 9:27 a.m. and it was the only form of consent the officers received to search the property and vehicles. (*See* Marlar Report, Ex. 28(a) NOLEX ECF 5-3, 31; *see also* Transcript of the Suppression Hearing, p. 309, lines 10-14; Consent to Search signed by Rena Loden, dated 6/23/00, Pet. Ex. 28(f). NOLEX ECF 5-3, 49.) According to Officer Marlar, it was only after this form was signed that the officers searched Rena Loden's residence, a black pickup truck, and an Oldsmobile, where they found the rope. However, according to Officer Marlar's evidence submission form, the rope was recovered at 8:30 a.m.- prior to the written consent. (Evidence Submission Form, Pet. Ex. 28(d) NOLEX ECF 5-3,44.) With respect to the blood-stained shorts, days after the search, Officer Marlar wrote a report reflecting that Loden's room was not searched prior to the warrant being issued and that the shorts were recovered only after the officers obtained the search warrant. (*See* Marlar Report, Pet. Ex. 28(a), NOLEX ECF 5-3,32.) During the hearing, however, Officer Marlar maintained that he saw the blood-stained

shorts in Loden's room in plain view before the search warrant was issued to reflect the reference to the shorts in his Affidavit for a search warrant. (Transcript of the Suppression Hearing, p. 271, lines 7-14, Search Warrant, Pet. Ex. 28(b), NOLEX ECF 5-3,38.)

Officer Jones provided two reports memorializing the chronology of the search. The two reports were inconsistent and contradicted aspects of Officer Marlar's account. According to Officer Jones, after Mrs. Loden stated that Loden was probably at the pond, the Officers obtained permission to search Mrs. Loden's Oldsmobile and only then went on to the pond. (Case Report by Investigator Bryan Jones, dated 6/22/00, ("Jones I"), Pet. Ex. 28(g), NOLEX ECF 5-3,53 (pp. 070-072).). After returning from the pond, the officers discussed obtaining a search warrant. (*Id.*) Officer Jones then left the property to obtain a search warrant and returned some time later with a signed warrant. (*Id.*) Officer Jones' first report omits any mention of the blood-stained shorts.

In his second report, Officer Jones revised his account of the search. (Case Report by Investigator Bryan Jones, dated 6/22/00, ("Jones II"), Pet. Ex. 28(h), NOLEX ECF 5-3,55-57 (pp. 890-892).) He maintained that the officers received permission to search the Oldsmobile before proceeding to the pond but added that upon returning from the pond they received additional consent to search Mrs. Loden's property "to include, but not limited to the home of Mrs. Loden and the room in which E. Loden was staying." (*Id.* at ECF 5-3, 57, (p. 892).) He went on to state that Officer Marlar called him into the room where Loden was staying and showed him a pair of shorts with what appeared to be blood on them. (*Id.*) According to Jones' second report, it was only at this point that the officers discussed obtaining a search warrant. (*Id.*) Officer Jones was not called to testify by the Prosecution during the suppression hearing. Attorneys Johnstone and Daniels did not subpoena Officer Jones for testimony and thus did not cross examine him regarding any of the above inconsistencies.

Moreover, trial counsel did not question Officer Marlar regarding the discrepancy between his testimony that he discovered Loden's room in a state of disarray, and the fact that police photos show Loden's room both with the bed made and the overnight bag packed *and* with the bed unmade and the bag unpacked, as if the room was just searched. (*See* Suppression Hearing Transcript, (p. 271, lines 7-14); Photographs of the search, Pet. Ex. 28(e), NOLEX ECF 5-3, 46-47.). This would have further demonstrated that an illegal search took place.

Following his arrest, when Loden's wife visited him in jail, Kat told Loden's attorneys' investigator, Herb Wells, that she convinced Loden to speak to the investigators at their request and "strong encouragement." (*See* Herb Wells Report, Ex. 26(a), NOLEX ECF 5-2, 129.) In part due to this coercion, Loden provided a statement even though he did not recall most of the events described in his alleged confession. (*See* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 4, ¶ 15.) Since Loden's attorneys did not meet with Loden, discuss what would occur at the suppression hearing or prepare him for testimony, they failed to ensure that Loden would fully present his testimony and did not adequately cross examine witnesses regarding Loden's statement.

Finally, Loden's counsel failed to ask any questions on cross examination of Judge Bean who issued the search warrants in Loden's case. (Suppression Hearing Transcript, p. 326, lines 19-20.)

### C. Counsel Failed To Provide Loden With Discovery Prior To The Suppression Hearing And To Prepare Loden For His Testimony

Immediately after Loden's first visit from Attorney Daniels in January 2001, Loden wrote to Daniels asking for a complete copy of the discovery in the case. Daniels did not respond. Thereafter, Loden wrote to both Daniels and Wells at least 16 times asking that he be provided a copy of the discovery in the case so he could review, consider and comment on the evidence against him. (Loden Aff. Pet. Ex. 1, NOLEX

ECF 5-1,4, ¶ 13.)  Loden did not receive a response to any of those requests and was not provided with the requested discovery until after his suppression hearing.

Loden's counsel did not consult with him about the grounds for the suppression motions, whether he would be asked to testify, or prepare him for such testimony. (Loden Aff. ¶ 14, Ex. 1.)  This, despite Loden's numerous requests to meet with counsel prior to the hearing.  (*Id.*; see Loden letter to Daniels 3/20/01, Ex. 30(c), NOLEX ECF 5-3, 114.)  Instead, Attorney Daniels turned to Loden during the suppression hearing, asked him if he would like to testify, and then put Loden on the stand completely unprepared. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 4, ¶ 14.)

The court denied Loden's motions to suppress.  *After* Judge Gardner denied the suppression motions, Daniels spent 4.5 hours copying the discovery and delivering it to Loden in jail—when it was too late to be useful to Loden to in connection with his pre-trial motions and hearing.  (*See* Daniels' Itemized Statement for Compensation and Expenses, NOLEX ECF 5-4, 64-65 (TR 249).)

After Loden was able to examine the discovery relevant to the suppression hearing, he discovered a number of inconsistencies in the State's evidence suggesting police misconduct and a potentially illegal search of his van.  (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 4, ¶ 17.)  After realizing that none of these issues were addressed by his defense counsel, Loden detailed his findings in a letter to defense counsel and asked counsel to file a second suppression motion.  (*Id.*; *see also* Exs. 30(h) and 30(j) NOLEX ECF 5-3, 130-132, 145.)  Attorney Johnstone told Loden that he would file a second suppression motion.  He never did so.  In part due to counsel's performance at the suppression hearing, Loden began contemplating obtaining new counsel.  (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 4, ¶ 16.)

**D.    Loden's Trial Counsel Did Not Provide The Defense Psychiatric Expert With Sufficient Background Information For A Proper Evaluation Of Loden**

At a hearing on April 25, 2001, Judge Gardner authorized a mental evaluation of Loden. (*See* Order for Mental Examination, TR 119-122.)  Loden's counsel retained Dr. C. Gerald O'Brien, a psychologist, to conduct the mental evaluation. (*See* Order on the Application for Funds Ex Parte for a Forensic Psychologist, TR 157-159.)  Although Judge Gardner signed the order authorizing counsel to retain Dr. O'Brien on April 25, 2001, nothing happened for months. (*Id.* at TR 159.)  In early July 2001, Daniels' assistant contacted Dr. O'Brien for the first time to discuss the need to evaluate Loden. (G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 2-3, ¶ 2.)  Dr. O'Brien informed the assistant that he could not evaluate Loden until after July 30. (*Id.*)  On August 10, 2001, Judge Gardner issued an order authorizing Loden to be transported to Dr. O'Brien's office for evaluation. (*See* August 10, 2001 Order, TR 175.)

Attorney Daniels did not discuss Loden's defense case with Dr. O'Brien before the evaluation, nor did he ask him to evaluate whether Loden was competent to plead guilty. (G. O'Brien Aff. Pet. Ex. 18, NOLEX ECF 5-2, 2,3, ¶¶ 2, 3.)  This was despite knowledge, at least by co-counsel Johnstone, that Loden's family members were concerned about his persistent suicidal state and that Loden had made numerous attempts to commit suicide throughout his life, including several attempts after his arrest. (*See* Johnstone's Handwritten Notes from 7/6/00 meeting, Pet. Ex. 25(a), NOLEX ECF 5-2, 120; 7/13/00 regarding call from M. Baker regarding Loden suicide attempt, Pet. Ex. 25(b), NOLEX ECF 5-2, 122; 8/22/00 meeting with Loden family noting their concerns regarding his psychological state, Ex. 25(b), *Id.*)

Daniels provided only limited documents and background information to Dr. O'Brien. (G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 2,3, ¶ 5; G. O'Brien Report, Pet. Ex. 29(a), NOLEX ECF 5-3, 100.)  Dr. O'Brien interviewed Loden on August 13, 2001 for two hours, and Loden told him many things that should have been investigated

in furtherance of a mitigation case.  Dr. O'Brien drafted his report on Saturday, September 14, 2001, and faxed it to Daniels' office on September 17, 2001.  (G. O'Brien Report, Pet., Ex. 29(a), NOLEX ECF 5-3, 94-101 .)  Daniels did not thereafter contact Dr. O'Brien to discuss the report, the opinions expressed in the report, or whether Dr. O'Brien would testify.  By the time that Daniels received Dr. O'Brien's draft report, Daniels was already in discussions with Loden and the prosecution about pleading guilty. (G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 5,6, ¶¶ 13-15.)

Although Dr. O'Brien did find that Loden suffered from an emotional disturbance at the time of the crime, he did not link this finding to any diagnoses or provide sufficient context for the finding.  (G. O'Brien Report, Pet. Ex. 29(a), NOLEX ECF 5-3, 94-101; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 122, (p. 43); G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 6, ¶ 17.)  Most importantly, Dr. O'Brien did not diagnose Loden with PTSD or test for disassociative symptoms, which would have explained the significance of Loden's reported amnesia as a reflection of the extreme degree of emotional disturbance suffered by Loden.  (G. O'Brien Report, Pet. Ex. 29(a), NOLEX ECF 5-3, 94-101; G. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 5, 6, ¶¶ 10, 17; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 122-123(pp. 43-44).)

## IV.    LODEN'S PLEA WAS NOT KNOWING, VOLUNTARY, OR INTELLIGENT

Aside from being forced to make a plea decision in a legal and factual vacuum imposed by defense counsel, Loden's psychiatric predisposition and his mental state around the time of the plea did not allow him to enter a knowing, intelligent and voluntary guilty plea.  From childhood forward, at the time of his arrest, and to the present, Loden suffered from borderline personality disorder, depression, and complex PTSD.  (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 122-123 (pp. 34-35).)  Loden's condition was exacerbated by his attorneys' failure to present him with any options and

contributed to his feelings of depression and hopelessness. (*See* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 8, ¶¶ 36, 37.)

Counsel knew that Loden attempted suicide on numerous occasions throughout his lifetime. (Attorney Johnstone's Handwritten Notes, Pet. Ex. 25(a), NOLEX ECF 5-2, 120 (p. 4).) Both Counsel and the trial court knew that Loden was discovered the morning after the crime with his wrists slashed and that he attempted suicide while in jail awaiting trial. (Attorney Johnstone's Handwritten Notes, Ex. 25(b).) Counsel did not bother to obtain psychiatric counseling or medication for Loden despite knowledge of the suicide attempts. (*Id.*)

Throughout the plea and sentencing itself, trial counsel did nothing to notify the court that Loden's plea may not be knowing, voluntary and intelligent. In fact, in noting that they would not present mitigation evidence as supposedly instructed by Loden, counsel made no attempt to express their reservations to the court about Loden's competence and the voluntariness of his decision. (*See generally*, Plea and Sentencing; *see also* S. O'Brien Aff., Pet. Ex. 17, NOLEX ECF 5-1, 146, ¶ 30, noting that "In more than twenty-five years of specializing in the representation of persons facing the death penalty, I have seen many situations in which clients attempted to waive constitutional rights and pursue a course of action contrary to his best interests. However, this is the first such case I have seen in which trial counsel expressed no reservations about his client's competence or the voluntariness of the decision.")

Also, although the exchange between Judge Gardner, Loden, the prosecution and defense counsel takes up approximately 54 pages of the hearing transcript, the question of appeal is brought up only once—on pages 18-19. In the context of questioning Loden regarding his decision to waive a determination of his guilt and sentence by a jury, Judge Gardner asks Loden whether he understands that "the question of your guilt or innocence or imposition of the punishment determined by the jury would be something that you could appeal to the Supreme Court of this State?" (*See* Plea and Sentencing, p. 18,

lines 10-20). Judge Gardner then went on to ask whether Loden understood that if "the Court makes a determination of your guilt, you will have no right to appeal that? Do you understand that?" (*See* Plea and Sentencing, p. 19, ll. 14-18.) Although Loden replied that he understood, he explicitly noted that the questions he had were answered by his attorneys. (*See* Plea and Sentencing, p. 61, ll. 22-23.) This exchange did nothing to alter Loden's erroneous understanding of the law that was provided to him by his trial counsel. After Loden replied to the colloquy questions, Judge Gardner did not go on to discuss the finer points of the appeals process with Loden. The trial court, for instance, did not discuss the availability of post-conviction or habeas relief with Loden, notwithstanding the fact that these are potential post-conviction proceedings, an appeal of sorts, though not a direct one. Thus, a Court's inquiry regarding the finality of an appeal as to guilt or innocence did not alter Loden's understanding, based on his trial counsel's erroneous advice, that certain pre-trial issues could still be reviewed.

## V. LODEN'S APPELLATE COUNSEL INADEQUATELY LITIGATED HIS MOTION TO VACATE GUILTY PLEA

On February 12, 2002, Loden, by and through trial counsel Daniels, filed a notice of appeal. The Mississippi Supreme Court *sua sponte* remanded the matter to the Circuit Court for consideration whether Mr. Daniels should be removed from the case and substitute counsel appointed. The Order was issued in light of Daniels' new position as an Assistant District Attorney. Judge Gardner appointed the Mississippi Office of Capital Defense as Loden's counsel. The Mississippi Office of Capital Defense Counsel assumed representation of Loden and filed a "Motion to Vacate Guilty Plea and Incorporated Memorandum of Law" on July 16, 2003.

Loden asserted that his appellate counsel was ineffective in the manner in which they developed and presented evidence to challenge the constitutionality of his guilty plea. The vast additional evidence presented in this petition regarding Loden's background, psychological history and his trial counsel's numerous instances of

-44-

ineffectiveness, necessarily alters the totality of circumstances that were previously considered by the state court.

For instance, in connection with Loden's Motion to Vacate the Guilty Plea, Loden's appellate counsel did not present or develop evidence of the numerous attempts Loden made to meet with counsel to review the discovery materials and discuss the suppression issues in his case, to obtain advice on possible defense strategies and to suggest witnesses to testify on his behalf. As such, Loden's appellate counsel neglected to fully develop evidence that Loden pled guilty with the understanding that the issues he attempted to address with trial counsel, and that were so important to him, could still be reviewed by the Mississippi Supreme Court after Loden's entry of a guilty plea. As such, appellate counsel failed to demonstrate to the state trial court and the Mississippi Supreme Court that in pleading guilty, Loden, contrary to the State's repeated assertions, did not intend to waive his appeal rights and to acquiesce in the State's desire to put him to death. Moreover, Loden's appellate counsel did not develop or present evidence regarding Loden's mental state at the time of his plea. Counsel failed to present to the Mississippi Supreme Court psychiatric testimony that at the time when Loden relied on his counsel's questionable advice that, Loden had a long history of untreated depression, suicide attempts and was suffering from complex PTSD. (*See* High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 104-107, 113-114 (pp. 25, 26-28, 34-35).)

Furthermore, appellate counsel did not present evidence that trial counsel's failure to advise Loden on the value of mitigation evidence or to present a potential defense strategy contributed to Loden's feelings of hopelessness and ultimately led to his decision to plead guilty and attempt to raise all issues on appeal with the Mississippi Supreme Court.

## VI.  LODEN'S DIRECT APPEAL OF THE MOTION TO VACATE GUILTY PLEA AND PETITION FOR DENIAL OF POST-CONVICTION RELIEF

On June 24, 2005, Loden filed his direct appeal in the Mississippi Supreme Court. On September 5, 2006, Loden appealed Judge Gardner's order on the Motion to Vacate to the Mississippi Supreme Court. The Mississippi Supreme Court consolidated Loden's appeals. On October 4, 2007, the Mississippi Supreme Court denied relief, affirming the denial of the motion to vacate guilty plea and Loden's sentence of death. *Loden v. State*, 971 So. 2d 548 (Miss. 2007).

Loden filed a Petition for Writ of Certiorari with the Supreme Court of the United States on April 16, 2008.  (*Loden v. Mississippi*, No. 07-10475, 129 S. Ct. 45 (Oct. 6, 2008).) The Supreme Court denied that petition on October 6, 2008.

## VII.  THE MISSISSIPPI SUPREME COURT REFUSED TO GRANT LODEN RELIEF ON LODEN'S PETITION FOR POST-CONVICTION RELIEF

### A.  The Mississippi Supreme Court Denied Loden's Claims Of Ineffective Assistance Of Trial Counsel

#### 1.  The Court Found That Loden's Trial Counsel Were Not Ineffective And That Loden Was Not Prejudiced In Any Event

Loden filed a Petition for Post-Conviction Relief pursuant to Mississippi Code § 99-39-27. Loden asked the Mississippi Supreme Court to reverse his conviction and sentence of death pursuant to Mississippi Code § 99-39-27(7)(a). Alternatively, Loden requested that the court allow further proceedings before the trial court, pursuant to Mississippi Code § 99-39-27(7)(b), so that Loden could present additional evidence in support of his claims.

In *Loden v. State*, 43 So. 3d 365, 379–380 (Miss. 2010) ("the Opinion"), the Mississippi Supreme Court cited *Strickland* and concluded that Loden's trial counsel did not render ineffective assistance of counsel and, even if it did, the failure to mitigate was not prejudicial.  *Loden v. State*, 43 So. 3d 365, 379–380 (Miss. 2010) (*citing Wiley v. State*, 517 So. 2d 1373, 1378 (Miss. 1987) (emphasis added).

-46-

The court initially held that Loden's trial counsel was not effective as a matter of law merely because "counsel [was] specifically instructed not to present mitigation evidence." *Loden*, 43 So. 3d at 380–381 (citing *Bishop v. State*, 882 So. 2d 135, 143-46 (Miss. 2004)). The court then weighed trial counsel's 2008 and 2009 affidavits that Johnstone and Daniels had conducted a mitigation investigation. The court quoted, for example, a barrage of self-serving statements by Daniels that, among other things,

- " 'I personally interviewed [Loden's] mother and his sister regarding possible mitigation should we have needed it'";

- "'I also spoke personally with a Marine liaison officer who traveled to my office in Tupelo, Mississippi to talk with me about [Loden's] military situation and background'"; and

- "'It was my opinion that evidence of [Loden's] traumatic early childhood and his good military background would not have been insubstantial if offered in mitigation. However, [Loden] elected not to go to trial, and not to put on any mitigation evidence.'"

*Loden*, 43 So. 3d at 381–382 (quoting Daniels affidavit). As for Johnstone, the court cited Johnstone's notes about a single hour-and-a-half meeting in which Johnstone recorded details about Loden's early family life, and about the night of Ms. Gray's death. *Loden v. State*, 43 So. 3d at 382. In all, the court relied on trial counsel's claims that they "***intended*** to subpoena [Loden's mother, grandmother, sister, and aunt] as witnesses, if the matter proceeded to trial" and had engaged expert Wells to conduct a mitigation investigation on behalf of defense counsel. *Id.* The court found trial counsel's mitigation investigation sufficient.

Relying again on Loden's purported instructions not to present a mitigation investigation, the court found no prejudice: "even if additional mitigation evidence had

been discovered, pursuant to [Loden's] instructions, it could not be presented during the sentencing phase of the trial." (Citing *Bishop, 882 So. 2d.* at 146). As such, held the court, Loden "cannot show that counsel's performance was deficient or that such deficiency prejudiced him." *Loden*, 43 So. 3d at 381.

### 2. The Court Found That Ineffective Assistance Did Not Result In A Jury Waiver

The court relied on three items in making this determination. The court determined that Loden's "Waiver of Jury for Trial and Sentencing" signed by Loden on September 21, 2001 and Loden's statements to the trial judge that "I understand I had [a right to a jury], and I understand I waived it" conclusively showed that Loden had knowingly, intelligently, and voluntarily waived his right to a jury. *Loden*, 43 So. 3d at 385–386. The court also stated that the "record is replete with evidence beyond all doubt that Loden knowingly, intelligently, and voluntarily waived jury sentencing," though it did not cite any such evidence. *Id*. To the extent Loden showed that counsel failed to advise Loden that his jury waiver would result in a waiver of all appeals, the court rejected the point, instead stating that Loden failed to provide evidence "to determine the nature of that advice." *Id*. Loden's jury waiver, therefore, remained intact.

### 3. The Court Rejected The Ineffective Assistance Claim By Trial Counsel's Failure To Object To State Evidence

The court found trial counsel rendered effective assistance when it declined to object to state evidence or to cross examine state witnesses, and pursue funds for expert mitigation assistance. The court found that trial counsel's representation was not deficient because Loden "adamantly advised defense counsel that he did not want them to cross-examine witnesses for the State or object to the introduction of evidence presented by the State." In support of this conclusion, the Court cited Loden's statement, "I'm just doing what I feel I need to do." *Loden v. State*, 43 So. 3d at 387.

-48-

4. **The Court Rejected The Ineffective Assistance Claim By Trial Counsel's Failure To Litigate The Motion For Funds For Expert Mitigation Assistance**

The court found trial counsel rendered effective assistance when it declined to pursue funds for expert mitigation assistance. Instead of considering the merits of Loden's claim, the court relied on the same reason it found the mitigation investigation satisfactory: Loden's alleged statement not to present mitigation evidence. *Loden v. State*, 43 So. 3d at 387–388. The court offered no other reasons.

5. **The Court Found That The Claim That Trial Counsel Rendered Ineffective Advice Was Procedurally Barred And That Loden's Affidavits Were Not Credible**

Loden presented evidence that trial counsel rendered ineffective assistance by offering erroneous advice that Loden would enjoy automatic appellate review if he pled guilty, which advice compelled Loden to enter his guilty plea. In his 2008 affidavit, for example, attorney Johnstone revealed "'I told Loden that if he pled guilty and was sentenced to death, the Mississippi Supreme Court would review his sentence, and that they would review everything that was in the record'"—the statements on which Loden relied when he made his decision to plead guilty. *Loden v. State*, 43 So. 3d 365 at 388 (quoting 2008 Johnstone affidavit).

The Mississippi Supreme Court found the argument procedurally barred and rejected it. The court stated that it had previously held that Loden's guilty plea was knowing and voluntary, and not the result of ineffective counsel, and thus that it was procedurally barred. *Loden*, 43 So. 3d at 388. The court also rejected the argument that the 2008 and 2009 affidavits constituted "evidence[] not reasonably discoverable at the time of trial" that would have excused any claimed procedural bar. *Id.* (quoting Miss. Code Ann. §§ 99-39-23(6), 99-39-27(9) ,). The court held that Loden could have, but did not, issue subpoenas for Johnstone and Daniels when Loden filed his Motion to Vacate Guilty Plea," and thus the affidavits "do not constitute 'evidence, not reasonably discoverable at the time of trial.'" *Loden*, 43 So. 3d at 390 (quoting Miss. Code Ann. §§

-49-

99-39-23(6), 99-39-27(9)).  The court thus determined that the affidavits were reasonably discoverable during trial and did not excuse a procedural bar.

Aside from the procedural bar argument (addressed below), the court also appeared to find the affidavits not credible.  The court quoted deposition testimony that contradicted the affidavit's admissions that trial counsel advised Loden that he would enjoy an automatic appeal with a guilty plea.  *Loden*, 43 So. 3d at 389.  Said the court: the "deposition testimony . . . is convincingly similar to Daniels's deposition testimony that erroneous advice was not given to Loden" despite the statements to the contrary in the affidavits.  *Loden*, 43 So. 3d at 390.  Based in part on this apparent credibility determination, the court held that trial counsel's statements regarding Loden's chances for appellate review did not amount to ineffective assistance.

### 6. The Court Found That Loden's Trial Counsel Had Adequately Made Use Of The Psychologist

Loden asserted that trial counsel failed to provide Loden's psychologist, Dr. O'Brien, with sufficient material—i.e., mitigation evidence—to permit him to determine that Loden was not competent to stand trial.  *Loden v. State*, 43 So. 3d at 390–391.  The court rejected this ground for relief for the same reasons it rejected the argument that trial counsel rendered ineffective assistance by failing to conduct a mitigation investigation. *Id.*  The court also determined that, in any case, Dr. O'Brien was "acquainted" with Loden's family background and childhood, and therefore had sufficient information to render an adequate opinion.  *Id.*  The court thus rejected this ground for relief.

### 7. The Court Rejected Loden's Ineffective Assistance Claim That His Trial Counsel By Failed To Challenge The State's Evidence At The Suppression Hearing

The court dismissed Loden's claim that trial counsel offered ineffective assistance at the suppression hearings (where trial counsel failed to challenge any of the state's evidence) because, according to the court, the argument was procedurally barred because trial counsel failed to raise the issue in the direct appeal.  *Loden v. State*, 43 So. 3d at 392.

-50-

The court claimed that such a claim was merely an "improper backdoor challenge" to the guilty plea. *Id.*

### 8. The Court Rejected Loden's Ineffective Assistance Claim Based On The Totality Of Circumstances

The court rejected the claim that the totality of circumstances resulted in constitutionally ineffective assistance because each individual problem with trial counsel's assistance failed. *Loden v. State*, 43 So. 3d at 393–394.

### B. The Court Rejected Loden's Claim That His Plea Was Not Knowing, Voluntary, or Intelligent

Aside from trial counsel's ineffectiveness itself, Loden argued his guilty plea was not knowing, voluntary or intelligent because (1) Loden relied on trial counsel's inept advice that Loden's case would be subject to review regardless whether he plead guilty, (2) trial counsel's ineffectiveness in pursuing mitigation evidence rendered Loden unaware of his mitigation and defense options, and (3) Loden's Post-Traumatic Stress Disorder rendered him unable to make a knowing, voluntary, and intelligent plea.

The court rejected all of Loden's contentions again as procedurally barred. The first post-conviction appeal "concluded that Loden's guilty plea was 'knowing and voluntary,'" the new evidence Loden introduced—the 2008 and 2009 Johnstone and Daniels affidavits—did not excuse the argument from a procedural bar because it did not constitute evidence not reasonably discoverable at the time of trial, and even if it did, the affidavits would not be practically conclusive that they could would have reached a different result with it. *Loden v. State*, 43 So. 3d at 394-395.

### C. The Court Rejected Loden's Claim That His Appellate Counsel Was Ineffective

The Mississippi Supreme Court affirmed the ruling of the Circuit Court denying a challenge to the constitutional validity of the guilty plea raised in Loden's Motion to Vacate Guilty Plea. *Loden v. State*, 971 So.2d 548 (Miss. 2007). The court relied on the reasoning applied by the trial court to conclude that Loden's post-conviction submissions

"are woefully insufficient to rise to the level necessary to invalidate his express plea-colloquy statements to the circuit judge, so as to create a 'reasonable probability' that his 'Motion to Vacate Guilty Plea' would have been granted." *Loden*, 43 So. 3d 396, 397. The Mississippi Supreme Court concluded Loden could not prove that he is entitled to relief on this claim. *Id.*

> **D.** **The Court Rejected Loden's Argument That The Psychiatric Report of Dr. McMichael Violated The Reliability Standard**

With respect to the McMichael Report, the Mississippi Supreme Court doubted whether the trial court was provided with a full copy of the McMichael Report. The Mississippi Supreme Court noted that the record contains only a summary report that did not include the biased, disparaging, and unsupported allegations Loden challenges on post-conviction relief. *Loden*, 43 So. 3d at 387 n.31. The Opinion also stated, however, that the record "does not reveal" whether the trial court was presented with the full McMichael Report. *Id.* Based on the record, it is not known with certainty whether the trial court viewed the full McMichael Report or which version of the McMichael Report—the full or summary—was before the trial court for sentencing purposes.

> **E.** **The Court Denied Loden's Claim That His Right to Develop And Present Evidence Was Violated**

The Mississippi Supreme Court relied on statements by Daniels regarding the contents of the Loden case that Daniels destroyed in concluding that because there was no harm caused by Daniels' destruction of Loden's file, and thus that Loden's Fourteenth Amendment claim amounts to a "veritable red herring." *Loden*, 43 So. 3d at 400, 401 (internal quotations omitted). Although the Mississippi Supreme Court recognized that Daniels' act was improper (especially given Daniels' present employment with the District Attorney's office that prosecuted Loden), the court concluded that Loden failed to show that he was denied his due process right to fully develop and present evidence.

## LEGAL STANDARD

28 U.S.C. section 2254 directs the grant of writ of habeas corpus on a claim adjudicated on the merits in state court when (a) the defendant's constitutional rights have been violated and (b) the state court's failure to recognize and remedy those violations can be attributed to one or more analytical mistakes enumerated in 28 U.S.C. § 2254(d)(1) or (2) . *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 390–98 (2000) (finding constitutional violations and holding Virginia Supreme Court's adjudication of claims satisfied § 2254(d)(1) or (2)).

Under section 2254(d)(1), a defendant should be granted habeas relief if the state court's prior adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law." (Emphasis added). The "contrary to" and "unreasonable application of" clauses have independent meanings. *See Bell v. Cone*, 535 U.S. 685, 693–694 (2002). Under the "contrary to" clause, a defendant is entitled to relief if the state court (a) "applies a rule that contradicts governing law" as set forth in Supreme Court cases, or (b) decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003); *Bell*, 535 U.S. at 694. Under the "unreasonable application" clause, a defendant is entitled to relief if the state court identifies the applicable legal principle, but unreasonably applies it to the facts at issue. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Bell*, 536 U.S. at 694.

Under section 2254(d)(2), a defendant should be granted habeas relief if the state court's prior adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240–41 (2005); *Wiggins*, 539 U.S. at 528.

## ARGUMENT

I.  **LODEN IS ENTITLED TO HABEAS RELEIF BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AND CAUSED HIM TO ENTER A GUILTY PLEA AND WAIVE JURY SENTENCING UNKNOWINGLY, INVOLUNTARILY, AND UNINTELLIGENTLY IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS**

    A.  **Clearly Established Federal Law Guarantees Competent Advice From Counsel During All Critical Stages Of The Criminal Proceedings**

        1.  **Clearly Established Supreme Court Precedent Guarantees Effective Assistance Of Counsel In Connection With Advice Given Whether To Forego Trial And Waive Jury Sentencing**

The Supreme Court of the United States recently reaffirmed, in its two companion decisions of *Missouri v. Frye* and *Lafler v. Cooper,* that defendants have a Sixth Amendment right to effective assistance of counsel "at all critical stages of the criminal proceedings." *See Missouri v. Frye*, 132 S. Ct. 1399, 1402 (2012) (recognizing that "[p]lea bargains have become so central to today's criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires . . . ."); *Lafler v. Cooper*, 132 S. Ct. 1376, 1387 (2012) (holding, *inter alia*, that "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."). A defendant is entitled to effective assistance during the entry of the "guilty plea," but the right also extends to the "plea-bargaining process" as a whole. *See Frye*, 132 S. Ct. at 1406; *Lafler*, at 1387 (March 21, 2012); *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010) (setting aside guilty plea because counsel misinformed the defendant of the immigration consequences of the conviction); *accord Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

Clearly, a defendant is entitled to constitutionally effective advice whether to forego trial. *United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005) ("One of the most important duties of an attorney representing a criminal defendant is advising the

defendant whether he should plead guilty."); *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004) (same). "An attorney fulfills this obligation by informing the defendant about the relevant circumstances and the likely consequences of the plea . . . A defendant cannot make an intelligent choice whether to accept a plea offer unless he fully understands the risks of proceeding to trial." *Herrera*, 412 F.3d at 580 (remanding Section 2255 petition for evidentiary hearing as to whether counsel misadvised petitioner on sentencing exposure and whether petitioner relied on such misrepresentations in rejecting plea offer); *Grammas*, 376 F.3d at 436–37 ("'When the defendant lacks a full understanding of the risks of going to trial, he is unable to make an intelligent choice whether to accept a plea or take his chances in court.'" (quoting *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995)).

Moreover, a defendant is entitled to effective assistance of counsel in connection with advice rendered in the context of sentencing. *See Wiggins*, 539 U.S. at 538; *see also Strickland v. Washington*, 466 U.S. 668, 684–86 (1984). As Justice Brennan noted in his separate opinion in *Strickland*:

> *In contrast to a case in which a finding of ineffective assistance requires a new trial, a conclusion that counsel was ineffective with respect to only the penalty phase of a capital trial imposes on the State the far lesser burden of reconsideration of the sentence alone. On the other hand, the consequences to the defendant of incompetent assistance at a capital sentencing could not, of course, be greater.* Recognizing the unique seriousness of such a proceeding, we have repeatedly emphasized that "'where discretion is afforded a sentencing body on a matter so grave as the determination whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'"

466 U.S. at 704 (emphasis added; citations omitted) (Brennan, J., concurring in opinion but dissenting from judgment).[5]  Loden's sentencing hearing, such as it was, "cannot be

---

[5] Consistent with Justice Brennan's warning, the Supreme Court has repeatedly cautioned that "the Eighth Amendment requires that a sentence of death not be imposed arbitrarily." *Jones v. United States*, 527 U.S. 373, 38 (1999) (citing *Buchanan v. Angelone*, 522 U.S.

-55-

relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "In the context of a capital sentencing hearing, it is particularly important that counsel not be allowed to shirk her responsibility." *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997); *see also Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001) ("Indeed, we have recognized a need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case.'" (citation omitted).)

The Supreme Court's decisions in *Strickland*, 466 U.S. 668 and its progeny stand as the "clearly established Federal law" for Loden's ineffective assistance claim. *Soffar v. Dretke*, 368 F.3d 441, 471–472 (5th Cir. 2004) (reversing denial of habeas relief to inmate awaiting death penalty because counsel failed to investigate client's case sufficient to render effective assistance) (citing *Strickland*, 466 U.S. at 687). Under *Strickland*, a defense lawyer renders constitutionally ineffective assistance if (1) his performance falls below an objective standard of reasonableness; and (2) the defendant consequently suffers prejudice. *See* 466 U.S. at 687–88; *Williams*, 529 U.S. at 390.

> **2.  To Render Effective Assistance, Counsel Must Advise The Client About The Pros And Cons Of Important Decisions, Such As Whether To Plead Guilty Or Waive Jury Sentencing**

In determining whether a defense lawyer renders constitutionally ineffective assistance, counsel's services are not evaluated in isolation; the court must consider all circumstances in determining whether performance was reasonable under prevailing professional standards. *e.g.*, *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988) (citing *Strickland*, 466 U.S. at 688). "Claims of ineffective assistance of counsel require

---

269, 275 (1998)); *California v. Ramos*, 463 U.S. 992, 998-99 & n.9 (1983). Rather, to pass constitutional muster, a capital sentencing hearing must adhere to increased measures of reliability. *See Herrera v. Collins*, 506 U.S. 390, 405 (1993). "'The qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (quoting *Ramos*, 463 U.S. at 998-99). A crucial part of the process of guaranteeing that imposition of the death penalty is not arbitrary or irrational is "meaningful appellate review." *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (citing *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990)).

an inquiry into the actual performance of counsel and the determination whether representation was reasonably effective must be based on the totality of the circumstances." *Beckham v. Wainwright*, 639 F.2d 262, 265 (5th Cir. 1981). Counsel renders constitutionally incompetent performance where, as here, the assistance "'falls below an objective standard of reasonableness'" as measured by "prevailing professional norms." *Soffar*, 368 F.3d at 472–473 (quoting *Strickland*, 466 U.S. at 688); *Beckham*, 639 F.2d at 267 ("To prove that counsel was ineffective, the defendant must demonstrate that the advice 'was not within the range of competence demanded of attorneys in criminal cases.'") (*quoting Tollett v. Henderson*, 411 U.S. 258, 266 (1973)).

The Supreme Court recognizes that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") embody such norms. "[T]he *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases. This principle adds clarity, detail, and content to the more generalized and indefinite 20-year-old language of *Strickland* . . . ." *Hamblin v. Mitchell*, 354 F.3d 482, 486, 487 (6th Cir. 2003) (granting penalty-phase relief); *accord Wiggins*, 539 U.S. at 524 (the ABA Guidelines comprise "well-defined norms" and are "standards to which [the court] long [has] referred as guides to determining what is reasonable."); *accord Rompilla v. Beard*, 545 U.S. 374, 389 n.7 (2005) (citing for professional norms and duties applicable to defense counsel); *Florida v. Nixon*, 543 U.S. 175, 191–92, n.6 (2004) (same).

Counsel has an "overarching duty to advocate the defendant's cause," *Strickland*, 466 U.S. at 688—that is, a duty to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." ABA Standards for Criminal Justice, 4-5.1(a). Counsel has a duty "to consult with the defendant on important decisions," *Strickland*, 466 U.S. at 688, and "give the defendant

the tools he needs to make an intelligent decision," *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002). *See Summerlin v. Schriro*, 427 F.3d 623, 638 (9th Cir. 2005) (counsel must "'explain developments in the case to the extent reasonably necessary to permit the client to make informed decisions regarding the representation'") (quoting ABA Standards for Criminal Justice, 4-3.8(a)).

As the ABA Guidelines explain, trial counsel must "discuss with the client early in the case the sentencing alternatives available, and the relationship between the strategy for the sentencing phase and for the guilt/innocence phase." 2003 ABA Guidelines 10.11(B). The deference owed to such a "strategic" decision does not apply when trial counsel fails to provide the client with information to make an informed decision. *e.g.*, *Ex Parte Dunham*, 650 S.W. 2d 825, 827 (Tex. Crim. App. 1983) (finding counsel ineffective where "applicant was not given competent advice and thus applicant was prevented from making an informed and conscious choice regarding his right to a jury trial").

A guilty plea is valid only when it represents a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The record of the plea proceedings must affirmatively show that the plea was knowing and voluntary. *Boykin v. Alabama,* 395 U.S. 238, 239-242 (1969); *Alexander v. State*, 226 So. 2d 905, 909 (Miss. 1969). Whether a plea has been knowingly, intelligently and voluntarily entered depends on the totality of circumstances surrounding the plea. *Brady v. United States*, 397 U.S. 742, 749 (1970) (voluntariness of the plea "can be determined only by considering all of the relevant circumstances surrounding it.") The validity of the waiver will therefore vary with the facts and circumstances of each case. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

When a plea is based on the erroneous advice of counsel, it is not voluntary. *Kennedy v. Maggio*, 725 F.2d 269, 273 (5th Cir. 1984) (a plea is not voluntary where it is "entered in reliance on the defendant's attorney's patently erroneous statement of the law

in relation to the facts."); *see also Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996);

*Fields v. Gibson*, 277 F.3d 1203, 1213 (10th Cir. 2002) ("A plea may be involuntary

when an attorney materially misinforms the defendant of the consequences of the plea,"

quoting *United States v. Rhodes*, 913 F.2d 839, 843 (10th Cir. 1990).

   In *Dickerson*, the Third Circuit granted relief on petitioners' challenge to their

guilty pleas based on allegations that counsel were ineffective for failing to advise them

that their plea would preclude them from appealing a pre-trial evidentiary ruling.  The

petitioners pled nolo contendere relying on their counsel's advice that they would be able

to appeal certain pre-trial rulings despite the plea.  The Pennsylvania Supreme Court held

that the petitioners' plea colloquy barred them from challenging the voluntariness of their

plea. That colloquy read:

> "Do you understand your only appeal rights are whether
> this [crime] happened in Bucks County; whether [the]
> sentence is lawful and whether you're entering this plea of
> your own free will?"

*Dickerson*, 90 F.3d at 88.

   Petitioners replied that they understood.  *Id*.  The Third Circuit held that the

decision of the Pennsylvania Supreme Court was "contrary to" clearly established federal

law.  *Id.* at 92.  The court relied on relevant federal law in *Blackledge v. Perry*, 17 U.S.

6321 (1974), a series of Third Circuit cases, and *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)

to support its holding that a guilty plea based on the erroneous advice of counsel is

involuntary.  *Id.* at 91-92.  Therefore, Supreme Court precedent clearly establishes that

counsel must advise the client about the pros and cons of strategic choices, such as

whether to plead guilty or waive jury sentencing.

    **3. To Competently Advise The Client, Counsel Must Thoroughly
Investigate The Law And The Facts, Including Facts Related
To Mitigation**

   Applying *Strickland*, the Fifth Circuit has held: "Strategic choices made after less

than complete investigation are reasonable only to the extent that reasonable professional

judgments support the limitations on investigation." *Moore v. Johnson*, 194 F.3d 586, 592 (5th Cir. 1999). Further, "[m]itigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in a given case." *Id.* at 612; *cf. Wiggins*, 539 U.S. at 524 ("Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.").

   As the Supreme Court recognized in *Williams*, a criminal defendant has "a constitutionally protected right" to be advised of his mitigation case and provide the jury with mitigation evidence. 529 U.S. at 393. The Court has clearly enunciated a rule that defense counsel's investigation "'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (emphasis added; quoting 1989 ABA Guidelines, Guideline 11.4.1(C) at 98); *see also Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) ("[A]n attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case.'" (citation omitted)); *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (counsel must undertake "to discover *all reasonably available* mitigating evidence" in order "[t]o perform adequately in a capital case" (emphasis in original; citations omitted); *Dickerson v. Badley*, 453 F.3d 690, 695 ("[C]onducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland's* requirements."); *Daniels v. Woodford*, 428 F.3d 1181, 1202 (noting that counsel "had an independent duty to investigate the facts of [petitioner's] case and possible mitigation evidence"(collecting authorities)).

**B.** **Trial Counsel's Erroneous and Incompetent Advice Violated Loden's Sixth Amendment Right to Effective Assistance and  Caused Loden To Enter A Guilty Plea And Waive Jury Sentencing In Violation Of The Fourteenth Amendment**

     **1.** **Loden's Right To Effective Assistance Was Violated By Trial Counsel's Erroneous Advice On the Law**

        **(i)** **Trail counsel's unfounded advice to Loden that he could appeal pre-trial rulings if he pled guilty violated Loden's right to effective assistance**

There can be no doubt that Loden was improperly informed of the consequences of his plea.  The expression of the advice provided to Loden regarding his right to appeal is contained in the Affidavit of James P. Johnstone. *Johnstone Aff.*, Petition ("Pet") Ex. 19, NOLEX ECF 5-2, 9.  Attorney Johnstone conceded that he told Loden that three issues may be reviewed on appeal: (1) the rulings on the suppression motions, (2) the order denying the request for funds to hire a mitigation specialist, and (3) the use of Loden's wife Kat to induce Loden to talk with the police on June 30, 2000. *Johnstone Aff.* Ex. 19, *Id.*

Loden's hopes, therefore, hung on the prospects of appeal—in particular, whether the pre-trial rulings (especially the rulings on the suppression motions), were reviewable by a higher court if he pled guilty.  (Loden's Aff., Pet. Ex. 1, NOLEX ECF 5-1, 5,¶ 19; *see also* Pet. Ex. 30(l), Loden letter to Daniels, 2/7/02, NOLEX ECF 5-3, 153 ("My only hope was re-presenting everything on appeal.  Glad to hear that I still can.").)  Counsel had duty to advise his client "fully . . . as to the prospects of success on appeal."  ABA Ethical Canon 7-7.  They did not.

Instead, trial counsel gave erroneous advice about Loden's chances for an appeal of Judge Gardner's pretrial rulings.  They did not tell him that the Mississippi Supreme Court would not review Judge Gardner's pre-trial rulings if Loden pled guilty.  They advised that if Loden were convicted and sentenced to death, the Mississippi Supreme

Court would review the case and everything in the record. (*See* Loden Aff., Pet., Ex. 1, NOLEX ECF 5-1, 5, ¶ 19; Johnstone Aff., Pet. Ex. 19, NOLEX ECF 5-2,9, ¶ 12.)[6]

Counsel's advisory errors proved catastrophic for Loden. Loden thought, based on the advice, that in order to get the pre-trial rulings reviewed, he needed to receive a death sentence. (*See* Loden Aff., Pet., Ex. 1, NOLEX ECF 5-1, 5 ¶ 19; Johnstone Aff. Pet. Ex. 19, NOLEX ECF 5-2,9, ¶ 12.) Thus, Loden agreed to plead guilty and did not oppose the State's evidence during the sentencing phase. (Loden Aff. Pet., Ex. 1, NOLEX ECF 5-1, 5,, ¶¶ 18, 19, 27; *see also* S. O'Brien Aff., Pet. Ex. 17, NOLEX ECF 5-1, 126, ¶ 28.)

Loden's constitutional right to effective assistance of counsel was violated because Johnstone and Daniels informed him of an incorrect legal rule regarding the availability of appeals and the desirability of a death sentence. *See, e.g.*, *Lafler*, 132 S. Ct. 1376 (holding counsel's advice to reject plea ineffective assistance because counsel informed defendant of incorrect legal rule during plea negotiations); *Padilla*, 130 S. Ct. 1473 (setting aside guilty plea because counsel misinformed the defendant of the immigration consequences of the conviction); *Battenfield*, 236 F.3d at1234 (failure to provide competent advice regarding penalty phase proceedings constituted ineffective assistance of counsel).

It is well established that counsel's failure to know the law applicable to his client's case, as was the case here, falls below the objective standard of reasonableness and cannot possibly reflect a "conscious and informed decision on trial tactics." *See, e.g.*, *Ward v. Dretke*, 420 F.3d 479, 491 (5th Cir. 2005); *Smith v. Dretke*, 417 F.3d 438, 442–

---

[6] Daniels' deposition shows that he failed to provide Loden with *any* advice about appellate review that would have allowed Loden to make a "knowing and voluntary" plea. *See, e.g.,* Daniels Depo. at p. 165:17–20, Ex. 46 ("I thought I would be misadvising [Loden] and misinforming him if I tried to tell him what the Supreme Court would look at or what they would decide on, regarding any issue"); *id.* at pp. 156:8–158:3 (Daniels did not recall if he had done any legal research concerning Supreme Court review).

43 (5th Cir. 2005) ("Failing to introduce evidence because of a misapprehension of the law is a classic example of deficiency of counsel." (citing *Williams*, 529 U.S. at 395)); *Tenny v. Cockrell*, 420 F. Supp. 2d 617, 632 (W.D. Tex. 2004) (counsel's actions cannot be justified as reasoned or sound trial strategy because he failed to apprise himself of the law and facts of petitioner's case), *aff'd sub nom., Tenny v. Dretke*, 416 F.3d 404 (5th Cir. 2005); *see also Dixon v. Snyder*, 266 F.3d 693, 703 (7th Cir. 2001) (finding that counsel's performance "cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a 'startling ignorance of the law'" (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986))).  Specifically, the Fifth Circuit has repeatedly "stated that 'one of the most precious applications of the Sixth Amendment may well be in affording counsel to advise a defendant concerning whether he should enter a guilty plea.'" *Childress*, 103 F.3d at 1227 (collecting cases; quoting *Reed v. United States*, 354 F.2d 227, 229 (5th Cir. 1965)).  "'It is clear that a defendant is entitled to the effective assistance of counsel in determining how to plead and in making his plea, and can attack his conviction collaterally if he is not given this right.'"  *Childress*, 103 F.3d at 1227 (quoting *Colson v. Smith*, 438 F.2d 1075, 1078 (5th Cir. 1971)).  *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (citations omitted); *Smith*, 417 F.3d at 442–43 (state court's conclusion that counsel was not deficient was unreasonable where counsel misunderstood law applicable to case); *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001)(holding when counsel fails to advise a client of all the consequences of his decision either to plead guilty or to reject a plea bargain, that counsel's performance "certainly [falls] below an objective standard of reasonableness under prevailing professional norms") ; *see also U.S. v. Day*, 969 F.2d 39, 43 (3rd Cir. 1992) (explaining that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty"); *cf. Summers v. United States*,

538 F.2d 1208, 1210 (5th Cir. 1976) (per curiam) (finding ineffective assistance of counsel where attorney failed to explain ramifications of pleading guilty).

(ii) **Trial counsel's failure to know and advise Loden that a mitigation case was still available with a guilty plea amounted to ineffective assistance**

Trial counsel not only erroneously advised Loden of an incorrect legal rule, they failed to explain the sentencing phase to Loden and the fact that it presented another chance to fight against the death sentence. Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,5-6, ¶¶ 8, 21. Loden's attorneys failed to explain that jury sentencing could have been available even though Loden had pled guilty. Rather than explain his options to him, they repeatedly told him that he had no viable defense and would get the death penalty no matter what they did. *Id*. ¶ 8.

Trial counsel's failure to advise Loden about his right to jury sentencing was severely exacerbated by the Circuit Court Judge's erroneous plea colloquy during which he informed Loden that "by entering a plea of guilty to this charge, or the capital murder case, you are waiving the jury making those determinations, as to the guilt *and* as to the punishment to be imposed." (Plea and Sentencing Transcript, p. 18, ll. 4-8 (emphasis added).) This compound statement is entirely confusing as to Loden's right to jury sentencing, especially given that Loden received no information about the sentencing phase from his counsel. Trial counsel neither corrected the statement on the record nor tried to clarify it with Loden. *Id.* Trial counsel's failure to properly advise Loden on the law of waiver violated Loden's right to effective assistance. *Lafler*, 132 S. Ct. 1376; *Padilla*, 130 S. Ct. 1473; *Battenfield*, 236 F.3d at 1234.

-64-

    **2.**    **Loden's Right To Effective Assistance Was Violated Because Trial Counsel Failed To Advise Loden About The Pros And Cons Of Pleading Guilty And Waiving Jury Sentencing**

        **(i)**    **Trial counsel failed to advise Loden about the potential downside of pleading guilty and forgoing jury sentencing**

Following trial counsel's ineffective assistance to encourage Loden to plead guilty, arrangements were made to take Loden's guilty plea and determine sentencing the next day, September 21, 2001. Counsel did not discuss the benefits of cross-examining the State's witnesses or objecting to the State's evidence during the sentencing phase with Loden. (Loden Aff. Pet. Ex. 1, NOLEX, 5-1, 6, ¶ 25.) As explained in great detail in the Petition at Ground I, trial counsel, still having not conducted a mitigation investigation, knew virtually nothing of the possible mitigating circumstances in Loden's case.

What counsel *did* know is that Judge Gardner had a bleak track record of doling out death sentences to defendants who waived jury sentencing. Given Judge Gardner's track record, trial counsel's failure to advise Loden of the possibility of jury sentencing violated Loden's right to effective assistance of counsel. *See Wilson v. State*, 81 So. 3d 1067, 1090–91 (2012) (remanding to circuit court for evidentiary hearing because trial counsel [Johnstone] had not advised defendant of Judge Gardner's track record). Even minimally competent counsel would have advised Loden not to put sentencing in Judge Gardner's hands. Yet, Loden's counsel said nothing.

Given what counsel knew about Judge Gardner, counsel's "advice"—to continue with waiving jury sentencing—is shocking. *Cf. Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995) (decisions that are "completely unreasonable" and "bear[] no relationship to a possible defense strategy" are constitutionally ineffective).

In sum, any reasonably strategic decision to waive jury sentencing would have included at least some consideration of the costs of waiving sentencing. In particular, counsel did not advise Loden:

- That if he pled guilty and waived jury sentencing, (1) he would almost undoubtedly receive a death sentence from Judge Gardner *and* (2) he would be prevented from challenging Judge Gardner's rulings due to the guilty plea.;

- Of his chances of convincing Judge Gardner to sentence him to life as opposed to convincing at least one of the 12 jurors to make that decision; or

- About Judge Gardner's recent sentencing record, and whether counsel had any reason to believe that Judge Gardner would be more sympathetic to Loden than he was to Byrom.

Counsel's failure to discuss with Loden the known costs and benefits of waiving jury sentencing amounted to constitutionally deficient counsel.

### (ii) Trial counsel failed to explain the potential upside of presenting a mitigation case because they did not come close to conducting a reasonable mitigation investigation

#### (1) Because trial counsel did not properly investigate the case, they could not have competently advised Loden of his plea and sentencing options in violation of Loden's rights to effective assistance

Johnstone's affidavit confirms that he and Daniels "did not have a mitigation case to present because *there had not been any mitigation investigation*." (Johnstone Aff., Pet. Ex. 19, NOLEX ECF 5-2, 11, ¶ 11 (emphasis added).) Given that they had conducted no mitigation investigations, trial counsel could not have properly advised Loden regarding his options because they could not have fathomed what his options truly were. A defendant facing the death penalty has the right to provide the jury with mitigating evidence. "It is unquestioned that under the prevailing professional norms at the time of [the defendant's] trial, counsel had an 'obligation to conduct a *thorough* investigation of the defendant's background.'" *Porter v. McCollum*, 130 S. Ct. 447, 452–53 (2009)

(quoting *Williams*, 529 U.S. at 396) (emphasis added). "[T]he Constitution requires that 'the sentencer in capital cases must be permitted to consider any relevant mitigating factor.'" *Porter*, 130 S. Ct. at 454–55 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)). In *Porter*, the Court recognized the mitigation value of evidence showing the existence of a brain abnormality and cognitive defects. *Id.* at 455. "It is unreasonable to discount to irrelevance the evidence of [the defendant's] [mitigation evidence], especially when that kind of history may have particular salience for a jury evaluating [the defendant's] behavior. . . ." Id. "We do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Id.* at 455–56 (quoting *Strickland*, 466 U.S. at 693–94).

**(2)  Prevailing professional norms require trial counsel to conduct an expansive mitigation investigation**

Trial counsel's duties to investigate all avenues of possible mitigation are clear:

> Counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.

2003 ABA Guidelines 10.11(A); *see Wiggins*, 539 U.S. at 515 ("investigation into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"); *Smith v. Dretke*, 422 F.3d 269, 284 (5th Cir. 2005) ("[C]ounsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary."); *Blystone v. Horn*, 664 F.3d 397, 419 (3d. Cir. 2011) ("Unquestionably, investigation is essential to a lawyer's duties as both advisor and advocate.") (citing 1 ABA Standards for Criminal Justice 4-1.1 (2d ed. 1980)).

The Supreme Court explained the special demands placed on counsel regarding mitigation investigation in death penalty cases in *Wiggins*. After Wiggins was convicted of capital murder, counsel planned to ask the trial court to bifurcate the sentencing phase so that they could, among other things, "present a mitigation case." *Wiggins*, 539 U.S. at 515. When the court denied the motion to bifurcate, counsel elected not to present the mitigation case, but did proffer to the court some of the evidence they had assembled regarding Wiggins's background, though the proffer did not include "any evidence of petitioner's life history or family background." *Id.* During post-conviction proceedings, it emerged that counsel's only attempts to research Wiggins's background were to have him evaluated by a psychologist, and to collect records from a local social services agency and a presentence investigation. *Id.* at 523. The question before the Court was whether trial counsel had a legitimate strategic justification for failing to go beyond the information contained in those three sources.

The Court held counsel's failure to conduct a further investigation amounted to unconstitutionally ineffective assistance of counsel. *Wiggins*, 539 U.S. at 534–35. In reaching its decision, the Court emphasized the critical role of preparatory investigation in the context of death penalty trials. The Court explained that the constitutional inquiry was framed not by the question whether Wiggins's counsel "should have presented a mitigation case," but rather "***whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins's background was itself reasonable***." *Id.* at 536 (citing *Strickland*, 466 U.S. at 688, 690–91 (1984) (emphasis added)). The Court concluded that Wiggins's counsel's performance fell short of the "well-defined norms" reflected in the ABA Guidelines. Counsel's performance was particularly unreasonable given that records available to trial counsel contained indications of abuse and deprivation in Wiggins's background: "[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice

among possible defenses, particularly given the apparent absence of any aggravating factors in the petitioner's background." *Id.* at 535.

The ABA Guidelines offer clear directions regarding the kind of investigation reasonably effective counsel must perform to be able to make informed decisions about the proper strategy for the penalty phase of a capital murder trial[7]:

> [P]enalty phase preparation requires extensive and generally unparalleled investigation into personal and family history. [Footnote omitted] At least in the case of the client, this begins with the moment of conception. Counsel needs to explore:
> (1) Medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
> (2) Family and social history, (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as . . . the loss of a loved one . . . ;
> . . .
> (4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);
> (5) Employment and training history (including skills and performance . . .) . . .
> It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records—from courts, government agencies, the military, employers, etc.– can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections.

---

[7]    The ABA Guidelines were revised in 2003. Courts agree that the revised ABA Guidelines "simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence. . . . [and] do not depart in principle or concept from *Strickland, Wiggins,* or our court's previous cases concerning counsel's obligation to investigate mitigation circumstances." *Hamblin*, 354 F.3d at 487.

ABA Guidelines at Guideline 10.7 at pp. 1022–24 (footnotes omitted). As the Guidelines make clear, this wide-ranging inquiry into potentially relevant mitigating information will generally require hundreds of hours to complete.[8]

Given the long-held standards recognized by the United States Supreme Court and the ABA Guidelines, trial counsel who barely perform any investigation, as was the case with Loden's trial counsel, fail to provide constitutionally mandated effective assistance of counsel.

> **(3)** **Trial counsel's failure to conduct an expansive mitigation investigation fell below the standards required by prevailing professional norms**

In this case, trial counsel's performance fell far below the range of competence demanded of lawyers. As fully detailed in the Factual Background section, *supra*, counsel's failure to conduct an independent investigation, gather relevant documentation, locate, interview and prepare mitigation witnesses, and supply the defense psychiatric expert with information sufficient for an accurate analysis was inconsistent with the duties of competent capital defense counsel. There can be no dispute that Loden's trial counsel failed substantially to investigate Loden's history and background, even though they had many valuable leads to compelling mitigating evidence.

Trial counsel's decision not to investigate mitigating circumstances was not reasonable; to the contrary, Loden's counsel initially acknowledged they would need to pursue the numerous leads available to them as part of a reasonable investigation. In support of the Motion for Appointment of Investigator for the Defense, counsel argued that the court should appoint an investigator to, *inter alia*, "locate and interview potential

---

[8]  In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889. (*See* 2003 ABA Guidelines, Commentary to Guideline 6.1, p. 968.)

mitigating witnesses" and assist in locating records for the penalty phase, "because Mr. Loden has numerous friends and relatives, including siblings residing in other parts of the State and country, and he himself has lived in other States" and "to ***follow up the numerous leads already known to Mr. Loden's attorney at this time***."  (Mtn. for Appointment of Investigator for the Defense, TR 77-79.)  But after the Circuit Court denied the Motion, trial counsel did nothing to conduct the very investigation that they acknowledged was vital to Loden's defense, and which would take hundreds of hours to complete.  As trial counsel later admitted, they failed to conduct *any* mitigation investigation:

> [W]e did not have a mitigation case to present because ***there had not been <u>any mitigation investigation</u>***.

(Ex. 3, Johnstone Aff. NOLEX ECF 5-2, 9, ¶ 11 (emphasis added).)  Trial counsel failed to investigate leads that would have uncovered the following compelling, mitigating evidence, including that Loden:

- was sexually molested as a child;

- was physically abused as a child;

- was serving at the time of the arrest as a Marine recruiter with over 18 years of decorated service, including a combat tour in Kuwait and Iraq during Desert Storm;

- was decorated for his combat service;

- suffered from Post-Traumatic Stress Disorder ("PTSD") and would have frequent nightmares following his service during Desert Storm;

- suffered from dissociative disorder;

- suffered severe stress from his Marine recruiting

  assignment due to unobtainable goals;

- exhibited suicidal behavior before and after the arrest,

  including failed attempts to take his own life;

- endured the pain of his wife having numerous sexual affairs

  with other men;

- was told by his wife, shortly before the crime, that she

  intended to sleep with a partner at the law firm where she

  worked; and

- was intoxicated and under the influence of GHB the night

  of the crime.

(Attorney Johnstone's Handwritten Notes, Pet., Ex. 25(a), NOLEX ECF 5-2, 116-120; Loden Aff. Pet., Ex. 1, NOLEX ECF 5-1, 12, ¶ 4. "[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice" whether to present a mitigation case or waive jury sentencing. *Wiggins*, 539 U.S. at 525; *see also Neal v. Puckett*, 286 F.3d 230, 240 (5th Cir. 2002) (finding ineffective assistance where lawyers had some indication of defendant's difficult life, but chose not to pursue those sources of evidence); *Weaver v. Warden, Nev. State Prison*, 822 P.2d 112 (1991) (counsel ineffective for failure to investigate and make argument regarding defendant's PTSD resulting from Vietnam War combat experience).

    This type of detailed background evidence is precisely what the Fifth Circuit requires trial counsel to investigate in order to fulfill their "constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in a given case." *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999). Evidence about the accused's background is particularly relevant in a death penalty case

"because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Id.* at 613.

The evidence is not insignificant. To the contrary, as psychiatrist Dr. O'Brien observed, the evidence could have reduced "the defendant's moral culpability (i.e., by demonstrating the good in the client's character or the bad that affected his upbringing and development) and evidence that may refute the prosecution's theory of legal culpability (e.g., by reducing culpable mental states or disproving purported, inflammatory facts)." (S. O'Brien Aff., Pet. Ex. 17, NOLEX ECF 5-1, 134-136, ¶¶ 18-20)

Where, as here, trial counsel failed to "investigate and present the substantial mitigating evidence available" or engage in "minimal preparation for the penalty phase proceedings" before advising their client to waive a mitigation defense, trial counsel committed ineffective assistance that the Mississippi Supreme Court should have recognized was constitutionally deficient. *Ladd v. Cockrell*, 311 F.3d 349, 359 (5th Cir. 2002) (finding ineffective assistance where counsel "fail[ed] to follow a lead which could have led to the discovery of mitigating evidence . . . could be considered objectively unreasonable"); *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir. 2001) (granting habeas relief where trial counsel, *inter alia*, "interviewed one defense witness for only ten minutes on the morning she was scheduled to testify" and "failed to examine Ainsworth's employment records, medical records, prison records, past probation reports, and military records"); *Hall*, 106 F.3d at 749–750 ("Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance.").

-73-

**(4)     Trial counsel's failure to investigate mitigating circumstances was not part of a concerted trial strategy, but the result of incompetence and conflicts of interest**

**(a)     The decision not to conduct a mitigation investigation was not the product of a reasonable professional judgment**

There is no justification for trial counsel's failure to seek and develop mitigation evidence for Loden. It is "indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *See Neal*, 286 F.3d at 236. That did not occur here.

It cannot be said that Loden's counsel's decision not to investigate mitigating evidence was a result of a strategic, tactical decision. Trial counsel did not even request the records or make initial contact with many of the relevant individuals to determine what they would say or reveal about Loden's unsettling background. Without conducting a proper investigation, trial counsel's advice with respect to trial strategy and sentencing was tainted because it lacked the basic diligence required in all capital murder cases.

Sadly, had trial counsel initially contacted even some of the following individuals, they would have discovered that many people were willing and ready to assist them in learning about Loden's background. Despite the "well-defined norms" for capital counsel, Loden's trial counsel chose to ignore the many family members, friends, fellow veterans and colleagues who would have provided a strong mitigation case in favor of a lesser penalty:

- Mann Aff., Pet. Ex. 12, NOLEX ECF 5-1, 60, 64, ¶ 17 ("I was

    never contacted by Eddie's[9] trial attorneys to provide background

    information about Eddie. I am completely unaware of any

---

[9]     Loden's family and friends from his childhood refer to Loden as "Eddie" – the shortened version of his middle name.

investigation made on his behalf prior to his sentencing in this case. Had I been contacted by Eddie's prior trial attorneys or an investigator in advance of his sentencing for capital murder, I would have gladly spoken to them and provided any information they requested.");

- Ferrier Aff., Pet. Ex. 8, NOLEX ECF 5-1, 39, ¶ 4 ("No one on Eddie's prior defense team contacted me or asked me to provide background information about Eddie. Had an attorney or investigator contacted me in advance of Eddie's sentencing for capital murder, I would have been happy to answer any questions and help in any way I could.");

- Craig Aff., Pet. Ex. 5, NOLEX ECF 5-1, 28-29, ¶ 8 ("I was not contacted by any member of Tom Loden's defense team with regard to this conversation with Kat Loden [Loden's wife at the time]. If I had been contacted, I would have told Loden's lawyers the truth about my relationship with Kat, and her communications with me the night of June 22, 2000.");

- Renick Aff., Pet. Ex. 13, NOLEX ECF 5-1, 67, 70, ¶ 14 ("Prior to Eddie's trial, I spoke to Dave Daniels and Herb Wells. I do not recall being asked about Eddie's childhood or family background. I would have been happy to help in any way I could.");

- Akamine Aff., Pet. Ex. 2, NOLEX ECF 5-1, 11, 15, ¶ 15 ("Tom's trial attorneys never contacted me to provide background

information on him.  I do not know of any investigation made on his behalf prior to his sentencing in this case.  Had Tom's prior trial attorneys or an investigator contacted me prior to his sentencing, I would have gladly spoken to them and provided background information about Tom and this statement.");

• Brown Aff. Pet. Ex. 3, NOLEX ECF 5-1, 16, 20, ¶ 17, ("Eddie's trial attorneys and their investigator never asked me about Eddie's childhood or family background.  If they did, I would have been happy to help in any way I could."); and

• Dyas Aff., Pet. Ex. 6, NOLEX ECF 5-1, 31, 32, ¶ 7 ("I was not contacted by Tom's trial attorneys.  If they contacted me, I would have provided them with information in this Affidavit.").[10]

---

[10] *See also* Kittel Aff., Pet. Ex. 10, NOLEX ECF 5-1, 51, 53, ¶ 15 ("No one from Tom's initial defense team attempted to contact me for any form of statement or background information on Tom.  If someone had contacted me, I would have provided this statement and any additional information I could have recalled."); Leslie Aff., Pet. Ex. 11, NOLEX ECF 5-1, 56,57, ¶ 12 ("I gladly would have cooperated and provided this statement to any member of Eddie's prior defense team, but no one asked me to provide any information concerning Eddie."); Christian Aff., Pet. Ex. 4, NOLEX ECF 5-1, 22,26, ¶¶ 20 & 22 ("I was not interviewed by Eddie's trial attorneys about Eddie's background or our family history"; "I would have been happy to tell Eddie's attorneys the things in this affidavit and to testify at the trial."); Epperly Aff., Pet. Ex. 7, NOLEX 5-1, 34, 36, ¶ 14 ("None of Eddie's lawyers has ever spoken to me.  I would have been more than happy to testify on Eddie's behalf if anyone had asked me to do so."); Houle Aff. Pet. Ex. 9, NOLEX ECF 5-1, 46, 47,¶ 4,  ("No one on Tom's prior defense team contacted me or asked me to provide background information about Tom…I would have been happy to speak to them and help in any way I could."); Sanders Aff., Pet. Ex. 15, NOLEX ECF 5-1, 76, 77, ¶ 11 ("No one on Mr. Loden's prior defense team contacted me or asked me to provide background information about Mr. Loden.  Had an attorney or investigator contacted me in advance of Mr. Loden's sentencing for capital murder, I would have been happy to speak to them and help in any way I could."); Reynolds Aff., Pet. Ex. 14, NOLEX ECF 5-1, 72, 73, ¶ 11 ("No one on Tom's prior defense team contact me or asked me to provide background information about Tom.  Had an attorney or investigator

As stated in *Neal*, "[p]erhaps the most troubling aspect of these affidavits is that they indicate that counsel never contacted any of the other people . . . who have provided the additional testimony we now have before us, and which would have added to and developed the skeletal evidence before the jury." *Neal*, 286 F.3d at 240. Based upon the wealth of this additional mitigating evidence, trial counsel's failure to investigate was not "'part of a calculated trial strategy,' but is likely the result of either indolence or incompetence." *Anderson*, 338 F.3d at 393. The decision not to conduct a mitigation investigation was not the product of a reasonable professional judgment. *See United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); *see also Loyd v. Whitley*, 977 F.2d 149, 157 (5th Cir. 1992) (finding defense counsel's failure to pursue crucial line of investigation in a capital murder case was not professionally reasonable); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) (explaining that tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum); *Wilson v. Butler*, 813 F.2d 664, 672 (5th Cir. 1987) (remanding for an evidentiary hearing because the record did not reflect whether counsel made a sound strategic decision not to present mitigating evidence of troubled background and mental impairment).

That defense counsel sought some type of evaluation does not insulate a challenge to counsel's performance. *Rompilla v. Beard,* 545 U.S. 374, 392 (2003) (finding counsel ineffective for not uncovering evidence to provide to experts). Where, as here, counsel fails to provide an expert with critical information, counsel's performance is deficient. *See, e.g., Wilson v. Sirmons*, 536 F3d 1064, 1089 (10th Cir 2008) (counsel has a responsibility to investigate and bring to the attention of mental health experts who are

contacted me in advance of Tom's sentencing for capital murder, I would have been happy to speak to them.").

examining his client, facts the experts do not request and must at a minimum exercise supervisory authority over the expert); *also Bond v. Beard,* 539 F.3d 256, 289 (3d Cir. 2008) (Counsel found ineffective for failing to obtain readily available records, conduct a meaningful social history investigation, and provide consulting expert sufficient information).

**(b)**      **Trial counsel's ineffective assistance is explained by a clear conflict of interest**

Counsel's lackadaisical representation was given context by counsel's split allegiances:  Daniels's preparation for entering the district attorney's office (the very same office that was prosecuting his client) while simultaneously representing Loden (Pet., Ex. 46, Daniels Depo. at 17:12–16).  At the time of trial, Daniels was negotiating for employment as an attorney with the DA's office, the same office that was prosecuting Loden.  The conflict of interest might explain why trial counsel expressed no reservation about Loden's decision not to plead guilty and oppose the State's evidence.  Even the Mississippi Supreme Court commented that "Daniels exercised poor judgment" by seeking his "present employment with the district attorney's office."  *Loden*, 43 So. 3d at 400.

Daniels's surprisingly "poor judgment" in working for the very prosecutors that have sought to execute Loden, however, goes far in explaining subsequent problems, and presents an example of ineffective assistance so egregious that the Supreme Court *presumes* prejudice from it:

> Lawyers owe their clients a duty of loyalty, including the duty to avoid conflicts of interest. And the Supreme Court has emphasized that the duty of loyalty is perhaps the most basic of counsel's duties. . . .[¶]  if a defendant shows that a conflict of interest existed and that it adversely affected counsel's performance, prejudice will be presumed and the defendant need not demonstrate a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would  have been different.

-78-

*Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002); *Strickland*, 466 U.S. at 688 ("Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."); *United States v. Cook*, 45 F.3d 388, 393 (10th Cir. 1995) ("a defendant's right to counsel free from conflicts of interest . . . extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person."); *see also Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("an actual conflict of interest [that] adversely affected his lawyer's performance" amounts to ineffective assistance.

Daniels' conduct in connection with Loden's post-conviction proceedings is evidence that Daniels was and is more concerned about his own interests and the State's interests than Loden's interests.

### 3. Loden's Right To Effective Assistance Was Violated When Trial Counsel Failed To Maintain Sufficient Contact With Him

Counsel's failure to keep in sufficient contact with Loden to consult with him and keep him "informed of important developments in the course of the prosecution" was ineffective assistance. *Strickland*, 466 U.S. at 688; *see also* Nixon, 543 U.S. at 187 ("An attorney undoubtedly has a duty to consult with the client regarding 'important decisions' including questions of overarching defense strategy.").

Over the course of their 14-month representation of Loden, counsel spent just 142 (Daniels) and 130.75 (Johnstone) hours in preparing for trial. (*See* Johnstone & Daniels' Itemized Statements for Compensation and Expenses, TR 243-47, 248-52.) Indeed, Johnstone did almost nothing—his time records reflect that he only met with Loden four

times.[11]  (*See* Johnstone Itemized Statement for Compensation and Expenses, TR 243-247.)  Over the course of six months, Johnstone made just two phone calls on Loden's behalf—one to the Police Department and one to the Marines—and he conducted a mere two and a half hours of legal research.  (*Id.*)

An impending trial did not change counsel's detachment.  In July 2001, Loden's counsel moved to continue the trial date, and the court set trial for October 8, 2001, but instead of preparing in earnest for Loden's impending trial, Attorneys Daniels and Johnstone did even less work on the case.  Daniels and Johnstone did not ask Wells to conduct any further investigation and did not contact or interview any witnesses themselves.  Between the suppression hearing and Loden's plea, counsel—together— spent a stunning total of only 36.5 hours preparing for trial.  (*See* Time Records, TR 243-247; 249–252.)  As Mr. O'Brien, an experienced capital defense lawyer, opined: "This amount of time is grossly inadequate to fulfill counsel's duty of competent representation in *any* capital case.  It is inevitable that with such minimal investment of time and resources, significant duties under the Sixth and Eighth Amendment and relevant ABA Guidelines remained unfulfilled."  (S. O'Brien Aff., Pet. Ex. 17, NOLEX ECF 5-1, 126, 136–137, ¶ 20.)

Having seen little of his attorneys, Loden resorted to outright begging for more client contact.  By July 2001, Loden pleaded to his attorneys:

> I hate it, but I'm so short on time now.  Would you ***please***,
> take the time and speak with me just as soon as possible?
> ***Please***.

(July 8, 2001 Letter, Pet. Ex. 30(i) (NOLEX ECF 5-3, 138); emphasis in original.)

Loden's plea followed dozens of other request letters over the course of the several

---

[11]  Attorney Johnstone's time records indicate that he met with Loden again on July 7, 2000 in New Albany, but that might be an error since his notes indicate that he spoke only with law enforcement that day.  (Johnstone Aff., Pet., Ex. 19, NOLEX ECF 5-2, 9, 11,¶ 5.)

months pleading to see his lawyers. Beginning in February, Loden made several inquiries to his lawyers and, after receiving no responses, apologized because he was afraid the previous three letters he sent went to a wrong address. In fact, the letters were properly addressed. (Feb. 7, 2001 Letter, Pet. Ex. 35(b) (NOLEX ECF 5-4, 35; *see also* Feb. 2, 2001 Letter, Pet. Ex. 35(a) (NOLEX ECF 5-4, 31) ("I'd like to speak to you of the 'interview' with the state police. It might or might not be of assistance, I just question a few things the more I think about it."); Feb. 17, 2001 Letter, Pet. Ex. 35(c) (NOLEX ECF 5-4, 38) ("I was just wondering if it would be possible to speak with you when you do become available.").)

By the time discovery had commenced, Loden asked several times for updates from his counsel (*e.g.*, Mar. 20, 2001 Letter, Pet. Ex. 30(c) (NOLEX ECF 5-3, 114)), and strategic issues concerning his upcoming trial (*e.g.*, July 27, 2001, Pet. Ex. 35(j) (NOLEX ECF 5-4, 57)). Concerned that the lack of response was a result of counsel's impatience with his repeated requests for assistance and counsel, Loden apologized and wrote: "I do hate to intrude or impose on you or Mr. Johnstone, truly I do." (*Id.*) Counsel continued to have little contact with Loden.

Frustrated with his trial counsel, Loden turned to the *investigator* working on his case, Herb Wells, to whom he noted that "I'm afraid I've offended my lawyers." (Loden Aff., Pet. Ex. 35(*l*) (NOLEX ECF 5-4, 61, Aug. 17, 2001 Letter.) Loden's fear followed numerous attempts to get from Wells the assistance he previously sought (but lacked) from Johnstone and Daniels. (*Id.* Pet. Ex. 35(d) (NOLEX ECF 5-4, 41), Apr. 1, 2001 Letter ("I hope you have been able to contact the people you need, I have sent word, but haven't heard back myself yet."; *see also* Pet. Ex. 35(h) (NOLEX ECF 5-4, 52), June 7, 2001 Letter ("There's several issues I'd like to speak of if you could come, and a few people you may want to speak with soon, before next motions."); Pet. Ex. 35(i) (NOLEX ECF 5-4, 55), June 14, 2001 Letter ("I'd like to ask, sorry to impose more than already, for copies of all my military records."); Pet. Ex. 30(h) (NOLEX ECF 5-3, 130), July 3,

2001 Letter (telling Daniels he wants to talk). Trial counsel's minimal efforts to keep in contact with their client—who was facing the death penalty—amounted to ineffective assistance of counsel. *E.g.*, *Lin v. Ashcroft*, 377 F. 3d 1014, 1024 (9th Cir. 2004) (assistance inadequate in part because of minimal evidence that counsel sufficiently "spoke to [defendant] about the substance of his case"), *Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir. 2005) *overruled on other grounds*; *Daniels v. Woodford*, 428 F.3d 1181, 1201 (9th Cir. 2005) ("lack of attorney-client communication" amounted to "ineffective assistance" of counsel); *U.S. v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (counsel's failure to communicate plea offer to client deemed ineffective assistance of counsel); *Paris v. Turner*, 187 F.3d 637, at *2 (6th Cir. 1999) (failure to communicate and inform client of rights amounts to ineffective assistance of counsel); *Novarro-Orozco v. Gonzales*, 152 Fed. Appx. 687, 688 (9th Cir. 2005) (ineffective assistance of counsel due to failure to communicate); *Singh v. DeMore*, 150 Fed. Appx. 639, 643 (9th Cir 2005) (ineffective assistance where petitioner sent counsel "a variety of emails inquiring about the status of filing a motion . . . all of which went unanswered).

>    **4.     Because Loden Received Erroneous and Ineffective Advice Whether To Forgo Trial, His Guilty Plea And Waiver Of Jury Sentencing Was Not Knowing, Voluntary, And Intelligent**

Loden's decision to plea and waive jury sentencing was made in a vacuum in light of trial counsel's utter failure to undertake even the basic steps to prepare a mitigation case. As a result, counsel had no mitigation evidence to present to Loden or the court. Without it, counsel could not, and did not, discuss with Loden what a mitigation case would entail and how it could aid him with respect to his potential sentence. (Loden Aff., Pet., Ex. 1 NOLEX ECF 5-1, 2, 5, ¶ 21.) It is not unusual for capital defendants to become suicidal while awaiting trial. (S. O'Brien Aff. ¶ 28, Pet. Ex. 17, NOLEX ECF 5-1, 126, 142-143.) Loden's counsel, however, chose to treat Loden's suicidal comments (which, had counsel spent the time talking to Loden, reading his records or talking to his family, they should have known were not new or unusual) as a mentally sound decision

to plead guilty, accept the death penalty and offer himself up for the death penalty without presenting any mitigation evidence.

A decision to plea made by a depressed individual sitting in isolation in a prison cell, believing his case is hopeless and hearing no argument to the contrary from his attorneys, is quite different than a decision made with a full awareness of legal and mitigation defenses. Loden repeatedly expressed to counsel his frustration at his inability to review the discovery materials, communicate with counsel or receive clear answers to his questions. (*See generally*, Exs. 30(a)-30(i) (NOLEX ECF 5-1, 107-141); *see also* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2, 4,¶¶ 12, 13, 14.) Moreover, Loden had no idea of the scope of support he would garner form his friends, family and military colleagues, which is substantial as demonstrated by the supporting affidavits attached hereto, as he languished alone in jail and wrote countless unanswered letters to counsel. (*See* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,6, ¶¶ 23-26.)

Despite Loden's efforts, Counsel spent very little time meeting with Loden, did not keep him apprised of the facts and the law affecting his case, and did nothing to dispel Loden's belief that Loden did not have any viable defenses. (*See* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,4, ¶¶ 8, 12; *see also* Johnstone and Daniels Itemized Statement for Compensation and Expenses reflecting that, at best, Johnstone spent 35 *hours speaking with Loden and Daniels spent 26 hours in client interviews over the course of the entire representation,*[12] TR 243-252.) Counsel knew that Loden was convinced that everyone, including his own defense attorneys, were afraid to zealously represent him because of the political implications of his case in a small town. (*See* Loden's letter to Daniels, Ex. 30(i) (NOLEX ECF 5-3, 138), p. 3, *"I know that you would have to continue to go before the judges, with the police, and live in this area."*) Rather

---

[12] The time records do not always distinguish travel time and mix conferences with co-counsel and the prosecution with entries reporting client interviews. The hours above represent the maximum amount of time counsel could have spent with Loden.

than acting like Loden's zealous advocate, counsel fed Loden's hopelessness by telling him that he had no chance and would get the death penalty no matter what. (*See* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2-4, ¶ 8.)

 **C.**  **Trial Counsel's Constitutionally Defective Assistance Prejudiced Loden**

   **1.**  **Because Loden Was Not Advised Of His Sentencing Options, He Was Necessarily Prejudiced**

When a defendant in a capital case is not properly advised of his sentencing options, prejudice necessarily results. *See Herrera*, 412 F.3d at 580 ("A defendant cannot make an intelligent choice whether to accept a plea offer unless he fully understands the risks of proceeding to trial"); *accord Grammas*, 376 F.3d at 436; *accord Teaguet*, 60 F.3d at 1170 ("In determining whether or not to plead guilty, the defendant should be made aware of the relevant circumstances and likely consequences so that he can make an intelligent choice."); *see also* 2003 ABA Guidelines, Guideline 10.9.1.

The Supreme Court recently affirmed "in cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial," "prejudice," under *Strickland*, means "'a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Frye*, 132 S. Ct. at 1409 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Here, "a reasonable probability is a probability sufficient to undermine confidence" that Loden would have pled guilty and waived jury sentencing. *See Id.*; *Williams*, 529 U.S. at 391 (quoting *Strickland*).

It is clear that Loden would have exercised his right to a fair trial and jury sentencing if his attorneys provided competent advice regarding the pros and cons of foregoing trial. Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 12, ¶ 2. Had Johnstone and Daniels performed a reasonably conscientious investigation of their client's background, counsel could have properly advised Loden that he could and should present a mitigation case, that it was against his interests if mitigation evidence was not presented, what

mitigation evidence they could present, and how presenting a mitigation case would benefit Loden. Counsel would have realized the true extent of their client's psychological, social, and emotional problems, and been able to convince Loden to present a mitigation defense. Based on this information, Loden would have been able to make more informed choices whether he wanted to present mitigating evidence. In addition, if Loden was properly advised that pre-trial motions could not be appealed after a guilty plea, Loden would not have "wished" to receive a death sentence and with it, what he believed to be "a strict scrutiny" of the pre-trial rulings by the Mississippi Supreme Court. *See Battenfield*, 236 F.3d at 1234 (finding prejudice where counsel failed to provide competent advice regarding penalty phase proceedings). Because the penalty phase was certainly tainted by the uninformed and misinformed decisions Loden was coerced into making by his counsel's incompetence, the result of that penalty phase is unreliable within the meaning of *Strickland*. *See Frye*, 132 S. Ct. at 1406; *Lafler*, 132 S. Ct. at 1387; *Padilla*, 130 S. Ct. 1473; *Higgins*, 539 U.S. at 524; *Morris v. Thaler*, 425 Fed. Appx. 415, 418–424 (5th Cir. Tex. 2011).

> ### 2. Loden Was Prejudiced Because Compelling Mitigation Evidence Would Have Been Presented To The Judge Or Jury Had His Attorneys Conducted A Reasonable Mitigation Investigation

Loden was prejudiced not only because he was incompetently advised whether to plead guilty and waive jury sentencing but also because his counsel's ineffective assistance prevented him from presenting compelling evidence to the finder of fact. As the Supreme Court explained, "prejudice," under *Strickland*, means "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *Williams*, 529 U.S. at 391 (quoting *Strickland*). "To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the

jury with that which could have been presented had counsel acted appropriately." *Daniels*, 428 F.3d at 1201. "The prejudice prong is satisfied if 'there is a reasonable probability that at least one juror would have struck a different balance.'" *Dickerson*, 453 F.3d at 699 (quoting *Wiggins*, 539 U.S. at 537). In the words of the Supreme Court, "the question is whether there is a reasonable probability that, absent the errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.")

As the Factual Background shows, since Loden's *pro bono* counsel became involved in his case, they have followed up on the multiple leads previously available to Attorneys Daniels and Johnstone and uncovered a plethora of compelling information for Loden's mitigation case. This information includes a proper mental diagnosis of PTSD-chronic and disassociate amnesia from which Loden suffers, and a humanizing, complete picture of Loden's character and life—including sexual and physical abuse at the hands of his parents—that directly impacts his sentencing determination.

Given their failure to obtain the necessary information, trial counsel were unable to present or even consider presenting mitigation evidence on Loden's behalf. As such, they failed to gather and present evidence that would have mitigated Loden's moral culpability, or to advise Loden about the possibility and benefits of putting on a mitigation case.

Prejudice at the sentencing phase is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced at trial. *See Wiggins*, 539 U.S. 510. As discussed above, the mitigation evidence regarding Loden's childhood abuse, substance abuse, complex PTSD, borderline personality disorder, dissociative amnesia, failing marriage, suicidal tendencies and depression is compelling evidence that the trial judge should have heard in deciding on a sentence. Loden's troubled history on

the one hand, and absence of a criminal record, his exemplary military service, his care for his family and for his fellow Marines on the other hand, are all relevant to assessing his moral culpability. *See, e.g.*, *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'"); *Eddings*, 455 U.S. at 112 (noting that consideration of the offender's life history is "'part of the process of inflicting the penalty of death'"). The Mississippi death sentencing statute requires the trial judge to consider evidence of mitigating circumstances before imposing the death penalty. *See* Miss. Code Ann. § 99-19-101(1); *see also Billiot v. Puckett*, 135 F.3d 311, 315 (5th Cir. 1998) (under Mississippi law, the jury is required to balance statutorily-defined aggravating factors against any mitigating factors in determining whether the death penalty is warranted).

Where this type of mitigation evidence is absent from the record, courts are inclined to find prejudice. In *Porter*, the Supreme Court reversed the lower court's judgment reversing the grant of a writ habeas corpus because trial counsel's failure to uncover and present any evidence of the inmate's mental health or mental impairment, family background, or military service clearly constituted deficient performance of counsel that was prejudicial to the death-row inmate. *Porter*, 130 S. Ct. at 453–54 (citing *Williams*, 529 U.S at 397–98). Nothing distinguishes the defective assistance of Porter's counsel from Loden's in any material respect.

Similarly, in *Wiggins*, 539 U.S. at 535–36, the Court found prejudice in a failure-to-investigate case involving new testimony about repeated physical and sexual abuse. In *Williams*, 529 U.S. at 395, the Court found prejudice in a failure-to investigate case where counsel failed to uncover "extensive records graphically describing Williams' nightmarish childhood." Likewise, in *Antwine v. Delo*, 54 F.3d 1357, 1368 (8th Cir. 1995), the court found prejudice where counsel failed to investigate defendant's mental

condition fully and did not present evidence of defendant's bipolar disorder and the corresponding possibility that he was "in the throes of a manic episode during the offense." *See also Carter v. Bell*, 218 F.3d 581, 599–600 (6th Cir. 2000) (finding prejudice where counsel performed no investigation and presented no evidence of defendant's family history, mental condition and positive relationships with children); *Hardwick v. Crosby*, 320 F.3d 1127, 1167–69 (11th Cir. 2003) (finding prejudice where counsel presented no mitigating evidence of defendant's alcohol and drug intoxication at the time of offense or of his abusive family life).

Had Daniels and Johnstone performed a mitigation investigation and insisted upon a jury, they would have had to convince only one of twelve people that Loden's compelling and bleak background was deserving of something less than death. At least one juror would have concluded that the aggravating factors did not outweigh the mitigating factors given a full portrait of Loden's circumstances. Therefore, there is a "reasonable probability" that, but for trial counsel's numerous errors in connection with Loden's sentencing, the jury would have returned a sentence other than death. *See, e.g.*, *Draughon v. Dretke*, 427 F.3d 286, 293 (5th Cir. 2005) ("In our analysis we do not attempt to place the events of trial into two separate airtight containers of the first and second prongs of *Strickland*. The facts that demonstrate a reasonable probability of a different outcome but for counsel's decisions can cast light on their reasonableness."); *Stouffer v. Reynolds*, 214 F.3d 1231, 1235 (10th Cir. 2000) (holding that defense counsel's "omissions and failures," including the failure to investigate and challenge the state's case constituted ineffective assistance prejudicing the defendant); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) ("Although some mitigating evidence was presented, the representation in this case 'fell below an objective standard of reasonableness.'" (quoting *Strickland*, 466 U.S. at 688)).

3.    **Unlike Counsel In *Landrigan*, Trial Counsel Cannot Blame Loden For Their Failure To Conduct A Mitigation Investigation And Competently Advise Loden Regarding A Mitigation Case**

(i)    ***Landrigan* is inapposite**

*Landrigan*, where the Supreme Court held petitioner was not prejudiced by incompetent counsel because "he would not have allowed counsel to present any mitigating evidence," cannot reasonably be applied to Loden. 550 U.S. 465, 481. The Court in *Landrigan* relied on several facts in rendering its decision: (1) trial counsel advised defendant and put in the record that it was "very much against his interests" not to present mitigation evidence; (2) the trial court questioned defendant regarding his instruction not to present mitigation evidence; and (3) defendant actively subverted the sentencing hearing after he told his attorney not to present the mitigating evidence he had prepared. *Id.* at 470, 479. Landrigan's subversive actions included:

- instructing the witnesses not to testify;

- interrupting counsel to contradict the assertion that Landrigan worked in a legitimate job to support his family and insisting that he was "doing robberies" to support his family;

- interrupting counsel's attempt to explain Landrigan's prior murder conviction as having elements of self-defense and clarifying that the victim "'didn't grab me. I stabbed him'";

- contradicting counsel's attempt to mitigate the circumstance of Landrigan's prior assault in prison and declaring: "'I stabbed him 14 times. It was lucky he lived'"; and

- telling the sentencing judge: "I think if you want to give me the death penalty, just bring it on. I'm ready for it.'"

*Id.* at 470. Referring to these repeated interruptions "when counsel tried to proffer anything that could have been considered mitigating[,]" the Supreme Court concluded that Landrigan's "behavior confirms what is plain from the transcript of the colloquy: that Landrigan would have undermined the presentation of any mitigating evidence that his

-89-

attorney might have uncovered." *Id.* at 477. The Supreme Court's conclusion was based on, among other things, his counsel's advice to pursue (rather than undermine) efforts at mitigation; defendant's incessant and aggressive sabotage of his counsel's attempt to shield him from the death penalty; the trial court's confirmation through exhaustive questioning of the petitioner's intent not to present a mitigating defense; and the weakness of Landrigan's evidence that was not presented. *See Gray v. Branker*, 529 F.3d 220, 232 (4th Cir. 2008) (noting that the *Landrigan* Court "reaffirmed the Court's earlier holdings that counsel has an affirmative duty to investigate for mitigating evidence when preparing for sentencing[.]" and finding that defendant's statement to his lawyer that he did not wish to spend his money on a psychiatrist did not "relieve his counsel of their duty to investigate for mitigating mental health evidence").

Loden is nothing like the obstinate petitioner in *Landrigan*, and the state court could not have reasonably concluded that Loden would have "undermined the presentation of any mitigating evidence that his attorney might have uncovered." Unlike the *Landrigan* defendant, Loden urged his counsel to investigate the case fully, contemplated seeking new counsel because of their deficient performance, and decided ultimately to plead guilty only when his counsel told him he had to make a decision and provided erroneous advice about the consequences of a plea. Nor was Loden intent on death, unlike the petitioner in *Landrigan*. In fact, it was Loden's *counsel*—not, as in *Landrigan*, the defendant himself—who sabotaged the defense by preventing any real investigation. Loden's repeated pleas of his counsel to conduct a mitigation investigation shows that, unlike the *Landrigan* petitioner, Loden did not want to be put to death and did not actively interfere with counsel's attempts to present a mitigation case. (*Cf.* Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2, 6, ¶ 22 ("At no time did I instruct counsel that I did not want them to fully investigate the case including a mitigation case. To the contrary, I constantly urged them to investigate the case fully, and I was extremely disappointed

when they did not, so I told them of my disappointment in their representation on several occasions.").)

All the cases that have followed *Landrigan* show it applies only where the petitioner went to great lengths to prevent presentation of mitigation evidence—in striking contrast to Loden, who urged the opposite of his lawyers. *Blystone v. Horn*, 664 F.3d 397, 426 (3d Cir. 2011) (incorrect and unreasonable to infer that defendant who waived lay witness testimony would have prevented counsel from presenting *any* mitigating evidence); *E.g.*, *Allen v. Fl. Dept. of Corrections*, 611 F.3d 740, 760–761 (11th Cir. 2010) (petitioner stated that he "desire[d] to receive a death sentence in lieu of life in prison" in sworn documents, and direct statements to the court and jury); *Adams v. Quarterman*, 324 Fed. Appx. 340, 347-48 (5th Cir. 2009) (holding that defendant's instruction to counsel not to contact family members does not relieve counsel of conducting investigation into other avenues of mitigating evidence);*** *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009) (defense counsel's mitigation investigation was unreasonably deficient where defendant refused to assist in his defense but did not impede the many other avenues of mitigating evidence available to counsel); *Cummings v. Dept. of Corrections*, 588 F.3d 1331, 1361, 1366 (11th Cir. 2009) (petitioner "clearly, consistently, and adamantly insisted that he wanted no mitigation evidence presented in the penalty phase" by telling counsel not to present mitigation defense, telling the court he refused a mitigation defense, refusing to cooperate in a post-conviction evidentiary hearing, and stating that he "preferred a sentence of death to one of life imprisonment"); *Taylor v. Horn*, 504 F.3d 416, 450-51 (3d Cir. 2007) (petitioner "testified that he had instructed counsel not to present any witnesses at the degree of guilt or penalty phases," admitted to the Court that he "prevented [counsel] from presenting anything that would have caused the death penalty not to be imposed," and "telephoned scheduled witnesses the night before the . . . penalty hearing, telling them not to appear"); *Owens v. Guida*, 549 F.3d 399, 405 (6th Cir. 2008) (petitioner "[h]amstrung [h]er [o]wn [a]ttorneys" by

refusing to: testify at either the guilt or penalty phase of trial, contrary to counsel's advice; cooperate with her counsel's move for an independent mental evaluation for battered-wife syndrome, which may have supported a battered-wife-syndrome defense; or let her counsel interview her family members); *Brawner v. Epps,* No. 2:07-cv-16-MPM, 2010 U.S. Dist. LEXIS 7487, at *35 (N.D. Miss. Jan. 27, 2010) (petitioner "was adamant that no proof be presented that he deserved a sentence less than death"—a position emphasized repeated on the record to prosecutors, defense counsel, and the court—and prevented counsel from allowing mother, sister, and psychologist from testifying at sentencing); *Kayer v. Ryan*, CV07-2120-PHX-DGC, 2009 U.S. Dist. LEXIS 96671, at *60–62 (D. Az. Oct. 19, 2009) (after counsel engaged in a "full-scale investigation" of mitigation evidence, petitioner directed counsel not to present it because of, among other things, "an unwillingness to involve his family in an investigation into his background and a belief that no valuable information could be obtained"); *Morris v. Beard*, 2007 WL 1795689 (E.D. Pa. June 20, 2007) ("[T]his case is far removed from the recent case of *Schriro v. Landrigan*, . . . where the petitioner's instructions not to present any mitigating evidence were clear, defense counsel thoroughly explained the consequences of the petitioner's instructions to him, and the trial court ensured that the record was clear on both of these counts.").

In contrast, recent cases analyzing evidence strikingly similar to the State's proffer here demonstrate that *Landrigan* does not control and that the state court reached an unreasonable, erroneous conclusion in finding no prejudice to Loden. In *Blystone*, for example, trial counsel failed to conduct an adequate mitigation investigation pertaining to the petitioner's mental health, but the State of Pennsylvania argued that the defendant was not prejudiced because he had chosen to forego the presentation of mitigation evidence during sentencing. *Blystone*, 664 F.3d at 426. The Third Circuit affirmed the district court's rejection of that argument and found that *Landrigan* did not control

because there was not a "constellation of refusals to have mitigating evidence presented."

*Id.* The court stated:

> [W]e believe this case bears little resemblance to *Schriro* [*Landrigan*], in which the petitioner was certainly aware that other types of mitigating evidence could be presented on his behalf, since nearly all of the evidence that the petitioner claimed would have been uncovered in an adequate investigation was in fact proffered to the judge— over the interruptions of the petitioner—at sentencing.

*Id.* The court found that it was unreasonable for the state court to infer from the colloquy between the trial court and the petitioner that "Blystone would have prevented counsel from presenting any mitigating evidence, regardless of the form that it took." *Id.*

Likewise, in *Thomas v. Horn*, 570 F.3d 105 (3d Cir. 2009), the Third Circuit found *Landrigan* not controlling because the defendant "never indicated that he would interfere with or otherwise prevent the presentation of all mitigating evidence, regardless of its nature." *Id.* at 129. As in *Blystone*, the court also found the colloquy between the trial court and the defendant to be insufficient to form the "conclu[sion] that Thomas' conduct at sentencing eliminated all possibility that counsel's performance caused him prejudice." *Id.*

Like the states' "evidence" in *Blystone*, *Young*, and *Thomas*, the State's evidence against Loden does not show that he would have forgone all mitigation efforts in the penalty phase "had his trial counsel investigated and prepared to present all of the available mitigating evidence" discovered post-conviction. *Blystone*, 664 F.3d at 426; *Young*, 551 F.3d at 959. Quite the contrary, Loden repeatedly urged his trial counsel to conduct a mitigation investigation to no avail. (Loden Aff., Pet., Ex. 30(a), (b), (c), (d), (e), (h), (i), (j), (k); 35(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (l), (NOLEX ECF 5-3, 107-156).) The reasoning in *Landrigan* simply does not apply here.

(ii)     **Trial counsel cannot blame their failure to investigate on Loden**

(a)     **Loden did not preclude his trial counsel from conducting an investigation**

Loden never asked trial counsel not to investigate for the penalty phase. To the contrary, during the 14 months preceding his sentencing, Loden repeatedly encouraged his counsel to interview witnesses and gather relevant records. In the face of counsel's recalcitrance, Loden repeatedly encouraged—indeed, begged—his counsel to interview witnesses and gather relevant records:

- February 2, 2001: Loden writes to Johnstone asking for a meeting: "I'd like to speak to you of the 'interview' with the state police. It might or might not be of assistance, I just question a few things the more I think about it." (Ex. 35(a).) (*Id*. at ECF 5-4, 31)

- February 7, 2001: Loden writes to Daniels expressing concern that Daniels' refusal to respond to Loden's previous three letters suggests a problem with the mail, "I'm again sorry to be a bother, but I'm afraid the previous three letters I've sent to you went to a wrong address." [Loden's earlier three letters were properly addressed] (Ex. 35(b).) (*Id*. at ECF 5-4, 35)

- February 17, 2001: Loden again writes to Daniels, "I was just wondering if it would be possible to speak with you when you do become available." (Ex. 35(c).) (*Id*. at ECF 5-4, 38)

- February 25, 2001: Loden writes to Daniels asking for copies of the discovery and requesting that Daniels subpoena his phone records which would provide evidence of the call with his wife shortly before the crime. (Ex. 30(a).) (*Id*. at ECF 5-3, 108)

- March 11, 2001: Loden writes to Daniels requesting telephone records of his wife's conversations with the man with whom she was having an affair. (Exs. 30(b), (c).) (*Id*. at ECF 5-3, 111, 114)

- March 20, 2001: Loden writes to Daniels asking for discovery, following up on his prior request to subpoena phone records, asking for a schedule and for information regarding what motions he and Johnstone are working on, and requesting to speak with him and Johnstone. (Ex. 30(c).) (*Id*. at ECF 5-3, 114)

- April 1, 2001: Loden writes to Herb Wells, the investigator hired by counsel: "Thank you for your time and effort. I hope you have been able to contact the people you need, I have sent word, but haven't heard back myself yet." (Ex. 35(d).) (*Id*. at ECF 5-4, 41)

- May 13, 2001: Loden again writes to Wells, "Sir, I'm sorry to bother you, I know you must be busy, but there is something or actually several things I'd like to discuss with you." (Ex. 35(e).) (*Id*. at ECF 5-4, 44)

- May 15, 2001: Loden writes to Wells: "If I could remind you, could I have a copy of the 'interviews' in the discovery, especially the ones from [my wife] Kat." (Ex. 35(f).) (*Id*. at ECF 5-4, 47)

- May 15, 2001: Loden writes to Wells: "Oh, if you or anyone hear from the Marines Captain Chaney would you attempt to have him contact me. I've had no luck in the letters or messages I've sent him." (Ex. 35(f).) (*Id*. at ECF 5-4, 47)

- May 28, 2001: Loden writes to Wells requesting to see discovery material "to help me determine if there might be someone I want to testify." (Ex. 30(d).) Loden also writes to Daniels, stating "I also request a copy of all the discovery material be given to me, on your next visit here." (Ex. 35(g).) (*Id*. at ECF 5-3, 117)

- June 6, 2001: Loden writes to Daniels, "I'd like the discovery material . . . . I also have questions of if the Marines are available for subpeona's [sic], people and paper work." (Ex. 30(e).) (*Id*. at ECF 5-3, 121)

- June 7, 2001: Loden again writes to Wells, "There's several issues I'd like to speak of if you could come, and a few people you may want to speak with soon, before next motions." (Ex. 35(h).) (*Id*. at ECF 5-4, 52)

- June 14, 2001: Loden again writes to Daniels, "I'd like to ask, sorry to impose more than already, for copies of all my military records." (Ex. 35(i).) (*Id*. at ECF 5-4, 55)

- July 3, 2001: Loden writes a detailed letter to Daniels, stating that he has reviewed the discovery materials and believes he found the "smoking gun." He tells Daniels he wants to talk. (Ex. 30(h).) (*Id*. at ECF 5-3, 130)

- July 8, 2001: About two months before his plea, Loden is forced to resort to outright begging: "I hate it, but I'm so short on time now. Would you ***please***, take the time and speak with me just as soon as possible? ***Please***." (Ex. 30(i); emphasis in original.) (*Id*. at ECF 5-3, 138)

- July 20, 2001: Loden writes to Johnstone stating he wants another motion to suppress the original warrant because of the "new evidence" he has found. (Ex. 30(j).) (*Id*. at ECF 5-3, 145)

- July 27, 2001: Loden writes to Daniels and raises multiple issues he thinks might be helpful to his defense, including his mental state at the time of his initial appearance: "I do hate to intrude or impose on you or Mr. Johnstone, truly I do. Yet there is so much I continue to ponder over. I do [sic] profess to be a lawyer, far from it, I just see things and question. . . . The latest is dealing of an issue I've mentioned already but different as to how it may apply. It's my 'initial appearance,' and a possible case point of law with it." (Ex. 35(j).) (*Id*. at ECF, 5-4, 57)

- August 17, 2001: Loden writes to Wells asking for a visit from him because "I'm afraid I've offended my lawyers." (Ex. 35(*l*).) (*Id*. at ECF, 5-4, 61)

- August 29, 2001: Loden writes to Daniels asking, "[D]ose [sic] any of the 'Desert Storm Syndrom [sic]' stuff I wrote Mr. Johnstone about matter?" (Ex. 30(k).) (*Id*. at ECF, 5-3, 149)

During the sentencing phase, trial counsel informed the court that Loden chose not to present a mitigation defense or object to prosecution evidence or witnesses, and that they would abide by Loden's wishes. (Plea and Sentencing Transcript, pp. 201–02.) Trial counsel did not explain the impetus for this instruction and the court did not ask either counsel or Loden. Trial counsel did not state that, in their opinion, mitigation witnesses should be called or that they so advised Loden. This is because they did not have any discussion with Loden about the sentencing phase. (Petitioner Aff., Pet. Ex. 1, NOLEX, ECF, 5-1, 5-6, ¶¶ 18-26.) Trial counsel's statement is inconsistent with the fact that they did not have any witnesses lined up, or even identified. (*See* Johnstone Aff.,

Pet. Ex. 19, NOLEX, ECF, 5-2, ¶¶ 9, 11.)  It is also inconsistent with Loden's repeated instructions and suggestions for investigation.  Finally, it is inconsistent with trial counsel tendering the report of the psychologist, Dr. O'Brien, to the trial judge (the report that Loden did not see until after it was submitted into evidence, and that was wholly inadequate and incomplete).  (*See* Plea and Sentencing Transcript 202, ll. 19–24.)

To protect themselves, trial counsel made one rambling statement in the record regarding the mitigation evidence that they claimed they would have presented, although in truth, counsel did not have any witnesses lined up to provide the evidence.  (*See* Plea and Sentencing, p. 201-202, ll. 1-8, 201:1-29, 202:1-8.)  A wealth of mitigating evidence uncovered by post-conviction counsel, however, was missing from trial counsel's short list.  Among the most glaring omissions was evidence of Loden suffering from complex PTSD and dissociative disorder.

And as explained above and more fully below, Loden would not have "undermined the presentation of any mitigating evidence that his attorney might have uncovered."  This is not a case where the defendant urged the court to "bring it on" and argued against his own lawyer's attempt to submit mitigating evidence.  Just the opposite. Loden urged his counsel to fully investigate the case, contemplated seeking new counsel because of their deficient performance, and ultimately decided to plead guilty only when his counsel told him he had to make a decision and provided erroneous advice about the consequences of a plea.

**(b)     The ABA Guidelines and relevant case law make clear that trial counsel's failure to investigate cannot be excused by any purported wish of their client**

ABA Guideline 10.7.1.2 mandates:  "The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."  The commentary to this guideline reaffirms this duty:  "Counsel's duty to investigate and present mitigating evidence is now well-

established. The duty to investigate exists regardless of the expressed desires of a client."

2003 Guidelines, Commentary to Guideline 10.7, p. 1021 (footnotes omitted). This

citation is not merely aspirational, it is bolstered by precedent.

In *Blystone*, the court held that trial counsel's failure to explore institutional

records in the course of investigating the petitioner's background fell short of

professional standards articulated in the ABA Guidelines. *Blystone*, 664 F.3d at 419-23.

The court explicitly rejected the argument that the petitioner would have declined the

presentation of mitigation evidence had counsel conducted a competent investigation

because the petitioner ultimately declined to introduce mitigation evidence at trial:

> The fact that Blystone chose to forego the presentation of
> his own testimony and that of the two family members,
> which counsel was prepared to put on the stand, simply
> does not permit the inference that, had counsel competently
> investigated and developed expert mental health evidence
> and institutional records, Blystone would have also
> declined their presentation.

(*Id.* at 426.)

Similarly, in *Hamblin*, trial counsel tried to defend his inadequate investigation of

the client's background by reference to the client's wish not to have mitigation evidence

presented. 354 F.3d at 492. The court, citing the ABA Guidelines, emphatically rejected

that excuse:

As to the second justification, the district court said that counsel cannot be

> ineffective when counsel is simply following a defendant's
> wishes not to investigate or prepare for the mitigation phase
> of the case. There is no evidence in the record that counsel
> informed Hamblin about the importance of mitigation to
> the penalty phase or the consequences of limiting the
> penalty phase to his unsworn statement and the testimony
> of [one other witness]. Since the district court did not
> permit an evidentiary hearing or discovery in this case, it is
> not clear what Hamblin said to [trial counsel] about
> investigating the case or what [trial counsel] advised

-98-

> Hamblin. But ABA and judicial standards do not permit
> the courts to excuse counsel's failure to investigate or
> prepare because the defendant so requested, assuming that
> this finding is factually accurate.

*Id.*

And in *Silva v. Woodford*, the court held that "counsel's duty to investigate mitigating evidence is neither entirely removed nor substantially alleviated by his client's direction not to call particular witnesses to the stand. Furthermore, a lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made [an] 'informed and knowing' judgment." 279 F.3d 825, 838 (9th Cir. 2002). *See also Hardwick*, 320 F.3d at 1190 n. 215 (even in the face of client's request not to present mitigation, lawyer "had a duty to [client] at the sentencing phase to present available mitigating witnesses as Hardwick's defense against the death penalty"); *Carter*, 218 F.3d at 596 ("The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility. We find that reluctance on Carter's part to present a mental health defense or to testify should not preclude counsel's investigation of these potential factors."); *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that "[counsel] could not make a valid strategic choice because he had made no investigation"); *Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002) (counsel's "failure to investigate the abuse through other family members and witnesses was error of constitutional magnitude").

*Blanco v. Singletary*, 943 F.2d 1477, 1501-03 (11th Cir. 1991) is particularly instructive. In *Blanco*, petitioner instructed his attorneys not to call any family members or acquaintances to testify during the penalty phase. The court noted that his desires not to present mitigating evidence did not terminate counsel's responsibilities. "The reason

lawyers may not blindly follow such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit." *Id.* at 1502 (internal quotation marks omitted). The court then found counsel ineffective because the decision "not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto Blanco's statements that he did not want any witnesses called." *Id.* at 1503. The court further emphasized that during the period when defendant's lawyers started preparing his penalty phase case, defendant was "noticeably morose and irrational." *Id.* at 1502. Thus, counsel had "a greater obligation to investigate and analyze available mitigation evidence." *Id.*

Thus, even where a client tells counsel not to conduct an investigation (which Loden manifestly ***did not do***), counsel are nonetheless required to investigate. Counsel "cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case." 2003 Guidelines, Commentary to Guideline 10.7, p. 1021.

Messrs. Johnstone and Daniels remained ignorant of much information critical to competently advising their client. (*See* Johnstone Aff., Pet. Ex. 19, NOLEX ECF 5-2, 9-11, ¶¶ 9, 11). So they advised him that he had no case. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,5-6, ¶ 25) As in *Blanco*, trial counsel here eagerly "latched onto" Loden's agreement to plead guilty and not to oppose the State's evidence, an uninformed decision reached as a result of trial counsel's failure to develop Loden's mitigation case. Even worse, they knew Loden was deeply depressed and had attempted suicide three times within the last year. (*See* Attorney Johnstone's Handwritten Notes, Ex. 25(b) (NOLEX, ECF 5-2, 122) ("July 13. . . conversation with M. Baker. . . client tried to kill himself"; "8/22. . . Meeting with [family]. . . . Feels he is still suicidal"); *cf.* High Aff., Pet. Ex. 16,

pp. 26-28 (NOLEX ECF 5-1, 105-107).) Thus, counsel had an even greater obligation to ensure that Loden understood the consequences of his decision. *See Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986) ("An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment.").

Finally, it was trial counsel's decision about what type of evidence to introduce during the sentencing phase and what type of objections to make with respect to the State's evidence. They did not have the right to do nothing and blame it all on Loden. Decisions about presenting evidence ultimately rest with the attorney, not the defendant. In a criminal trial, the defendant controls only five decisions: whether to plead guilty, waive a jury, testify in his own behalf, take an appeal, or represent himself. *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (citing *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1 (1977)); *see also Florida*, 543 U.S. at 187; *New York v. Hill*, 528 U.S. 110, 114-15 (2000); Mississippi Rules of Professional Conduct, Rule 1.2(a), (Amd. eff. 11/3/2005), p. 12 ("[i]n a criminal case, a lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify").

All other decisions—including decisions about the presentation of evidence at the penalty phase—belong to the attorney. Thus, the attorney has absolute control over the decision about presenting mitigation evidence. Certainly, the attorney should consider his client's wishes in deciding trial tactics. But ultimately, the attorney, not the defendant, determines whether presenting a mitigation case is in the defendant's best interest and decides what mitigating evidence to present. The defendant's requests do not bind counsel and do not nullify his professional duty to make this judgment. *See* Mississippi Rules of Professional Conduct, Rule 1.2 cmt. "Scope of Representation", p. 13 ("a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so. . . . In questions of means, the lawyer should

assume responsibility for technical and legal tactical issues . . . .").  Here, Daniels and
Johnstone were in no position to make strategic decisions regarding the penalty phase of
Loden's case because they lacked the basic information about Loden's familial, social
and psychological history to determine what affirmative evidence they could present and
how best to challenge the State's evidence.

> **D.** **The Mississippi Supreme Court's Rulings On Loden's Claims Under The Sixth And Fourteenth Amendments Were Unreasonable In Light Of Clearly Established Federal Law**
>
> **1.** **The Mississippi Supreme Court Ruling That Loden Was Not Prejudiced By His Counsel's Ineffective Assistance Was Contrary To And An Unreasonable Applications Of Clearly Established Supreme Court Precedent**

As set forth above, clearly established United States Supreme Court precedent
provides that the test for prejudice in claims of constitutionally ineffective assistance in
connection with advice rendered during the plea and sentencing process is whether the
defendant "would have insisted on going to trial" had he been properly advised.  *Frye*,
132 S. Ct. at 1409 ("In cases where a defendant complains that ineffective assistance led
him to accept a plea offer as opposed to proceeding to trial, the defendant will have to
show "a reasonable probability that, but for counsel's errors, he would not have pled
guilty and would have insisted on going to trial.") (quoting *Hill v. Lockhart*, 474 U.S. 52,
59 (1985)).

Nowhere in the Mississippi Supreme Court's decision is there any discussion
whether Loden would not have pled guilty, waived jury sentencing, or put on a mitigation
case had he been advised properly about the pros and cons of doing so.

The Mississippi Supreme Court, therefore, failed to conduct the correct
constitutional inquiry into whether Loden was prejudiced by his counsel's failure to
advise him adequately during such critical stages of the criminal proceedings.  Instead,
the state court found that Loden was not prejudiced by his trial counsel's ineffective
assistance because Loden pled guilty and waived jury sentencing, *Loden*, 43 So. 3d at

385–86, 388, and "waived presentation of mitigation evidence in sentencing." *Loden*, 43 So. 3d at 381 ("Loden's investigation argument is without merit because "even if additional mitigation evidence had been discovered, pursuant to [Loden's] instructions, it could not be presented during the sentencing phase of the trial.") (quoting *Bishop v. State*, 882 So. 2d 135, 145 (Miss. 2004)); *id.* at 388 ("Moreover, as the underlying substantive issue was found both to be without merit and moot on account of Loden's decision not to present mitigation evidence."); *id.* at 391 ("Fundamentally, Loden's argument is moot on account of his decision not to present mitigation evidence. As such, he cannot establish any prejudice resulting from defense counsel's alleged "failure to make adequate use of the psychologist . . . .").

Loden's uninformed decisions to plead guilty, waive jury sentencing, and not present a mitigation case say nothing whether or not he would have made those decisions had he been properly advised by his counsel in the first place.

The Mississippi Supreme Court's reasoning, therefore, was contrary to and an unreasonable application of clearly established federal law. *Frye*, 132 S. Ct. at 1409; *Morris v. Thaler,* 425 Fed. Appx. 415, 418-419 (5th Cir. Tex. 2011) (appropriate inquiry is whether "there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial") (citing *Lockhart*, 474 U.S. at 59.)

      **2.**     **The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That His Counsel Was Ineffective <u>By Failing To Conduct A Mitigation Investigation</u> Was An Unreasonable Application Of Clearly Established Federal Law, And Was Based Upon An Unreasonable Determination Of The Facts**

          **(i)**     **The Mississippi Supreme Court's finding that trial counsel was not ineffective as a matter of law was an unreasonable application of clearly established Supreme Court precedent**

The state court's finding that Loden's trial counsel was not ineffective as a matter of law merely because "counsel [was] specifically instructed not to present mitigation

evidence," *Loden*, 43 So. 3d at 380–381 (citing *Bishop*, 882 So. 2d at 143–46), was an unreasonable application of *Strickland*. The Mississippi Supreme Court denied post-conviction relief based on (1) *Schriro v. Landrigan*, 550 U.S. 465 (2007), which holds that a defendant cannot claim ineffective assistance where the evidence conclusively established that the defendant categorically refused to present mitigation evidence; and (2) the absurd notion that, based on inferences from Loden's conduct *after* trial, counsel opted not to conduct making any mitigation investigation *before* trial.

As explained in Part I.C.4.(i) *supra*, *Landrigan* cannot reasonably be applied to Loden. 550 U.S. at 1944. To hold that a defendant may not succeed on an ineffective assistance of counsel claim where, as here, the defendant evinced an objective desire that his counsel conduct a mitigation investigation amounts to an unreasonable application of *Landrigan*.

          **(ii)**     **The Mississippi Supreme Court's conclusion that Loden was not prejudiced because he wanted to plead guilty and be put to death was unreasonable in light of the evidence**

The Mississippi Supreme Court excused trial counsel's inadequate investigation by holding that Loden suffered no prejudice because "even if additional mitigation evidence had been discovered, pursuant to [Loden's] instructions, it could not be presented during the sentencing phase of the trial . . . As such, Loden 'cannot show that counsel's performance was deficient or that such deficiency prejudiced him.'" *Loden*, 43 So. 3d at 381 (citation omitted). The Opinion cites to Johnstone's 2009 deposition wherein Johnstone stated that Loden allegedly became "very firm" and "adamant" sometime between September 18 and 20, 2001 that he did not want to present a mitigation case. *Id.* at 379 n.15. The Mississippi Supreme Court's factual determination here was unreasonable in light of the evidence.

**First**, the Opinion does not (and cannot) cite to any evidence in the record where Loden "formally waived" his right to present mitigating evidence. The Court did not ask Loden if he had instructed counsel not to present any mitigation evidence. Before the sentencing hearing began, the Court asked Loden if he was knowingly waiving his right to have a jury determine his sentence, but the Court did not ask any questions about his allegedly instructing his attorneys not to present mitigation evidence. *Compare Landrigan*, 550 U.S. at 1937–38 (noting that petitioner stated explicitly that he did not want a mitigation investigation and that "if you want to give me the death penalty, just bring it on. I'm ready for it.'"); *compare also Cummings*, 588 F.3d at 1338 (petitioner told trial judge in open court that he did not want to present mitigation evidence after the court explained the purpose and benefit of mitigation evidence); *Brawner* 2010 U.S. Dist. LEXIS 7487, at * 34 (petitioner was "repeatedly questioned by the trial court to ensure that he understood that he was waiving his right to present [mitigation] evidence").

**Second**, Johnstone's 2009 deposition testimony is contradicted by the record. Loden submitted an affidavit clearly stating that Johnstone and Daniels never discussed a mitigation case with him; what evidence they might put on in mitigation; mitigation witnesses that should have been contacted or asked Loden for a list of mitigation witnesses; or that Loden's family and military experiences could serve as mitigating evidence. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2, 5-6, ¶¶ 21-25.) Nor have either Johnstone or Daniels ever produced a single document memorializing any discussion with Loden about mitigation evidence or Loden's alleged instructions that no mitigation case be introduced. Conflicting testimony from witnesses is exactly the sort of factual dispute that must be resolved in an evidentiary hearing to assess the witnesses' credibility and, thus, precludes a finding against Loden at this stage of his post-conviction Petition. *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) (state court's failure to conduct evidentiary hearing unreasonably deprived habeas petitioner of due process); *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (district court did not abuse discretion in

holding evidentiary hearing at which federal habeas petitioner could attempt to prove the petition's factual allegations); *Guidry v. Dretke,* 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in capital case where state court's decision was based on factual finding that ignored countervailing record evidence; under "§ 2254(d)(2), the district court concluded properly that the state court's adjudication of the claim was based on an unreasonable determination of the facts").

**Third**, even if one were to credit Johnstone's testimony that Loden decided to plead guilty and not present mitigation evidence (a day or two before Loden was forced to choose whether to plead or go to trial), *Landrigan* and its progeny stand for the proposition that a failure to conduct an adequate mitigation investigation will be deemed non-prejudicial *only when* the defendant makes it abundantly clear that he would have thwarted the presentation of any mitigation evidence because he wanted death. *Landrigan*, 550 U.S. at 478. This rule is not designed to protect incompetent counsel who fail to conduct a mitigation investigation, ask the client what he wants them to do at trial, and then claim they are simply following their client's instructions when the client elects to forego a trial and sentencing for which counsel is not prepared. Nothing in the record suggests that Loden would have thwarted any effort by his trial counsel to present a mitigation case had counsel conducted an adequate mitigation investigation and been prepared to present it.

Trial counsel's statements come nowhere close to the type of evidence that would justify the conclusion that a mitigation investigation would not have affected Loden's decision making.

*Daniels v. United States*, 54 F.3d 290 (7th Cir. 1995) is instructive. In that case, the Seventh Circuit ordered an evidentiary hearing to resolve a conflict between the petitioner, who asserted that he was coerced to plead guilty, and his former counsel who asserted that the defendant voluntarily elected to plead.

> Daniels makes detailed and specific allegations that his fee dispute with [counsel] caused [counsel] to provide him with ineffective assistance. Daniels submitted a sworn affidavit containing his version of events; [counsel] submitted a sworn affidavit suggesting a different version. Contrary to the district court's characterization, we believe that the record does not conclusively demonstrate that Daniels' claims are without basis. The record is insufficiently developed for this court to determine what actually occurred in 1990. Thus, Daniels is entitled to an evidentiary hearing if proof of his allegations could result in the invalidation of his guilty plea.

*Id.* at 293, 294. The same result should apply here where the record is likewise insufficiently developed for the Court to make a determination as to Loden's claims, particularly in light of competing affidavits that warrant an evidentiary hearing.

(iii) **The Mississippi Supreme Court's conclusion that counsel's investigation was adequate was unreasonable in light of federal law and the evidence**

The state court ruled that the mitigation investigation allegedly conducted by Loden's former counsel "was not deficient." *Loden*, 43 So. 3d at 381. In doing so, the state court accepted numerous, unsupported statements from Johnstone and Daniels claiming that they conducted an "extensive" investigation into mitigating factors through interviews with Loden's family. *Id*. at 381–82. What makes the state court's uncorroborated findings even more astounding is that they are completely and directly refuted by evidence submitted by Loden. Loden's mother and half-sister swear under oath that Daniels never discussed any mitigation evidence with them, such as Loden's family history and background. (Christian Aff., Pet. Ex. 4, NOLEX ECF 5-,1, 22, 26, ¶¶ 20-22; Christian Aff., Pet. Ex. 38, NOLEX ECF 5-4, 70-71, ¶¶ 6-9; Brown Aff., Pet. Ex. 3, NOLEX ECF 5-1, 16, 20, ¶ 17; Brown Aff., Pet. Ex. 39, NOLEX ECF 5-4, 73, ¶¶ 4-5.) In fact, Loden's half-sister never talked to Daniels at all, (Brown Aff., Pet., Ex. 39, NOLEX ECF 5-4, 73, ¶¶ 4-5), and his mother only talked to Daniels about Loden's treatment in jail and need for psychiatric care (Christian Aff., Pet. Ex. 4, NOLEX, ECF,

-107-

5-1, 26, ¶ 21). In addition, Loden's aunt does not recall Daniels or Investigator Herb Wells[13] ever asking her about Loden's childhood or background. (Renick Aff., Pet. Ex. 13, NOLEX ECF 5-1, 70, ¶ 14.) Thus, at least four people, including Loden himself, directly contradict Daniels' statements. At the very least, the state court should have ordered an evidentiary hearing to assess the veracity of Daniels' claim. *See Guy v. Cockrell*, 343 F.3d 348, 354 (5th Cir. 2003) (ordering evidentiary hearing where affidavits from petitioner's mother and aunt contradicted evidence that the defense investigator interviewed relevant mitigation witnesses). Unfortunately for Loden, it did not.

The state court also relied on Daniels' supposed interview of Loden's military personnel and friends. Tellingly, the numerous affidavits from individuals who knew Loden in the military prove that Daniels never interviewed them, (Ferrier Aff., Pet. Ex. 8, NOLEX ECF 5-1, 39, ¶ 4; Houle Aff., Pet. Ex. 9, NOLEX ECF 5-1, 46-47, ¶ 4; Kittle Aff., Pet. Ex. 10, NOLEX ECF 5-1, 51, 53, ¶ 15; Sanders Aff., Pet. Ex. 15, NOLEX ECF 5-1, 76, 77, ¶ 11), and, thus, further call into question the reliability of Daniels' statements. And although Daniels declared that he interviewed military personnel, he could not recall if he ever asked Loden for the names of his military colleagues. (Daniels Depo. at p. 171:6-8.) The only person who corroborates Daniels' representation is Major Chaney. Daniels' interview of Major Chaney, however, did not elicit adequate mitigating information because the interview lasted only five to fifteen minutes and Daniels failed to ask for any specific details of Loden's service or military records. (Chaney Aff., Pet., Ex. 44, NOLEX ECF 5-4, 106, 107, ¶¶ 7-11.)

---

[13] As for Investigator Wells, almost all of his investigation related to a suppression hearing as to certain evidence. He did almost no work after the June 26 hearing on that issue and never conducted an investigation related to the penalty phase of Loden's case. (*See* Wells Investigation Notes, Ex. 26(b) NOLEX ECF 5-2, 131-138; Wells Aff. NOLEX ECF 5-4, 18-20, ¶ 8.)

Even Johnstone and Daniels provided conflicting testimony amongst themselves as to whether they had adequately investigated Loden's mitigating circumstances and were prepared to put on a mitigation case. In fact, the evidence strongly suggests that they were not prepared in the least. Johnstone's affidavit confirms that, in September 2001, he and Daniels "did not have a mitigation case to present because there had not been any mitigation investigation." (Johnstone Aff., Pet. Ex. 19, NOLEX ECF 5-2, 9, 11, ¶ 11 (emphasis added).) Although Johnstone tried to backtrack in his 2009 deposition by stating that Loden claimed he did not want to present mitigation evidence, Johnstone admitted in that same deposition that he had no recollection of ever discussing mitigation evidence with Loden. (Johnstone Depo. at pp. 73:11-22, 74:11-20, 78:9-13.) Daniels for his part merely speculates[14] as to what Johnstone meant to say in his affidavit, *Loden*, So. 3d at 382 n.24, and contends without any evidentiary support that they were prepared to present a mitigation case. [15]

---

[14] Daniels' 2009 deposition should be viewed with skepticism because it is clear that he has abandoned his fiduciary duties to Loden and is antagonistic to Loden in this case. Daniels began his employment with the prosecutor's office almost immediately after Loden's trial case was completed. (Daniels Depo. at p. 17:12-19, Ex. 46.) Daniels also voluntarily submitted an affidavit while working at the prosecutor's office in support of the State's position after he had previously submitted a sworn affidavit saying that he would not speak further about this case. (Daniels 2003 Aff. ¶ 4, Ex. 41.) And most importantly, he inexplicably destroyed all of his files associated with this case knowing full well that Loden was continuing to fight his death sentence. (Daniels Depo. at pp. 46:22-48:9, Ex. 46.) These facts raise serious doubts regarding the credibility of Daniels' testimony.

[15] The Opinion's statement that there is no proof that defense counsel quit preparing for trial and sentencing, *Loden*, 43 So. 3d at 384–385, is contradicted by the record. Trial counsel's time records establish that they spent a mere 36.5 hours combined preparing for trial between the suppression hearing on June 26 and Loden's plea on September 21. (*See* Time Records, TR 243-247; 249-52.) Daniels testified that he intended to call various witnesses to testify at trial, but had failed to issue any subpoenas with less than 17 days before the trial date. That Johnstone and Daniels could investigate and prepare a thorough mitigation case in less than three weeks, in addition to their other trial duties for Loden, is incredulous at best.

Despite this conflicting evidence not only between Loden and his trial attorneys, but between Johnstone and Daniels themselves, the state court nevertheless adopted Daniels' unfounded intimation that Loden essentially handcuffed him and Johnstone in their investigative efforts. The state court relies on trial counsel's characterization that "while Loden did not expressly discourage mitigation investigation, he was reluctant to discuss either the underlying facts of the case, the development of mitigation evidence . . . or the prospect of testifying." *Loden*, So. 3d at 382. This contention is patently untrue and contradicted by the record, including contemporaneous evidence. As shown above, Loden repeatedly implored his counsel (in vain) to interview witnesses and gather relevant records during their 14-month representation of him. (*See, e.g.*, Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2-6, ¶¶ 7, 9-11, 13, 22; 6/6/01 Letter from Loden to Daniels requesting information regarding Marines, Ex. 30(e) (NOLEX ECF 5-1, 120); 3/11/01 and 3/20/01 Letters from Loden to Daniels requesting telephone records of his wife's conversations, Ex. 30(b), (c) (NOLEX ECF 5-3, 111, 114.) Nor did trial counsel ever discuss with Loden whether he should testify on his own behalf during the sentencing phase. (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 2, 5-6, ¶¶ 21-22.)

In sum, Loden has submitted substantial, credible evidence that supports his claim of trial counsel's inadequate mitigation investigation. At the very least, Loden's evidence casts doubt on Daniels' testimony that he diligently investigated mitigating leads. Yet, the state court ignored Loden's evidence, credited trial counsel's testimony, and incorrectly denied Loden's state petition. In light of this inconsistent and contradictory testimony between trial counsel, and given the Mississippi Supreme Court's failure to consider Loden's evidence, the determination that trial counsel conducted an effective mitigation investigation was objectively unreasonable. *Guidry v. Dretke,* 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in capital case where state court's decision was based on factual finding that ignored countervailing record evidence; under "§ 2254(d)(2), the district court concluded properly that the state court's adjudication of the claim was based

on an unreasonable determination of the facts"); *Childress*, 103 F.3d at 1226 n.7 ("While the measure of deference afforded state court factual findings is substantial, we note that it is not absolute. Section 2254(d)(2) authorizes issuance of the writ if the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented'"); *Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (section 254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts").

3. **The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That His Counsel Was Ineffective <u>By Advising Loden To Waive Jury Sentencing</u> Was An Unreasonable Application Of Clearly Established Federal Law, And Was Based Upon An Unreasonable Determination Of The Facts**

Despite the wealth of evidence submitted by Loden showing his waiver was not made knowingly, intelligently or voluntarily, the Mississippi Supreme Court concluded that it could not determine whether trial counsel's advice was deficient because "Loden's affidavit failed to provide any details of his discussion with defense counsel regarding the waiver of jury sentencing." *Loden*, 43 So. 3d at 385–386. The lack of details, however, is due to the fact that Loden's counsel ***never*** advised him about his sentencing rights: "Messrs. Daniels and Johnstone did not discuss with me what would happen next. *In fact, Messrs. Daniels and Johnstone never discussed with me the sentencing phase and their strategy for it.*" (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 2, 6, ¶ 21 (emphasis added).) It is simply impossible for Loden to provide details of a conversation that never occurred.[16]

---

[16] Nonetheless, Loden submitted a supplemental affidavit to the Mississippi Supreme Court in his Motion for Rehearing that details the various issues that his counsel failed to discuss with him. (Loden Supp. Aff., Ex. 48.) Specifically, Johnstone and Daniels never advised Loden regarding (1) the sentencing phase, (2) the advantages of having a jury sentence him rather than the trial judge, or (3) the fact that a jury could consider mitigating evidence when deciding what sentence to impose. (*Id.* ¶ 4.)

Moreover, Loden's evidence submitted with his Petition disproves—and at the very least contradicts—the contention that his purported waiver of his right to jury sentencing was knowing, intelligent and voluntary. Loden's sworn affidavit shows that his trial counsel never explained to him what his rights were with respect to sentencing. For example, trial counsel failed to explain the possible advantages of having a jury decide Loden's penalty as opposed to the trial judge (such as the requirement that any decision to impose the death penalty be unanimous). (Loden Aff., Pet., Ex. 1, NOLEX ECF 5-1, 2,6, ¶ 21; Loden Supp. Aff. ¶ 4, Ex. 48; Loden Pet. at pp. 59-61.) As such, Loden did not have the information necessary to make an informed decision. This naturally led to his confusion during the hearing because his ability to understand the court's compound and confusing statements or the sentencing waiver that he signed was extremely limited. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2, 6, ¶ 20; Loden Pet. at pp. 79–84, 86–91.)

Additionally, trial counsel's failure to conduct an adequate investigation into mitigating circumstances critically altered the reliability of their legal advice, which undermined the knowing, intelligent and voluntary nature of Loden's waiver. *See Lewyellyn v. Wainwright*, 593 F.2d 15, 17 (5th Cir. 1979) (per curiam) ("Because [defendant] was ignorant of the maximum sentence which he could receive upon entering a guilty plea, his plea was involuntary and invalid under the due process clause."). The failure to investigate numerous compelling facts that were favorable to Loden meant that Loden had no appreciation for the strength of his mitigation case. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2-6, ¶ 18-26; Loden Pet. at pp. 24–25, 34–48.) Thus, he failed to grasp how his abusive childhood background, suicidal tendencies and mental disorders—which were usually sources of embarrassment to him—could aid his defense. (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2-6, ¶ 24.) Instead, Johnstone and Daniels repeatedly admonished Loden that he would get the death penalty no matter what he did, which

-112-

contributed significantly to Loden's uninformed decision to waive jury sentencing. (Loden Aff. Pet. Ex. 1, NOLEX ECF 5-1, 2-6,¶¶ 8, 37.)

Thus, while the Opinion states that the record is "replete with evidence beyond all doubt that Loden knowingly, intelligently, and voluntarily waived jury sentencing," *Loden*, 43 So. 3d at 386, significant doubt does exist in this case. The evidence shows that Loden's purported waiver was made without the benefit of an adequate mitigation investigation or competent advice from counsel. To the contrary, Loden's evidence sets forth a valid claim of ineffective assistance of counsel that, if proven true, would render Loden's waiver of jury sentencing void.

The Mississippi Supreme Court's further reliance on Loden's statements to Dr. O'Brien regarding his preference for death over life was further unreasonable in light of the record. The evidence shows that Loden was completely hopeless, which was fostered and reinforced by his counsel's repeated predictions to him that he "would get the death penalty no matter what they did." (Loden Aff., Pet. Ex. 1 NOLEX ECF 5-1, 2-9, ¶¶ 8 & 37 ("My shame and remorse was reinforced by my attorneys telling me that I would get the death penalty no matter what, and thus failing to give me any hope that I might not be sentenced to death.").) Furthermore, Loden continuously urged his counsel—in vain—to investigate sound leads regarding potential mitigating factors and sought assurances that he could appeal all pre-trial rulings. In fact, Loden wrote to Daniels in one letter: "My only hope was re-presenting everything I had trouble with on appeal. Glad to hear that I still can."[17] (Loden letter to Daniels, 2/7/02, Ex. 30(*l*) NOLEX ECF 5-3, 153.) These actions dispel, and are wholly inconsistent with, the

_____

[17] The advice Loden received from Daniels and Johnstone with respect to what issues were appealable is another ground for granting Loden's Petition. Loden's two former attorneys could not explain what he could raise on appeal if he plead guilty, *Loden*, 43 So. 3d at 388-390, even though he was relying solely on their advice to make such a paramount decision. The effect that this uncertainty had on Loden's judgment in waiving certain rights is critical in assessing the adequacy of his counsel, and can only be resolved at an evidentiary hearing.

notion that Loden's waiver was knowing, intelligent, and voluntary because he allegedly wanted to die.

Contrary to the Mississippi Supreme Court's conclusion, the record in this case does not "clearly [establish] that Loden knowingly, intelligently, and voluntarily" waived his jury sentencing rights. *Loden*, 43 So.3d at 398. The court's ruling against Loden on this issue misconstrues the facts because it is based on the faulty premise that counsel adequately conducted a mitigation investigation, advised Loden of his right to jury sentencing, and his chances before a jury versus Judge Gardner, and that Loden, nevertheless, instructed his counsel not to present a mitigation defense. Therefore, the purported "repeated opportunities in which [Loden] was apprised of the implications of waiving jury sentencing," *id.*, are rendered meaningless when considered within the context of evidence showing the ineffective assistance of Loden's trial counsel.

Thus, considering all of the evidence, there can be no question that the Mississippi Supreme Court's finding of waiver was unreasonable in light of the law and evidentiary record and that the validity of Loden's jury sentencing waiver must be decided with an evidentiary hearing in the trial court. *Miller-El*, 545 U.S. 231, 261; *Wiggins*, 539 U.S. at 528; *Guidry,* 397 F.3d at 328.

That the Mississippi Supreme Court would reach a different result in a case with the same material facts evinces the unreasonable nature of the court's application of the law. *Wilson v. State*, 81 So. 3d 1067 (2012). In *Wilson*, the very same Attorney Johnstone failed to advise the defendant that Judge Gardner had sentenced others to death (including Michelle Byrom and Loden) after they had waived jury sentencing. Citing United States Supreme Court precedent, the Mississippi Supreme Court ruled that Wilson was entitled to an evidentiary hearing in light of Johnstone's failure to inform him that Judge Gardner had sentenced defendants to death after they had waived jury sentencing. *Wilson*, 81 So. 3d at 1090–1091, citing *Brady*, 397 U.S. at 748. Attorney Johnstone's failure to inform Loden of Judge Gardner's track record and advise him that his chances

-114-

to avoid a death sentence were undoubtedly better before a jury for sentencing was equally deficient. The Mississippi Supreme Court's application of law to Loden's circumstances was unreasonable.

### 4. The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That His Counsel Was Ineffective <u>By Providing Erroneous Advice To Loden</u> Was An Unreasonable Application Of Clearly Established Federal Law

In rejecting Loden's claim of ineffective assistance of counsel pertaining to trial counsel's advice regarding waiver of jury sentencing, the state court failed to apply *Strickland* to assess Loden's claim. *Loden*, 43 So. 3d 385–86. Instead, the court found that Loden "knowingly, intelligently, and voluntarily" waived his right to a jury for the sentencing phase of the case and that the matter was procedurally barred. *Id*. There was no discussion whether trial counsel's advice was constitutionally effective or not. By failing to apply *Strickland* to assess the ineffective assistance of counsel claim Loden raised, the state court's adjudication was contrary to clearly established federal law. *See Lafler*, 132 S. Ct. 1376  1390 (holding "an inquiry into whether the rejection of a plea is knowing and voluntary . . . is not the correct means by which to address a claim of ineffective assistance of counsel" in connection with the advice given during the plea negotiation process).

### 5. The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That His Counsel Was Ineffective <u>By Failing To Make Adequate Use Of The Psychologist</u> Was An Unreasonable Application Of Clearly Established Federal Law, And Was Based Upon An Unreasonable Determination Of The Facts

#### (i) The Mississippi Supreme Court's denial of Loden's ineffective assistance of counsel claim, as it relates to trial counsel's failure to investigate and develop expert mental health testimony, was contrary to, and an unreasonable application of clearly established Supreme Court precedent

The Mississippi Supreme Court's Opinion regarding the investigation of Loden's mental health for purposes of mitigation commits two fatal flaws. ***First***, the Opinion fails

to recognize that counsel's duty to conduct a reasonable investigation of mitigating evidence regarding mental health exists independently of counsel's duty to present a mitigation case. *See Blystone*, 664 F.3d at 420. In other words, the former is a necessary predicate to the latter: if counsel fails to conduct a reasonable investigation into a defendants' mental health for sentencing, "he cannot possibly be said to have made a reasonable decision as to what to present at sentencing [if anything]." *Id.* Therefore, for purposes of conducting a *Strickland* analysis, Loden's purported decision not to present mitigation evidence, is irrelevant to the adequacy of trial counsel's mitigation investigation of Loden's mental health. By failing to apply *Strickland* to trail counsel's wholly inadequate mitigation investigation into Loden's mental health merely because Loden allegedly decided not to present mitigation evidence, *Loden*, 43 So. 3d at 391, the Mississippi Supreme Court's ruling was contrary to clearly established federal law. *See Blystone*, 664 F.3d at 420–22.

*Second*, the Mississippi Supreme Court failed to recognize the distinction between a mental health examination for purposes of mitigation at a capital sentencing proceeding and that for competency at trial. *Loden*, 43 So. 3d at 392. That Dr. O'Brien found Loden competent to stand trial "does not . . . lead inexorably to the conclusion that the report gave [Loden] a clean bill of mental health for purposes of mitigation." *Blystone*, 664 F.3d at 421. In fact, as shown below, the record before the Mississippi Supreme Court showed quite the opposite. Here, again, the Mississippi Supreme Court's decision was contrary to and an unreasonable application of clearly established federal law. *Id* at 421–22.

### (ii) The Mississippi Supreme Court's finding that trial counsel's use of the psychologist was constitutionally effective was unreasonable in light of the evidence

The fact that Loden's counsel obtained another mental evaluation of Loden by Dr. O'Brien is irrelevant where Johnstone and Daniels again failed to provide Dr. O'Brien with the necessary information to develop an accurate clinical profile and

seek his input as to all relevant issues. *Wilson v. Sirmons*, 536 F.3d 1064, 1089–90 (10th Cir. 2008) ("[C]ounsel may not simply hire an expert and then abandon all further responsibility.").[18] Loden's trial counsel failed him in this regard by not providing Dr. O'Brien with the requisite background information. Had trial counsel done so, Dr. O'Brien would have been able to put Loden's mental condition in proper focus and to contextualize the crime in light of Loden's condition, as Dr. O'Brien subsequently did when affirming Dr. High's conclusions. (Dr. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 3-6, ¶¶ 6-11, 17.) Multiple, deficient evaluations cannot absolve Johnstone and Daniels of their constitutionally ineffective assistance.

The Opinion, nevertheless, rejects the suggestion that Dr. O'Brien did not have sufficient information to render a proper evaluation of Loden by concluding that the report reflects that Dr. O'Brien "was acquainted with Loden's [background]." *Loden*, 43 So. 3d at 391-392. Yet, Dr. O'Brien himself establishes that the Mississippi Supreme Court's conclusion is wrong. His 2008 affidavit rejects his prior opinion and states that his previous 2001 findings regarding Loden would have been materially altered had he been provided with the details that were missing at that time. (Dr. O'Brien Aff., Pet. Ex. 18, *Id*. at ECF 5-2, 6, ¶ 17.) In particular, Dr. O'Brien's 2008 affidavit states that he would have reached the same diagnoses that Dr. High reached regarding Loden's numerous mental disorders. (*Id.*) At a minimum, the fact that Dr. O'Brien recanted his previous conclusions mandates an evidentiary hearing in the trial court. Yet, the Mississippi Supreme Court gave no weight to this 2008 affidavit. This was unreasonable in light of the evidence.

---

[18] *See also Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002), *cert. denied*, 536 U.S. 951 (2002) ("This duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation.").

6. **The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claims That His Counsel Was Ineffective <u>By Failing To Object To And Cross Examine Witnesses</u> Was Based Upon An Unreasonable Determination Of The Facts**

The Mississippi Supreme Court held that trial counsel was not ineffective in failing to object to or cross-examine witnesses during the sentencing hearing. The court reasoned that Loden instructed his counsel not to contest those witnesses or the McMichael Report and, thus, could not have been ineffective simply for following orders. *Loden*, 43 So. 3d at 386.

Loden's purported instructions to counsel, however, are not credible when viewed within the context in which they were made. As with the issue regarding Loden's uninformed decision to forego presenting a mitigation case, the Mississippi Supreme Court ignored the fact that Loden's instructions were based entirely on his counsel's ineffective assistance as to how to proceed with the case. Thus, the Opinion cannot reasonably hold that Loden made any informed decisions when they were based on defective advice.

For example, counsel never showed Loden the McMichael Report or advised Loden regarding the drawbacks to its admission. Had they done so, Loden would never have consented to the Report's admission in light of its false and misleading contents, (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,6, ¶ 25), which attempted to link Loden to unrelated murders and characterized cattle slaughtering on his grandfather's farm as a sadistic abuse of animals (McMichael Report, Pet. Ex. 28(j), NOLEX ECF 5-3, 80; High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 121). By refusing to grant an evidentiary hearing on these issues and, instead, relying on Loden's uninformed instructions for counsel to "stand down" during sentencing, the Mississippi Supreme Court simply exonerates Johnstone's and Daniels' deficient performance that caused Loden to render those instructions in the first place. This was an unreasonable determination of the facts given the evidence in the record. *See Guy v. Cockrell*, 343 F.3d 348, 354 (5th Cir. 2003) (ordering evidentiary hearing where affidavits from petitioner's mother and aunt

-118-

contradicted evidence that the defense investigator interviewed relevant mitigation witnesses).

**7.    The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment Claim That His Trial Counsel Was Ineffective <u>By Failing to Litigate the Expert Mitigation Motion Adequately</u> Was Based Upon An Unreasonable Determination Of The Facts**

With respect to trial counsel's failure to litigate the expert mitigation motion adequately, the Mississippi Supreme Court held that there was no valid claim for ineffective assistance of counsel because Loden suffered no prejudice on account of his "decision not to present mitigation evidence[.]"  *Loden*, 43 So. 3d at 388.  But that factual determination was unreasonable for the reasons previously discussed.  *See* Part D.2.c.ii.  The Opinion relies on Loden's instructions but ignores that he was woefully uninformed when he "decided" not to present a mitigation defense.  Trial counsel failed to follow up on many significant leads that would have uncovered meaningful mitigating evidence, which would have undoubtedly affected the strategic decision on whether to present a mitigation defense.  It is improper to blame Loden in this instance where his counsel's failure to develop the existing evidence directly lead him to issue uninformed instructions on how to proceed.  Thus, given the compelling evidence submitted with Loden's Petition, coupled with the lack of any unimpeachable documentary evidence to the contrary, the Mississippi Supreme Court's determination that trial counsel's litigation of the mitigation expert motion was adequate was unreasonable.

-119-

**8.** **The Mississippi Supreme Court's Denial Of Loden's Sixth Amendment and Fourteenth Amendment Claims <u>That His Guilty Plea and Waiver of Jury Sentencing Was Not Knowing, Voluntary, Or Intelligent</u> Was An Unreasonable Application Of Clearly Established Federal Law, And Was Based Upon An Unreasonable Determination Of The Facts**

**(i)** **The Opinion disregarded Loden's credible, competing evidence that his waiver of jury sentencing was not knowing, intelligent or voluntary**

The Mississippi Supreme Court held that Loden "knowingly, intelligently, and voluntarily" waived his right to a jury for the sentencing phase of the case. *Loden*, 43 So. 3d at 385-386. In rejecting Loden's claim of ineffective assistance of counsel on this issue, the Opinion relied on a "Waiver of Sentencing Jury" signed by Loden, statements made during the hearing, and statements made by Loden to Dr. O'Brien that purportedly suggested Loden preferred death over life. *Loden*, 43 So. 3d at 386. Loden respectfully submits that the Opinion erred on this point; the evidence relied upon is not unimpeachable and conflicts with numerous facts that demonstrate Loden's waiver of jury sentencing was founded on flawed advice from his trial counsel.

**(ii)** **Loden presented reliable evidence that his waiver was not knowingly, intelligently or voluntarily made**

Despite the wealth of evidence submitted by Loden showing his waiver was not made knowingly, intelligently or voluntarily, the Mississippi Supreme Court concluded that it could not determine whether trial counsel's advice was deficient because "Loden's affidavit failed to provide any details of his discussion with defense counsel regarding the waiver of jury sentencing." *Loden*, 43 So. 3d at 386. The lack of details, however, is due to the fact that Loden's counsel ***never*** advised him about his sentencing rights: "Messrs. Daniels and Johnstone did not discuss with me what would happen next. *In fact, Messrs. Daniels and Johnstone never discussed with me the sentencing phase and their strategy*

-120-

*for it*." (Loden Aff., Pet. Ex. 1, NOLEX 5-1, 2,5, ¶ 21 (emphasis added).) It is simply impossible for Loden to provide details of a conversation that never occurred.[19]

Moreover, Loden's evidence submitted with his Petition disproves—and at the very least contradicts—the contention that his purported waiver of his right to jury sentencing was knowing, intelligent and voluntary. Loden's sworn affidavit shows that his trial counsel never explained to him what his rights were with respect to sentencing. For example, trial counsel failed to explain the possible advantages of having a jury decide Loden's penalty as opposed to the trial judge (such as the requirement that any decision to impose the death penalty be unanimous). (Loden Aff., Pet., Ex. 1, NOLEX ECF, 5-1, 2,5, ¶ 21; Loden Supp. Aff. ¶ 4, Supplemental Exhibit In Support of Rebuttal to Petition for Post Conviction Relief Ex. 48; Loden Pet. at pp. 59-61.) As such, Loden did not have the information necessary to make an informed decision. This naturally led to his confusion during the hearing because his ability to understand the court's statements or the sentencing waiver that he signed was extremely limited. (Loden Aff., Pet. Ex. 1, NOLEX ECF, 5-1, 2,5, ¶ 20; Loden Pet. at pp. 79-84, 86-91.)

Additionally, trial counsel's failure to conduct an adequate investigation into mitigating circumstances critically altered the reliability of their legal advice, which undermined the knowing, intelligent and voluntary nature of Loden's waiver. To be enforceable, a plea "must emanate from the accused's informed consent." *Mitchener v. State*, 964 So. 2d 1188, 1193 (Miss. App. 2007) (citing *Myers v. State*, 583 So. 2d 174, 177 (Miss. 1991)) (petitioner's plea was not made knowingly, intelligently or voluntarily where, despite a facially correct guilty plea colloquy, his trial counsel had wrongly

---

[19] Nonetheless, Loden has submitted a supplemental affidavit with this Motion for Rehearing that details the various issues that his counsel failed to discuss with him. (Loden Supp. Aff., Ex. 48.) Specifically, Johnstone and Daniels never advised Loden regarding (1) the sentencing phase, (2) the advantages of having a jury sentence him rather than the trial judge, or (3) the fact that a jury could consider mitigating evidence when deciding what sentence to impose. (*Id.* ¶ 4.)

guaranteed that he would receive a specific sentence if he pled guilty).[20]  The failure to investigate numerous compelling facts that were favorable to Loden meant that Loden had no appreciation for the strength of his mitigation case.  (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,5-6, ¶ 18–26; Loden Pet. at pp. 24–25, 34–48.)  Thus, he failed to grasp how his abusive childhood background, suicidal tendencies and mental disorders— which were usually sources of embarrassment to him—could aid his defense.  (Loden Aff., Pet. Ex. 1, *Id.* at 2, 5-6, ¶ 24.)  Instead, Johnstone and Daniels repeatedly admonished Loden that he would get the death penalty no matter what he did, which contributed significantly to Loden's uninformed decision to waive jury sentencing. (Loden Aff., Pet. Ex. 1, *Id.* at 2, 3, 8, ¶¶ 8, 37.)

Thus, while the Opinion states that the record is "replete with evidence beyond all doubt that Loden knowingly, intelligently, and voluntarily waived jury sentencing," *Loden*, 43 So. 3d at 386, significant doubt does exist in this case.  The evidence shows that Loden's purported waiver was made without the benefit of an adequate mitigation investigation or competent advice from counsel.  To the contrary, Loden's evidence sets forth a valid claim of ineffective assistance of counsel that, if proven true, would render Loden's waiver of jury sentencing void.  *Cf. Ex Parte Dunham*, 650 S.W. 2d at 827 (finding counsel ineffective where "applicant was not given competent advice and thus applicant was prevented from making an informed and conscious choice regarding his right to a jury trial").

---

[20] *Johnson v. State*, No. 2008-CA-01359-COA, 2010 Miss. App. LEXIS 327, at *9 (Miss. App. Jun. 22, 2010) (en banc) (superseded by statute, as stated in, followed by *Chappell v. State*, No. 2011-CA-00336-COA, 2012 Miss. App. LEXIS 366 (Miss App. June 19, 2012), (petitioner entitled to evidentiary hearing on claim of involuntary plea because he was never informed of the statutory minimum sentence); *Lewellyn v. Wainwright*, 593 F.2d at 17(per curiam) ("Because [defendant] was ignorant of the maximum sentence which he could receive upon entering a guilty plea, his plea was involuntary and invalid under the due process clause.").

### (iii) Loden's evidence undermines the claim that he preferred death over life

The Opinion's reliance on Loden's statements to Dr. O'Brien regarding his preference for death over life is misplaced. The evidence shows that Loden was completely hopeless, which was fostered and reinforced by his counsel's repeated predictions to him that he "would get the death penalty no matter what they did." (Loden Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,3-8, ¶¶ 8 & 37 ("My shame and remorse was reinforced by my attorneys telling me that I would get the death penalty no matter what, and thus failing to give me any hope that I might not be sentenced to death.").) Furthermore, Loden continuously urged his counsel—in vain—to investigate sound leads regarding potential mitigating factors and sought assurances that he could appeal all pre-trial rulings. In fact, Loden wrote to Daniels in one letter: "My only hope was re-presenting everything I had trouble with on appeal. Glad to hear that I still can."[21] (Loden letter to Daniels, 2/7/02, Pet. Ex. 30(*l*), NOLEX ECF 5-3, 153.) These actions dispel, and are wholly inconsistent with, the notion that Loden's waiver was knowing, intelligent, and voluntary because he allegedly wanted to die.

### 9. The Mississippi Supreme Court's Denial Of Loden's Claim That He Was Denied His Fourteenth Amendment Due Process Right To Fully Develop Evidence In His Case Was Based Upon An Unreasonable Determination Of The Facts And Was Contrary To Clearly Established Law

Relying exclusively on self-interested statements made by Daniels, the Mississippi Supreme Court concluded that there was no harm caused by Daniels' destruction of Loden's file, and thus that Loden's Fourteenth Amendment claim amounted to a "veritable red herring." *Loden*, 43 So. 3d at 400 (internal quotations

---

[21] As explained above, the advice Loden received from Daniels and Johnstone with respect to what issues were appealable is another ground for granting Loden's Petition. Loden's two former attorneys could not explain what he could raise on appeal if he plead guilty, *Loden*, 43 So. 3d 388-390, even though he was relying solely on their advice to make such a paramount decision. The effect that this uncertainty had on Loden's judgment in waiving certain rights is critical in assessing the adequacy of his counsel, and can only be resolved at an evidentiary hearing.

omitted).  There is no question that Daniels willfully destroyed his case files despite knowing that Loden's post-conviction proceedings were ongoing.  Although the Mississippi Supreme Court recognized that Daniels' act was improper (especially given Daniels' present employment with the District Attorney's office that prosecuted Loden), the court concluded that Loden failed to show that he was denied his due process right to fully develop and present evidence.  The evidence does not support such a conclusion.

Daniels' own testimony, on which the Mississippi Supreme Court relies, is inconsistent.  On the one hand, Daniels states that he copied Johnstone "on a lot of things" and that "there would have been a good bit of duplication, *I think*, between his file and mine."  *Loden*, 43 So. 3d at 400.  On the other hand, Daniels states that "[e]verything I had was copies."  *Id*.  These two statements do not add up, and certainly do not support a conclusion that everything in Daniels' file was a copy of the documents in Johnstone's file, or that Johnstone's file contained everything in Daniels' file.  Daniels has not stated that he copied Johnstone on everything, or that the two attorneys' files were identical.

Unfortunately for Loden, we cannot know the contents of Daniels' file now that it has been destroyed.  Nor can Daniels be counted on to reliably testify as to its contents—particularly where his conduct has violated Mississippi law and ethical obligations he owed to his former client.  The only logical inference is that by destroying his file, Daniels deprived Loden his right to fully develop and present evidence in this case.

The Mississippi Supreme Court's finding of no harm was based on an unreasonable factual determination in light of the evidence.

In addition, because Daniels intentionally destroyed his files while he was working at the prosecutor's office as an agent of the State and knew of this ongoing litigation, Loden should have been entitled to an inference that those files were adverse to Daniels.  See Arizona v. Youngblood, 488 U.S. 51, 58 (1994) (adverse inference jury instruction may be proper where evidence "potentially useful" to defendant is destroyed

in bad faith, and "permanently lost"); *Allen v. Thaler*, No. A-11-CV-789-SS, 2012 WL 1067388, at *10 (W.D. Tex. Mar. 28, 2012) (adverse inference proper where defendant shows potentially useful evidence was destroyed in bad faith). In instances of bad faith, the evidence need only be "potentially useful" to a defendant. Youngblood, 488 U.S. at 58. Here, Daniels actions to shred relevant evidence pertinent to an ongoing matter while an agent of the State demonstrates bad faith. In any event, the file of an attorney accused of ineffective assistance is unquestionably not just "potentially useful" but "material" in showing that attorney's inadequate investigation and litigation of a defendant's case. Yet, the court failed to permit an inference in Loden's favor regarding Daniels' spoliated file. Instead, the Court illogically concluded that Johnstone had Daniels' complete file simply because Daniels testified—without corroboration—that everything he had was copies. Loden, 43 So. 3d at 400. And it conducted this improper fact finding without any evidence that Daniels actually knew what was in Johnstone's files and thus whether the two files were in fact identical. Moreover, the evidence strongly suggests that "everything" in Daniels' files was not merely "copies," since Daniels did not merely take a copy of the Johnstone file but also worked on the case for months after joining Johnstone as co-counsel, and presumably generated material that would only exist in his file. Contrary to the fallacious reasoning of the Mississippi Supreme Court, Daniels' file was permanently lost when he destroyed it in bad faith, and it is not obtainable from another mean

### E. Loden Requests An Evidentiary Hearing

#### 1. Loden Is Entitled To An Evidentiary Hearing On His Claims Where The Mississippi Supreme Court's Ruling Was Unreasonable In Light Of Clearly Established Law Or Was Based On An Unreasonable Determination Of The Facts

Loden requests an evidentiary hearing. Clearly established Supreme Court precedent provides for a federal evidentiary hearing if the requirements of § 2254(d)(1) or (2) are satisfied; that is, if the state court's ruling was contrary to or an unreasonable

application of federal law, or was based on an unreasonable determination of the facts in light of the evidence, a federal evidentiary hearing should be conducted. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1412 (2011) (Breyer, J., concurring in part) ("If the federal habeas court finds that the state court decision fails (d)'s test (or if (d) does not apply), then an (e) hearing may be needed."); *Morris v. Thaler*, 425 Fed. Appx. 415, 422–424 (5th Cir. 2011) (reversed district court for failing to conduct an evidentiary hearing when it "lacked sufficient undisputed facts to make an informed decision on the merits" of the petitioner's claims) (internal quotations omitted); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) (state court's failure to conduct evidentiary hearing unreasonably deprived habeas petitioner of due process); *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (district court did not abuse discretion in holding evidentiary hearing at which federal habeas petitioner could attempt to prove the petition's factual allegations); *Williams v. Quarterman*, 551 F.3d 352, 359 (5th Cir. 2008) Reversed on Subsequent Appeal by Williams v. Thaler, 450 Fed. Appx. 327, Opinion Withdrawn by Sub. Op. at Williams v. Thaler, 2012 U.S. Appx. Lexis 12532 (5th Cir. June 19, 2012) (Fifth Circuit reversed and remanded for full de novo evidentiary hearing on ineffective assistance of counsel claims); *Coker v. Quarterman*, 270 Fed. Appx. 305, 310-11 (5th Cir. 2008) (remand warranted for evidentiary hearing regarding habeas petitioner's claim that he diligently pursued habeas relief); *Singleton v. Johnson*, 178 F.3d 381, 382 (5th Cir. 1999) (habeas petitioner entitled to de novo evidentiary hearing on issue whether counsel knew of his desire to appeal); *Boyd v. Johnson*, 167 F.3d 907, 908 (5th Cir. 1999) (court of appeals ordered evidentiary hearing concerning petitioner's ineffective assistance of counsel claim); *Titsworth v. Cockrell*, No. 2:99-CV-0061-J, 2003 U.S. Dist. LEXIS 15941, at *1 (N.D. Tex. Sept. 11, 2003) (granting evidentiary hearing limited to certain of habeas petitioner's claims); *Siler v. Storey*, 587 F. Supp. 986, 987 (N.D. Tex. 1984) (granting petition for writ of habeas corpus after an evidentiary hearing); *Xanthull v. Beto*, 307 F. Supp. 903, 904 (S.D Tex. 1970) (granting full oral evidentiary hearing on

the issues before denying habeas petition); *White v. Clemmons*, 241 F. Supp. 121, 121 (E.D. La. 1965) (same).

As Justice Breyer explained in his concurrence in *Pinholster*, a hearing may be needed in these circumstances for a variety of permissible purposes:

> [I]f the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a (d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true. Or if the state-court rejection rested on a state ground, which a federal habeas court found inadequate, then an (e) hearing might be needed to consider the petitioner's (now unblocked) substantive claim. Or if the state-court rejection rested on one of only several related federal grounds (e.g., that counsel's assistance was not "inadequate"), then, if the federal court found that the state court's decision in respect to the ground it decided violated (d), an (e) hearing might be needed to consider other related parts of the whole constitutional claim (e.g., whether the counsel's "inadequate" assistance was also prejudicial).

*Id. See also Morris v. Thaler*, 425 Fed. Appx. at 423, No. 09-10529, 2011 U.S. App. LEXIS 10111 (5th Cir. May 18, 2011) (a hearing may be necessary "not to evaluate the state court's decision, but to determine whether [petitioner's] allegations are true").

As shown above, the Mississippi Supreme Court's rulings on Loden's Sixth and Fourteenth Amendment claims were contrary to or unreasonable applications of federal law, and were based or an unreasonable determinations of the facts in light of the evidence. An evidentiary hearing on Loden's claims is therefore appropriate.

To properly answer the questions set forth in § 2254(d), this Court must carefully review the state court's *process*. Federal law requires the state court to have afforded sufficient process to resolve disputed facts and reach an accurate, reasonable, and non-arbitrary decision. *See e.g.*, *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("If federal fact finding is to be avoided, then . . . the State must also ensure that its procedures are adequate for the purpose of finding the facts."); *Wiley*, 625 F.3d 199 (refusing to apply AEDPA deference when petitioner satisfied state law requirements for a prima facie case

-127-

but was nevertheless denied an evidentiary hearing); *Hall v. Quarterman,* 534 F.3d 365 (5th Cir. 2008) (federal hearing required because Hall was denied a meaningful hearing; as a result, there was a high risk of error in the state court proceedings); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).[22]

The state court is not permitted to dismiss Petitioner's well-pleaded federal claims by arbitrarily resolving disputed factual questions against him without a hearing. *Morris v. Thaler*, 425 Fed. Appx. at 422–424 (5th Cir. 2011) (reversed district court for failing to conduct an evidentiary hearing when it "***lacked sufficient undisputed facts*** to make an informed decision on the merits" of the petitioner's claims) (internal quotations omitted) (emphasis added); *Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000) (remanding for an evidentiary hearing because material factual disputes remained, precluding the court from resolving the petition on the basis of the paper record alone); *Goodwin v. Johnson*, 224 F.3d 450, 454 (5th Cir. 2000) (granting evidentiary hearing to resolve factual dispute held on remand). A failure to apply a reasoned process according to the well-settled norms to resolve factual disputes amounts to arbitrary decision-making and a decision made in that manner is, by definition, objectively unreasonable. *See e.g.*, *Herman*, 350 U.S. 166 (1956), *Palmer*, 342 U.S. 134 (1952), *Coleman*, 377 U.S. 129 (1964). If a state court is to be afforded the last word on the federal questions raised by a well-pleaded claim under *Strickland*, as § 2254 contemplates, then that court is obligated to adjudicate these questions on a record sufficient *both* to permit legitimate fact-finding *and* to inform appropriate application of the constitutional rules implicated by Loden's claims. *See e.g., Williams v. Taylor*, 529 U.S. at 397–98; *Wiggins*, 539 U.S. at 536;

---

[22] *C.f. Valdez v. Cockrell*, 274 F.3d 941, 948–50 (5th Cir. 2001) (holding that a full and fair hearing with admission of all exhibits is not a pre-requisite for a presumption of correctness to the state court's finding). *Valdez* and its progeny are distinguishable because the PCR court and the trial court are the same in Texas. Having already heard live testimony on the factual disputes, a PCR court in Texas is in a better position to conduct a mere paper hearing than a PCR court that never took part in oral proceedings, such as the Mississippi Supreme Court here.

*Rompilla v. Beard*, 545 U.S. at 393; *Porter*, 130 S. Ct. at 453–54 (citing *Williams*, 529 U.S at 397–98)

The Mississippi Supreme Court did not properly adjudicate Loden's federal claims in accordance with federal substantive and procedural law, and its decision was "contrary to, or involved an unreasonable application of, clearly established federal law" and "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). Loden is entitled to an evidentiary hearing.

> **2. The Mississippi Supreme Court Resolved Many Factual Disputes Without An Evidentiary Hearing In Contravention Of Federal Law And Its Own Standards**

This Court should convene an evidentiary hearing on any factual issue not adequately resolved by the Mississippi Supreme Court, so long as Loden has alleged facts which, if proven, would entitle him to relief. See Rule 8, Rules Governing Section 2254 Cases in the United States District Courts; *Townsend v. Sain*, 372 U.S. 293, 312 (1963); *Guidry*, 397 F.3d at 323; *Murphy v. Johnson*, 205 F.3d 809, 815-816 (5th Cir. 2000).

As set forth above, the Mississippi Supreme Court resolved many factual disputes without conducting an evidentiary hearing, including but not limited to the following:

- trial counsel's mitigation investigation efforts were adequate, *Loden*, 43 So. 3d at 383;

- Loden made an informed decision not to put forth a mitigation case, *Id* at 380–81;

- Loden's waiver of jury sentencing was knowing, voluntary, and intelligent, *Id.* At 386, 395–96;

- Dr. O'Brien had sufficient information to render an adequate opinion, *Id*. at 391–92;

-129-

- Loden made an informed instruction to his counsel not to cross-examine the State's witnesses during the sentencing hearing, *id*. at 386–87;

- Loden preferred death over life, *Id*. at 386; and

- Loden was not prejudiced by the destruction of Daniels' file because it only contained copies of Johnstone's file, *Id*. at 400.

These facts are critical. First, they distinguish this case from all of the prior opinions that the Mississippi Supreme Court relied upon in concluding that Loden suffered no harm from his trial counsel's failure to conduct an adequate mitigation investigation, including *Landrigan*.

Second, they show that trial counsel could not have given Loden constitutionally effective advice regarding his mitigation case, guilty plea, and waiver of jury sentencing because trial counsel had no mitigation case as they failed to gather and present evidence that would have mitigated Loden's moral culpability. Had Loden's attorneys provided competent advice regarding the pros and cons of pleading guilty and waiving jury sentencing, Loden would have exercised his right to a fair trial and jury sentencing. Loden's Aff., Pet. Ex. 1, NOLEX ECF 5-1, 2,¶ 2 ("Prior to my guilty plea on September 21, 2001, my attorneys gave me legal advice which I have since learned is erroneous. Had I been properly advised, I would not have pled guilty or waived a jury for sentencing, and I would have insisted that my attorneys present mitigation evidence on my behalf.") If these allegations in Loden's Petition were true, he would be entitled to habeas relief. *Hall*, 534 F.3d at 268 (holding that a District Court must grant any evidentiary hearing if "such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief").

In addition, the Mississippi Supreme Court made numerous credibility determinations against Loden without conducting an evidentiary hearing. This was an abuse of discretion. *Morris v. Thaler*, 425 Fed. Appx. 415 424 ("The resolution of the

disputed facts in this petition—facts which, if proven true, would entitled Morris to relief—ultimately require determinations of credibility. On this record, such determinations will require live testimony.") This was also in contravention of the Mississippi Supreme Court's own standard that requires all doubts to be resolved in favor of the accused in a death penalty case "because what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *See, e.g., Havard v. State*, 928 So. 2d 771, 779–80 (Miss. 2006) (internal quotes omitted). Where the death penalty is at issue, the Mississippi Supreme Court must employ a heightened scrutiny and resolve all doubts in the petitioner's favor. *See, e.g. Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978) ("We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed."); *Havard*, 928 So. 2d at 779–80 ("Under this standard of review, all doubts are to be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" (quoting *Irving*, 361 So. 2d at 1363)).

An evidentiary hearing is mandated "unless it appears beyond a doubt that the petitioner can prove no set of facts in support of his claim . . . .'" *See Sanders v. State*, 846 So. 2d 230, 234 (Miss. App. 2002) (quoting *Marshall v. State*, 680 So. 2d 794 (Miss. 1996)). Where a petitioner's application and affidavit creates a possibility that the petitioner can prove facts to support his claim, an evidentiary hearing is required unless the petitioner's "affidavit is overwhelmingly belied by unimpeachable documentary evidence in the record such as, for example, a transcript or written statements of the affiant to the contrary" that establishes that the affidavit is a sham. *Young v. State*, 731 So. 2d 1120, 1122-23 (Miss. 1999).

In this case, there is no "unimpeachable documentary evidence" that conclusively establishes Loden wanted to be put to death, or that he did not want any mitigation evidence presented to ensure that he would receive a death sentence.

For example, the Opinion questioned the veracity of Loden's diagnosis, including PTSD and other disorders.  The Opinion improperly concluded that Loden's military records and Major Chaney's affidavit contradict Loden's "health and military-history assertions" because they "contain no evidence of mental-health issues or diagnosis of post-traumatic stress disorder."  *Loden*, 43 So. 3d at 391 n.32.  This finding was fundamentally at odds with the plethora of competing, credible evidence regarding Loden's mental condition.  For instance, Dr. High diagnosed Loden with chronic Complex PTSD, as well as Dissociative Amnesia and Borderline Personality Disorder. (High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 80-113-114 (pp. 34–35)); *see Porter*, 130 S. Ct. at 455(per curiam) (unreasonable for state court to "discount entirely the effect that [the] testimony [of petitioner's mental health expert] might have had on the jury or the sentencing judge").  And while the Opinion relied on Dr. O'Brien's 2001 Report to support the finding that Loden was "competent to stand trial and assist in his own defense," *Loden*, 43 So. 3d at 391-392, Dr. O'Brien himself has repudiated his earlier Report and *agreed with Dr. High's diagnoses*.  (Dr. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 2, 6,¶ 17 (declaring that if he had "all the data and information that Dr. High had relied upon, I would have come to the same conclusions and diagnoses that Dr. High did.").).)[23]

The Opinion also rejected Loden's claim that trial counsel's failure to present a mitigation case resulted in no prejudice to Loden because the evidence that he claims should have been presented was "not significantly greater than that which was actually

---

[23] Dr. O'Brien found the following undisclosed facts important: (1) raw data from the psychological tests performed at the Mississippi State Hospital; (2) the history of Loden's memory problems to evaluate significance of Loden's amnesia at the time of the crime; (3) the history of suicidal behavior in Loden's family; (4) information on Loden's military experience, including military records, interviews with Loden's military colleagues, or basic information about Loden's combat experience, to evaluate Loden for PTSD; and (5) information from Loden's friends and military colleagues on Loden's PTSD symptoms to put Loden's substance abuse problems in the proper context. (Dr. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 3-5,¶¶ 6, 8–11.)

before the circuit judge." *Loden*, 43 So. 3d at 385. Yet, the only evidence relied upon by the Opinion was trial counsel's brief and superficial comments at the sentencing hearing regarding Loden's service in the military and sexual abuse as a child. There was no mention to the trial court regarding Loden's affliction with chronic PTSD and Disassociate Disorder, or emotional and physical abuse by his stepmother.[24] The trial court also did not know the extent of the physical abuse Loden suffered from his stepfather, the frequency of his suicide attempts, and the extent of his intoxication and his wife's taunting regarding her infidelity on the night of the crime. It cannot be definitively said that this additional information would not have altered the outcome of Loden's sentencing. *Havard*, 928 So. 2d at 779–80.

The Opinion similarly rejected evidence favorable to Loden with respect to the questionable findings in the McMichael Report. Dr. High, for example, opined that the McMichael Report's diagnoses of malingering amnesia and Antisocial Personality Disorder were "unsupported by any evidence." (High Aff. , Pet. Ex. 16, NOLEX ECF 5-1, 80, 120, (pp. 40–42).) Dr. High explained that the state doctors failed to administer any standard test or screening measures for PTSD and inappropriately considered "several biased and certainly tainting and unsupported statements" including that: (1) Loden was a suspect in similar murders in Louisiana and Mississippi; and (2) Loden's cattle slaughtering on his grandfather's farm was "sadistic abuse of animals." (*Id.* at ECF 5-1, 121 (p. 42).) Nevertheless, the Opinion improperly relied on the McMichael Report despite substantial questions regarding its credibility.

In light of the numerous, factual disputes and material errors in credibility determinations, the Mississippi's Supreme Court's failure to grant an evidentiary hearing was

---

[24] *See Porter*, 130 S. Ct. at 455 (state court "unreasonably discounted the evidence of [the petitioner's] childhood abuse and military service" because "the relevance of [his] extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigation the intense stress and mental and emotional toll that combat took on [him]").

-133-

an unreasonable application of federal law and any factual findings by the state court should not be entitled to a presumption of correctness.  *See e.g.*, *Hall ,* 534 F.3d at 372; (*Taylor*, 366 F.3d at 1001.  Like the district court in *Hall,* the Mississippi Supreme Court's "errors would have been drawn out in a hearing with an opportunity [] to examine the witnesses." *Hall*, 534 F.3d at 372.  Moreover, the Mississippi Supreme Court's "conclusions rely heavily on the conflicting expert opinions of psychologists, asserted in affidavits unaired in court and shielded from cross examination."  *Id.*  "Given the material errors in credibility determinations and factfinding at the state level," any "**failure of the district court [] to conduct a meaningful hearing**" would be an "abuse of discretion."  *Id.*

      **3.**      **To The Extent The Factual Record Was Not Developed In The State court Proceedings, That Was Not The Fault Of Loden; Section 2254(e)(2) Therefore Does Not Apply**

           **(i)**      **Certain portions of the factual record were undeveloped because the Mississippi Supreme Court incorrectly ruled that such evidence was procedurally barred**

Loden's request for an evidentiary hearing is not subject to § 2254(e)(2)'s restrictions on federal evidentiary hearings to the extent Loden was unable to develop the factual record before the Mississippi Supreme Court because such was not the result of a lack of diligence attributable to Loden.  *Murphy*, 205 F.3d at 815  (holding that cases which do not present procedural defaults do not fall under § 2254(e)(2) and thus the propriety of granting a federal hearing is governed by pre-AEDPA jurisprudence); *)* *Williams v. Taylor*, 529 U.S. 420 (2000) (holding that § 2254(e)(2) does not apply "unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"); *see also McDonald v. Johnson*, 139 F.3d 1056, 1058–60 (5th Cir. 1998); *Fisher v. Lee*, 215 F.3d 438, 454 (4th Cir. 2000).

To the extent Loden was unable to develop the factual record in the Mississippi Supreme Court, it was the result of the Mississippi Supreme Court's incorrect ruling that numerous arguments put forth by Loden were procedurally barred.  Specifically, the Mississippi Supreme Court ruled that Loden could not contest the following issues:

(1) the voluntariness of his guilty plea; (2) trial counsel's deficient representation at the suppression hearing; (3) trial counsel's failure to obtain key evidence from the State; (4) trial counsel's inadequate litigation of the mitigation funds motion; and (5) trial counsel's failure to object to the McMichael Report.

The procedural bars raised by the Mississippi Supreme Court are contained in Mississippi Code Annotated sections 99-39-21, 99-39-23(6), and 99-39-27(9) as well as in Mississippi Rule of Appellate Procedure 22(b). Section 99-39-21 provides that various procedural bars apply to post-conviction petitions for relief, including res judicata and collateral estoppel. Sections 99-39-23(6) and 99-39-27(9) create procedural bars for successive post-conviction relief applications. None of these procedural bars apply where the petitioner raises evidence "not reasonably discoverable at the time of trial" and "which would have actually adversely affected the ultimate outcome of the conviction or sentence" (for section 99-39-21), or which is "practically conclusive" to show that "it would have caused a different result in the conviction or sentence" (for sections 99-39-23(6) and 99-39-27(9)). *See, e.g., State v. Bass*, 4 So. 3d 353, 357 (Miss. App. 2008) ("Regardless of the procedural bars discussed, newly discovered evidence can overcome the successive-writ and time bar.").

Rule 22(b) provides that "[w]here the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise [issues based on facts *fully apparent* from the record] on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings." M.R.A.P. 22(b). If the issue requires consideration of matters outside of the trial record, then it is not fully apparent from the record and there is no waiver. *See, e.g., Johnson v. State*, 29 So. 3d 738, 746 (Miss. 2009) (holding that "matters outside of the trial record would need to be analyzed to determine whether . . . trial counsel was ineffective" and thus, not fully apparent from the record).

As shown below, none of these procedural bars apply in this case.

-135-

**(1)** **Loden's challenge to his guilty plea is not barred because of newly discovered evidence**

The Mississippi Supreme Court held that challenges to Loden's guilty plea were procedurally barred because the challenges were not based on newly discovered evidence. *Loden*, 43 So. 3d at 390. The Mississippi Supreme Court further held, in the alternative, that consideration of the "new" evidence would not have led to a different result because of the purported knowing and voluntary nature of Loden's guilty plea. *Id.* at 390.

As shown above and in the Petition, trial counsel's advice regarding Loden's appeal rights rendered Loden's guilty plea involuntary because the plea was the direct result of Daniels' and Johnstone's critically flawed advice.[25] This is clearly shown by Daniels' 2009 affidavit, which confirms that Daniels and Johnstone misinformed Loden about the availability of appellate review despite a guilty plea. Daniels' affidavit constitutes newly discovered evidence as it was previously unavailable and only came to the surface when introduced by the State. *Cf. Howard*, 945 So. 2d at 350 (holding that, based on trial counsel and direct appeal counsel interest in the case, affidavit of expert consulted by trial counsel constituted newly discovered evidence); *see also Lewis*, 776 So. 2d at 682 (excusing the petitioner's failure to obtain affidavit of trial counsel because "the fact that Lewis has also made an allegation of ineffective assistance of counsel [means] he would be hard pressed to get an affidavit from his former attorney.").

The Mississippi Supreme Court also erred in finding that Daniels' 2009 affidavit would not have led to "a different result." That affidavit confirms that trial counsel

---

[25] The Mississippi Supreme Court relied on Daniels' deposition testimony to conclude that Daniels did not provide Loden with *erroneous* advice. Bu the deposition illustrates Daniels failed to provide Loden with *any* meaningful, i.e., *effective*, advice regarding appellate review that would have allowed Loden to make a "knowing and voluntary" plea. *See, e.g.,* Daniels Depo. at p. 165:17-20, Ex. 46 ("I thought I would be misadvising [Loden] and misinforming him if I tried to tell him what the Supreme Court would look at or what they would decide on, regarding any issue"); *Id.* at pp. 156:8-158:3 (Daniels did not recall if he had done any legal research concerning Supreme Court review).

advised Loden that the "Mississippi Supreme Court would automatically review a sentence of death." (1/23/09 Daniels Aff. ¶ 6, State's Resp., Ex. A.) When coupled with trial counsel's failure to advise Loden about the scope of that review and their insistence that his conviction was all but certain, Daniels' 2009 affidavit at the very least raises significant questions about the knowing and voluntary nature of Loden's guilty plea.

> **(2)** **Consideration of trial counsel's failure to provide effective assistance at the suppression hearing and of Loden's inability to obtain color photographs from the state are not procedurally barred because they are relevant to the sentencing phase**

In holding that Loden is procedurally barred from contesting his attorneys' conduct at the suppression hearing, the Mississippi Supreme Court stated that Loden failed to raise the suppression hearing on direct appeal despite the fact that he was represented by new counsel. *Loden*, 43 So. 3d at 393. Furthermore, the Mississippi Supreme Court found that Loden offered "no explanation of how the suppression issues relate to sentencing[.]" *Id.* at *393.

The Mississippi Supreme Court's acknowledgement that Loden's appellate counsel failed to raise the suppression hearing on direct appeal only confirms Loden's claim of ineffective assistance as to his appellate counsel. *Loden*, 43 So.3d at 393-394. Thus, this provides additional support for ordering an evidentiary hearing on that issue.

Furthermore, the new evidence submitted with Loden's Petition necessarily opens the door to scrutiny of the guilt phase of Loden's case. Much of that evidence was unavailable due to trial counsel's failure to investigate Loden's case properly. Thus, the new evidence should be considered in evaluating whether Loden's plea was knowing, intelligent and voluntary.

Additionally, the inadequate challenges to the suppression hearing are clearly relevant to the sentencing phase. Had trial counsel provided effective assistance in contesting the State's evidence, the trial court would have been precluded from

considering certain evidence when determining the severity of Loden's punishment. For example, the key evidence considered by Judge Gardner in imposing the death penalty was the videotape allegedly depicting the crime. *Loden*, 43 So.3d, at 373, 396. If trial counsel had adequately inspected the State's evidence and effectively cross-examined the State's witnesses at the suppression hearing, the videotape might never have been admitted into evidence. (*See* Loden's Rebuttal to State's Response to Petition for Post-Conviction Relief at 33-35 (describing evidence that an effective attorney would have challenged including the rope, the videotape, and the blood-stained shorts).) Thus, trial counsel's representation at the suppression hearing was critical not only for the guilt phase, but also for sentencing.

Similarly the State's denial of access to key evidence prevents Loden's post-conviction relief counsel from fully assessing trial counsel's advice at the sentencing phase. For example, the color photographs taken in the course of the State's investigation were germane to the suppression issues in that they support the claim that the police tampered with the evidence or conducted a warrantless search, thereby rendering the search illegal. As discussed above, this could have impacted the sentencing phase had certain evidence not come in.[26] Thus, the claim based on the State's refusal to turn over this evidence is relevant to the validity of Loden's sentencing and, therefore, not barred by Loden's prior post-conviction petition challenging his guilty plea.

> **(3)     Loden's ineffective assistance of counsel claim based on trial counsel's inadequate litigation of the mitigation funds motion does not rephrase an issue from the consolidated direct appeal and first post-conviction petition**

The Mississippi Supreme Court held that Loden's ineffective assistance of counsel claim based on trial counsel's inadequate litigation of the Motion for Funds for

---

[26] Loden notes that the very absence of these photographs from trial counsel's case files further illustrates trial counsel's inadequate investigation, incomplete preparation of their experts, and minimal trial preparation.

Expert Mitigation Assistance was barred because it only rephrases a substantive issue—whether Judge Gardner abused his discretion in deciding that Loden was not entitled to a mitigation expert—that was fully addressed on direct appeal. *Loden*, 43 So.3d at 388. But Loden is not challenging the court's substantive determination. Rather, Loden asserts that Daniels and Johnstone's motion "set forth only generic reasons for the need of an additional expert, which effectively mirrored (their) prior requests to obtain an investigator and an expert in the field of psychology[.]" *Loden v. State*, 971 So. 2d 548, 564 (Miss. 2007). Thus, Loden's claim is based on his trial counsel's failure to adequately litigate the motion itself. *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008) ("[I]neffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings . . . because during direct appeals the Court is limited to the trial court record in its review of the claim[,]"). As such, the Mississippi Supreme Court erred in ruling that this claim was procedurally barred.

### (4) Trial counsel's failure to object to the McMichael report was not fully apparent from the record

Finally, the Mississippi Supreme Court held that any challenge to the introduction of the McMichael Report at the sentencing hearing was barred because the challenge was "fully apparent from the record" and not raised on direct appeal pursuant to Mississippi Rule of Appellate Procedure 22(b). *Loden*, 43 So. 3d at 396. Yet, the objectionable aspects of that Report were not readily apparent. Indeed, this Mississippi Supreme Court suggests that the objectionable portions of the Report may not have been part of the record at all. *Loden*, 43 So. 3d at 387 n.31 ("We note that the record does not reveal that the circuit judge was ever presented with the full Mississippi State Hospital report at issue, as the record contains only a summary report which does not include the subject allegations"). Because it is inconclusive whether the objectionable portions of the Report were before the trial court, challenges to these unsupported allegations are not barred by Mississippi Rule of Appellate Procedure 22(b). *See Johnson*, 29 So. 3d at 746.

## II.     LODEN IS ENTITLED TO HABEAS RELEIF BECAUSE HE WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

### A.     Loden Was Denied Effective Assistance Of Appellate Counsel

Loden's appellate counsel was ineffective in the manner in which he developed and presented evidence to challenge the constitutionality of Loden's guilty plea.  Because Petitioner pled guilty, he lost the advantages set forth in Rule 22(c), MRAP. Significantly, neither the trial judge nor defense counsel informed Loden that his guilty plea waived his right to the rights guaranteed in Rule 22.  Consequently, he had no choice but to rely on appellate counsel to prepare a petition for post-conviction relief to challenge his guilty plea.

The Mississippi Supreme Court affirmed the ruling of the Circuit Court denying a challenge to the constitutional validity of the guilty plea raised in Loden's Motion to Vacate Guilty Plea.  *Loden v. State*, 971 So. 2d 548 (Miss. 2007).  However, in the collateral proceedings before the Mississippi Supreme Court, Loden introduced a wealth of evidence that appellate counsel did not present.  Loden presented extensive evidence that was not investigated or presented by Loden's counsel in his direct appeal in showing that his plea was not knowing, voluntary and intelligent,.  First, the knowing, intelligent and voluntary nature of the plea depends on the totality of circumstances surrounding its entry.  *Brady*, 397 U.S. at 749.  Moreover, habeas counsel had gathered and presented additional evidence supporting Loden's claims that he pled guilty based on the erroneous advice of counsel that would have had a reasonable probability of altering the credibility finding on Loden's Motion to Vacate the Guilty Plea, including the plethora of competing, credible evidence regarding Loden's mental condition (*see* High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 104-107, 113-114 (pp. 25, 26-28, 34-35)) and evidence of trial counsel's erroneous advice on the law and failure to consult Loden on the value of mitigation evidence or to present a potential defense strategy contributed.

Under *Evitts v. Lucey*, 469 U.S. 387 (1985), Loden is guaranteed the effective assistance of counsel on direct appeal.  Where state law requires appellate counsel to

develop and present additional evidence in support of grounds for relief, Loden had the right to a sufficient investigation by his appellate counsel to uncover relevant facts and present them effectively before the tribunal. *See generally Strickland, Id.*, 466 U.S. 668. Here, appellate counsel failed to fulfill his constitutional obligations. Moreover, for the reasons set forth previously, Loden was prejudiced by counsel's deficient performance. Had appellate counsel effectively represented him in connection with the challenge to the guilty plea, there is at least a reasonable probability that the Mississippi Supreme Court would have altered its credibility ruling, and the Petitioner's Motion to Vacate his guilty plea would have been successful. *See Hill*, *Id.*, 474 U.S. 52.

   **B.     The Mississippi Supreme Court's Denial Of Loden's Sixth
           Amendment Claim <u>That He Was Denied Effective Assistance Of
           Appellate Counsel</u> Was An Unreasonable Application Of Clearly
           Established Federal Law, And Was Based Upon An Unreasonable
           Determination Of The Facts**

        In holding that Loden is not entitled to relief on his claim that appellate counsel rendered ineffective assistance in a post-conviction challenge to his guilty plea, the Mississippi Supreme Court erroneously relied on the reasoning applied by the trial court to conclude that Loden's post-conviction submissions "are woefully insufficient to rise to the level necessary to invalidate his express plea-colloquy statements to the circuit judge, so as to create a 'reasonable probability' that his 'Motion to Vacate Guilty Plea' would have been granted." *Loden*, 43 So. 3d at 396. Therefore, the Mississippi Supreme Court concluded Loden could not prove that he is entitled to relief on this claim. *Id*. That holding, however, is contrary to the record developed in post-conviction proceedings, which entitles Loden to an evidentiary hearing on whether he received ineffective assistance of appellate counsel.

        To support the conclusion that Loden knowingly and voluntarily pled guilty and waived his right to appeal, the trial court, and by extension the Mississippi Supreme Court, relied on Loden's statements during the plea colloquy and two psychological reports by Dr. McMichael and Dr. O'Brien that opined Loden had "the sufficient present

ability to consult with his attorney with reasonable degree of rational understanding" and that he was "competent to stand trial and assist in his own defense." *Loden*, 43 So. 3d at 395-396. Neither of these bases, however, were proper bases on which either the trial court or the Mississippi Supreme Court could rely—both are unreliable and directly contradicted by Loden's post-conviction submissions.

As previously discussed, the two psychological reports were unreliable, and do not constitute unimpeachable documentary evidence that obviates the need for an evidentiary hearing. Loden has already shown that Dr. O'Brien has since rejected his own 2001 report and corroborated Dr. High's diagnoses that Loden suffers from PTSD, Borderline Personality Disorder, and Dissociative Amnesia. (Dr. O'Brien Aff., Pet. Ex. 18, NOLEX ECF 5-2, 2,6, ¶ 17.) Likewise, aside from containing uncorroborated and highly prejudicial statements about Loden, the McMichael Report also conflicts with Dr. High's Report and Dr. O'Brien's 2008 affidavit. (*See* McMichael Report at Pet. Ex. 28(j), NOLEX ECF 5-3, 79-80 (pp. 11, 12); *see also* High Aff., Pet. Ex. 16, NOLEX ECF 5-1, 120-121 (pp. 41-42).) In direct contradiction, Loden's post-conviction evidence shows his mental state at the time of his plea was compromised, and includes psychiatric testimony that, at the time he relied on his counsel's questionable advice to plead guilty, Loden had a long history of untreated depression, suicide attempts, and was suffering from Complex PTSD. (*See* High Aff. Pet. Ex. 16, Id. at 5-1, 104, 105-107, 113-114 (pp. 25, 26-28, 34-35).) Accordingly, neither Dr. O'Brien's 2001 report nor the McMichael Report support the inferences the Court has drawn against Loden, and under state law, an evidentiary hearing is required to resolve the conflicts between these evaluations and the post-conviction evidence submitted by Loden. *Wright*, 577 So. 2d at 389–90.

With respect to the plea colloquy, the record does ***not*** "speak[] for itself" regarding the knowing and voluntary nature of Loden's guilty plea. *Loden*, 43 So.3d at 395. The Mississippi Supreme Court's reliance on Loden's statements at the plea hearing overlooks the critical fact that Loden's plea was based on the erroneous advice of counsel

-142-

and does not account for the inconsistent and mistaken advice that he had previously received from his attorneys with respect to his (non-existent) right to appeal "everything [that] was in the record."[27]  Therefore, a post-conviction showing that Loden's appellate counsel neglected to develop this evidence mandates an evidentiary hearing because the record does not show beyond a doubt that Loden can prove no facts in support of his claim of ineffective assistance of appellate counsel.

## III.   LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE STATE'S USE OF THE PSYCHIATRIC REPORT FROM DR. MCMICHAEL VIOLATED THE EIGHTH AMENDMENT'S RELIABILITY REQUIREMENT, THE SIXTH AMENDMENT'S CONFRONTATION CLAUSE, AND DUE PROCESS

### A.   The Use Of The McMichael Report During The Sentencing Hearing Violated Numerous Constitutional Rights That Prejudiced Loden

The State's use of the psychiatric report from Dr. McMichael undermined the reliability of Loden's death sentence and rendered it constitutionally infirm.  The Eighth Amendment requires that evidence introduced in a capital case must meet a heightened standard of reliability and accuracy.  *See, e.g., Barefoot v. Estelle*, 463 U.S. 880, 924 (1983) (Blackmun, J. dissenting) (this principle is "as firmly established as any in our Eighth Amendment jurisprudence").  "The fundamental respect for humanity underlying the Eight Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case."  *Johnson*, 486 U.S. at 584.  *See also Smith v. Estelle*, 602 F.2d 694, 703 (5th Cir. 1979), *aff'd on other grounds*, 451 U.S. 454 (1981) (capital sentencing proceedings demand "extraordinarily fair and reliable procedures"); *Vuong v. Collins*, 867 F. Supp. 1268, 1277 (E.D. Tex. 1994), *aff'd sub nom.* 62 F.3d 673 (5th Cir.), *cert*

---

[27] This confusion about the true consequences of his plea was further compounded by the fact that Loden was a complete novice to the criminal justice system. *Cf. Roland v. State*, 666 So. 2d 747, 750 (Miss. 1995) (noting that the defendant was not a novice in the criminal justice system to support finding that plea was voluntary and denying ineffective assistance of counsel claims.)  Loden had no prior legal training or basis to question the soundness of trial counsel's advice.

*denied*, 64 U.S.L.W. 3395 (1995) ("In capital sentencing, there is a mandate for a high degree of reliability in the information upon which the sentencing decision is based").

In *Johnson*, the petitioner was convicted of the murder of a police officer. 486 U.S. at 584. The jury found that the aggravating circumstances outweighed any mitigating circumstances and sentenced petitioner to death. One of the aggravating circumstances was a prior felony conviction from the State of New York. Subsequent to the imposition of the death sentences, the prior felony conviction was reversed by the New York Court of Appeals. In light of these facts, the Supreme Court concluded that the petitioner's sentence could not stand. *Id.*

The present case presents the same type of "unreliability in sentencing" that prompted the Court to vacate the sentence in *Johnson*. At the sentencing phase of Loden's trial, the State offered—and the trial court considered—the psychiatric report of Dr. McMichael. (Pet., Ex. 28(j), NOLEX ECF 5-3, at 68[28].) His report contains several biased, tainting and unsupported allegations that were presented to the sentencing judge. These include an unsupported allegation that Loden may have committed prior similar murders in Louisiana and Mississippi, the tainting and unsupported diagnoses of Malingering and Antisocial Personality Disorder, and the attempt by the doctors and the social worker to turn cattle slaughtering on his grandfather's farm into sadistic abuse of animals. (Pet. Ex. 28(j), NOLEX ECF 5-3, at 80, 88.) Dr. McMichael's data in no way supports this diagnosis. Antisocial Personality Disorder is a favored diagnosis of prosecution psychiatrists. But affixing it to Loden is unsupported and can only be a result of the examiners' biases toward him. (Pet., Ex. 16, NOLEX ECF 5-1, at 121.) In addition, despite evidence that Loden served in combat in Operation Desert Storm and claimed amnesia at the time of the crime, Dr. McMichael failed to administer any standard test or screening measures for PTSD or Dissociative Amnesia, instead choosing

---

[28]  All references to NOLEX page numbers shall mean and refer to the ECF imprinted page number at the top of each page.

to administer only the Minnesota Multiphasic Personality Inventory ("MMPI"). (*Id.*, at 121-122.) These disparaging, unsupported allegations of criminal activity and general bad character in the report negatively skewed the proper mental diagnosis of Loden and tainted the reliability and accuracy of the sentencing in violation of the Eight Amendment.

The statements in the report about similar murders in Mississippi and Louisiana also constituted inadmissible hearsay. *See Lanier v. State*, 533 So.2d 473, 488 (Miss. 1988) (Whitfield report constituted inadmissible hearsay evidence improperly used at sentencing). The consideration of this baseless innuendo was legally improper on this additional ground.

Furthermore, the manner in which the State used the report afforded Loden no opportunity to cross-examine the conclusions of the state doctors and the highly damaging hearsay statements in the report. The confrontation clause of the Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Article 3, Section 26 of the Mississippi Constitution contains an almost identical provision. "[T]he crucial question under the confrontation clause is not compliance with common law hearsay rules, but fulfillment of the 'mission of the confrontation clause to advance the accuracy of the truth determining process . . . by assuring that the trier of fact has a satisfactory basis for evaluating the truth of a prior statement.'" *See Lanier*, 533 So.2d at 488 (citation omitted). The right of a criminal defendant to cross examine the witnesses against him is at the heart of the confrontation clause. Introducing Dr. McMichael's report into evidence during the sentencing phase violated Loden's Sixth Amendment right to confront witnesses against him. *See Lanier*, 533 So.2d at 488 (Whitfield report's admission violated Mississippi's evidentiary rules and defendant's Sixth Amendment rights to confront witnesses against him).

-145-

Finally, the introduction of the statements in the report violated Loden's due process rights. In *Townsend v. Burke*, 334 U.S. 736 (1948), the Court was asked to reverse the sentence of a prisoner who, without the benefit of counsel, had been sentenced on the basis of assumptions concerning his criminal record that were materially untrue. *Id.* at 741. In concluding that due process required that the sentence be reversed, the Court found that the foundation of the sentence was materially false and, thus, the proceedings lacked due process. Likewise, in *Lewis v. Lane*, 832 F.2d 1446 (7th Cir. 1987), the prosecution erroneously represented to defense counsel, and to the jury during the sentencing hearing, that the petitioner had previously been convicted of four prior felony convictions. Certified records that were later obtained by the prosecution, yet concealed from defense counsel, revealed that petitioner had actually been convicted of only two prior felony convictions. Based on the inaccurate nature of this information and the inability of the petitioner to adequately respond to same, the court determined in the context of a Sixth Amendment "effective assistance of counsel" claim that the sentence imposed must be reversed. *Id.* at 1458.

The due process concerns which underlie the decisions in *Townsend* and *Lewis* are present in the instant case as well. Specifically, Loden's due process rights were violated by the introduction of unsupported accusations regarding murders that were being attributed to him at his sentencing hearing. The references to murders could not be missed. They were presented in the context of a purported expert report, which provided them with additional weight. Based on all of these facts, the introduction of the report into evidence constituted a deprivation of due process.

**B.     By Weighing The Evidence Against Loden Without An Evidentiary Hearing, The Mississippi Supreme Court Made An Unreasonable Determination Of The Facts**

In finding that the State's use of the McMichael Report did not violate Loden's constitutional rights, the Mississippi Supreme Court failed to resolve doubts in Loden's

favor and failed to grant the evidentiary hearing mandated by the record in these post-conviction proceedings.

With respect to the McMichael Report, the Mississippi Supreme Court doubted whether the trial court was provided with a full copy of the McMichael Report. The Mississippi Supreme Court noted that the record contains only a summary report that did not include the biased, disparaging, and unsupported allegations Loden challenges on post-conviction relief. *Loden*, 43 So. 3d at 387 n.31. The Opinion also stated, however, that the record "does not reveal" whether the trial court was presented with the full McMichael Report. *Id.* Based on the record, it is not known with certainty whether the trial court viewed the full McMichael Report or which version of the McMichael Report—the full or summary—was before the trial court for sentencing purposes. Despite admitting that the record is less than clear on this issue, the Mississippi Supreme Court resolved this doubt against Loden. The Court improperly concluded—in the absence of evidence to the contrary—that Loden's arguments regarding the prejudice resulting from the unsupported and false allegations contained in the full Report were flawed. Loden, 43 So. 3d at 396-97.

Similarly, the Mississippi Supreme Court's characterization of the McMichael Report's damaging and unsupported allegations as both "benign" and insignificant when compared to the other materials considered by the sentencing judge is an improper factual determination. (*Loden v. State*, 2007 DR-01758-SCT, Slip op. at 49, (Miss. 2010) (*en banc*), 2010 Miss LEXIS 194. ) The conclusions in the McMichael Report, including those evaluating Loden's mental state, have been undermined by compelling evidence submitted by Loden in post-conviction proceedings. (Pet. Ex.16, NOLEX 5-1 ECF. at 113-114; Pet. Ex. 18, NOLEX 5-1 ECF, at 134, ¶ 17.) Yet, the Mississippi Supreme Court gave no credence to this new evidence, or to the issues of fact it created. In the absence of unimpeachable documentary evidence to the contrary, Loden at the very least

-147-

is entitled to an evidentiary hearing to determine whether the State's use of the

McMichael Report violated Loden's constitutional rights.  (*Id*., at 154, ¶¶ 38-40.)

**IV.    LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE—IN VIOLATION OF THE FOURTEENTH AMENDMENT—HE WAS IMPROPOERLY DENIED FUNDS TO RETAIN THE ASSISTANCE OF A FORENSIC SOCIAL WORKER TO INVESTIGATE AND PRESENT RELEVANT MITIGATING FACTORS**

**A.    Trial Counsel's Inaction Following The Denial Of His Motion For Funds To Hire A Mitigation Investigator Was Constitutionally Deficient**

On March 2, 2001, trial counsel filed a motion to hire a mitigation investigator on

Loden's behalf.  The motion argued the importance of that crucial aspect of the case:

> [t]o adequately prepare for this trial. . . . A defendant's need for investigative assistance is especially strong in capital cases because of the extremely broad avenues of potentially relevant mitigation evidence. . . . adequate investigation and preparation is an indispensable prerequisite to effective assistance, since a lawyer who 'does not seek out all the facts relevant to his client's case is prepared to do little more than stand still at the time of the trial . . .' In order to present a competent defense at him [sic] sentencing trial, Mr. Loden requires the services of an independent mitigation investigator . . . Among other things, the mitigation investigator will locate and interview potential mitigating witnesses and assist in locating Mr. Loden's school and medical records.
>
> Defense counsel is unable without the assistance of an investigator to interview and prepare all mitigation witnesses. Counsel has consulted with a mitigation specialist, Mr. Gary Mooers, in regards to this case . . . and he estimates that approximately 200 hours of work may be required . . . Only through the use of an investigator can Mr. Loden adequately develop the full range of mitigating circumstances that exist in this case.

(*State v. Loden*, 2002-DP-00282-SCT, Itawamba County Case No. CR00-

068 (Sep. 21, 2001) Record Excerpts Sup. Ct. Miss., TR 61-67.)

In support of the Motion for Funds to Conduct a Mitigation Investigation,

Loden's counsel submitted the affidavit of Professor Gary Mooers, a mitigation

specialist, that set forth the type and sources of his proposed investigation into mitigating

circumstances. Professor Mooers stated:

> it is imperative that I interview the client to obtain detailed social history information, and to ascertain the names or identities of collateral sources of information. Information that will be obtained from the client regarding childhood and adulthood should include . . . makeup of family unit, including background information on birth parents. . . . educational history . . . discipline in the home, including the form of discipline, how administered, by whom, and for what, family relationships, including the nature and quality of the client's relationship with each parent, siblings and other relatives, and the relationship between the parents; friends and any significant relationships; any significant childhood experiences, including . . . divorce of parents, abandonment by parent, family violence, parental alcohol, or drug abuse of the client, including physical, sexual or emotional abuse; . . . employment history, including . . . description of jobs and duties; . . . health of the client and all family members . . . significant relationships, including marriages, children and the nature and quality of these relationships . . . .
>
> I also conduct interviews with the family members . . . childhood and adult friends and neighbors . . . I will locate and interview any other witnesses who may be able to provide information about the client and the circumstances of the alleged crime . . . .

(*State v. Loden*, 2002-DP-00282-SCT, Itawamba County Case No. CR00-068 (Sep. 21, 2001) Record Excerpts [Sup. Ct. Miss., TR 69-75.) Dr. Mooers stated that his hourly rate was $50, the mitigation investigation would require an estimated 150 to 250 hours, and his expenses would range between $750 to $1500. (*Id.* at 74.)

On April 25, 2001, Loden's Motion for Funds for a Mitigation Investigation came on for hearing. At the argument, Johnstone argued that the proposed mitigation expert "is an extremely important expert in this case." (Ex. 27, NOLEX, 5-3 ECF, at 14, Tr. 64:4 ) Despite being advised of the importance of a mitigation investigation in this capital case, Judge Gardner denied the motion. The trial court noted that it had already appointed Herb Wells as the criminal defense investigator and did not see a reason why funds for a separate mitigation investigator were necessary. (*Id.*, at Tr. 75:8-10.) The denial was without prejudice, however, to Loden's counsel providing authority for the idea that there is a "particular specialty within the law or a scientific basis for the kind of thing" that the mitigation expert proposed to do. (*Id.* at Tr. 75:20-23 .) Although Johnstone represented

-149-

to the court that he would "look and provide that for" the court, he did neither. (*Id.* at Tr. 76:2-3.)

Once the trial court denied funds for Loden's trial counsel to spend the anticipated 200 hours needed to prepare the mitigation investigation, Loden's counsel ignored this admittedly crucial aspect of the case. Indeed, trial counsel did not personally conduct any mitigation investigation. Nor did they advise the investigator they did have, Herb Wells, that their motion to hire a mitigation specialist had been denied so he would have to conduct a mitigation investigation. Almost all of Wells' investigation before the June 26 Suppression Hearings related to the suppression issue. He did almost no work after the June 26 Suppression Hearing and never conducted an investigation related to the penalty phase. (Ex. 26(b), NOLEX 5-2, at 131; Ex. 34, NOLEX, 5-4 EFC, at 19,¶ 8.) Trial counsel's inaction was inexcusable.

### B. The Mississippi Supreme Court Made An Unreasonable Application Of The Facts When Assessing The Prejudice Loden Suffered

Loden was unduly prejudiced by trial counsel's inaction on the mitigation front. Yet, the Mississippi Supreme Court relied on Loden's alleged instructions at the sentencing hearing to find no prejudice under *Strickland*. *See Loden*, 43 So. 3d at 388. The Mississippi Supreme Court's ruling assumes Loden was adequately informed when he "decided" not to present a mitigation defense. Quite the opposite; he was woefully *uninformed*. As previously shown, trial counsel failed to follow up on many significant leads that would have uncovered meaningful mitigating evidence, which undoubtedly affected their advice to Loden on whether to present a mitigation defense. It is improper to blame Loden for his counsel's failure to develop the existing evidence that resulted in their uninformed instructions on how to proceed. The compelling evidence since unearthed, coupled with the coupled with trial counsel's self-serving testimony to the contrary, warrants an evidentiary hearing to determine whether Loden's constitutional rights were violated. Moreover, the alleged decision at the sentencing not to present a

mitigation case cannot excuse the failure to take away action to <u>develop</u> a mitigation

case. "Deciding" not to present a case that counsel did not have ready is no excuse.

**V.      LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE A DEATH-ELIGIBLE OFFENSE, AND FAILED TO GIVE NOTICE OF THE ELEMENTS SOUGHT TO BE USED TO ELEVATE THE POTENTIAL SENTENCE FROM LIFE IMPRISONMENT TO THE DEATH PENALTY, IN VIOLATION OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND FAIR NOTICE GUARANTEES UNDER THE SIXTH AMENDMENT**

**A.      Facts Necessary To The Adjudication Of This Claim**

Count I of the indictment returned by the grand jury charged that on or about June

22 or 23, 2000, Thomas Edwin Loden, Jr.:

> did willfully, unlawfully, feloniously and without authority of law, with or without any design to effect death, kill and murder Leesa Marie Gray, a human being, while he, the said THOMAS EDWIN LODEN, JR., was engaged in the commission of the felony crime of kidnapping . . . in violation of Section 97-3-53, all in violation of 97-3-19(2)(e), of the Mississippi Code of 1972, as amended.

Trial Transcript ("T.T"), Vol. I, 9-10.[29]

On direct appeal, Loden argued that this indictment "did not include a valid

statutory aggravating factor nor a *mens rea* element of Miss. Code Ann. §99-19-101(5)

and (7) respectively." *Loden v. State*, 971 So. 2d 548, 564 P35 (Miss. 2007) (reciting

Loden's claim). Because those two elements are necessary prerequisites to the

imposition of the death penalty under Mississippi law, Loden asserted that the indictment

violated the Fifth, Sixth and Fourteenth Amendments as interpreted by the United States

Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536

U.S. 584 (2002), and *Blakely v. Washington*, 542 U.S. 296 (2004). Loden alleged:

[I]n Mississippi, the finding of an aggravating circumstance and a mens rea

element increases the penalty over the statutory maximum absent that circumstance, and

therefore implicates the Due Process Clause of the Fifth Amendment and the notice and

---

[29] Count II charged Loden with the rape of Ms. Gray, and Count III through VI charged separate instances of sexual battery.

jury trial guarantees of the Sixth Amendment, and the corresponding provisions of [the Mississippi] constitution.  *Loden*, 971 So. 2d at 564-65, ¶35.

### B.  The State Court's Adjudication Of The Claim

The Mississippi Supreme Court held that this claim was not procedurally barred, because "the sufficiency of the indictment is not waivable and may be raised for the first time on appeal."  *Loden*, 971 So. 2d at 565 (*citing Byrom v. State*, 863 So. 2d 836, 865 (Miss. 2003) and *State v. Berryhill*, 703 So. 2d 250, 253 (Miss. 1997)).

The Mississippi Supreme Court then correctly recited the governing precedent of the United States Supreme Court:

> Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime ***must be charged in the indictment***, submitted to a jury, and proven beyond a reasonable doubt.

*Loden*, 971 So. 2d at 565, P36, *citing Ring*, 536 U.S. at 600, and *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999) (emphasis added).

Citing its own pre-*Apprendi* precedent, the Mississippi Supreme Court reasoned that "an indictment is sufficient without listing aggravating circumstances, as anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment."  *Loden*, 971 So. 2d at 565, P36, *quoting Williams v. State*, 445 So. 2d 798, 804-05 (Miss. 1984).  The Court then cited, without explicating, its post-*Apprendi* precedent for the proposition that "*Ring* and *Apprendi* have no applicability to Mississippi's capital murder sentencing scheme."  *Loden*, 971 So. 2d at 565, (*citing Berry v. State*, 882 So. 2d 157 (Miss. 2004), *Jordan v. State*, 918 So. 2d 636, 661 (Miss. 2005), *Knox v. State*, 901 So. 2d 1257, 1269 (Miss. 2005), *Hodges v. State*, 912 So. 2d 730, 775-77 (Miss. 2005), *Thorson*, 895 So. 2d at 105-06).

### C. The State Court's Adjudication Was Contrary To, And An Unreasonable Application Of, *Apprendi, Ring, Blakely,* And *Jones*

Under the Due Process Clause of the Fifth Amendment, the notice and jury trial guarantees of the Sixth Amendment, and the corresponding provision of our state constitution, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. *Apprendi,* 530 U.S. at 476.

A "fact that increases the penalty for a crime" is one that exposes the defendant to a punishment exceeding the maximum he could receive if punished according to the facts reflected in the jury verdict alone. *Id.* at 496. A sentence of death is different from any other sentence, and exceeds a sentence of life imprisonment. *Ring,* 536 U.S. at 602-605; *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976),

Under the Mississippi statutory scheme, without a sentencing hearing as mandated in Miss. Code § 99-19-101, the maximum penalty for capital murder is life imprisonment. *See Pham v. State*, 716 So. 2d 1100, 1103-04 (Miss. 1998). If a sentencing hearing is conducted and the finder of fact fails to find at least one aggravating factor and a *mens rea* element, pursuant to Miss. Code § 99-19-101 (5) and (7) respectively, the statutory maximum is life. *See Berry v. State*, 703 So. 2d 269, 284-85 (Miss. 1997); *White v. State*, 532 So. 2d 1207, 1219-20 (Miss. 1988); *Gray v. State*, 351 So. 2d 1342, 1349 (Miss. 1977).

The U.S. Supreme Court has made perfectly clear that when a life sentence is the maximum penalty absent the finding of additional factors, then *Apprendi* applies, and the State must include the specific additional factors in the indictment, and prove them to the finder of fact beyond a reasonable doubt. *Ring,* 536 U.S. 584 at 597 ("Based solely on the jury's verdict finding Ring guilty of first-degree murder, the maximum punishment he could have received was life imprisonment").

Thus, in Mississippi, because the finding of an aggravating circumstance and a *mens rea* element *is necessary* to increase the penalty over the statutory maximum absent

-153-

that circumstance, the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment require that those factors be found by the grand jury and pled in the indictment. *See United States v. Cotton*, 535 U.S. 625, 632 (2002) ("The Government concedes that the indictment's failure to allege a fact, drug quantity, that increased the statutory maximum sentence rendered respondents' enhanced sentences erroneous under the reasoning of *Apprendi* and *Jones.*"); *United States v. Lincks*, 447 Fed. Appx. 943, 944-45 (11th Cir. 2011); *Newton v. Avoyelle's Women's Correction Center, Warden*, 423 Fed. Appx. 419 (5th Cir. 2011).

*Newton* is instructive. There the Fifth Circuit held that the Louisiana Court of Appeal and Louisiana Supreme Court unreasonably applied *Apprendi* and its progeny. As the Fifth Circuit explained, "The [Louisiana] appellate court reasoned that because count three of the indictment—the obstruction of justice count—was worded in the conjunctive, the trial court did not err in concluding that the jury had convicted Newton of obstructing the investigation of both underlying offenses. The appellate court further reasoned that "[t]he conjunctive listing of the crimes ... subject[ed] Newton to the penalty provisions for either crime." *Newton*, 423 Fed. Appx. at 421 (*citing State v. Newton*, 973 So. 2d 916, 920 (La. App. 2007)).

This argument is not dissimilar to the Mississippi Supreme Court's logic, in dismissing Loden's claim, that "anytime an individual is charged with murder, he is put on notice that the death penalty may result." *Loden*, 971 So. 2d at 565.

But in *Newton*, the Fifth Circuit held:

> The trial court concluded that the jury found Newton guilty of obstruction of both underlying offenses charged in the indictment and sentenced Newton to a term based on the more serious underlying crime of aggravated arson. Based on the wording of the indictment, the jury instructions and La. C. Crim. P. art. 480, we find that the state court's decision is an unreasonable application of clearly established federal law, particularly *Apprendi*.

-154-

*Newton*, 423 Fed. Appx. at 423. In short, a blanket notice—that a defendant may be punished under an alternative series of possible underlying facts—is insufficient to protect the defendant's rights under *Apprendi* and its progeny.

The State cannot avoid these constitutional requirements by classifying any factor which operates as an element of a crime as a mere "sentencing factor." The "look" of the statute—that is, the construction of the statute or, perhaps, the legislative denomination of the statute—is not at all dispositive of the question as to whether the item at issue is an element of the offense or a sentencing factor. *See Jones,* 526 U.S. at 232-33; *Ring*, 536 U.S. at 602, 604, (noting the dispositive question from *Apprendi* was "one not of form, but of effect"); *Apprendi*, 530 U.S. at 495 (New Jersey's placement of word "enhancer" within the criminal code's sentencing provision did not render the "enhancer" a non-essential element of the offense). Rather, any fact which elevates punishment above the maximum is considered an "element of an aggravated crime." *Harris v. United States*, 536 U.S. 545, 557 (2002).

This was made clear in *Blakely*, 542 U.S. 296. Blakely was convicted of a class B felony which carried up to ten years under the state sentencing guidelines. Blakely pled to a class B offense that the guidelines called for sentencing of 53 months. The judge sentenced him to an additional 37 months after finding aggravating factors. The state argued that because the statutory maximum was up to ten years, *Apprendi* did not apply. Justice Scalia writing for the majority flatly rejected that argument.

Although *Blakely*, like *Apprendi* and *Ring* before it, does not go as far as the indictment question, it clearly sets forth the two foundations of the rule established in *Apprendi*. That rule reflects two longstanding tenets of common-law criminal jurisprudence: the right to a jury trial and "that 'an accusation which lacks any particular fact which the law makes essential to the punishment is … no accusation within the requirements of the common law, and it is no accusation in reason'". *Blakely*, 542 U.S. at 301-302 .

In *Rose v. Mitchell*, 443 U.S. 545, 557 n. 7 (1979), the United States Supreme held that if a state elects to prosecute by indictment, that process must comport with the Fourteenth Amendment and the arbitrary denial of a state right violates the Fourteenth Amendment and due process. *See also Hicks v. Oklahoma*, 447 U.S. 343 (1980). And Mississippi law has long recognized that due process requires full notice of the elements of the offense to be set forth in the indictment:

> It has long been the law of this land that an accused person has a constitutional right to be informed of the nature and material elements of the accusation filed against him. All the authorities are to the effect that an indictment, to be sufficient upon which a conviction may stand, must set forth the constituent elements of a criminal offense. Each and every material fact and essential ingredient of the offense must be with precision and certainty set forth.

*Burchfield v. State*, 277 So. 2d 623, 625 (Miss. 1973).

Based on the principles discussed above, the State must include in the indictment any aggravating factors which it intends to prove at the sentencing phase of the trial where those factors are related to the commission of the crime and are not judicially noticed facts. *Apprendi*, 530 U.S. at 488; *see generally Allen v. United States*, 536 U.S. 953 (2002); *United States v. Allen*, 357 F.3d 745 (8th Cir. 2004) (following remand, Eighth Circuit held that the failure to charge the aggravating factors in the indictment invalidated the death sentence).

The indictment in this case failed to set forth the statutory aggravating factors on which the State sought the imposition of capital punishment[30] or *mens rea* element. The state court unreasonably applied *Apprendi* and its progeny in denying relief on this claim. This Court should therefore grant the writ of habeas corpus and require the State to resentence Loden on the basis of a constitutionally permissible indictment.

---

[30] Loden notes that the indictment does charge kidnapping, rape and sexual battery which were submitted as aggravating factors. T.T. 702. For the reasons set forth Claim IV, Loden asserts that it is not a valid aggravator. However, at a minimum, based on Claim II, the "avoiding arrest" aggravator and the "especially heinous" aggravator must be set aside for the failure to charge in the indictment.

**VI.    LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE SUBMISSION OF THE "AVOIDING ARREST" AGGRAVATING CIRCUMSTANCE VIOLATED THE FOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUTION**

**A.    Facts Necessary To The Adjudication Of This Claim**

The trial court found as an aggravating circumstance that the killing was committed by Loden "for the purpose of avoiding or preventing his lawful arrest" and weighed that circumstance in reaching the decision to sentence him to death.  (T.T. 712.) This was improper as a matter of law and fact. The Mississippi Supreme Court's affirmance of this finding on direct appeal was an unreasonable application of clearly established federal law as declared by the U.S. Supreme Court in *Jackson v. Virginia,* 443 U.S. 307 (1979) and *Lewis v. Jeffers*, 497 U.S. 764  (1990). Also, the Mississippi Supreme Court's ruling resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. section 2254 (d)(2).

The only evidence the prosecutor offered in support of the aggravator was Loden's tentative response to interrogators as to a possible reason why he killed the victim: "Looking back now, I wouldn't have released her because I would've lost the image of being the picture perfect Marine. . . .  I guess the big question of this is do I know that I killed Ms. Gray?  Yes, I know I did.  I have many questions as far as exactly how and why, but the next morning when I woke up, I saw the body, I knew I had done it."  (T.T. 535, 634, 730.)  In addition, Loden, a U.S. Marine of 18 years at the time of the offense, guessed he committed the killing "because [he] didn't want to tarnish [his] image as the perfect Marine."  (T.T. 535, 634.)

The standard for determining whether a defendant has been convicted of a crime on insufficient evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 317-318; *Wingo v. Blackburn,* 786 F.2d 654, 655 (5th Cir. 1986) (*relying on Jackson*, 443 U.S. at 313)

("[t]o satisfy the due process requirement of the Fourteenth Amendment, the evidence as viewed most favorably to the prosecution must warrant the conclusion that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). The United States Supreme Court has extended this principle to hold that a petitioner's rights under the Eighth Amendment and Due Process Clause of the Fourteenth Amendment are violated when a state court finds an aggravating circumstance that no reasonable sentencer could have found based on the evidence adduced at trial. *Lewis*, 497 U.S. at 783. Thus, as a matter of federal constitutional law, when there is insufficient evidence to support an aggravating circumstance, the sentencing body may not consider that aggravating circumstance. *Jackson,* 443 U.S. at 313.

The Supreme Court has been clear that due process requires more than the mere existence of some relevant evidence to support the finding of an element of an offense (or statutory aggravating circumstance) beyond a reasonable doubt. "[I]t could not be seriously argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt." *Jackson,* 443 U.S. at 320.

The aggravating circumstance is defined by state law, to the extent it is narrowly drawn as required by the Eighth Amendment. Mississippi's avoiding arrest aggravator requires "evidence from which it may be reasonably inferred that <u>a substantial reason for the killing</u> was to <u>conceal the identity of the killer</u> or killers <u>or to 'cover their tracks'</u> so as to avoid apprehension and eventual arrest by authorities[.]" *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983); *Porter v. State*, 732 So. 2d 899, 905-06 (Miss. 1999) (*relying on Ivy v. State*, 589 So. 2d 1263, 1266 (Miss. 1991)); *Taylor v. State*, 672 So. 2d 1246, 1275 (Miss. 1996).(emphasis added).

Each aggravating circumstance must be proven beyond a reasonable doubt. *White*, 532 So. 2d 1207. The narrow definition applied by the Mississippi Supreme Court is of constitutional significance. The United States Supreme Court requires that statutory aggravating circumstances appreciably narrow the class of defendants subject to the death

penalty so as to avoid "the kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238 (1972)." *Maynard v. Cartwright*, 486, U.S. 356, 362 (1988). The avoiding arrest aggravating circumstance only satisfies this requirement because it has been interpreted narrowly "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." *Gray v. Lucas.* 677 F.2d 1086, 1110 (5th Cir. 1982). The aggravating circumstance is appropriate where a substantial reason for the killing was to conceal one's identity or cover one's tracks and so avoid arrest for a different crime, not where the defendant attempted to avoid arrest <u>after</u> the murder. *Holland v. State,* 705 So. 2d 307, 355-56 (Miss. 1997) (emphasis added); *Edwards v. State,* 737 So. 2d 275, 312 (Miss. 1999); *Chase v. State.* 645 So. 2d 829, 856-58 (Miss. 1994).

A sentencer may not presume that the state has carried its burden of establishing this aggravating circumstance beyond a reasonable doubt simply because a rape victim was murdered.  "It is a tragic reality that the murder of a rape victim is all too frequently the culmination of the same hostile-aggressive impulses which triggered the initial attack and not a reasoned act motivated primarily by the desire to avoid detection.  Based on the facts in the record before this Court, we hold that the state has not proven this aggravating factor [avoiding arrest] beyond a reasonable doubt."  *Doyle v. State*, 460 So. 2d 353, 358 (Fla. 1984).

The Mississippi Supreme Court in *Taylor,* 672 So. 2d 1246, held that the aggravator of 'killing to prevent or avoid [arrest]' absolutely cannot stand where only assumption and speculation on the part of the state exists to support it.  In *Taylor*, the court upheld a murder conviction where the police found the body of the defendant's ex-wife's daughter after the defendant had indicated a desire to get even with the ex-wife by harming her child.  *Id.* at 1254.  The court found, however, that there was "no evidence that a desire to avoid apprehension and arrest was a substantial reason for the killing."  *Id.* at 1275 (vacating death sentence); *see also Ladner v. State,* 584 So. 2d 743, 763 (Miss.

1991) ("avoiding lawful arrest" aggravating circumstance not lawfully used "unless clearly supported by the evidence").

**B.     The State Court's Adjudication Of The Claim**

This claim was raised on direct appeal on both state law and federal constitutional grounds. On direct appeal the Mississippi Supreme Court reviewed this claim on the merits. *Loden,* 971 So. 2d at 565–567. That court is obligated to review the sufficiency of the evidence in support of the aggravating circumstances notwithstanding the lack of an objection. *See Manning*, 735 So. 2d at 349. ("[B]ecause this Court is required by statute to review the sufficiency of the evidence supporting the jury's finding of aggravating circumstances, there can be no procedural bar here."); *Simmons v. State*, 805 So. 2d 452, 495–96 (Miss. 2001) ("Miss Code Ann. § 99-19-105(3)(b) states that this Court <u>must</u> consider the sufficiency of the evidence to support the aggravating circumstances." (emphasis added)). The Mississippi Supreme Court simply ignored any constitutional analysis holding "the issue is without merit." *Loden*, 971 So. 2d at 567. The Mississippi Supreme Court simply held that a rational trier of fact could find beyond a reasonable doubt that Loden killed Ms. Gray in order to avoid apprehension and arrest. *Loden*, 971 So. 2d at 567. This finding was an unreasonable application of both fact and law.

**C.     The State Court's Adjudication Was An Unreasonable Application Of Fact And Was Unreasonable In Light Of The Evidence**

Reviewing the record in the instant case, there is ***no*** evidence to support the aggravating circumstance at issue here. The only evidence of a motive was Loden's post-arrest speculation that the murder may have resulted from a desire to protect his reputation as a Marine; it had nothing to do with avoiding an arrest. Moreover, all other circumstances surrounding the crime suggest that Loden was not concerned with avoiding arrest. Loden's van was parked in plain sight at the home of his grandmother, Rena Loden. (T.T. 522-523.) The van contained most of the evidence used against

-160-

Loden, the victim's body, the victim's clothes, the JVC camcorder, and JVC compact videocassette.  (T.T. 523-524.)  Loden made no attempt to conceal the van or its contents. When Loden was found, not far from his grandmother's farm, he had the words "I'm sorry" carved into his chest.  (T.T. 525.)  It is inconceivable that he was seeking to avoid arrest.

Loden did not remember killing Miss Gray, but knew he had when woke up and saw her in the van.  (T.T. 535, 633.)  The use of the language "[l]ooking back, I wouldn't have released her because …" is nothing more than an attempt to guess in hindsight his own motive, and no other evidence supports his own spur-of-the-moment speculation. *See Evans-Smith v. Taylor,* 19 F.3d 899, 910 n.29 (4th Cir. 1994) ("[f]avoring the prosecution with all inferences does not mean that we must ignore evidence that is in the record").

To take such speculation as fact in proving the elements of an aggravator beyond a reasonable doubt necessarily involves assumption of the sort condemned in *Taylor*. This is particularly unacceptable when a defendant's life is at stake.  *See Juan H v. Allen*, 408 F.3d 1262, 1279 (9th Cir. 2005) (in reviewing sufficiency of the evidence, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence"); *O'Laughlin v. O'Brien*, 568 F.3d 287, 302 (1st Cir. 2009) (evidence supporting a "reasonable speculation" may be insufficient evidence to establish guilt); *Newman v. Metrish*, 543 F.3d 793 (6th Cir. 2008) (same).

The plain language of the statement itself proves motive other than "avoiding arrest."  Loden, a U.S. Marine of 18 years at the time of the offense, guessed he committed the killing "because I didn't want to tarnish my image as the perfect marine." (T.T. 535, 634.)  Thus, the only motive even speculated on in this tentative statement, which is also the only evidence whatsoever presented to support the aggravator, fails to even indicate that Loden sought to avoid arrest at all.  He clearly stated *concern over his professional image only*, and nowhere did he so much as imply concern over preventing

or avoiding arrest. Simply substituting concern over professional image for desire to prevent arrest, without any evidence to support the substitution, merely invokes an unreasonable logical fallacy; certainly not the reasonable inference required by *Leatherwood*, 435 So. 2d 645. This is far short of the proof the Mississippi Supreme Court has required to establish the aggravating circumstance.[31]

In short, the State's aggravator rests on a single statement, which did not concern arrest as a possible motive, and is unsupported by any other evidence. Moreover, because the avoiding arrest aggravator cannot be sustained on the proof before the state court, and the prosecutor asserted the aggravator as a ground for the Court's weighing analysis and in support of the death sentence, the unconstitutional finding of the "avoiding arrest" aggravator cannot be harmless error. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Sochor v. Florida*, 504 U.S. 527, 533 (1992) (employing an invalid aggravating factor in the weighing process "creates the possibility . . . of randomness, by placing a thumb [on] death's side of the scale") (citations omitted).

---

[31] *See, e.g., West v. State*, 725 So. 2d 872, 884 (Miss. 1998) (evidence and a confession to the effect that the murder was committed to eliminate witnesses); *Edwards*, 737 So. 2d at 312,320(defendant burned a car connected to the crime in an attempt to destroy evidence and made statements indicating that he shot the victim to avoid being caught); *Hodges v. State*, 912 So. 2d 730, 786 (Miss. 2005) (defendant attempted to disguise himself, shot the victim when he was recognized anyway, hid the murder weapon, kidnapped another person and fled, and disposed of his disguise); *Chase*, 645 So. 2d at 856-58 (finding an inference that the defendant sought to avoid detection where he wore gloves to avoid fingerprints, eliminated tire tracks, and killed a victim where he had to do so to escape without detection, but could have simply escaped without committing the murder); *Thorson,* 895 So. 2d at 99,102 (the defendant confessed to killing the victim after not believing her statement that she would not report the underlying rape, tried to eliminate fingerprints and items tying him to the crime scene, attempted to disguise the crime scene to make it look like someone else was responsible, and shot the victim in the head when she screamed for help); *Scott v. State*, 878 So. 2d 933, 981(Miss. 2004) (the defendant traveled to another town where he was unknown, followed the victim home rather than commit robbery in a public place, attempted to avoid being seen while waiting, shot at a witness, planned from the beginning to avoid arrest, and fled the scene in a high-speed chase before ditching his car and hitching a ride home).

The State's evidence fell far short of the quality and quantity of evidence necessary to prove beyond a reasonable doubt that Loden committed murder to avoid arrest. Therefore, there is insufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Loden committed the murder for the purpose of avoiding arrest. The trial court's consideration of the aggravator was, therefore, error.

For these reasons, the Mississippi Supreme Court unreasonably applied *Jackson* and *Jeffers* to the facts of this case, and further resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the writ of habeas corpus should issue vacating the death sentence and requiring the State to initiate new sentencing proceedings within a reasonable time.

## VII. LODEN IS ENTITLED TO HABEAS RELIEF BECAUSE THE SUBMISSION OF FELONY-MURDER AS AN AGGRAVATING CIRCUMSTANCE VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS

### A. Facts Necessary To The Adjudication Of This Claim

Loden was indicted in a six-count indictment alleging capital murder defined as killing during the commission of a kidnapping, rape and four counts of sexual battery against Leesa Marie Gray. On September 21, 2001, Loden pled guilty to all charges and the court accepted these pleas. (T.T. 551-53.) Loden then proceeded to the sentencing phase on the capital murder charge before the court without a jury. (T.T 555.) As to Count I, capital murder, the trial court sentenced Loden to death. (T.T. 714.)

During the sentencing of Loden, the state trial court submitted the Mississippi Code § 99-19-101(5)(d) felony-murder aggravator in this case. As the prosecutor's argument to the court made clear, this aggravator was substantially based in part on the rape and sexual battery charged in Counts II-VI of the indictment. (T.T. 702-03.) Loden was separately convicted and sentenced on those charges. (T.T. 552-53, 715-16.)

On direct appeal, Loden challenged the use of Count II through VI's rape and sexual assault allegations in the court's sentencing decision on Count I (the capital murder charge). The argument on direct appeal was based on both Federal and Mississippi decisions interpreting the Federal Constitution's prohibition against double jeopardy.

### B.      The State Court's Adjudication Of The Claim

The Mississippi Supreme Court first held the Double Jeopardy Claim to be procedurally barred because it was raised for the first time on appeal. *Loden*, 971 So. 2d at 568, ¶46. Without standing on the procedural bar as an independent grounds for its decision, the court then stated: "nonetheless, this Court will consider the substantive merit" of the Double Jeopardy claim. *Id*.

On the merits, the state court held that because Loden was convicted of capital murder in the course of kidnapping, but that none of the other counts in the indictment charged kidnapping, there was no Double Jeopardy violation. *Loden*, 971 So. 2d at 570, ¶¶49-50.

### C.      The State Court's Adjudication Is An Unreasonable Application Of Clearly Established Federal Law As Established In *Apprendi* And *Ring*

The threshold question for this Court's determination is whether the state court's invocation of a procedural bar precludes this Court from reaching this claim. For two reasons, this Court can address the claim. First, the state court did not clearly express its reliance on an adequate and independent state grounds for affirmance. *Harris v. Reed*, 489 U.S. 255, 263 (1989). Although there are no 'magic words' required from a state court to rely on an independent ground, an ambiguously worded opinion obliges the Federal habeas court to reach the merits of the claim.

For example, in *Walker v. Epps*, 1:97CV29KS, 2012 U.S. Dist. LEXIS 41604 (S.D. Miss., Mar. 27, 2012) the Mississippi Supreme Court both procedurally barred, then considered, a claim that the privilege against self-incrimination was violated. The

state court's jurisprudence held that the privilege was based on a fundamental right, and thus a claim that the prosecution had commented on the defendant's exercise of his privilege could not be procedurally defaulted. Because of this, the ambiguous statement regarding procedural default in Walker's case was held to be an insufficient statement of reliance on an independent state law grounds for decision, and the District Court considered the merits of the claim. *Walker* at *29, 30.

As in *Walker*, the Mississippi Supreme Court has made clear that the prohibition against double jeopardy is a fundamental right which can be raised for the first time on appeal. *Rowland v. State*, 42 So. 3d 503, 508 P.14 (Miss. 2010); *Graves v. State,* 969 So.2d 845, 846–47 (Miss.2007). *See also Fuselier v. State,* 654 So. 2d 519, 522 (Miss.1995) (same); *Kennedy v. State,* 732 So. 2d 184, 186–87 (Miss.1999) (right to be free from an illegal sentence is fundamental). Thus, the ambiguous invocation of procedural default in the Loden direct appeal opinion is not sufficient to constitute an independent state grounds for decision.

As demonstrated by *Rowland* and the other cases set forth above, the Mississippi courts do not regularly and consistently impose any procedural bar to claims based on the Double Jeopardy Clause. This Court cannot honor a procedural default rule which is inconsistently applied. "A state procedural ground to bar consideration of an issue is not adequate unless it is 'strictly or regularly followed.' *Wilcher v. Hargett*, 978 F.2d 872, 879 (5th Cir. 1992), *quoting Johnson v. Mississippi*, 486 U.S. 578, 587 (1988).

Turning to the merits, the State court's opinion is contrary to, and an unreasonable application of, *Ring*, 536 U.S. 584 and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Mississippi Supreme Court looked too narrowly in its analysis, asking only whether Loden had been separately ***convicted*** of kidnapping and murder in the course of a kidnapping. *Loden*, 971 So. 2d at 570, ¶¶49-50. Under *Ring* and *Apprendi*, however, the relevant question is whether Loden was sentenced twice for the same facts—the alleged rape and sexual battery of the victim.

The answer to that question is clearly in the affirmative. The felony-murder aggravator, as asserted by the prosecutor in sentencing was based in large part on the same conduct charged in Counts II-VI of the indictment. (T.T. 702-03.) Loden was separately convicted and sentenced on those charges, (T.T. 552-53, 715-16.) It is well established that a Mississippi defendant convicted of capital murder based on an underlying felony may not be punished separately for that felony without violating double jeopardy. *See generally Meeks v. State*, 604 So. 2d 748, 752-54 (Miss. 1992); *see also Holly v. State,* 671 So. 2d 32, 45 (Miss.1996), citing *United States v. Buckley,* 586 F. 2d 498, 505 (5th Cir.1978); *Edwards*, 737 So. 2d at 321.

It has long been clear that the Double Jeopardy Clause applies to the separate sentencing proceeding mandated in death penalty cases. *Bullington v. Missouri*, 451 U.S. 430 (1981). The Court's emphasis in *Bullington* was that the State is obliged to allege and prove specific facts in order to convince a capital sentencing jury to return a verdict of death:

> The procedure that resulted in the imposition of the sentence of life imprisonment upon Loden Bullington at his first trial, however, differs significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing. The jury in this case was not given unbounded discretion to select an appropriate punishment from a wide range authorized by statute. Rather, a separate hearing was required and was held, and the jury was presented both a choice between two alternatives and standards to guide the making of that choice. *Nor did the prosecution simply recommend what it felt to be an appropriate punishment. It undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts.* The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes.

*Bullington*, 451 U.S. at 438 (emphasis added).

After *Apprendi*, 530 U.S. 466 and *Ring*, 536 U.S. 584 , it is even more clear that the facts alleged by the State as aggravating circumstances in a capital sentencing

proceeding are "elements" of the offense for constitutional purposes. This result is inevitable based on the recognition in *Apprendi* that any fact which increases the maximum punishment is an element which must be found beyond a reasonable doubt, and the recognition in *Ring* that aggravating circumstances which are required to be found before a sentence of death may be imposed are such elements. *See id*.

As a result, the Mississippi Supreme Court was obliged to determine whether the State had used the same elements to sentence Loden twice for the same behavior, in violation of the Double Jeopardy Clause. Although Loden argued this same contention regarding *Ring* and *Apprendi* in his direct appeal brief, the Mississippi Supreme Court did not even refer to this clearly established Federal law in its opinion. The significance of the omission is demonstrated by the Court's refusal to see that the facts alleged as aggravating circumstances in the prosecutor's summation in Circuit Court are elements of the offense at sentencing—as *Ring* expressly holds.

Thus, by using the facts alleged in Counts II-VI as separate components of an aggravating circumstance exposing Loden to the death penalty in Count I, the state placed him in jeopardy of the penalty of death for those offenses. He cannot be twice punished for the legally discrete combination of conduct constituting Counts II-VI any more than he could be sentenced for the underlying felony of kidnapping. The Mississippi Supreme Court's decision was contrary to, or an unreasonable application of, *Ring* and *Apprendi* (which it did not consider, despite being part of Loden's direct appeal argument on the claim). Because the capital sentencing of Loden violates the Double Jeopardy Clause, the aggravating circumstance based on the separately punished offenses must be struck and the writ issued vacating his death sentence.

## CONCLUSION

WHEREFORE, for the foregoing reasons, and for any additional reasons set forth in the Petition, as well as such others as may be noted by this Court, Petitioner Thomas E. Loden Jr. requests that this Court set aside his convictions and sentence of death and grant a new trial within a reasonable amount of time and all other relief that is just and proper under the circumstances. Petitioner requests that the Court, at a minimum, conduct an evidentiary hearing.

Respectfully Submitted
THOMAS E. LODEN, Petitioner


By: /s/ Mark R. McDonald (*appointed pro hac vice*)
Charles E. Patterson (*appointed pro hac vice*)
Charles S. Barquist (*appointed pro hac vice*)
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California 90013-1024
Telephone: 213.892.5200
Facsimile: 213.892.5454


/s/Stacy L. Ferraro
Stacy L. Ferraro
MS Bar #100263
P.O. Box 708
Flora, Mississippi 39071
Telephone: (601) 853-8331

Attorneys for Petitioner

## ATTESTATION OF FILER

I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.


/s/ Stacy L. Ferraro

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have served this pleading upon Jason L. Davis, Special

Assistant Attorney General, by filing this pleading on this Court's Electronic Filing

System.

This the 13th day of July, 2012.

<u>/s/ Stacy L. Ferraro</u>