# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**THOMAS EDWIN LODEN**,                                          *Petitioner*

*versus*                                          **CAUSE NO. 1:10-CV-00311-NBB**

**CHRISTOPHER EPPS, COMMISSIONER,
MISSISSIPPI DEPARTMENT OF CORRECTIONS,
AND JIM HOOD, ATTORNEY GENERAL,**                    *Respondents*

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF THE ANSWER TO THE PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY UNDER SENTENCE OF DEATH
_____

**COME NOW** the Respondents in the above styled and numbered cause and file this Memorandum of Authorities in Support of the Answer to the Petition for Writ of Habeas Corpus filed in the above styled and numbered cause. In response to the allegations contained in the numbered paragraphs of the petition, respondents would show unto the Court the following.

### I. INTRODUCTORY STATEMENT

This Court has jurisdiction over habeas corpus petitions under 28 U.S.C. §2254 as amended on April 24, 1996 by the Antiterrorism and Effective Death Penalty Act (AEDPA).

1

The fact that this habeas petition is filed after that date requires that the provisions of the AEDPA be applied with full force to this petition. *Lindh v. Murphy*, 521 U.S. 320, 324-26, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding that AEDPA applies to all federal habeas applications filed on or after April 24, 1996); *Pippin v. Dretke*, 434 f.3d 782, 786 (5th Cir. 2005); *Aguilar v. Dretke*, 428 F.3d 526, 530 (5th Cir. 2005); *Neville v. Dretke*, 423, F.3d 474, 478 (5th Cir. 2005); *Nobles v. Johnson*, 127 F.3d.. 409 (5th Cir. 1997); *Williams v. Cain*, 125 F.3d 269, 273-74 (5th Cir. 1997); *McBride v. Johnson*, 118 F.3d 432, 436 (5th Cir. 1997) ("Because this case comes within the parameters of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996), we apply the standard of review embodied in the AEDPA. *See Drinkard v. Johnson*, 97 F.3d 751 (5th Cir.1996), *cert. denied*, 502 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997)."). The proper application of the AEDPA is fully explained in the decision of the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), *Cullen v. Pinholster*, ___U.S.___, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), and *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)

## II. PROCEDURAL HISTORY

Petitioner was indicted on November 21, 2000, during the Vacation Term, 2000 of the Circuit Court of Itawamba County, Mississippi, in a six count indictment. The charges included:

I.      The crime of capital murder of Leesa Marie Gray while engaged in the commission of the crime of kidnapping in violation of MISS. CODE

ANN. § 97-3-19 (2)(e);

II.     The rape of Leesa Marie Gray;

III.    The sexual battery of Leesa Marie Gray by forcing her to perform
        fellatio on the appellant;

IV.     The sexual battery of Leesa Marie Gray by inserting his finger into her
        vagina;

V.      The sexual battery of Leesa Marie Gray by inserting his finger into her
        anus;

VI.     The sexual battery of Leesa Marie Gray by inserting an inanimate
        object into her vagina.

CP. at 9-11.

Loden filed a motion for change of venue. The trial court granted the motion and

moved the trial to Rankin County, Mississippi. Thereafter, Loden decided to enter a plea of

guilty to the six counts of the indictment making the necessity for a change of venue moot.

On September 21, 2001, the trial court held a hearing to consider Loden's pleas of guilty to

the six counts. Tr. 495-553. The trial court accepted the guilty pleas. Loden then moved to

waive trial by jury on the sentence to be imposed on the conviction of capital murder. The

State of Mississippi also waived the jury trial for the sentence phase as is required by MISS.

CODE ANN. § 99-19-101(1).

Petitioner's sentencing trial then was conducted before the trial court sitting without

a jury. At the conclusion of the sentencing phase the trial court entered a sentencing order.

CP. 226-231. In pertinent part the order reads:

3

As a threshold finding, the Court, when making a determination of the sentence without a jury, must find from the evidence beyond a reasonable doubt in writing that one or more of those factors set out in Section 99-19-101 (7( a.-d.) exists in order to impose a death sentence. In this case the Court finds beyond a reasonable doubt that (a) the Defendant, Thomas Edwin Loden, Jr., actually killed Leesa Marie Gray, a human being; (b) the Defendant, Thomas Edwin Loden, Jr., attempted to kill Leesa Marie Gray; (c) the Defendant, Thomas Edwin Loden, Jr., intended the killing of Leesa Marie Gray take place, and (d) the Defendant, Thomas Edwin Loden, Jr., contemplated that lethal force would be employed.

Having found each of the four factors provided in Subsection (7) of Section 99-19-101, Mississippi Code of 1972, Annotated, to exist, the Court must then determine whether sufficient aggravating circumstances exists as enumerated in Subsection (5) of that code section. The Court is limited to those circumstances enumerated and may not consider any other factors.

In considering those circumstances the Court must find beyond a reasonable doubt that they exist. The Court, having considered the aggravating circumstances, is of the opinion and finds beyond a reasonable doubt that the following aggravating circumstances provided in that subsection exist as follows:

1.    The capital offense (Capital Murder) was committed while the Defendant, Thomas Edwin Loden, Jr., was engaged in the commission of the felony crimes of kidnapping, rape and sexual battery of Leesa Marie Gray, a human being;

2.    The capital offense (Capital Murder) was committed by the Defendant, Thomas Edwin Loden, Jr., for the purpose of avoiding or preventing his lawful arrest; and

3.    The capital offense (Capital Murder) was especially heinous, atrocious or cruel.

The Court, having found that one or more of the aggravating circumstances exists beyond a reasonable doubt as set out above, must now consider whether there are mitigating circumstances which outweigh the aggravating circumstances found to exist. In doing so, the Court must consider the following elements in determining whether the death penalty should be

4

imposed:

    1.    The Defendant's age at the time of the Capital Murder;

    2.    Any other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought before you during the trial of this case which the Court, deems to be mitigating on behalf of the Defendant;

    3.    Whether or not the Defendant has a significant history of prior criminal activity.

    4.    Whether or not the offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance;

    5.    Whether or not the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

    6.    Any other mater, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought to the Court during the presentation of evidence in this cause which the Court deems to be mitigating on behalf of the Defendant.

The Court having considered and weighed the aggravating and mitigating circumstances finds that the aggravating circumstances outweigh the mitigating circumstances and that the mitigation circumstances do not outweigh the aggravating circumstances and that the death penalty should be imposed.

CP. at 228-30.

Thereafter, Loden was sentenced to death for the capital murder charge contained in Count I of the indictment. CP. 230. Loden was also sentenced to 30 years for the rape conviction contained in Count II of the indictment (CP. 230); 30 years for the sexual battery conviction

5

contained in Count III (CP. 230); 30 years for the sexual battery conviction contained in Count IV (CP. 231); 30 years for the sexual battery conviction contained in Count V (CP. 231); and 30 years for the sexual battery conviction contained in County VI (CP. 231). The sentences, in addition to the death penalty, were all to run consecutive to all other sentences imposed in this cause.

Petitioner took his automatic appeal of the sentence of death to the Supreme Court of Mississippi.[1] *See Loden v. State*, No. 2002-DP-00282-SCT. Trial counsel was allowed to withdraw and the Office of Capital Defense Counsel was substituted as appellate counsel on January 27, 2003. Both appellant and the State filed appellate brief with the court below.

On July 16, 2003, counsel filed a post-conviction motion to vacate the guilty plea to capital murder with the Circuit Court of Itawamba County, Mississippi.[2] C.P. at 6-30. The proceedings in the direct appeal were stayed pending the resolution of the post-conviction challenge to the guilty plea. On October 13, 2004, the trial court filed an order dismissing the motion to withdraw the guilty plea on the basis of lack of jurisdiction in that the case was on appeal before the court below. C.P. 43-44. On January 24, 2005, the Mississippi Supreme Court entered an order noting that the circuit court had exclusive jurisdiction of a motion for post-conviction relief from the guilty plea entered by Loden. C.P. at 115-16. The trial court then set a hearing for June 2, 2005. C.P. at 120.

---

[1]There is no right of appeal for a conviction after a guilty plea. *See* MISS. CODE ANN. § 99-35-101 (Rev. 2008).

[2]*Loden v. State*, No. 03-090(G)1.

6

A hearing was held on Loden's post-conviction motion on June 2, 2005. At the conclusion of the hearing the trial court took the case under advisement. On February 16, 2006, the trial court entered an opinion and order dismissing the motion to vacate Loden's guilty plea to capital murder.[3]

Loden then took an appeal from the denial of post-conviction relief on the capital murder guilty plea. *See Loden v. State*, No. 2006-CA-00432-SCT. The appeal of the denial of post-conviction relief was consolidated with the direct appeal of the sentence phase of his capital trial, No. 2002-DP-00282-SCT. The issues relating to the direct appeal of the sentence presented to the state supreme court in this consolidated appeal were:

> (1) Whether Loden was improperly denied funds to retain the assistance of a forensic social worker to investigate and present relevant mitigating factors.
>
> (2) Whether the indictment charged a death-penalty eligible offense.
>
> (3) Whether the trial court erred in weighing the "avoiding arrest" aggravating circumstance.
>
> (4) Whether the submission of the Mississippi Code Annotated Section 99-19-101(5)(d) aggravating circumstance violated the state and federal constitutions.
>
> (5) Whether the trial court erred in considering both the Mississippi Code Annotated Section 99-19-101(5)(d) aggravating circumstance and the "especially heinous, atrocious or cruel" aggravating circumstance.

---

[3]Loden made no challenge to his entry of guilty pleas to the other five counts of the indictment in this case. On the appeal of the denial of post-conviction relief he focused solely on the guilty plea to capital murder and that remained the focus of his argument before the Mississippi Supreme Court. Thus, any challenge to the guilty pleas and sentences to the remaining five counts of the indictment was abandoned.

7

> (6) Whether the statutorily-mandated proportionality review of Mississippi Code Annotated Section 99-19-105(3) was satisfied.

> 971 So.2d at 561-62.

The single issue presented relating to the guilty plea post-conviction was:

> (7) Whether alleged erroneous advice of trial counsel prejudiced Loden by causing him to enter an involuntary guilty plea to capital murder.

> 971 So.2d at 562.

On October 14, 2007, the Mississippi Supreme Court rendered its opinion affirming the sentence of death and affirming the denial of post-conviction relief on the guilt phase of the trial. *See Loden v. State*, 971 So.2d 548 (Miss. 2007). A timely petition for rehearing was filed and later denied on January 17, 2008.

Loden then filed a petition for writ of certiorari with the United States Supreme Court presenting two questions. These questions were:

> 1. Are the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States violated where counsel erroneously advises a capital defendant that he can appeal a guilty plea if he is sentence to death and the defendant enters a guilty plea based on that erroneous advice?

> 2. Are the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States violated where a state court denied an indigent capital defendant funds to retain a forensic social worker to investigate mitigating factors.

> Petition at I.

On October 6, 2009, the United States Supreme Court denied the petition for writ of certiorari. *See Loden v. Mississippi*, 555 U.S. 831, 129 S.Ct. 45, 172 L.Ed.2d 51 (2008).

Petitioner the filed a motion for leave to file a petition for post-conviction relief in the trial court seeking relief from his sentence of death with the Mississippi Supreme Court.[4] The claims presented were:

> (1) Loden was denied his constitutional right to effective assistance of counsel guaranteed by the United States and Mississippi Constitutions.

> (2) Apart from the ineffectiveness of Loden's counsel, his guilty plea was not knowing, voluntary or intelligent.

> (3) Loden was denied effective assistance of appellate counsel.

> (4) The State's use of the expert psychiatric report from Dr. McMichael violates the Eighth Amendment's reliability requirement, the Sixth Amendment's confrontation clause, and due process.

> (5) Loden's waiver of jury for sentencing was not voluntary, knowing and intelligent.

> (6) Loden has been denied his Fourteenth Amendment due process right to fully develop and present the evidence in his case.

> *Loden v. State*, 43 So.3d 365, 377 (Miss.,2010).

On April 15, 2010, the Mississippi Supreme Court denied post-conviction relief in a written opinion. *See Loden v. State*, 43 So.3d 365 (Miss. 2010). A petition for rehearing was filed and later denied on September 30, 2010. Petitioner did not file a petition for writ of certiorari with the United States Supreme Court following denial of post-conviction relief.

Petitioner has now filed a petition for writ of habeas corpus with this Court asserting several claim on which, he contends, he is entitled to relief from this Court.

---

[4]Petitioner also included issues related to the guilt phase of his case in this petition.

9

### III.  Factual Background.

At approximately 10:30 p.m. on the night of June 22, 2000, sixteen year-old Leesa Marie Gray left Comer's Restaurant where she worked and started her drive home.  About that same time, a friend telephoned Leesa at her home and the call was answered by her mother Wanda Farris.  Mrs. Farris called the restaurant and spoke with another employee, Richard Tallant, and was told that Leesa had just left on her way home.  When Leesa had not arrived home by 11:00 p.m. Mrs. Farris called Tallant at his home and inquired if he has seen Leesa since she left the restaurant.  Tallant stated that he had not seen her but he had seen a car with the emergency flashers blinking off of Highway 178 in Itawamba County on the road leading to Dorsey School.  Tallant told Mrs. Farris he would go check and see if it was Leesa's car.  Tallant discovered that the car with the emergency flashes on was in fact Leesa's car, that the car had a flat tire and that Leesa was not with the car.  Tallant drove to Wanda Farris home.  Wanda Farris, her husband Mike Farris and Tallant then proceeded back to the location of Leesa's car.  They found Leesa's purse and cellular telephone inside the unlocked car, but the car keys were missing.  Mr. Farris and Tallant changed the flat tire and went back to the Farris home and called the Itawamba County Sheriff's Office to report the situation.

Officer David Sheffield talked with Tallant and other patrons of the restaurant who related that an individual had arrived at the restaurant driving a dark colored two tone van shortly before closing wanting a cheese burger.  Tallant stated that he had gone to school

10

with this person and that his name was Thomas Edwin Loden, Jr., and that he had grown up in the area. He also stated that Loden had been in the restaurant earlier in the day and had attempted to flirt with Leesa Marie Gray. Tallant also knew that Loden was visiting his grandmother, Mrs. Rena Loden, who lived at 2000 Ballardsville Road.

Officer Sheffield then went and examined the flat tire that had been removed from Leesa's car and found a razor blade in the center of the tire tread.

At approximately 5:00 a.m. on June 23, 2000, Officer Sheffield and Investigator Bryan Jones went to the home of Rena Loden. They were met by a sitter, Joyce Brewer, who stayed with Mrs. Loden because of her age and physical condition and health. Mrs. Brewer stated that Thomas Loden was in the house asleep. The officers did not disturb Loden at that time, but returned to the restaurant and continued to question other patrons from the previous day and search for further clues relating to Leesa's disappearance.

At approximately 7:30 a.m. on the morning of June 23, 2000, Msgt. Rick Marlar of the Mississippi Highway Patrol Criminal Investigative Bureau arrived to assist the Itawamba Sheriff's Department in the investigation. Marlar and Officer Jones decided to return to Rena Loden's house to interview Thomas Loden as he was about the only one that had been at the restaurant the night before who had not been interviewed. When they arrived Mrs. Loden told them that Thomas had gone fishing at the lake a couple of hundred yards behind house in the pasture. Mrs. Loden gave the officers permission to attempt to locate Loden. The officers were unable to locate Loden even after shouting for him and looking around the

11

lake. They returned to Mrs. Loden's house and she told them that she and her grandson had a signal to summons him if she needed him – three blasts of the car horn. The officers used that signal to no avail.

Becoming suspicious, the officers asked and obtained the permission from Mrs. Loden to search the house and area around the house. In the bedroom used by Thomas Loden the officers found a pair of shorts with what appeared to be blood in the crotch area. They then obtained permission to search Mrs. Loden's car in which they found a rope fashioned into a handcuff styled knot. Based on these findings, the officers sought a search warrant for the van belonging to Thomas Loden, the other vehicles on the property and all of the property and buildings located at 2000 Ballardsville Road, Itawamba County, Mississippi. The property was secured until the search warrant was issued by Justice Court Judge Lance Bean. The van belonging to Thomas Loden was locked and no keys were found in Mrs. Loden's house that would unlock it. The van was towed under law enforcement escort to the F Troop Highway Patrol Headquarters in New Albany, Mississippi. The van was secured in a garage until the arrival of Ken Gill of the Mississippi Crime Laboratory. While the van was being processed the body of Leesa Marie Gray was found stuffed under the folded down seat in the rear of the van. Leesa Marie body was nude and her hands and feet were bound with the same type rope found in the search of Mrs. Loden's car. The crime scene technician also found a JVC Compact camcorder and three compact video cassettes. The also found a set of keys containing a Honda key, a Schlage key, a Kroger card, pink plastic shoe, white and

read beads with Six Flags printed on it in the driver's door pocket. Also retrieved from the van was an H & R Sportsman .22 caliber revolver and a box of Winchester Super X .22 long rifle hollow point high velocity cartridges. The crime lab personnel also recovered numerous items that included the victim's clothing. A plastic Wal-Mart bag with tape around the top and hair fiber stuck in the tape. Numerous box cutter blades similar to the razor blade which had been removed from the flat tire of Leesa's Honda automobile were also found in the van.

A large scale search was instituted for Thomas Loden and continued through out the day. Later in the day Mary Ann Brown informed the authorities that she had found a man lying beside Charlie Donald Road, just north of Rena Loden's farm. Around 5:45 p.m. on June 23, the authorities responded Mrs. Brown's call and found Loden. Loden was given his rights and the officers attempted to get him to tell them where Leesa Marie was.[5] Loden acknowledged his rights but provided no information to the officers. Loden had apparently carved the words "I'm sorry" into his chest and had lacerated his wrist. Loden was transported by ambulance to the North Mississippi Medical Center accompanied by Investigator Marlar and FBI Special Agent Matt Bullwinkle. After they arrived at the hospital, Loden's injuries were treated, but he continued to deny any knowledge of Leesa Marie Gray. Officials were in the process of obtaining search warrants of Loden's person when Leesa Marie's body was found in Loden's van. The search warrant was obtained and

---

[5]Leesa Marie's body had not been found at this point in time.

13

executed on Loden to obtain certain tissue samples from Loden. These samples were taken into custody by Investigator Marlar for transport to the Crime Lab.

Immediately upon his release from the hospital, Loden was arrested and held in the Union County Jail. At his initial appearance before Judge Frank Russell, Loden indicated that he wished to hire his own attorney rather than have one appointed for him.

When the video tape found in the camera was viewed it first depicts Leesa Marie Gray inside the van belonging to Thomas Loden. Early in the video Leesa Marie is partially clothed with her hands tied behind her back and her feet and legs tied at the ankles, later in the video she is totally nude. The video shows Leesa Marie being forced to perform fellatio on Thomas Loden. During this assault, Loden orders Leesa Marie to smile because he wants to see her braces. The video is stopped and started numerous times during its duration with Loden giving commentary and directions to the Leesa Marie. When the second scene begins Loden is vaginally raping Leesa Marie. Later in the video Loden is seen penetrating Leesa Marie's vagina with his fingers. He removes his fingers and comments "You really were a virgin, weren't you?" Later in the video Loden is seen inserting his fingers into Leesa Marie's anus and then rotating his fingers between her anus and vagina, penetrating both. Later, when the video is restarted we see that Leesa Marie's pubic area has been partially shaved. Then the video depicts Loden repeatedly inserting a cucumber into Leesa Marie's vagina. During the episode Leesa Marie is heard telling Loden, "I'm hurting . . . . please . . . I think I'm hurt really bad." There is a break in the video as it is stopped again. When it

14

resumes we see Loden twisting Leesa Marie's breast and placing his fingers in her vagina in an apparent attempt to bring her back to consciousness. At the end of this segment Leesa Marie is still alive. The video stops again. When it is restarted, Leesa Marie is dead, her body has been cleaned up and posed in the back of the van with the cucumber being placed in her vagina. Loden then removes the cucumber and reinserts it several times before the video finally ends.

While incarcerated Loden indicated, through his wife, that he wished to make a statement to the law enforcement officers. Loden described in some detail the events of the evening and drew a map showing the different locations around Itawamba County where different acts took place. He stated that at one point he went to Rena Loden's house and went inside, got a glass of water for Leesa Marie, a comforter from his bedroom and a cucumber from the kitchen. He also admitted to raping Leesa Marie three other times that were not on the video tape. Loden claims not to have any recollection of making the video tape, but said that he was the only other person in the van other than Leesa Marie. He stated that he did not remember killing her, but he must have put her in a "sleeper hold and choked her."

Loden stated that when he awakened on June 23, he went out to the van and saw Leesa Marie's body. He locked the van and went back into the house and had a cup of coffee. He then drove around in the pickup truck to think. He said that when he arrived back at the farm he went for a walk. It was during this period of time when he heard the officers

15

calling for him. He hid and evaded the officers.

During the search of Rena Loden's farm the officers found a shovel next to a grave that had been dug behind the lake in the pasture. After viewing the video tape, the officers retrieved the comforter depicted therein from Loden's bedroom.

DNA testing was done on the bloody shorts, the blood on them matched Leesa Marie's DNA. Testing on the cucumber resulted in a major DNA match for the DNA of Leesa Marie and a minor match of Loden. A disposable razor found in the van and blood on the razor resulted in a major DNA match for Leesa Marie and a minor match for Loden. Loden's fingerprints were found on the tape containing hair fibers that was attached to the Wal-Mart bag. The hair stuck to the tape was found to be microscopically similar to Leesa Marie's head hair.

The autopsy conducted by Dr. Steven Hayne concluded that Leesa Marie had died of "suffocation/manual strangulation" and listed the death as a "homicide". Dr. Hayne noted contusions on Leesa Marie's forehead, lower lip, the back of her neck, the apex of her scalp and on her right cheek. He further found that there were deep furrows in her wrist and ankles where she was tightly bound by the ligatures found on her body when she was discovered. Dr. Hayne also found contusions on her left arm which he stated were consistent with defensive posturing injuries. Dr. Hayne further found contusions on her chest, her back, her buttocks, her rectum and her anus. There were also lacerations to her rectum and anus. Dr. Hayne stated that the lacerations and contusions to the rectum and anus were consistent with

penetration. His examination of her genitalia revealed extensive contusions and lacerations to her labia majora, labia minora, introitus and her vaginal vault consistent with penetration. The photographs taken during the autopsy demonstrate the extensive trauma to both the vaginal and anal area of Leesa Marie.

Loden moved for and was granted two mental examinations one at the State Hospital and another by Dr. C. Gerald O'Brien. The staff at the State Hospital found Loden to be competent to stand trial, competent to assist in his defense, competent to waive his constitutional rights. The staff further found that he knew the nature and quality of his acts and knew the acts were wrong and that his capacity to appreciate the criminality of his conduct, or confirm his conduct at the time of the crime was not substantially impaired. They also found that he was not suffering from extreme mental or emotional disturbance at the time of the crime. *See* State's Exhibit No. 39.

Dr. O'Brien found that Loden's intellectual functioning was average to high average and showed no evidence of neuropsychological difficulties. His testing showed that Loden tended to exaggerate his psychological difficulties. He concluded that at the time of the crime, Loden was under the influence of extreme mental and emotional disturbance and distress, "although this probably did not rise to the level that he did know the nature and quality of his acts or the difference between right and wrong in relation to those acts at that time." He further found that Loden's "capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was substantially impaired." Finally,

he found Loden to be competent to stand trial and to assist in his own defense. Defendant's Exhibit No. 38. Both of the documents were introduced during the sentence phase of the trial.

Prior to the selection of the jury for the trial of this case, Loden informed the trial court that he wished to plead guilty to all counts of the indictment and to waive the jury for the sentence phase of this trial. He further instructed his attorneys not to place any evidence in mitigation or make any argument on his behalf during the sentence phase of the trial.

A joint Offer of Proof outlining the investigation, the crimes against Leesa Marie Gray and the agreement to the counts of the indictment was submitted to the trial court during the hearing on the guilty pleas. This document was signed by both the State and Loden. CP. 208-224. After viewing the videotape, hearing arguments from the State and a personal statement by Loden, the trial court took the matter of sentence under consideration. After consideration the trial court entered a sentencing order, in proper form, sentencing Loden to death. CP. 226-231.

## IV. SCOPE OF REVIEW

Petitioner filed his petition for writ of habeas corpus with this Court on October 18, 2004. As stated above, because this petition was filed after April 24, 1996, the provisions of Antiterrorism and Effective Death Penalty Act (AEDPA) apply with full force to this petition. *Nobles v. Johnson*, 127 F.3d.. 409 (5th Cir. 1997); *Williams v. Cain*, 125 F.3d 269, 273-74 (5th Cir. 1997); *McBride v. Johnson*, 118 F.3d 432, 436 (5th Cir. 1997) ("Because this

case comes within the parameters of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996), we apply the standard of review embodied in the AEDPA. *See Drinkard v. Johnson*, 97 F.3d 751 (5th Cir.1996), *cert. denied*, 502 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).").  *See also Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The petition presents several grounds for relief several of which were barred from consideration by the Mississippi Supreme Court on the basis of an adequate and independent state law procedural bar.  The Mississippi Supreme Court alternatively addressed the merits of these many of these claims, however, that alternative merits analysis does not vitiate the imposition of the procedural bar.  Petitioner has presented at least two claims in this petition that were never presented to the Mississippi Supreme Court in the context which they are presented to this Court and are therefore unexhausted.  However, they are also now barred from consideration as it would be futile to resort to the state court in an attempt to exhaust these claims.  The claims that are not barred were fully addressed on the merits by the Mississippi Supreme Court on direct appeal and/or on state post-conviction review.  The resolution of the merits of these claims do not represent a decision which is contrary to or an unreasonable application of clearly established United States Supreme Court precedent as announced by the United States Supreme Court.  Therefore, under the standards of review found in the AEDPA, habeas relief cannot be granted with respect to these claims.

The most sweeping change provided in the AEDPA is found in Section 104(3)

codified in 28 U.S.C. § 2254(d). This subsection provides as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

Thus, Loden's claims involving mixed questions of law and fact are governed by the dictates of § 2254(d), which holds that a federal court cannot grant habeas corpus relief unless it determines that the state court's decision involved an unreasonable application of the law to the facts. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Moore v. Johnson*, 101 F.3d 1069, 1075-76 (5th Cir. 1996) (*citing Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th Cir. 1996)).[6]

This "unreasonable application" standard of review of state court decisions does not mean that a federal court may grant habeas relief based on a simple disagreement with the state court decision; such a standard would amount to nothing more than a de novo review. *Drinkard*, 97 F.3d at 768. Instead, a federal habeas court can grant habeas relief only if the

---

[6]While *Moore* and *Drinkard* incorrectly applied the AEDPA retroactively to habeas corpus petitions pending prior its enactment, the manner in which the AEDPA will be applied in a proper case is controlling on this case. *McBride v. Johnson*, 118 F.3d 432, 436 (5th Cir. 1997).

20

state court decision was unreasonable.  In *Williams v. Taylor, supra*, the Supreme Court held:

> Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

529 U.S. at 411.

The Court further stated in *Williams*,

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-413.

"In effect, a reasonable, good faith application of Supreme Court precedent will immunize the state court conviction from federal habeas reversal."  *Mata v. Johnson*, 99 F.3d 1261, 1268 (5th Cir. 1996), *vacated in part on other grounds*, 105 F.3d 209 (5th Cir. 1997).

Loden has failed to demonstrate how, and respondents assert he cannot show, the resolution of the claims raised on direct appeal or state post-conviction review "resulted in

a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time of the direct appeal and post-conviction review litigation. Further, any claims of ineffective assistance of counsel being questions of mixed law and facts do not present decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. Loden has not stated a claim on which relief can be granted.

The long standing requirement of deference to factual findings made by state courts remains intact in the amendments to § 2254. Section 2254(e) reads:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

However, the AEDPA changed the standard of proof that a petitioner must adduce to rebut the presumption of correctness of state court findings of fact. The standard is no longer a preponderance of the evidence standard, but the higher standard of clear and convincing evidence. Loden cannot meet the burden to overcome the findings of fact made by the State courts by clear and convincing evidence. *See Patterson v. Dretke*, 370 F.3d 480, 484 (5th Cir. 2004); *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004).

In cases governed by the AEDPA, 28 U.S.C. § 2254, the analysis differs depending upon whether the issue is one of law, fact, or both. *See Drinkard v. Johnson*, 97 F.3d 751,

767-68 (5th Cir.1996). For questions of fact, habeas relief may be granted only if the Court finds that the state court made a determination of fact which was unreasonable in light of the evidence presented to it. *See* 28 U.S.C. § 2254(d)(2); *Drinkard*, 97 F.3d at 767-68. When reviewing such factual determinations, the Court must presume correct the factual findings of the state court, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir.1997). When considering questions of law, on the other hand, this Court may grant habeas relief only if the state court's determination of law is contrary to "clearly established" Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *Drinkard*, 97 F.3d at 768. The Fifth Circuit, in *Jones v. Dretke*, 375 F.3d 352 (5th 2004), explained this requirement, stating:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . . 28 U.S.C. § 2254(d) (emphasis added). The Supreme Court, interpreting § 2254(d)(1), held that "a state-court decision is . . . contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In order to find that a state adjudication is objectively unreasonable, "the state court's application [of federal law] must be more than merely incorrect." *Robertson v. Cockrell*, 325 F.3d 243, 248 (5th Cir.2003) (*en banc*)

> 375 F.3d at 353 -354.

23

Thus, the state court resolution of a claim must "not only be erroneous, but objectively unreasonable" in order for habeas relief to be granted. *Yarborough v. Alvarado*, 541 U.S. 652, 665-66 (2004); *Middleton v. McNeil*, 541 U.S. 433, 436 (2004); *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *Williams v. Taylor*, 529 U.S. 362, 409 (2000). In *Holland v. Jackson*, 542 U.S. 649 (2004), the United States Supreme Court gave the federal habeas courts the following admonition:

> As we explained in *Visciotti*, § 2254(d) requires that "state-court decisions be given the benefit of the doubt." *Id*., at 24, 123 S.Ct. 357. "[R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Ibid*. The Sixth Circuit ignored those prescriptions.

> 542 U.S. at 655.

*See Woodford v. Visciotti*, 537 U.S. 19 (2002).

In *Amos v. Thornton*, 646 F.3d 199(5th Cir. 2011), the Fifth Circuit addressed the latest law regarding the application of § 2254(d)(1). The court held:

> Section 2254(d)(1) imposes a "'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'"[9] It is not enough for a petitioner to show that a state court's decision was incorrect or erroneous; he must show that the decision was objectively unreasonable, which is "a substantially higher threshold."[10] Very few petitioners can make this showing.[11] "*As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*."[12] In assessing the reasonableness of a state court's application of clearly established federal law, *our review "is limited to the record that was before the state court*."[13]

---

9. *Cullen v. Pinholster*, ⸺ U.S. ⸺, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)).

10. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *see also Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

11. *See Harrington v. Richter*, ⸺ U.S. ⸺, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) ("*It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.... If this standard is difficult to meet, that is because it was meant to be.*").

12. *Id*. at 786–87.

13. *Pinholster*, 131 S.Ct. at 1398.

646 F.3d at 204-05. [Emphasis added.]

On the question of § 2254(d)(2), the Fifth Circuit in *Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) held:

> Section 2254(d)(2) commands substantial deference to the factual determinations made by state courts.[16]  It is not enough to show that a state court's decision was incorrect or erroneous.  A petitioner must show that the decision was objectively unreasonable, "a substantially higher threshold."[17] To clear that threshold, the petitioner must show that "a reasonable factfinder *must* conclude" that the state court's determination of the facts was unreasonable.[18]  *"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."*[19]

---

16. *See Brown v. Dretke*, 419 F.3d 365, 371 (5th Cir.2005) ("With respect to the review of factual findings, AEDPA significantly restricts the scope of federal habeas review."), *cert. denied*, 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *see also Hogues v. Quarterman*, 312 Fed.Appx. 684, 686 (5th Cir.) (per curiam) (unpublished) (describing 28 U.S.C. § 2254(d)(2) & (e)(1) as "highly deferential to the state court"), *cert. denied sub nom. Hogues*

25

*v. Thaler*, —— U.S. ——, 130 S.Ct. 373, 175 L.Ed.2d 143 (2009).

17. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *see also Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

18. *Rice v. Collins*, 546 U.S. 333, 341, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (emphasis added); *see also Miller–El v. Dretke*, 545 U.S. 231, 275, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (Thomas, J., dissenting) (explaining that a petitioner is not entitled to relief under § 2254(d)(2) unless he can "show that, based on the evidence before the Texas state courts, the only reasonable conclusion was that" a constitutional violation occurred).

19. *Wood*, 130 S.Ct. at 849, 130 S.Ct. 841; *see also Collins*, 546 U.S. at 342, 126 S.Ct. 969 (stressing that AEDPA forbids a federal court from using "a set of debatable inferences" to set aside a state court's factual determination). Discussing § 2254(d) generally, the Supreme Court recently explained that a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 786–787, 178 L.Ed.2d 624 (2011).

665 F.3d at 654-55. [Emphasis the Court's and emphasis added.]

Looking to mixed questions – that is, those containing issues of law and fact – the Fifth

Circuit held in *Patterson v. Dretke*,  370 F.3d 480 (5th Cir. 2004):

"Section 2254(d)(1) provides the standard of review for questions of law and mixed questions of law and fact." *Caldwell v. Johnson*, 226 F.3d 367, 372 (5th Cir.2000).   A state court's decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412- 13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  A decision "involve[s] an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court identifies the correct governing legal principle from th[e] Court's decisions but

26

unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413, 120 S.Ct. 1495.

370 F.3d at 483-84.

*See Williams v. Taylor*, 529 U.S. 362, 412- 13 (2000); *Haley v. Cockrell*, 306 F.3d 257, 263 (5th Cir. 2002); *Carter v. Johnson*, 110 F.3d 1098, 1106-08 (5th Cir.) ("With a mixed question of law and fact, the facts are presumed correct and then the law is reviewed for reasonableness, not de novo."). These are the standards that must be applied by this Court in determining the claims made in this case.

Habeas relief generally may not be premised on rules of constitutional law that have yet to be announced or that were announced after the challenged conviction became final. *See Teague v. Lane*, 489 U.S. 288, 305-07 (1989). *See also Schriro v. Summerlin*, 542 U.S. 348 (2004); *Beard v. Banks*, 542 U.S. 406 (2004). In explaining what rules are to be retroactively applied the United States Supreme Court, in *Tyler v. Cain*, 533 U.S. 656(2001), held:

> The Supreme Court does not "ma[k]e" a rule retroactive when it merely establishes principles of retroactivity and leaves the application of those principles to lower courts. In such an event, any legal conclusion that is derived from the principles is developed by the lower court (or perhaps by a combination of courts), not by the Supreme Court.[4] *We thus conclude that a new rule is not "made retroactive to cases on collateral review" unless the Supreme Court holds it to be retroactive.*[5]

_____
4. Similarly, the Supreme Court does not make a rule retroactive through dictum, which is not binding. *Cf. Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (contrasting dictum with holdings, which include the final disposition of a case as well as the preceding determinations "*necessary* to that result" (emphasis added)).

5. Tyler argues that defining "made" to mean "held" would create an anomaly: When it is obvious that a rule should be retroactive, the courts of appeals will not be in conflict, and this Court will never decide to hear the case and will never make the rule retroactive. Thus, Tyler concludes, we should construe § 2244(b)(2)(A) to allow for retroactive application whenever the "principles" of our decisions, as interpreted by the courts of appeals, indicate that retroactivity is appropriate. This argument is flawed, however. First, even if we disagreed with the legislative decision to establish stringent procedural requirements for retroactive application of new rules, we do not have license to question the decision on policy grounds. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Second, the "anomalous" result that Tyler predicts is speculative at best, because AEDPA does not limit our discretion to grant certiorari to cases in which the courts of appeals have reached divergent results.

533 U.S. at 663. [Emphasis added.]

Thus, no new rule can be retroactively applied unless the Supreme has specifically held it to have retroactive application.

Further, even if the Court finds error in some aspect of the case, before the Court can grant habeas relief, the Court must also conduct a harmless error analysis under the dictates of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (*Brecht* standard applies even if state court did not apply *Chapman* harmless error on direct review or did not apply harmless error review at all.); *Kittelson v. Dretke*, 426 F.3d 306, 320-21 (5th Cir. 2005); *Nixon v. Epps*, 405 F.3d 318, 328-332 (5th Cir. 2005), *cert. denied*, 546 U.S. 1016, *reh. and stay of execution denied*, 546 U.S. 1083 (2005); *Billiot v. Puckett*, 135 F.3d 311 (5th Cir. 1998), *cert. denied*, 525 U.S. 966 (1998). Any constitutional error found, must be subjected to an analysis of whether the "error had a substantial and injurious effect or influence in determining the jury's verdict."

28

507 U.S. at 637.

Basically, in order for habeas relief to be granted to petitioner, this Court must find that the State court resolution of the claims raised were contrary to or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Jones v. Dretke*, 375 F.3d 352, 354 (5th Cir. 2004).

Respondents would further point out that petitioner is not entitled to an evidentiary hearing on any of the claims presented in this petition. *See Cullen v. Pinholster*, ___U.S. ___, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). The Fifth Circuit has recognized this precedent in the recent case of *Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011), holding:

> The Supreme Court has recently clarified the evidentiary scope for a reviewing court's habeas analysis under § 2254(d)(1). *See Cullen v. Pinholster*, ___U.S. ___, *131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)*. Before *Pinholster*, federal courts generally relied on § 2254(e)(2) to determine whether an evidentiary hearing was appropriate in a habeas case. Section 2254(e)(2) prohibits a district court from holding an evidentiary hearing to develop the factual basis of a claim previously asserted in state court unless a petitioner's claims meets certain exceptions. *Pinholster*, 131 S.Ct. at 1400–01. In *Pinholster*, the Court held that § 2254(e)(2) was not applicable to § 2254(d)(1) petitions such as Pape's. *Id*. at 1398, 1400–01. Instead, the Court analyzed the language of § 2254(d)(1) and held that habeas "review under § 2554(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398. *The Court concluded that § 2254(d)(1) bars a district court from conducting such an evidentiary hearing because the statute "requires an examination of the state court decision at the time it was made," which limits the record under review to "the record in existence at that same time i.e., the record before the state court."* *Id*.

645 F.3d at 287-88. [Emphasis added.]

*See Williams v. Thaler* . 684 F.3d 597, 603 (5th Cir.,2012); *Halley v. Thaler* . 448 Fed.Appx. 518, 524-525,(5th Cir.,2011); *McCamey v. Epps*, 658 F.3d 491, 497 (5th Cir.. 2011).

Further, many of the substantive claims Loden presents here were held to be procedurally barred from consideration on direct appeal or state post-conviction review. Thus, this Court is similarly barred from consideration of these claims as they rest on the adequate and independent state law ground of procedural bar or waiver. *See Wainwright v. Sykes*, 433 U.S. 72 (1977); *Coleman v. Thompson*, 501 U.S. 722 (1991); *Ylst v. Nunnemaker*, 501 U.S. 797 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). Further, in those instances where the state court has imposed a procedural bar and then gone on to address the merits of the claim, the procedural bar must be recognized by this Court as a bar to consideration of the merits of that claim. *See Harris v. Reed*, 489 U.S. 255, 264, n. 10 (1989).

In *Gray v. Netherland*, 518 U.S. 152 (1996), the United States Supreme Court held:

. . . Title 28 U.S.C. § 2254(b) bars the granting of habeas corpus relief "unless it appears that the applicant has exhausted the remedies available in the courts of the State." Because "[t]his requirement . . . refers only to remedies still available at the time of the federal petition," *Engle v. Isaac,* 456 U.S. 107, 125, n. 28, 102 S.Ct. 1558, 1570, n. 28, 71 L.Ed.2d 783 (1982), it is satisfied "if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law," *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989). However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default. *Teague v. Lane, supra,* at 298, 109 S.Ct., at 1068-1069; *Isaac, supra,* at 125, n. 28, 129, 102 S.Ct., at 1570, n. 28, 1572; *Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S.Ct. 2497, 2508-2509, 53 L.Ed.2d 594 (1977).

518 U.S. at 161-162.

30

Earlier in *Teague v. Lane*, 489 U.S. 288 (1989), the Court held:

. . . "It is well established that 'where an appeal was taken from a conviction, the judgment of the reviewing court is *res judicata* as to all issues actually raised, and those that could have been presented but were not are deemed waived.'" *People v. Gaines,* 105 Ill.2d 79, 87-88, 85 Ill.Dec. 269, 274, 473 N.E.2d 868, 873 (1984) (citation omitted), cert. denied, 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 282 (1985). The default prevents petitioner from raising the *Swain* claim in collateral proceedings under the Illinois Post-Conviction Act, Ill.Rev.Stat., ch. 38, ¶ 122-1 *et seq.* (1987), unless fundamental fairness requires that the default be overlooked. *People v. Brown,* 52 Ill.2d 227, 230, 287 N.E.2d 663, 665 (1972).

The fundamental fairness exception is a narrow one, and has been applied in limited circumstances. Compare *People v. Goerger*, 52 Ill.2d 403, 406, 288 N.E.2d 416, 418 (1972) (improper instruction on reasonable doubt "does not constitute such fundamental unfairness as to obviate the *res judicata* and waiver doctrines"), with *People v. Ikerd,* 47 Ill.2d 211, 212, 265 N.E.2d 120, 121 (1970) (fundamental fairness exception applies "where the right relied on has been recognized for the first time after the direct appeal"), and *People v. Hamby,* 32 Ill.2d 291, 294-295, 205 N.E.2d 456, 458 (1965) (fundamental fairness exception applies to claims that defendant asked counsel to raise on direct appeal). It is clear that collateral relief would be unavailable to petitioner. *See People v. Beamon,* 31 Ill.App.3d 145, 145-146, 333 N.E.2d 575, 575-576 (1975) (abstract of decision) (not invoking fundamental fairness exception and holding that *Swain* claim not raised on direct appeal could not be raised for the first time in collateral proceedings). As a result, petitioner has exhausted his state remedies under 28 U.S.C. § 2254(b) with respect to the *Swain* claim. See *Engle v. Isaac,* 456 U.S. 107, 125-126, n. 28, 102 S.Ct. 1558, 15701571, n. 28, 71 L.Ed.2d 783 (1982); *United States ex rel. Williams v. Brantley,* 502 F.2d 1383, 1385-1386 (CA7 1974).

Under *Wainwright v. Sykes,* 433 U.S. 72, 87-91, 97 S.Ct. 2497, 2506-2509, 53 L.Ed.2d 594 (1977), petitioner is barred from raising the *Swain* claim in a federal habeas corpus proceeding unless he can show cause for the default and prejudice resulting therefrom. See *Engle v. Isaac, supra,* 456 U.S., at 113-114, 117, 124-135, 102 S.Ct., at 1564-1565, 1566, 1570-1576 (applying procedural default rule to claim that had never been raised in state court). Petitioner does not attempt to show cause for his default. Instead, he argues that the claim is not barred because it was addressed by the Illinois Appellate

Court. Cf. *Caldwell v. Mississippi*, 472 U.S. 320, 327- 328, 105 S.Ct. 2633, 2638-2639, 86 L.Ed.2d 231 (1985). We cannot agree with petitioner's argument. The Illinois Appellate Court rejected petitioner's Sixth Amendment fair cross section claim *without* mentioning the Equal Protection Clause on which *Swain* was based or discussing whether *Swain* allows a prosecutor to be questioned about his use of peremptory challenges once he volunteers an explanation. See *People v. Teague,* 108 Ill.App.3d, at 895-896, 64 Ill.Dec., at 405, 439 N.E.2d, at 1070. Accordingly, we hold that petitioner' *Swain* claim is procedurally barred, and do not address its merits.

Our application of the procedural default rule here is consistent with *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), which holds that a "procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar" (citations and internal quotations omitted). The rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding. It is simply inapplicable in a case such as this one, where the claim was never presented to the state courts. *See id.,* at 268- 270, 109 S.Ct., at 1046-1047 (O'CONNOR, J., concurring).

489 U.S. at 297-299.

Any claim that has not been fairly presented to the state courts is unexhausted. Under the provisions of § 99-39-5 (2)[7] and § 99-39-27 (9)[8], petitioner cannot now exhaust these claim as they would be barred from consideration. Therefore, this Court must hold any such claims to be procedurally barred from consideration on federal habeas review unless petitioner demonstrates cause and actual prejudice to overcome the bar to the consideration of the claims. Petitioner has shown neither in this case.

---

[7]One year statute of limitations barr.

[8]Successive petition bar.

32

## THE CLAIMS

**I. LODEN'S COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE OF COUNSEL WHICH CAUSED HIM TO ENTER A GUILTY PLEA TO CAPITAL MURDER AND WAIVE A SENTENCING JURY IN HIS CAPITAL MURDER TRIAL.**

Petitioner has grouped all of the ineffective assistance of counsel claims under this one main heading, but has divided it into several sections. Each will be addressed separately. However, the decision of the Mississippi Supreme Court on each of these issues is neither contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, nor do they represent an unreasonable determination of the facts as found in the record.

Respondents would first point out that the Mississippi Supreme Court identified the correct precedent to be applied to the ineffective assistance of counsel claims and then applied it to the individual claims. In the first post-conviction opinion the Court stated:

### Ineffective Assistance of Counsel

¶ 61. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. In evaluating counsel's performance:

> [f]irst, the defendant must show that *counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance *prejudiced* the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that

33

renders the result unreliable.

*Id*. at 687, 104 S.Ct. 2052 (emphasis added). "[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697, 104 S.Ct. 2052. This Court finds that the circuit court was not "clearly erroneous" in finding that counsel's performance was not deficient. *Brown*, 731 So.2d at 598.

971 So.2d at 573-74. [Emphasis the Court's]

In the second post-conviction petition prior to addressing the individual claims the

Court held:

## I. Loden was denied his constitutional right to effective assistance of counsel guaranteed by the United States and Mississippi Constitutions.

¶ 11. Loden was represented at trial by Johnstone and Daniels. Prior to representing Loden, Johnstone had been a part-time public defender since 1994 and had represented defendants in two prior capital-murder cases, one of which resulted in a verdict of life without parole. Prior to representing Loden, Daniels had been a public defender since 1996 and had represented defendants in two prior capital-murder cases, one of which resulted in a directed verdict of acquittal. Regarding the representation of defendants in capital cases, Daniels stated "[i]t's what I did."

¶ 12. According to Daniels, as the trial date approached, the State made no plea offers to Loden, as "it was a situation where he was either going to have to plead guilty to the indictment in its entirety or go to trial on the indictment."[12] Daniels stated that:

probably latter part of August, maybe end of September ... [Loden] said before that ... he didn't want the case to go to trial. We had prevailed upon him that we needed to prepare for trial and that we needed to try and get this case in the ... most favorable posture we could. That's the reason we were filing these motions, but at some point he said, I'm not going to trial, I'm not going to. He didn't want to plead but he didn't want to go to trial.

34

Nonetheless, Daniels and Johnstone continued to prepare for trial.[13] Thereafter, according to Johnstone, "Loden came to us and ... indicated that he didn't want to proceed anymore, *he wanted to plead guilty, he didn't want to put the family through a trial*."[14] (Emphasis added.)

¶ 13. On September 21, 2001, seventeen days before the scheduled trial date of October 8, 2001, Loden formally waived his right to a jury at trial and in sentencing; pleaded guilty to all six counts in the indictment; waived presentation of mitigation evidence in sentencing, as well as any cross-examination of the State's witnesses[15] or objection to the introduction of evidence presented by the State;[16] admitted responsibility and culpability to the victim's family for "taking an irreplaceable element out of your world;" and made a brief statement of apology.[17] Notwithstanding Loden's waiver, Daniels made a brief statement summarizing the mitigation evidence which would have been offered on behalf of Loden.[18] *See* footnote 4, *supra*. The circuit court subsequently found "that the aggravating circumstances outweigh the mitigating circumstances and that the mitigating circumstances do not outweigh the aggravating circumstances and that the death penalty should be imposed."

¶ 14. Loden now claims that his trial counsel's "failure to perform any mitigation investigation, to litigate pre-trial motions competently, to assist the independent psychologist in his evaluation of Loden, to advise Loden competently regarding his guilty plea and sentencing, and to present any mitigation evidence resulted in a denial of Loden's Sixth Amendment right to competent counsel."

¶ 15. This Court has stated that:

[u]nder *Strickland*[19] ... the Court makes a *two-pronged inquiry; first*, a defendant must show that counsel's performance was *deficient* by identifying specific acts and omissions. *Counsel's conduct, viewed as of the time of the actions taken, must have fallen outside of a wide range of reasonable professional assistance*.[20] *The attorney's actions are strongly presumed to have fallen within that range*, and a court must examine counsel's conduct without the use of judicial hindsight.[21] *Secondly*, a defendant must show that the *deficient performance was prejudicial*, that is, that there is *a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different*. A reasonable probability is

a probability sufficient to undermine confidence in the outcome.

*Wiley v. State*, 517 So.2d 1373, 1378 (Miss.1987) (emphasis added).

_____

12. As Daniels stated, Loden "was up against it evidentiary wise."

13. According to Daniels, "I was going to be prepared for trial no matter what[,]" and "I wasn't going to wait for him to make up his mind."

14. This comports with Dr. O'Brien's report which "reveals the mindset of Loden within thirty days before his pleas of guilty, stating, in part, that: ['][Loden] makes a point of telling me 'I don't want life,' in prison, and that he would like to plead so that he will receive the death penalty.[']"  *Loden*, 971 So.2d at 555.

15. According to Johnstone, Loden was "[v]ery firm" and "adamant" in his request for no cross-examination of the State's witnesses and no presentation of mitigation evidence at sentencing.

16. The evidence presented at sentencing included a summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital and the report of Loden's independent psychologist, Dr. O'Brien.

17. For details of the proceedings, see paragraph 4, *supra* (quoting *Loden*, 971 So.2d at 552-61).

18. According to Daniels, "I wanted the [c]ourt to know ... that there was some evidence that could be put on but that [Loden] elected not to do it[,]" and "I was hoping to impress the [j]udge with ... some of the good things Loden had done and some of the bad things that may have prompted him doing what he did."

19. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

20. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.

21. A "fair assessment of attorney performance requires that every effort be

made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Byrom v. State*, 927 So.2d 709, 714 (Miss.2006) (quoting *Stringer v. State*, 454 So.2d 468, 477 (Miss.1984)).

43 So.3d at 378-80. [Emphasis the Court's.]

Clearly, the Mississippi Supreme Court correctly identified the correct precedent to be applied to petitioner's claims. Respondents submit that the state court properly applied these precedents in this case.

**A. Guilty plea**.

Loden presented the claim that the erroneous and incompetent advice of counsel caused him to plead guilty to capital murder and to waive the sentencing jury in his case to the Mississippi Supreme Court in the first post-conviction petition which challenged the guilty plea.[9] The Mississippi Supreme Court, in its first opinion, held:

**VII. Whether alleged erroneous advice of trial counsel prejudiced Loden by causing him to enter an involuntary guilty plea to capital murder.**

¶ 57. Loden has disingenuously presented argument that he:

pled guilty to capital murder, relying on trial counsel's erroneous advice that he could still appeal adverse rulings on pre-trial motions after entering the guilty plea. This advice, of course, is not the law.... Consequently, this plea was involuntary. A plea of guilty is not binding upon a criminal defendant unless it is entered voluntarily and intelligently.

Loden loosely attempts to undergird his argument, offering:

---

[9]This post-conviction petition was consolidated with the direct appeal of the sentence phase of his case.

37

the letter to trial counsel less than two months before the plea [August 2, 2001], letter to trial court less than six months after the plea [March 14, 2002] and after numerous attempts to contact counsel, the plea colloquy itself, the affidavit of trial counsel, the Designation of Record filed by trial counsel now employed by the district attorney [Daniels] and the trial court's clear misunderstanding of the legal question at issue in this case.

As such, he unpersuasively asserts that the ineffective-assistance-of-counsel standard set forth in *Strickland* is met. Specifically, Loden argues, deficient performance exists in counsel "erroneously advising [that] he could appeal his conviction based on a guilty plea[,]" and prejudice exists, in that "he would not have pled guilty but for the erroneous advice of counsel." Therefore, he asserts that "the guilty plea to capital murder must be vacated."

¶ 58. In response, the State contends that Loden "failed to sustain his burden of proof by a preponderance of evidence that he would not have plead[ed] guilty, but for the alleged incorrect advice of trial counsel regarding his right to appeal." In short, the State maintains that Loden's argument is based on self-serving testimony and a skewed interpretation of the guilty plea colloquy and affidavit of trial counsel. According to the State:

the claim Loden makes is that he was not advised that by pleading guilty he would not get a direct appeal of his conviction. That question was specifically asked during the plea colloquy and Loden answered that he understood that by pleading guilty he would not get a direct appeal of his conviction. Further, the affidavit of his trial attorney, furnished to the trial court by Loden, states without reservation that Loden was informed that by pleading guilty he would not get a direct appeal of the conviction.

In total, the State asserts that the circuit court's rejection of "Loden's post-plea claim that he had not been properly advised of the consequence of a guilty plea on his right to appeal[,]" and subsequent denial of post-conviction relief, was not clearly erroneous.

¶ 59. "When reviewing a lower court's decision to deny a petition for post conviction relief this Court will not disturb the trial court's factual findings unless they are found to be *clearly erroneous*." *Brown v. State*, 731 So.2d 595, 598 (Miss.1999) (citing *Bank of Mississippi v. Southern Mem'l*

38

*Park, Inc.*, 677 So.2d 186, 191 (Miss.1996)) (emphasis added). In making that determination, "[t]his Court must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact....'" *Mullins v. Ratcliff*, 515 So.2d 1183, 1189 (Miss.1987) (quoting *Cotton v. McConnell*, 435 So.2d 683, 685 (Miss.1983)). That includes deference to the circuit judge as the "sole authority for determining credibility of the witnesses." *Mullins*, 515 So.2d at 1189 (citing *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963)). Before the circuit court, Loden bore the burden of "proof by a preponderance of the evidence" that he was entitled to post-conviction relief. *See* MISS .CODE ANN. § 99-39-23(7) (Rev.2007); *Lambert v. State*, 941 So.2d 804, 811 (Miss.2006).

### *Voluntariness*

¶ 60. While there is "not a per se rule prohibiting collateral attack on a plea in all circumstances, simply because the transcript on its face reflects recitation of voluntariness and awareness of the consequences[,]" *Baker v. State*, 358 So.2d 401, 403 (Miss.1978), there is " a *strong presumption of validity of anyone's statement under oath*." *Holt v. State*, 650 So.2d 1267, 1270 (Miss.1994) (emphasis added). According to this Court:

> [a] plea of guilty is not binding upon a criminal defendant unless it is entered voluntarily and intelligently. *Myers v. State*, 583 So.2d 174, 177 (Miss.1991). A plea is deemed "voluntary and intelligent" only where the defendant is advised concerning the nature of the charges against him and the consequences of the plea. *See Wilson v. State*, 577 So.2d 394, 396-97 (Miss.1991). Specifically, the defendant must be told that a guilty plea involves a waiver of the right to trial by jury, the right to confront adverse witnesses, and the right to protection against self-incrimination.... Rule 3.03 of the Uniform Criminal Rules of Circuit Court Practice additionally requires, inter alia, that the trial judge "inquire and determine" that the accused understands the maximum and minimum penalties to which he may be sentenced.

*Alexander v. State*, 605 So.2d 1170, 1172 (Miss.1992). Furthermore, this Court has held "that when the trial court questions the defendant and explains his rights and the effects and consequences of the plea on the record, the plea is rendered voluntary despite advice given to the defendant by his attorney."

*Harris v. State*, 806 So.2d 1127, 1130 (Miss.2002). The record clearly reflects that Judge Gardner expressly informed Loden of the charges against him; the consequences of his guilty plea, including the minimum and maximum penalties in sentencing; and the implications of waiving his right to trial by jury, right to confront adverse witnesses, and right to protection against self-incrimination. Furthermore, Loden affirmatively stated under oath that his guilty pleas were "free and voluntary." Thereafter, Loden pleaded guilty to all charges. As such, this Court finds that the circuit court was not "clearly erroneous" in finding that Loden's guilty plea was "knowing and voluntary." *Brown*, 731 So.2d at 598.

### Ineffective Assistance of Counsel

¶ 61. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. In evaluating counsel's performance:

> *[f]irst*, the defendant must show that *counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance *prejudiced* the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687, 104 S.Ct. 2052 (emphasis added). "[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697, 104 S.Ct. 2052. This Court finds that the circuit court was not "clearly erroneous" in finding that counsel's performance was not deficient. *Brown*, 731 So.2d at 598.

¶ 62. Johnstone's affidavit provides that he and Daniels "advised [Loden] that by pleading guilty he was *waiving his right to direct appeal*." (Emphasis added). Furthermore, Loden responded to the following questions from Circuit Judge Gardner, as follows:

Q. ... Do you understand that as to each of the charges, Counts I through VI, if you proceeded to trial before a jury and if the jury found you guilty of those charges and returned a verdict fixing the penalty at whatever they might fix it, in any event, the question of your guilt or innocence or imposition of the punishment determined by the jury *would be something that you could appeal to the Supreme Court of this state*?

A. *Yes*, sir, I understand.

...

Q. *Do you understand that if you proceed through the course of this and the Court makes a determination of your guilt, you will have no right to appeal that*? ...

A. *Yes*, sir.

(Emphasis added). Loden attempts to prop this unpersuasive claim upon a self-serving affidavit and dubious testimony mixed with evasive responses at the post-conviction relief hearing. He contests Johnstone's affidavit insofar as it provides that "I told Loden that this automatic review would be some sort of appeal but that was unclear to us which issues would be subject to review." Circuit Judge Gardner considered all evidence and arguments, and then concluded:

a review of the record reveals there is no merit to [Loden's] claim of ineffective assistance of counsel based on allegations that his attorney did not properly advise him, that by pleading guilty, he was waiving his right to appeal. Specifically, at the guilt plea hearing, the Court advised [Loden] of his rights. [Loden] acknowledged that he was giving up his right to appeal by pleading guilty to the charge.

It was the trial court's responsibility to assess Loden's credibility. *See Mullins*, 515 So.2d at 1189. It is obvious that the circuit judge considered prior proceedings and the entire record before him, including Loden's testimony, Loden's prior letters to Johnstone and the circuit court, affidavits of Loden and Johnstone, and the plea colloquy. The lower court rejected Loden's pretext and found no deficiency in counsel before Loden pleaded guilty and waived his right to appeal. This Court, accepting all evidence reasonably supporting that

41

finding and the reasonable inferences therefrom,[20] *see id.*, finds no support for the proposition that the circuit court's conclusion that counsel's performance was not deficient was "clearly erroneous." *Brown*, 731 So.2d at 598. This issue is without merit.

_____

20. For instance, a reasonable inference regarding Johnstone's affidavit on automatic review is that he was simply advising Loden to get all matters on the record because, while he was uncertain which specific issues this Court would address, he was certain that this Court would only address issues of record.

971 So.2d at 572-74. [Emphasis the Court's.]

Respondents submit that this decision of the state court is neither contrary to or an unreasonable application of *Strickland*.

In his post-conviction petition of the sentence phase, petitioner again asserted the claim that counsel was ineffective regarding the entry of his guilty plea. The Mississippi Supreme Court held:

**(E) Trial counsel provided ineffective assistance by providing erroneous advice to Loden.**

¶ 40. Issue VII in Loden's first post-conviction-relief appeal addressed "[w]hether alleged erroneous advice of trial counsel prejudiced *Loden* by causing him to enter an involuntary guilty plea to capital murder." *Loden*, 971 So.2d at 562. This Court concluded that Loden's guilty plea was "knowing and voluntary[,]" and that his claim of ineffective assistance of counsel was "without merit," as defense counsel's performance was not deficient. *See* paragraph 6, *supra* (quoting *Loden*, 971 So.2d at 573-74).

¶ 41. Notwithstanding this Court's earlier ruling, Loden urges that this ineffective-assistance-of-counsel argument is not procedurally barred because Johnstone's 2008 affidavit and Daniels's 2009 affidavit constitute "evidence, not reasonably discoverable at the time of trial" (*see* MISS. CODE ANN. §§ 99-39-23(6), 99-39-27(9) (Rev.2007), which "provides an exception to any claimed procedural bar.").

42

¶ 42. Johnstone's 2008 affidavit provides, in pertinent part, that:

> Loden wanted to know whether, if he pleaded guilty, he could appeal, and in particular whether he could appeal from the [c]ircuit [c]ourt's adverse pre-trial rulings including the rulings on the suppression motions. I told Loden that if he *pleaded guilty* and was sentenced to death, the Mississippi Supreme Court would *review his sentence*, and that they would review everything that was in the record. I told Loden that I believed that (1) the rulings on the suppression motions, (2) the order denying the request for funds to hire a mitigation specialist, and (3) the use of Loden's wife Kat to induce Loden to talk with the police on June 30, 2000 *were issues that might be reviewed that were potentially viable*.

(Emphasis added.) In his subsequent deposition, Johnstone explained this statement to Loden's present counsel as follows:

> I believe the language reviewed that were potentially viable was language back and forth between you and I ... on this affidavit.... *I told Loden that I did not know what the ... Supreme Court or any other court ... would review ... in their automatic review should he get the death penalty*.

> ...

> I knew the statute said that it would be an automatic review, and, therefore, I told him that rather than say they would review certain things or would not review certain things, I said, I do not know what they would review.... *[P]otentially viable is a term that I would say would mean I don't know whether they would review them or not*.

> *That meaning that they might review them or they might not, but that the direct appeal would not be available to him if he ... plead guilty. Specifically he would be told that he could not appeal a ... guilty plea.* ***That in order to ... preserve for sure*** any of his appealable grounds, it's like Daniels said, ***he had to go to trial and have a jury verdict***.

(Emphasis added.) Daniels's 2009 affidavit provides that:

> Loden asked me whether if he pleaded guilty to Capital Murder he

43

could appeal his case. *I told him there would be no direct appeal by us*, but that the Mississippi Supreme Court would automatically review a sentence of death. I told him that we could not guarantee him exactly what the Court might do, or not do upon such review. ***I told [Loden] if he wanted to directly appeal*** *and assign particular grounds for reversal of his conviction,* ***that would be best served by going to trial.***

(Emphasis added.)  Daniels's subsequent deposition testimony adds that:

A. ... ***The answer was always the same and unequivocal,*** *... if he plead guilty, he could not appeal his case.  And* ***that if he wanted to appeal those issues that he was unhappy with what had been decided by the [c]ourt, he would need to go to trial.***

I did tell him that if the [j]udge gave him the death penalty or if a jury gave him the death penalty, that the Supreme Court would review his sentence. And *I'm aware that's one of the provisions that the Supreme Court makes is whether or not the evidence supports the [j]udge's findings.*

...

*[A]t no time did I ever tell him that he could appeal this or that the Supreme Court would reconsider those suppression issues or not.* Because I can't tell the Supreme Court what they're going to look at and not look at ... ***he understood that there would be no appeal.***

...

Q. So what did you tell him that the Supreme Court was going to review?

A. The [j]udge's finding, the [j]udge's sentence, whether or not evidence supported the sentence, whether or not there was a proper finding regarding the aggravators and mitigators, whether or not he killed, attempted to kill, whether legal [sic] force had been contemplated and those types of things. And he's a reasonably intelligent person.  He understood all of that.

(Emphasis added.)

44

¶ 43. In light of the circuit court's and this Court's earlier denial of post-conviction relief, see paragraph 40, *supra*, *this Court finds that this issue is procedurally barred*. *See* MISS. CODE ANN. § 99-39-23(6) (Rev.2007) ( [T]he circuit court "order dismissing the petitioner's motion or otherwise denying relief under this article is a final judgment and shall be conclusive until reversed. It shall be a *bar to a second or successive motion* under this article.") (emphasis added); Miss.Code Ann. § 99-39-27(9) (Rev.2007) ("[t]he dismissal or denial of an application under this section is a final judgment and shall be a *bar to a second or successive application* under this article.") (emphasis added). Mississippi Code Sections 99-39-23(6) and 99-39-27(9) provide exceptions to their respective procedural bars for "cases in which the petitioner can demonstrate ... that he has evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be *practically conclusive* that, *if it had been introduced at trial, it would have caused a different result in the conviction or sentence*." MISS. CODE ANN. §§ 99-39-23(6), 99-39-27(9) (Rev.2007). As Loden was represented by new counsel when he filed his "Motion to Vacate Guilty Plea," he could have issued subpoenas for both Johnstone and Daniels and had them appear and testify at the post-conviction hearing. As such, the subject affidavits do not constitute "evidence, not reasonably discoverable at the time of trial...." *Id*.

¶ 44. However, with respect only to Daniels's 2009 affidavit, Loden contends that this is "evidence, not reasonably discoverable at the time of trial," *id*., because Daniels's 2003 affidavit stated " *I do not intend to ever disclose any information I gained during that representation to anyone*." (Emphasis added.) Even assuming arguendo that Loden's contention is correct, this Court cannot conclude that such evidence "would be practically conclusive that ... it would have caused a different result in the conviction and sentence." *Id*. This Court previously emphasized that Loden's plea was "knowing and voluntary" because of his affirmative responses to Judge Gardner's queries regarding his guilty plea. *See Loden*, 971 So.2d at 573. As to Johnstone's 2003 affidavit statement that "I told Loden that this automatic review would be some sort of appeal but that was unclear to us which issues would be subject to review[,]" which is remarkably similar to the contested statement in Daniels's 2009 affidavit that "I told him that we could not guarantee him exactly what the Court might do, or not do upon such review [,]" this Court determined "a reasonable inference regarding Johnstone's affidavit on automatic review is that he was simply advising Loden to get all matters on the record because, while he was uncertain which specific issues this Court would address, he was certain that this Court would only address

issues of record." *Id*. at 574 n. 20. Therefore, Daniels's 2009 affidavit, additionally explained by his subsequent deposition testimony, does not lead this Court to conclude that "a different result" would have been "practically conclusive." MISS. CODE ANN. §§ 99-39-23(6), 99-39-27(9) (Rev.2007). In short, Daniels's 2009 affidavit is not "practically conclusive" for purposes of the circuit court's vacating Loden's guilty plea, and his deposition testimony is conclusive for the opposite, and is convincingly similar to Daniels's deposition testimony that erroneous advice was not given to Loden. Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

43 So.3d at 388-90. [Emphasis the Court's.]

This decision is likewise, not an unreasonable application of *Strickland*.

Looking first to the claim raised in his appeal from the denial of post-conviction relief regarding the entry of his guilty plea, Loden contended that his guilty plea to capital murder was not voluntary as he received incorrect advice from his attorneys concerning his ability to appeal that plea.

Loden contends that his attorneys did not know that he would not be able to appeal his conviction of capital murder because it was based on his plea of guilty to capital murder. However, this is belied by the record in this case. That record includes the affidavit of trial counsel, James Johnstone, attached to his petition to vacate his guilty plea filed in the circuit court. That affidavit clearly states that Loden was informed that if he entered a guilty plea he would have no direct appeal from the conviction. Loden now contends that he thought that the automatic review of the sentence would include a review of the guilt phase issues. The respondents assert, that the denial of petitioner's ineffective assistance of counsel claim by the trial court was properly affirmed by the Mississippi Supreme Court.

46

First, we look to the guilty plea colloquy where we find that Loden was specifically asked about his right to appeal his guilty plea. His responses to the trial court's questions are as follows:

[BY THE COURT]: And that by entering a plea of guilty to this charge, or capital murder case, you are waiving the jury making those determinations as to guilt and as to the punishment to be imposed; –

[BY LODEN]: Yes, sir. I am waiving that.

Q. – do you understand that? Do you understand that as to each of the charges, Counts I through VI, if you proceed to trial before a jury and if the jury found you guilty of those charges and returned a verdict fixing the penalty as whatever they might fix it, in any event, *the question of your guilt or innocence or imposition of the punishment determined by the jury would be something that you could appeal to the Supreme Court of this State*?

A. Yes, sir, I understand.

Q. Do you understand that by waiving a jury for the trial of this case and for the imposition or determination of an appropriate sentence to be imposed by this Court, you are giving up or waiving a valuable right?

A. Yes, sir, I am.

Q. And you understand that?

A. Yes, sir.

Q. It is my understanding that you have agreed that this Court may accept or take your plea of guilty to the charge, each of the charges contained in the indictment including capital murder.

A. Yes, sir.

Q. And further, that the Court may consider and determine a proper sentence to be imposed.

47

A.    Yes, sir.

Q.    Again, do you understand that you are giving up or waiving a valuable right that you have?

A.    Yes, sir, I do.

Q.    *Do you understand that if you proceed through the course of this and the Court makes a determination of your guilt, you will have no right to appeal that?  Do you understand that*?

A.    Yes, sir.

Tr. 507-08.  [Emphasis added.]

The record of the plea colloquy clearly demonstrates that Loden was specifically asked if he understood that should a jury determine his guilt, he would have an appeal to the Mississippi Supreme Court.  Loden stated, without hesitation, that he understood.  Shortly thereafter, the trial court put the same question to Loden in the converse form asking him if he understood that if the trial court determined his guilt, he would have no right to appeal.  Again, without hesitation, Loden stated that he understood that he was waiving that right.

Loden's entire argument is based on his own self serving testimony and the skewed interpretation he places on the record of the guilty plea colloquy and the affidavit of trial counsel.  Loden contends that a portion of the plea colloquy demonstrates he had questions regarding his right to appeal that were answered incorrectly by his attorneys.  However, when a reading of the post-conviction transcript clearly shows the petitioner took the section of the transcript out of context and is now attempting to apply the response to that question to the appeal question.  The transcript reads:

48

[BY THE COURT]:     Mr. Loden, you have had the services, the advice and counsel of two attorneys during the course of these proceedings. Have you had occasion to talk with them throughly, to discuss fully all of the facts and circumstances surrounding this case?

[MR. LODEN]:     Yes, sir.

Q.     Have you had occasion to talk with them about your constitutional rights and the statutory provisions concerning the trial of a capital murder case –

A.     Yes, sir.

Q.     – the count in Count I?

A.     Yes, sir.  The questions I had were answered.  Yes, sir.

Q.     Once again, do you understand that you have a constitutional right and a statutory right under the law of the State of Mississippi to have a jury decide first of all your guilt and innocence on the charge of capital murder and in phase two to determine the punishment that is to be imposed?

A.     I understand I had it, and I understand I waived it, sir.

Q.     And your are aware of that and you wish to proceed to enter pleas of guilty to these charges?

A.     I do, sir.

Q.     Mr. Loden, is there anything about these proceedings that you do not understand?

A.     Not at this time, sir.

Guilty Plea Tr. 550-51.

There is no specific mention of an appeal or the lack thereof at this point in the colloquy.  In fact, it is clear from the context of the transcript that the question and answer went to the

"constitutional rights and the statutory provisions concerning the *trial* of a capital murder case". *Id.* [Emphasis added.]

Loden attempts to support his assertion that the comment about questions being answered in his plea colloquy referred to his right of appeal.  In support of this claim he submitted a letter  he sent to his trial attorneys on August 2, 2002, almost two months prior to the entry of the guilty plea that was attached to his post-conviction motion filed in the trial court as Exhibit 3.  C.P. at 22-23.  In the letter of August 2, 2002, Loden raised questions he wished to discuss regarding his right to appeal.  Loden also requested that counsel attempt to get the trial court to revisit the question regarding the "warrant".  C.P. at 22.[10]  He then stated that if the judge refused to reconsider his ruling on the warrant, he would like to talk to Mr. Johnstone about the appeals process and "go ahead and enter a plead [sic]".  *Id.* Loden then lists the questions he wished to discuss regarding the appeals process.  The letter reads:

> Of the questions of that route, (1) I'm fairly confident I'd get the death penalty, but how does "appeal" work either way?
>
> (2) In your professional judgement, do I have good grounds for an appeal?
>
> (3) How long, generally, would an appeal take to be heard?
>
> (4) With all I've told you and shown, again your opinion on appeal chances.

---

[10]The State assumes that he is referring to the search warrant as this is the only warrant discussed in the post-conviction proceedings.

C.P. at 22.

Loden does not contend that his attorneys did not answer the questions raised in the August 2, 2002, letter. In fact, when we look to his testimony on direct examination in the transcript of the post-conviction hearing, we find Loden testifying that he and counsel discussed the appeals process in some detail. PCR Tr. at 15. However, Loden asserts he was never told he could not appeal the ruling on the suppression hearing. PCR Tr. at 17-18. He then asserts that had he been told that he could not appeal the rulings on the suppression motions he would not have plead guilty. PCR Tr. at 18. Loden further stated that had he been told that the only review he would receive would be a review of his sentence, he would not have pled guilty. PCR Tr. at 18-19.

Loden also attached the affidavit of one his trial attorneys, James P. Johnstone, as Exhibit 2 to his Motion to Vacate Guilty Plea and Incorporated Memorandum of Law, filed with the trial court. Upon reading Johnstone's affidavit we find the following:

> 2.    I am an attorney licensed to practice law in the State of Mississippi, I represented Thomas Edwin Loden, Jr., on a capital murder charge. I was assisted on the case by attorney David Daniels, also a member of the Mississippi Bar.
>
> 3.    Mr. Loden pled guilty to capital murder and was sentenced to death on September 21, 2001.
>
> 4.    *Prior to Mr. Loden's entry of the guilty plea, Mr. Daniels and I advised Mr. Loden that by pleading guilty he was waiving his right to direct appeal.* I also informed him that if he received a sentence of death that the case would be subject to an automatic review by the Mississippi Supreme Court.

51

5. I told Mr. Loden that this automatic review would be some sort of appeal but was unclear as which issues would be subject to review.

C.P. at 19. [Emphasis added.]

When questioned during the post-conviction hearing, Loden freely acknowledged that Johnstone's affidavit was correct when it stated that if he pled guilty he would not get a direct appeal. Looking to the PCR transcript we find:

Q. I understand the paragraph you're wanting to read from. I'm asking you to look at the one where he tells you, that he tells that he advised you that you were giving up your right to appeal.

A. That is not what the affidavit says. *To quote the affidavit, the affidavit says that by pleading guilty he was waiving his right to direct appeal, period. And I would have to kind of agree with that.* Yes, that's correct.

PCR Tr. at 25. [Emphasis added.]

Even with Loden's attempt to parse words, he had to "agree" with the affidavit. Later, Loden testified:

Q. And as Mr. Johnstone said in his affidavit, he told you that you had no right to a direct appeal, didn't he?

A. *He told me that I had no right to a direct appeal*, but that everything automatically got reviewed, and as long as it was in the record, that was part of what would get reviewed.

PCR Tr. at 27. [Emphasis added.]

Johnstone's affidavit also points out that if he received the sentence of death that he had an automatic appeal from the sentence of death and that it was unclear what issues would be reviewed on that automatic sentence review. Loden's contention is that he was told that

52

everything in the record would be reviewed. During his testimony, Loden continually attempted to read paragraph five (5) of trial counsel's affidavit regarding automatic sentence review with the portion of the affidavit in paragraph four (4) stating that he was informed that there would be no direct appeal from the guilty plea. Loden's reading of the affidavit is not logical.

Loden's contention is based solely on his self serving testimony given during the post-conviction hearing on his motion to vacate that he did not understand that he was waiving the right to appeal his guilty plea. Looking to Loden's cross-examination by the State during the post-conviction hearing we find the following colloquy:

> [BY MR. JOYNER]: *And as Mr. Johnstone said in his affidavit, he told you that you had no right to a direct appeal, didn't he?*
>
> [BY MR. LODEN]: *He told me that I had no right to a direct appeal*, but that everything automatically got reviewed, and as long as it was in the record, that was part of what would be reviewed.
>
> PCR Tr. at 27. [Emphasis added.]

Later, we find Loden testifying as follows:

> Q.  Did they tell you that they were prepared to go to trial and would go to trial if that's what you wanted?
>
> A.  I believe they did. Yes, I believe they did.
>
> Q.  Okay. And as part and parcel of that did they not tell you if you went to trial you could appeal, you would then have a right to a direct appeal, as Mr. Johnstone told you. If you plead, you had no right to a direct appeal?
>
> A.  And I believe that's where we spoke about it again is that – the whole argument about the whole day is that Johnstone told me as long as our

issues were in the record, we were going to have rights to have them looked at.

      Q.     Even though he had told you you had no right to an appeal?

      A.     *He had told me I had no right to a direct appeal*, but I got an automatic review, and as long as everything was on the record, it was part of that review.

PCR T. at 45-46. [Emphasis added.]

Loden's testimony is simply not believable on this point.

Under Mississippi law the trier of fact in a post-conviction proceeding is the trial court which includes the determinations of credibility. *See Johns v. State*, 926 So.2d 188, 194 (Miss. 2006); " *Mullins v. Ratcliff*, 515 So.2d 1183, 1189 (Miss.1987). In this case, the trial court did not find Loden's testimony regarding the advice he was given regarding his right to appeal to be credible.

Petitioner also contended that the trial court employed an incorrect standard of proof in deciding the issue of whether his plea was voluntary and whether he received ineffective assistance of counsel based on the information that he received regarding his right to appeal his guilty plea. Looking first to the burden of proof that a post-conviction petitioner must bear under Mississippi law, we look to MISS. CODE ANN. §99-39-23(7). This code section states:

     (7) No relief shall be granted under this article unless the prisoner proves by a preponderance of the evidence that he is entitled to such.

*See Lambert v. State*, 941 So.2d 804, 811 (Miss. 2006); *Gooden v. State*, 856 So.2d 267, 276,

¶ 22 (Miss. 2003); *Foster v. State*, 848 So.2d 172, 175, ¶ 12 (Miss. 2003); *Russell v. State*, 848 So.2d 95, 148, ¶ 248 (Miss. 2003); *State v. Santiago*, 773 So.2d 921, 924-25, ¶ 15 (Miss. 2000); *Neal v. State*, 687 So.2d 1180, 1186-87 (Miss. 1996). Petitioner simply failed to meet his burden of proof to demonstrate that his guilty plea was involuntary or that he received ineffective assistance of counsel in the advice that was given to him by trial counsel.

In addition to Loden's testimony at the post-conviction hearing, the trial court had before it as exhibits to the Motion to Vacate Guilty Plea and Incorporated Memorandum of Law, among others, Exhibit 2, affidavit of trial counsel, James P. Johnstone, and Exhibit 3, the letter petitioner wrote to counsel prior to entering his guilty plea. *See* C.P. 19 (trial counsel's affidavit); C.P. 22-25 (petitioner's letter). Further, the trial court had before it the only exhibit petitioner actually introduced at the hearing, a copy of the transcript of the guilty plea. *See* C.P. Exhibit Vol. Clearly, the trial court was presented with the pre-trial letter Loden wrote to counsel, the affidavit of trial counsel, the transcript of the plea colloquy and Loden's self serving testimony. The trial court specifically mentioned the affidavit during the post-conviction hearing stating:

> THE COURT:     All right. I've read the affidavit several times, Counsel. I know what it says. Let's go ahead.

> PCR Tr. at 72-73.

These things constitute the record before the trial court. Petitioner's contention that the trial court based its decision on the plea colloquy is incorrect as is evidenced by the following passages from the trial court's order dismissing the post-conviction motion:

55

> Petitioner alleges that he was denied effective assistance of counsel. Petitioner claims that he was not properly informed by counsel that, by pleading guilty, he was waiving his right to appeal. To prove ineffective assistance, Petitioner bears the burden of showing that there were deficiencies in his counsel's performance, and that the deficient performance prejudiced the Petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is a strong presumption that counsel's performance was within a within a wide range of reasonable professional assistance. *Moody v. State*, 644 So.2d 451, 456 (Miss. 1994). A presumption exists that the attorney's conduct was adequate. *Burns v. State*, 813 So.2d 668, 673 (Miss. 2001). *When evaluating the effectiveness of counsel, the alleged deficiency and any prejudicial effect are measured by looking at the totality of circumstances. Hiter v. State*, 660 So.2d 961, 965 (Miss. 1995).
>
> *This Court finds that a review of the record reveals there is no merit to Petitioner's claim of ineffective assistance of counsel based on allegations that his attorney did not properly advise him, that by pleading guilty, he was waiving his right to appeal.* Specifically, at the guilty plea hearing, the Court advised Petitioner of his rights. Petitioner acknowledged that he was giving up his right to appeal by pleading guilty to the charge.

C.P. at 143-44. [Emphasis added.]

While it is true that the trial court relied heavily on the guilty plea colloquy in its order and opinion, it is also clear that the trial court stated that it had reviewed the record in this case. Further, after stating that an ineffective assistance of counsel claim is to be measured by the totality of the circumstances, it is hard to argue that the trial court simply ignored all the evidence but the guilty plea transcript. The trial court simply did not believe Loden's post-plea claim that he had not been properly advised of the consequence of a guilty plea on his right to appeal.

It is clear that both the trial court and the Mississippi Supreme Court identified the proper precedent under which the claim was to be assessed by citing to *Strickland v.*

56

*Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and cases relying on *Strickland*, in its order and opinion. C.P. at 143. The trial court and the Mississippi Supreme Court properly assessed the claim of ineffective assistance of counsel. The respondents would assert that petitioner has not demonstrated deficient performance and further, that he was not prejudiced by the actions of trial counsel. Petitioner has not shown, by a preponderance of the evidence, that but for counsel's advice he would not have entered a plea of guilty to capital murder.

The petitioner again contended that he would not have entered a plea of guilty absent this alleged erroneous advice in his second post-conviction petition. Loden raised a claim that his guilty plea should be vacated because he was given erroneous advice regarding the availability of appeal in his first post-conviction motion. Petitioner also contended that his counsel was ineffective in giving him erroneous advice regarding appeal. The Mississippi Supreme Court resolved these claims against petitioner in its opinion affirming the denial of the first post-conviction relief petition. *See* 971 So.2d at 572-74, ¶¶ 57-62.

Petitioner attempted to relitigate this same claim and expand it to include other pre-trial rulings. The Mississippi Supreme Court held the claim to be procedurally barred from reconsideration the provisions of MISS. CODE ANN. § 99-39-25(6)[11] and MISS. CODE ANN.

---

[11]This subsection reads:

(6) The order as provided in subsection (5) of this section or any order dismissing the prisoner's motion or otherwise denying relief under this article is a final judgment and shall be conclusive until reversed. *It shall be a bar to a second or successive motion under this article*. [Emphasis added.]

§ 99-39-27(9).[12]

While petitioner again relied on an affidavit from one of his trial counsel, James P. Johnstone, albeit, a new one, Loden failed to demonstrate that this was newly discovered evidence within the meaning of the exceptions to the bar to successive petitions. As stated previously, there was an evidentiary hearing held in this case by the circuit court, petitioner did not call either of this trial counsel to testify, instead relying on the cryptic wording of an affidavit. Clearly, original post-conviction counsel could have issued subpoenas for both Mr. Johnstone and Mr. Daniels and had them appear and testify at the post-conviction hearing when it was held. For whatever reason, counsel chose not to do that. This new affidavit is not newly discovered evidence that was not reasonably discoverable at the time of the evidentiary hearing regarding petitioner's challenge to his guilty plea. The petitioner failed to fit himself into either exception to the bar to successive petitions.[13] This claim was properly barred as an attempt to file a successive post-conviction petition by the provisions of § 99-39-23(6) and § 99-39-27(9), as well as by the *res judicata* provisions of the post-conviction collateral relief act. Further, because the bar being imposed was the *res judicata*

---

[12]This subsection reads:

(9) The dismissal or denial of an application under this section is a final judgment and shall be a bar to a second or successive application under this article.

[13]The other exception, a new decision of this Court of the United States Supreme Court that would have actually adversely affected the outcome, is not even hinted at by petitioner.

bar it does not bar the consideration of the original decision.

Respondents would assert that the decision of the Mississippi Supreme Court is neither contrary to or an unreasonable application of *Strickland. See Harrington v. Richter*, ___U.S. ___, 131 S.Ct. 770, 793, 178 L.Ed.2d 624 (2011) ("The likelihood of a different result must be substantial, not just conceivable." (citing *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052)). Further, in *Cullen v. Pinholster*, ___U.S. ___, 131 S.Ct. 1388, 1408, 179 L.Ed.2d 557 (2011), the United States Supreme Court held, "'[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " (alteration in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))). Further, in *Harrington v. Richter*, 131 S.Ct. at 786, the high court held "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). Petitioner is not entitled to habeas relief on this portion of this claim.

## B. Sentence phase.

### (i) Investigate and Present Mitigation Evidence

Loden contends that counsel was ineffective in failing to investigate for and present mitigation evidence and advising him to waive the sentencing jury in this case. This claim was presented to the Mississippi Supreme Court in the post-conviction petition. That court

separated claims and addressed them as follows:

**(A) Trial counsel provided ineffective assistance by failing to investigate and present available mitigation evidence.**

¶ 16. Loden argues that:

[t]he State attempts to blur an important distinction between Daniels and Johnstone's failure to *present* mitigation evidence at the sentencing hearing, and their failure to *investigate* mitigation evidence before the hearing. Defense counsel cannot "latch-on" to a client's instruction not to present mitigation evidence to justify their prior failure to investigate mitigating evidence.

(Emphasis in original.) We recognize that there is a distinction between the investigation and the presentation of mitigation evidence. *See Wood v. Quarterman*, 491 F.3d 196, 203 n. 7 (5th Cir.2007). However, this Court previously has found no ineffective assistance of counsel with respect to either the investigation or the presentation of mitigation evidence when counsel is specifically instructed not to present mitigation evidence. *See Bishop v. State*, 882 So.2d 135, 143-46 (Miss.2004).

¶ 17. In *Bishop*, the defendant expressly declined to offer any mitigating facts or circumstances in sentencing. *See id.* at 143-44. After being sentenced to death, Bishop argued on appeal that "there was an abundance of relevant, significant mitigating evidence which could have been obtained from his family members, but his counsel failed to interview them." *Id*. at 143. Regarding the presentation of mitigating evidence, this Court held that:

Bishop has included the affidavits of his mother, other family members, and his ex-wife to support his argument. However, *the quantity and quality of possible mitigation evidence is irrelevant based on Bishop's instructions to his defense attorneys. Bishop's counsel did all that they could, within the limitations placed on them by Bishop. Witnesses were not called, and mitigation evidence was not presented pursuant to Bishop's specific instructions. Because defense counsel acted in accord with Bishop's instructions, their performance was not deficient.*

*Id*. at 144-45 (emphasis added). *See also Wood*, 491 F.3d at 203 ("[n]either the Supreme Court nor this court has ever held that a lawyer provides

60

ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence. In fact, this court has held on several occasions that a defendant cannot instruct his counsel not to present evidence at trial and then later claim that his lawyer performed deficiently by following those instructions."); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir.2000); *Clark v. Johnson*, 227 F.3d 273, 283-84 (5th Cir.2000). As to the investigation of mitigating evidence, this Court concluded that:

> Bishop "has not submitted sufficient evidence of a breach of the duty of counsel to investigate and present mitigation evidence as described by the United States Supreme Court in *Wiggins v. Smith* [, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ]." *Simmons v. State*, 869 So.2d 995, 1004 (Miss.2004). Finally, even if additional mitigation evidence had been discovered, pursuant to Bishop's instructions, it could not be presented during the sentencing phase of the trial. Bishop cannot show that counsels' performance was deficient or that such deficiency prejudiced him.

*Bishop*, 882 So.2d at 146 (emphasis added). *See also Schriro v. Landrigan*, 550 U.S. 465, 478, 127 S.Ct. 1933, 1942, 167 L.Ed.2d 836 (2007) ( "[I]t was not objectively unreasonable for [the Arizona postconviction court] to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.").


¶ 18. As Loden waived presentation of mitigation evidence in sentencing, "defense counsel act[ing] in accord with Loden's instructions ... was not deficient." *Bishop*, 882 So.2d at 145. Likewise, Loden's investigation argument is without merit because "even if additional mitigation evidence had been discovered, pursuant to [Loden's] instructions, it could not be presented during the sentencing phase of the trial." *Id*. at 146. As such, Loden "cannot show that counsel's performance was deficient or that such deficiency prejudiced [22] him." *Id*. Accordingly, Loden fails to prove that he is entitled to any relief on this issue. However, even assuming arguendo that Loden's instruction not to present mitigating evidence is not case-dispositive for purposes of defense counsel's prior mitigation investigation, this Court further concludes that such mitigation investigation was not deficient.

¶ 19. According to Loden's 2008 affidavit:

[i]f my attorneys had conducted a thorough mitigation investigation and properly advised me about the mitigation case that could be presented, I would have instructed them to present mitigation evidence on my behalf.

Had I been properly advised, I would have also instructed my attorneys to contact and ask my friends, family and military colleagues to testify on my behalf in the course of a mitigation presentation.

By contrast, Daniels's 2003 affidavit states that "I conducted extensive investigation into the facts of the case, and into mitigation factors, which included interviews with my client, military personnel, his family and friends."

¶ 20. In his present petition, Loden places great weight upon statements from Johnstone's 2008 affidavit.[23] That affidavit provides that after the circuit court's ruling on the "Ex Parte Motion for Funds for Expert Assistance in the Field of Mitigation Investigation," Johnstone "did not personally interview any mitigation witnesses, and ... did not personally conduct a 'mitigation' investigation." Johnstone's affidavit further states that on September 19, 2001, "*we did not have a mitigation case to present because there had not been any mitigation investigation*."[24] (Emphasis added.) In response to Johnstone's 2008 affidavit,[25] Daniels filed a 2009 affidavit providing that:

[r]egarding mitigation, our Motion for Funds to Hire a Mitigation Expert was denied by the [c]ourt, I believe, in lieu of our psychological expert. However, I personally interviewed [Loden's] mother and his sister regarding possible mitigation should we have needed it.

I also spoke personally with a Marine liason officer who traveled to my office in Tupelo, Mississippi to talk with me about [Loden's] military situation and background.

It was my opinion that *evidence of [Loden's] traumatic early childhood and his good military background would not have been insubstantial if offered in mitigation. However, [Loden] elected not to go to trial, and not to put on any mitigation evidence.*

(Emphasis added.)

¶ 21. Johnstone's 2008 affidavit states that:

> I first met with Loden on July 6, 2000 for about one to one and a half hours.... [D]uring that initial meeting Loden told me that ... he had been a Marine since 1982 and had performed well with many promotions over the years; he had been married twice before, but both those marriages ended because both wives had been unfaithful; ... he fought in "Operation Desert Storm" from August 1990 to April 1991 where he was "first in and last out;" he saw a friend of his burned to death and couldn't do anything about it; ... he was transferred in about 1995 to Virginia to serve as an instructor in the Marine Corps FAST ("Fleet Anti Terrorism Security Team") which Loden described as a prestigious and high pressure assignment; and more recently, he had been assigned to recruiting in Vicksburg, Mississippi, which also imposed pressures on Loden to make his recruiting goals every month. Loden told me that his parents were divorced when he was two; his mother thereafter abandoned him; his stepmother abused him as a boy; he had been sexually abused at church at a young age; he had been exposed to pornography at a young age; he was shuffled back and forth between his mother and father while growing up; his sister had attempted suicide as an adolescent; Loden himself had attempted suicide several times; and his father died when he was 16. Regarding the night of Ms. Gray's death, Loden told me that he had spoken to his wife that evening via cell phone, and that he had been drinking.

According to Johnstone, this initial interview gave him "a lot of leads to work with," and he subsequently shared this information with Daniels. Thereafter, however, while Loden did not expressly discourage mitigation investigation, he was reluctant to discuss either the underlying facts of the case, the development of mitigation evidence (*e.g.*, the alleged incident of sexual abuse), or the prospect of testifying.

¶ 22. According to Daniels, court-appointed criminal defense investigator Herb Wells assisted him in the mitigation investigation.[26] Daniels also gathered mitigation evidence regarding Loden's childhood, family background, claim of past sexual abuse,[27] military experience, and the possibility of psychological issues arising from that military experience,[28] through interviews with Loden's mother, grandmother, sister, and aunt.[29] Daniels states that he intended to subpoena each of these individuals as witnesses if the matter had proceeded to trial.[30] Furthermore, Daniels spoke

with Loden and Major Gregory L. Chaney, a Marine liason officer, about Loden's "exemplary military service." During his conversation with Major Chaney, Daniels "may have talked to him about the possibility of him testifying...." Additionally, Daniels states that "some of the mitigating evidence came by way of just a general talking to witnesses and people that knew anything about [Loden] or anything about the case." In Daniels's estimation, "Loden would be the best mitigation witness we had because he could relate his experiences in the military, his experience [of] traumatic sexual abuse as a small child, and his mother and sister could testify to those facts as well."

¶ 23. Loden now argues that:

[i]f a lawyer does not conduct an adequate investigation into all potentially available areas of mitigation evidence that can be presented in the penalty phase, he will not have sufficient information to make informed decisions about trial strategy or how to advise his client; nor will the client have sufficient information "to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued."

*See* MISS. R. PROF'L CONDUCT 1.4 cmt. Loden now offers that if defense counsel had conducted an adequate investigation:

the [c]ircuit [j]udge or the jury would have heard that (1) Loden was suffering from Complex Post Traumatic Stress Disorder ... and Disassociative Disorder; (2) his childhood was characterized by abandonment, instability and ongoing physical and sexual abuse; (3) on the night of the crime, Loden's wife had tormented Loden by boasting about her plans to sleep with a successful and well known attorney and law partner at the firm where she worked as a legal assistant; (4) he had a long history of depression and suicide attempts; (5) he had suffered further trauma during his service in the Marines, including his combat experience in the Gulf War; (6) he was heavily intoxicated at the time of the crime; and (7) despite all these hardships, Loden was a loving and caring grandson and father, had an exemplary military career, was a highly decorated veteran, and served as a mentor to younger Marines.

Loden contends that "but for counsel's complete failure to prepare a mitigation case, Loden would not have been sentenced to death."

64

¶ 24. Loden's health and military-history assertions are contradicted by Loden's military records and an affidavit of Major Chaney which states, "[t]he only discussion which [Daniels] and I had concerning [Loden's] service in the United States Marine Corps was my indicating to [Daniels] that I was surprised to see [Loden] charged with this crime because he had had a good record up to that time in the Marine Corps."

¶ 25. Regarding Loden's parenting abilities, Daniels stated that he "thought it best, strategically, to leave it alone[,]" as "part of the discovery was a lot of web sites that had been logged on to ... on Loden's computer. And a lot of them were about incest and having sex with little children and men reciting episodes of sex with their daughters."

¶ 26. The State responds that:

[t]he record shows ... counsel had investigated the area of mitigation and was ready to present such evidence to the trial court had they been allowed to do so. This recorded colloquy appears to refute the affidavit of [Johnstone].... Perhaps, Johnstone has forgotten what was stated to the trial court in the transcript or perhaps he did not personally do any mitigation investigation. It is clear from the transcript that [Daniels] had done an investigation into mitigation evidence and was ready to produce such evidence. Further, [Daniels] has furnished an affidavit regarding his representation of [Loden].... Counsel was not ineffective because an investigation into mitigation was done. However, ... this is not a question in this case because [Loden] instructed his attorneys that they were to put no case in mitigation on in his behalf. In addition[,] counsel were instructed they were not to cross-examine any of the state's witnesses or object to any exhibits.

¶ 27. Defense counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Porter v. McCollum*, ___U.S. ___, 130 S.Ct. 447, 452-53, 175 L.Ed.2d 398 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). However, there is a strong presumption that such investigation was within the "wide range of reasonable professional assistance." *Wiley*, 517 So.2d at 1378. Moreover, this assessment "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Byrom*, 927 So.2d at 714 (quoting *Stringer*, 454 So.2d at 477).

¶ 28. Evaluating defense counsel's conduct from their perspective "at the time" is of particular import in the case sub judice. *Id*. This is because trial was scheduled for October 8, 2001, seventeen days after Loden pleaded guilty on September 21, 2001. No proof has been presented that defense counsel quit preparing for trial prior to Loden's pleading guilty and instructing his attorneys not to prepare for trial or present evidence on his behalf. Daniels testified that he intended to subpoena Loden's mother, grandmother, sister, and aunt as witnesses, had the matter proceeded to trial. Furthermore, the investigation conducted by Daniels up to that point had been significant. *See* paragraph 22, *supra*. Additionally, Wells was engaged in mitigation investigation on behalf of defense counsel, and separate psychiatric examinations of Loden had been conducted by the Mississippi State Hospital and Dr. O'Brien. In sum, the mitigation investigation already conducted by Loden's defense counsel until they were told to stand down, presents a stark contrast to the negligible mitigation investigation efforts by defense counsel in *Wiggins* and *Porter*.

¶ 29. *Wiggins* and *Porter* are further distinguishable by the fact that they did not involve defendants who opposed the presentation of mitigation evidence. While Loden cites *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir.1991), as an analogous case in which defense counsel was still found to have engaged in deficient mitigation investigation despite the defendant's instruction not to present mitigating evidence, that case is likewise distinguishable insofar as there was a jury verdict in the guilt phase, no statement by defense counsel of the evidence that would have been presented in mitigation, and no psychiatric examination of the defendant at any point. *See id.* In *Wiggins*, the United States Supreme Court found defense counsel's mitigation investigation to constitute deficient performance, as it was limited to obtaining a presentence investigation report and Department of Social Services records "documenting petitioner's various placements in the State's foster care system." *Wiggins*, 539 U.S. at 523, 533, 123 S.Ct. 2527. In *Porter*, defense counsel was for the first time "represent[ing] a defendant during a penalty-phase proceeding. At the postconviction hearing, he testified that he had only one short meeting with Porter regarding the penalty phase. He did not obtain any of Porter's school, medical, or military services records or interview any members of Porter's family." *Porter*, 130 S.Ct. at 453. Finally, the information which Loden asserts should have been presented, *see* paragraph 23, *supra*, is not significantly greater than that which was actually before the circuit judge despite Loden's insistence that no mitigation evidence be presented. Specifically, Daniels's brief summary of the mitigation evidence

which would have been presented, see footnote 4, *supra*, the summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital, and Dr. O'Brien's report collectively addressed nearly every subject deemed pertinent by Loden. Accordingly, on this basis as well, Loden fails to prove that he is entitled to any relief on this issue.

**(B) Trial counsel was ineffective in advising Loden to waive jury sentencing**.

¶ 30. The "Waiver of Jury for Trial and Sentencing" signed by Loden on September 21, 2001, provided that:

> I understand that I am entitled to have a sentencing hearing or proceeding on the Capital Murder Count of the Indictment ... before a jury empaneled for the purpose of determining the sentence I shall receive, pursuant to Section 99-19-101 of the Mississippi Code of 1972, as amended. *I hereby expressly waive my right to a jury for sentencing in this cause* and hereby agree that [Circuit Judge Gardner] may sentence me in this matter without a jury after a sentencing hearing without a jury pursuant to said Section 99-19-101.

(Emphasis added.) The "Waiver of Sentencing Jury" signed by Loden on September 21, 2001, stated that "I understand the [c]ourt has the discretion to sentence me to the death penalty...." The sentencing hearing reflects the following colloquy:

> Q. Once again, *do you understand that you have a constitutional right and a statutory right under the law of the State of Mississippi to have a jury* decide first of all your guilt and innocence on the charge of capital murder and *in phase two to determine the punishment that is to be imposed*?
>
> A. I understand I had it, and *I understand I waived it ....*
>
> ...
>
> Q. Do you understand that on your plea of guilty to capital murder and the other charges in this indictment it is possible that I will, acting pursuant to the waiver, impose the death penalty in this case? Do you understand that?

67

A. I understand that fully....

(Emphasis added.)  Finally, the "Sentencing Order" of the circuit court stated that "[t]he [c]ourt ... examined [Loden] concerning his understanding of his right to have a jury fix the punishment to be imposed ... in the event he was found guilty of Capital Murder...."

¶ 31.  Loden argues "it was entirely unreasonable for [defense counsel] to advise Loden to waive jury sentencing ... in light of Judge Gardner's capital sentencing record."  Loden's argument is dubious, for it lacks credibility when compared to his statements to his mental health expert, Dr. O'Brien, that he preferred death over life and that he would "like to plead so that he will receive the death penalty."  *See* paragraph 4, supra.  Now, Loden unpersuasively argues that defense counsel "should have advised [him] that if he ... waived jury sentencing, he would almost undoubtedly receive a death sentence from Judge Gardner...."  Loden now asks this Court to assume that "[i]t is reasonably probable that at least one juror would have concluded that the aggravating factors did not outweigh the mitigating factors if a full portrait of Loden's circumstances [had] been presented."

¶ 32.  The State responds that "this claim is simply an extension and a replay of what [Loden] presented to this Court in the post-conviction appeal regarding the entry of the guilty plea."  *See Loden*, 971 So.2d at 572-74.  Specifically, "[t]he circuit court found that petitioner's waiver of the sentencing jury was knowing, intelligent and voluntary. [Loden] has presented nothing to this Court that indicates that [Loden] did not knowingly, intelligently, voluntarily waive the sentencing jury in this case."

¶ 33.  The record is replete with evidence beyond all doubt that Loden knowingly, intelligently, and voluntarily waived jury sentencing.  *See* paragraph 30, *supra*.  Moreover, in order to prove that the advice given to Loden constituted deficient performance, this Court first would have to determine the nature of that advice.  Loden's affidavit fails to provide any details of his discussion with defense counsel regarding the waiver of jury sentencing.  Absent the details of such advice, the deficiency thereof cannot be determined.  Finally, Loden's statement to Dr. O'Brien, which has not been repudiated, contradicts this claim of error.  Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

_____

22. With respect to mitigation evidence, "[i]n assessing prejudice, we reweigh

the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527.

23. This affidavit initially was prepared by Loden's present counsel, Mark R. McDonald.

24. Subsequently, both Johnstone and Daniels expounded on the content of the affidavit. According to Johnstone, "I think the true meaning would have been *I did not do any mitigation ..., Daniels was pretty much in charge of that* [;]" that "Daniels certainly could have talked to ... people that I do not recall that he discussed with me[;]" and that "[e]ssentially *what I was talking about was an expert to testify in the field of mitigation and* ... the real meaning of that statement is that in my opinion ... the expert ... was needed to flush out that mitigation.... *Certainly we had some evidence*." (Emphasis added.) Daniels stated, "I'm guessing probably what [Johnstone] meant was *that there was no formal mitigation investigation done*. We requested a mitigation expert ... that was denied by the [c]ourt, and so in that sense there was no formal mitigation presentation prepared." (Emphasis added.)

25. According to Daniels, Johnstone "said there was no mitigation investigation done, ... and I didn't feel like that was entirely correct. And I didn't want the Court to be misled."

26. Daniels stated that the investigation performed by Wells "was inclusive" of mitigation investigation.

27. No one was able to provide Daniels with the name of the alleged offending individual.

28. Regarding additional investigation into post-traumatic stress disorder, Daniels stated that Loden "said there aren't any records of ... my seeking psychological help or anything else as the result of his Gulf War experiences. So I mean, I took him at his word."

29. However, Loden's mother and sister now maintain that they never had discussed such mitigation evidence with Daniels.

30. Loden responds that "[a]t the time of [the] plea, trial was about three weeks away. Daniels' claim that he would have subpoenaed witnesses if Loden had

not pleaded guilty is not credible or competent."

43 So.3d at 380-86. [Emphasis the Court's.]

Respondent would assert that the decision of the Mississippi Supreme Court is neither contrary to or an unreasonable application of *Strickland*.

Petitioner contends that counsel was ineffective in failing to investigate for and present mitigation evidence. Relying heavily on the decisions in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) and *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), petitioner contends that he is entitled to relief because counsel did not preform an adequate investigation into mitigating evidence and then present the same during the sentencing phase of the case.

Petitioner continues to argue that the merits of this claim are controlled by *Wiggins* or *Williams*. Respondents assert the claim is controlled by the decision in *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), where the United States Supreme Court held:

> The Court of Appeals held that, even if Landrigan did not want any mitigating evidence presented, the Arizona courts' determination that Landrigan's claims were "'frivolous' and 'meritless' was an unreasonable application of United States Supreme Court precedent." 441 F.3d, at 647 (citing 28 U.S.C. § 2254(d)(1)). This holding was founded on the belief, derived from *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), that "Landrigan's apparently last-minute decision cannot excuse his counsel's failure to conduct an adequate investigation prior to the sentencing." 441 F.3d, at 647.
>
> Neither *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing

court. *Wiggins, supra*, at 523, 123 S.Ct. 2527 ("[W]e focus on whether the investigation supporting *counsel's* decision not to introduce mitigating evidence of Wiggins' background was itself reasonable" (emphasis added and deleted)). Indeed, we have never addressed a situation like this. In *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), on which the Court of Appeals also relied, the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented. In short, at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.

127 S.Ct. at 1942.

Quite simply put, a defendant cannot instruct counsel not to put on a case in mitigation and then assert that counsel is ineffective for failing to investigate mitigation. Because the petitioner ordered his counsel not to put on a case in mitigation he could not obtain relief on the merits of this claim.

In a case decided before the United States Supreme Court's decision in *Schriro v. Landrigan, supra,* the state court was faced with a strikingly similar challenge in *Bishop v. State*, 882 So.2d 135 (Miss. 2004). The state court held:

¶ 15. In evaluating a similar ineffective assistance of counsel claim, the Fifth Circuit held that counsel is not ineffective for failing to present any evidence at the punishment phase, pursuant to his client's instructions. *Clark v. Johnson*, 227 F.3d 273, 283-84 (5th Cir.2000). In that case, Clark had been convicted of capital murder in Texas. In his federal habeas corpus proceedings, he argued that his trial counsel's failure to present any evidence during the punishment phase constituted constructive denial of counsel and was presumed prejudicial. *Id*. The Fifth Circuit held that

Clark himself testified that he made the decision not to call any witnesses after talking with his attorneys the day before.

71

> "'[M]eaningful discussion with one's client' is one of the 'cornerstones of effective assistance of counsel.'"

*Id*. (quoting *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir.1983)).

¶ 16. In another case handed down later the same year, the Fifth Circuit reached the same result. In *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir.2000), another Texas death penalty case, Dowthitt argued his counsel was ineffective for failing to present mitigation evidence via his family members during the punishment phase of his trial. The Fifth Circuit held

> The state habeas court found that Dowthitt "did not want any of his family testifying on his behalf." Counsel will not be deemed ineffective for following their client's wishes, so long as the client made an informed decision. *See Autry v. McKaskle*, 727 F.2d 358, 361 (5th Cir.1984) ("By no measure can . . . [the defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient.").

230 F.3d at 748.

¶ 17. The record in this matter is clear. Bishop was thoroughly advised by his defense counsel and the trial court of the consequences of his decision. Bishop blocked his counsels' efforts and cannot not claim deficient performance. *Clark*, 227 F.3d at 284; *Dowthit*t, 230 F.3d at 748. *See also Williams v. State*, 722 So.2d 447, 450 (Miss.1998). Counsels' performance was not deficient pursuant to *Strickland v. Washington*, 466 U.S. at 688, 104 S.Ct. at 2064-65.

¶ 18. Bishop additionally argues that counsel was ineffective in failing to perform an adequate investigation, pursuant to *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Affidavits from Bishop's mother, aunt, brother and ex-wife, all dated after the State filed its response, were included with Bishop's reply. Each of these affiants state that Bishop's trial attorneys either did not speak with them at all or only spoke with them briefly. Each state they would have testified for Bishop and presented mitigating evidence, had they been asked. The State included affidavits from both of Bishop's trial counsel in its response. In his affidavit, John Weddle stated that he personally interviewed members of Bishop's family, including Bishop's mother and aunt, and was ready to offer mitigating evidence, but

Bishop prevented him from doing so. In his affidavit, David Daniels stated the following:

> I conducted investigation into Mr. Bishop's childhood and had witnesses ready to testify to his traumatic and neglected childhood. These witnesses came from the State of Texas for the purpose of testifying on behalf of the Defendant. Further, I had acquired Mr. Bishop's medical records from his previous place of incarceration, which included evidence of mental instability, hallucinations, and depression. Against my advice, Mr. Bishop elected to forego presenting mitigation evidence.

> Mr. Bishop, of average intelligence, was informed by the trial judge that the Court would consider anything Mr. Bishop desired to present in mitigation, yet he remained steadfast in his desire to forego a sentencing hearing, and mitigation presentation.

¶ 19. This case is clearly distinguishable from the facts in *Wiggins*. Wiggins's background can only be described as horrific. He was starved, neglected, beaten, abused, and raped for most of his childhood, and he had a diminished mental capacity. Despite all of that, Wiggins had no criminal history prior to the murder. *Wiggins*, 123 S.Ct. at 2533, 2537. From the affidavits submitted by Bishop, his childhood was difficult and he had emotional problems, however, his background does not rise to the same level as Wiggins's.

¶ 20. Bishop "has not submitted sufficient evidence of a breach of the duty of counsel to investigate and present mitigation evidence as described by the United States Supreme Court in *Wiggins v. Smith*." *Simmons v. State*, 869 So.2d 995, 1004 (Miss.2004). Finally, even if additional mitigation evidence had been discovered, pursuant to Bishop's instructions, it could not be presented during the sentencing phase of the trial. Bishop cannot show that counsels' performance was deficient or that such deficiency prejudiced him. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

882 So.2d at 145-46.[14]

_____

[14]Relying on *Schriro*, the United States Court of Appeals for the Fifth Circuit affirmed the denial of habeas relief against Bishop's challenge that counsel was ineffective in failing to investigate for and present mitigation evidence against petitioner's expressed wishes. *See*

Loden is simply making the same claim and the respondents assert his claim is without merit.

In *Schriro, supra*, the United States Supreme Court held:

> The Court of Appeals also stated that the record does not indicate that Landrigan's decision not to present mitigating evidence was "informed and knowing," 441 F.3d, at 647, and that "[t]he trial court's dialogue with Landrigan tells us little about his understanding of the consequences of his decision." *Ibid*. We have never imposed an "informed and knowing" requirement upon a defendant's decision not to introduce evidence. *Cf., e.g.*, *Iowa v. Tovar*, 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004) (explaining that waiver of the right to counsel must be knowing and intelligent). Even assuming, however, that an "informed and knowing" requirement exists in this case, Landrigan cannot benefit from it, for three reasons.

127 S.Ct. at 1943.

Thus, there is no requirement that Loden's refusal to allow mitigation evidence to be presented be knowing and intelligent.

Unlike the case in *Landrigan*, Loden's decision to instruct his attorneys not to put on a case in mitigation or to challenge the death sentence was not a last minute decision. The state court pointed out in its direct appeal opinion when discussing petitioner's waiver of a jury:

> ¶ 13. . . . Significant to the issue raised in Loden's post-conviction relief appeal, Dr. O'Brien's report reveals the mindset of Loden within thirty days before his pleas of guilty, stating, in part, that:
>
> > [*Loden*] *makes a point of telling me 'I don't want life,' in prison, and*

---

*Bishop v. Epps*, 265 Fed. Appx. 285, 291-92 (5th Cir.), *cert. denied*, 554 U.S. 925, 128 S.Ct. 2975, 171 L.Ed.2d 899 (2008). The Fifth Circuit found that the decision of the Mississippi Supreme Court was neither contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court.

74

> *that he would like to plead so that he will receive the death penalty*. This is not only because of his regret about the crime, but also because 'I don't want to see my wife lie on the stand,' referring to statements she has made which do not match up with his recollection of events, and also because he has diminishing confidence in his lawyers' handling of his case.
>
> ¶ 14. Faced with a mountain of evidence (of Himalayan proportions) sufficient to overwhelmingly prove his guilt, on September 21, 2001, Loden expressly waived his right to a jury at trial and in sentencing,[5] and pleaded guilty to all six counts in the indictment. The circuit court accepted the pleas and adjudged Loden guilty on each count.

971 So.2d at 555.

Thus, at least thirty days before his trial was set to begin, Loden had already decided to waive his right to a jury trial and stated that he wanted to be sentenced to death. Petitioner has attempted to distinguish this case from *Landrigan* by arguing that "Loden was not intent on death, unlike the petitioner's in *Landrigan*." Clearly, petitioner wants to ignore what he told Dr. O'Brien over a month before trial. In fact, petitioner wants to ignore all of the things that he said and did and now blame his own decisions on his attorneys. This he cannot do.

Further, looking to the questioning of petitioner by the circuit court we find the following in the transcript:

> [BY THE COURT] Q.   Do you understand that if you did proceed to trial on these charges before a jury, you would have the right to have the process of this court issue requiring the attendance of any witnesses that you wished to call to give evidence in your behalf during that trial?
>
> [LODEN] A.   Yes, sir.
>
> Q.   As to Count I of this indictment, that being the capital murder charge, do you understand that a capital murder charge is conducted in two

phases; that the jury in phase one determines guilt or innocence as to the charge itself, that being capital murder?

A.  Yes, sir, I understand.

Q.  And that by entering a plea of guilty you are waiving your right to have the jury make that determination?

A.  I am, yes, sir.

Q.  That in the event the jury found you guilty of capital murder in phase one of the trial, the law provides that the jury would then or a jury would then decide in phase two of the trial the punishment to be imposed; that is, whether or not the death penalty would be imposed or –

A.  Yes.

Q.  – in the alternative, life without parole or life in prison.  Do you understand that?

A.  Yes, sir, I understand.

Q.  And that by – and that by proceeding to enter pleas of guilty to this charge you are waiving your right to have the jury make the determination of your guilt, first of all, and to determine what punishment would be imposed.

A.  Yes, sir, I understand.

 Tr. 504-05.

Looking further, we find:

Q.  And in phase two, that is in Count I, the capital murder charge, the jury would likewise be required to unanimously agree upon the existence of certain factors which they are called upon to weigh and determine during the course of that trial.

A.  Yes, sir, I understand.

Q.  Do you understand that?

A.   Yes, sir.

Q.   And if they are unable to agree unanimously as to the existence of those factors, they cannot return a verdict or cannot impose the death penalty. Do you understand that?

A.   Yes, sir.

Q.   That the jury in making a determination concerning the punishment to be imposed as to Count I, the capital murder charge, are required to weigh aggravating circumstances that might exist in the case and to weigh those as opposed to mitigating circumstances that might exist in the case and to make a determination, again unanimously, as to the existence of the aggravating circumstances.  Do you understand that?

A.   I understand that, sir.

Q.   And they must determine unanimously in order to invoke the death penalty –

A.   Yes, sir.

Q.    – or impose that penalty.  That the aggravating circumstances outweigh the mitigating circumstances.

A.   Yes, sir.

Q.   Or stated in another way, that the mitigating circumstances do not outweigh the aggravating circumstances.  Do you understand that?

A.   Yes, sir, I understand.

Q.   And that by entering a plea of guilty to this charge, or the capital murder case, you are waiving the jury making those determinations as to guilt and as to the punishment to be imposed; –

A.   Yes, sir.  I am waiving that.

Tr. 506-07.

77

Still further, we find:

> Q.   And further, that the Court may consider and determine a proper sentence to be imposed in this case.

> A.   Yes, sir.

> Q.   Again, do you understand that you are giving up or waiving a valuable right that you have?

> A.   Yes, sir, I do.

Tr. 508.

From this colloquy, it is clear that Loden was fully aware of the rights he was waiving when he waived the jury for sentencing.

Again, after the State presented the agreed offer of proof , the trial court questioned both defense counsel and petitioner regarding his desire to plead guilty and waive the sentencing jury. The transcript reflects the following colloquy:

> THE COURT:  Mr. Daniels, as one of the attorneys representing the defendant throughout these proceedings, have you discussed with him thoroughly each of the charges contained in the indictment, the factual circumstances, any possible defenses that might be asserted, all of the facts and circumstances of this case, advised him of his constitutional and statutory rights concerning these charges and the trial to be conducted on each of these? Since they're in one indictment they would all be done in one trial, but have you talked with him and advised him thoroughly concerning his rights, both constitutional and statutory?

> MR. DANIELS:  I have, Your Honor.  Over the past several months Mr. Johnstone and I have conferred with Mr. Loden about the charges, about his possible defenses and about the bifurcated hearing process.  I believe that he understands the nature of these proceedings and that he surely wants to enter these pleas to these charges.

THE COURT: Specifically, have you had occasion to discuss with him the statutory provisions concerning the two-phase trial that he is entitled to under the law of this state?

MR. DANIELS: Yes, Your Honor, we have.

THE COURT: Have you stressed to him that this is a valuable right and that by giving up this right he is placing the decision about the sentence to be imposed in the hands of the Court solely without a jury?

MR. DANIELS: Yes, Your Honor.

THE COURT: Do you think that he understands the significance and importance of that?

MR. DANIELS: I believe he does, Your Honor.

THE COURT: And do you think that he has agreed to and is now in the process of entering pleas of guilty to these charges with a full understanding of all of his rights, all of the law concerning matters of this nature, the practice and procedure in the trial of the capital murder case, that he is doing so freely and voluntarily, with full understanding?

MR. DANIELS: Yes, Your Honor, I do.

THE COURT: Mr. Johnstone, you too have represented this defendant throughout the course of these proceedings. Have you talked with him concerning each of the charges contained in this indictment, the facts, the circumstances, any possible defenses that might be asserted?

MR. JOHNSTONE: Yes, sir, I have, Your Honor.

THE COURT: Have you discussed with him the scheme or practice in capital murder cases where he is entitled to have a jury determine first his guilt or innocence and then to determine the appropriate punishment to be imposed on his conviction?

MR. JOHNSTONE: Yes, sir, Your Honor. As Mr. Daniels stated, we've discussed that extensively with Mr. Loden.

THE COURT: Do you think that based on your discussions with him that he fully understands and appreciates the significance of what he is doing in entering pleas of guilty to these charges?

MR. JOHNSTONE: Yes, sir, Your Honor. I believe he fully understands and appreciates the significance of his plea today and also the subsequent waiver of ANY jury trial. We've continually told Mr. Loden that we were prepared to go trial, would go to trial if that was what he wished. We've gone over the extensive discovery that's been provided for us. And as I stated to the Court, I fully believe that Mr. Loden has considered that and that he fully understands the nature of what he's doing by entering his plea of guilty today.

THE COURT: Do you think that he is entering or will enter these pleas of guilty freely and voluntarily with a full understanding of the legal ramifications of doing that?

MR. JOHNSTONE: Yes, sir, I do.

BY THE COURT: (Continuing)

Q. Mr. Loden, you have had the services, the advice and counsel of two attorneys during the course of these proceedings. Have you had occasion to talk with them thoroughly, to discuss fully all of the facts and circumstances surrounding this case?

A. Yes, sir.

Q. Have you had occasion to talk with them about your constitutional rights and the statutory provisions concerning the trial of a capital murder case

A. Yes, sir.

Q. – the count in Count I?

A. Yes, sir. The questions I had were answered. Yes, sir.

Q. Once again, do you understand that you have a constitutional right and a statutory right under the law of the State of Mississippi to have a jury decide first of all your guilt or innocence on the charge of capital murder and

in phase two to determine the punishment that is to be imposed?

A. I understand I had it, and I understand I waived it, sir.

Q. And you are aware of that and you wish to proceed to enter pleas of guilty to these charges?

A. I do, sir.

Q. Mr. Loden, is there anything about these proceedings that you do not understand?

A. Not at this time, sir.

Q. Are there any questions that you wish to direct to me as judge about these proceedings?

A. No, sir. No, sir.

Q. Do you understand that on your plea of guilty to capital murder and the other charges in this indictment it is possible that I will, acting pursuant to the waiver, impose the death penalty in this case? Do you understand that?

A. I understand that fully, sir.

Q. All right, sir. Mr. Loden, as to Count I, that being the charge of capital murder, do you plead guilty or not guilty?

A. Guilty, sir.

Tr. 546-51.

Again, petitioner without hesitation stated that he fully understood the consequences of his actions in entering a plea of guilty and waiving the sentencing jury.

After the trial court had accepted the guilty pleas to all six counts of the indictment the court had this further colloquy with the defendant.

THE COURT: Mr. Loden, I'm going to ask you and your attorneys to stand during the course of my voir dire examination. I failed to ask questions which are not insignificant, and I think it's important that I do ask you. You may remain seated.

Are you satisfied with the legal services and the advice given you by your attorneys?

THE DEFENDANT: Yes, I am, sir.

THE COURT: Do you think that they have properly advised you concerning your constitutional rights, your legal rights, ad properly advised you before pleading guilty to these charges?

THE DEFENDANT: Yes, sir, I do.

. . .

THE COURT: Before we go any further, Mr. Loden, I have other questions to address to you. I have in my possession, and I don't – this is not a document that I have exhibited to you earlier. It is captioned Waiver of Jury for Trial and Sentencing. Are you familiar with this document?

THE DEFENDANT: Yes, sir. That is the one I signed.

THE COURT: All right. And on page two of this document there appears to be what is your signature. Is that in fact your signature?

THE DEFENDANT: Yes, it is, sir.

THE COURT: Did you have occasion to read this waiver and to discuss it with your attorney.

THE DEFENDANT: Yes, sir. I understand.

THE COURT: And do you understand that in agreeing to proceed in this you are again giving up, waiving valuable, a valuable right that you have; that is, to have a jury hear the evidence in this case and to determine what sentence is to be imposed?

THE DEFENDANT: I understand, sir.

THE COURT: Likewise, is a single-page document having the same effect; that is, waiving a jury for determining a sentence to be imposed? Is that your signature?

THE DEFENDANT: Yes, sir, it is.

THE COURT: *And do you now, after having thought about this thing, talked with your lawyers, agree that we may proceed without a jury to conduct the second phase or sentencing phase of this hearing?*

THE DEFENDANT: *Yes, sir. Let's proceed.*

Tr. 554-57. [Emphasis added.]

Once again, the petitioner, without hesitation, stated he understood the rights he was giving up by waiving the sentencing jury, and then, seemingly impatient, stated to the Court – "Let's proceed."

Respondents would assert that this claim is simply an extension, replay and/or regurgitation of what petitioner presented to the state court in the post-conviction appeal regarding the entry of the guilty plea. In the discussion under the section entitled "The Facts" the state court stated:

¶ 11. In August 2001, Loden wrote a letter to Johnstone and requested that Johnstone:

make the motion for a re-visit of the original warrant. I'd like that at least for the record. Would you do your best at trying to convince the judge to hear this. Then immediately following his ruling on that, if against, *I'd like to speak to you of the appeal process, and go ahead and enter a plead* [sic].

(Emphasis added). Regarding the appeal process, Loden asked "(1) *I'm fairly*

83

*confident I'd get the death penalty, but how does 'appeal' work either way?* (2) In your professional judgment, do I have good grounds for an appeal?" (Emphasis added).

¶ 12. After a forensic mental evaluation of Loden, the Mississippi State Hospital unanimously[4] found that Loden:

> has the sufficient present ability to consult with his attorney with [a] reasonable degree of rational understanding in the preparation of his defense, and that he has a rational as well as factual understanding of the nature and object of the legal proceedings against him.

> We are unanimous in our opinion that [Loden] would have known the nature and quality of his alleged acts at the time of the alleged offenses, and that he would have known at that time that those alleged acts would be wrong.

> *We are unanimous in our opinion that [Loden] has the capacity knowingly, intelligently, and voluntarily to waive or assert his constitutional rights.*

> We are unanimous in our opinion that [Loden] was not experiencing extreme mental or emotional disturbance at the time of the alleged offenses, and that *his capacity to appreciate the criminality of his alleged conduct, or to conform his conduct to the requirements of the law was not substantially impaired at that time.*

(Emphasis added). The report concluded that factors such as Loden's alleged physical and sexual abuse as a child, combat-related trauma, and job and life-related stresses at the time of the crimes did not "rise to the level of exculpation, or even of statutory mitigation."

¶ 13. Loden's expert, Dr. O'Brien, opined that Loden was of average to above-average intelligence and, after extensively reviewing Loden's background, concluded that:

> it is my opinion that, at the time of the incident with which he is charged, *[Loden] was under the influence of extreme mental and emotional disturbance and distress, although this probably did not rise to the level that he did not know the nature and quality of his acts or the*

*difference between right and wrong in relation to those acts at that time*. However, his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired. In addition, there is no history of prior criminal activity reported or found in the records reviewed. *He appears at the present time to be competent to stand trial and assist in his own defense*.

(Emphasis added). Significant to the issue raised in Loden's post-conviction relief appeal, Dr. O'Brien's report reveals the mindset of Loden within thirty days before his pleas of guilty, stating, in part, that:

> [Loden] makes a point of telling me 'I don't want life,' in prison, and that he would like to plead so that he will receive the death penalty. This is not only because of his regret about the crime, but also because 'I don't want to see my wife lie on the stand,' referring to statements she has made which do not match up with his recollection of events, and also because he has diminishing confidence in his lawyers' handling of his case.

¶ 14. Faced with a mountain of evidence (of Himalayan proportions) sufficient to overwhelmingly prove his guilt, on September 21, 2001, Loden expressly waived his right to a jury at trial and in sentencing,5 and pleaded guilty to all six counts in the indictment.

_____

4. The report of the Mississippi State Hospital was submitted by three mental health experts, Reb McMichael, M.D., Philip Meredith, M.D., and Shirley M. Beall, Ph.D.

5. The State likewise filed a "Waiver of Sentencing Jury."

971 So.2d at 554-55. [Emphasis the Court's.]

The Mississippi Supreme Court also pointed out the following:

¶ 15. In the subsequent sentencing hearing, Loden testified under oath:

> Q. *Are you satisfied with the legal services and the advice given you by your attorneys?*

A. *Yes*, I am, sir.

Q. Do you think that they have properly advised you concerning your constitutional rights, your legal rights, and properly advised you before pleading guilty to these charges?

A. Yes, sir, I do.

(Emphasis added). Consistent with Loden's stated desire to Dr. O'Brien to concede guilt and accept the death penalty, *supra*, Johnstone advised the court that "[w]e have conferred with our client Mr. Loden . . . and he's advised us that he does not want us to cross-examine witnesses or object to the introduction of any exhibits that are being introduced through these witnesses that the State intends to call." Furthermore, Loden's other attorney Daniels informed the Court that Loden "has elected to and instructed us that he desires to waive presentation of . . . mitigation evidence for reasons I feel he will explain to the Court when given an opportunity to make a statement."[8] According to Loden, "I'm just doing what I feel I need to do."

_____

8. Nonetheless, Daniels made a brief statement summarizing the mitigation evidence which would have been offered absent Loden's instruction otherwise. According to Daniels:

> through our investigation and our clinical psychologist's expert that's been appointed by the Court we've been able to develop that Mr. Loden has a childhood history of extreme sexual child abuse himself; that in spite of that he was an exemplary student, that he entered the marine corps, that he served in the United States Marines with distinction for eighteen years, that he attained the rank of E-7, that he was highly decorated and a combat veteran in Desert Storm. He has no criminal history prior to today.

971 So.2d at 557. [Emphasis the Court's.]

The court further stated:

¶ 17. After having instructed counsel not to speak on his behalf, Loden asked to make a statement to the court, which was granted.[10] Loden proceeded to apologize to the friends and family of Leesa and admitted responsibility and

86

culpability for "tak[ing] an irreplaceable element out of your world. . . . I hope you may have some sense of justice when you leave here today." The State, in requesting the death penalty, submitted that each factor required by Mississippi Code Annotated Section 99-19-101(7) was satisfied and that the "aggravating circumstances . . . far outweigh [the] mitigating circumstances. . . ." Specifically, the State further maintained that the requirements of Mississippi Code Annotated Section 99-19-101(5)(d) were satisfied in that "the capital offense, murder was committed . . . while the defendant was engaged in the crime of kidnapping[;]" that the requirement of Mississippi Code Annotated Section 99-19-101(5)(e) was satisfied because Loden had concealed a hidden grave to bury Leesa's body to prevent its discovery and protect his reputation as a well-respected Marine; and that the requirement of Mississippi Code Annotated Section 99-19-101(5)(h) was satisfied as a five-foot, one-inch, 110-pound, sixteen-year-old girl was kidnapped around 10:45 p.m., then subjected to brutal repeated acts of rape and sexual battery while being videotaped, before her murder at approximately 2:30 a.m.

¶ 18. The sentencing order reveals that the learned trial judge:

conducted an extensive, on the record, examination of the Defendant for the purpose of determining whether or not the pleas of guilty offered by him were to be entered by him knowingly, freely, understandingly and voluntarily. The Court further made specific inquiry concerning the Defendant's understanding of his rights under the Constitution of the United States and the State of Mississippi and his right to have a jury hear the evidence offered by the State of Mississippi and himself on the issue of guilt or innocence on each of the charges against him and to decide those issues. *The Court further examined Defendant concerning his understanding of his right to have a jury fix the punishment imposed (i.e. death, life without parole or life imprisonment) in the event he was found guilty of [c]apital [m]urder by a jury.*

The circuit court further stated that it:

does hereby find that each of the *pleas of guilty entered by Defendant were knowingly, freely, understandingly and voluntarily made* and that such pleas were not the result of any promises, threats or coercion of any kind *and that the Defendant was fully advised by his attorneys and the Court of his [c]onstitutional and statutory rights with regards to*

87

*each charge and more specifically with reference to the sentence to be imposed*; that is that the Defendant had a statutory right to have the punishment to be imposed for the crime of [c]apital [m]urder determined by a jury and not the Court acting without a jury.

(Emphasis added). In imposing the sentence on the capital murder count, the circuit court:

considered all of the evidence previously introduced in the proceedings on entry of Defendants['] pleas of guilty, and the additional proof offered including photographs introduced by the State, a video tape recovered from the vehicle of the Defendant introduced by the State, the psychiatric reports of [Dr.] McMichael and members of the [s]taff at Mississippi State Hospital, and [Dr.] O'Brien, a clinical psychologist and forensic consultant who examined the Defendant at the request of the Defendant's attorneys.

. . .

_____

10. The following was stated:

Court: Counsel for the defendant, I will give you an opportunity to argue. I understand your client has instructed you not to exercise your right, but you do understand I will permit that. If you wish to make any argument, I will certainly hear that. I am going to give the defendant an opportunity to make a statement.

Mr. Daniels: Your Honor, . . . in keeping with Mr. Loden's wishes, we will not make any formal argument. He would like to address the Court at this time.

971 So.2d at 557-59. [Emphasis the Court's & emphasis added.]

The circuit court found that petitioner's waiver of the sentencing jury was knowing, intelligent and voluntary. Petitioner presented nothing to the Mississippi Supreme Court that indicated that petitioner did not knowingly, intelligently, and voluntarily waive the sentencing jury in this case. Simply put, petitioner did not want to have the general public

see how depraved he was by having the State put on the evidence, including the videotape of the abuse and murder, of his actions. Petitioner has failed to demonstrate that his waiver was not voluntary.

Further, while it is not crucial to this inquiry because of the precedent found in *Landrigan*, *supra*, it is clear from the record that counsel had conducted an investigation into mitigation evidence on behalf of petitioner. When the State rested in chief during the sentence phase, the following exchange occurred:

THE COURT: What says the Defendant?

MR. DANIELS: Your Honor, we will not be submitting any mitigation evidence in this case. I would like to, if the Court will allow me, make a brief statement summarizing what our mitigation evidence that's been developed would be followed by our explanation for not submitting it to the Court.

THE COURT: All right, sir. You may proceed.

MR. DANIELS: Your Honor, through our investigation and our clinical psychologist's expert that's been appointed by the Court we've been able to develop that Mr. Loden has a childhood history of extreme sexual child abuse himself; that in spite of that he was an exemplary student, that he entered the marine corps, that he served in the United States Marines with distinction for eighteen years, that he attained the rank of E-7, that he was highly decorated and a combat veteran in Desert Storm. He has no criminal history prior to today.

The expert clinical psychologist that was appointed for the defense by the Court, Dr. Gerald O'Brien, would have been offered as an expert in the field of clinical psychology. Dr. O'Brien opines that at the time of the crimes Mr. Loden was not capable of appreciating the criminality of his conduct and that he was also incapable of conforming his conduct to the requirements of the law.

And finally that at the time of the crimes he was suffering from extreme

89

mental and emotional disturbance.

Notwithstanding, Mr. Loden has elected to and has instructed us that he desires to waive presentation of this mitigation evidence for reasons I feel he will explain to the Court when given an opportunity to make a statement. Thank you.

THE COURT: Counsel, do you wish to tender a copy of the report of Dr. O'Brien?

MR. DANIELS: Your Honor, I do have a copy I believe that Your Honor has examined that en camera. We would offer this as the defendant's exhibit to this proceeding for the limited purposes of this sentencing proceeding.

THE COURT: All right.

MR. DANIELS: I provided the State with a copy of it.

MR. YOUNG: They have provided us a copy, Your Honor, and we have told them that WE would stipulate to the report and they could put it into evidence.

THE COURT: All right. Pass a copy to the court reporter.

(WHEREUPON, THE REPORT OF DR. O'BRIEN WAS RECEIVED AND MARKED AS STATE'S EXHIBIT NO. 38 IN EVIDENCE.)

Tr. 689-92.

The record shows that counsel had investigated the area of mitigation and was ready to present such evidence to the trial court had they been allowed to do so. This recorded colloquy refutes the affidavit of James P. Johnstone, Esquire, co-counsel in this case, when he states that on September 18 and 19, 2001, when counsel met with petitioner "we did not have a mitigation case to present because there had not been any mitigation investigation."

Pet. Ex. 19 at 3, ¶ 11. Perhaps, Johnstone has forgotten what was stated to the trial court in the transcript or perhaps he did not personally do any mitigation investigation. This statement was clarified in Johnstone's later deposition. It is clear from the transcript that Mr. Daniels had done an investigation into mitigation evidence and was ready to produce such evidence. Further, Mr. Daniels furnished an affidavit regarding his representation of petitioner. *See* Resp. PCR Exhibit A. In this affidavit, Daniels states that he spoke with the petitioner's mother and sister regarding possible mitigation evidence. *See* Resp. PCR Ex. A, at 1, ¶ 3. He further states that he personally spoke with a Marine liaison officer about Loden's military situation and background. *Id.*, at 1, ¶ 4. He also states that it was his opinion that petitioner's "traumatic early childhood and his good military background would not have been insubstantial if offered in mitigation." *Id.*, at 1, ¶ 5. With regards to any appeal, Daniels states that:

> Mr. Loden asked me whether if he pleaded guilty to Capital Murder he could appeal his case. I told him there wold be no direct appeal by us, but that the Mississippi Supreme Court would automatically review a sentence of death. I told him that we could not guarantee him exactly what the Court might do, or not do upon such review. I told Mr. Loden if he wanted to directly appeal and assign particular grounds for reversal of his conviction, that would be best served by going to trial.

> *Id.*, at 1-2, ¶ 6.

The record and the affidavit demonstrate that Daniels had done an investigation into mitigation, whether Johnstone had done so or not. Counsel was not ineffective because an investigation into mitigation was done. However, as stated above, this is not a question in

91

this case because petitioner instructed his attorneys that they were to put no case in mitigation on in his behalf. In addition, counsel were instructed they were not to cross-examine any of the state's witnesses or object to any exhibits. Petitioner cannot now complain that counsel followed his instructions. *See Landrigan, supra*.

Finally, petitioner relies on the ABA *Guidelines for Appointment and Performance of Counsel in Death Penalty Cases* as authority for granting relief in this case. While the United States Supreme Court cited these guidelines favorably, it has done so only as a guide. In *Newland v. Hall*, 527 F.3d 1162 (11th Cir. 2008), the Eleventh Circuit in addressing the import of the ABA standards held

> First, petitioner invokes Standard 4-4.1 of the 1982 ABA Standards for Criminal Justice.[71] The ABA Standards are "'only guides' and do not set the constitutional baseline for effective assistance of counsel." *Rompilla*, 545 U.S. at 400, 125 S.Ct. at 2473. (Scalia, J., dissenting) ( quoting *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2065); *see Chandler*, 218 F.3d at 1317 ("In particular, we do not understand the Supreme Court to make the ABA Standards part of the highest law of the land, even if one accepts that those standards reflect a good policy.").

527 F.3d at 1207. [Footnote omitted.]

That is just what they are, they are not a constitutional mandate. Petitioner's reliance on these guides is misplaced.

Respondents would assert that petitioner's voluntary actions resulted in no case being put on in mitigation. The decision of the Mississippi Supreme Court on this claim is neither contrary to or an unreasonable application of *Strickland*. *See Cullen v. Pinholster, supra; Harrington v. Richter, supra*. Petitioner is entitled to no relief on these claims of ineffective

assistance of counsel.

### (ii.)  Failure to Object to Sentence Phase Evidence,
### to Cross-examine Witnesses and by Stipulating to Report

Petitioner also contends that he was afforded ineffective assistance of counsel by counsel's failure to object to the evidence introduced during the sentence phase, cross-examine witnesses and by stipulating to the summary report from the Mississippi State Hospital at Whitfield.  This claim was presented to the Mississippi Supreme Court on post-conviction review of the sentence phase.  The Mississippi Supreme Court addressed the issue as follows:

**(C) Trial counsel provided ineffective assistance of counsel by failing to object [to] and cross-examine witnesses during the sentencing phase and [by] stipulating to the State psychiatric report**.

¶34. Loden "adamant[ly]" advised defense counsel that he did not want them to cross-examine witnesses for the State or object to the introduction of evidence presented by the State.  As Loden stated, "I'm just doing what I feel I need to do."

¶ 35. In spite of the clarity of his then-declared position, Loden now argues that the Mississippi State Hospital report contained "a number of biased, disparaging and unsupported allegations[,]"[31] upon which defense counsel had "an obligation ... to discuss the downside of admission so that Loden could have made a somewhat informed decision."  The State responds that "[o]n top of the fact that the [Mississippi State Hospital] examination was conducted at the behest of [Loden], ... [Loden] instructed counsel not to object to exhibits offered by the State during the sentencing hearing [and] they cannot be held ... ineffective in doing what he instructed them...."

¶ 36. The State's position is in accord with our law. "Because defense counsel acted in accord with [Loden's] instructions, *their performance was not deficient.*"  *Bishop, 882 So.2d at 145.  See also Strickland, 466 U.S. at 691,*

104 S.Ct. 2052 ("[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

_____

31. According to Loden:

> [t]hese include an unsupported and extremely prejudicial allegation attributed to police officers that Loden may have committed prior similar murders in Louisiana and Mississippi, the tainted and unsupported diagnoses of Malingering and Antisocial Personality Disorder, and the attempt by the doctors and the social worker to turn cattle slaughtering on his grandfather's farm into sadistic abuse of animals.

We note that the record does not reveal that the circuit judge was ever presented with the full Mississippi State Hospital report at issue, as the record contains only a summary report which does not include the subject allegations.

43 So.3d at 386-87.

This decision is neither contrary to or an unreasonable application of *Strickland*.

Petitioner next contends that counsel were ineffective in failing to cross-examination witnesses during the sentence phase of the trial and for stipulating to the "state's" psychiatric report from the State Hospital.

The simple reason that counsel did not cross-examine witnesses during the sentence phase is because they had been instructed by petitioner not to do so. Looking to the transcript of the sentencing hearing, we find the following:

MR. JOHNSTONE: Your Honor, if we could at this time advise the Court. We have conferred with our client Mr. Loden, and as the Court noted earlier we were not making any objections nor cross-examining these witnesses. And we've conferred with Mr. Loden and *he's advised us that he does not want us to cross-examine witnesses or object to the introduction of any exhibits* that are being introduced through these witnesses that the State intends to call.

Tr. 594. [Emphasis added.]

Clearly, counsel were following petitioner's directions not to cross-examine witnesses.

With regards to the stipulation to the psychiatric report from the State Hospital, the respondents submit that the report was not the "state's" report. The motion for a mental examination by the forensic staff at the State Hospital was filed by the petitioner on March 5, 2001, not by the State. *See* DA Rec. C.P. at 93-94. A pre-trial hearing was held on this motion. The record reflects the following:

[BY THE COURT]  All right, sir. The next matter Involves the motion for psychiatric examination.

MR. DANIELS: Yes, Your Honor.  My conversations with Mr. Loden, just state as a matter of opinion I think that calls into question whether or not he is competent at the time of the commission of the crime charged and in assisting in his defense.  Discovery is replete with instances of his repeated *attempts at suicide*.  He's intimated to me some *instances of blackouts and amnesia* and that sort of thing.  So I'm really compelled to seek the Court's order for a psychiatric examination.  I prepared an order and I prepared all the necessary documents for submission to the state hospital for this examination. I think it can be done rather expeditiously.

THE COURT:  Does the State have anything?

MR. YOUNG:  Your Honor, with them making this motion, I believe of course that the defendant should be given a psychiatric examination at the state facility in Whitfield.  I would ask that the defense and the State coordinate everything so that we can get all the information that they need down there as soon as possible.  Some of this is information which they will have to get as the defense and from the defendant.

In the past there have been problems with getting all this down there, and the state hospital will not usually take them until they get this information. So I would just ask that that be expedited so that we can see that he is sent as promptly as possible and get the results back as soon as possible so that we

95

know what they are and can proceed to trial.

THE COURT: Yes, sir. Mr. Daniels, you exhibited to me a moment ago a packet of information that you think is sufficient to provide the information that they will require.

MR. DANIELS: I have, Your Honor. I already have everything the state hospital requires and more right here.

THE COURT: All right. Well, I would simply observe that this seems to be a major roadblock in getting the information which satisfies them because they demand a great deal of information.

It's a burdensome thing on counsel, I know, to try to satisfy their requirements.

A psychological evaluation will be required by the Court at the Mississippi State Hospital. In that order, and I have not examined that order, counsel, but I will, I would assume that the classic questions are posed to the psychiatrist about the present mental capacity as well as asking that they address the capacity of the defendant at the time of the alleged commission.

After that examination has been conducted and a report rendered the court, and I will need that as soon as possible, I will conduct yet a second hearing to determine what the circumstances might be as a result of that. That report is to be provided to the State and the Court or I will see that that is done when I receive it.

If the State has any desire to seek additional examination or whatever, I will take up any motion you might file in that regard, counsel.

MR. YOUNG: Thank you. May I inquire as to counsel? Has anything been sent to Whitfield yet or are you just prepared to send it now?

MR. DANIELS: It's all right here.

The only thing I don't have, Your Honor, is – has there been an NCIC report done in this case? My client has an absence of a criminal record and they do require that report, Your Honor.

THE COURT: An NCIC report indicating no – I would assume it may at this point reflect a charge coming out of this very circumstance, but other than that. . . . .

MR. YOUNG: To my knowledge we don't have one, but if we can get one, we'll be glad to provide it.

THE COURT: I can assist in that maybe if it's necessary.

Counsel, let me ask you to pass that order to the State. Before I sign it I want them to look at it so that all of the issues are addressed of the questions asked, and if agreeable, I will sign that order and we'll get this matter on the way.

Now, from the list of circumstances of motions filed, I think that exhausts all those things that you intended to call up today.

MR. DANIELS: Yes, sir.

DA Tr. 86-90.

Clearly, this was Loden's motion, not the State's. The motion was granted by the circuit court in an order dated April 26, 2001. The extensive order granting the motion for mental examination was prepared by petitioner and approved by the State. *See* DA Rec. C.P. at 119-22. This order specifically stated that the written report of the evaluation should be furnished to defense counsel, the district attorney and to the trial court. *See* DA Rec. C.P. at 120. Further, the order included instructions to determine petitioner's competency to stand trial, his sanity at the time of the offense, his "capacity to understand and to knowingly, intelligently, and voluntarily waive or assert constitutional rights" and to make a determination regarding two mitigating circumstances: 1) whether the offense was committed while petitioner was under the influence of extreme mental or emotional

97

disturbance (and also a lesser degree of emotional disturbance); 2) whether the offense which petitioner was charged was committed while his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (and also whether it was impaired to a lesser degree). *See* DA C.P. at 119-20.

On top of the fact that the examination was conducted at the behest of petitioner, not the State, petitioner had instructed counsel not to object to exhibits offered by the State during the sentencing hearing. Tr. 594. Since counsel were following the directions of petitioner they cannot be held to be ineffective in doing what he instructed them not to do. *See Strickland*, 466 U.S. at 691 ("[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."): *United States v. Masat*, 896 F.2d 88, 91-94 (5th Cir.1990). The decision of the Mississippi Supreme Court on this issue is neither contrary to or an unreasonable application of *Strickland*. Petitioner is entitled to no relief on this claim.

### (iii.) Funds for Expert Mitigation Assistance

Petitioner next contends that trial counsel were ineffective in failing to effectively and adequately litigate the motion for funds for an expert mitigation assistance. This claim was presented to the Mississippi Supreme Court on post-conviction review of the sentence phase of this case. The Mississippi Supreme Court resolved the claim as follows:

**(D) Trial counsel provided ineffective assistance of counsel through their wholly inadequate litigation of the Motion for Funds for Expert Mitigation Assistance.**

¶ 37. Issue I in Loden's direct appeal addressed "[w]hether Loden was improperly denied funds to retain the assistance of a forensic social worker to investigate and present relevant mitigating factors." *Loden*, 971 So.2d at 562. This Court concluded that:

> [w]hile "American Bar Association standards and the like ... are guides to determining what is reasonable ... *they are only guides*." *Strickland* [, 466 U.S. at 688, 104 S.Ct. 2052] (emphasis added). *See also Wiggins* [, 539 U.S. at 524, 123 S.Ct. at 2527]. Furthermore, "[t]he State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand." [*Thorson v. State*, 895 So.2d 85, 122 (Miss.2004) ]. The lower court did not err in concluding that [Mooers's] redundant services were not justified. This Court finds there is no evidence to support that the learned circuit judge abused his discretion in so finding.

*Loden*, 971 So.2d at 564. In an accompanying footnote, this Court added that "[a]lternatively, this Court agrees with the State that this issue is moot because Loden chose to present no mitigation evidence to the circuit court." *Id*. at 564 n. 15.

¶ 38. Notwithstanding this Court's earlier ruling, Loden now argues that:

> [h]ad counsel initiated their investigation into Loden's social, mental, military and employment history from the moment they were appointed as Loden's counsel-as they were required to do by the prevailing norms-they would have been able to present "concrete reasons" for requiring assistance of Dr. Mooers. In addition, had counsel adequately researched the law on the need for a mitigation expert and provided more compelling authority to the court, the court would have (and certainly should have) granted the motion.

The State responds that Loden:

> now wants to relitigate this as a claim of ineffective assistance of counsel for counsel's failure to better argue in the trial court for such an expert. Because this Court has found no error in the underlying

substantive claim [Loden] cannot demonstrate prejudice and therefore cannot demonstrate ineffective assistance of counsel under *Strickland* ....

This is simply ... an extension of [Loden's] claim that counsel failed to properly investigate for mitigation evidence. Just as the substantive claim was held to be moot by the Court on direct appeal, the ineffective assistance of counsel claim is moot because [Loden] instructed counsel not to present any evidence in mitigation, not to cross-examine witnesses and not to object to any exhibits offered by the State.

¶ 39. The substantive issue underlying this ineffective-assistance-of-counsel claim was fully addressed on direct appeal. "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of res judicata." *Bishop*, 882 So.2d at 149 (quoting *Jackson v. State*, 860 So.2d 653, 660-61 (Miss.2003)). Moreover, as the underlying substantive issue was found both to be without merit and moot on account of Loden's decision not to present mitigation evidence (*see Loden*, 971 So.2d at 564 n. 15), Loden cannot establish the requisite prejudice under *Strickland* to prove ineffective assistance of counsel. Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

43 So.3d at 387-88.

This decision is not an unreasonable application or contrary to *Strickland*.

Petitioner contends that counsel were ineffective in their litigation of the need for a forensic social worker to develop mitigation in his case. The substantive claim underlying this claim of ineffective assistance of counsel was presented to this Court in the direct appeal of petitioner's sentencing phase. The Court held:

I. **Whether Loden was improperly denied funds to retain the assistance of a forensic social worker to investigate and present relevant mitigating factors.**

¶ 28. Loden filed an "Ex Parte Motion for Funds for Expert Assistance in the Field of Mitigation Investigation." The motion sought the services of

forensic social worker Gary Mooers to aid defense counsel in interviewing and preparing mitigation witnesses and "adequately develop[ing] the full range of mitigating circumstances that exist in this case." The circuit court denied Loden's motion, finding that it had already granted Loden's earlier motion for an investigator and Mooers would repeat work "that the investigator, the attorneys or psychiatrists, psychologists would be involved in in developing the case."

¶ 29. Loden now asserts that Mooers "would have uncovered substantial mitigation evidence[,]" and "[t]he denial of funds to hire a forensic social worker violated the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States and Article 3[,] §§ 14, 26 and 28 of the Mississippi Constitution of 1890." In support thereof, he refers to the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.

¶ 30. The State replies that "[t]he trial court provided Loden with an investigator and an independent psychologist in the person of [Dr. O'Brien], in addition to a full evaluation by the staff at the Mississippi State Hospital at Whitfield." Thereafter, "[t]he trial court found that since he had furnished Loden with an investigator and an independent psychologist that those experts would be qualified to do what Loden proposed that such an expert would do." The State argues that this was not an abuse of discretion by the trial court and that the issue is moot "because Loden instructed his counsel not to present any mitigation evidence to the court on his behalf."

¶ 31. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court stated:

> [w]e recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has *access to the raw materials integral to the building of an effective defense*. Thus, while the Court has *not* held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, *see Ross v. Moffitt*, 417 U.S. 600[, 94 S.Ct. 2437, 41 L.Ed.2d 341] (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to " an adequate opportunity to present their claims fairly within the adversary system," *id*. at 612[, 94 S.Ct. 2437].

*Ake*, 470 U.S. at 77, 105 S.Ct. 1087 (emphasis added).

¶ 32. This Court has stated that:

"[t]he trial court's decision on a motion for funding for consultants or investigators for an indigent defendant is reviewed for abuse of discretion." *Grayson v. State*, 806 So.2d 241, 254 (Miss.2001) (citing *Hansen v. State*, 592 So.2d 114, 125 (Miss.1991)). The State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand. *Johnson v. State*, 476 So.2d 1195, 1202 (Miss.1985). However, this Court does recognize that expert assistance should be paid for in certain cases and will address the need for support on a case-by-case basis to determine whether a defendant is prejudiced by the denial of expert assistance to `the extent that he or she is denied a fair trial. *Id.* In determining whether a defendant was denied a fair trial because of failure to appoint or allow funds for an expert, some of the factors to consider are whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts. *Fisher v. City of Eupora*, 587 So.2d 878, 883 (Miss.1991). This Court has also considered to what extent the State's case depends upon the State's expert, *Tubbs v. State*, 402 So.2d 830, 836 (Miss.1981), and the risk of error in resolving the issue for which the expert is requested. *Johnson v. State*, 529 So.2d 577, 592 (Miss.1988).

*Thorson*, 895 So.2d at 122-23 (quoting *Townsend v. State*, 847 So.2d 825, 829 (Miss.2003)) (emphasis added). *See also Harrison v. State*, 635 So.2d 894, 901 (Miss.1994) (quoting *Johnson*, 529 So.2d at 590) (this Court "will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair."). Moreover, "[a]n indigent's right to defense expenses is 'conditioned upon a showing that such expenses are needed to prepare and present an adequate defense.' *Ruffin v. State*, 447 So.2d 113, 118 (Miss.1984). Concrete reasons for requiring an expert must be provided by the accused." *Howell v. State*, 860 So.2d 704, 721 (Miss.2003) (quoting *Green v. State*, 631 So.2d 167, 171-72 (Miss.1994)) (emphasis added). *See also Harrison*, 635 So.2d at 901 ("a defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial").

¶ 33. The circuit court judiciously provided Loden with state-funded investigative assistance in developing mitigation evidence.   An order authorizing a Criminal Defense Investigator ("CDI") was granted, followed by an order granting additional funds for the CDI.   An order providing a psychological evaluation of Loden at the Mississippi State Hospital was granted.   Finally, an order making state funds available for Dr. O'Brien, Loden's selected psychologist, to examine and evaluate Loden was granted. Moreover, Loden's later-filed motion set forth only generic reasons for the need of an additional expert, which effectively mirrored his prior requests to obtain an investigator and an expert in the field of psychology (*i.e.* "interview[ing] and prepar[ing] all mitigation witnesses" and "adequately develop[ing] the full range of mitigating circumstances that exist in this case"). Finally, Loden conceded that Mooers's services were indistinguishable from those of the other experts except insofar as Mooers had an alleged undefined special expertise and a Ph.D., which amount to "unsubstantiated assertions," not "concrete reasons."  *Id*.

¶ 34. While "American Bar Association standards and the like . . . are guides to determining what is reasonable . . . they are only guides." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added).  *See also Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).  Furthermore, "[t]he State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand." *Thorson*, 895 So.2d at 122.  The lower court did not err in concluding that Mooers's redundant services were not justified.   This Court finds there is no evidence to support that the learned circuit judge abused his discretion in so finding.[15]

_____

15. Alternatively, this Court agrees with the State that this issue is moot because Loden chose to present no mitigation evidence to the circuit court.  In either case, this Court finds that the April 14, 2005, affidavit of Mooers (copies of which were filed with this Court on appeal) ought not be considered, as it was not part of the original record of trial court proceedings.  *See* Miss. R. App. P. 10(f); *Craig v. State*, 208 Miss. 528, 44 So.2d 860 (1950).

971 So.2d at 562-64.

The state court held that the denial of the motion for a forensic social worker or what

is more commonly called a "mitigation specialist or expert" was not error in the opinion on

direct appeal of the sentencing phase.[15]  Petitioner attempted to relitigate this as a claim of ineffective assistance of counsel for counsel's failure to better argue in the trial court for such an expert. Because the Mississippi Supreme Court found no error in the underlying substantive claim, it found that petitioner could not demonstrate prejudice and therefore could not sustain a claim under *Strickland, supra*.

Respondents would assert that this claim of ineffective assistance of counsel  is controlled by the precedent found in *Landrigan, supra*.  This is simply an extension of petitioner's claim that counsel failed to properly investigate for mitigation evidence.  Just as the substantive claim was held to be moot on direct review, the ineffective assistance of counsel claim is likewise moot because petitioner instructed counsel not to present any evidence in mitigation, not to cross-examine witnesses and not to object to any exhibits offered by the State.  Even had counsel successfully argued and obtained the services of Dr. Moores, it would not have been futile because petitioner would not have allowed him to testify in mitigation, if such testimony is actually admissible.

Because petitioner instructed his counsel to put on no case in mitigation the precedent found in *Landrigan, supra*, applies to this case and petitioner is entitled to no habeas relief on this claim of ineffective assistance of counsel.

---

[15]Death penalty litigation has created a niche for people to now hold themselves out to mitigation "experts" or "specialist".  While they may hold degrees in social work or other recognized fields, what they testify to is nothing more than hearsay.  Such a person may be helpful in amassing testimony, as an investigator would, but his or her testimony is nothing more than hearsay.

### (iv.)  Evaluation by Independent Psychologist

Petitioner also contends that trial counsel was ineffective by delaying in having petitioner evaluated by independent psychologist, Dr. C. Gerald O'Brien.  This claim was also presented to the Mississippi Supreme Court in the post-conviction petition from the sentence phase of the trial.  The Mississippi Supreme Court held:

**(F) Trial counsel's delay in having Loden evaluated by an independent psychologist and failure to make adequate use of the psychologist amounted to ineffective assistance of counsel.**[

¶ 45. Dr. O'Brien's 2008 affidavit provided that "[b]ased on my observations at the time and the limited history that was given to me, I concluded that [Loden] was competent to stand trial and assist in his own defense."  However, Dr. O'Brien stated that this conclusion and the remainder of his diagnosis would have been significantly different had he been provided with additional background information on Loden (*e.g.*, "any military records, interviews of [Loden's] military colleagues, or even basic information about [Loden's] combat experience.").[32]

¶ 46. According to Loden, the information sources provided to Dr. O'Brien "were in no way sufficient for [him] to form a reliable clinical picture of Loden's mental state at the time of the crime, or potential mitigating factors in Loden's background."  Specifically, Loden emphasizes that Dr. O'Brien:

was not able to put Loden's mental condition in proper focus because he did not diagnose Loden with PTSD, did not connect Loden's problems with his experiences in childhood and during the Gulf War, and did not take into account or explain the possible significance of amnesia as a reflection of the extreme degree of mental disturbance Loden was suffering.  A diagnosis of PTSD, developed while Loden was serving his country in the Marines, would have provided especially powerful mitigating evidence.

¶ 47. Loden's argument relates back to the lack of mitigation investigation argument in I(A), insofar as he claims that, because defense counsel failed to adequately investigate mitigation evidence, Dr. O'Brien failed

to receive sufficient background material, and, as a result, Dr. O'Brien's report was prejudicially flawed. Fundamentally, Loden's argument is moot on account of his decision not to present mitigation evidence. As such, he cannot establish any prejudice resulting from defense counsel's alleged "failure to make adequate use of the psychologist...." Accordingly, Loden fails to prove that he is entitled to any relief on this issue.

¶ 48. But even considered solely from a deficient-performance perspective, Loden's argument is without merit. On March 5, 2001, Loden filed a "Motion for Psychiatric Examination," requesting examination of Loden's "capacity ... at the Mississippi State Hospital...." Following an "Order for Mental Examination," the summary report of the Mississippi State Hospital was completed in June 2001. On July 16, 2001, Loden filed an "Ex Parte Motion for Funds to Secure Expert Assistance in the Field of Psychology," stating that:

> [b]ecause the report [of the Mississippi State Hospital] confirms that several factors taken together may have influenced [Loden's] mental state at the time of the alleged offenses, and because such factors are mitigating in nature, [Loden] needs to have these factors evaluated, for possible defense, or for mitigation, during any sentencing trial.

The circuit court granted Loden's motion for a second evaluation, to be performed by Dr. O'Brien. In short, Loden's allegedly ineffective defense counsel was able to secure a discretionary, second evaluation by Dr. O'Brien from the circuit court. *See Byrom v. State*, 863 So.2d 836, 852 (Miss.2003) (" *Ake*[33] does not require that an indigent defendant be given funds to pay for the psychiatrist of his or her own choosing, even in cases where sanity is at issue."). Furthermore, a review of Dr. O'Brien's report reflects that he was acquainted with Loden's family background and childhood, claim of sexual abuse, alleged history of substance abuse, military experience,[34] suicidal ideation, and personal experience on the evening of the crime. Possessing this information, Dr. O'Brien concluded, like the Mississippi State Hospital, that Loden "appears at the present time to be competent to stand trial and assist in his own defense." Under these circumstances, and given the strong presumption that defense counsel's actions fell within "a wide range of reasonable professional assistance[,]" *Wiley*, 517 So.2d at 1378, this Court cannot conclude that defense counsel's performance was deficient. On this basis as well, Loden fails to prove that he is entitled to any relief on this issue.

———————————————————————

32. This Court has reviewed the military records exhibited in this appeal, which contain no evidence of mental-health issues or diagnosis of post-traumatic stress disorder ("PTSD"). Rather, those records are replete with positive comments regarding Loden's leadership, skills, abilities, intelligence, and insightfulness. For example, appraisals of Loden's professional character provided, inter alia, "[f]irst-rate leader, manager and organizer[;]" "[a] gifted leader he combines drive and patience to accomplish the mission with excellence[;]" "[d]etermined, loyal and aggressive! Initiative is strongest trait[;]" "the most intelligent staff noncommissioned officer I know[;]" "an imaginative and far-sighted thinker [;]" "[a]rchitect of the plan-then makes it happen with the desired results[;]" "[a] self-starter who[se] initiative is only surpassed by his imagination[;]" "INNOVATIVE and FLEXIBLE....".

33. *See Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

34. For example, Dr. O'Brien's report provided that "[a]t times he hears the voice of his friend, 'Frank,' who was killed in 1991 during a missile attack. He describes times when he can 'still see it, smell it.'"

43 So.3d at 390-92.

This decision is neither contrary to or an unreasonable application of *Strickland*.

Counsel filed petitioner's *ex parte* motion for examination by an independent psychologist on July 16, 2001. The trial court granted the motion on July 17, 2001. Petitioner was examined by Dr. O'Brien on August 13, 2001. Petitioner's trial did not begin until September 21, 2001, over a month after Dr. O'Brien's evaluation. Therefore, there was no delay in having petitioner examined once the motion was granted.

Perhaps petitioner's argument is based on his misconception of the record. Perhaps he is still confused as to who requested the evaluation at the State Hospital. Trial counsel timely moved for a mental evaluation by the forensic staff at the State Hospital at Whitfield

on March 5, 2001. *See* DA C.P. 93-94. The trial court granted his motion for mental evaluation on April 26, 2001. *See* DA C.P. 119-23. The examination at the Hospital at Whitfield, took place on or before June 22, 2001, as that is the date that appears on the report. *See* DA C.P. 135-37. This summary report was filed with the Circuit Court on June 27, 2001. Petitioner being dissatisfied with the Whitfield report, then sought a second examination by Dr. O'Brien, a mere nineteen (19) days after the Whitfiled summary report was filed with the trial court and presumably received by trial counsel. There was no delay.

Under the precedent of the Mississippi Supreme Court, petitioner was not entitled to the additional examination by Dr. O'Brien. The state court has repeatedly held that when a defendant is examined by an expert appointed by the court, he has no right to an independent examination. *See Byrom v. State*, 863 So.2d 836, 852, ¶ 33 (Miss. 2003); *Manning v. State*, 726 So.2d 1152, 1190-91, ¶¶ 157-61 (Miss. 1998); *Woodward v. State*, 726 So.2d 524, 528-29, ¶¶ 14-20 (Miss. 1997); *Butler v. State*, 608 So.2d 314, 321 (Miss. 1992); *Willie v. State*, 585 So.2d 660, 671 (Miss. 1991). Where as here, the defendant is examined and evaluated by a psychiatrist and psychologist from the Mississippi State Hospital at Whitfield, "the examination 'satisfied "the constitutional mandate of [*Ake v. Oklahoma*]." *See Woodward v. State*, 726 So.2d 524, 528-29, ¶¶ 14-20 (Miss. 1997); *Butler v. State*, 608 So.2d 314, 321 (Miss. 1992); *Willie v. State*, 585 So.2d 660, 671 (Miss. 1991); *Cole v. State*, 666 So.2d 767, 781 (Miss. 1995); *Lanier v. State*, 533 So.2d 473, 480-81 (Miss. 1988).

Further, Loden clearly stated in his July 16, 2001, motion that the State Hospital found

no mitigating circumstances existed and that he wanted an additional examination in an effort to find some. *See* Pet. PCR Ex. 28-J at 21-22. While it could be argued that the forensic staff found no mitigation, the summary report did not foreclose mitigation.

In any event, petitioner was dissatisfied with his first examination and wanted another evaluation to try and contradict the State Hospital report even though he was not entitled to such an additional examination. The Mississippi Supreme Court has also held the trial court is not required to grant multiple psychiatric and psychological examinations in efforts by the defendant to secure an expert who will testify favorably for him. *See Willie v. State*, 585 So.2d 660, 671 (Miss. 1991); *Hill v. State*, 432 So.2d 427, 437-38 (Miss. 1983). However, counsel, who petitioner now faults, was able to convince the trial court to grant him a second evaluation in an attempt to develop some mitigation evidence.

Further, counsel had the right to rely on the findings of the forensic staff at the State Hospital appointed for the defense by the trial court without being subject to a later finding of ineffective assistance of counsel. The Fifth Circuit held in *Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002), *cert. granted*, 539 U.S. 986 (2003), *cert. dismissed under 46.1*, 541 U.S. 913 (2004):

> Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so. Mr. Parnham's actions in this case were objectively reasonable. The state habeas court did not unreasonably apply federal law in denying Smith's request for relief on this ground. We reverse the district court's holding to the contrary; there is no *Strickland* violation.[9]

---

9.    Because we find that counsel's performance was not objectively unreasonable, we do not need to reach the second prong of the *Strickland* analysis.

311 F.3d at 676-77.

*See Summerlin v. Stewart*, 341 F.3d 1082, 1094 (9ᵗʰ Cir. 2003), *vacated on other grounds*, *Schriro v. Summerlin*, 542 U.S. 348 (2004)(counsel entitled to rely on opinions of experts to determine issues to pursue); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9ᵗʰ Cir. 1995), *cert. denied*, 517 U.S. 1111 (1996)(Reliance on the conclusions of his expert shields counsel from claims of ineffective assistance of counsel).

Petitioner continues to ignore the fact that it was he who requested the evaluation at Whitfield and not the State. Petitioner still refers to the Whitfield report as the State's evaluation. This is simply not the case. He requested it, he got it and its his report.

He now wants to hold counsel ineffective for failing to properly utilize Dr. O'Brien. However, by the time of Dr. O'Brien's examination, petitioner had decided on his course of action. He had decided that he wanted to plead guilty and be sentenced to death – he told Dr. O'Brien this during his examination of petitioner. Thus, by the time counsel received Dr. O'Brien's report, petitioner had already decided that he wanted to plead guilty and be sentenced to death.

Petitioner now contends that counsel did not request that Dr. O'Brien assess his competence to waive his right to trial. Whether he requested it or not, Dr. O'Brien provided an opinion regarding petitioner's competence. The concluding sentence of Dr. O'Brien's

110

report states:

> He appears at the present time to be competent to stand trial and assist in his own defense.

> Pet. PCR Ex. 30 at 8.

Thus, both the forensic staff at the State Hospital and Dr. O'Brien found petitioner competent to stand trial and to assist in his defense.[16]  The finding that one is competent to stand trial and assist in their own defense clearly includes competency to waive a jury trial for guilt and sentence.  The Mississippi Supreme Court did not unreasonably hold that petitioner's claim regarding the use of Dr. O'Brien was without merit.

Petitioner has failed to demonstrate that the decision of the Mississippi Supreme Court is contrary to or an unreasonable application of *Strickland*.  *See Cullen v. Pinholster, supra; Harrington v. Richter, supra.*  Petitioner is entitled to no relief on this claim.

### (v.) Suppression Hearing Issue

---

[16]With regard to competency the forensic staff at the State hospital found:

> We are unanimous in our opinion that Mr. Loden has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in the preparation of his defense, and that he has a rational as well as a factual understanding of the nature and object of the legal proceedings against him.
> 
>                                    . . .
> 
> We are unanimous in our opinion that Mr. Loden has the capacity to knowingly, intelligently, and voluntarily to waive or assert his constitutional rights.

Pet. Ex. 28-J at 21.

Petitioner also contends that trial counsel were ineffective in their litigation of the suppression hearing prior to the trial of this case. This claim was also presented to the Mississippi Supreme Court in the post-conviction petition challenging the sentence phase of the case. The Mississippi Supreme Court held the claim was procedurally barred from consideration in the post-conviction petition challenging the sentence phase, as this claim could have been raised during the post-conviction petition challenging the guilty plea and that petitioner had failed to demonstrate how the claim related to the sentence phase of the case. The state court opinion reads:

**(G) Counsel provided constitutionally ineffective assistance of counsel by failing to effectively inspect the State's evidence and adequately cross-examine the State's witnesses during the suppression hearings.**¶

¶ 49. Loden argues that "the police officers' account of the search was riddled with inconsistencies[,]" and that defense counsel's "failure to inquire into these issues at the suppression hearing was not a tactical or strategic choice-it was simply ineffective representation." According to Loden, defense counsel "did nothing before, during or after the suppression hearing other than placate Loden by telling him he had no chance in front of Judge Gardner anyway and he's better off raising these issues on appeal." Loden's 2008 affidavit provides that:

[i]f my trial attorneys had properly advised me I would have testified during the suppression hearing that (i) I observed [p]olice [o]fficers inside my van sometime before 11 A.M. on the day of my arrest, which I now know was before a warrant was issued for a search of my van; (ii) when I was arrested a[p]olice [o]fficer told me that they had seen the videotape which showed that they had searched my van before obtaining a warrant; and (iii) I provided a statement to the police even though I did not recall most of the events I described in my alleged confession.

¶ 50. Insofar as Loden raises this issue as a backdoor challenge to his

purportedly "involuntary guilty plea," with no new evidence presented in support thereof, *this Court concludes that it is a procedurally barred "second or successive motion*...." *See* paragraph 43, *supra* (citing Miss.Code Ann. §§ 99-39-23(6), 99-39-27(9) (Rev.2007)). To the extent that this issue pertains directly to the performance of defense counsel at the suppression hearings, this Court likewise concludes that it is *procedurally barred*. The purpose of the Mississippi Uniform Post-Conviction Collateral Relief Act "is to provide prisoners with a procedure, limited in nature, to review those objections, defenses, claims, questions, issues or errors which in practical reality could not be or should not have been raised at trial or on direct appeal." MISS. CODE ANN. § 99-39-3(2) (Rev.2007) (emphasis added). Therefore:

> [i]ssues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record. *Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceeding*.

MISS. R.APP. P. 22(b) (emphasis added). *See also* MISS. CODE ANN. § 99-39-21(1) (Rev.2007) ("[f]ailure by a prisoner to raise ... issues ... either in fact or law which were capable of determination at trial and/or on direct appeal ... shall constitute a waiver thereof and shall be procedurally barred...."); MISS. R.APP. P. 22(b) cmt. ("[u]nder this provision, issues such as claims of ineffective assistance of counsel for failure to object to evidence offered by the state or to argument by the state must be raised on direct appeal."). Loden was represented by new counsel on direct appeal and his first motion for post-conviction relief, and this issue was "based on facts fully apparent from the record[,]" MISS. R.APP. P. 22(b), yet Loden failed to raise the suppression issue. As such, he is procedurally barred from raising it now. *See* MISS. R.APP. P. 22(b); MISS. CODE ANN. § 99-39-21(1) (Rev.2007). While Loden may assert that his failure to raise the suppression issue on direct appeal was dictated by the waiver-of-guilt-phase issues arising from his purportedly involuntary guilty plea, such an argument merely returns this Court to the improper backdoor challenge to that plea as referenced *supra*.

¶ 51. Additionally, *Loden offers no explanation of how the suppression issues relate to sentencing*, the requisite focal point of this Petition for Post-Conviction Relief. These suppression issues might have been pertinent during the guilt phase of trial had he not pleaded guilty, but Loden fails to

explain how he was prejudiced in sentencing by defense counsel's performance during the suppression hearings. Accordingly, Loden fails to prove that he is entitled to any relief on this issue, as it is both procedurally barred and without merit.

43 So.3d at 392-93. [Emphasis the Court's and emphasis added.]

The invocation of the procedural bar to this claim bars it from consideration on federal habeas review. *Sykes*, *supra*. Further, the decision is not contrary to or an unreasonable application of *Strickland*.

Petitioner contended that counsel was ineffective during the suppression hearing. The state argued that insofar as this claim applied to the guilt phase of the trial it was barred as an attempt to file a successive petition for post-conviction relief since post-conviction relief had been denied on the guilt phase. *See* MISS. CODE ANN. § 99-39-27(9), *Loden v. State*, 971 So.2d 548, 575 (Miss. 2007).

The state also argued that to the extent that this claim applies to the sentence phase of the case, it is totally without merit. Petitioner attempted to create a time line that would show that the officers' reports differ and that a search was done on Mrs. Loden's car before consent was given to do so. Petitioner contends that the reports of Highway Patrol Master Sargent Rick Marlar and that of Criminal Investigator Byron Jones of the Itawamba County Sheriff's Officer differ on several key points. While petitioner has provided the reports of these officers and refers to them generally, he never identifies where the inconsistences

114

appear in these reports.[17]

Looking to Marlar's report we find:

This writer followed Deputy Jones to the Rena Loden residence and arrived at approximately 0730 hours, Friday, June 23, 2000. Deputy Jones knocked at the back door and we were let in by a white female who is a caretaker for Rena Loden, who is elderly and in a wheel chair. Deputy Jones and this writer identified ourselves and explained why we were there. This writer stated to Rena Loden that we need to talk to Eddie, Rena Loden stated that Eddie had gone fishing behind the house just a couple of hundred yards in the pasture. This writer requested permission from Rena Loden to attempt to locate Eddie and talk to him. Rena Loden granted Deputy Jones and this writer permission to do this.

Deputy Jones and this writer located the pond, but could not locate Eddie Loden or any signs of fishing equipment. Deputy Jones and this writer then called out to Eddie Loden, but received no response. Deputy Jones and this writer then returned to the residence. This writer informed Rena Loden that we could not locate Eddie. Rena Loden advised us that Eddie could not have gone far because he is requested to stay within hearing distance of a vehicle horn, which this writer later utilized approximately 20 times in an attempt to locate Eddie. Rena Loden also advised this writer that Eddie was supposed to take her car to repair shop to have her air conditioner repaired. This writer then asked fro permission to search for all the common areas of the property and Rena Loden's vehicle. Rena Loden then complied with this request. Deputy Jones and this writer then searched the residence, excluding the room that Eddie Loden slept in. Deputy Jones and this writer then went outside and searched a 1986 GMC C10 pickup, black in color, bearing MS tag MM2 546, VIN 1GTDC14H4G711643, which is registered to Rena Loden's deceased husband. E.O. Loden. Rena Loden's Oldsmobile passenger car was also searched and this writer located at the driver's side door rocker panel area a military-style general purpose rope, green in color, which appeared to be in a handcuff design. This writer took this rope into evidence. This writer then advised Deputy Jones to contact his department to request more officers assist us. This writer then contacted Captain Mike Berthay, B-2, MHP/CIB. Captain Berthay advised this writer to secure the scene until he arrived. Deputy Jones

---

[17]Marlars report is seven pages single spaced and Jones' reports are three and five pages respectively single spaced.

left to secure a search warrant for the Rena Loden property, out buildings and all vehicles on the property. Captain Berthay arrived and Criminal Investigation Bureau took control of the scene. Captain Stanley Sisk, B-3, MHP/CIB, also arrived to assist in this case. The Itawamba County Sheriff's Office had also utilized a helicopter to assist. This helicopter was circling the Rena Loden property and the adjacent properties, but still Eddie Loden was not located. Captain Berthay sent this writer to assist Deputy Jones with the search warrant.

This writer located Deputy Jones and assisted Deputy Jones in completing the task of securing a search warrant. Once this search warrant was issued, this writer and Deputy Jones returned to the scene to start the search. Eddie Loden's van was locked and had poor visibility through the windows due to curtains and blinds. This van was placed on a West Wrecker Service rollback wrecker and taken to MHP/Troop F shop to be searched by forensic evidence examiner Ken Gill of he Mississippi Crime Laboratory. This van was escorted by Deputy Charles Justice, I-12.

This writer conducted a search of Eddie Loden's bedroom and recovered a pair of gray shorts at the right side of the bed on the floor. These shorts had what appeared to be blood stains on the left front pocket. This writer also located an overnight bag, red in color at the foot of the bed which contained a JVC video camera power supply. This writer located two pornographic magazines in a lady's dresser in the top right drawer. These two magazines were not seized in this search warrant. Several other articles were recovered which are listed on the search warrant return. Most of these items were in plain view and were observed when Deputy Jones and this writer had asked for permission to search.

Pet. PCR Ex. 28-A, at 008-009.[18]

Looking to the transcript of Marlar's testimony we find the following related to the activity

_____

[18]It is clear from this report that it was not written until sometime after July 12, 2000, since the lost paragraph speaks of going to Jackson and Vicksburg on that date to do further investigation of this case. The investigation began on June 23, 2000, the morning after the crime. Therefore, there was a time span of at least 20 days from the beginning of this investigation which is in question here and the time the report was written. *See also* Tr. at 322.

at the Rena Loden property. The record reads:

Q.  Okay.  And what did you do after that?

A.   We went to Rena B. Loden's address on Ballardsville Road.  I believe that address is 2000 Ballardsville Road, and that was Deputy Jones and myself.

Once we arrived there, we went to a door that had like a wheelchair ramp to it and knocked on that door.  I believe that's actually maybe considered a back door and were met by a sitter.  Ms. Loden was elderly and in a wheelchair.  And we advised Ms. Loden with her caretaker present what we were doing there, why we were there and who – that we were trying to locate Ms. Gray and that we wanted to talk to Eddie Loden in order to see if he could give us any information that might help us locate Ms. Gray.  And we were advised by Ms. Loden that Eddie had gone fishing, and she gave us specific directions as to where the fishing pond was on their property.  And then that's when we requested permission to go onto her property, physically walk to the pond where Eddie was supposed to be and have a conversation with him, which she gave us permission to go to that pond.

Q.  Okay.  And did you execute a consent to search form?

A.  No, sir, not just – at that time we just wanted to talk to Mr. Loden to find out if he could tell us anything about Ms. Gray being missing that might help us.  And at that time we did not consider him a suspect or anything at that time.  We just asked verbal permission to go and talk to him.

Q.  And she gave you that verbal permission?

A.  She gave us that permission, yes.

Q.  And what happened then?

A.  We walked -- the direction she told us to go to had us walking right past a customized full-size van.  And we looked in the windows as we went by, saw some objects in the window of the vehicle, went ahead and crossed over a cattle gate, walked through a field over a little rise just a couple of hundred yards to a pond.

117

Q.  Let me stop you, if I could, for a moment, Officer.

. . .

Q.  Now after obtaining permission from her to go to talk to Eddie, Tom, whatever he calls himself, did you in fact attempt to do that?

A.  Yes, sir, we did.

Q.  And was he at the pond adjacent to the house?

A.  No, sir.  When we got to that pond, there was no fishing gear, and we did not see Mr. Eddie Loden nowhere around.  We came back to the residence at that time.  Now while at the pond we yelled or called out several times, called his name out several times with no response.  Came back to the house, requested if they was any more ponds, and there was another pond across from the residence.

We went to that pond first or secondly, did the same thing, no fishing gear, called out, no Mr. Loden.  Came back to the residence.  And at that time we requested a consent to search of Ms. Rena Loden's residence.

Q.  Prior to the consent to search did Ms. Loden attempt to make some kind of contact with Mr. Loden as well?

A.  She couldn't understand why Mr. Loden was not there or readily visible.  We were advised by Ms. Loden that he was supposed to stay within hearing distance of a car horn, due to her ailments I'm assuming, and that one of the signals for him would be several sharp blows on the horn, which we also did that with no avail.  And she also advised us that he had an appointment to take her vehicle for air conditioner repair because she needed an air conditoner in order to go to the doctor.

Q.  Okay.  And at that point when he's not fishing and you tried to use I guess her signal to summon him and he's not appeared, at that point is when you asked for permission to search; is that correct?

A.  Yes, sir, it is.

Q.  And did you – did she comply with that request?

118

A.   Yes, sir.  She signed a consent.

Q.   And did you execute a form?

A.   Yes, sir, I did.

Q.   Okay.  Do you have that form with you?

A.   Yes, sir, I do.

Q.   Now, if you could – if you could read that form.

A.    It says, Permission to Search.  "I, Rena B. Loden, have been informed by Rick Marlar, B-44, and Bryan Jones, I-7 who made proper identification as or an authorized law enforcement officers of the Mississippi" – or its abbreviation – "MHP/CIB and Itawamba County S. O. of my constitutional right not to have a search made of my premises and property owned by me or under my care, custody and control without a search warrant. Knowing my lawful rights to refuse to consent to such a search, I willingly give my permission to the above named officers to complete a search of the premises and property, including all buildings, vehicles, both inside and outside of the property located at 2000 Ballardsville Road, Fulton, Mississippi. The above-said officers further have my permission to take from my premises and property any letters, papers, materials and any other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation.  This written permission to search  without a search warrant is given by me to the above officers voluntarily and without any threats or promises of any kind at 9:27 a.m. on this 23rd day of June, 2000, at 2000 Ballardsville Road, Fulton, Mississippi 38843." Signed Rena B. Loden and witnessed by Rick Marlar B-44 and Bryan Jones of the Itawamba County sheriff's office.

Q.   And she signed that in your presence?

A.   Yes, sir, she did.

Q.   And she was advised of everything therein?

A.   Yes, sir, she was.

119

BY MR. DANIELS:  Objection to the leading, Your Honor.

THE COURT:  Don't lead your witness, counsel.

Q.  Did you in fact read that to her?

A.  Yes, sir, we did.

Q.  And how – did she appear to you to understand that?

A.  Yes, sir, she did.

Q.  Did she ask any questions?

A.  No, sir.  The only statement she made,  she couldn't understand why Eddie was not at the pond.

Q.  Okay.  Did she indicate that that's what he had told her that's where he was going to be?

A.  Yes, sir, that he was going fishing.

Q.  Okay.  After she complied with that request and gave the two of you consent to search her property, what happened then?

A.  At that time we asked her which room that Mr. Loden stayed in. Mr. Loden – or we were advised it was the room that we were looking at.  But in order to go through the rest of the house you have to pass through his room. There's no – there's no way of getting from what I call the living room to the kitchen area or the other parts of the house.  It's like a breezeway.  You've got to go through that room.  And we had to cross that threshold in order to go through the rest of the house.

. . .

BY MR. JOYNER: (Continuing)

Q.  All right.  Officer Marlar, after you – upon walking through this common area as you've described it, can you tell us what happened next?

120

A.   Like I said, we went through that area.  We were wanting to ensure that Mr. Loden was not anywhere in the house.  As we walked through that area, you could tell that there was an unmade bed that was evident that somebody had slept in.  There was clothes hanging off the end of the bed.  What I call an overnight bag was laying visible on the floor and also a pair of cargo shorts that was laying on the floor.   These cargo shorts had what appeared to be blood on the cargo shorts.

Q.   Do you know where on the shorts they were – the blood was?

A.   No, sir, not without reading.  It was somewhere on the front of the pants.

Q.   And you've participated in homicide investigations prior to this?

A.   Yes, sir.

Q.   And based on your experience what you saw appeared to you to be blood on those shorts?

A.   Yes, sir.

Q.   Okay.  At that time did that cause you concern?

A.   Yes, sir.  At that point that's when once we completed the back side of the house we came back through, advised Ms. Loden that we were going to be securing that part of the house, that nobody would be allowed – or property from that particular room would not be allowed to leave the premises.

I went outside and conducted the search of the automobiles.  In Ms. Loden's vehicle on the driver's side, what I call the rocker panel as you open the door, was a military-type rope.  This rope was fashioned into a set of handcuffs.  And I collected that, photographed it and collected that for evidence.

Q.   Okay.  And did that cause you concern as well?

A.   With the fact that Mr. Loden was the last person to see her, he's not where he's supposed to be, there's blood on her pants – on his pants or pants in his room, which I assume to be his, and the fact that there's general purpose

121

is what – I'm also a retired military, and I also contacted some people that are in the guard – that is known as general purpose utility military rope, and the fact that he's a marine corps recruiter that raised my suspicion level at that time that there might be foul play.

Q.   Okay.  And at that point after you had, you and deputy – did you and Deputy Jones look at the van?

A.   We could only see inside the van from the outside.   The van was – had tinted windows in it, and on the back it had like venetian blinds, which were pulled.  And just walking by the van when we first went by, we could see inside the van.  There was a pair of soiled boots that was visible.  And I'd have to check my notes to see what else was visible from the outside.

Q.   But on your cursory inspection of it did you see anybody in the van?

A.   No, sir, could not.

Q.   All right.  After finding what you've told us you found there, what did y'all do at that point?

A.   We still furthered our search for Mr. Loden by blowing the horn in two to three successions or two to three bursts from the horn about twenty times.  There was still no call for Mr. Loden or he did not appear.  At that time I contacted my supervisor, which was Captain Mike Bethay.  My immediate supervisor is Lieutenant Baker, but he was out of town.  I believe he was in Jackson or Meridian at that time.  And I was advised to secure the scene.  And I also requested that the sheriff's officer contact his immediate supervisor, which was the sheriff, and they made arrangements to get a helicopter in the air.

Q.   Okay.  Now, who went to secure the warrant?

A.   Deputy Jones actually left first to

Q.   Had a van been mentioned in your – in the investigation at that point?

Tr. at 263-74.

122

Marlar further testified during direct examination to the following:

> Q.  Now, let me backtrack a minute.  When you saw these shorts in that little common area of that room of his –
>
> A.  Yes, sir.
>
> Q.  – did you take them into custody at that time?
>
> A.  No, sir.
>
> Q.  Or did you go to the further step of obtaining a warrant?
>
> A.  I did not take them in custody at that time.  Like I said, we just advised Ms. Rena Loden that we were going to secure that particular area at that time.  And when Captain Bethay got there he ensured that nobody left with anything from that room while we were obtaining the search warrant.

Tr. 280.

On cross-examination Marlar testified as follows:

> Q.  Tell me how you conducted the search.  You went in, got permission –
>
> A.  Which one are we talking about?  The consent or –
>
> Q.  I'm getting to that.  You come in, you ask Mrs. Loden for her consent. –
>
> A.  Yes, sir.
>
> Q.  – to search the residence.
>
> A.  Yes, sir.  Read the form to her.
>
> Q.  *Did you first get her to agree to it and then come back later and get her to sign the consent form?*
>
> A.  *No, sir.  We explained to her that we would like to search her*

123

*premises and that we were still were looking for Mr. Loden. I read the form to her, made sure she understood that if she didn't want to sign this form that was perfectly all right with us, that she was under no obligation to sign that form. And she signed it at that time.*

*Q. Okay. So that's the only time that you asked her for her consent to search and that's the only time that you talked to her about her right to refuse and that sort of thing?*

*A. Yes, sir, prior to her signature.*

Q. Did you read that form to her?

A. Yes, sir, I did.

Q. And who was present when you did that?

A. Officer Jones.

Q. He was the only one present?

A. The caretaker may have been there, but I don't recall. I don't know if she had stepped out of the room. I believe she was still there.

Q. At some point did you send her home?

A. I didn't send her home. I don't, I don't know when she left.

Q. Who was in charge of that crime scene there?

A. At that particular time I was.

Q. Was Mr. Bethay present when you got that consent form signed by Mrs. Loden?

A. No, sir, he was not.

Q. Did you know that Mrs. Loden required someone to care for her?

A. Yes, sir. The lady identified herself as being the caretaker. Yes,

124

sir.

Q.   Did you know that she had someone care for her 24 hours a day?

A.   I didn't at that time, no, sir.

Q.   Did you happen to observe that she was a weakened and older woman?

A.   I observed that she was very elderly, and she was in a wheelchair. I did try to maintain to make sure that she was capable of understanding what she was saying, and the fact that she articulated very well how to get to Mr. Loden at the pond.  I mean, she gave us – I can't give directions that well. And then the fact that they had a system worked out for him to return, the fact that she, you know, could recall that he told her he was going fishing.  All these facts together led me to the conclusion that she understood what was going on.

Q.   Who did you verify that with, the information that she told you?

A.   Do what now?

Q.   Did you verify these things that she told you, the system that she had worked out?

A.   I went outside and blew the horn, if that's what you're asking.

Q.   Did you speak with Stella Renick, her daughter?

A.   Sometime later, but not during the consent.  No, sir, I don't recall.

Q.   Did you speak with her about whether or not they had this system worked out and this sort of thing?

A.   No, sir, I did not.

Q.   Did you ask any of the family members whether or not she was always lucid and mentally alert?

A.   No, sir, I did not.

125

Q. Did you ask whether or not she was ever in a confused state of mind?

A. No, sir, I did not. She appeared to be very lucid and in control of her mental facilities as you are now.

Q. When you begin a search, you said you secured that scene and told no one to leave?

A. No, sir.

Q. Tell me.

A. Yes, sir. I secured the area and was not about to let anybody leave with any items out of that room.

Q. Where was Mrs. Loden in the house when you got the consent to search?

A. In the living room. I'm calling a living room. It's where we walked into that door.

Q. Was she brought out to talk with y'all or did y'all go back to where she was?

A. No. We did not go back. She was in that room because we did not enter through Mr. Loden's area until after we got a consent, so she was already present there.

Q. Okay. So you didn't have to go – you didn't have to go into and through Mr. Loden's room to get to the living room there where you first talked with Mrs. Loden?

A. When you go in the door, I call it a living, it may be a den, but it's an area that has a couch, chairs, TV, table.

Q. Okay. As you searched the place, where was Mrs. Loden? Now you stated she was in the den or living room there.

126

A.   I believe she was still in the den as we went through the rest of the house, yes, sir.

Q.   So she wasn't moving around throughout the house –

A.   No, sir.

Q.   – with you?

A.   No, sir, she was not.

Q.   Okay.  And how long did it take you to do this search?

A.   Just a few minutes.  Less than ten minutes, probably less than five because we didn't see anybody in the house and that satisfied us right then at that point.

 Tr. 308-12. [Emphasis added.]

Perhaps petitioner's confusion about when the consent to search was signed was brought about by the highlighted portion of the cross-examination.  Petitioner's allegation is that there is a conflict in the report and the testimony because consent to search was given twice.  It is his allegation here that the house was searched first when consent was given.  However, if one reads Marlar's report and his testimony, there is no conflict.  The first consent was given to go on her property to search for Loden out by the pond where he was supposed to be fishing.  The officers went to the pond behind the house and upon not finding him, asked if there was another pond on the property.  Finding there was indeed a second pond, they proceeded there in search of petitioner.  Still not finding him, they returned to the house and obtained a written consent to search the house to make sure petitioner was not inside.  It was

127

at that time that they had to came through the room where petitioner slept and noticed the shorts with what appeared to be blood stains on them on the floor in plain view in this area. Marlar testified that he did not touch the shorts at that time but called his supervisor and instituted the procedures necessary to get the search warrant. Also, pursuant to the written consent, the black pickup truck and Mrs. Loden's car were searched. The van was not searched until the search warrant had been obtained. Therefore, Marlar's report and testimony do not conflict.

Further, on redirect examination Marlar testified to the following:

Q. Do you recall on cross-examination when you were asked whether or not you had picked up the shorts and inspected them?

A. Yes, sir.

Q. Okay. When that question was asked of you, tell us, if you would, what your training is regarding what you're to do with items of physical evidence. Are you to pick them up and play with them?

A. No, sir, I'm not. And at the time that I saw those, like I said, we were not wanting to violate Mr. Loden's right to privacy. We had to go through his room to go to the rest of the house, but until I had that search warrant I wasn't going to touch anything inside that room. And our trip through the room was as quickly as possible because we were going to the other areas of the house. We did not stay for an extended period of time nor make inventory of anything in that room at that time.

Tr. 320-21.

Again, Investigator Marlar stated that he did not touch the shorts until after the search warrant was obtained. This does not conflict in any way with his report or with Jones' reports as will be shown.

128

Looking to the claimed conflict between Marlar's report and Jones' reports we referr

to the pertinent part Jones' first report (Pet. PCR Ex. 28-G) we find the following:

> When Inv. Marlar arrived at Comers restaurant, at approximately 0600 he was briefed [sic] myself and Sheffield/ Myself and Marlar proceeded back to 2000 Ballardsvill Rd, where we contacted the owner of the house Beatrice Loden. We spoke with Ms. Loden and briefed her on the situation. We then asked to speak with Eddy. Ms. Loden stated Loden was at the pond, approximately 200 yards away fishing. We then asked and were able to obtain a consent to search on Ms. Loden's Buick, by Ms Ms [sic] Loden. I then conducted a "walk around the van and found several suspicious items in the van. Myself and Marlar then proceeded to the pond to talk with Loden, with no results. At that time it was discussed of a Search Warrant of the property. I contacted Sheffield, Dept. DP C. Loden, Dep Donnie Johnson and Tremont Ms. Police Chief Chris Umfress to respond and secure the area while I drove up and had signed by Justice Court Judge Lance Bean.
>
> When I arrived back to 200 Ballardsville road with a copy of the signed search warrant, it was explained and a copy was given to Ms. Loden and an intense search of the property was conducted by several Law Enforcement agencies. The van, belonging to Loden, was seized and transported to New Albany, Ms., where for any and all evidence. The property was also searched for evidence as well as Loden.
>
> Pet. PCR Ex. 28-G at 71-72.

Jones' second report differs somewhat from the one above and reads:

> When Inv. Marlar arrived at Comers restaurant, at approximately 0600 he was briefed [sic] myself and Sheffield/ Myself and Marlar proceeded back to 2000 Ballardsvill Rd, where we contacted the owner of the house Beatrice Loden. We spoke with Ms. Loden and briefed her on the situation. We then asked to speak with Eddy. Ms. Loden stated Loden was at the pond, approximately 200 yards away fishing. *We then asked and were able to obtain a consent to search on Ms. Loden's Buick, by Ms Ms [sic] Loden. Among other things found inside of Ms. Loden's vehicle was a green military type rope, placed in a handcuff tie know.* After the search of the vehicle, Marlar and I then conducted a "walk around" the van and found several suspicious items in the van. Myself and Marlar then proceeded to the pond to talk with Loden, with

no results. *Marlar obtained permission to search all of Ms. Loden's property to include, but not limited to the home of Ms. Loden and the room which E. Loden was staying Marlar called me into the room where Loden was staying and stated that he had found a pair of shorts that appeared to have blood stains on them.* At that time it was discussed of a Search Warrant of the property. I contacted Sheffield, Dept. DP C. Loden, Dep Donnie Johnson and Tremont Ms. Police Chief Chris Umfress to respond and secure the area while I drove up and had signed by Justice Court Judge Lance Bean.

Pet. PCR Ex. 28-H at 891-92.[19]

Other than the highlighted changes the reports are identical.[20]

It appears that the conflict the petitioner found so nefarious in Marlar's report and testimony was that Mrs. Loden's car was not searched until after the consent to search was signed and after they had returned from searching for Loden at the ponds, while Jones' report states that it was searched prior to going to the pond. Jones' first statement does not even refer to the search of the house while the second one states it was conducted after the consent was obtained. Jones' second statement does not say that the bloody shorts were seized at that time, but that was what triggered the request for a search warrant. What ever the case, it is clear that Mrs. Loden gave consent for the searches.

Petitioner contends the conflicts in the statements of the two officers would give credence to his claim that he saw the officers in his van that morning. However, we find from the record that Marlar testified that the van was locked and that he was not the person

---

[19]It cannot be determined when either of Jones' reports were prepared.

[20]Also of note is the fact that Jones had taken two people out to look at the van at the Loden farm prior to Marlar arriving on the scene. Tr. 317.

who ultimately searched the van, as it was done by the crime scene investigator from the Crime Lab at the Highway Patrol Garage in New Albany. Tr. 315.

Petitioner makes much of this small conflict. However, considering the testimony given at the suppression hearing, this there is no reasonable probability that this conflict would have caused a different ruling by the circuit court on the suppression motion. Petitioner's theory for suppression was that the original consent was not knowing and voluntary because Mrs. Loden was supposedly incompetent to give consent. The theory being that if it could be shown that Mrs. Loden's consent was invalid then the search warrant issued that day and the additional four search warrants issued at later times would all fall. However, in addition to the law enforcement officer who testified, Mrs. Loden's minister, and the women who were her round the clock sitters all testified that she was of sound mind and that her mental deterioration did not begin until after the events involving her grandson, the petitioner. Even her daughter and granddaughter could not say that Mrs. Loden was incompetent at the time she gave consent to the search of her home and car. In fact, one of the care givers, Mrs. Gassaway, testified that she was present at the time Mrs. Loden was read and signed the consent to search form and that in her opinion she knew what she was doing. Tr. 399-409.[21]

_____

[21]Loden also attempted to make an argument that Mrs. Loden's home was his residence even though he did not live there, during his suppression hearing testimony. His testimony during the suppression hearing is of note because of his continued arguing with the prosecutor during the examination. Loden's absolute arrogance is readily apparent from a reading of this testimony. Tr. 376-87. Respondent would assert that this is additional evidence that Loden is and was competent to assert and also waive his right to a jury trial at

Considering the evidence produced at the hearing, respondent would submit that petitioner could not demonstrate deficient performance or actual prejudice as there is no reasonable probability that there result of the hearing would have been different. Since both showings are required to sustain a claim of ineffective assistance of counsel under *Strickland, supra*, petitioner has failed to meet his burden of proof. The decision of the Mississippi Supreme Court imposing the procedural bar to the claim is not unreasonable nor is the alternative merits decision. *See Cullen v. Pinholster, supra; Harrington v. Richter, supra.* The respondents would assert that petitioner is not entitled to habeas relief on this claim of of ineffective assistance of counsel.

### (vi.) Totality of the Circumstances

Petitioner also argues that the totality of the circumstances demonstrated that deficient performance by trial counsel resulted in prejudice and therefore he is entitled to relief. This claim was presented to the Mississippi Supreme Court during the post-conviction litigation of the sentence phase of the case. The Mississippi Supreme Court held:

> **(H) The totality of the circumstances demonstrates that constitutionally ineffective assistance of counsel resulted in extreme prejudice to Loden.**

> ¶ 52. Loden, in "catch-all" form, argues that:

> [i]f Daniels and Johnstone had performed adequately, then Loden would have faced an entirely different situation. He would have had a

---

the guilt and sentence phase of the trial. While the guilt phase was not before the Mississippi Supreme Court in the post-conviction petition from the sentencing phase, this testimony only reinforced the findings of the state court in the direct appeal of the denial of post-conviction relief on the guilt phase.

line of fourteen witnesses in mitigation, ready, willing, and able to testify to Loden's tumultuous family history marred by physical, emotional, and sexual abuse, and to his honorable and outstanding service to the Nation as a Marine serving in Operation Desert Storm. He would have had a mitigation investigator to provide experienced assistance to his trial counsel, who were in any case obliged to conduct a thorough mitigation investigation on their own. He would have had a properly-informed psychological expert in Dr. O'Brien, who could comment meaningfully on his suffering from PTSD and other combat-related trauma having been provided with his military records. He would have been properly advised on the consequences of pleading guilty and the inability to appeal the suppression rulings thereafter. He would have elected to try his mitigation case to a jury of twelve-knowing that he need only convince one of them to spare his life-instead of agreeing to be sentenced by a judge with a well-established record of handing down death sentences. Most importantly, he would have had legitimate hope that at least one of the twelve sentencing jurors would have found his life history sufficiently compelling to spare him the death penalty.[35]

¶ 53. "In order for there to be a cumulative effect of errors, there must first be errors." *Walker v. State*, 863 So.2d 1, 23 (Miss.2003). *See also Miller v. Johnson*, 200 F.3d 274, 286 n. 6 (5th Cir.2000) ("Miller has not demonstrated error by trial counsel; thus, by definition, Miller has not demonstrated that cumulative error of counsel deprived him of a fair trial."). As this Court has concluded that Loden fails to prove that he is entitled to any relief on each of his ineffective-assistance-of-counsel claims individually, this Court likewise concludes that Loden fails to prove that he is entitled to any relief on such claims cumulatively.

_____

35. In support of this ineffective-assistance-of-counsel argument, Loden includes the affidavit of attorney Sean D. O'Brien whose "primary area of criminal practice has involved the trial, appeal and post-conviction representation of individuals in capital cases." O'Brien concludes that:

[i]t is my professional judgment that [Loden's] trial defense team failed to perform consistently with the ABA guidelines on the appointment and performance of counsel in capital cases as well as with the supplemental guidelines on the defense mitigation function in capital cases, and that their performance fell below the constitutional minimum

standard of care.

This Court will not consider O'Brien's affidavit as:

> it would not matter if a petitioner could assemble affidavits from a
> dozen attorneys swearing that the strategy used at his trial was
> unreasonable. The question is not one to be decided by plebiscite, by
> affidavits, by deposition, or by live testimony. It is a question of law
> to be decided by the state courts, by the district court, and by this Court,
> each in its own turn.

*Johnson v. Quarterman*, 306 Fed.Appx. 116, 129 (5th Cir.2009) (quoting
*Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998)).

43 So.3d at 393-94.

This decision of he Mississippi Supreme Court is neither contrary to or an unreasonable

application of clearly established law as announced in *Strickland*.

Petitioner contended at the totality of the circumstances demonstrated demonstrate that

petitioner was deprived of the effective assistance of counsel. This claim is nothing more

than a rehashing of the previous claims of ineffective assistance of counsel in the state court

petition. This claim includes an argument that related to a challenge against the guilty plea.

This portion of the claim was improper as it was a successive claim relating to the guilt phase

of the trial. *See* MISS. CODE ANN. § 99-39-25(6) and MISS. CODE ANN. § 99-39-27(9). Thus,

petitioner was attempting to relitigate a claim that had been decided against him in an earlier

petition.

Petitioner set forth what he contended is the test for assessing prejudice at the sentence

phase of a capital murder trial. However, the Supreme Court in *Wiggins, supra*, actually

134

held:

> In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. *Strickland*, 466 U.S., at 692, 104 S.Ct. 2052. In *Strickland*, we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence. In this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis.

539 U.S. at 534.

The problem with petitioner's argument is that he presumed deficient performance. However, as pointed out above, there is no deficient performance where a capital defendant instructs counsel not to put on a case in mitigation. *See Schriro v. Landrigan, supra*. Petitioner expends a great deal of ink attempting to distinguish this case from *Landrigan*, however, that case was not as fact driven as petitioner contends. The Court in *Landrigan*, addressing, one by one, the discrete reasons that the court of appeals had relied on to reverse the case is what petitioner relied on, not the overall finding of the Court.

The respondent would further assert that viewing the evidence in this case, especially the video tape of petitioner's sexual abuse and torture of Leesa Gray, that no amount of mitigation would have created a reasonable probability that the result of the sentencing phase in this case would have been different. *See Clark v. Thaler*, 673 F.3d 410, 424 (5th Cir. 2012). In comparison to the aggravating evidence, the mitigation evidence pales, even the

135

additional evidence petitioner has concocted and produced in the post-conviction petition. Petitioner failed to demonstrate that the totality of the mitigating circumstances would outweigh the aggravating circumstances in this case.

Petitioner also contends that the affidavits he presents from several attorneys, supposed experts in capital litigation, show that counsel's performance was deficient and at the very least entitle him to an evidentiary hearing. The Fifth Circuit has addressed the use of just such affidavits in an attempt to show ineffective assistance of counsel in *Johnson v. Quarterman*, 306 Fed.Appx. 116 (5th Cir. 2009). There the Fifth Circuit held:

> In support of his ineffective assistance claim, Johnson attached to his federal habeas petition the affidavits of five attorneys experienced in Texas capital law. All five attorneys stated in their affidavits that no reasonable trial counsel would have used the strategy that Johnson's trial counsel used in this case.[5] The district court refused to consider the affidavits, because the proffered expert testimony did not assist the court within the meaning of Rule 702 of the Federal Rules of Evidence. The district court explained:
>
> > This court is intimately acquainted with the legal standards governing ineffective assistance of counsel claims. Expert testimony purporting to tell the court how those legal standards apply to the facts of a particular case invade the court's province as trier of the law, and are not helpful to the court in determining the facts of the case. Because the proposed expert testimony both moves beyond the appropriate boundaries of expert testimony and is unhelpful to the court in its role as trier of fact, the affidavits will not be considered.
>
> We conclude that, for the reasons given by the district court, the district court did not abuse its discretion in refusing to consider the attorney affidavits. We agree with the reasoning of the Eleventh Circuit in *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998):
>
> > [I]t would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was

> unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony. It is a question of law to be decided by the state courts, by the district court, and by this Court, each in its own turn.

306 Fed.Appx. at 128-29.

The State would submit that the affidavits of these other attorneys presented by petitioner were properly excluded as they would invade the province of the court in making its decision. These affidavits do not entitle petitioner to an evidentiary hearing on this claim. Petitioner is entitled to no relief on this claim.

If, instead, petitioner's totality argument is actually a contention that the cumulative effect of the various claims of ineffective assistance of counsel support a finding of ineffective assistance of counsel his contention is not supported by law. The Fifth Circuit held in *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343, 127 S.Ct. 2029, 167 L.Ed.2d 772 (2007). The Fifth Circuit held:

> Hall also claims that he is entitled to a COA on his ineffective assistance of counsel claim because of the cumulative effect of the various errors he alleges. *Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.* *See Miller v. Johnson*, 200 F.3d 274, 286 n. 6 (5th Cir.2000) (stating that in the absence of specific demonstrated error, a defendant cannot, by definition, show that cumulative error of counsel deprived him of a fair trial); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir.1993) (stating that because certain alleged errors did not rise to constitutionally ineffective assistance of counsel, and because certain other claims were meritless, a petitioner had "presented nothing to cumulate"). Accordingly, no reasonable jurist could debate the district court's conclusion that the cumulative effect of the alleged errors did not constitute ineffective assistance of counsel, and Hall is not entitled to a COA on this issue.

455 F.3d at 520-21. [Emphasis added.]

Earlier, in *Turner v. Quarterman*, 481 F.3d 292 (5th Cir.), *cert. denied*, 551 U.S. 1193, 128

S.Ct. 34, 168 L.Ed.2d 810 (2007) the Fifth Circuit held:

> Turner argues that the cumulative effect of the afore-mentioned constitutional violations denied him due process of law. "[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir.1992) (*en banc*) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). As is apparent from this standard, and as this court has stated explicitly, where individual allegations of error are not of constitutional stature or are not errors, there is "nothing to cumulate."[11]

> Turner has failed to make a substantial showing of the denial of a federal constitutional right regarding his first four claims, and his final two claims are procedurally defaulted. Because he has pointed to no errors that involve matters of constitutional dimension and that are procedurally preserved for review, he has presented nothing to cumulate. A COA is denied

_____

11.    *See Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir.1993); *see also Miller v. Johnson*, 200 F.3d 274, 286 n. 6 (5th Cir.2000) ("*Miller has not demonstrated error by trial counsel; thus, by definition, Miller has not demonstrated that cumulative error of counsel deprived him of a fair trial.*"); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir.2006) ("*Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.*"), petition for cert. filed (Nov. 30, 2006) (No. 06-8178).

481 F.3d at 301. [Emphasis added.]

*See Walker v. State*, 863 So.2d 1, 21, ¶¶ 60-65 (Miss. 2003) (Mississippi Supreme Court

rejecting same type claim.).

Therefore, there can be no cumulation of separate claims of ineffective assistance of counsel that have been found to be without merit in order to establish relief on such a ground. The decision of the Mississippi Supreme Court on this claim is neither contrary to or an unreasonable application of *Strickland*. *See Harrington v. Richter, supra*. Petitioner is not entitled to habeas relief based on this theory.

## II.   LODEN'S APPELLATE COUNSEL WAS NOT INEFFECTIVE.

Loden also claimed that appellate counsel rendered ineffective assistance of counsel in failing to raise certain claims in the original appeal from the denial of post-conviction relief. This claim was presented to the Mississippi Supreme Court in the post-conviction petition of the sentence phase of the case. The Mississippi Supreme Court held:

### III. Loden was denied effective assistance of appellate counsel.[

¶ 56. Loden relied upon De Gruy of the Mississippi Office of Capital Defense Counsel "to prepare a petition for post-conviction relief to challenge his guilty plea." [38] Loden argues that he "has presented extensive evidence to this Court in support of Loden's claims that his plea was not knowing, voluntary and intelligent, that was not investigated or presented by Loden's counsel in his direct appeal." Specifically, Loden refers to "[t]he vast additional evidence presented in this [P]etition regarding Loden's background, psychological history and his [c]ounsel's numerous instances of ineffectiveness...." According to Loden, "appellate counsel [De Gruy] neglected to fully develop evidence that Loden pled guilty with the understanding that the issues he attempted to address with trial counsel ... could still be reviewed by the Supreme Court after Loden's entry of a guilty plea." In Loden's estimation, "[h]ad appellate counsel presented the evidence contained in the instant Petition and informed the [c]ourt of all factors surrounding Loden's decision to plea," then "there is at least a reasonable probability that the [c]ourt would have altered its credibility ruling and [Loden's] Motion to Vacate his guilty plea would have been successful."

139

¶ 57. Throughout his argument on this ground, Loden ignores the circuit court's specific reasoning in finding that his guilty plea was voluntary. At the sentencing hearing, the circuit court was presented with the summary report of the forensic mental evaluation of Loden by the Mississippi State Hospital and the report of Dr. O'Brien. The summary report of the Mississippi State Hospital provided that Loden has "the sufficient present ability to consult with his attorney with reasonable degree of rational understanding in the preparation of his defense" and "the capacity knowingly, intelligently, and voluntarily to waive or assert his constitutional rights...." Dr. O'Brien's report provided that Loden "appears at the present time to be competent to stand trial and assist in his own defense." Thereafter, Loden pleaded guilty following extensive inquiry by the circuit judge into the nature of that plea. *See* paragraph 4, *supra*. In its "Order and Opinion" dismissing Loden's motion for post-conviction relief, the circuit court stated, in pertinent part, that:

> at the guilt plea hearing, the [c]ourt advised [Loden] of his rights. *[Loden] acknowledged that he was giving up his right to appeal by pleading guilty to the charge.*

> ...

> [Loden] was informed in his lengthy guilty plea hearing of the important constitutional rights that he was waiving by entering a plea of guilty. In addition, [Loden] stated under oath at the plea hearing that he had been fully advised of all aspects of his case by his counsel, including the nature and elements of the charge. Subsequently, at the guilty plea hearing, the [c]ourt advised [Loden] of the charges against him and asked him if he understood that charge, to which he replied in the affirmative.... *The [c]ourt fully advised [Loden] that he was waiving his right to appeal. The [c]ourt then found that [Loden] had entered a knowing and voluntary plea.*

(Emphasis added.) In short, the circuit court found that "[t]he record speaks for itself." There is "a strong presumption of validity of anyone's statement under oath." *Holt v. State*, 650 So.2d 1267, 1270 (Miss.1994). Moreover, this Court has held "that when the trial court questions the defendant and explains his rights and the effects and consequences of the plea on the record, the plea is rendered voluntary despite advice given to the defendant by his attorney." *Harris v. State*, 806 So.2d 1127, 1130 (Miss.2002).

140

¶ 58. On these bases, this Court concludes that the submissions by Loden are woefully insufficient to rise to the level necessary to invalidate his express plea-colloquy statements to the circuit judge, so as to create a "reasonable probability" that his "Motion to Vacate Guilty Plea" would have been granted. Accordingly, Loden fails to prove that he is entitled to any relief on this ground.

_____

38. According to De Gruy, he did not include information regarding Loden's mental state or social history in connection with this challenge to the guilty plea because he believed such claims "would probably have to be raised in a post-conviction petition challenging the sentence...."

43 So.3d at 395-96.

The decision of the Mississippi Supreme Court is neither contrary to or an unreasonable application of *Strickland* or *Evitts v. Lucey*, 469 U.S. 387 (1985).

Counsel on direct appeal of the denial of post-conviction relief on the guilty plea raised the claim that was pertinent to that case. The other claims relating to the sentence phase were not properly the subject of that appeal. Present counsel raised those claims in the post-conviction petition related to the sentence phase. Pursuant to not one, but two mental evaluations, petitioner had been found competent to stand trial and assist in the defense of his case. The record demonstrates that Loden was well aware of the proceedings that were taking place and actively participated in the colloquy during the guilty plea. The fact that petitioner has now found a mental health professional – years after trial – to assert that Loden was not competent, does not change the facts that were presented to appellate counsel. He could not change the record that was presented to the trial court during the challenge to the guilty plea, and after two mental evaluations there was no chance that the trial court would

141

have granted petitioner a third evaluation.

Petitioner has failed to demonstrate that the decision of the Mississippi Supreme Court is contrary to or an unreasonable application of *Strickland*. *See Harrington v. Richter*, 131 S.Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004))). Petitioner is entitled to no habeas relief on this claim.

## III. THE USE OF THE REPORT BY DR. McMICHAEL DID NOT VIOLATE THE DICTATES OF THE SIXTH OR EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION NOR DID IT VIOLATE DUE PROCESS.

Petitioner next contends that he was denied his constitutional rights under the Sixth and Eighth Amendments by the trial judge's consideration of the Summary Whitfield Report that was prepared by Dr. Reb McMichael. Petitioner presented this claim to the state court in his post-conviction petition from the sentence phase of the case. The Mississippi Supreme Court decided the issue holding:

> **IV. The State's use of the expert psychiatric report from Dr. McMichael violates the Eighth Amendment's reliability requirement, the Sixth Amendment's confrontation clause, and due process**.
>
> ¶ 59. Loden asserts that the "disparaging, unsupported allegations of criminal activity and general bad character" in the full Mississippi State Hospital report[39] "tainted the reliability and accuracy of the sentencing in violation of the Eighth Amendment[;]" violated the Confrontation Clause of the Sixth Amendment because he had "no opportunity to cross-examine the conclusions of the state doctors and the highly damaging hearsay statements in the report[;]" and generally deprived him of due process.

142

¶ 60. This Court concludes that the flaws in Loden's argument are myriad. Addressing these flaws without assigning order of import, we first observe, as noted earlier, see footnote 31, *supra*, the record does not indicate that the circuit judge was presented with the full Mississippi State Hospital report at issue, but only with a summary report which does not include the complained-of allegations. Second, as Loden was represented by new counsel on appeal, and the issue of objection to evidence at the sentencing hearing is "based on facts fully apparent from the record[,]" he is procedurally barred from presenting it for the first time in this Petition for Post-Conviction Relief. *See* MISS. R. APP. P. 22(b); Miss.Code Ann. § 99-39-21(1) (Rev.2007). Third, Loden's claim is altogether duplicitous given his instruction to defense counsel not to cross-examine any of the State's witnesses or object to the introduction of evidence presented by the State at sentencing. Finally, this Court rejects the implication that these contextually benign statements within the full Mississippi State Hospital report led to his death sentence. The evidence considered by the circuit court in imposing that sentence included a graphic videotape of Loden's repeated brutal raping, taunting, and sexually abusing of a sixteen-year-old child before he murdered her. On any of the aforementioned bases, Loden fails to prove that he is entitled to any relief on this ground.

_____

39. Regarding such allegations, see footnote 31, *supra*.

43 So.3d at 396-97. [Emphasis added.]

Because the state court referred to footnote 31, in its decision of this issue, it will be reproduced here.

31. According to Loden:

[t]hese include an unsupported and extremely prejudicial allegation attributed to police officers that Loden may have committed prior similar murders in Louisiana and Mississippi, the tainted and unsupported diagnoses of Malingering and Antisocial Personality Disorder, and the attempt by the doctors and the social worker to turn cattle slaughtering on his grandfather's farm into sadistic abuse of animals.

*We note that the record does not reveal that the circuit judge was ever*

143

> *presented with the full Mississippi State Hospital report at issue, as the record contains only a summary report which does not include the subject allegations.*

43 So.3d at 387. [Emphasis added.]

The Mississippi Supreme Court held that this claim was barred from consideration:

> *. . . as Loden was represented by new counsel on appeal, and the issue of objection to evidence at the sentencing hearing is "based on facts fully apparent from the record[,]" he is procedurally barred from presenting it for the first time in this Petition for Post-Conviction Relief.* See MISS. R.APP. P. 22(b); MISS. CODE ANN. § 99-39-21(1) (Rev.2007).

> *Id*. at 396-97.

MISS. R.APP. P. 22(b) reads:

> Issues which may be raised in post-conviction proceedings may also be raised on direct appeal. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute waiver barring consideration of the issues in post-conviction proceedings.

*See Havard v. State*, 928 So.2d 771, 782-87 (Miss.,2006); *Hodges v. State*, 912 So.2d 730, 758 (Miss.,2005); *Branch v. State*, 882 So.2d 36. 49 (Miss.,2004). This claim is barred from consideration based on the imposition of an adequate and independent state law procedural ground. The fact that the Mississippi Supreme Court also addressed the merits of the claim does not vitiate the imposition of the bar. *Harris v. Reed, supra.*

Without waiving the bar to the consideration of this claim, the respondents would assert that this claim is specious as the trial judge never saw or considered the full report from the State Hospital at Whitfield. The only report presented during the sentence phase of petitioner's trial was the summary report which did not contain the information of which

144

Loden complains. No habeas relief can be grounded on this claim. The merits decision of the Mississippi Supreme Court is neither contrary to or an unreasonable application of federal law.

Looking to the record, we find that Loden filed a motion to be examined by the forensic staff at the State Hospital at Whitfeild. The motion was filed by Loden, not the State. Further, the order signed by the circuit court granting the motion was prepared by defense counsel. The order contained the provision that the report from Whitfield would be furnished to the trial court, defense counsel and the State. The State Hospital complied with the order of the trial court and a copy of the *summary* report was sent to the court, the State and to defense counsel. This summary report is contained in the record. *See* DA C.P. at 35-37.

This summary report was later introduced during the sentencing phase of petitioner's trial. *See* DA Exhibit #39. What petitioner fails to recognize is that this is the summary report, not the full report. The full report, that contains the information to which petitioner is referring in his argument was not introduced into evidence as an exhibit during the sentencing phase of this case. Generally, unless *specifically requested*, the forensic staff only sends out the summary report of its findings. It is highly unlikely that the trial court ever saw the full report since it is not found in any of the court papers in this case. As stated, the full report usually has to be specifically requested before it is furnished. From reading Exhibit 39, introduced at the sentencing phase, we find that the language that petitioner contends

145

deprived him of his constitutional rights does not appear in that exhibit. This claim that the trial court was in some manner prejudiced is totally baseless. Evidentially, petitioner did not bother to compare the exhibit introduced at trial and the exhibit he contends prejudiced the trial court to verify that they were the same document. A simple review of the record would have resolved this issue.

While the full report was not introduced into evidence in this case and was not considered by the trial court, it is interesting to note a few of petitioner's concerns.[22] Petitioner contended that the report contains "an unsupported and extremely prejudicial allegation" that Loden may have committed similar murders in Louisiana and Mississippi. Looking to the report we find that the staff at Whitfield interviewed Investigator David Sheffield regarding Loden.[23] Under the section entitled Social History we find the following:

> According to Inv. David Sheffield, "There are two unsolved criminal cases (one in South MS and one in Louisiana) that are very similar to this Itawamba Co. case against Mr. Loden. He was a military recruiter and traveled a lot with his job. We can place him in each location at the times of the other crimes against two teenager girls; but, unless he also confesses to those, there's no way he can be charged for these crimes."

> Pet. PCR. Ex. 28-J at 12.

This is simply reporting what one of the people contacted regarding this evaluation stated

---

[22]Petitioner attached a copy of the full report from the State Hospital as Petitioner's Exhibit 28-J, to his post-conviction petition. State attached an Addendum to the full report which it the Results of Psychological Testing as Exhibit B to its response.

[23]A staff member conducted a live interview with Investigator Sheffield as part of the compilation of background information for the full report.

during their interview regarding petitioner. The trial court did not see this full report so this was not information that in any way tainted the sentencing decision.

Petitioner next claimed the report contains "tainted and unsupported diagnoses of Malingering and Antisocial Personality Disorder." He argued that antisocial personality disorder "is a favored diagnosis of *prosecution* psychiatrists." First, we again point out that the examination by the Whitfield staff was not at the behest of the prosecution, it was petitioner's own motion that instigated that evaluation. Thus, the staff report from Whitfield cannot be characterized as the prosecution's examination, as petitioner's new expert Dr. High, has done in his affidavit. The basis for this finding is Loden's result from the administration of on the SCID-II. The report on the results of psychological testing states:

> On the SCID-II, a structured interview designed to assess clinical and personality functioning, *Mr. Loden endorsed three items reflecting antisocial behaviors prior to the age of fifteen and three items and one subcomponent of one other item after the age of fifteen*. Prior to the age of fifteen, he reported that he tortured and hurt animals on purpose and that he shoplifted things. he reported that he ran away form home and stayed away overnight at least twice. Subsequent to the age of fifteen, he reported that he has done things that are against the law and that there has been a time when he had no regular place to live. He reported that he has been in fights and has thrown things at his wife. He reported that he as physically threatened to harm other and that he has driven a car when he was drunk and high. He reported that he has received approximately five speeding tickets. According to the SCID-II, an individual must endorse two or more items before the age of fifteen and three or more after the age of fifteen in order to meet the criteria for Antisocial Personality Disorder. *Therefore, he does meet the criteria for Antisocial Personality Disorder according to this instrument*.

State's PCR Exhibit B, at 3, (Addendum to the Full Report). [Emphasis added.]

Therefore, there was empirical data upon which to make the assessment that petitioner

147

suffered has antisocial personality disorder.[24]

As to the claim regarding malingering, we look again to the results on the psychological testing report and find that malingering is discussed. The report reads:

> **MALINGERING:** Mr. Loden was given several test to assess his general mental state and identify possible negative response bias. He was given the MMPI-2 and the M-Test as assist in ruling out possible over-exaggeration or feigning of psychotic symptoms and/or psychological problems, the Shipley and the WRAT-3 to rule out malingered intellectual deficits, and the MMSE to assess his general mental state. Results of the M-Test suggest that he was not feigning psychotic symptoms. *Results from the MMPI-2 suggest that he was exaggerating psychological problems*. Results of the Shipley and the WRAT-3 suggest that he was not malingering intellectual deficits.
>
> The M-Test is a brief test designed to assess the presence of someone grossly feigning psychotic symptoms. Mr. Loden obtained a total score of 0. Scores of 4 or greater are considered indicative of someone malingering psychotic symptoms.
>
> On a brief cognitive screening measure, the MMSE, Mr. Loden received a score of 26/30, which falls in the normal range.
>
> State's PCR Exhibit B, at 2. [Emphasis added.]

Looking further to the results of the MMPI-2 we find:

> **PERSONALITY:** The MMPI-2 is a personality inventory designed to assess a wide sampling of behaviors significant to psychologist. Mr. Loden obtained a validity configuration that suggest that the profile should be interpreted with caution. Considered collectively, his level of intelligence, clinical presentation, an scores obtained on this measure, support an exaggerated response set and rule out random responding, confusion, and reading problems. *They appear to suggest either deliberate distortion or exaggeration of the severity of psychopathology in an attempt to derive secondary gain or a plea*

---

[24]We would note that the Whitfield report list Antisocial Personality Disorder as a second diagnosis under AXIS II in the report. Borderline Personality Disorder is listed first. *See* Pet. PCR Ex. 28-J at 20.

148

*for help by an extremely anxious individual.*

Mr. Loden obtained a 3-6 codetype. Individuals with this codetype are often seen as angry, hostile individuals who strongly deny their readily apparent hostile and angry feelings. When they do become aware of their anger, they try to justify it in terms of the behavior of others. They are tense, anxious, and hypersensitive to criticism. They often exhibit strong needs for power and control. They frequently avoid acknowledging any kind of responsibility for their problems. Their self-concept is generally narcissistic and egocentric. In general, they are defiant, uncooperative, and hard to get along with. Their interpersonal relationships are usually characterized by conflicts.

State's PCR Exhibit B at 2-3. [Emphasis added.]

Finally, summary of the testing report reads:

Results of the psychological testing appear valid. Mr. Loden made no obvious attempt to malinger intellectual deficits or psychotic symptoms. *However, he appeared to exaggerate psychological difficulties during the personality assessment phases of this evaluation.* In summary, Mr. Loden appears to be functioning in the average range of intelligence and achievement. Results of personality testing and the clinical interview reveal a *longstanding history of antisocial, impulsive, defiant, and explosive* behavior, as well as substance abuse. He has strong needs for power and control and appears to be a very angry and hostile individual. The intensity of his anger varies as a function of perceived injustice, unfair treatment, and criticism. His interpersonal relationships are characterized by conflicts.

State's PCR Exhibit B, at 3. [Emphasis added.]

Clearly, there was support for both the malingering and antisocial findings by the forensic

staff at Whitfield. Petitioner's allegation is baseless.[25]

Finally, petitioner contended that the report shows an attempt to "turn cattle

---

[25]We also note that Dr. O'Brien's report stated that his testing showed that Loden tended to exaggerate his psychological difficulties. Exaggerating psychological difficulties is malingering. *See* Pet. Ex. 29.

slaughtering on his grandfather's farm into sadistic abuse of animals." This allegation clearly

indicates that Dr. High ignored the full report and only cherry picked what supported is pre-

conceived conclusion. The question regarding killing of animals came up in the interview

with petitioner's mother, Bobbie Christian. The report states that Ms. Christian related the

following in her interview:

> . . . Mrs. Christian further reported, "his grandparents adored him, more or less let him do as he pleased." She said that around the age of 16 or 18, the defendant would ". . . kill cows and calves on his grandfather's farm. Well, actually he killed his grandparent's cows and calves until he was about 21. He did come home to visit from time to time after he joined the marines when he was 18 years old." When our social worker asked how the defendant killed the cattle, his mother replied, "I don't know." When our social worker asked if he [sic] grandparents did anything to him about the killings or punished/disciplined him in any way she replied, "Nothing."

> Pet. PCR Ex. 28-J, at 11.

This response apparently came as a result of a question of whether Loden had ever been cruel

to animals.[26] One unfamiliar with farm life, at first blush, could take this the wrong way.

However, as indicated above, we only have to read the next page to get an explanation of this

activity. Looking under the SOCIAL HISTORY section of the report on the next page, we

find:

> She [Ms. Christian] did endorse a history of cruelty to animals as noted in the Family History section. The defendant's ex-wife stated that the defendant did not kill the cattle out of cruelty, but would butcher them for food or to kill one that was suffering. She further added, "I do know of one other cow that he killed. He thought I was running around on him. He got his grandfather's gun

---

[26]Perhaps petitioner's mother felt it cruel to slaughter cattle for meat. That is not explained.

and killed the cow. He told me he then had sex with the dead cow." Inv. Davis Sheffield reported to our social worker that he grew up on a farm adjacent to the defendant's grandparents' farm. He stated, "If there was any cow killing on that place, it was done for food. This is a small, close-knit community. If he'd been just killing cows from time to time, we'd all have heard about it. . . .

Pet. PCR Ex. 28-J, at 12.

Thus, it appears that for the most part the cattle were slaughtered for food. However, his wife did state what petitioner related to her about killing the cow and having sex with the cow after it was dead. Further, as pointed out above, when being administered the SCID-II, Loden, himself, "reported that he tortured and hurt animals on purpose". *See* Pet. PCR Ex, 28-J at 3. We also note that Investigator David Sheffield, mentioned above, clearly came to petitioner's defense with regard to the "killing cows", allegation. Dr. High's snide conclusions are baseless.

Again, none of this material was presented to the sentencing judge in this case, so it could not have influenced the trial court's decision in any manner. Petitioner only had to look at the exhibits contained in the record of this case to determine that the trial court saw only the summary report. However, apparently petitioner still refuses to realize that the full report was never furnished to the trial court during the sentence phase of petitioner's trial.

This claim is specious, as the trial court did not consider the report that petitioner contends that he saw. The claim is barred from consideration and alternatively totally without merit. Petitioner is entitled to no habeas relief on this claim.

IV.     **LODEN WAS NOT IMPROPERLY DENIED THE FUNDS TO HIRE A**

**FORENSIC SOCIAL WORKER.**

Loden contends that he was improperly denied the funds to hire a "forensic" social worker to investigate mitigation evidence by the trial court prior to his capital murder trial. The respondents would assert that the decision of the Mississippi Supreme Court on this claim, which was presented in the original appeal filed with that court, was not contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, therefore, petitioner is entitled to no relief on this claim.

In the original appeal of the sentence phase of this case petitioner presented a claim reading:

> (1) Whether Loden was improperly denied funds to retain the assistance of a forensic social worker to investigate and present relevant mitigating factors.

971 So.2d at 561-62.

The Mississippi Supreme Court decided the claim on the merits and held:

> ¶ 28. Loden filed an "Ex Parte Motion for Funds for Expert Assistance in the Field of Mitigation Investigation." The motion sought the services of forensic social worker Gary Mooers to aid defense counsel in interviewing and preparing mitigation witnesses and "adequately develop[ing] the full range of mitigating circumstances that exist in this case." The circuit court denied Loden's motion, finding that it had already granted Loden's earlier motion for an investigator and Mooers would repeat work "that the investigator, the attorneys or psychiatrists, psychologists would be involved in in developing the case."

> ¶ 29. Loden now asserts that Mooers "would have uncovered substantial mitigation evidence[,]" and "[t]he denial of funds to hire a forensic social worker violated the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States and Article 3[,] §§ 14, 26 and 28 of the Mississippi Constitution of 1890." In support thereof, he refers to the

152

American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.

¶ 30. The State replies that "[t]he trial court provided Loden with an investigator and an independent psychologist in the person of [Dr. O'Brien], in addition to a full evaluation by the staff at the Mississippi State Hospital at Whitfield." Thereafter, "[t]he trial court found that since he had furnished Loden with an investigator and an independent psychologist that those experts would be qualified to do what Loden proposed that such an expert would do." The State argues that this was not an abuse of discretion by the trial court and that the issue is moot "because Loden instructed his counsel not to present any mitigation evidence to the court on his behalf."

¶ 31. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court stated:

> [w]e recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has *access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, *see Ross v. Moffitt*, 417 U.S. 600[, 94 S.Ct. 2437, 41 L.Ed.2d 341] (1974), it has often reaffirmed that *fundamental fairness* entitles indigent defendants to "*an adequate opportunity to present their claims fairly within the adversary system*," *id*. at 612[, 94 S.Ct. 2437].

*Ake*, 470 U.S. at 77, 105 S.Ct. 1087 (emphasis added).

¶ 32. This Court has stated that:

> "[t]he trial court's decision on a motion for funding for consultants or investigators for an indigent defendant is reviewed for abuse of discretion." *Grayson v. State*, 806 So.2d 241, 254 (Miss.2001) (citing *Hansen v. State*, 592 So.2d 114, 125 (Miss.1991)). The State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand. *Johnson v. State*, 476 So.2d 1195, 1202 (Miss.1985). However, this Court does recognize that expert assistance should be paid for in certain cases and *will*

153

*address the need for support on a case-by-case basis to determine whether a defendant is prejudiced by the denial of expert assistance to the extent that he or she is denied a fair trial. Id.* In determining whether a defendant was denied a fair trial because of failure to appoint or allow funds for an expert, some of the factors to consider are whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts. *Fisher v. City of Eupora*, 587 So.2d 878, 883 (Miss.1991). This Court has also considered to what extent the State's case depends upon the State's expert, *Tubbs v. State*, 402 So.2d 830, 836 (Miss.1981), and the risk of error in resolving the issue for which the expert is requested. *Johnson v. State*, 529 So.2d 577, 592 (Miss.1988).

*Thorson*, 895 So.2d at 122-23 (quoting *Townsend v. State*, 847 So.2d 825, 829 (Miss.2003)) (emphasis added). *See also Harrison v. State*, 635 So.2d 894, 901 (Miss.1994) (quoting *Johnson*, 529 So.2d at 590) (this Court "will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair."). Moreover, "[a]n indigent's right to defense expenses is 'conditioned upon a showing that such expenses are *needed to prepare and present an adequate defense*.' *Ruffin v. State*, 447 So.2d 113, 118 (Miss.1984). Concrete reasons for requiring an expert must be provided by the accused." *Howell v. State*, 860 So.2d 704, 721 (Miss.2003) (quoting *Green v. State*, 631 So.2d 167, 171-72 (Miss.1994)) (emphasis added). See also Harrison, 635 So.2d at 901 ("a defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial").

¶ 33. The circuit court judiciously provided Loden with state-funded investigative assistance in developing mitigation evidence. An order authorizing a Criminal Defense Investigator ("CDI") was granted, followed by an order granting additional funds for the CDI. An order providing a psychological evaluation of Loden at the Mississippi State Hospital was granted. Finally, an order making state funds available for Dr. O'Brien, Loden's selected psychologist, to examine and evaluate Loden was granted. Moreover, Loden's later-filed motion set forth only generic reasons for the need of an additional expert, which effectively mirrored his prior requests to obtain an investigator and an expert in the field of psychology *(i.e.* "interview[ing] and prepar[ing] all mitigation witnesses" and "adequately

154

develop[ing] the full range of mitigating circumstances that exist in this case"). Finally, Loden conceded that Mooers's services were indistinguishable from those of the other experts except insofar as Mooers had an alleged undefined special expertise and a Ph.D., which amount to "unsubstantiated assertions," not "concrete reasons." *Id*.

¶ 34. While "American Bar Association standards and the like . . . are guides to determining what is reasonable . . . they are only guides." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added). *See also Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Furthermore, "[t]he State does not have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand." *Thorson*, 895 So.2d at 122. The lower court did not err in concluding that Mooers's redundant services were not justified. This Court finds there is no evidence to support that the learned circuit judge abused his discretion in so finding.[15]

_____

15. Alternatively, this Court agrees with the State that this issue is moot because Loden chose to present no mitigation evidence to the circuit court. In either case, this Court finds that the April 14, 2005, affidavit of Mooers (copies of which were filed with this Court on appeal) ought not be considered, as it was not part of the original record of trial court proceedings. *See* Miss. R.App. P. 10(f); *Craig v. State*, 208 Miss. 528, 44 So.2d 860 (1950).

971 So.2d at 562-64.

This decision is neither contrary to or an unreasonable application of federal law.

Petitioner was not requesting the assistance of a mental health professional, he was requesting the services of a social worker to investigate mitigation. The state court relied on on its decison in *Thorson v. State*, 895 So.2d 85 (Miss. 2004), which reads:

We have stated:

"The trial court's decision on a motion for funding for consultants or investigators for an indigent defendant is reviewed for abuse of discretion." *Grayson v. State*, 806 So.2d 241, 254 (Miss.2001) (citing *Hansen v. State*, 592 So.2d 114, 125 (Miss.1991)). The State does not

have a constitutional obligation to provide indigent defendants with the costs of expert assistance upon every demand. *Johnson v. State*, 476 So.2d 1195, 1202 (Miss. 1985). However, this Court does recognize that expert assistance should be paid for in certain cases and will address the need for support on a case-by-case basis to determine whether a defendant is prejudiced by the denial of expert assistance to the extent that he or she is denied a fair trial. *Id*. In determining whether a defendant was denied a fair trial because of failure to appoint or allow funds for an expert, some of the factors to consider are whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts. *Fisher v. City of Eupora*, 587 So.2d 878, 883 (Miss. 1991). This Court has also considered to what extent the State's case depends upon the State's expert, *Tubbs v. State*, 402 So.2d 830, 836 (Miss. 1981), and the risk of error in resolving the issue for which the expert is requested. *Johnson v. State*, 529 So.2d 577, 592 (Miss. 1988).

*Townsend v. State*, 847 So.2d 825, 829 (Miss. 2003). The Fifth Circuit has held that:

> Moore's claim of entitlement to a mitigation expert fails under the *Yohey* explication of a defendant's right to non-psychiatric experts. As the *Yohey* court explained, "[a]n indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert." *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993). Moore does not make such a showing.

*Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir.2000). In reviewing the record, we can find no instance, other than to say the jury must be educated about the possibility of false confessions, of a substantial need for such an expert. Thorson was only able to show the trial court that there was a mere possibility of assistance from Dr. Leo. As to experts in the field of false confessions, several jurisdictions have held that this type of testimony, which essentially goes to the credibility of a witness, is not an appropriate subject for an expert witness, but should be left to the province of the jury. *See United States v. Adams*, 271 F.3d 1236 (10th Cir.2001); *State v. Tellier*, 526 A.2d 941 (Me. 1987); *State v. Ritt*, 599 N.W.2d 802 (Minn. 1999); *State v. Davis*, 32 S.W.3d 603, 608 (Mo.Ct.App.2000). We can find no evidence that the trial court

abused its discretion in denying funds to hire Dr. Leo. The trial court also did not err in finding that such testimony would not be properly submitted to the jury without a proper foundation. Therefore, this issue is without merit.

895 So.2d at 122-23.

*See Howell v. State*, 860 So.2d 704, 721, ¶ 41 (Miss. 2003) (citing *Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000); *Grayson v. State*, 806 So.2d 241, 255, ¶¶ 37-39 (Miss. 2001) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)).

Looking to the Fifth Circuit's explanation as to why there was no entitlement to a mitigation specialist in *Moore v. Johnson*, , 225 F.3d 495 (5th Cir. 2000), we find:

> With regard to the mitigation expert, it appears that the trial court provided Moore the opportunity to present additional information to demonstrate that the expert "would be significantly more effective in marshaling the evidence in [Moore]'s behalf than his own counsel," but that "no further request or showing of necessity for a mitigation expert was made." Moore, as a result, did not enjoy the benefits of a mitigation expert. Later, before the Court of Criminal Appeals, Moore again failed to argue that he should have been provided a mitigation expert. That court held that "since appellant does not make any arguments regarding expert assistance on this issue, we will only address expert assistance on the jury selection issue." *Moore*, 935 S.W.2d at 130 n. 2. If a petitioner "offer[s] little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision" not to provide that assistance. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Moreover, claims that are barred as a consequence of a failure to comply with state procedural rules do not merit habeas relief[3] and therefore cannot warrant issuance of a COA.

> *Moore's claims that he was constitutionally entitled to either of these experts fail on their merits as well. He bases his argument on the pronouncement in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), that states must provide indigent defendants "access to a competent*

*psychiatrist" in cases in which "a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial."* *Id*. at 83, 105 S.Ct. 1087. Moore argues that the *Ake* holding compels a finding in his favor.

> In coming to its conclusion, the Court in *Ake* held that
>
> [t]his Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. . . . [A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain *that he has access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system.

*Id*. at 76-77, 105 S.Ct. 1087 (internal citations and quotation marks omitted; emphases added). This circuit has, in light of *Ake*, held that "non-psychiatric experts . . . should be provided only if the evidence is both critical to the conviction and subject to varying expert opinion." *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993) (citations and internal quotation marks omitted).

Neither of Moore's claims of right to expert assistance can survive under these standards. His purported right to a jury-selection expert withers before the language of *Ake*. As the Court explained, a defendant cannot expect the state to provide him a most-sophisticated defense; rather, he is entitled to "access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77, 105 S.Ct. 1087. *Most of those raw materials come to the defendant in the form of his court-appointed lawyer-in his expert knowledge about how to negotiate the rules of court, how to mount an effective defense, and so forth*. Other materials come from lay witnesses, such as evidence necessary to the defendant to establish his defense. Defendants enjoy access to court-appointed psychiatric professionals because the Court expects those professionals

> to gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; [ ] analyze the

158

information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and [ ] offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee v. Balkcom*, 339 U.S. 9, 12, 70 S.Ct. 457, 94 L.Ed. 604 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Id*. at 80, 105 S.Ct. 1087.

. . .

As the recital of facts indicates, Moore's defense included testimony from lay and psychiatric witnesses favorable to him suggesting that his childhood had been scarring and that he did not present a threat to his fellow prisoners. He provides no explanation of how a mitigation expert might have provided "critical" assistance to a defense team already including a lawyer and psychiatrist, both cognizant of the role of mitigating evidence in staving off the death penalty.

The precedent of the Supreme Court and this circuit, then, forecloses entirely Moore's arguments, denying him the chance to demonstrate that our court could resolve the issues in his favor or that the questions are adequate to deserve encouragement to proceed further. He therefore has not made a substantial showing of the denial of a constitutional right and cannot receive a COA on these grounds.

_____

3. *Coleman v. Thompson*, 501 U.S. 722, 754, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

225 F.3d at 502-04.

Simply put, there is no constitutional right under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to the appointment of non-psychiatric experts. The appointment of non-psychiatric experts falls under the precedent stated in *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which approved the Mississippi Supreme Court's holding regarding the furnishing of non-psychiatric experts.

The trial court provided Loden with an investigator and an independent psychologist in the person of Dr. C. Gerald O'Brien, in addition to a full evaluation by the staff at the Mississippi State Hospital at Whitfield.

Looking to the Motion for Appointment of Investigator for the Defense, CP. 77-79, filed by Loden, we find the following reasons stated for needing such assistance. The motion reads, in part:

### III.

The need for an investigator in this case is three-fold. First, because the State is seeking to execute Mr. Loden, it is critical that an extensive investigation of potentially mitigating facts be undertaken. Among other things, *the investigator will locate and interview potential mitigating witnesses and assist in locating Mr. Loden's school and medical records*. Moreover, because Mr. Loden has numerous friends and relatives, including siblings residing in other parts of the State and country, and he himself has lived in other States, the search for mitigation witnesses will be time consuming. Second, because of the sensitive nature of this case, and the publicity in the are regarding both this case and the death penalty in general, an investigator is needed to survey the community to determine if a change of venue will be necessary to insure Mr. Loden receives a fair trial. Third, an investigator's services are required to follow up the numerous leads already known to Mr. Loden's attorney at this time. His investigative skills will also be needed to

160

help rebut the prosecution's guilt phase case.

IV.

*Defense counsel is unable without the assistance of an investigator to interview and prepare all witnesses; adequately develop the full range of mitigating circumstances that exist in this case*; rebut the State's evidence complied by several investigators and detectives from several government agencies; and insure Mr. Loden receives as fair a trial as possible. Such matters to be investigated can be put forward in more detail at an ex parte hearing on this matter.

CP. 77-78. [Emphasis added.]

The trial court entered an order granting Loden the services of an investigator. CP. 102.

Later, Loden filed a motion requesting additional funds be provided for the investigator. CP.

171-74. The trial court granted this motion for additional funds. CP. 176.

When we look to the Ex Parte Motion for Funds for Expert Assistance in the Field of

Investigation, CP. 61-68, (the motion for funds to hire Moores) we find that pages six and

a portion of the seventh page of this motion are legal arguments attempting to explain the

entitlement to such an expert. When we get to the last sentence of paragraph eight (8 )of the

motion Loden finally begins his reasons for why he needs such an expert. The motion reads:

8.  . . . Among other things, the mitigation investigator will locate and interview potential mitigating witnesses and assist in locating Mr. Loden's school and medical records.

9.  Defense counsel is unable without the assistance of an investigator to interview and prepare all mitigation witnesses. . . .

10.  Only through the use of an investigator can Mr. Loden adequately develop the full range of mitigating circumstances that exist in this case.

161

CP. 67.[27]

These are the only reasons forwarded by Loden in the motion to support the need for a mitigation investigator. These reasons amount to nothing more than undeveloped assertions of need. Loden requested and was given an investigator who he obtained by asserting that the investigator would do the same thing he stated in his motion that a mitigation investigator would do.

The trial court held a hearing on the motion for an investigator, and as we have stated above, granted the motion. CP. 102. The trial court also held a hearing on the motion for the appointment of a mitigation specialist or expert. Tr. 63-76. After this hearing, the trial court denied the motion for a mitigation specialist, but left the door open for Loden to show additional reasons for the necessity of such an expert. The trial court's ruling on this issue reads:

> THE COURT: I have already authorized your employing an investigator. I believe I have.
>
> MR. JOHNSTONE: Yes, sir.
>
> THE COURT: And in looking at what he proposes to do to the tune of about fourteen thousand dollars is to investigate, develop information, which all seems to be either something that the investigator, the attorneys or psychiatrists, psychologists would be involved in in developing the case. I don't know of any particular specialty within the law or a scientific basis for the kind of thing he proposes to do.
>
> I'll give you an opportunity to tell me if you can locate any authority for

---

[27]If the reasons sound familiar, they are the exact reasons Loden used to support his request for an investigator.

162

this other than the fact that he's done it in the past. I would like to know what the courts of this country have said about this before I authorize this expenditure.

I understand –

MR. JOHNSTONE: We'll look and provide that for you, Your Honor.

Tr. 75-76.[28]

The trial court found that since he had furnished Loden with an investigator and an independent psychologist that those experts would be qualified to do what Loden proposed that such an expert would do. Counsel stated that they would furnish the trial court with additional authority regarding the request for this expert, but we find no such additional authority in the record of this case. In addition, the respondents find no further mention of hiring a mitigation specialist in the record of this case.[29]

It may be that the change in strategy by Loden, deciding to plead guilty to the charges in the indictment and put no case on in mitigation of sentence, is the reason that we find no further mention of such an expert. Clearly, if Loden had instructed his attorneys to put on

_____

[28]The respondents would assert that a mitigation specialist or investigator is nothing more than an investigator. The ultimate issue is whether any such specialist or investigator could be qualified as an expert in order to give opinion testimony. It appears to the respondents that such "experts" are nothing more than glorified investigators and could not testify as to opinions they form from the evidence they gather.

[29]Loden attached an affidavit of Dr. Mooers dated April 14, 2005, which contains several exhibits to his direct appeal of the sentence. It is clear that this affidavit was prepared at some point post-trial. This was clearly not a part of the original record of the proceedings in the trial court in this case and the State objected to its submission on appeal. *See* Miss. R. App. Proc., Rule 10 (f). As is shown by the opinion of the state court, the exhibit was found to be proper for consideration on appeal. *See* 971 So.2d at 564, n. 15.

163

no case in mitigation there was no necessity for further investigation into this area. In any event, Loden was provided with an investigator for the same purposes and was allowed additional funds for further investigation by the investigator.

Loden filed a motion for a psychiatric examination requesting that he be examined at the State Hospital at Whitfield. CP. 93-94. The trial court granted this motion and ordered Loden be examined at the State Hospital. CP. 119-22. The State Hospital filed its report with the trial court on June 22, 2001. The State Hospital found Loden was competent, sane and not suffering from emotional or mental disorder or distress. CP. 135-37. Not liking the results of this examination, Loden filed an Ex Parte Motion for Funds to Secure Expert Assistance in the Field of Psychology. CP. 140-56. He requested this further examination in order to "present to the jury the full array of mitigating circumstances that exist in this case". CP. 147. He specifically requested the services of Dr. C. Gerald O'Brien. CP. 148. The trial court granted this motion for funds and examination.[30] CP. 157-59.

However, in the final analysis, the claim presented in this assignment of error is moot.

---

[30]Loden clearly received a benefit to which he was not entitled. Being dissatisfied with the results of the first mental examination conducted at the State Hospital, he was allowed to obtain the services of a psychologist of his choice to attempt to refute the findings of the staff of the State Hospital. The precedent of the state court is that a criminal defendant does not have the right to a psychiatrist or psychologist of his choice or to receive funds to hire one of his choice; rather he has a right only to a competent one. The state court has further held that once defendant is examined by an expert appointed by the court he has no right to a separate independent examination. *Byrom v. State*, 863 So.2d 836, 852, ¶ 33 (Miss. 2003); *Manning v. State*, 726 So.2d 1152, 1190-91, ¶¶ 157-61 (Miss. 1998); *Woodward v. State*, 726 So.2d 524, 528-29, ¶¶ 14-20 (Miss. 1997); *Butler v. State*, 608 So.2d 314, 321 (Miss. 1992); *Willie v. State*, 585 So.2d 660, 671 (Miss. 1991).

This is so because Loden instructed his counsel not to present any mitigation evidence to the court on his behalf. Tr. 691; 698. However, contrary to Loden's expressed wishes, counsel did offer a proffer of some of what they would have presented in mitigation had they been allowed to do so by Loden. *See* Tr. 689-92.

This brings us to the key to the decision on this issue. In *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), the United States Supreme Court, in reversing the decision of the Ninth Circuit held:

> The Court of Appeals first addressed the State's contention that Landrigan instructed his counsel not to offer any mitigating evidence. If Landrigan issued such an instruction, counsel's failure to investigate further could not have been prejudicial under *Strickland*. The Court of Appeals rejected the findings of "the Arizona Supreme Court (on direct appeal) and the Arizona Superior Court (on habeas review)" that Landrigan instructed his counsel not to introduce any mitigating evidence. 441 F.3d, at 646. According to the Ninth Circuit, those findings took Landrigan's colloquy with the sentencing court out of context in a manner that "amounts to an 'unreasonable determination of the facts.'" *Id.*, at 647 (quoting 28 U.S.C. § 2254(d)(2)).

> Upon review of record material and the transcripts from the state courts, we disagree. As a threshold matter, the language of the colloquy plainly indicates that Landrigan informed his counsel not to present any mitigating evidence. When the Arizona trial judge asked Landrigan if he had instructed his lawyer not to present mitigating evidence, Landrigan responded affirmatively. Likewise, when asked if there was any relevant mitigating evidence, Landrigan answered, "Not as far as I'm concerned." App. to Pet. for Cert. D–4. These statements establish that the Arizona postconviction court's determination of the facts was reasonable. And it is worth noting, again, that the judge presiding on postconviction review was ideally situated to make this assessment because she is the same judge who sentenced Landrigan and discussed these issues with him.

> Notwithstanding the plainness of these statements, the Court of Appeals concluded that they referred to only the specific testimony that counsel planned

165

to offer—that of Landrigan's ex-wife and birth mother. The Court of Appeals further concluded that Landrigan, due to counsel's failure to investigate, could not have known about the mitigating evidence he now wants to explore. The record conclusively dispels that interpretation. First, Landrigan's birth mother would have offered testimony that overlaps with the evidence Landrigan now wants to present. For example, Landrigan wants to present evidence from his biological father that would "confirm [his biological mother's] alcohol and drug use during her pregnancy." *Id.*, at E–2. But the record shows that counsel planned to call Landrigan's birth mother to testify about her "drug us[e] during her pregnancy," *id.*, at D–10, and the possible effects of such drug use. Second, Landrigan interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating. He even refused to allow his attorney to proffer that he had worked a regular job at one point. *Id.*, at D–6, D–7. This behavior confirms what is plain from the transcript of the colloquy: that Landrigan would have undermined the presentation of any mitigating evidence that his attorney might have uncovered.

On the record before us, the Arizona court's determination that Landrigan refused to allow the presentation of any mitigating evidence was a reasonable determination of the facts. In this regard, we agree with the initial Court of Appeals panel that reviewed this case:

> "In the constellation of refusals to have mitigating evidence presented . . . this case is surely a bright star. No other case could illuminate the state of the client's mind and the nature of counsel's dilemma quite as brightly as this one. No flashes of insight could be more fulgurous than those which this record supplies." *Landrigan v. Stewart*, 272 F.3d 1221, 1226 (C.A.9 2001).

Because the Arizona postconviction court reasonably determined that Landrigan "instructed his attorney not to bring any mitigation to the attention of the [sentencing] court," App. to Pet. for Cert. F–4, it was not an abuse of discretion for the District Court to conclude that Landrigan could not overcome § 2254(d)(2)'s bar to granting federal habeas relief. The District Court was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence. Accordingly, the District Court could conclude that because of his established recalcitrance, Landrigan could not demonstrate prejudice under *Strickland* even if granted an evidentiary hearing.

B

The Court of Appeals offered two alternative reasons for holding that Landrigan's inability to make a showing of prejudice under *Strickland* did not bar any potential habeas relief and, thus, an evidentiary hearing.

1

The Court of Appeals held that, even if Landrigan did not want any mitigating evidence presented, the Arizona courts' determination that Landrigan's claims were "'frivolous' and 'meritless' was an unreasonable application of United States Supreme Court precedent." 441 F.3d, at 647 (citing 28 U.S.C. § 2254(d)(1)). This holding was founded on the belief, derived from *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), that "Landrigan's apparently last-minute decision cannot excuse his counsel's failure to conduct an adequate investigation prior to the sentencing." 441 F.3d, at 647.

Neither *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court. *Wiggins, supra,* at 523, 123 S.Ct. 2527 ("[W]e focus on whether the investigation supporting *counsel's* decision not to introduce mitigating evidence of Wiggins' background was itself reasonable" (emphasis added and deleted)). Indeed, we have never addressed a situation like this. In *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), on which the Court of Appeals also relied, the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented. In short, at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.

2

The Court of Appeals also stated that the record does not indicate that Landrigan's decision not to present mitigating evidence was "informed and knowing," 441 F.3d, at 647, and that "[t]he trial court's dialogue with Landrigan tells us little about his understanding of the consequences of his decision," *ibid*. We have never imposed an "informed and knowing"

167

requirement upon a defendant's decision not to introduce evidence. *Cf., e.g., Iowa v. Tovar*, 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004) (explaining that waiver of the right to counsel must be knowing and intelligent). Even assuming, however, that an "informed and knowing" requirement exists in this case, Landrigan cannot benefit from it, for three reasons.

First, Landrigan never presented this claim to the Arizona courts.[3] Rather, he argued that he would have complied had other evidence been offered. Thus, Landrigan failed to develop this claim properly before the Arizona courts, and § 2254(e)(2) therefore barred the District Court from granting an evidentiary hearing on that basis.

Second, in Landrigan's presence, his counsel told the sentencing court that he had carefully explained to Landrigan the importance of mitigating evidence, "especially concerning the fact that the State is seeking the death penalty." App. to Pet. for Cert. D–3. Counsel also told the court that he had explained to Landrigan that as counsel, he had a duty to disclose "any and all mitigating factors . . . to th[e][c]ourt for consideration regarding the sentencing." *Ibid.* In light of Landrigan's demonstrated propensity for interjecting himself into the proceedings, it is doubtful that Landrigan would have sat idly by while his counsel lied about having previously discussed these issues with him. And as Landrigan's counsel conceded at oral argument before this Court, we have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence. Tr. of Oral Arg. 26.

Third, the Court of Appeals overlooked Landrigan's final statement to the sentencing court: "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." App. to Pet. for Cert. D–16. It is apparent from this statement that Landrigan clearly understood the consequences of telling the judge that, "as far as [he was] concerned," there were no mitigating circumstances of which she should be aware. *Id.*, at D–4.

IV

Finally, the Court of Appeals erred in rejecting the District Court's finding that the poor quality of Landrigan's alleged mitigating evidence prevented him from making "a colorable claim" of prejudice. *Id.*, at C–46. As summarized by the Court of Appeals, Landrigan wanted to introduce as

mitigation evidence

> "[that] he was exposed to alcohol and drugs in utero, which may have resulted in cognitive and behavioral deficiencies consistent with fetal alcohol syndrome. He was abandoned by his birth mother and suffered abandonment and attachment issues, as well as other behavioral problems throughout his childhood.
>
> "His adoptive mother was also an alcoholic, and Landrigan's own alcohol and substance abuse began at an early age. Based on his biological family's history of violence, Landrigan claims he may also have been genetically predisposed to violence." 441 F.3d, at 649.

As explained above, all but the last sentence refer to information that Landrigan's birth mother and ex-wife could have offered if Landrigan had allowed them to testify. Indeed, the state postconviction court had much of this evidence before it by way of counsel's proffer. App. to Pet. for Cert. D–21. The District Court could reasonably conclude that any additional evidence would have made no difference in the sentencing.

In sum, the District Court did not abuse its discretion in finding that Landrigan could not establish prejudice based on his counsel's failure to present the evidence he now wishes to offer. Landrigan's mitigation evidence was weak, and the postconviction court was well acquainted with Landrigan's exceedingly violent past and had seen first hand his belligerent behavior. Again, it is difficult to improve upon the initial Court of Appeals panel's conclusion:

> "The prospect was chilling; before he was 30 years of age, Landrigan had murdered one man, repeatedly stabbed another one, escaped from prison, and within two months murdered still another man. As the Arizona Supreme Court so aptly put it when dealing with one of Landrigan's other claims, '[i]n his comments [to the sentencing judge], defendant not only failed to show remorse or offer mitigating evidence, but he flaunted his menacing behavior.' On this record, assuring the court that genetics made him the way he is could not have been very helpful. There was no prejudice." 272 F.3d, at 1229 (citations and footnote omitted).

V

169

The Court of Appeals erred in holding that the District Court abused its discretion in declining to grant Landrigan an evidentiary hearing. Even assuming the truth of all the facts Landrigan sought to prove at the evidentiary hearing, he still could not be granted federal habeas relief because the state courts' factual determination that Landrigan would not have allowed counsel to present any mitigating evidence at sentencing is not an unreasonable determination of the facts under § 2254(d)(2), and the mitigating evidence he seeks to introduce would not have changed the result. In such circumstances, a District Court has discretion to deny an evidentiary hearing. The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

_____

3. Landrigan made this argument for the first time in a motion for rehearing from the denial of his postconviction petition. Under Arizona law, a defendant cannot raise new claims in a motion for rehearing. *State v. Byers*, 126 Ariz. 139, 142, 613 P.2d 299, 302 (App.1980), overruled on other grounds, *State v. Pope*, 130 Ariz. 253, 635 P.2d 846 (1981).

550 U.S. at 475-481. [Emphasis the Court's.]

*See Brawner v. Epps*, 439 Fed.Appx. 396, 404-08 (5th Cir. 2011); *Bishop v. Epps*, 265 Fed.Appx. 285, 291-92 (5th Cir. 2008). Loden instructed his counsel not to put on any evidence in mitigation in this case. He cannot now complain that he was not afforded the funds for further investigation into possible mitigation evidence.

In any event, considering the choices Loden made regarding pleading guilty to the charges in the indictment and then waiving a jury for the sentence phase of this case, the question of whether such an expert was necessary becomes moot. Loden can demonstrate no prejudice in the trial court's denial of the motion.

In conclusion, the trial court furnished Loden with an investigator to seek out mitigation and not one, but two mental examinations, one specifically to determine mitigation

170

evidence. The finding of the Mississippi Supreme Court that the trial court did not abuse its discretion in denying funds to hire a mitigation investigator in this case is not an unreasonable application of federal law as announced by the United States Supreme Court. Loden is entitled to no habeas relief on this claim.

## V.     THE INDICTMENT IN THIS CHARGED A DEATH ELIGIBLE OFFENSE UNDER MISSISSIPPI LAW.

Petitioner also contended in his appeal of the sentence phase of his trial that the indictment did not charge a death eligible offense. The Mississippi Supreme Court decided this claim on the merits in the appeal. The Mississippi Supreme Court held:

¶ 35. Loden contends that "[t]he indictment did not include a valid statutory aggravating factor nor a mens rea element of MISS. CODE ANN. § 99-19-101(5) and (7) respectively." He asserts that:

in Mississippi, the finding of an aggravating circumstance and a mens rea element increases the penalty over the statutory maximum absent that circumstance, and therefore implicates the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, and the corresponding provisions of our state constitution.

While conceding that "this Court has held that the indictment in a death penalty case need not include aggravating circumstances, [see ] *Williams v. State*, 445 So.2d 798, 804 (Miss.1984)," Loden argues that "the reasoning in *Williams* must be reconsidered in light of *Apprendi [v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ], *Ring [v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) ], and *Blakely [v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) ]." As such, Loden maintains that "[b]ecause the indictment in this case failed to set forth a statutory aggravating factor or mens rea element, the death sentence imposed on [Loden] must be vacated and this case remanded for imposition of a life sentence, the maximum penalty for the offense charged in the indictment." In reply, the State argues that Loden's claim is without merit as "[t]he charge of

capital murder is contained in Count I of the indictment." Moreover, the State insists that "[t]his Court has held that the decisions in *Ring* and *Apprendi* have no application to the Mississippi capital sentencing scheme."

¶ 36. "[T]he sufficiency of the indictment [is] not waivable and may be raised for the first time on appeal[.]" *Byrom v. State*, 863 So.2d 836, 865 (Miss.2003) (citing *State v. Berryhill*, 703 So.2d 250, 253 (Miss.1997)). The United States Supreme Court has stated that:

> [u]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Ring*, 536 U.S. at 600, 122 S.Ct. 2428 (quoting *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). This Court previously has held that an indictment is sufficient without listing aggravating circumstances, as "[a]nytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment." *Williams*, 445 So.2d at 804-805. Furthermore, this Court previously has rejected similar arguments regarding the applicability of *Ring* and *Apprendi* to Mississippi's capital murder sentencing scheme. *See Jordan v. State*, 918 So.2d 636, 661 (Miss.2005); *Knox v. State*, 901 So.2d 1257, 1269 (Miss.2005); *Hodges v. State*, 912 So.2d 730, 775-77 (Miss.2005); *Thorson*, 895 So.2d at 105-106.[16] As this Court found in *Jordan*, so we find in the case sub judice, "[i]n *Berry v. State*, 882 So.2d 157 (Miss.2004), this Court determined that *Ring* and *Apprendi* have no applicability to Mississippi's capital murder sentencing scheme. This issue is thus without merit." *Jordan*, 918 So.2d at 661 (citations omitted).

_____

16. This Court finds that these holdings extend also to *Blakely*, which required the United States Supreme Court "to apply the rule [they] expressed in *Apprendi* . . . ." *Blakely*, 542 U.S. at 301, 124 S.Ct. 2531.

971 So.2d at 564-65.

This decision by the Mississippi Supreme Court is neither contrary to or an unreasonable

application of clearly established federal law as announced by the United States Supreme Court.

The Mississippi Supreme Court has rejected claims similar to Loden's argument in every instance that it has been rasied.  *See Moffett v. State*, 49 So.3d 1073, 1114-15 (Miss.,2010); *Gillett v. State*, 56 So.3d 469, 510-11 (Miss.,2010); *Pitchford v. State*, 45 So.3d 216, 257-58 (Miss.,2010); *Goff v. State*, 14 So.3d 625, 665 (Miss.,2009); *Le v. State*, 967 So.2d 627, 632-33 (Miss.,2007); *Ross v. State*, 954 So.2d 968, 1013-14 (Miss.,2007); *Lynch v. State*, 951 So.2d 549, 553-54 (Miss.,2007); *Brown v. State*, 948 So.2d 405, 413-14 (Miss.,2006); *Brawner v. State*, 947 So.2d 254, 365 (Miss.,2006); *Powers v. State*, 945 So.2d 386, 395-97 (Miss.,2006); *Howard v. State*, 945 So.2d 326, 363-64 (Miss.,2006); *Bennett v. State*, 933 So.2d 930, 951-53 (Miss.,2006); *Havard v. State*, 928 So.2d 771, 800-02 (Miss.,2006); *Byrom v. State*, 927 So.2d 709, 725-26 (Miss.,2006); *Spicer v. State*, 921 So.2d 292, 319 (Miss.,2006); *Jordan v. State*,918 So.2d 636 , 661 (Miss. 2005); *Hodges v. State*, 912 So.2d 730m 775-77 (Miss. 2005); *Knox v. State*, 901 So.2d 1257, 1269, ¶¶ 46-47 (Miss. 2005); *Berry v. State*, 895 So.2d 85, 104-05, ¶¶ 44-45 (Miss. 2004); *Brown v. State*, 890 So.2d 901, 917-18, ¶¶ 60-62 (Miss. 2004); *Gray v. State*, 887 So.2d 158, 173-74, ¶¶ 45-48 (Miss. 2004); *Mitchell v. State*, 886 So.2d 704, 710-11, ¶¶ 15-21 (Miss. 2004);  *Berry v. State*, 882 So.2d 157, 170-73, ¶¶ 57-69, 173-74, ¶¶ 73-76 (Miss.2004);  *Puckett v. State*, 879 So.2d 920, 944-47, ¶¶ 86-97 (Miss.2004); *Holland v. State*, 878 So.2d 1, 7-9, ¶¶ 21-27 (Miss. 2004); *Simmons v. State*, 869 So.2d 995, 1008-1011, ¶¶ 43-53 (Miss.2004); *Stevens v. State*,

867 So.2d 219, 225-27, ¶¶ 21-27 (Miss. 2003).

Further, the United States District Courts in Mississippi have addressed this same question on four different occasions. Each found the claim to be without merit. In each case COA was denied or the petitioner did not take the matter to the Fifth Circuit on appeal. Looking to the decision of the United States District Court for the Southern District of Mississippi in *Mitchell v. Epps*, 2010 WL 1141126 (S.D.Miss. 2010), we find Judge Guirola holding the following:

> **F. The aggravating factors elevating the charge to a capital offense were not included in Petitioner's indictment, and, therefore, Petitioner's death sentence must be vacated.**
>
> Mitchell argues that the aggravating circumstances on which the State intended to rely were not listed in his indictment, in violation of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This argument was considered on post-conviction, and the Mississippi Supreme Court rejected it. *Mitchell v. State*, 886 So.2d 704, 710–11. In so doing, that court recognized *Apprendi's* holding—that aggravating circumstances on which a federal prosecutor intends to rely must be listed in an indictment. 886 So.2d at 710 (citing *Apprendi*, 530 U.S. at 490). The court also correctly stated the holding in *Ring*—that any aggravating circumstance used to justify the death penalty is equivalent to a finding of a greater offense, and must be found by a jury. *Id.* (citing *Ring*, 536 U.S. at 609). However, the petitioner in *Ring* did not attack the constitutionality of his indictment, and the Supreme Court referred to the claim that he did make—that the Sixth Amendment required the jury to find any aggravating factors—as "tightly delineated." *Id.* at 597.
>
> The holding in *Ring* cannot be extended to invalidate a state court indictment because it did not list all of the aggravating circumstances that the state intended to prove at trial. Such an extension would not help Mitchell in any event, since his conviction became final after [sic] *Ring* was decided. A conviction becomes final for retroactivity analysis when the direct appeal to

174

the state court is concluded and the time for petitioning for certiorari has expired or a timely petition for certiorari has been denied. *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). In Mitchell's case, the Supreme Court denied his petition for writ of certiorari on direct appeal on March 18, 2002. *Mitchell v. Mississippi*, 535 U.S. 933, 122 S.Ct. 1308, 152 L.Ed.2d 218 (2002). *Ring* was decided on June 24, 2002, so it could only help Mitchell if its holding could be applied retroactively; however, its holding has been held to be procedural and not to be applied retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

Due process requires that a defendant be informed of the charges brought against him by the state. *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948). However, there is no clearly established federal law that requires that each aggravating circumstance on which the state intends to rely to pursue the death penalty must be named in the indictment. The Mississippi Supreme Court recognized this and held, based on state law, that the indictment was sufficient. Mitchell has not shown that the Mississippi Supreme Court's decision is contrary to or an unreasonable application of clearly established federal law because there has been no case from the United States Supreme Court that suggests otherwise. *See Brawner v. Epps*, No. 2:07cv16MPM, 2010 WL 383734 at *22 (N.D.Miss.2010); *Simpson v. Quarterman*, No. 1:04–CV–485, 2007 WL 1008193 at *21 (E.D.Tex. Mar.29, 2007) ("Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment.") Therefore, Mitchell's argument here has no merit.

2010 WL 1141126 at 36 -37.

Earlier in *Brawner v. Epps*, 2010 WL 383734 (N.D. Miss. 2010), a Northern District case,

Judge Mills held:

## II. Apprendi and Ring

Petitioner argues that any fact that increases the maximum penalty for a crime, other than a prior conviction, must be charged in the indictment. He maintains that the grand jury in his case did not set forth the aggravating circumstances in the indictment, and that the Mississippi Supreme Court unreasonably excluded the constitutional principles of Apprendi and Ring in rejecting this claim. In *Apprendi v. New Jersey*, the United States Supreme

175

Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 446, 490 (2000); *see also Ring v. Arizona*, 536 U.S. 584, 589 (2002) (applying *Apprendi's* rule to facts subjecting a defendant to death).

On post-conviction review, the Mississippi Supreme Court held this claim barred for Petitioner's failure to raise it on direct appeal. *See Brawner II*, 947 So.2d at 264. In the alternative, the court noted it had "repeatedly dealt with this argument" and found it without merit. *Id*. at 265. The court held that the indictment for capital murder put Petitioner on notice of the statutory aggravating factors that would be used against him, and it held that "*Ring and Apprendi* have no applicability to Mississippi's capital murder scheme." *See id*.

The bar relied upon by the Mississippi Supreme Court has been recognized as independent and adequate grounds to bar habeas relief. *See Stokes v. Anderson*, 123 F.2d 858, 860-61 (5th Cir.1997). Petitioner has not demonstrated cause and prejudice for the default, or that a fundamental miscarriage of justice will result if the claim is not considered. *See, e.g., Coleman*, 501 U.S. at 750. Even in the absence of a procedural bar, however, Petitioner would not be entitled to relief on this claim.

Petitioner relies in part upon *Jones v. United States*, 526 U.S. 227 (1999), in which the Court held that facts authorizing higher penalties must be charged in the indictment and proven beyond a reasonable doubt. *See Jones*, 526 U.S. at 243 n.6. However, *Jones* was a federal prosecution case. Petitioner interprets *Jones*, *Apprendi*, and *Ring* to hold that aggravating circumstances increase the penalty over Mississippi's statutory maximum, thereby requiring that they be recited in the indictment. Petitioner's logic is sound and the practice urged seems reasonable. However, no clearly established Supreme Court precedent requires that aggravating factors be alleged in a state court indictment. *See Branzburg v. Hayes*, 408 U.S. 665, 687-88 n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"). *Apprendi* itself noted that "the Fifth Amendment right to 'presentment or indictment by a Grand Jury" has never been incorporated against the states. *Apprendi*, 530 U.S. at 477 n.3. Evidence on the appropriate aggravating factors under Mississippi law was submitted to the jury, and the

jury found the existence of aggravators beyond a reasonable doubt before the sentence of death was imposed. Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

2010 WL 383734 at 21 -22.

Still earlier the claim was presented to the United States District Court for the Southern District of Mississippi in *Gray v. Epps*, 2008 WL 4793796 (S.D.Miss.,2008), where Judge Guirola held:

### The Indictment

The indictment charged that Gray "did willfully, unlawfully, feloniously and of his malice aforethought kill and murder Grace Blackwell, a human being, while engaged in the commission of the crime of kidnapping [sic] and/or rape, contrary to and in violation of Section 97-3-19(2)(e), MISS. CODE ANN. (1972), as amended." At the close of the guilt phase, the jury was instructed that capital murder "is the killing of another person while engaged in another crime. In this case, either kidnaping or rape. It doesn't have to be both kidnaping or rape, but killing in the course of a kidnaping or a rape, one or the other."

Gray did not raise this particular claim on direct appeal. However, he did argue that the indictment was defective because the underlying offenses were described in the disjunctive. The Mississippi Supreme Court held that the issue was procedurally barred. The court reasoned that, although Gray had moved to quash the indictment on other grounds, he did not attack the indictment language. *Gray*, 728 So.2d at 36. Later, in his state post-conviction petition, Gray raised the issue of the omitted aggravating factors in the indictment. Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Gray argued that inclusion of the aggravating factors was essential to a capital murder indictment. The Mississippi Supreme Court disagreed, holding that the scope of *Apprendi* and *Ring* was restricted and did not control the issue of whether aggravating circumstances must be included in the indictment. *Gray*, 887 So.2d at 174. Moreover, the court held, the indictment was proper under state law:

> We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment.

*Id*. (quoting *Williams v. State*, 445 So.2d 798, 804-05 (Miss.1984)).

Respondents point out that Gray's direct appeal was concluded prior to the United States Supreme Court decisions in *Apprendi* and *Ring* and that their holding cannot be applied retroactively. A conviction becomes final for retroactivity analysis when the direct appeal to the state court is concluded and the time for petitioning for certiorari has expired or a timely petition for certiorari has been denied. *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). After direct appeal, Gray filed a petition for writ of certiorari to the United States Supreme Court. The petition was denied on April 5, 1999. *Apprendi* was decided in 2000, and *Ring* was decided in 2004, so neither would apply to his case.

In considering Gray's challenge on the merits, the Mississippi Supreme Court found that both *Apprendi* and *Ring* "held unconstitutional sentencing procedures where a judge rather than a jury determined whether there were aggravating circumstances sufficient to warrant imposition of the death penalty." *Gray*, 887 So.2d at 173. The court also found that *Ring* did not apply, because the petitioner in *Ring* was contesting the propriety of a judge's making aggravating factor findings, not the sufficiency of the indictment. Gray has not shown that the Mississippi Supreme Court's decision regarding the sufficiency of the indictment is contrary to or an unreasonable application of clearly established federal law. *See also Simpson v. Quarterman*, No. 1:04-CV-485, 2007 WL 1008193 at *21 (E.D.Tex. Mar.29, 2007) ("Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment.")

2008 WL 4793796 at 3-4.

In another Southern District case, *Stevens v. Epps*, 2008 WL 4283528, 25 (S.D.Miss.,2008),

Judge Starrett held:

Finally, Stevens argues that the aggravating circumstances on which the State intended to rely were not listed in his indictment, in violation of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This argument was considered on post-conviction, and the Mississippi Supreme Court rejected it. Part of that court's rationale, in which it failed to apply *Ring* retroactively, was in error, as *Ring* was decided before Stevens's case was final-a fact admitted by the Respondents. However, the opinion went on to state that *Apprendi's* holding-that aggravating circumstances on which a federal prosecutor intends to rely must be listed in an indictment-did not apply to state courts. It further held that *Ring* did not subsequently extend *Apprendi's* holding on indictments to state court. Stevens has not shown that the Mississippi Supreme Court's decision is contrary to or an unreasonable application of clearly established federal law because there has been no later case from the United States Supreme Court that suggests otherwise. *See Simpson v. Quarterman*, No. 1:04-CV-485, 2007 WL 1008193 at *21 (E.D.Tex. Mar.29, 2007) ("Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment.") Therefore, Stevens's argument here has no merit.

2008 WL 4283528 at 25.

*See Williams v. Haviland*, 467 F.3d 527, 531-36 (6th Cir. 2006); *Roberts v. Thaler*, 2011 WL 5433982, * 23-24 (E.D.Tex.,2011); *Guevara v. Thaler*, 2011 WL 4455261, * 31-32 (S.D.Tex.,2011); *Grim v. Buss*, 2011 WL 1299930 * 67-68 (N.D.Fla.,2011); *Lott v. Workman*, 2011 WL 1302286, * 41-43 (W.D.Okla.,2011); *Blue v. Thaler*, 2010 WL 8742423, * 31-32 (S.D.Tex.,2010); *Hall v. Bell*, 2010 WL 908933, *42-43 (E.D.Tenn.,2010); *Kayer v. Ryan*, 2009 WL 3352188, * 41 (D.Ariz.,2009).

The decisions in *Ring* and *Apprendi* apply to federal cases with regard to the inclusion of aggravating circumstances in an indictment, however, they do not apply to state court indictments. The decision of the Mississippi Supreme Court on this claim is neither contrary

179

to or an unreasonable application of clearly established federal law. Petitioner is entitled to

no habeas relief on this claim.

## VI. THE CONSIDERATION OF THE "AVOIDING ARREST" AGGRAVATING FACTOR BY THE SENTENCER DID NOT VIOLATE THE FOURTEENTH AMENDMENT.

Petitioner next argues that the consideration of the "avoiding arrest" aggravating

factor violated the Fourteenth Amendment. This claim was presented to the Mississippi

Supreme Court on the appeal of the sentence of death. The state court held:

> ¶ 37. Loden maintains that this aggravating circumstance was not proven beyond a reasonable doubt as "[t]he only evidence offered in support of the aggravator . . . was [Loden's] tentative response to interrogators as to why he killed: 'Looking back now, I wouldn't have released her because I would've lost the image of being the picture perfect [M]arine. . . .'" Loden argues that this statement amounts to speculated "concern over his professional image only, and nowhere did he so much imply concern over preventing or avoiding arrest." Loden asserts that there is no "evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal [his] identity or to 'cover [his] tracks' so as to avoid apprehension and eventual arrest by authorities." *See Leatherwood v. State*, 435 So.2d 645, 651 (Miss.1983). As such, he contends that "the death sentence must be vacated and this cause remanded for a new sentencing trial without submission of the 'avoiding arrest' aggravating circumstance."

> ¶ 38. The State first argues that because Loden did not object to consideration of the "avoiding arrest" aggravating circumstance at trial, nor raise the issue in any post-trial motion, then "the claim is waived and barred from consideration by this Court for the first time on appeal." Procedural bar notwithstanding, the State asserts that in addition to Loden's "statement regarding ruining his perfect military record[,]" there was evidence that "Loden had dug a grave in which to bury [Leesa's] body, but was prevented from doing so by the arrival of law enforcement officers." From this evidence, the State submits that it reasonably could be inferred that Loden was acting to avoid apprehension and eventual arrest. Alternatively, the State argues that under Mississippi Code Annotated Section 99-19-105(3)(d), if an aggravating

circumstances is found invalid on appeal, this Court "shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both." MISS. CODE ANN. § 99-19-105(3)(d) (Rev.2007).[17] As Loden turned aside his opportunity to present mitigating evidence, the State contends that "it cannot be said that had the avoiding arrest aggravator not been found by the trial court that the death sentence would not have been returned based on the remaining aggravating circumstances found by the court." Therefore, the State maintains that "[t]he consideration of the 'avoiding arrest' aggravator in this case was at best harmless beyond a reasonable doubt."

¶ 39. As Loden spurned objection to the submission of this aggravating circumstance at trial, this Court finds that he is procedurally barred from raising it for the first time on appeal. *See Woodward v. State*, 726 So.2d 524, 540-41 (Miss.1997) (citing *Chase v. State*, 645 So.2d 829, 857 (Miss.1994)). Notwithstanding the procedural bar, we consider whether Loden's argument has substantive merit.

¶ 40. Under the applicable standard of review:

[w]e must view the evidence and all reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. *We have no authority to disturb the verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found the fact at issue beyond a reasonable doubt.*

*White v. State*, 532 So.2d 1207, 1220 (Miss.1988) (emphasis added).

¶ 41. When considering the "avoiding lawful arrest" aggravating circumstance:

if there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or . . . to "cover their tracks" *so as to avoid apprehension and eventual arrest by authorities*, then it is proper for the court to allow the jury to consider this aggravating circumstance.

Upon this construction the Court properly submits this

181

aggravator to the jury if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.

*Woodward*, 726 So.2d at 541 (quoting *Foster v. State*, 687 So.2d 1124, 1140 (Miss.1996)) (citations omitted) (emphasis added). In *Mitchell v. State*, 792 So.2d 192 (Miss.2001), this Court found "sufficient evidence in the record to show that Mitchell murdered Milliken in an attempt to cover up evidence that he had inflicted the injuries she had received by his hand, all in hope of avoiding arrest." *Id.* at 219-20.

¶ 42. Viewing Loden's statements and the grave dug in a secluded wooded area on the property of Loden's grandmother in the light most favorable to finding this aggravating circumstance (*see White*, 532 So.2d at 1220) this Court concludes that a rational trier of fact could find beyond a reasonable doubt that Loden killed Leesa in order to avoid apprehension and arrest. *See Woodward*, 726 So.2d at 541. As such, this issue is without merit.[18]

_____

17. In reweighing the remaining aggravating circumstances against mitigating circumstances, this Court is authorized to "(I) affirm the sentence of death or (II) hold the error in the sentence phase harmless error and affirm the sentence of death or (III) remand the case for a new sentencing hearing. . . ." MISS. CODE ANN. § 99-19-105(5)(b) (Rev.2007).

18. Assuming arguendo the issue does have merit, utilizing the reweighing mandated by Mississippi Code Annotated Section 99-19-105(3)(d) and (5)(b), this Court would hold the error harmless and affirm the sentence of death because Loden presented no mitigating evidence.

971 So.2d at 565-67. [Emphasis the Court's.]

As clearly stated in paragraph 39 of the opinion above, the Mississippi Supreme Court held the claim to be procedurally barred from consideration because Loden failed to interpose an objection to the avoiding arrest aggravating factor at trial.

Petitioner argues that there can be no imposition of a procedural bar to an aggravating

182

circumstance. He relies on passages from *Manning v. State*, 735 So.2d 323, 349 (Miss. 1999), and *Simmons v. State*, 805 So.2d 452, 495-96 (2001), in support for this assertion. The Mississippi Supreme Court addressed a similar claim in *Blue v. State*, 674 So.2d 1184, (Miss.,1996), holding:

> Blue was charged and convicted of sexual battery. Thereafter, over defense objection in the penalty phase, the jury was instructed to consider as an aggravating circumstance that "the capital offense was committed while the Defendant was engaged in the commission of sexual battery."

> Blue's argument that the submission of this aggravating circumstance of error is twofold: (1) it does not narrow the class of death-eligible defendant in a rational manner; the instruction violates the Eighth Amendment because it does not narrow the class of death-eligible defendants, and (2) by punishing the defendant twice for conduct punishable by count II of the indictment, it offends the state and federal prohibitions against double jeopardy

> The State contends that this assignment of error is procedurally barred due to Blue's failure to make a specific contemporaneous objection to the instruction at trial. *Foster v. State*, 639 So.2d at 1270–71; *Chase*, 645 So.2d at 835. (This Court has repeatedly held that if no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case); *Cole v. State*, 525 So.2d 365, 369 (Miss.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); *Irving v. State*, 498 So.2d 305 (Miss.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); *Johnson v. State*, 477 So.2d 196 (Miss.1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); *In re Hill*, So.2d 460 So.2d 792 (Miss.1984); *Hill v. State*, 432 So.2d 427 (Miss.1983), *cert. denied*, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).

> Blue contends that this claim cannot be procedurally barred because of two reasons. First, this Court has refused to apply this bar to aggravating circumstances. *See, e.g., Clemons v. State*, 535 So.2d 1354 (Miss.1988) (failure to object and raise on direct appeal no bar to review improperly submitted aggravating circumstance); *Pinkney v. State*, 602 So.2d 1177 (Miss.1992); *Clemons v. State*, 593 So.2d 1004 (Miss.1992); *see also Smith v. State*, 477 So.2d 191 (Miss.1985) (this Court looks beyond procedural bar

*where error is of constitutional dimension); accord* Smith v. Black, 970 F.2d 1383, 1387 (5th Cir.1992). Second, this Court has a statutory obligation, pursuant to MISS. CODE ANN.1972 § 99–19–105(3)(a)(b) (Supp.1993), to consider possible sentencing errors that are not raised by the defendant or not objected to at trial. *See Beam v. Paskett*, 3 F.3d 1301 (9th Cir.1993) *cert. denied*, *Arave v. Beam*, 511 U.S. 1060, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994). *We find this issue to be procedurally barred*.

674 So.2d at 1215-16. [Emphasis added.]

The Mississippi Supreme Court has rejected a similar argument that petitioner is making here. In fact, the Mississippi Supreme Court has regularly applied the procedural bar to claims that aggravating circumstances were improperly submitted to the jury. *See Spicer v. State*, 921 So.2d 292, 324 (Miss.,2006); *Knox v. State*, 901 So.2d 1257, 1269 (Miss.,2005); *Thorson v. State*, 895 So.2d 85, 105-06 (Miss.,2004); *Dycus v. State*, 875 So.2d 140, 163-64 (Miss.,2004); *Howell v. State*, 860 So.2d 704, 775-76 (Miss.,2003); *Porter v. State*, 732 So.2d 899. 900-01 (Miss.,1999); *Gray v. State*, 728 So.2d 36, 74 (Miss.,1998); *Bell v. State*, 725 So.2d 836, 856 (Miss.,1998); *Woodward v. State*, 726 So.2d 524, 540-41 (Miss.,1997); *Berry v. State*, 703 So.2d 269, 285 (Miss.,1997); *Wilcher v. State*, 697 So.2d 1087, 1108 (Miss.,1997); *Wilcher v. State*, 697 So.2d 1123, 1138 (Miss.,1997); *Williams v. State*, 684 So.2d 1179, 1187 (Miss.,1996); *Blue, supra*; *Ballenger v. State*, 667 So.2d 1242, 1259 (Miss.,1995); *Davis v. State*, 660 So.2d 1228, 1247 (Miss.,1995); *Carr v. State*, 655 So.2d 824, 853-54 (Miss.,1995); *Cole v. State*, 525 So.2d 365, 374 (Miss.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988). Respondents would submit that the Mississippi Supreme Court has regularly imposed the failure to object procedural bar to

184

claims relating to aggravating circumstances in similar cases.  The claim is barred from consideration on habeas review.

The fact that the Mississippi Supreme Court also addressed the merits of the claim does not vitiate the imposition of the procedural bar to this claim.  In footnote 10 of *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the United States Supreme Court held:

> 10.  *Moreover, a state court need not fear reaching the merits of a federal claim in an alternative holding*.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.  *See Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S.Ct. 183, 184, 80 L.Ed. 158 (1935).  Thus, by applying this doctrine to habeas cases, *Sykes* curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.  In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

> 489 U.S. at 264. [Emphasis added.]

*See Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004)

Respondents would submit that *Harris, supra*, does not require any magic words be used in an opinion to invoke a bar clearly. Harris simply holds that the state court must explicitly invoke a procedural bar as a separate basis for its ruling.  That is just what the Mississippi Supreme Court did in this case.  Respondents would submit that the fact that the Mississippi Supreme Court addressed the merits of the claim under alternatively in addition to holding it barred does not vitiate the procedural bar.

185

However, unlike petitioner's characterization that the state court merely held that the evidence was sufficient to support the aggravator, it went further. The Mississippi Supreme Court held the claim to be without merit and also held the error, if error at all, to be harmless beyond a reasonable doubt.

Without waiving the bar to the consideration of this claim, the respondents would alternatively address the merits to demonstrate the claim is additionally devoid of merit. The Mississippi Supreme Court has held that the mere killing of the victim does not automatically give rise to this avoiding or preventing arrest aggravating circumstance. Other factors must be presented to show that the defendant killed the victim to "cover his tracks." "If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer . . . to 'cover their tracks' so as to avoid apprehension and eventual arrest . . . it is proper for the court to allow the jury to consider this [aggravator]. *See Mitchell v. State*, 792 So.2d 192, 219-20, ¶ 103-07 (Miss. 2001); *Walker v. State*, 740 So.2d 873, 888, ¶¶ 63-65 (Miss. 1999)*; Puckett v. State*, 737 So.2d 322, 361-62, ¶¶ 123-26 (Miss. 1999); *Edwards v. State*, 737 So.2d 275, 312, ¶¶ 120-22 (Miss. 1999); *Manning v. State*, 735 So.2d 323, 350, ¶¶ 65-66 (Miss. 1999); *Woodward v. State*, 726 So.2d 524, 540, ¶¶ 66-73 (Miss. 1997); *West v. State*, 725 So.2d 872, 884, ¶¶ 41-42 (Miss. 1998); *Evans v. State*, 725 So.2d 613, 689-90, ¶¶ 348-53 (Miss. 1997); *Brown v. State*, 682 So.2d 340, 355-56 (Miss. 1996); *Doss v. State*, 709 So.2d 369, 390-91, ¶¶ 88-91 (Miss. 1996); *Taylor v. State*, 672 So.2d 1246, 1275 (Miss. 1995); *Walker v. State*, 671 So.2d 581, 611-12 (Miss. 1995);

186

*Carr v. State*, 655 So.2d 824, 853-54 (Miss. 1995), *cert. denied*, 515 U.S. 1076, 116 S. Ct. 782, 133 L.Ed.2d 733 (1996); *Chase v. State*, 645 So.2d 829, 856-58 (Miss. 1994), *cert. denied*, 515 U.S. 1123, 115 S.Ct. 2279, 132 L.Ed.2d 282, *reh. denied*, 515 U.S. 1179, 116 S.Ct. 20, 132 L.Ed.2d 903 (1995); *Hansen v. State*, 592 So.2d 114, 152-53 (Miss. 1991); *Lanier v. State*, 533 So.2d 473, 490 (Miss.1988); *Tokman v. State*, 435 So.2d 664, 671 (Miss.1983); *Leatherwood v. State*, 435 So.2d 645, 650-51 (Miss. 1983), *cert. denied*, 465 U.S. 1084, 104 S.Ct 1455, 79 L.Ed.2d 772 (1984). In *Grayson v. State*, 879 So.2d 1008 (Miss. 2004), the state Court reiterated its previous holdings with regard to this aggravator stating:

> This Court has held:
>
>> Each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing *was to conceal the identity of the killer* or killers or *to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities*, then it is proper for the court to allow the jury to consider this aggravating circumstance.
>
> *Wiley v. State*, 750 So.2d at 1206 (quoting *Chase v. State*, 645 So.2d 829, 858 (Miss.1994) (quoting *Hansen v. State*, 592 So.2d 114, 153 (Miss.1991))). It was proper for the trial court to allow the jury to consider this aggravating circumstance, and this issue is without merit.
>
> 879 So.2d at 1023.

Loden would have us believe that the only evidence to support this aggravating circumstance is his statement regarding ruining his perfect military record. The prosecutor in his submission during the sentence phase of the trial, stated:

> The other aggravating circumstance or another one is Subsection E of that section. It says the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. *This little girl was killed because he didn't want anyone to know what he had done. He didn't want to be arrested for it, and in his statement he said it would mess up his perfect military career.*

> Tr. 703.

The prosecutor further stated:

> Why it occurred, I don't know or will never know, but I know that it occurred, I know that this defendant did it, and I know that *he was going to cover it up by burying this girl and clearing out* but he got caught before he did.

> Tr. 704.

Loden dug a grave in which to bury Leesa Marie Gray's body, but was prevented from doing so by the arrival of law enforcement officers. Digging a grave to hide a body is clearly covering ones tracks. As the state court stated in *Doss v. State*, 882 So.2d 176 (Miss. 2004), "[i]n the present case, there appears to be no other motive, except the desire to eliminate witnesses." 882 So.2d at 195. This aggravator is amply supported by the evidence in this case.

Petitioner argues that the van and its contents were in plain view so this showed that Loden was not attempting to avoid arrest. Leesa Marie's body was clearly not in plain view as it had been stuffed under the rear seat of the van and was not discovered until the van had been towed into the police garage for processing.

Further, if one of the aggravating circumstances fails, the provisions of MISS. CODE

ANN. § 99-19-105 (3)(d) become applicable. This code subsection (3) (d) reads:

> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

The Mississippi Supreme Court clearly had the authority to conduct such an analysis according to § 99-19-105 (5) (b), which reads:

> (5) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
>
> . . .
>
> (b) Reweigh the remaining aggravating circumstances against the mitigating circumstances should one or more of the aggravating circumstances be found to be invalid, and (i) affirm the sentence of death or (ii) hold the error in the sentence phase harmless error and affirm the sentence of death or (iii) remand the case for a new sentencing hearing; . . .

Considering the aggravating circumstances found in this case, it cannot be said that had the Mississippi Supreme Court's reweighing of the avoiding arrest aggravator found by the trial court that the death sentence was unreasonable. This procedure is clearly allowed by *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Under the evidence presented, no reasonable jurist could find that the sentencer would not have returned the death penalty based on the remaining aggravating circumstances found by the court. To the extent that this Court reweighs the aggravating and mitigating factors presented

189

by the appellant, it cannot be said that the mitigating evidence, which was none,[31] would outweigh the aggravating circumstances.

Further, the Mississippi Supreme Court found the the consideration of the "avoiding arrest" aggravator in this case was at best harmless beyond a reasonable doubt. On habeas review, before granting relief a habeas court must conduct a harmless error analysis under the dictates of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Any harmless error analysis on habeas review is to be performed under *Brecht*, regardless of whether the state court conducted a harmless error review in its opinions. *See Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007); *Nixon v. Epps*, 405 F.3d 318, 329 n. 13 (5th Cir.2005) (noting that a federal court must "use the more lenient *Brecht* review,

---

[31]Loden simply made a statement apologizing to the family and friends of Leesa Marie Gray. He made no plea for mercy to the trial court. Further, he personally waived the presentation of any mitigation evidence for consideration by the trial court. However, counsel did submit a copy of the report of Dr. Gerald O'Brien a clinical psychologist who opined that Loden was suffering from extreme mental and emotional disturbance at the time of the crime although this "probably did not rise to the level that he did not know the nature and quality of his acts or the difference between right and wrong in relation to those acts at that time. However, he further opined that his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was substantially impaired. He further found Loden competent to stand trial and assist in his own defense. Tr. 690-91; Defendant's PCR Exhibit 38. Loden was also examined by the staff at the State Hospital at Whitfield the report of that examination was introduced by the State during the sentence phase of the trial. CP. 135-37; Tr. 693-94; State's Exhibit 39. The State Hospital staff found Loden was competent to stand trial and assist his attorneys, that he would have known the nature and quality of his acts at the time of the offenses, and would have known at the time that his acts were wrong. They also found that Loden was not experiencing extreme mental or emotional disturbance at the time of the offenses and that he had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. They also found that was competent to waive his constitutional rights.

regardless whether the state court ever conducted a harmless error analysis"); *Billiot v. Puckett*, 135 F.3d 311, 314-20 (5th Cir. 1998); *Hogue v. Johnson*, 131 F.3d 466, 499 (5th Cir.1997). Under *Brecht*, the question is whether the state court trial error, submission of an invalid aggravating circumstance for the jury to weigh, can be said to have had a "substantial and injurious effect on the verdict reached by the [sentencer]." 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Pursuant to *Brecht*, "a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had *substantial effect or influence in determining the verdict*." *Billiot*, 135 F.3d at 318 (emphasis added).

The respondents would submit that the claim relating to this aggravating circumstance is barred from consideration for the failure by the imposition of an adequate and independent state law procedural ground based on petitioner's failure to raise an objection to the aggravator at trial. *See Sykes, supra.* Alternatively, this aggravator is fully supported by the record as Loden took actions to cover his tracks and avoid detection of this crime. The fact that he was not able to complete that task does not vitiate the finding of this aggravator. The decision of the Mississippi Supreme Court is neither contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, nor is it an unreasonable determination of the facts as found in the record of this case. Further, even if this aggravator is invalid, when the other factors are reweighed without this aggravator there

191

is no reasonable probability that the sentence would have been anything other than death. The inclusion of this aggravator did not have a "substantial effect or influence in determining the verdict." Petitioner is entitled to no habeas relief on this claim. This claim is barred from consideration and alternatively without merit. Loden is entitled to no relief on this .

## VII. THE CONSIDERATION OF FELONY MURDER AS AN AGGRAVATING CIRCUMSTANCE DID NOT VIOLATE THE FIFTH, SIXTH, EIGHTH OR FOURTEENTH AMENDMENTS.

Loden contends that allowing the jury to consider the felony murder as an aggravating circumstance violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and additionally contends that allowing the jury to consider the conviction for rape and the convictions for sexual battery violated the double jeopardy clause. Petitioner presented the following claim in the appeal:

> (4) Whether the submission of the Mississippi Code Annotated Section 99-19-101(5)(d) aggravating circumstance violated the state and federal constitutions.

The aggravating factor found in MISS. CODE ANN. § 99-19-101(5)(d) reads:

> (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, Mississippi Code of 1972, or the unlawful use or detonation of a bomb or explosive device.

Thus, petitioner argued that it was unconstitutional for the sentencer to consider the fact that the murder was committed during the course of the underlying felony. He further contended

192

that the use of the rape and sexual battery convictions as aggravators violated the double jeopardy clause. The Mississippi Supreme Court held the double counting claim was properly preserved for review but that the double jeopardy claim was barred from consideration. However, the Court alternatively addressed the merits of the barred claim. The Mississippi Supreme Court held:

> **IV. Whether the submission of the Mississippi Code Annotated Section 99-19-101(5)(d) aggravating circumstance violated the state and federal constitutions**.
>
> ¶ 43. This issue reiterates, in part, Loden's "Motion to Declare MISS. CODE ANN. § 97-3-19(2) Unconstitutional; or, In the Alternative, to Preclude the Prosecution From Relying on MISS. CODE ANN. § 99-19-101(5)(d) as an Aggravating Circumstance at Defendant's Capital Resentencing Trial." The circuit court denied Loden's motion to declare Mississippi Code Annotated Section 97-3-19(2) unconstitutional.
>
> ¶ 44. Loden posits that "[t]he use of the underlying felony as an aggravating circumstance does not narrow the class of death[-]eligible offenders." Stated otherwise, he maintains that "treating every felony-murder as an aggravating circumstance cannot be a principled means of distinguishing death-eligible defendants" and, therefore, Mississippi Code Annotated Section 99-19-101(5)(d) is "unconstitutionally applied" in light of *Apprendi*, *Ring*, and *Blakely*. Additionally, Loden contends, for the first time on appeal, that because use of the Mississippi Code Annotated Section 99-19-101(5)(d) aggravating circumstance was "based in part on Counts II-VI of the indictment and [Loden] was separately convicted and sentenced on those charges," then "the double jeopardy clause of the state and federal constitutions are violated." Loden asserts that "[u]nder the Double Jeopardy clauses of the state and federal constitutions, the aggravating circumstance based on the separately punished offenses must be struck and the death sentence vacated."
>
> ¶ 45. Procedurally, the State maintains that the "double[-]use" claim is barred because "Loden should have sought a ruling on that portion of the motion [in the circuit court] and did not[,]" while the "double[-]jeopardy" claim is barred because it is raised for the first time on appeal. Substantively,

193

the State responds that use of the underlying felony as an aggravating factor has been repeatedly approved by both this Court and the United States Supreme Court, even in light of *Apprendi* and *Ring*.[19] Regarding the "double[-]jeopardy" claim, the State submits:

> [a] reading of the verdict of the sentencing order of the trial court demonstrates that each of these additional aggravating factors was found *beyond a reasonable doubt*. . . . The jury having been waived, the trial judge was the proper finder of fact and found beyond a reasonable doubt that the capital murder was committed during the commission of the crimes kidnapping, rape and sexual battery. . . . The claim that the rape and sexual battery convictions merge into the capital murder is untenable. . . . *Loden was charged with one count of capital murder while engaged in the commission of kidnapping.* Had he been indicted in a separate count for the kidnapping and had the trial court found him guilty of that count of kidnapping and sentenced him for that conviction there would be a double jeopardy claim. However, . . . [t]he rape and four counts of sexual battery were *separate counts* of the indictment and *did not merge into the capital murder*. . . . Loden was not being doubly sentenced for these crimes.

(Emphasis added).

¶ 46. Procedurally, this Court finds that the "double-use" claim was properly raised in the circuit court and is not barred, while the *"double-jeopardy" claim is raised for the first time on appeal and is barred*. *See Thorson*, 895 So.2d at 104. Nonetheless, this Court will consider the substantive merit of each.

### *"Double-Use" Claim*

¶ 47. The United States Supreme Court has stated that:

> [i]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion."

194

*Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (quoting *Gregg v. Georgia*, 428 U.S. 153, 196 n. 47, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). In order "[t]o pass constitutional muster, a capital sentencing scheme must '*genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence* on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)) (emphasis added). Aggravating circumstances are "a means of *genuinely narrowing* the class of death-eligible persons and thereby channeling the jury's discretion. [There is] no reason why this narrowing function may not be performed by jury findings at *either* the sentencing phase of the trial or the guilt phase." *Lowenfield*, 484 U.S. at 244-45, 108 S.Ct. 546 (emphasis added). There are only two requirements for aggravating circumstances, "[f]irst, the circumstances may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder. . . . Second, the aggravating circumstances may not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

¶ 48. Mississippi Code Annotated Section 97-3-19(2)(e) defines capital murder as:

> [t]he *killing of a human being without the authority of law* by any means or in any manner ... *in the following cases*: ... [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, *kidnapping*, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies....

MISS. CODE ANN. § 97-3-19(2)(e) (Rev.2006) (emphasis added). In Mississippi, one aggravating circumstance exists if:

> [t]he capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, *kidnapping*, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section

195

97-5-39, Mississippi Code of 1972, or the unlawful use or detonation of a bomb or explosive device.

MISS. CODE ANN. § 99-19-101(5)(d) (Rev.2007) (emphasis added). This Court previously has upheld the general constitutionality of the capital sentencing scheme as:

> Mississippi requires more than simple felony murder to sentence a defendant to death. *Miss. Code Ann.* § 99-19-101 allows a jury to consider as an aggravating circumstance the fact that a murder was committed while the defendant was engaged in the commission of felony. However, after *Enmund [ v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) ] *and the amendments to our sentencing scheme, that fact alone is insufficient to impose the death penalty*. Rather, a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed in order to impose a death sentence.

*Evans v. State*, 725 So.2d 613, 684 (Miss.1997) (emphasis added). *See also Thorson*, 895 So.2d at 106 (quoting *Wilcher v. State*, 697 So.2d 1087, 1108-1109 (Miss.1997)) ("[n]ot every defendant eligible for the death penalty will have committed murder in the course of robbery or kidnapping or the other statutorily enumerated felonies. *See* MISS. CODE ANN. § 97-3-19. Therefore, the felony murder aggravator genuinely narrows the class of defendants eligible for the death penalty."). Furthermore, this Court previously has found *Ring* and *Apprendi* inapplicable to Mississippi's capital murder sentencing scheme. *See* Issue II *supra*. In light of those rulings, this Court consistently has held that there is no constitutional error in using the underlying felony as an aggravating circumstance. *See Thorson*, 895 So.2d at 105-106 (quoting *Wilcher*, 697 So.2d at 1108-1109) ("[t]he use of the underlying felony ... as an aggravator during sentencing has been consistently upheld in capital cases."); *Goodin v. State*, 787 So.2d 639, 654 (Miss.2001); *Evans*, 725 So.2d at 697-98. *See also Williams v. Taylor*, 529 U.S. 362, 393 n. 16, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[i]n *Lowenfield* ... we held that an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself."). Therefore, this Court finds that Loden's "double-use" claim is without merit.

### *"Double-Jeopardy" Claim*

196

¶ 49. In *Meeks v. State*, 604 So.2d 748 (Miss.1992), the defendant was charged in one count with capital murder, with an underlying felony of kidnapping, and in another count with kidnapping. *See id.* at 750. After being convicted on both counts, Meeks raised a "double-jeopardy" claim. *See id.* at 750-51. This Court reversed and rendered Meeks's kidnapping conviction, finding that "the Constitution precludes the [S]tate punishing him further for the kidnapping of Tana Meeks via Count II of the indictment." *Id.* at 754. In *Hodges*, this Court delineated the boundaries of *Meeks*, finding that the defendant could be convicted on both a kidnapping charge and a capital murder charge when the underlying felony was burglary. *Hodges*, 912 So.2d at 787.

¶ 50. The case sub judice is more akin to *Hodges* and is distinguishable from *Meeks*. Loden was convicted on a capital murder charge with the underlying felony of kidnapping, but no separate charge of kidnapping was in the indictment. As such, this Court finds that no double-jeopardy issues exist and Loden's claim is without merit.

_____

19. As to Blakely, "[t]he State would assert that [it] has no application . . . because Loden waived the sentencing jury and the judge was the proper finder of fact. . . ."

971 So.2d at 567-70. [Emphasis added.]

The double jeopardy claim is barred from consideration based on the imposition of an adequate and independent state law procedural bar. *See Wainwright v. Sykes, supra*. Further, the decision on the merits by the Mississippi Supreme Court on both claims is not contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court .

The double jeopardy claim is barred from consideration. Petitioner's contention that the invocation of the procedural bar is unclear is not availing. The state court held:

¶ 46. Procedurally, this Court finds that the "double-use" claim was properly raised in the circuit court and is not barred, while the

197

*"double-jeopardy" claim is raised for the first time on appeal and is barred.* *See Thorson*, 895 So.2d at 104. Nonetheless, this Court will consider the substantive merit of each.

971 So.2d at 568. [Emphasis added.]

The fact that the state court stated that it would also discuss the merits of the claim does not make the invocation of the bar unclear. A state court is allowed to hold a claim barred and then address the merits of the claim alternatively without the bar being vitiated. *See Harris v. Reed, supra*. There are no magic words that make the invocation of a procedural clear.

Without waiving the bar to the consideration of this claim, respondents note that petitioner basically contends that the United States Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), have *sub silento*, overruled several other precedents that apply to this claim, therefore entitling him to habeas relief. The respondents submit the petitioner is simply wrong.

While it is not clear whether petitioner is arguing both the double use claim and the double jeopardy claim, respondents will address both out of an abundance of caution.

Looking first to the "double use" claim, that of using the during the commission of a kidnapping aggravator, respondents would point out that the United States Supreme Court has held that there is no constitutional error in using the underlying felony as an aggravating factor. *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In a California case, a weighing state, the United States Supreme Court held: "The aggravating

198

circumstance may be contained in the definition of the crime or in a separate sentencing factor (*or in both*)." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2634-35, 129 L.Ed.2d 750 (1994) (parenthetical the Court's, emphasis added). In *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the high court held that a death sentenced inmate was not denied ineffective assistance of counsel when counsel failed to object to aggravating circumstance that duplicated the underlying felony. In addition, the United States Supreme Court held that the Eighth Circuit was correct in its decision in *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir. 1989), as *Lowenfield*, *supra*, required it to overrule prior Eighth Circuit precedent, holding that using an aggravator that duplicates an element of the underlying felony was unconstitutional. *See Williams v. Taylor*, 529 U.S. 362, 393 n.16, 120 S.Ct. 1495, 1513 n. 16, 146 L.Ed.2d 389 (2000). The lower federal courts have held the same. *See Hall v. United States*, 152 F.3d 381, 416-17 (1998); *United States v. Flores*, 63 F.3d 1342, 1370-72 (5th Cir. 1995); *Evans v. Thigpen*, 809 F.2d 239, 241 (5th Cir. 1987) (Holding that no constitutional right is violated by use of aggravating factor that duplicates an element of the underlying felony); *Glass v. Blackburn*, 791 F.2d 1165, 1172-73 (5th Cir. 1986) (same); *Wingo v. Blackburn*, 783 F.2d 1046, 1051 (5th Cir. 1986) (same); *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir. 1989), *cert. denied*, 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989) (Same); *Nixon v. Hargett*, 194 F.Supp. 501, 518 (S.D. Miss. 2002) (same).

More recently, the Fifth Circuit in *Holland v. Anderson*, 583 F.3d 267 (5th Cir. 2009),

held in a Mississippi case:

### D. The Effect of Rape Being Both an Element of Holland's Crime of Conviction and an Aggravating Circumstance

Although Holland does not argue that it is improper for an aggravating factor to duplicate an element of capital murder-and such an argument would lack merit-we briefly address the fact of the overlap in this case as it bears on our decision. The Supreme Court has explained that "[t]o pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (internal quotation marks omitted). This is the purpose of requiring a jury to find at least one aggravating circumstance before allowing the imposition of the death penalty: "By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition." *Id.*

The Supreme Court has long accepted that an aggravating circumstance may duplicate an element of the capital crime of conviction. *See Lowenfield v. Phelps*, 484 U.S. at 244-46, 108 S.Ct. 546. In *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Court further explained the role of aggravating circumstances:

> Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision. To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. *See Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) ("If the sentencer fairly could conclude that an

aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm"). Second, the aggravating circumstance may not be unconstitutionally vague.

*Id*. at 971-72, 114 S.Ct. 2630 (citations omitted). Thus, as long as an aggravating circumstance serves to narrow the class of defendants convicted of murder (and is not unconstitutionally vague), it "may be contained in the definition of the crime [of conviction] or in a separate sentencing factor (*or* in both)." *Id*. at 972, 114 S.Ct. 2630 (emphases added). The Court's use of the word "or" in this requirement indicates that a jury must find this factor only once to render a death sentence (assuming all other requirements are satisfied). The Court's language clearly indicates that a jury need not find an aggravating circumstance at both the guilt and sentencing phases.[12]

583 F.3d at 283-84. [Footnote omitted.]

In *Crawford v. Epps*, 353 Fed.Appx. 977, 2009 WL 4324990 (5th Cir. 2009), in denying an

application for COA, the Fifth Circuit held:

### I. Whether the use of kidnapping as both an element of capital murder and an aggravating circumstance violated Crawford's Eighth Amendment rights

As a prerequisite to Crawford's capital murder conviction, the jury found during its guilt deliberations that Ray's murder occurred during the course of a kidnapping. *See* MISS. CODE ANN. § 97-3-19(2)(e) (1992). During the sentencing deliberations, the jury also found, as an aggravating circumstance, that the killing was committed during the course of a kidnapping. Crawford contends that duplicating an element of the offense as an aggravating circumstance violates the Eighth Amendment.

In *Lowenfield v. Phelps*, the Supreme Court held that a state capital sentencing scheme may narrow the category of death-eligible defendants in either of two ways. 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). "The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Id*.[12] Elaborating on *Lowenfield* in *Tuilaepa v. California*, the Court stated: "To render a defendant

201

eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." 512 U.S. 967, 971-72, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Id*. at 972, 114 S.Ct. 2630.

Crawford further contends that all defendants charged with felony murder are eligible for the death penalty in Mississippi. This contention is flatly contradicted by MISS. CODE ANN. § 97-3-19(1)(c), which designates as murder (as opposed to capital murder) any homicide "by any person engaged in the commission of any felony other than" certain enumerated felonies.

Here, the kidnapping element, as a requisite element of a capital murder conviction, was used to render Crawford eligible for a death sentence in the guilt phase. It was then found as an aggravating factor during the sentencing phase to support the jury's actual imposition of the death penalty. This kind of scheme was approved by the *Tuilaepa* Court and is not constitutionally invalid. A COA shall not issue on this claim.

_____

12. Crawford's attempt to distinguish the Louisiana statutory framework from the Mississippi framework is unavailing. He contends that, unlike Louisiana, Mississippi does not narrow the class of death-eligible defendants at the guilt phase. This contention is contradicted by MISS. CODE ANN. § 97-3-19 (1992), which distinguishes capital murder from noncapital murder. Sections 97-3-19(2)(a)-(g) set forth the specific circumstances in which a defendant may be convicted of capital murder.

353 Fed.Appx. at 988-89, 2009 WL 4324990, 10.

Respondents have found no case, and petitioner has cited to no case, in which any court, much less the United States Supreme Court, has ruled that *Lowenfield*, *Tuilaepa* or *Williams v. Taylor* have been held to be overruled or modified by *Ring* or *Apprendi*.

The decision of the Mississippi Supreme Court on the double use claim is neither contrary or an unreasonable application of the clearly announced found in *Lowenfield* and

*Tuilaepa*. Petitioner is entitled to no relief on the double use claim.

Looking to petitioner's double jeopardy claim, he is contending that allowing the sentencer to consider the rape and sexual battery as aggravating circumstances constituted double jeopardy as he was being doubly punished for those crimes. Again, he relies on *Ring* and *Apprendi* to support his claim. Petitioner's argument is without any merit.

With regard to any double jeopardy claim relating to the use of the underlying felony being used as an aggravating circumstance the Mississippi Supreme Court fully addressed this claim in *Brawner v. State*, 947 So.2d 254 (Miss.,2006). There, the state court held:

¶ 32. Brawner's third argument is that use of the underlying felony at sentencing exposed him to double jeopardy. For this proposition Brawner points to no case law in support. This Court has held that failure to cite to relevant authority relieves us of the duty of reviewing the issue. *Glasper v. State*, 914 So.2d 708, 726 (Miss.2005). Without lifting the procedural bar this argument is also without merit. The United States Supreme Court in *Schiro v. Farley*, 510 U.S. 222, 230, 114 S.Ct. 783, 789, 127 L.Ed.2d 47 (1994) addressed this issue and concluded that double jeopardy does not apply.

¶ 33. The *Schiro* Court held that double jeopardy applies to prevent three errors it protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction and (3) multiple punishments for the same offense. *Schiro*, 510 U.S. at 229, 114 S.Ct. 783 (citing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)). These protections stem from the premise that an accused should not be tried or punished twice for the same offense. *Id*. (citing *United States v. Wilson*, 420 U.S. 332, 339, 95 S.Ct. 1013, 1020, 43 L.Ed.2d 232 (1975)). Double jeopardy operates as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent. *United States v. DiFrancesco*, 449 U.S. 117, 136, 101 S.Ct. 426, 437, 66 L.Ed.2d 328 (1980).

¶ 34. In the present situation there is no threat of multiple prosecutions

203

for the same offense or for repeated punishment arising from the same conviction. *See Schiro*, 510 U.S. at 230, 114 S.Ct. 783. The sentencing phase of a capital murder trial is one part of the whole trial which includes the guilt phase. The use of the underlying felony at sentencing does not expose the defendant to double jeopardy. Therefore, Brawner's arguments under Issue II are without merit.

947 So.2d at 265-66.

*U.S. v. Wittie*, 25 F.3d 250, 257-58 (5th Cir. 1994); *U.S. v. Cruce*, 21 F.3d 70, 74-75 (5th Cir.,1994). The decision of the state court in this case is not contrary to or an unreasonable application of the decision in *Schiro v. Farley*, 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

As was stated earlier, Loden was sentenced to 30 years for the rape conviction contained in Count II of the indictment (CP. 230); 30 years for the sexual battery conviction contained in Count III (CP. 230); 30 years for the sexual battery conviction contained in Count IV (CP. 231); 30 years for the sexual battery conviction contained in Count V (CP. 231); and 30 years for the sexual battery conviction contained in County VI (CP. 231). The sentences, in addition to the death penalty, were all to run consecutive to all other sentences imposed in this cause. Loden pled guilty to these separate crimes. During the sentence phase of the trial, the sentencer considered the following aggravating circumstance:

> The capital offense (Capital Murder) was committed while the Defendant, Thomas Edwin Loden, Jr., was engaged in the commission of the felony crimes of kidnapping, rape and sexual battery of Leesa Marie Gray, a human being

Loden contends that by using the crimes of rape and sexual battery he was being subjected

204

to double jeopardy as he was being doubly punished for those crimes. The precedent of the

Fifth Circuit and the United States Supreme Court holds to the contrary.

In *U.S. v. Wittie*, 25 F.3d 250 (5th Cir. 1994), *cert. denied*, 519 U.S. 1120 (1997), the

Fifth Circuit held:

> It is well-settled that using prior crimes to " enhance" a sentence does not impinge on double jeopardy, because defendants are not "punished" for crimes so considered.[31] Pre-Guidelines, uncharged criminal conduct could be "considered" at sentencing as aggravating circumstances and could still form the basis of a later indictment, conviction, and sentence without violating double jeopardy.[32]
>
> _____
>
> 31. If a defendant is convicted of murder and given a life sentence, and is later convicted for having kidnapped the murder victim, the sentencing court may consider the fact that the kidnaping victim was murdered when assessing a death penalty rather than a life sentence without violating double jeopardy. *Williams v. Oklahoma*, 358 U.S. 576, 585-86, 79 S.Ct. 421, 426-27, 3 L.Ed.2d 516 (1959).
>
> 32. *Sekou v. Blackburn*, 796 F.2d 108, 111-12 (5th Cir.1986) ("[C]onsideration of other crimes at sentencing does not implicate the Double Jeopardy Clause because the defendant is not actually being punished for the crimes so considered." 796 F.2d at 112.).
>
> 25 F.3d at 257.

In *Callins v. Collins*, 998 F.2d 269 (5th Cir. 1993), *cert. denied*, 998 F.2d 269 (1994), the

Fifth Circuit held:

> Although the prohibition of double jeopardy includes subjection to multiple punishments for the same offense, *see Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 308-09, 104 S.Ct. 1805, 1813-14, 80 L.Ed.2d 311 (1984), it does not offend the Fifth Amendment to sentence within the upper end of the permissible range for a crime on the basis of a defendant's other conduct. As we noted in *Sekou v. Blackburn*, 796 F.2d 108, 111-12 (5th Cir.1986), "[c]onsideration of criminal conduct as an aggravating circumstance

205

does not convert the sentencing proceeding into a trial, conviction, or punishment for the criminal activity so considered." *See also United States v. Carey*, 943 F.2d 44, 46-47 & n. 4 (11th Cir.1991), *cert. denied*, 503 U.S. 987, 112 S.Ct. 1676, 118 L.Ed.2d 394 (1992). The Double Jeopardy Clause thus poses no bar to the jury's consideration of Callins's other conduct in determining an appropriate punishment for his aggravated robbery convictions.

998 F.2d at 274.

*See Muhammad v. Castro*, 2009 WL 466799, 19-22 (E.D.Cal.,2009); *Murray v. Schriro*, 2008 WL 2278140, 36-37 (D.Ariz.,2008); *King v. Schriro*, 2006 WL 1735247, 14-15 (D.Ariz.,2006); *Bowling v. Parker*, 138 F.Supp.2d 82, 917 (E.D.Ky.,2001).

Simply put, during the commission of a rape and sexual battery, aggravating circumstances were used as aggravation of the murder, Loden received no additional sentence for these crimes other than the separate sentences imposed for those convictions. There is simply no doubly jeopardy violation here.

Again, petitioner has cited to no pertinent authority from the United States Supreme Court, nor any of the lower federal courts for that matter, that interprets *Ring* and *Apprendi* in the manner in which he wishes this Court to rule. There is simply no established federal precedent which holds as petitioner argues.

Respondents would assert that the decision of the Mississippi Supreme Court is neither contrary to or an unreasonable application of clearly established federal law as announced by the Supreme Court. Petitioner is entitled no habeas relief on this claim.

### Evidentiary Hearing

Respondents would assert that any requested evidentiary hearing is foreclosed by the

decision in *Cullen v. Pinhonster, supra*. Petitioner is not entitled to discovery or an evidentiary hearing.

### CONCLUSION

Respondents respectfully move this Court deny an evidentiary hearing, dismiss the petition for writ of habeas corpus filed herein with prejudice, and deny petitioner a certificate of appealability to appeal this matter to the United States Court of Appeals for the Fifth Circuit.

Respectfully submitted,
this, the 25th day of September, 2012

**JIM HOOD**
ATTORNEY GENERAL
STATE OF MISSISSIPPI

**JASON L. DAVIS**
SPECIAL ASSISTANT ATTORNEY GENERAL
Miss. Bar No. 102157
*(Counsel of Record)*

BY:   s/ *Jason L. Davis*

**OFFICE OF THE ATTORNEY GENERAL**
Post Office Box 220
Jackson, Mississippi 39205
Telephone:   (601) 359-3680
Telefax:       (601) 359-3796
jdavi@ago.state.ms.us

## CERTIFICATE OF SERVICE

This is to certify that I, Jason L. Davis, Special Assistant Attorney General for the State of Mississippi, have electronically the foregoing MEMORANDUM IN SUPPORT OF ANSWER AND RETURN TO PETITION FOR WRIT OF HABEAS CORPUS with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Charles E. Patterson, Esquire
Charles S. Barquist, Esquire
Mark R. McDonald, Esquire
Morrison & Foster, LLP
555 West Fifth Street
Los Angeles, California 90013-1024

Stacy Ferraro, Esqure
P.O. Box 708
Flora, Mississippi 39071

This, the 25th day of September, 2012.

s/ *Jason L. Davis*