# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### ABERDEEN DIVISION

THOMAS EDWIN LODEN, JR.                                        PETITIONER

vs.                                        CIVIL ACTION NO.:  1:10CV311-NBB

CHRISTOPHER EPPS, et al.                                        RESPONDENTS

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on a petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, in which Thomas Edwin Loden, Jr., the petitioner in this action, seeks to challenge his otherwise final conviction and sentence of death for the capital murder of Leesa Marie Gray.[1] Having fully considered the pleadings, the record, and the applicable law, the Court finds that the petition should be denied, for the reasons that follow.

### Background Facts and Procedural History[2]

In June 2000, Thomas Edwin Loden, Jr., an eighteen-year veteran of the United States Marine Corps, was employed as a Marine recruiter and lived in Vicksburg, Mississippi, with his wife and young daughter.  Around June 21, 2000, he traveled to northern Mississippi to visit his elderly and infirm grandmother, Rena Loden, at the family farm in the Dorsey Community of Itawamba County.  Less than forty-eight hours later, on June 22-23, 2000, Loden kidnapped, raped, and sexually battered sixteen-year-old Leesa Marie Gray before suffocating and strangling

---

[1] In addition to capital murder, Loden was convicted of rape and four counts of sexual battery.

[2] Because so many of the same facts are relevant to several claims raised in the instant petition, the Court recounts them at the outset in order to avoid unnecessary repetition in the body of the opinion.

her to death.

On June 22, 2000, Leesa Marie Gray was working as a waitress at Comer's Restaurant, which was located approximately a mile from her family's home. Loden, who had been in the restaurant earlier that day, came back to the restaurant around 9:00 p.m. and ordered a cheeseburger to go. After getting his cheeseburger, he left the restaurant. Leesa left work at approximately 10:30 p.m. According to Loden, he discovered Leesa stranded on the side of the road at around 10:45 p.m. with a flat tire on her car.[3] After telling her his profession and asking whether she would ever want to join the Marines, Loden stated that Leesa told him, "[n]o, that'd be the last thing I want to do with my life." Loden stated that her response made him so angry that he ordered her into his van and drove her to his family's farm. Over the course of the next few hours, he raped her numerous times and battered her sexually, videotaping portions of the abuse, before suffocating and strangling her to death inside of the van. He then pushed her nude, bound body under a fold-out seat in his van, went inside his grandmother's house, and fell asleep.

When Leesa did not return home from work as expected, her mother, Wanda Marie Farris, became worried and began making telephone calls in an attempt to locate her daughter. Mrs. Farris called Comer's Restaurant cook, Richard Tallant, who told her that he had earlier seen a car on the side of the road with its hazard lights flashing. Tallant returned to the abandoned car, saw that it was Leesa's, and drove to Mrs. Farris' home. Mr. and Mrs. Farris and Tallant drove back to the location of Leesa's car. They discovered that one of the tires on the vehicle was flat, the doors were unlocked, and Leesa's purse and cell phone were inside the car.

---

[3] A utility knife blade, or something closely resembling it, was found in the tread of the tire. (*See, e.g*, Pet. Ex. 28(a), Marlar Report).

The Itawamba County Sheriff's Office was contacted, and an investigation began into Leesa's disappearance.

After Tallant and various patrons of Comer's Restaurant were questioned, law enforcement officers learned that Thomas Edwin Loden, Jr., had been seen at the restaurant in two different vehicles: A beige Oldsmobile 88 Regency and a green full-sized Ford van. They learned that he had shown up just before closing time on the night of Leesa's disappearance and ordered food. Tallant recounted that he knew Loden from school, and that Loden had been in the restaurant earlier that day attempting to flirt with Leesa. He also stated that he knew that Loden was visiting his elderly grandmother, with whom Loden used to live. Officers went to Rena Loden's residence to interview Loden and were met by Mrs. Loden's sitter, Joyce Brewer, who stated that Loden was asleep inside the house. Officers left the Loden residence and continued investigating Leesa's disappearance.[4]

After law enforcement officials had located and interviewed all of the customers who had been at Comer's Restaurant the previous evening, except Loden, they returned to Rena Loden's property and spoke with Mrs. Loden, who informed them that Loden had gone fishing at a lake a couple of hundred yards behind her house. The officers obtained her consent to walk to the pond to look for Loden, but they could not locate him. Officers then asked for and obtained Mrs. Loden's consent to search her home, car, and surrounding property. Based on the report of Loden's behavior at the restaurant the previous evening, along with the discovery of a pair of

---

[4] Officer Jones states in his report that he saw a van at Mrs. Loden's residence matching the description of the one seen at Comer's Restaurant. He maintains that he brought two witnesses from Comer's Restaurant to Mrs. Loden's property to determine whether they could identify the van as the same one they had previously seen at the restaurant. Neither witness could make a positive identification. (*See, e.g.*, Pet. Ex. 28(g)).

shorts with what appeared to be blood on them in Loden's bedroom and a rope fashioned into a hand-cuff style knot in Rena Loden's Oldsmobile, a search warrant was obtained for the home, Loden's van, the other vehicles on the property, and all surrounding property and buildings.[5] Officers gathered evidence from Mrs. Loden's residence and transported Loden's locked van to the Highway Patrol Headquarters in New Albany, Mississippi, where it was secured until a member of the Mississippi Crime Laboratory arrived.

Meanwhile, a full-scale search was underway for Loden. On the afternoon of June 23, 2000, he was discovered lying on the side of the road with the words "I'm sorry" carved into his chest and with self-inflicted lacerations on his wrists. He was transported to the hospital and treated for his injuries. He denied any knowledge of Leesa Gray or her whereabouts. While Loden was being treated, Leesa's body was found pushed under a fold-down seat in Loden's van. Along with other evidence, a JVC camcorder was recovered from the van, and a VHS compact video cassette was removed from it. Footage from the videotape depicts Leesa Marie Gray being forced to engage in fellatio on Loden[6], Loden vaginally raping her, Loden demonstrating vaginal and anal penetration of Leesa with his fingers, and the repeated vaginal insertion of a cucumber. Loden can be heard instructing Leesa to smile so that he can see her braces, and after he subjects her to a digital vaginal penetration, he comments, "You really were a virgin, weren't you?". There is a break in the videotape, and then the footage depicts Loden twisting the breast of an

---

[5] In his supporting brief, Loden argues that the inconsistencies in the reports of two of the investigating officers suggest that a search was unlawfully conducted. The Court notes, however, that Loden signed an Offer of Proof containing these facts prior to pleading guilty.

[6] Loden's face is not clearly shown in the videotape, but his voice is clearly audible, as is the interior of his van, along with a comforter and other items seized from the van.

unconscious Leesa in an apparent attempt to bring her back to consciousness. Another break in the continuity of the video occurs, and when videotape footage reappears, the apparently murdered body of Leesa is seen propped up and posed in the van with the cucumber inserted in her vagina, which Loden removes and reinserts several times before the videotape finally stops.[7]

A DNA analysis performed on the cucumber found in Loden's van yielded a minor DNA profile that matches Loden.[8] After he was released from the hospital, Loden was immediately arrested. Officers executing a search warrant at Mrs. Loden's residence the day after Loden's arrest discovered a freshly dug grave and shovel located approximately twenty yards into the woods in a well-hidden, thickly vegetated area. A few days later, Loden's wife, Katrina "Kat" Loden, visited him in jail. Loden indicated through Kat that he wished to make a statement to law enforcement officers in which he admitted raping Leesa Gray. He denied knowing that he killed her, but he acknowledged that he must have done so.

On November 21, 2000, Loden was indicted for capital murder during the commission of a kidnapping (Count I), rape (Count II), and four counts of sexual battery (Counts III-VI). The same day, attorney James P. Johnstone was appointed to represent Loden. Loden pleaded not guilty to all charges at his arraignment. In January 2001, attorney David Lee Daniels began assisting in Loden's defense, and he was formally appointed as co-counsel in February 2001. In preparation for trial, defense counsel filed numerous motions, and presiding Judge Thomas J.

_____

[7] The Court has a DVD copy of the videotape secured in its vault. Due to its highly sensitive contents, the Court determines that the DVD should be protected from public access and will not be placed in public mail. Therefore, it will remain in the possession of the Court unless or until it is transported to the Fifth Circuit at the appellate court's direction.

[8] A warrant was secured and executed to obtain tissue samples from Loden.

Gardner, III, granted Loden's motion for a change of venue and motion for the authorization of funds for the defense to retain DNA expert, George Schiro. It denied defense counsel's motion to hire Dr. Gary Mooers as a mitigation specialist, noting that it appeared that Dr. Mooers wanted funds to do the work that the investigator, psychiatrist, and attorneys would be doing in the case. The judge stated a willingness to revisit the issue, however, provided defense counsel could provide the court with some authority supporting the authorization of a mitigation specialist. Despite the trial court's stated willingness to revisit its ruling, defense counsel did not present any additional authority to the court.

Additionally, the court authorized defense counsel funds to retain Herb Wells as a criminal defense investigator, and it granted defense counsel's motion to allow the Mississippi State Hospital to conduct a psychiatric evaluation of Loden. Loden was subsequently evaluated at the Mississippi State Hospital by psychiatrists Dr. Reb McMichael and Dr. Philip Meredith, along with psychologist, Dr. Shirley Beall. They unanimously opined that Loden:

> [H]as the sufficient present ability to consult with his attorney with [a] reasonable degree of rational understanding in the preparation of his defense, and that he has a rational as well as factual understanding of the nature and object of the legal proceedings against him[;] . . . that [Loden] would have known the nature and quality of his alleged acts at the time of the alleged offenses, and that he would have known at that time that those alleged acts would be wrong[;] . . . that [Loden] has the capacity knowingly, intelligently, and voluntarily to waive or assert his constitutional rights[; and]. . . that [Loden] was not experiencing extreme mental or emotional disturbance at the time of the alleged offenses, and that his capacity to appreciate the criminality of his alleged conduct, or to conform his conduct to the requirements of the law was not substantially impaired at that time.

They further concluded that factors, such as the alleged physical and sexual abuse he suffered as a child, combat-related trauma, and job and life-related stresses at the time of the crimes may have influenced Loden's mental state at the time of the offenses, but opined that the factors did

not "rise to the level of exculpation or even of statutory mitigation."

After the Mississippi State Hospital report was received, defense counsel moved *ex parte* for funds to secure the assistance of an independent psychologist, Dr. C. Gerald O'Brien. The court trial granted the request, and Loden was evaluated by Dr. O'Brien on August 13, 2001. Loden reportedly informed Dr. O'Brien that he did not want to receive a sentence of life imprisonment, and that he wanted to plead in order to receive the death penalty because of his remorse about the crime, the fact that he did not want his wife to give false testimony, and because of his "diminishing confidence in his lawyers' handling of his case." Dr. O'Brien concluded as a result of his evaluation that Loden "was under the influence of extreme mental and emotional disturbance and distress" at the time of the crime but opined that it "probably did not rise to the level that he did not know the nature and quality of his acts or the difference between right and wrong in relation to those acts at the time. However, his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired." He offered the forensic opinion that Loden appeared "to be competent to stand trial and assist in his own defense."

In pretrial proceedings, Loden moved to suppress his statement to police, as well as the evidence discovered following the search of Mrs. Loden's residence and the vehicles on her property. Loden argued that his statement to police was involuntarily given and given without the benefit of counsel, and that the physical evidence was obtained as the result of a search that was not fully consensual or voluntary. He also argued that the first affidavit and issuing search warrant was not supported by probable cause, such that all of the evidence yielded in the subsequent searches was inadmissible. After a hearing held on June 26-27, 2001, the trial court

denied the suppression motions.

In August 2001, Loden wrote to defense counsel Johnstone and asked him to make a motion asking the trial court to reconsider the validity of the original search warrant. Loden stated that if the motion was unsuccessful, he wanted to talk to Johnstone about the appeals process "and go ahead and enter a plead [*sic*]." The letter continued, "(1) I'm fairly confident I'd get the death penalty, but how does 'appeal' work either way? (2) In your professional judgment, do I have good grounds for an appeal? (3) How long, generally, would an appeal take to be heard? (4) With all I've told you and shown, again your opinion on appeal chances?" Loden's attorneys met with him for a total of approximately twenty hours on three consecutive days preceding Loden's September 21, 2001, court appearance.

On September 21, 2001, seventeen days before his October 8, 2001 trial date, Loden waived his right to a jury trial and jury sentencing and pleaded guilty to all six counts of the indictment. The trial court asked Loden a series of questions that were designed to determine whether Loden understood the proceedings and was entering the plea voluntarily. After putting Loden under oath and informing him of his right to consult with counsel, the following exchange transpired:

> The Court: Do you understand that by these questions the Court is attempting to determine if the pleas of guilty which you have offered to make will be made by you knowingly, freely, understandingly and voluntarily?
> Loden: Yes, sir.
> Q. Are your pleas of guilty free and voluntary on your part?
> A. Yes, sir, they are.
> ***
> Q. Do you understand that by entering pleas of guilty to these charges you are giving up or waiving a great number of legal rights that you have as a defendant in criminal proceedings?
> A. Yes, sir.
> Q. Do you understand the meaning of the word waive, W-A-I-V-E?

A.  Yes, sir.

***

Q.  As to Count I of this indictment, that being the capital murder charge, do you understand that a capital murder charge is conducted in two phases; that the jury in phase one determines guilt or innocence as to the charge itself, that being capital murder?

A.  Yes, sir, I understand.

Q.  And that by entering a plea of guilty you are waiving your right to have the jury make that determination?

A.  I am, yes, sir.

***

Q.  And that by - - and that by proceeding to enter pleas of guilty to this charge you are waiving your right to have the jury make the determination of your guilt, first of all, and to determine what punishment would be imposed.

A.  Yes, sir, I understand.

Q.  All right.  Do you understand that during the course of the guilt phase on all of these charges, all twelve of the jurors selected for the trial of your case would have to agree, it would have to be a unanimous verdict as to each of the counts in this indictment, each of the charges?

A.  I understand.

Q.  And in phase two, that is in Count I, the capital murder charge, the jury would likewise be required to unanimously agree upon the existence of certain factors which they are called upon to weigh and determine during the course of that trial.

A.  Yes, sir, I understand.

Q.  Do you understand that?

A.  Yes, sir.

Q.  And if they are unable to agree unanimously as to the existence of those factors, they cannot return a verdict or cannot impose the death penalty.  Do you understand that?

A.  Yes, sir.

***

Q.  And that by entering a plea of guilty to this charge, or the capital murder case, you are waiving the jury making those determinations as to guilt and as to the punishment to be imposed; - -

A.  Yes, sir.  I am waiving that.

Q.  - - do you understand that?  Do you understand that as to each of the charges, Counts I through VI, if you proceeded to trial before a jury and if the jury found you guilty of those charges and returned a verdict fixing the penalty at whatever they might fix it, in any event, the question of your guilt or innocence or imposition of the punishment determined by the jury would be something that you could appeal to the Supreme Court of this state?

A.  Yes, sir, I understand.

Q.  Do you understand that by waiving a jury for the trial of this case and for the imposition or determination of an appropriate sentence to be imposed by this Court, you

9

are giving up or waiving a valuable right?

A. Yes, sir, I am.

Q. And you understand that?

A. Yes, sir.

\*\*\*

Q. Do you understand that if you proceed through the course of this and the Court
makes a determination of your guilt, you will have no right to appeal that? Do
you understand that?

A. Yes, sir.

\*\*\*

Q. [D]o you understand that on your plea of guilty to the charge of capital murder
in Count I in this cause the maximum penalty which this Court might impose
would be death; that the minimum penalty which this Court might impose would
be life without parole. Do you understand that?

A. Yes, sir, I understand that.

After all of the charging portions of the indictment were read into the record, and Loden

stated his understanding of the charge and penalty, along with his plea of guilty, the prosecution

submitted its "Offer of Proof," which was examined and signed by Loden before it was read into

the record.[9] The prosecution made sentencing recommendations, including a recommendation

that a sentence of death be imposed as to Count I. Loden stated that he knew that the prosecution

would make those recommendations, and he informed the trial court that his willingness to plead

was not based on an understanding that a different recommendation would be made if he pleaded

guilty.

Defense counsel Daniels informed the trial court that he and Johnstone had conferred

with Loden and believed he understood the charges, his possible defenses, the bifurcated process,

and the rights he would be abandoning by entering a plea. Defense counsel both signed a

---

[9] For the full content of the State's "Offer of Proof" *see, e.g.*, Trial Tr. vol. 2, 208-223.
The state court papers and trial transcript are contained in seven consecutively numbered
volumes. Therefore, the Court uses "Trial Tr. vol. __" to reference particular locations in the
record, regardless of whether the citation is to state court papers or the trial transcript itself.

"Certificate of Counsel" stating that, in their opinions, Loden was competent to waive a jury trial and sentencing. Thereafter, the trial judge questioned Loden, asking:

> BY THE COURT: (Continuing)
> Q. Mr. Loden, you have had the services, the advice and counsel of two attorneys during the course of these proceedings. Have you had occasion to talk with them thoroughly, to discuss fully all of the facts and circumstances surrounding this case?
> A. Yes, sir.
> Q. Have you had occasion to talk with them about your constitutional rights and the statutory provisions concerning the trial of a capital murder case - -
> A. Yes, sir.
> Q. - - the count in Count I?
> A. Yes, sir. The questions I had were answered. Yes, sir.
> Q. Once again, do you understand that you have a constitutional right and a statutory right under the law of the State of Mississippi to have a jury decide first of all your guilt or innocence on the charge of capital murder and in phase two to determine the punishment that is to be imposed?
> A. I understand I had it, and I understand I waived it, sir.
> Q. And you are aware of that and you wish to proceed to enter pleas of guilty to these charges?
> A. I do, sir.
> Q. Mr. Loden, is there anything about these proceedings that you do not understand?
> A. Not at this time, sir.
> Q. Are there any questions that you wish to direct to me as judge about these proceedings?
> A. No, sir. No, sir.
> Q. Do you understand that on your plea of guilty to capital murder and the other charges in this indictment that it is possible that I will, acting pursuant to the waiver, impose the death penalty in this case? Do you understand that?
> A. I understand that fully, sir.

Thereafter, Loden pleaded guilty to each count in the indictment, and the trial court accepted the pleas after finding that Loden did so "knowingly, understandingly[,] freely[,] and voluntarily." Loden stated he was satisfied with the legal service rendered by counsel, and he voiced his understanding that he was abandoning his right to have a jury determine his punishment. The waivers of a jury trial and sentencing, which had been executed by Loden prior

to the hearing, were presented to the court, and Loden informed the court that he and his attorneys had discussed the waivers.[10] The court asked whether Loden agreed that the court should proceed without a jury to the sentencing phase of the hearing, and Loden responded, "Yes, sir. Let's proceed."

The prosecution reintroduced its "Offer of Proof" and Loden's guilty pleas before calling witnesses in its case-in-chief. At the lunch break, counsel Johnstone informed the court:

> Your Honor, if we could at this time advise the Court. We have conferred with our client Mr. Loden, and as the Court noted earlier we were not making any objections nor cross-examining these witnesses. And we've conferred with Mr. Loden and he's advised us that he does not want us to cross-examine witnesses or object to the introduction of exhibits that are being introduced through these witnesses that the State intends to call.
> THE COURT: All right. Mr. Loden, you understand that in instructing your attorneys to that effect you are again giving up a valuable right of cross-examination and timely objections to evidence which might or might not be admissible under the rules of this court.
> THE DEFENDANT: I understand, sir. I'm just doing what I feel I need to do.

During the presentation of its case in support of aggravating circumstances, the prosecution presented testimony from various law enforcement officials and forensic examiners, along with the testimony of Leesa's mother and Richard Tallant. Additionally, a forensic pathologist testified that Leesa was a virgin prior to her rape and would have experienced "significant pain" as a result of the rape, suffocation, and manual strangulation.

Once the State concluded its proof, defense counsel Daniels informed the court that the defense would not be offering mitigating evidence in the case. However, he asked for permission to summarize the mitigation evidence that had been developed, along with an explanation for its

---

[10] Loden executed a "Waiver of Jury for Trial and Sentencing" and a separate "Waiver of Sentencing Jury." (Trial Tr. vol. 2, 202, 205).

absence from the sentencing proceedings.  Daniels stated:

> [W]e've been able to develop that Mr. Loden has a childhood history of
> extreme sexual child abuse himself; that in spite of that he was an exemplary
> student; that he served in the United States Marines with distinction for eighteen
> years, that he attained the rank of E-7, that he was highly decorated and a combat
> veteran in Desert Storm.  He has no criminal history prior to today.
>
> The expert clinical psychologist that was appointed for the defense by the
> Court, Dr. Gerald O'Brien, would have been offered as an expert in the field of
> clinical psychology.  Dr. O'Brien opines that at the time of the crimes Mr. Loden
> was not capable of appreciating the criminality of his conduct and that he was also
> incapable of conforming his conduct to the requirements of the law.  And finally
> that at the time of the crimes he was suffering from extreme mental and emotional
> disturbance.
>
> Notwithstanding, Mr. Loden has elected to and has instructed us that he
> desires to waive presentation of this mitigation evidence for reasons I feel he will
> explain to the Court when given an opportunity to make a statement.  Thank you.

Defense counsel tendered a copy of Dr. O'Brien's report and informed the court that

Loden did not wish for closing arguments to be presented on his behalf, although Loden would

like to make a statement prior to sentencing.  In rebuttal, the prosecution introduced a copy of the

Mississippi State Hospital's report of the results of its evaluation of Loden.  When the

prosecution concluded its closing argument in which it pressed for the death penalty, Loden was

allowed to address the court.  After expressing remorse for his crime, he said "I am sorry for the

delay, and I hope you may have some sense of justice when you leave here today."

The trial court found that Loden's pleas were entered "knowingly, freely,

understandingly[,] and voluntarily" and that he "was fully advised" of his constitutional and

statutory rights as to each charge and the sentence to be imposed by both his attorneys and the

trial court.  The court imposed a sentence of death as to Count I after considering all of the

evidence introduced at the guilty plea and at the sentencing phase, which included the

photographs introduced by the prosecution, the videotape recovered from Loden's van, the

psychiatric report of Mississippi State Hospital, and the report of Dr. O'Brien. The court first found that Loden actually killed Leesa Gray, attempted to kill her, intended that her killing take place, and that he contemplated that lethal force would be employed. It then found as aggravating circumstances that the murder was committed while Loden was engaged in the felony crimes of kidnapping, rape, and sexual battery; that it was committed for the purpose of avoiding or preventing a lawful arrest; and that it was especially heinous, atrocious, or cruel. Finding that the aggravating circumstances outweighed the mitigating circumstances, the judge sentenced Loden to a sentence of death for Count I, and to thirty-year consecutive sentences of imprisonment on each remaining count.

In February 2002, Loden, represented by trial counsel Daniels, filed a motion for leave to file an out-of-time appeal. On January 2, 2002, the Mississippi Supreme Court remanded the issue to the circuit court for a determination of whether Daniels should be removed and substitute counsel appointed due to Daniels' new position as an assistant district attorney.[11] Daniels moved to withdraw as counsel in January 2003, when the trial judge appointed the Mississippi Office of Capital Defense Counsel ("the Office") to represent Loden.

In July 2003, the Office filed a motion to vacate Loden's guilty plea, alleging that it was involuntarily given on the basis of inaccurate legal advice. Specifically, Loden maintained that he only pleaded guilty in reliance upon his lawyer's advice that he could still appeal adverse pretrial rulings despite entering a guilty plea. Loden supported the motion with an affidavit asserting that he would not have pleaded guilty if he had known he could not raise the

---

[11] Daniels began working for the Itawamba County District Attorney's Office on July 1 or 2, 2002. (*See* Daniels' Deposition, p.17).

suppression issues on appeal; correspondence to his attorneys wherein he raised questions about the appellate process; an affidavit from Johnstone stating that Loden was advised that it was unclear which issues the Mississippi Supreme Court would consider on automatic review; the August 2001 letter from Loden to Johnstone indicating his desire to plead guilty if the trial court would not reverse its pretrial suppression rulings; and a March 14, 2002, letter from Loden to the trial judge explaining Loden's attempts to communicate with counsel and requesting discovery of evidence presented to the grand jury to assist him in defending the motion for a new trial and for appellate review.

The trial court held a hearing on the motion on June 2, 2005, and Loden testified. He testified that he felt hopeless after the suppression issues were decided against him, and that he waived his right to a jury and pleaded guilty in order for his case to receive review from the Mississippi Supreme Court. He maintained that his attorneys indicated to him that cases with death sentences received a more careful review, and that anything in the record would be reviewed. He iterated that he would not have pleaded guilty if his attorneys had properly advised him that he could not appeal the suppression issues, and that he was "basically assured" by his attorneys that he would receive the death penalty if he pleaded guilty and waived sentencing.

On cross-examination, Loden admitted that, initially, he wanted to receive a death sentence in order to get the case over with as quickly as possible, but that he changed his mind later in the process once he "got better" emotionally and mentally. He stated that he seemed to recall his attorneys telling him that they were prepared to go to trial if Loden wanted to proceed to trial, and he admitted that he freely and voluntarily waived his right to a jury, pleaded guilty, and desired the death penalty for the sake of the families involved. He maintained that, though

he was told he had no appeal rights, he was told that he would get an automatic review of everything in the record if he pleaded guilty, waived a jury, and received a death sentence. Neither Daniels nor Johnstone were subpoenaed for the hearing.

In an order filed February 16, 2006, the circuit court found "no merit to Petitioner's claim of ineffective assistance of counsel based on allegations that his attorney did not properly advise him, that by pleading guilty, he was waiving his right to appeal. Specifically, at the guilty plea hearing, the Court advised Petitioner of his rights. *Petitioner acknowledged that he was giving up his right to appeal by pleading guilty to the charge*." (emphasis added). The court dismissed the motion, finding that Loden knowingly and voluntarily entered his plea and waived his right to appeal.

Subsequently, the Mississippi Supreme Court consolidated Loden's appeal of the denial of post-conviction relief, *i.e.*, the denial of his motion to vacate his guilty plea, with his direct appeal. The Mississippi Supreme Court denied relief on October 4, 2007, affirming the denial of the motion to vacate the guilty plea and Loden's sentence of death. *Loden v. State*, 971 So. 2d 548 (2007), *cert. denied*, 555 U.S. 831 (2008) ("*Loden I*"). He then filed a second petition for post-conviction relief, which was denied. *Loden v. State*, 43 So. 3d 365 (Miss. 2010) ("*Loden II*"). Following the appointment of federal habeas counsel, the instant petition was filed with the Court on July 18, 2011.[12]

---

[12] In order to avoid confusion, the Court refers to the Mississippi Supreme Court's disposition of Loden's consolidated action as his direct appeal, while it simply refers to Loden's second set of proceedings with the Mississippi Supreme Court as his post-conviction proceedings.

## Legal Standard

A federal court may "entertain an application for a writ of habeas corpus . . . only on the ground that [the person] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). An application for such relief is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides that federal habeas relief may not be granted in connection with any claim adjudicated on the merits in state court proceedings unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence. *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); 28 U.S.C. § 2254(d)(1) & (2). Additionally, the factual findings of the state court are presumed correct, and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause of § 2254(d)(1) where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry,

and it does not turn on whether the decision is merely incorrect. *See Landrigan*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Williams*, 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5ᵗʰ Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable); *see also Harrington v. Richter*, ___U.S. ___, 131 S. Ct. 770, 793 (2011) ("The likelihood of a different result must be substantial, not just conceivable.") (citing *Strickland*, 466 U.S. at 693). The Court is required to deny federal habeas relief on any claim found lacking in merit by the state court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, ___ U.S. at ___, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Additionally, a petitioner must exhaust his claim in state court, which requires him to fairly present his claim to the highest court of the state prior to seeking federal habeas relief. *See Morris v. Dretke*, 379 F.3d 199, 204 (5ᵗʰ Cir. 2004); *Martinez v. Johnson*, 255 F.3d 229, 238 (5ᵗʰ Cir. 2001); 28 U.S.C. §2254(b)(1). The federal claims presented for habeas relief must be the substantial equivalent of those presented to the state court in order to satisfy the requirement of fair presentation. *See Morris*, 379 F.3d at 204-05; *Fisher v. Texas*, 169 F.3d 295, 302 (5ᵗʰ Cir. 1999); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5ᵗʰ Cir. 2001) ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement.").

Where a petitioner fails to exhaust his state remedies, but it is clear that the state court to which he would return to exhaust the claim would find the claim procedurally barred, the claim is

procedurally defaulted for purposes of federal habeas corpus relief.  *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995).  Likewise barred from federal habeas review are claims that the state court held procedurally barred on review on the basis of independent and adequate state law grounds.  *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement.  In these cases, the state judgment rests upon independent and adequate state procedural grounds."); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977).  In order to receive federal habeas review of procedurally defaulted claims, a petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted).

In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (internal quotations omitted).  If a petitioner is unable to demonstrate cause and prejudice, he may obtain review of his claim only by demonstrating that the application of the procedural bar would result in a miscarriage of justice because he is actually innocent of the crime.  *See House v. Bell*, 547 U.S. 518, 537-38 (2006).  In terms of the sentencing phase of a capital murder trial, innocence of the death penalty requires "a habeas petitioner who challenged his sentence in an otherwise defaulted petition [to] show 'by

clear and convincing evidence that but for constitutional error, no reasonable juror would [have found the petitioner] eligible for the death penalty.'"  *Schlup v. Delo*, 513 U.S. 298, 339 (1995) (citing *Sawyer v. Whitley*, 505 U.S. 335, 348 (1992)).  Moreover, where a state court holds a claim barred on independent and adequate state law grounds and reaches the merits of the claim in the alternative, the bar imposed by the state court is not vitiated.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by state court's alternative holding that constitutional claim lacked merit).

Finally, the Court notes that an evidentiary hearing is not available to a petitioner if his claims were reviewed on the merits, unless he meets the standards set forth in § 2254(d).  *See Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011).  The AEDPA otherwise limits the circumstances in which an evidentiary hearing may be granted for those petitioners who fail to diligently seek to establish the factual bases for their claims in state court.  *See Williams*, 529 U.S. at 433-34 (prisoners at fault for deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2).  Even where an evidentiary hearing is not precluded due to a petitioner's lack of diligence, the decision to grant an evidentiary hearing is discretionary.  *See, e.g., Clark,* 202 F.3d at 765-66.  In order to be entitled to an evidentiary hearing in federal court, a petitioner must demonstrate that he was denied a "full and fair hearing" in State court and persuade the Court that his allegations, if true, would warrant relief.  *Id.* at 766 (citations omitted).

In light of these standards, the Court considers Loden's specific claims for relief.

**Analysis**[13]

**I. Ineffective Assistance of Counsel**

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *See, e.g., Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). A federal habeas petitioner's claim that he was denied the effective assistance of counsel at trial is generally measured by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, Loden must establish that (1) his trial counsel's performance was so deficient that it cannot be said that he was functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient performance prejudiced his defense. *See id.* at 687; s*ee also Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (ineffective assistance of counsel claims analyzed under *Strickland* framework). The failure to prove either deficient performance by counsel or actual prejudice as a result of counsel's actions or omissions defeats a claim of ineffective assistance. *See Strickland*, 466 U.S. at 397; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998); *Smith v. Puckett*, 907 F.2d 581, 584 (5th Cir. 1990).

Where an attorney's representation falls below an objective standard of reasonableness as determined by professional norms, that performance is deficient. *See Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *Strickland*, 466 U.S. at 687-89. Courts scrutinizing counsel's performance assume a "strong presumption" that the assistance was adequate and "that the challenged conduct was the product of reasoned trial strategy." *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996)

---

[13] The brief filed in support of the petition fails to track the claims presented in the petition itself. While the Court has considered all of the claims raised by the pleadings, it has consolidated some claims and reordered them for the sake of convenience.

(citation omitted). This presumption may be overcome if a petitioner can identify acts or omissions of counsel that were not the result of a reasoned, professional judgment. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, even unreasonable errors by counsel do not warrant relief if the errors did not affect the judgment. *See Strickland*, 466 U.S. at 691. Rather, actual prejudice results from the errors of counsel when there exists a reasonable probability that, but for the errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

As claims of ineffective assistance of counsel involve mixed questions of law and fact, claims previously considered and rejected by the State court may be overturned only if "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Strickland*, 466 U.S. at 698; 28 U.S.C. § 2254(d)(1). Counsel's failure to preserve a claim in State court can in some circumstances constitute cause sufficient to overcome a procedural default. *See Coleman*, 501 U.S. at 753-54. However, a petitioner claiming ineffective assistance of counsel for the purpose of having the underlying substantive claim reviewed on its merits must ordinarily have presented the ineffective assistance of counsel claim independently in State court before it may be argued as cause to excuse a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451(2000).

## A. Mitigation Evidence

On September 21, 2001, Loden executed a "Waiver of Jury for Trial and Sentencing" and a separate "Waiver of Sentencing Jury" before he entered his guilty plea. (*See* Trial Tr. vol. 2, 202-205). At sentencing, Loden instructed his counsel not to object to the State's evidence, not to cross-examine the State's witnesses, and not to present any mitigating evidence on his behalf.

When the State rested, defense counsel stated it would like to summarize the developed evidence for the court in order to make a record. Counsel's statements, as previously recounted by the Court, indicated that an investigation had been performed and evidence obtained that Loden suffered "extreme" sexual abuse as a child, that he was a combat veteran with eighteen years of service in the Marine Corps, that he had been an exemplary student, and that he had no criminal history prior to the crimes at issue in this case. (Trial Tr. vol. 7, 691). Counsel also noted that the defense expert, Dr. O'Brien, opined that Loden "was suffering from extreme mental and emotional disturbance" at the time of the crimes and was incapable of appreciating the criminality of his conduct and/or conforming his conduct to the requirements of the law at the time of the murder. (*Id.*). Copies of both of Loden's mental health evaluations were submitted to the sentencing trial judge for consideration prior to sentencing, with defense counsel agreeing to stipulate to the report from the Mississippi State Hospital. (*Id.* at 694).[14]

Loden maintains that he only told his attorneys not to put on mitigation evidence at the sentencing phase of trial because they told him that he would get the death penalty regardless of the evidence presented. He contends that once the motion for funds to hire a mitigation expert was denied, his attorneys simply gave up and failed to investigate any of the numerous leads he provided them. He contends that they ignored his repeated requests for information about the case, and they failed to provide his retained expert, Dr. O'Brien, with sufficient information to allow him to conduct a proper evaluation. He argues that they did not discuss with him what might be presented as mitigating evidence, and that, had he been properly advised, he would not

---

[14] The parties dispute whether the summary report or the full report from the Mississippi State Hospital was tendered to the trial court.

have waived the presentation of evidence or jury sentencing. (*See, e.g.*, Pet. Ex. 1, Aff. of Thomas E. Loden, Jr.). However, that claim is contradictory to the transcript of the record in this case.

Loden maintains that he volunteered numerous leads to defense counsel Johnstone in their initial meetings. Information in Johnstone's handwritten notes shows that Johnstone was informed that Loden (1) was sexually and physically abused as a child; (2) had over 18 years of decorated service in the Marines; (3) suffered from frequent nightmares following his combat experience; (4) suffered severe stress from his Marine recruiting assignment; (5) exhibited suicidal behaviors before and after his arrest; (6) was told by his wife shortly before the crime that she intended to have sex with a co-worker; and (7) that he was intoxicated and under the influence of drugs on the night of the crime. (*See, e.g.*, Pet. Ex. 25). Loden argues that an investigation into that information would have yielded powerful evidence in mitigation.

Loden argues that the available and untapped mitigating evidence into his background would have also included that (1) he witnessed his father, who often drank alcohol, physically and sexually assault his mother; (2) at age two, he and his four-year-old sister were left alone for several days; (3) his parents were both unfaithful to each other and went through a bitter divorce; (4) his stepmother was physically and emotionally abusive to Loden and his sister; (5) Loden was sexually abused while attending a vacation Bible school and was later molested over course of two years by a church employee; (6) his molester encouraged Loden and a female classmate, whom he was also abusing, to have sex with one another; (7) Loden went to live with his mother and her new husband at approximately age ten, where he was abused and neglected; (8) Loden and his three siblings from his mother suffer substance abuse problems as a result of traumatic

24

childhood experiences; (9) Loden and his sisters have all attempted suicide; and (10) Loden performed well socially and academically when he lived with his grandparents. (*See* Pet. Exs. 3, 4, 7, 12, 13, 14, 16, 20, 22, 25).

Loden maintains evidence relevant to his adult life went undiscovered, as well. Loden argues that counsel failed to obtain his military records or interview his military colleagues, who would have testified that Loden was well-liked and well-respected. (*See* Pet. Exs. 8, 10, 15). He maintains that records would show that he joined the United States Marine Corps upon graduation and was selected an "outstanding recruit" and "honor man" of his platoon. (*See* Pet. Ex. 24). He was described by his commanding officer as a "poster Marine," and his performance reviews consistently urged promotion in the Corps. (*See* Pet. Exs. 9, 24). By 1992, he was an E-7 Gunnery Sergeant, and had received numerous military awards and medals. For instance, he received the good conduct medal fives times, the Navy Marine Corps Achievement Medal three times, and the Navy and Marine Corps Commendation Medal two times. (*See* Pet. Exs. 24(b), 24(c), 24(d)).

Loden maintains that counsel failed to investigate his Gulf War history and the possibility that he might suffer from Post-Traumatic Stress Disorder ("PTSD"). He notes that counsel, upon an investigation, would have learned that Loden was one of the first deployed, was often attacked, and repeatedly saw war casualties. (*See* Pet. Ex. 16, Aff. of Dr. James High). They would have learned that he witnessed a friend die when the vehicle in which he was riding was hit by friendly fire, and that his ex-wife reported that he was a different man after the war. (*See* Pet. Ex. 16 and Pet. Ex. 2). They could have learned, he argues, that he began to drink heavily and use drugs after the war, and that he then began getting in fights, suffering memory loss, and

experiencing nightmares and flashbacks. (*See* Pet. Ex. 16). He maintains that he did not report these problems to his military superiors for fear that it would hurt his chances of advancement, though he did report them to family members and friends. (*See* Pet. Exs. 9, 12, 16, 25, 31).

Additionally, he contends that an adequate investigation by counsel would have yielded information that, at the time of the crime, he was a devoted father with a struggling marriage to his third wife, Kat, whom he married in 1995. He maintains that when the Marines assigned him to a recruiting post in Vicksburg, Mississippi, in 1998, he was deprived of a military support system in a demanding, high-pressured job as a recruiter. (*See, e.g.*, Pet. Exs. 10, 29). Loden states that, during this time, Kat began having affairs, and that Loden sometimes participated in threesomes to keep her happy. (Pet. Ex. 29). He alleges that an investigation would have shown that, shortly before the crime, Kat began working as a paralegal at a prestigious law firm and began a flirtatious relationship with a partner in that firm. (*See* Pet. Ex. 5).

Loden maintains that when he came to visit the family farm, he found it deteriorated and his grandmother fragile. (*See* Pet. Ex. 29). He maintains that he drank beer, bourbon, and took some drugs throughout the day on June 22, 2000, before speaking to his wife, Kat, from his cell phone that evening. (*Id.*). He reports that she taunted him by telling him that she planned to have sex with the partner in the law firm where she worked, and he notes that the attorney has submitted an affidavit confirming his conversation with Kat that night, along with an assertion that Loden's attorneys never contacted him. (*See* Pet. Exs. 1, 5, 16, 29).

In connection with his post-conviction proceedings, Loden was interviewed by James R.

High, M.D.[15]  Dr. High also left numerous tests with Loden, which Loden completed in his cell and later returned to Dr. High.  After assimilating all of the information, Dr. High concluded that Loden suffers from Chronic PTSD and Complex PTSD, Borderline Personality Disorder, and Dissassociative Amnesia, and that he was suffering from these disorders at the time of the murder.  (Pet. Ex. 16).  Dr. High also opined that the crimes were committed while Loden was "under the influence of extreme mental or emotional disturbance."  (*Id.* ¶ 13).  He concluded that Loden's various work and family pressures, when combined Loden's fear that his wife might leave him for a male with a more prestigious job, "precipitated an acute episode of Dissociative Amnesia within his Borderline Personality Disorder during which he raped and murdered Leesa Gray."  (*Id.* ¶10).

Loden maintains that, had his background social information and military record information been shared with Dr. O'Brien prior to his pretrial evaluation, Dr. O'Brien would have known to test for dissociative symptoms that would have explained the significance of Loden's reported amnesia as a reflection of the extreme degree of emotional disturbance suffered by Loden.  Since reviewing the evidence adduced during Loden's post-conviction proceedings, he maintains, Dr. O'Brien has submitted an affidavit stating that he agrees with the later report of Dr. High.  (*See* Pet. Ex. 18).  Loden notes that counsel did not discuss Loden's case with Dr. O'Brien either before or after the evaluation, and that Daniels never responded to Dr. O'Brien's attempts to communicate with him.  (*See id.*; *see also* Daniels Dep. at 106).

Loden alleges that, on September 19, 2001, counsel met with him and informed him that

---

[15]  An affidavit from Dr. High is included in Loden's federal habeas filings, but it does not identify Dr. High's particular medical specialty.  For present purposes, the Court assumes that he is a psychiatrist.

he had to decide whether he was going to plead guilty by September 20, 2001. He argues that his attorneys never discussed with him the sentencing process or strategy for sentencing, and they did not discuss with him whether he wanted to put on a case in mitigation. (*See* Pet. Ex. 1). Loden maintains that the only time his family met with Johnstone was on August 22, 2000, and then they primarily discussed Loden's treatment in jail. (*See* Pet. Exs. 4 and 38, Affs. of Bobbie Christian; Pet. Ex. 13, Aff. of Stella Renick; Pet. Ex. 19, Johnstone time records). In support of his claim that counsel failed to adequately investigate, Loden presents numerous affidavits from friends, family, and military connections stating that defense counsel never made a concerted effort to speak with them about Loden's background. (*See, e.g.*, Pet. Exs. 2-15; 38, 39, 44). Loden maintains that the affidavits of his mother, Bobbie Christian, and his aunt, Stella Renick, contradict Daniels' assertion that he met with them and discussed Loden's background, as they state they only met with Daniels once to discuss getting Loden psychiatric treatment. (*See, e.g.*, Pet. Exs. 4, 13, 38). He notes that Johnstone concedes in his affidavit that no witnesses were identified nor a mitigation investigation performed at the time defense counsel announced that Loden had decided to forego the presentation of a case in mitigation. (*See, e.g.*, Pet. Ex. 19).

Loden further maintains that his attorneys ignored his requests to obtain a copy of discovery and gather evidence in the case, and that his letters demonstrate that his requests for discovery were ignored until after the suppression issues were decided. (*See* Pet. Ex. 30 and 35; Pet. Ex. 1). Loden argues that counsel did not consult with him regarding the grounds for the suppression motions, and they did not discuss whether he would testify at the hearing. (Pet. Ex. 1). He maintains that he began contemplating obtaining new counsel after defense counsel's performance at the suppression hearing, but that Johsntone and Daniels told him that the trial

28

judge would not allow the involvement of new counsel so late in the case. (*See* Pet. Ex. 1 ¶ 16).

Loden otherwise argues that Daniels' aspirations to join the Itawamba County Office of the District Attorney contributed to the ineffective assistance he rendered in this case, noting that Daniels destroyed Loden's case file in October 2008 without notice to Loden or his attorneys. Loden maintains that Daniels was clearly serving his own interests by destroying the file when Loden was fighting his death sentence, and he notes that Daniels submitted an affidavit on January 23, 2009, in support of the State's response to Loden's motion for post-conviction relief, even though he had submitted a sworn affidavit in 2003 stating that he would not speak about the case.

Loden notes that the time records of his investigator and of his counsel indicate that most of their efforts were spent preparing for the suppression hearing. (*See* Pet. Ex. 19; Pet. Ex. 36; Pet. Ex. 26(b)). Loden maintains that he cannot be blamed for counsel's failure to investigate, which is what led to his decision not to present mitigating evidence. Loden asserts that counsel did not have the right to fail to prepare his case and then blame the resulting absence of proof on him. Had the trier of fact been fully apprised of Loden's background and the circumstances of the offense, he maintains, he would not have been sentenced to death. The decision rejecting this claim, he argues, is unreasonable.

In reviewing this claim, the Mississippi Supreme Court declined to find ineffective assistance of counsel with regard to the investigation or the presentation of evidence in this case but found that Loden had expressly instructed his attorneys not to present mitigating evidence. *See Loden II*, 43 So.3d at 380. After citing the affidavits of Johnstone and Loden, the court noted that Daniels stated in an affidavit that he personally conducted a mitigation investigation,

including personal interviews with Loden's mother, sister, and a Marine liaison. *Id*. at 381-82. The court iterated parts of Johnstone's affidavit recounting the leads given to Johnstone in his initial interview with Loden, and it recounted Johnstone's statement that, later in the case, Loden became less forthcoming with information. *See id.* at 382. It noted that Johnstone stated that "while Loden did not expressly discourage mitigation investigation, he was reluctant to discuss either the underlying facts of the case, the development of mitigation evidence, or the prospect of testifying." *Id*. at 382. The court found that Daniels stated that investigator Wells assisted in uncovering mitigating evidence, as well. *Id.*

The court insinuated that some of Loden's assertions about the persuasiveness of some of the available mitigating evidence were overstated. For example, it noted that Loden's health and military history assertions were contradicted by Loden's records and Major Chaney's affidavit, which showed him to have a "good record" in the Marine Corps up to the time of his arrest. *Id.* at 384. It noted that defense counsel Daniels sated he thought it best to not speak to the court about Loden's parenting abilities, because an analysis of Loden's computer showed he had accessed websites involving incest with children. *Id.* at 384.

The court otherwise found that no proof had been presented that defense counsel stopped preparing for trial prior to Loden's plea and his instruction not to present evidence on his behalf, noting that Daniels stated that he intended to subpoena Loden's mother, grandmother, sister, and aunt as witnesses if the matter had proceeded to trial. *Id.* at 384. In concluding that the mitigation investigation conducted was not deficient, the court noted that Loden had failed to support his claim by pointing to cases where ineffective assistance was found in regard to an attorney's investigation into mitigation evidence where the defendant opposed the presentation of

30

such evidence.  *Id*. at 385.  Finally, citing the separate psychiatric examinations that had been conducted by the Mississippi State Hospital and Dr. O'Brien, the court found the information actually presented to the court through those reports was not sufficiently more than that Loden states should have been presented by counsel.  *Id.* at 384-85.[16]  The court concluded that Loden had failed to prove an entitlement to relief and rejected his claim.  *Id*. at 385.[17]

Respondents contend that this claim is controlled by *Schriro v. Landrigan*, 550 U.S. 465 (2007), which holds that it is not objectively unreasonable for a court to "to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence."  *Landrigan*, 550 U.S. at 478.  They maintain that Daniels stated on the record at sentencing that Loden expressly instructed his attorneys not to object or cross-examine witnesses, and that he instructed them to waive the presentation of mitigating evidence.  They note that Loden also stated on the record that he was satisfied with the advice given to him by his attorneys.  Moreover, they argue, it is clear that a mitigation investigation was conducted, as counsel introduced Dr. O'Brien's report and a brief summary into the record.  Johnstone's

---

[16]  The court found that the summary report of the forensic mental evaluation by the Mississippi State Hospital, Dr. O'Brien's report, and the brief summary presented by Daniels "collectively addressed nearly every subject deemed pertinent by Loden."  *Id*. at 385.

[17] The Mississippi Supreme Court considered whether Loden was denied the opportunity to fully develop evidence in this case due to Daniels' destruction of his case file.  *See Loden II*, 43 So. 3d at 400.  The court noted Daniels' "poor judgment in destroying" Loden's file, which was "exacerbated by his present employment with the district attorney's office."  *Id*.  The court found, however, that Daniels testified that he only had copies of documents, and that there would have been duplication between his file and Johnstone's file, which Loden did receive.  *Id.*  It also found that Loden had failed to allege and support a showing of prejudice "by failing to have Daniels's file of copies, when Loden had the originals of the very same material.  Thus, this Court is presented with a veritable 'red herring.'"  *Id.*

affidavit, they maintain, does not negate the fact that Daniels stated he did perform an investigation. Respondents maintain that the colloquy at sentencing demonstrates that Loden expressly made an "informed and knowing" decision *not* to introduce evidence.

Conversely, Loden argues that *Landrigan* is inapposite, because unlike the defendant in that case, there is no evidence that Loden "actively subverted the sentencing hearing after he told his attorneys not to present the mitigating evidence." *Id*. at 465, 470, 479, 481. Loden argues that the fact that he may not have been forthcoming with personal information does not insulate his attorneys from a challenge to the investigation they performed. *See, e.g., Porter v. McCollum*, 588 U.S. 30, 40 (2009) (holding that even a defendant's "fatalistic or uncooperative" behavior "does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation") (citing *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005) (holding counsel's mitigation investigation deficient despite defendant's refusal to discuss background)). This duty is well-established, he argues, and counsel's investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.I(C), p. 93 (1989)). Loden argues that his instructions for counsel to "stand down" were uninformed, and they were only given because of counsel's ineffective performance in the first place.

Loden maintains that nothing materially distinguishes his case from the facts in *Porter*, where the Supreme Court concluded that trial counsel's failure to uncover and present any evidence of the inmate's mental health or mental impairment, family background, or military

service clearly constituted deficient performance of counsel that was prejudicial to the death-row inmate. *See Porter*, 588 U.S. at 40-41. Loden argues that by failing to apply *Strickland* to trial counsel's inadequate investigation into Loden's mental health merely because Loden chose not to present mitigation evidence, the ruling is contrary to clearly established federal law. He notes that in a 2008 affidavit, Johnstone states that when he and Daniels met with Loden in September 2001 to discuss whether Loden would plead guilty, there was no "mitigation case to present because there had not been any mitigation investigation." (Pet. Ex. 19). Additionally, he argues, the fact that Dr. O'Brien was not given the information necessary to conduct a proper evaluation is proven by the fact that Dr. O'Brien has repudiated his prior opinion and agrees now with the diagnoses of Dr. High. Therefore, he argues, the decision is unreasonable light of the evidence.

The Court notes that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A court reviewing counsel's performance is "required not simply to 'give [the] attorneys the benefit of the doubt,' . . . but to affirmatively entertain the range of possible 'reasons [the petitioner's] counsel may have had for proceeding as they did[.]'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (citations and internal citations omitted). The determination that counsel was not deficient and Loden was not prejudiced "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quotations omitted).

In *Schriro v. Landrigan*, 550 U.S. 465 (2007), the Supreme Court held that "it was not objectively unreasonable for [a state] court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice." *Id.* at 478.

The Court there noted that "[n]either *Wiggins* nor *Strickland* addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court[,]" and it noted that the defendant in *Rompilla* "did not inform the court that he did not want mitigating evidence presented." *Id.* Loden argues this case does not fit within *Landrigan* because Loden did not refuse the presentation of a well-developed mitigation case after being fully informed of his options. The Court, however, finds that Loden has not demonstrated that it is unreasonable to conclude otherwise.

In his deposition testimony, Johnstone stated that he and Daniels explained to Loden the procedure of the sentencing hearing, as well as the evidence that could be presented to mitigate his crimes. (*See* Johnstone Dep., pp. 106-07). Johnstone states that, once Loden decided to enter a plea, Loden became adamant that he did not want witnesses cross-examined or evidence introduced in mitigation. (*See id.* at pp. 84-85, 87, 97, 103). Defense counsel Daniels asserted that Loden did not want to discuss the facts of the crime, because he "did not want to acknowledge what he had done." (Daniels Dep. at pp. 80-81, 149). Loden's statements to Dr. O'Brien also led Dr. O'Brien to opine that Loden did not want "further reminders of the things that happened." (Pet. Ex. 29). Additionally, Loden informed the trial judge that he understood the rights he was giving up by foregoing cross-examinations and objections to evidence. (*See* Trial Tr. vol. 6, 594). The Court notes that the trial court and the Mississippi Supreme Court determined that the waivers executed by Loden were knowing, voluntarily, and intelligently given, and the record exchanges between Loden and the trial court are sufficient to prevent the Court from concluding that finding is unreasonable.

However, even if *Landrigan* is inapposite, the Court finds that Loden's case is materially

distinguishable from *Porter*, as counsel in that case failed to conduct any investigation into Porter's background. *Porter*, 558 U.S. at 40-41. In his deposition testimony, Johnstone clarified that the statements in his 2008 affidavit concerning the lack of a mitigation case meant only that there was no expert to testify in the field of mitigation. (*See* Johnstone Dep. at p. 95). He maintained that Loden was informed that evidence of his background, military history, etc., could be put before the court for mitigation purposes. (*See id.* at pp. 106-07). Daniels claimed to have "conducted extensive investigation into the facts of the case, and into mitigation factors, which included interviews with my client, military personnel, his family and friends." (Daniels Dep., Ex. 12-B, 2003 affidavit). Specifically, Daniels maintained that he "personally interviewed" Loden's mother and sister, and that he spoke with a Marine liaison officer about Loden's "military situation and background." (Daniels Dep., Ex. 9, Daniels 2009 affidavit). Additionally, the record reveals that, at a pretrial hearing held in the case, the State referenced a list that Daniels had produced in discovery that contained the names of witnesses intended for mitigation purposes. (Trial Tr. vol. 1, 100).

Daniels denied the allegations in the affidavits of Loden's aunt, Stella Renick, and his mother, Bobbie Christian, stating that they were lying if they said that he did not meet with them and discuss Loden's background. (Daniels Dep. at p. 167). He concedes that he did not speak to Loden's sister or aunt about testifying at Loden's trial, but he stated that he intended to subpoena them if they were needed. (Daniels Dep. at pp. 83, 139). In his deposition testimony, Daniels stated that he and Wells both uncovered mitigation evidence, some of which was discovered by "just a general talking to witnesses" and people with knowledge of Loden or the case. (Daniels Dep. at p. 15). Although he conceded that Wells was not expressly instructed to conduct a

mitigation investigation, he maintained that Wells located witnesses and would have known the type of evidence the attorneys were looking to gather. (Daniels Dep. at pp. 76-77).

Wells maintains that he obtained information "about Mr. Loden's family background, his childhood and youth, that had been physically and sexually abused, the problems he had in his personal life, and his military experiences[,]" all of which he relayed to Daniels. (Pet. Ex. 34). Wells' time records show that he met with Loden's mother, aunt, ex-wife, and sister, and that he relayed the information learned to Daniels. (*See* Pet. Ex. 26-B). He also delivered some of Loden's military documents to Daniels' office on April 13, 2001, which he apparently obtained from Loden's mother. (*See id.*; *see also* Pet. Ex. 30, June 14, 2001 letter from Loden to Daniels).

The record evidence shows that between February 2, 2001 and August 29, 2001, Loden submitted approximately seventeen letters to his attorneys repeatedly requesting a copy of the discovery in the case, asking whether potential witnesses have been contacted, and inquiring about the possibility of getting phone records and his military records. (*See, e.g.*, Pet. Exs. 30, 35).[18] His attorneys met with him approximately ten times during the same period, outside of meetings at court proceedings. (*See* Daniels Dep. Ex. 2; Pet. Ex. 19). Investigator Wells also met with him at least four times during the same time period. (*See, e.g.*, Pet. Ex. 34).

Daniels' time sheet indicates that he copied all discovery and delivered it to Loden on July 11, 2001, which Loden contends was too late to do any good at the suppression hearing and evidences his attorneys' neglect of him. (*See* Pet. Ex. 36).[19] However, it is clear that as early as

---

[18] He also submitted several letters to investigator Wells, which are not included in the count.

[19] Daniels also states that he and Johnstone went over the evidence with Loden prior to the hearing, and that Loden never indicated that he wanted another attorney. (Daniels Dep. pp. at 153-55, 132-33).

April 1, 2001, Loden had been provided some discovery, as his letter to Wells on that date references questions about his confession based on the "papers" Daniels left him. (Pet. Ex. 35(d)). In a June 7, 2001, letter to Wells, Loden notes that Daniels, having recently come to visit him, brought a copy of Wells' interview with Kat. (Pet. Ex. 35(h)). In a letter to Daniels postmarked July 3, 2001, it is clear that Loden has a copy of the investigative reports, and this begins a series of letters wherein he points out to counsel perceived flaws and holes in the investigation of the case and asks counsel to file another suppression motion. (*See, e.g.*, Pet. Ex. 30(h), 30(i), 30(j)).[20]

Additionally, and contrary to Loden's claim that counsel waited months before contacting Dr. O'Brien to conduct an evaluation, the record shows that counsel was not authorized to retain Dr. O'Brien's services as a defense expert until July 2001. (*See, e.g.*, Trial Tr. vol. 1, 140-149; Trial Tr. vol. 2, 157-59). Dr. O'Brien evaluated Loden on August 13, 2001 and submitted his report to counsel on September 14, 2001. (*See* Pet. Ex. 18; Pet. Ex. 29).

The Court notes that Dr. O'Brien reports Loden sharing information regarding the trauma Loden experienced at the loss of his friend in combat, his father's death, his suicide attempts, his substance abuse, the absence of mental health treatment, his sexual addiction, his abandonment by family, his good performance in school, his failed marriages, his grandmother's poor health, his job stress, his wife's affair, his failed marriages, the sexual abuse he suffered as a child, and his lack of a criminal history prior to Leesa Gray's murder. (*See, e.g.,* Pet. Ex. 29). The Mississippi State Hospital Report, also generated as a result of defense counsel's request that

---

[20] The Court acknowledges that July 3, 2001, is a date after the suppression hearing was held. The Court includes this letter only to show that counsel was in communication with Loden and was attempting to get him information.

Loden undergo an evaluation, contains a recitation of factors that might have mitigating effect, though the examiners did not feel that they rose to the level of statutory mitigation. (*See, e.g.*, Pet. Ex. 28(j)). These factors included Loden's reported history of: childhood physical and sexual abuse; combat experiences, including witnessing the death of a close friend and killing others; experiencing and acting upon "paraphilic urges, including deriving sexual pleasure from the suffering of others"; intoxication at the time of the offenses; suicidal ideation at the time of the offenses; distress over his relationship with his wife, his work, his concern about the condition of his grandmother, and the condition of the family farm; and his experience of anger at the anti-Marine remark made by the victim a short time before the offenses. (*Id.*).

Loden faults counsel for not providing the court with evidence relating to the sexual abuse he suffered and the profound effect war and military pressures had on his mental state. However, his military records contained no description of any mental health treatment, and all mention of sexual abuse in the record comes from reports of individuals who stated that Loden informed them of the abuse. (*See* Pet. Ex. 3; Pet Ex 13; Pet. Ex. 16, p. 5). No one could identify the alleged abuser by name. (*See id.*; *see also* Daniels Dep. at 100). Additionally, it appears that counsel made a strategic decision not to introduce proof that Loden was a devoted husband and father, as that likely would have allowed the introduction of evidence that Loden's computer had accessed websites promoting incest and child molestation. *See Wong v. Belemontes*, 558 U.S. 15, 19-20 (2009) (holding that a court considering available but untapped mitigating evidence must also consider other inculpatory evidence that would have been admitted if the mitigating evidence had been presented).

Moreover, Dr. O'Brien's 2008 affidavit does not repudiate the conclusions he reached in

2001 when he evaluated Loden. Rather, he states that if he had known much of the information relied upon by Dr. High, he "would have come to the same conclusions and diagnoses[.]" (Pet. Ex. 18 ¶ 17). Dr. High's opinion, to which Dr. O'Brien states he agrees, is that the crime was committed while Loden was "under the influence of extreme mental or emotional disturbance." (Pet. Ex. 16 ¶ 13). Dr. O'Brien concluded the same when he evaluated Loden in 2001. (*See, e.g.*, Pet. Ex. 18, Pet. Ex. 29).[21] Regardless of any initial disagreement over which mental impairment or personality disorder served as the vehicle for Loden's mental disturbance, the fact is that the sentencing court had before it an expert opinion that Loden's mental state at the time of the crime could serve to mitigate his sentence. *See* Miss. Code Ann. 99-19-101(6)(b) (listing as a mitigating circumstance that "[t]he offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.").[22]

When Loden entered his plea on September 21, 2001, trial was still over two weeks away. The time records kept by the attorneys in this case show that trial preparations were still ongoing as of September 12 and 13, 2001. (*See* Pet. Ex. 19; Pet. Ex. 36). According to Daniels, Loden vacillated on whether he wanted to plead or go to trial, and Daniels " was going to be prepared for trial no matter what." (Daniels Dep. at p. 85). Counsel employed an investigator who uncovered leads, and Daniels spoke with family members and obtained records. There were no psychiatric records for counsel to pursue, and family members could not identify the person

---

[21] Dr. High notes that Dr. O'Brien "failed to give a diagnostic formulation from which he could support the conclusions he gave, though I agree with his opinion in that regard." (Pet. Ex. 16, pp. 43-44).

[22] Dr. High did not opine that Loden's impairments rendered him *M'Naghten* insane at the time of the murder. *See Edwards v. State*, 441 So. 2d 84, 86 (Miss. 1983) (noting that Mississippi follows the *M'Naghten* Rule for legal insanity).

resonsible for Loden's reported sexual abuse.[23]   The mental evaluations that were conducted prior

to trial yielded much of the information Loden states was undiscovered at the time of trial.   In

light of the record evidence, Loden has not demonstrated that it was objectively unreasonable to

conclude that he failed to show counsel performed deficiently at trial by failing to adequately

investigate the available mitigating evidence.[24]

As the Court found earlier, Loden is unable to demonstrate prejudice because of his

decision not to allow the introduction of mitigating evidence.   *See, e.g., Brawner v. Epps*, 439 F.

App'x 396, 404, 2011 WL 3822344 (5th Cir. 2011) (holding that the quality of counsel's

investigation could not have prejudiced a client who refused to allow the introduction of relevant

evidence).   That finding aside, the Court also determines that Loden has failed to demonstrate it

is unreasonable to reject a finding of prejudice as a result of counsel's performance.   The

question of prejudice asks "whether there is a reasonable probability that, absent the errors, the

sentencer. . . would have conlcuded that the balance of aggravating and mitigating circumstances

did not warrant death."   *Cullen v. Pinholster*, 131 S. Ct. 1388, 1408 (citing *Strickland*, 466 U.S.

at 695).   Under the facts and circumstances of this case, the Court finds no such reasonable

probability is found that the sentencer would have so concluded.

Loden kidnapped and raped a sixteen-year-old girl over the course of several hours,

---

[23]   The Court notes that Loden's mother was estranged from him for years prior to his arrest for the instant offense, and Daniels otherwise states that she was not forthcoming with information. (*See, e.g.,* Pet. Ex. 4 ¶¶18-19;  Daniels Dep. at p. 90).  It also notes that Loden's only full-blooded sibling did not submit an affidavit in this case.

[24]   Based on the Court's discussion of this claim, it finds that, to the extent Loden claims that Daniels' "split allegiances" between his representation of Loden and his preparation for entering the district attorney's office support this claim, he fails to demonstrate an entitlement to relief.

videotapping portions of the abuse and ignoring her pleas, before suffocating her and stuffing her nude, bound body beneath a seat in his van. The evidence counsel is alleged to have failed to uncover and present does not, in light of these aggravating facts, raise a reasonable probability that a sentence of death would not have been given had the evidence been presented. Loden has not demonstrated that the decision rejecting this claim is unreasonable, and habeas relief is denied on the issue of counsel's investigation and presentation of mitigating evidence.

## B. Guilty Plea and Waiver of Jury Sentencing[25]

1. Plea

Loden argues that once he failed to receive favorable pretrial rulings, he began to focus on the hope of a successful appeal of the trial judge's rulings. (*See* Pet. Ex. 1). He contends that he inquired of counsel whether pretrial rulings would be reviewed on appeal if he pleaded guilty, and that counsel repeatedly informed him that, if he received the death penalty, everything in the record would be reviewed by the Mississippi Supreme Court as part of its automatic review. (*See id*; *see also* Vol. 1 of 3, Ex. 5 to Mot. to Vacate).[26] Based on this alleged erroneous advice, he maintains, he chose to plead guilty and waive jury sentencing in hopes of receiving a death sentence that would necessitate review of the pretrial rulings.

Loden maintains that trial counsel failed to discuss with him his available defenses, his

---

[25] Loden asserts that the facts demonstrate his entitlement to relief on the substantive issue of the voluntariness of the guilty plea and waiver of jury sentencing, as well as on his claims of ineffective assistance of counsel. Because the underlying facts are the same for both asserted grounds for relief, the Court addresses them under this heading, although the grounds have been independently considered by the Court.

[26] In an August 2, 2001, letter to defense counsel Johnstone, Loden asked Johnstone to file a motion to revisit the suppression issues stemming from the original warrant, and if the court's ruling on those issues proved to be unfavorable, to speak with counsel about entering a plea. (*See* Vol. 1 of 3, p. 22, Ex. 3 to Mot. to Vacate).

appellate rights, or any of the questions that the trial judge might ask during the plea allocution. (Pet. Ex. 1). Loden contends that his mental and emotional condition barred his accurate understanding of the consequences of a decision to waive the right to a jury for sentencing, and that the trial judge erroneously told him that he was waiving a jury as to guilt and to punishment by entering a plea. He argues that his counsel failed to attempt to negotiate a plea with the prosecution, and that they failed to discuss with him whether to put on a case in mitigation or whether to waive a jury for sentencing. Loden alleges that trial counsel failed to advise him that he would almost assuredly receive a death sentence from the trial judge if he pleaded guilty, and counsel failed to advise him that he would not be able to challenge the judge's rulings. Loden contends that counsel failed to develop a mitigation case, failed to instruct their retained investigator to conduct a mitigation case, and they failed to ask the trial judge to reconsider his ruling denying funds for a mitigation expert. The totality of these factors, he maintains, renders his plea and waivers involuntary, even aside from counsel's performance.

Counsel met with Loden on September 18, 19, and 20, 2001. (*See, e.g.*, attachment to Pet. Ex. 19; Pet. Ex. 36). It is undisputed that Loden inquired, prior to pleading, whether he could appeal from the circuit court's adverse pretrial rulings if he pleaded guilty. (*See, e.g.,* Pet. Ex. 1; Johnstone Dep. at pp. 80-83; Daniels Dep. at pp. 161-62). According to Daniels, the State made no plea offers to Loden, and as the trial date approached, it became clear to counsel that Loden was either going to plead guilty to the indictment in its entirety or go to trial. (Daniels Dep. at p. 58). Daniels states that Loden vacillated on whether to plead guilty, and that he and Johnstone continued to prepare for trial up until they knew Loden intended to enter a plea. Daniels states that he "wasn't going to wait for [Loden] to make up his mind," and that he "was

42

going to be prepared for trial no matter what." (*Id.* at p. 85). Johnstone stated that Loden ultimately "indicated that he didn't want to proceed anymore, he wanted to plead guilty, [and] he didn't want to put the family through a trial." (Johnstone Dep. at p. 69).

At his September 21, 2001, plea, Loden stated on the record under oath that he was "konwingly, freely, understandingly, and voluntarily" entering a plea. (Trial Tr. vol. 6, 501). He acknowledged that he was waiving his right to have a jury make the determination as to his guilt and the punishment to be imposed. (*Id.* at 502). He acknowledged that, if he proceeded to a jury trial and received a sentence, he could appeal to the Mississippi Supreme Court, and that he was giving up that right by waiving a jury trial. (*Id.* at 502-510).

Loden later sought to vacate his guilty plea based upon counsel's advice regarding the scope of the Mississippi Supreme Court's automatic review, and he supported the motion with the transcript of the guilty plea colloquy, letters, his own affidavits, and a July 10, 2003 affidavit from Johnstone in which Johnstone admitted that he told Loden it was unclear which issues would be reviewed by the Mississippi Supreme Court as a part of their automatic review. (*See* Vol. 1 of 3, Ex. 1-5). Following a hearing, the trial court found that the record belied Loden's claims and found his claims without merit. (*See, e.g.*, Vol. 1 of 3, pp. 143-45).

Loden appealed the dismissal of his motion for post-conviction relief, which was consolidated with his earlier-filed direct appeal. The Mississippi Supreme Court considered whether trial counsel's advice caused Loden to enter an involuntary guilty plea to capital murder, noting that Loden bore the burden of proving to the circuit court by a preponderance of the evidence that he was entitled to post-conviction relief, and that the trial court's factual findings would not be disturbed unless they were clearly erroneous. *Loden I*, 971 So. 2d at 572. Citing

the on-the-record exchanges between Judge Gardner and Loden regarding the rights available to

Loden and the consequences of foregoing those rights, along with Loden's affirmations under

oath regarding his willingness to plea, the Mississippi Supreme Court found that the trial court

was not clearly erroneous in finding the plea "knowing and voluntary." *Id.* at 573.

The court also considered Loden's claim that counsel performed ineffectively in advising

him regarding the guilty plea. The court noted that Johstnone's affidavit stated that he advised

Loden that he would be waiving his right to appeal, and that Loden's exchanges with Judge

Gardner explicitly informed him that he would waive his right to appeal by pleading guilty. *Id.* at

574. The court found Loden's claim "unpersuasive," finding Loden failed to show the circuit

court's decision rejecting his claim clearly erroneous. *Id.*

Loden subsequently filed a second motion for post-conviction relief in which he argued

that he was denied the effective assistance of counsel in deciding whether to plead guilty and

waive jury sentencing. A 2008 affidavit from Johnstone, a 2009 affidavit from Daniels, and the

deposition testimony from both attorneys were submitted for the court's consideration. In his

2008 affidavit, Johnstone stated:

> Loden wanted to know whether, if he pleaded guilty, he could appeal, and in
> particular whether he could appeal the Circuit Court's adverse pre-trial rulings
> including the rulings on the suppression motions. I told Loden that if he pleaded
> guilty and was sentenced to death, the Mississippi Supreme Court would review
> his sentence, and that they would review everything that was in the record. I told
> Loden that I believed that (1) the rulings on the suppression motions, (2) the order
> denying the request for funds to hire a mitigation specialist, and (3) the use of
> Loden's wife Kat to induce Loden to talk with the police on June 30, 2010 were
> issues that might be reviewed that were potentially viable.

(Pet. Ex. 19, Johnstone Aff.) Daniels' 2009 affidavit states that Loden was informed that "there

would be no direct appeal by [trial counsel], but that the Mississippi Supreme Court would

automatically review a sentence of death. . . . [and that if Loden] wanted to directly appeal and assign particular grounds for reversal of his conviction, that would be best served by going to trial." (*See, e.g.*, Daniels Dep., Ex. 9).[27]

In a December 4, 2008, affidavit, Loden stated that his attorneys informed him that all pretrial issues would be reviewed by the Mississippi Supreme Court even if he pleaded guilty. (Pet. Ex. 1 ¶19). Daniels states that he discussed the court's review with Loden more than once, and "[t]he answer was always the same and unequivocal, and that was, if he plead guilty, he could not appeal his case. And that if he wanted to appeal those issues that he was unhappy with what had been decided by the [c]ourt, he would need to go to trial." (Daniels Dep. at pp. 161-62). Daniels stated that he did tell Loden that a death sentence would be reviewed by the Mississippi Supreme Court, but that he "at no time" told Loden that he could appeal any specific issues. (*Id*. at p. 162). Daniels maintained that he thought he would be misadvising Loden by attempting to tell him exactly what the court would consider in its review of "the sentence," but that he told Loden that the suppression issues would not be assigned as error if he pleaded guilty. (*Id*. at pp. 165-66). Daniels stated that Loden "understood that there would be no appeal." (*Id*. at p.162).

In his deposition testimony, Johnstone maintained that Loden wanted to plead guilty in order to spare the family a trial, and that Johnstone, along with Daniels, had several discussions with Loden about the appeal process. (*See* Johnstone Dep. at pp. 70, 81). Johnstone's testimony

---

[27] Daniels submitted an affidavit dated September 3, 2003, in which he stated he had never disclosed any information learned during his representation to an employee of the Office of the District Attorney, nor did he intend to do so. (*See* Pet. Ex. 41 ¶ 4). He later submitted an affidavit contesting Loden's claims of ineffective assistance of counsel.

was that Loden was informed that a review would be automatic, and that while some issues were potentially viable, Loden would "have to go to trial and have a jury verdict" in order to assuredly preserve his appealable grounds. (*See id.* at pp. 82-83).

On post-conviction review, with his claim bolstered by the affidavits of counsel, Loden argued that trial counsel provided ineffective assistance by providing erroneous advice to him regarding the Mississippi Supreme Court's automatic review of his death sentence. The court found the issue procedurally barred in light of its earlier denial. *Loden II*, 43 So. 3d at 389 (citing Miss. Code Ann. § 99-39-23(6)). Specifically, it noted that Loden had new counsel when he filed his motion to vacate the guilty plea and could have issued subpoenas for his trial attorneys to testify at that proceeding. *Id*. at 390. It otherwise noted that both attorneys informed Loden that they could not guarantee which issues the Mississippi Supreme Court would address, and that a reasonable inference from Johnstone's advice is that Loden needed to get everything on the record. *Id*. at 390. The court otherwise found that Daniels' 2009 affidavit was not evidence that was "practically conclusive" to have caused a different result in Loden's conviction or sentence, and "his deposition testimony is conclusive for the opposite, and is convincingly similar to Daniels's deposition testimony that erroneous advice was not given to Loden." *Id*. at 390. The court denied relief.

Separate and apart from Loden's claim that counsel performed ineffectively in advising him as to the plea, the court considered Loden's claim that his plea was not knowing, voluntary, or intelligent. *Loden II*, 43 So. 3d at 394. The court noted that it had already found his plea "knowing and voluntary" in its prior decision, and that even if Daniels' 2009 affidavit were considered, it was not evidence that is "practically conclusive . . . [to] have caused a different

result[.]" *Id*. at 395. The court determined that Loden was not entitled to relief. *Id.*

At the outset, the Court notes that no plea offer was made to Loden, who cites *Missouri v. Frye* and *Lafler v. Cooper*, in support of his claims. In *Missouri v. Frye*, defense counsel failed communicate a plea offer to the defendant, and it lapsed. *See* ___ U.S. ___, 132 S. Ct. 1399, 1409 (2012) (noting the case involved an "application of *Strickland* to the instances of an uncommunicated, lapsed plea"). In *Lafler v. Cooper*, a favorable proposed plea agreement was rejected upon the erroneous advice of counsel. *See* ___ U.S. ___, 132 S. Ct. 1376, 1390 (2012). To the extent that Loden argues that counsel was ineffective for failing to negotiate a plea in this case, no support is found in the record for such a claim. The evidence in this case suggests that the State had no interest in extending a plea offer to Loden. At a January 11, 2001, hearing, the prosecutor informed the trial court that it was "highly unlikely" that any plea negotiations would take place. (Trial Tr. vol. 1, 20, 25). Daniels' deposition testimony likewise indicates that there was no reason to believe that the prosecution would be open to plea negotiations. (Daniels Dep. at p. 58). The State Hospital report reveals that Loden voiced an understanding to the forensic staff that the prosecution would not make a plea offer. (*See* Pet. Ex. 28(j)). Therefore, Loden's arguments are speculative, as there is no indication that any attorney could have negotiated a plea offer for Loden under these circumstances.

The Court otherwise notes that a guilty plea is valid only when it is "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Counsel's advice is competent when counsel informs the accused of the "relevant circumstances and the likely consequences" of entering a plea. *United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005). Conversely, pleas entered on

advice that fails to so inform the client are not voluntary. *See, e.g., Kennedy v. Maggio*, 725 F.2d 269, 273 (5th Cir. 1984). The *Strickland* test applies to ineffective assistance of counsel claims based on guilty pleas. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985). In order to prevail on such a claim, the Loden must show that counsel's representation fell below an objective standard of reasonableness, and that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*. at 57 (quotations omitted).

Loden maintains that the Mississippi Supreme Court's decision is unreasonable, because it merely found an absence of prejudice to Loden based on the fact that he pleaded guilty, waived jury sentencing, and waived the presentation of mitigating evidence in sentencing. Loden argues that the issue is whether he would have insisted on going to trial if he had been properly advised, and that his February 2002 post-plea letter to Daniels clearly shows that Loden misunderstood the review he would receive by the Mississippi Supreme Court. (*See, e.g.*, Pet. Ex. 30(L), "My only hope was re-presenting everything I had trouble with on appeal. Glad to hear that I still can.")).

The Supreme Court has held "[t]hat a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing." *McMann v. Richardson*, 397 U.S. 759, 770 (1970). Rather, counsel's advice must be "within the range of competence demanded of attorneys in criminal cases." *Id.* at 771. Where counsel makes an error in determining how a court will apply a law where the application allows for discretion, his actions are within range of competence demanded by the Sixth Amementment. *See, e.g., Parker v. North Carolina*, 397 U.S. 790, 797-98 (1970) (finding counsel's allegedly mistaken conclusion that defendant's confession was

admissible well within range of competence demanded of criminal defense attorney).  Where the law is clear, however, "the duty to give correct advice is equally clear." *Padilla v. Kentucky*, 559 U.S. 356, ___, 130 S. Ct. 1473, 1483 (2010) (discussing deficiency in immigration context).

Loden's attorneys interpreted the appeal waiver that accompanies a valid guilty plea in light of the statutory requirement that death sentences receive automatic review by the Mississippi Supreme Court.  *See* Miss. Code Ann. § 99-19-105 ("Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court."); Miss. Code Ann. § 99-35-101 (2001) ("Any person convicted of an offense in a circuit court may appeal to the supreme court, provided, however, an appeal from the circuit court to the supreme court shall not be allowed in any case where the defendant enters a plea of guilty.").  The record supports a conclusion that Johnstone and Daniels voiced their uncertainty to Loden as to what issues would specifically be reviewed if Loden were to plead guilty and receive a sentence of death, but that each stated that they informed Loden that he had to go to trial and get a jury verdict to ensure review of the alleged errors.  (*See, e.g.,* Daniels Dep.; Johnstone Aff. at 83).  Moreover, the Court notes that the Mississippi Supreme Court did address the issue of the trial court's ruling regarding the denial of a mitigation specialist, thus making it clear that they do, at least on occassion, consider pretrial rulings even in the face of a guilty plea.  *See, e.g., Loden I*, 971 So. 2d at 562-63.

Based on a review of the entirety of the record before it, the Court concludes that Loden has not rebutted by clear and convincing evidence the finding that Loden was informed that he would need a jury determination if he wanted to appeal any unfavorable determinations to the Mississippi Supreme Court.  Loden asks the Court to ignore the evidence that he entered a

knowing, intelligent, and voluntary plea and find that counsel rendered ineffective assistance because Loden wanted to receive a death sentence but not actually be subjected to the death penalty. The records supports a conclusion that Loden was made aware of the consequences of his plea and chose to proceed with the plea. He fails to demonstrate a reasonable probability that he would have proceeded to trial if his attorneys had given him different advice. *See, e.g.*, *Hill*, 474 U.S. at 59. His attorneys did not offer advice that led him to reject a favorable plea offer or accept a less than favorable offer, they did not fail to advise him of the risk of waiving a jury trial, and they did not fail to warn him of the consequences and likely result of waiving a jury for trial and sentencing.

Loden was informed by Judge Gardner that he was waiving both his right to a jury determination of guilt and punishment by entering a guilty plea, which Loden states supports his claim that his plea was not voluntarily given. Upon a review of the record, however, it appears that Loden had executed written waivers for both phases of trial prior to the plea colloquy. (*See, e.g.*, Trial Tr. vol. 2, 202-03, 205; *see also* Trial Tr. vol. 6, 555-56). Additionally, the effect of the plea and the rights related thereto were explained to Loden on the record, and he stated his understanding and desire to waive his right to a jury trial. *See, e.g., Roland v. State*, 666 So. 2d 747, 750 (Miss. 1995) ("Solemn declarations in open court [by a defendant] carry a strong presumption of verity.").

Attached to the motion to vacate that was presented to the trial court were exhibits that included two affidavits by Loden, Johnstone's 2003 affidavit, Loden's letter to Johnstone, and Loden's letter to Judge Gardner. (*See, e.g.*, Vol. 1, 6-30). At the hearing on the motion to vacate, the trial judge made a credibility determination based on the transcript of the plea

colloquy, Loden's testimony, and the evidence attached to the motion. The Mississippi Supreme Court found the trial judge's credibility determinations as to the knowing and voluntary nature of the guilty plea were not clearly erroneous and that counsel was not deficient. *See, e.g., Loden I*, 971 So. 2d at 574. The Court does not find this determination unreasonable.

Inasmuch as Loden raises a separate claim that his plea was not knowing and voluntary separate and apart from counsel's advice, the Court finds that a decision finding it voluntarily rendered is not unreasonable, and his challenge thereto is rejected based on the results of the two mental health evaluations conducted prior to Loden's trial, the information contained in the affidavits filed with the Court, as well as the on-the-record exchanges involving Loden, his attorneys, and the trial court. *See Brady v. United States*, 397 U.S. 742, 749 (1970) (holding voluntariness of a plea determined by totality of relevant surrounding circumstances). These exchanges show that Loden was aware of the charges against him and the consequences of his plea. *See, e.g., Boykin v. Alabama*, 395 U.S. 238, 244 (1969). Loden has not demonstrated that it was unreasonable to conclude that his wavier was voluntary, knowing, and intelligent. Relief on this claim will be denied.

## 2. Sentencing

Loden also maintains that his waiver of jury sentencing was not knowingly, intelligently, or voluntarily given. In his petition for post-conviction relief, Loden raised a claim that ineffective assistance was rendered based on trial counsel's advice to waive jury sentencing. *Loden II*, 43 So. 3d at 385. Loden argued that it was unreasonable for his attorneys to advise the waiver of jury sentencing in light of Judge Gardner's capital sentencing record. *Id*. at 386. The Mississippi Supreme Court found that the argument lacked credibility, particularly when it

considered Loden's statement to Dr. O'Brien that he wished to plead so that he would receive the death penalty.  *Id*.  The court found that the record "is replete with evidence beyond all doubt that Loden knowingly, intelligently, and voluntarily waived jury sentencing."  *Id*.  It found that Loden's affidavit failed to give any details of the discussion between defense counsel regarding the waiver of jury sentencing, and that any alleged deficiency by counsel, therefore, could not be determined.  *Id*.

On federal habeas review, Loden argues that he stated to Dr. O'Brien that one of the reasons that he wanted to plead and get the death sentence was due to his diminishing confidence in his attorneys.  (*See* Pet. Ex. 29).  Moreover, he notes that he did state that his attorneys failed to discuss the waiver issue with him, which renders the Mississippi Supreme Court's factual finding unreasonable.  (*See* Pet. Ex. 1 ¶ 21; Pet. Ex. 37 ¶ 4).

Prior to trial, the forensic staff of the Mississippi State Hospital found that Loden had "the capacity [to] knowingly, intelligently, and voluntarily . . . waive or assert his constitutional rights."  (Pet. Ex. 28(j)).  Dr. O'Brien opined that Loden was competent to stand trial and assist in his own defense.  (*See* Pet. Ex. 29).[28]  During his evaluation, Loden informed Dr. O'Brien that he wanted to get the death penalty.  (*See* Pet. Ex. 29).  Before he entered his plea, Loden was advised that, if he proceeded to a jury trial and sentencing, unanimity would be required among the jurors before the death penalty could be imposed.   (*See id.* at 508; *see also* Trial Tr. vol. 2, 202-05).

---

[28]  The forensic findings of mental health professionals can inform a court's determination of a defendant's competency, which is a legal determination that requires the defendant to have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402 (1960).

The record demonstrates that the trial judge informed Loden that he was waiving a jury as to guilt and sentencing because he executed two separate waivers stating such. (*See* Trial Tr. vol. 2, 202, 205). Loden was expressly asked by the trial court whether he understood that he had a right to have a jury determine his punishment, and Loden responded, "I understand I had it, and I understand I waived it, sir." (Trial Tr. vol. 6, 551). Before Loden entered his plea and waiver of jury sentencing, Daniels stated to the trial court that he and Johnstone had conferred with Loden "about the bifurcated hearing process," along with a discussion of the charges against him and his possible defenses thereto. (*Id*. at 547). Daniels informed the court that he believed Loden understood the significance of his waivers, and that he waived his rights "freely and voluntarily, with full understanding." (*Id*. at 548). Johnstone agreed with Daniels' impression of Loden's understanding. (*Id*. at 548-50). In response to the court's further inquiry, Loden stated that he understood that he had the right to have a jury determine his punishment and had waived it. (*Id*. at 556-57).

As this Court has already discussed, Loden's argument that his guilty plea and waiver of jury sentencing were invalid because of counsel's failure to make him aware of the mitigation that could be offered is contradicted by counsel's affidavits and deposition testimony. Johnstone specifically stated in his deposition that Loden was advised that the matters he did not want put before the trial court were issues that could be mitigating. (*See* Johnstone Dep. at pp. 105-07). Both attorneys stated that Loden was firmly against the cross-examination of witnesses or the presentation of mitigation evidence once he decided to plead guilty. (*See* Johnstone Dep. at pp. 84-85; Daniels Dep. at pp. 113-14).

Moreover, the record supports a finding that Loden knew prior to executing his wavier of

jury sentencing that the trial judge might impose a sentence of death.  (*See* Pet. Ex. 29; Trial Tr. vol. 6, 551-52).  Although Loden has argued that counsel should have insisted upon jury sentencing, the decision was Loden's to make.  *See, e.g., Florida v. Nixon*, 543 U.S. 175, 187 (2004) (noting that a defendant has "the ultimate authority" to decide whether to plead guilty).  Loden has failed to demonstrate that the waiver was invalid due to his ignorance of the mitigating evidence that could have been offered on his behalf, and he has failed to show that counsel was ineffective.  Loden has also failed to demonstrate that the Mississippi Supreme Court's decision rejecting his claim of ineffective assistance of counsel is contrary to, or involves an unreasonable it involve an unreasonable application of, *Strickland* or its progeny.  *See Harrington v. Richter*, ___U.S. ___, 131 S. Ct. 770, 788 (2011) (holding that inquiry on habeas is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard").

To the extent that Loden claims that his waiver of jury sentencing was involuntarily given aside from counsel's performance, the Court determines that the trial judge's exchange with Loden and his attorneys and the waiver executed by Loden demonstrates that Loden signed the waiver "with sufficient awareness of the relevant circumstances and likely consequences" of his action.  *Brady v. United States*, 397 U.S. 742, 748 (1970).  Therefore, the Court finds that Loden has not demonstrated that it was unreasonable to conclude that Loden's wavier of jury sentencing was voluntary, knowing, and intelligent.  Habeas relief on this claim will be denied.

3.  Sufficient Contact

In his petition, Loden also argues that his right to the effective assistance of counsel was violated when trial counsel failed to maintain sufficient contact with him.  He alleges that they

54

ignored his requests for information and consultation.  Respondents maintain that Loden failed to exhaust this claim for federal habeas relief in State court, and Loden maintains that Respondents waived the right to assert exhaustion as a defense to his claim.  However, the Court finds it unnecessary to resolve the procedural bar question on the facts of this case.  As the Court has already found, Loden pleaded guilty after a valid waiver of his rights to a jury trial and sentencing.  This Court has already determined that Loden is not entitled to habeas relief on his claims that counsel performed ineffectively in investigating evidence, or in advising him as to the effect of his guilty plea and waiver of jury sentencing.  Counsel's contact with Loden can hardly be deemed abandonment, and the Court notes that Loden had no right to a "meaningful relationship" with trial counsel.  *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) ("[W]e reject the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel.").  The lack of trust between Loden and his attorneys, if it existed during Loden's case, has not been demonstrated to be a product of any lack of effort by defense counsel.  Additionally, in light of Loden's guilty plea and waiver of the presentation of mitigating evidence, Loden has not demonstrated that he was prejudiced by the frequency of counsel's contact with him.  *See McCrae v. Blackburn*, 793 F.2d 684, 688  (5th Cir. 1986) (lack of communication between counsel and appellant did not constitute ineffective assistance absent showing that lack of communication resulted in prejudice to appellant).  Loden is denied relief on this claim.

## C.  Litigation of the Case

### 1.  Motion for Funds for Expert Mitigation Assistance[29]

---

[29]  In his reply brief, Loden argues that he "is not challenging the [trial court]'s substantive determination, as is made clear from Loden's Opening Brief."  Rather, he maintains

During pretrial proceedings, Loden's attorneys moved the trial court for funds to hire Dr. Gary Mooers, a professor of social work at the University of Mississippi, as a mitigation expert. They maintained that his participation in the case was critical to the development of mitigating evidence. (*See* Trial Tr. vol. 3, 61-75). The trial court heard argument on the motion but denied the request, noting that Loden had already been authorized funds for the service of an investigator, and that retaining Dr. Mooers would require expenditures of money that would be aimed at evidence normally investigated and developed by investigators, the attorneys, and psychologists or psychiatrists. (*Id*. at 75). The trial court, however, did inform defense counsel that if they could provide the court with additional authority for the proposition that there existed a speciality within the law for the appointment of a mitigation expert, the matter could be revisisted. (*Id*.). Trial counsel never provided the court with any additional authority, and Loden maintains that counsel performed ineffectively in failing to provide the trial court with the necessary information to obtain an expert.

On appeal, the Mississippi Supreme Court noted that the circuit court provided Loden with funds to hire an investigator, granted a psychological evaluation by the forensic staff at the Mississippi State Hospital, and granted defense funds to retain the services of Dr. O'Brien, an independent psychologist. *Loden* I, 971 So. 2d at 562-64. The court found that Loden's motion for a mitigation investigator "set forth generic reasons for the need of an additional expert" and "mirrored his prior requests to obtain an investigator and an expert in the field of psychology[.]" *Id*. The court concluded that the circuit court "did not err in concluding that Mooers's redundant

_____

that he is challenging counsel's failure to litigate the motion. (*See* doc. entry no. 33, 60). The Court notes that, to the extent Loden intended to assert this claim by citing it as a substantive issue in his petition, he has abandoned the claim. *See, e.g., Chambers v. Mukasey*, 520 F.3d 445, 448 n.1 (5th Cir. 2008).

services were not justified" and dismissed the claim. *Id.* Alternatively, the court noted that the issue was moot, given Loden's choice not to present mitigation evidence. *Id.* n.15. The court again considered the claim in the context of ineffective assistance of counsel on post-conviction review and found that Loden could not establish prejudice under *Strickland* because he waived the presentation of mitigating evidence. *See Loden II*, 43 So. 3d at 387-88.

On habeas review, Loden argues that, because investigator Wells' investigation was almost totally related to suppression issues, counsel rendered ineffective assistance in failing to followup on the trial court's order to supplement its motion.

First, the Court notes that counsel filed a well-cited motion in support of the motion for a mitigation expert. (*See* Trial Tr. vol. 1, 61-67). In his deposition testimony, Daniels stated that he was uncertain that additional authority would have altered the trial court's ruling, as the initial motion presented the best available support for the request. (Daniels Dep. at pp. 104-05). Second, the Court notes that the law entitles Loden not to the "most-sophisticated defense," but rather, an opportunity to create an "effective defense." *Moore v. Johnson*, 225 F.3d 495, 502-04 (5th Cir. 2000) (finding defendant failed to make sufficient showing to appoint mitigation expert). In this case, Loden was given funding to hire an investigator, he was provided a full evaluation by the forensic staff at the Mississippi State Hospital, and he was provided the services of an independent psychologist upon defense counsel's motion. He was given "the basic tools of an adequate defense." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971) (citation omitted); *see also Ake v. Oklahoma*, 470 U.S. 68, 76-77 (1985) (finding criminal defendants are guaranteed "access to the raw materials integral to the building of an effective defense" and "an adequate opportunity to present their claims fairly within the adversary system"). Defense counsel did not render

ineffective assistance merely by failing to supplement its motion, particularly where the record

demonstrates that counsel's initial attempt was well-cited, and counsel's other efforts secured

Loden investigative and psychiatric assistance. Loden has not demonstrated that the decision

rejecting this claim is unreasonable application of *Strickland*.

Moreover, Loden's claim is moot under *Schriro v. Landrigan*, 550 U.S. 465 (2007), as

the State courts found that he instructed counsel not to present evidence in mitigation, cross-

examine witnesses, or object to exhibits offered by the State. The Court has determined that he

has not rebutted this determination. Therefore, relief on this issue will be denied.

## 2. Failure to Challenge the State's Evidence - Suppression Hearing

At a pretrial hearing held June 26 - 27, 2001, defense counsel argued motions to suppress

Loden's statement to law enforcement and to suppress evidence from the initial search

conducted by law enforcement officers. Defense counsel argued that Loden's statements to law

enforcement officials were given without the benefit of counsel and were otherwise involuntary,

as Loden gave a statement only after his then-wife, Kat, encouraged him to speak to law

enforcement officials at their "strong encouragement." Defense counsel's theory for suppressing

the evidence that was seized from the Loden property was that: (1) the search was not

consensual and voluntary, inasmuch as Loden had a privacy interest in the home and Mrs. Loden

was incompetent to give consent; and (2) the initial search warrant signed by Itawamba County

Justice Court Judge, Lance Bean, was not supported by probable cause, thereby tainting the later

discovered evidence. (*See* Trial Tr. vol. 4, 257-59; *see also* Trial Tr. vol. 5, 343-45; 361-362).

After hearing evidence and the argument of counsel, the trial court found that Loden's statement

to law enforcement was "knowingly, understandingly, freely[,] and voluntarily given." (Trial Tr.

vol. 5, 341-32). It also found that Kat acted independently of the State when she encouraged

Loden to give a statement. (*Id.*). As for the physical evidence seized, the trial court found that

Mrs. Loden had given a valid consent to search her home and her property, and that the

information gained by law enforcement as a result of the consent search was sufficient probable

cause for a valid search warrant to issue. (*See id*. at 430-31).

On federal habeas review, Loden maintains that there was ample evidence suggesting that

law enforcement officials unlawfully searched his van, as evidenced by the fact that officers

tagged and removed a video camera charger from Loden's overnight bag located in his room at

Mrs. Loden's house at 12:00 p.m., some eight hours before officers obtained the warrant that

they formally relied upon for the search of his van. (*See* Pet. Ex. 28(a), 28(c), 28(e), and 28(i)).

Loden notes that officers failed to seize other items from his overnight bag, and that the

significance of the charger would not have been apparent unless the police had already been in

his van and found the video depicting the crime. He also refers the Court to a 2008 affidavit in

which he claimed that he saw police officers in his van before a search warrant was issued, and

that he was told by an officer upon his arrest that the officer had seen the videotape in his van.

(Pet. Ex. 1 ¶15). He contends that defense counsel performed ineffectively by failing to

challenge the timing of the recovery of the charger at the suppression hearing.

Loden also argues that counsel failed to cross-examine investigator Rick Marlar about the

discrepancies between his and officer Bryan Jones' chronologies of the search – specifically, the

timing of their recovery of the rope and blood-stained shorts that formed the basis for the initial

search warrant. He argues that Marlar's written report shows that Rena Loden gave written

consent to search her property and the vehicles on it at 9:27 a.m., which was after the military-

style rope was found in Ms. Loden's Oldsmobile at 8:30 a.m. (*See* Pet. Ex. 28(a); Pet. Ex. 28(d)). Loden also notes that Marlar's report states that Loden's room was not searched until the search warrant issued; however, at the suppression hearing, Marlar testified that he saw the blood-stained shorts in plain view before the search warrant issued. (*See* Pet. Ex. 28(a), 28(b); *see also* Trial Tr. vol. 4, 271). Loden also maintains that counsel failed to question Marlar about the discrepancy between his testimony that Loden's room was in disarray, and the fact that the police photos show Loden's room both neatly kept and in disarray, suggesting that an illegal search took place. (*See* Pet. Ex. 28(e); Trial Tr. vol. 4, 271). He also notes that his attorneys did not cross-examine the judge who issued the warrants in the case.

Further, Loden maintains that his attorneys failed to adequately cross-examine witnesses about his statement, which he alleges was obtained only after Kat met with investigators who requested that she convince Loden to make a statement. Finally, he notes that he requested that counsel file a motion to reconsider the rulings on the suppression issues after he was finally provided discovery and noticed these discrepancies, but that counsel failed to do so. Their failures in litigating the suppression issues, he maintains, rendered their assistance ineffective.

Loden first raised these issues on post-conviction review, where the Mississippi Supreme Court found them barred "[i]nsofar as [Loden] raises this issue as a backdoor challenge to his purportedly 'involuntary guilty plea,' with no new evidence presented in support thereof[.]" *Loden II*, 43 So. 3d at 392. The court also found Loden's claim that counsel performed ineffectively at the suppression hearing procedurally barred, as he had different counsel on direct appeal and failed to raise the issue at that time. *Id*. at 393. Additionally, the court noted that Loden offered no explanation for how the suppression issues affected his sentencing, inasmuch

as he pleaded guilty. *Id.* The court rejected the claim as procedurally barred and without merit.

*Id.*

Respondents urge the Court to find this claim barred, but they otherwise maintain that Loden cannot demonstrate that he is entitled to relief. The Court agrees that, because this record-based claim was available at the time of Loden's direct appeal and was not raised, an independent and adequate State law procedural ground bars its consideration on federal habeas review. *See* Miss. Code Ann. § 99-39-21(1); Miss. R. App. P. 22(b); *Coleman v. Thompson*, 501 U.S. 722 (1991); *see also Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (holding that § 99-39-21(1) contains an independent state procedural bar). Loden has not demonstrated the requisite cause and prejudice or fundamental miscarriage of justice as necessary to overcome application of the bar. *Coleman*, 501 U.S. at 749-50.

Notwithstanding the bar, the Court finds that a review of the merits would not support a determination that Loden is entitled to relief. Marlar's written report states that he and Jones arrived at the Loden residence at approximately 7:50 a.m. on June 23, 2000, and that Mrs. Loden gave officers verbal permission to go to the pond located on her property to speak with Loden. (*See* Pet. Ex. 28(a)). When officers could not locate Loden, Marlar maintains that he requested and received written consent to search "all the common areas of the property and Rena Loden's vehicle." (*Id.*). Marlar testified that he asked Ms. Loden which room Loden was occupying, and that she "advised it was the room that we were looking in. But in order to go through the rest of the house you have to pass through his room. . . . It's like a breezeway. . . . And we had to cross that threshold in order to go through the rest of the house." (Trial Tr. vol. 4, 269-70). Marlar stated that as they walked through the room to get to other common areas of the house, he

noticed that the bed was unmade, an overnight bag was on the floor, and that there was a pair of cargo shorts in plain view on the floor with what appeared to be blood on them. (*Id*. at 271; Trial Tr. vol. 5, 320). He stated at the hearing that he did not touch the shorts or anything else in Loden's room during the consent search. (*See* Trial Tr. vol. 5, 307).

Marlar stated that officers searched Ms. Loden's Oldsmobile and discovered a military-style rope in a handcuff design. (*See* Pet. Ex. 28(a), Trial Tr. vol. 4, 272). He stated that procedures were initiated to obtain a search warrant, Judge Bean signed the search warrant, and it was executed. (*See id.*; *id.* at 274-75). Marlar's report stated that Loden's shorts, the video camera charger, and other items were seized pursuant to the warrant and listed on the search warrant return. (*See* Pet. Ex. 28(a)). Most of these, he maintained, had been in plain view when he initially asked for permission to search. (*Id*.). Marlar stated that Loden's van, which was locked, was transported to the Highway Patrol headquarters for processing. (Trial Tr. vol. 5, 315; Pet. Ex. 28(a)).

Officer Jones did not testify at the suppression hearing. Jones' first report stated that the officers obtained consent and searched Ms. Loden's vehicle before they went to the pond to look for Loden, and it omitted any mention of Loden's blood-stained shorts. (Pet. Ex. 28(g)). It stated that the property was searched and the van was transported when the search warrant was in hand. (*Id.*). In his second report, Jones stated that he and Marlar obtained Mrs. Loden's consent and found the military-style rope in Mrs. Loden's Oldsmobile before going to the pond. (Pet. Ex. 28(h)). He stated, however, that the officers requested additional consent to search Ms. Loden's home upon their return. (*Id.*). Jones stated that, during the second consent search, Marlar called him into Loden's room and showed him the shorts, which is when the officers discussed

obtaining a search warrant.  (*Id.*).

The Court finds that there is no reasonable probability that the results of the hearing would have been different if the discrepancies alleged by Loden had been exposed at the suppression hearing.  It is clear from the reports that Ms. Loden was asked for and gave a verbal consent to search her property, followed by a written consent to search the common areas of her home and the vehicles on the property.  The testimony of Marlar and the reports of Jones indicate that the van was not searched until a search warrant was procured.  The "Offer of Proof," which Loden signed prior to pleading guilty, states that the van was locked when law enforcement officers seized it, and that the keys were not located.  (*See* Trial Tr. vol. 2, 211).  An additional report confirms that the van was locked until it was opened by Kenneth Gill of the Mississippi Crime Laboratory.  (*See, e.g.*, Pet. Ex. 28(i)).

Marlar's testimony was that, although he could see the blood-stained shorts in plain view, he did not attempt to touch them until a search warrant had been procured.  Nothing in Jones' report disputes this.  Marlar testified that he had to travel through Loden's room to get to other areas of the house, and Loden himself testified that it was a "fair statement" to say that one had to walk through his room to get to other parts of the house.  (*See, e.g,*. Trial Tr. vol. 5, 385).[30]  That the evidence submission form has a time of 8:30 a.m. for the recovery of the rope does not alter this conclusion, given the trial testimony and the reports of the officers stating that the rope was found following Ms. Loden's consent to search, which the trial court found was competently given.  (*See, e.g.*, Trial Tr. vol. 5, 430-31).

---

[30]At the suppression hearing, Mrs. Loden's two sitters both testified that it was necessary to go through Loden's room to gain access to the rest of the house, unless you entered from the back door.  (Trial Tr. vol. 5, 390-31; 408).

As for Loden' incriminating statement, various law enforcement officials, and Loden himself, testified that Loden was advised of his *Miranda* rights[31] and waived them before giving a statement. (Trial Tr. vol. 3, 114-150; Trial Tr. vol. 4, 151-255). Loden testified that, while he understood his constitutional rights and waived them, he only did so because law enforcement officers told him that he would not be able to see his wife and daughter again unless he cooperated with them. (Trial Tr. vol. 4, 186, 186-87, 194). Captain Bethay and Lieutenant Baker, who were present when Loden's statement were given, testified that Loden was not told that he had to confess to see his wife and daughter. (*See* Trial Tr. vol. 4, 206; 252-53).[32] Additionally, Loden admitted at the suppression hearing that he told his wife to inform law enforcement officers that he wanted to speak with them. (*Id*. at 196-97).

The trial court found Loden's statement "knowingly, understandingly, freely and voluntarily given by [Loden] after he had been properly advised repeatedly of his constitutional rights," and it found that Kat acted "independently of any interest or at the behest or request of the State" when she spoke to Loden. (Trial Tr. vol. 5, 431). The court found that there was no inducement, threat, or promise involved with Loden's statement, and it also determined that the State did not make any representations to Loden about visitation with his daughter if he would make a statement. (*Id*. at 432).

---

[31] "*Miranda* rights" refers to the familiar warnings that must be given by law enforcement officials prior to a custodial interrogation to protect an accused's Fifth Amendment privilege against self-incrimination. *See Gachot v. Stadler*, 298 F.3d 414, 418 (5th Cir. 2002). These rights include: (1) the right to remain silent; (2) that any statement may be used against them at trial; (3) the right to an attorney's presence during questioning; and (4) the right to an appointed attorney if the suspect cannot afford one. *Miranda v. Arizona*, 384 U.S. 436 (1966).

[32] FBI Special Agent Bullwinkel testified that he did not remember Loden's wife and children being mentioned during the interview. (Trial Tr. vol. 4, 224).

The record supports a finding that law enforcement officers obtained evidence against Loden during a valid consent search that gave them probable cause to secure a search warrant, which led to the discovery of Leesa's body and the videotape of Loden's abuse of her. That counsel failed to renew its motion based on the fact that conflicting times were listed on the consent form and the evidence submission form does not render counsel's performance ineffective in light of the surrounding circumstances. Additionally, the record evidence supports a finding that Loden knowingly and voluntarily and intelligently gave a statement to law enforcement officials implicating himself in the murder, and the fact that Loden now regrets his decision is not sufficient to rebut this finding. Therefore, the Court finds this claim barred, and it otherwise finds that it does not warrant federal habeas relief.

## 3. Dr. O'Brien

Upon defense counsel's motion, Judge Gardner authorized a mental evaluation of Loden at the Mississippi State Hospital. (*See* Trial Tr. vol. 1, 119-22). The court directed the staff there to render an opinion regarding Loden's competency, sanity, and the existence of any statutory mitigators related to Loden's mental state at the time of the offense. (*See, e.g., id.* at 119-20). After the report from the State Hospital was received and filed by the trial court on June 27, 2001, Loden filed a motion to secure funds to retain the services of psychologist, Dr. C. Gerald O'Brien, to assist the defense in preparing for the sentencing phase of trial. (Trial Tr vol. 1, 140-49). The trial judge granted the motion for funding and authorized Dr. O'Brien to evaluate Loden by order filed July 17, 2001. (Trial Tr. vol. 2, 157-59). Dr. O'Brien conducted his evaluation of Loden on August 13, 2001, and he faxed his completed report to defense counsel Daniels on September 17, 2001. (*See, e.g.*, Pet. Ex. 29(a)).

Loden maintains that trial counsel failed to discuss Loden's case with Dr. O'Brien prior to or following the evaluation, they failed to provide Dr. O'Brien with Loden's background information or information regarding his mental state, and he argues that counsel did not ask Dr. O'Brien to evaluate whether Loden was competent to plead guilty. Rather, he alleges that counsel only provided limited information to Dr. O'Brien and failed to discuss the report with Dr. O'Brien after it was received. (*See, e.g.*, Pet. Ex. 18). Due to the lack of information provided, Loden maintains, Dr. O'Brien did not link Loden's emotional disturbance at the time of the crime to his PTSD, nor did Dr. O'Brien otherwise provide a context for his findings. (*See* Pet. Ex. 29(a); Pet. Ex. 16; Pet. Ex. 18). Loden argues that Dr. O'Brien, unlike Dr. High, did not have access to the necessary information or do the proper testing in order to be able to contextualize Loden's crime in light of the emotional disturbance he was experiencing. Had he performed the proper testing, Loden maintains, Dr. O'Brien could have explained the significance of Loden's reported amnesia. (*See* Pet. Ex. 18; Pet. Ex. 16). Since reviewing the evidence offered during Loden's post-conviction proceedings, Loden maintains, Dr. O'Brien has submitted an affidavit stating he agreed with the later report of Dr. James R. High, who diagnosed Loden with chronic PTSD, Dissassociative Amnesia, and Borderline Personality Disorder. (*See* Pet. Ex. 16; Pet. Ex .18).

The Mississippi Supreme Court considered this claim on post-conviction review and determined that Loden could not establish that he suffered any prejudice as a result of counsel's lack of interaction with Dr. O'Brien, as Loden chose not to present mitigating evidence at trial. *Loden II*, 43 So. 3d at 391. The court otherwise determined that counsel did not perform deficiently, inasmuch as counsel secured Dr. O'Brien's independent examination as a second,

66

discretionary examination after the forensic staff at the Mississippi State Hospital also examined Loden. *Id.* at 392. The court found "a review of Dr. O'Brien's report reflects that he was acquainted with Loden's family background and childhood, claim of sexual abuse, alleged history of substance abuse, military experience, suicidal ideation, and personal experience on the evening of the crime." *Id.* at 392. The court also noted that Dr. O'Brien concurred with the earlier assessment that Loden was competent to stand trial and assist in his own defense. *Id.* In a footnote, the court stated that Loden's military records contain no evidence that Loden suffered mental health issues or a diagnosis of PTSD, but rather, are "replete with positive comments." *Id.* at 391 n. 32. The court found Loden failed to demonstrate any deficiency by counsel and rejected the claim. *Id.* at 392.

In *Ake .v Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that trial judges must "allow expert psychiatric or psychological assistance to indigent defendants upon a threshold demonstration that sanity will be an issue or for the purpose of rebutting the State's experts regarding mental condition." *Ake*, 470 U.S. at 83. Loden's first evaluation by the Mississippi State Hospital was sufficient to satisfy this requirement, and Loden had no entitlement to the second, independent evaluation by Dr. O'Brien, although he was provided it at his request. *See Byrom v. State*, 863 So. 2d 836, 852 (Miss. 2003); *Woodward v. State*, 726 So. 2d 524, 528-29 (Miss. 1997) (holding that evaluation by psychiatrist and psychologist from the Mississippi State Hospital satisfies *Ake*'s constitutional mandate). Defense counsel requested and received two separate forensic mental health evaluations of Loden prior to trial, and counsel could rely on findings by the forensic staff at the State Hospital without being subject to a later finding of ineffective assistance of counsel based on counsel's actions or inactions regarding the

discretionary evaluation. *See Smith v. Cockrell*, 311 F.3d 661, 676-77 (5th Cir. 2002) (finding

"[c]ounsel should be permitted to rely upon the objectively reasonable evaluations and opinions

of expert witnesses without worrying that a reviewing court will substitute its own judgment. . .

and rule his performance [] substandard for doing so."), *overruled in part on other grounds*,

*Tennard v. Dretke*, 542 U.S. 264 (2004).

Additionally, the Court notes that trial counsel moved for Dr. O'Brien's assistance less

than a month after the report was filed from the Mississippi State Hospital. (*See, e.g.*, Trial Tr.

vol. 1, 137, 140). The trial court granted the motion on July 17, 2001, but Dr. O'Brien was not

available to evaluate Loden until August, 2001, which is when the evaluation actually occurred.

(Trial Tr. vol. 2, 157-59, 161). Both the State Hospital and Dr. O'Brien opined that Loden

appeared competent to stand trial and assist in his defense. (*See, e.g.,* Trial Tr. vol. 1, 135-37;

Pet. Ex. 29(a)). Loden pleaded guilty within days of counsel's receipt of Dr. O'Brien's report.

The Court otherwise notes that Dr. O'Brien's report contains information regarding

Loden's statements about the death of his friend during combat, his father's death, his suicide

attempts, his substance abuse, the abandonment by his mother, his exemplary military service,

his school performance, his sexual addiction, his failed marriages, the stress of his recruiting

assignment, his wife's affair, his grandmother's illness, the physical and sexual abuse he suffered

in childhood, and the fact that he was intoxicated on the night of the offense. (*See, e.g.*, Pet. Ex.

29). In short, Dr. O'Brien was not as stunted in his understanding of Loden's history or

background as Loden now suggests. Additionally, Dr. High's assessment of Loden's behavior is

that Loden committed his crimes "while under the influence of extreme mental or emotional

disturbance, " which is a determination originally made by Dr. O'Brien following his assessment

of Loden in 2001.  (Pet. Ex. 16, p. 40 ¶13; *see also* Pet. Ex. 29).

Therefore, the Court finds that Loden has failed to demonstrate that the decision rejecting this claim warrants federal habeas relief, and relief on this claim will be denied.

4.  Witnesses and the State Hospital Report

Defense counsel requested that the trial court order an examination of Loden at the Mississippi State Hospital, citing Loden's suicide attempts and history of "blackouts and amnesia" as events that called into question Loden's competency.  (*See* Trial Tr. vol. 3, 86-87). The order granting the evaluation stated that the written report of the evaluation should be furnished to defense counsel, the district attorney, and to the trial court.  (Trial Tr. vol. 1, 120). The State Hospital's psychiatric report was introduced by the State at the sentencing phase of trial to rebut Dr. O'Brien's report, which was introduced by defense counsel.  Loden maintains that his defense counsel failed to show him the report or advise him of its contents, and that he would have instructed counsel to object to the evidence at the sentencing phase of trial if he had known what it contained.  He argues that the State Hospital report is highly prejudicial, as it attempts to link him to prior murders, turns cattle slaughtering into sadistic abuse, and offers prejudicial and unsupported diagnoses of Malingering and Antisocial Personality Disorder.

Loden presented this claim on post-conviction review, where the Mississippi Supreme Court noted that Loden had instructed defense counsel not to cross-examine the State's witnesses or object to the introduction of evidence.  *Loden II*, 43 So. 3d at 386.  The court found that counsel's behavior in accordance with their client's wishes precluded a finding that counsel performed deficiently, and it rejected the claim.  *Id.*

As the Court has already cited, Loden instructed defense counsel not to cross-examine

witnesses or object to the introduction of any evidence presented by the State during the sentencing phase of his trial. (*See* Trial Tr. vol. 6, 594). When the trial judge again reminded him that he was giving up a valuable right, Loden stated "I understand, sir. I'm just doing what I feel I need to do." (Id.). As Loden expressly instructed his attorneys not to cross-examine witnesses or object to evidence at the sentencing phase of trial, he cannot now claim that counsel was ineffective in following his instructions. *See Nixon v. Epps*, 405 F.3d 318, 325-26 (5th Cir. 2005) ("A defendant cannot block his counsel from attempting one line of defense at trial, and then on appeal assert that counsel was ineffective for failing to introduce evidence supporting that defense."); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir . 2004) (noting that defendant cannot claim ineffective assistance of counsel after he has blocked counsel's efforts). Moreover, the Court finds that it appears that only the summary report was submitted to the trial court, which does not include the allegations Loden finds objectionable. (Trial Tr. vol. 1, 135-37; *see also* State's Trial Ex. 39). This conclusion is supported by the fact that, when defense counsel submitted a motion for an independent psychological expert, he attached the State Hospital's summary report in support of his motion. (*See* Trial Tr. vol. 1, 150; Trial Tr. vol. 2, 151-52). Loden has not demonstrated that the decision rejecting this claim warrants federal habeas relief, and relief on this claim will be denied.

**D. Cumulative Prejudice**

Loden maintains that the aggregate prejudice of his counsel's constitutionally deficient acts and omissions compels the conclusion that the result of proceedings against him would have been different but for counsel's deficient performance.

On post-conviction review, the Mississippi Supreme Court considered Loden's "catch-

all" argument that he was denied the effective assistance of counsel at his capital murder trial. *Loden II*, 43 So. 3d at 393-94. Loden argued that if counsel's performance been adequate, fourteen mitigation witnesses would have testified as to his chaotic and abusive family background and his outstanding service as a Marine, he would have had a psychological expert who could have testified as to Loden's combat-related trauma, he would have been properly advised as to the consequences of pleading guilty, and he would have elected to be sentenced by a jury. *Id*. The court noted that Loden had also submitted the affidavit of an attorney primarily involved in criminal practice who concluded that the performance of Loden's attorneys fell below the minimum standard of care. *See id.* at 394 n.35. The Mississippi Supreme Court refused to consider the affidavit, however, as the question of counsel's effectiveness is one of law "not to be decided by plebiscite, by affidavits, by deposition, or by live testimony." *Id.* (citation omitted). Finding that Loden failed to demonstrate relief as to any of his individual ineffective assistance of counsel claims, the court denied his claim. *Id.* at 394.

The Court finds that Loden has failed to demonstrate that he was prejudiced by any alleged deficiencies of trial counsel, as Loden pleaded guilty, waived jury sentencing, and instructed his attorneys not to cross-examine witnesses or present evidence in mitigation. *See, e.g., Landrigan*, 550 U.S. at 478. The Court also finds that the evidence in this case of sexual abuse and torture is such that the evidence now cited by Loden would not have created a reasonable probability that the sentencing phase of the case would have been different had the cited evidence been introduced. *See Clark v. Thaler*, 673 F.3d 410, 424 (5th Cir. 2012) (noting that overwhelming evidence in aggravation makes it "virtually impossible to establish prejudice") (citation omitted).

Moreover, the Fifth Circuit has stated that the cumulative error theory: (1) applies only to actual errors committed at the trial level; (2) applies only to those errors which have not been procedurally defaulted; and (3) applies only to errors of constitutional dimension, i.e., those which "infused the trial with unfairness as to deny due process of law." *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (en banc). In the absence of individual instances of constitutional error, or errors at all, "there is 'nothing to cumulate.'" *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007). In this case, the Court has found that Loden has not identified any meritorious claim of ineffective assistance, and he has failed to demonstrate that the decision rejecting this claim warrants federal habeas relief. Relief on this claim will be denied.

**E. Appellate Counsel**

Loden maintains that appellate counsel, Andre De Gruy of the Mississippi Office of Capital Defense Counsel, failed to investigate and present evidence that Loden's guilty plea was not knowing, voluntary, and intelligent. He argues that, while appellate counsel filed a motion to vacate the guilty plea, counsel did not fully develop and present evidence of Loden's perceived abandonment by counsel or Loden's misunderstanding as to the effect of his guilty plea. Loden notes that appellate counsel did not present to the court psychiatric testimony of his depression, suicide attempts, or complex PTSD. He also argues that appellate counsel did not present evidence that trial counsel's failure to advise Loden or present a strategy for defense contributed to Loden's feelings of hopelessness and ultimately led to his decision to plead guilty.

On post-conviction review, Loden argued that, but for appellate counsel's ineffective assistance, "there is at least a reasonable probability that the [c]ourt would have altered its credibility ruling and [Loden's] Motion to Vacate his guilty plea would have been successful."

*Loden II*, 43 So. 3d at 395. The Mississippi Supreme Court found that Loden's argument ignored the circuit court's finding that his plea was voluntary, noting that the sentencing court had before it the Mississippi State Hospital's summary report and Dr. O'Brien's report. *Id.* at 395-96. It also noted that the "Order and Opinion" dismissing Loden's motion for post-conviction relief specifically stated that the court advised Loden of his rights, and that Loden "acknowledged that he was giving up his right to appeal by pleading guilty to the charge" and "entered a knowing and voluntary plea." *Id.* at 396. The court found that the exchange resolved the question of whether Loden knew that he was abandoning his right to appeal by pleading guilty, and that his sworn statement, coupled with the trial court's on-the-record explanations of Loden's rights and the "effects and consequences of the plea," rendered the plea voluntarily given in spite of any advice of counsel to the contrary. *Id.* The court concluded "that the submissions by [Loden] are woefully insufficient to rise to the level necessary to invalidate his express plea-colloquy statements to the circuit judge, so as to create a 'reasonable probability' that his 'Motion to Vacate Guilty Plea' would have been granted." *Id.*

On federal habeas review, Loden maintains that the Mississippi Supreme Court's decision is based on an unreasonable determination of facts, as the psychological reports of the State Hospital and Dr. O'Brien are unreliable and do not constitute unimpeachable documentary evidence. He otherwise notes that the State Hospital's report conflicts with Dr. High's report and Dr. O'Brien's 2008 affidavit, such that an evidentiary hearing is needed to resolve the conflicts.

A criminal defendant is constitutionally guaranteed the right to effective assistance of counsel on direct appeal, and counsel's performance on appeal is reviewed by the two-pronged *Strickland* standard. *Evitts v. Lucey*, 469 U.S. 387, 397-99 (1985). The record demonstrates that

Andre De Gruy, Director of the Office of Capital Defense, was appointed as counsel for Loden on direct appeal, along with current habeas co-counsel, Stacy Ferraro. (*See, e.g.*, vol. 3 of 3). De Gruy submitted an affidavit during the pendency of Loden's post-conviction proceedings stating his belief that claims regarding Loden's mental state or social history would have to be raised in a post-conviction challenge, and not in connection with a challenge to the guilty plea. (*See* Pet. Ex. 45).

The Respondents persuasively point out that the information in Dr. High's affidavit does not alter the facts presented to appellate counsel, which were that Loden had been found competent by two separate mental evaluations, and his trial transcript showed his awareness of the proceedings and his active participation in the plea colloquy. Given the two reports rendering a professional conclusion that Loden was competent, as well as the on-the-record exchanges where he expressly waived his rights and voiced his understanding that he was forgoing his right to appeal, the Court cannot conclude that the decision rejecting this claim is based upon an unreasonable determination of facts, nor is it "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 876-87. Relief on this claim will be denied.

## II. State Hospital Report

Loden maintains that the use of the State Hospital's psychiatric report at the sentencing phase of his trial violates the constitutional requirement that evidence introduced in a capital case meet a heightened standard of reliability, and it violates his right to confront witnesses against him. Loden asserts that the report, offered by the State and stipulated to by the defense, contains biased and unsupported allegations that were presented to the trial judge prior to sentencing.

Specifically, he argues that the report attempts to link him to murders in Louisiana and Mississippi, it labels him with the unsupported diagnoses of Malingering and Antisocial Personality Disorder, and it recharacterizes the slaughtering of cattle on his grandfather's farm as the sadistic abuse of animals.

Additionally, he asserts that the doctors at the State Hospital failed to administer standard tests or screening for PTSD or Dissociative Amnesia, which, combined with the unsupported allegations of Loden's character, skewed the proper mental diagnosis of Loden and tainted the reliability and accuracy of his sentencing. Loden also argues that the report was introduced in violation of the Confrontation Clause of the Sixth Amendment, as he did not have an opportunity to cross-examine the doctors as to the conclusions and statements in the report, and he maintains that its introduction violated his due process rights, as the sentencing judge considered the inaccurate information contained within the report in sentencing Loden to death.

The Mississippi Supreme Court considered this claim on post-conviction review and found that "the record does not indicate that the circuit judge was presented with the full Mississippi State Hospital report at issue." *Loden II*, 43 So. 3d at 396. It also found that Loden was procedurally barred from presenting the claim for the first time during his post-conviction proceedings, inasmuch as he was represented by new counsel on appeal and his claim is "based on facts fully apparent from the record." *Id.* at 396-97, citing Miss. R. App. P. 22(b); Miss. Code Ann. § 99-39-21(1). It otherwise found Loden's claim "duplicitous" in light of his instructions to defense counsel not to object to the State's introduction of evidence or cross-examine the State's witnesses. *Id.* at 397. Finally, it "reject[ed] the implication that these contextually benign statements within the full Mississippi State Hospital report" led to Loden's death sentence given

the graphic evidence considered by the trial court. *Id.*

Loden argues that the Mississippi Supreme Court's decision acknowledges that the record "does not reveal" whether the sentencing judge was presented with the full report from the State Hospital, and that it therefore improperly resolved doubt against Loden. He argues that because it is uncertain whether the full report was before the court, it is questionable whether the objectionable aspects were fully apparent from the record, and thus, this claim could not have been raised on direct appeal pursuant to Mississippi Rule of Appellate Procedure 22(b).[33] He also argues that the Mississippi Supreme Court's characterization of the report's allegations as "benign" is an improper factual determination. He argues that he has submitted "compelling evidence" in post-conviction proceedings to undermine the conclusions in the report, but that the Mississippi Supreme Court ignored the new evidence.

Respondents argue, persuasively, that Loden's claim is barred from consideration based on an independent and adequate state law ground. *See, e.g.*, *Coleman*, 501 U.S. 722, 729-30 (1991); Miss. Code Ann. § 99-29-21(1).[34] The Court also agrees, alternatively, that Loden cannot demonstrate an entitlement to relief. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (finding that courts may reach merits of barred claim in an alternative holding without lifting the

---

[33] At the time Loden entered his guilty plea, Miss. R. App. P. 22(b) read: "Issues which may be raised in post-conviction proceedings may also be raised on direct appeal. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute waiver barring consideration of the issues in the post-conviction proceedings." *See Loden II*, 43 So. 3d at 374 n.6. Rule 22(b) was amended effective February 10, 2005, to add that issues may be raised on direct appeal "if such issues are based on facts fully apparent from the record." *Id.*

[34] The Court notes that it has already rejected Loden's claim of ineffective assistance related to the State Hospital's report, such that counsel's performance cannot serve as "cause" for the procedural default. *See Coleman*, 501 U.S. at 750.

bar).

First, as the Court has already noted, the examination serving as the predicate to the report at issue was requested by defense counsel, who filed the motion for Loden to be examined by the forensic staff at the State Hospital. Second, the report introduced at Loden's sentencing hearing as "State Exhibit 39" is the short report. (*See* Trial Tr. vol. 7, 694 and "Vault" consolidated exhibit vol.). The full report is not contained in the record that was before the trial court at sentencing. Loden argues that Judge Gardner acknowledged at an April 2009 hearing that he had seen the full report, as Judge Gardner stated: "[Loden] has been - - he waived the trial, pleaded guilty, and at a sentencing hearing was sentenced. And I knew all about him. I had the benefit of all the information [post-conviction counsel has] probably seen." (PCR vol. 3, Ex A. to "Motion to Supplement Petition for Extraordinary Relief: Motion to Require Circuit Court to Entertain Discovery Motion and Motion to Stay Proceedings"). The Court notes, however, that later in the same proceedings, an attorney from the Attorney General's Office states that the report that was sent to the trial court does not contain the challenged information. (*Id.* at 12). Therefore, even if the trial court at one time saw the full report that was generated as a result of defense counsel's request for an examination, it was not the report that was introduced for consideration at sentencing.[35]

Additionally, the Court finds that the examiners did not create unsupported allegations of other murders or animal abuse, contrary to Loden's claim. The report states what interviewed individuals told the examiners. For instance, investigator David Sheffield stated that Loden could be placed in South Mississippi and Louisiana at the time that similar murders were

---

[35] A copy of the full report was sent to Daniels on August 14, 2001, by the medical-legal record coordinator at the Mississippi State Hospital. (*See* PCR vol. 2, *see also* Ex. 28(j)).

committed against two other teenage girls, but that Loden could not be charged for the crimes absent a confession. (Pet. Ex. 28(j), p. 12). Bobbie Christian, Loden's mother, told examiners, without explanation as to how or why, that Loden killed cows on his grandfather's farm. (*See id.* at 11).[36] However, the examiners also included a statement from Sheffield, who grew up on a farm adjacent to the farm of Loden's grandparents, that if Loden killed animals, it was for food. (*See id.* at 12). Conversely, Loden's ex-wife, Kat, stated that, although Loden ordinarily killed animals for food or when they were suffering, he once told her that he shot a cow and had sex with it because he thought Kat "was running around on him." (*Id.* at 12). Loden himself reported during administration of the psychological testing that he "tortured and hurt animals on purpose." (*See* PCR vol. 3, State's PCR Ex. B, p. 3). It appears, then, that the examiners merely documented the events reported and did not infer abuse where none was suggested.

The diagnoses given to Loden also find support in the record. An addendum to the State Hospital Report that recited the results of psychological testing administered to Loden on June 21, 2001, was submitted as an exhibit to the State's filings during Loden's post-conviction proceedings. (*See* PCR vol. 3, Response to Mot. for PCR Ex. B). The addendum indicates that Loden underwent approximately five hours of psychological testing in association with the evaluation, and that two separate personality inventories were used: the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and items associated with assessing antisocial traits on the Structured Clinical Interview for DSM-IV Axis II Personality Disorders ("SCID-II"). (*Id.*). The addendum notes that the examiner administered several different tests to assess Loden's general mental state and identify attempts at malingering. (*Id.*). Based on the testing results, the

_____

[36] The examiners noted that Mrs. Christian endorsed Loden's history of cruelty to animals. *(See* Pet Ex. 28(j) at 12).

examiners concluded that Loden did not attempt to feign psychotic symptoms or intellectual deficits, but that the MMPI-2 results indicated that he "was exaggerating psychological problems." (*Id.*). The examiners further noted that Loden's scores "appear to suggest either deliberate distortion or exaggeration of the severity of psychopathology in an attempt to derive secondary gain or a plea for help by an extremely anxious individual." (*Id.* at 2-3). In the summary of findings, the examiners stated that Loden "appeared to exaggerate psychological difficulties during the personality assessment phases of this evaluation" and noted his "longstanding history of antisocial, impulsive, defiant, and explosive behavior." (*Id.* at 3).

Loden notes that Dr. High maintains that there is no evidence to show that Loden has a "pervasive pattern of disregarding the rights of others[,]" "no history of lying or conning[,]" "no record of dangerous impulsivity, irresponsibility, lack of remorse, or reckless disregard for [] his own safety or that of others[,] and no evidence of a conduct disorder before the age of 15" as required for a diagnosis of Antisocial Personality Disorder. (Pet. Ex. 16, pp. 41-42). The results from the administration of the SCID-II show, however, that he met the criteria for a diagnosis of Antisocial Personality Disorder, which requires a finding of three out of seven items of antisocial behavior prior to the age of fifteen, and three items and one subcomponent of one other item after the age of fifteen. (*See* Response to Mot. for PCR Ex. B).[37]

In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the United States Supreme Court held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition

---

[37] Loden reported that prior to the age of fifteen, he had tortured animals, shoplifted, and that he ran away from home and stayed overnight at least twice. He reported that after the age of fifteen, he had broken the law, had at times had no regular place to live, had been in fights, had thrown things at his wife, had physically threatened to harm others, had driven a car when he was drunk and high, and that he had received approximately five speeding tickets. (*See* Response to Mot. for PCR Ex. B).

against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson*, 486 U.S. at 584 (citation omitted). Loden asks the Court to find the introduction of the State Hospital's report to violate this principle because an expert, years after Loden's trial, disagrees with the methodology and conclusions reached by two experts who examined Loden contemporaneously with his trial. The Court finds that the record contains statements from interviewees and Loden himself, along with empirical data, to support the conclusions contained in the State Hospital's report.

Loden expressly instructed his attorneys not to cross-examine witnesses or object to the State's evidence at trial. The State Hospital report was generated as the result of an examination requested by Loden, its contents appear supported by statements made to the interviewers and other empirical data, it was introduced in summary form only at trial, and its introduction did not deprive Loden of any constitutionally entitled procedures. Therefore, the Court concludes that the claim is barred from federal habeas review, and that it does not otherwise support an entitlement to relief under the AEDPA.

### III. Defective Indictment[38]

Loden argues that the indictment in his case failed to include a valid statutory aggravating factor or a mens rea element, such that it failed to give him proper notice and otherwise failed to charge a death-eligible offense as required by State law. He argues that the indictment violated the Fifth, Sixth, and Fourteenth Amendments as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Blakely v. Washington*, 542 U.S. 296

---

[38] This issue was raised for the first time on appeal but allowed because the court found that it was a non-waivable issue. *See Loden I*, 971 So. 2d at 565.

(2004), which require that any fact, other than a prior conviction, that increases the penalty for a

defendant's crime beyond the statutory maximum be submitted to a jury and proven beyond a

reasonable doubt.  *See, e.g., Apprendi*, 530 U.S. at 490; *Ring*, 536 U.S. at 602; and *Blakely*, 542

U.S. at 303.

Count I of the indictment returned by the grand jury charged, in relevant part, that on or

about June 22 or 23, 2000, Thomas Edwin Loden, Jr.:

> [D]id willfully, unlawfully, feloniously and without authority of law, with or
> without any design to effect death, kill and murder Leesa Marie Gray, a human
> being, while he, the said THOMAS EDWIN LODEN, JR., was engaged in the
> commission of the felony crime of Kidnapping . . . in violation of Section 97-3-
> 53, all in violation of 97-3-19(2)(e), of the Mississippi Code of 1972, as amended.

(Trial Tr. vol. 1, 9-10).

Loden's argument was rejected on direct appeal by the Mississippi Supreme Court.

Citing federal precedent, the court noted that "[u]nder the Due Process Clause of the Fifth

Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other

than prior conviction) that increases the maximum penalty for a crime must be charged in the

indictment, submitted to a jury, and proven beyond a reasonable doubt."  *Loden I*, 971 So. 2d at

565 (citing *Ring v. Arizona*, 536 U.S. 584, 600 (2002)) (quotation omitted).  The court found,

however, that the inclusion of aggravating circumstances in an indictment is unnecessary, as

"anytime an individual is charged with murder [in Mississippi], he is put on notice that the death

penalty may result."  *Id.* (citation omitted).  The court also noted that the death penalty statute

lists the only aggravating factors that may be relied upon by the prosecution in seeking the death

penalty.  *Id*.  Citing its previous holdings, the court found that *Ring*, *Apprendi*, and *Blakely* "have

no applicability to Mississippi's capital murder sentencing scheme."  *Id.*

Loden argues that the maximum statutory sentence in Mississippi for capital murder is life imprisonment unless a sentencing hearing is held where the finder of fact finds at least one aggravating factors and a mens rea element. *See* Miss. Code Ann. § 99-19-101(5) and (7). Since a sentence of death exceeds a sentence of life imprisonment and cannot be imposed absent additional factors, Loden maintains, *Apprendi* applies and the State must include the additional factors in the indictment and prove them beyond a reasonable doubt. *See Ring*, 536 U.S. 584 at 597. He argues that because the finding of additional facts elevate the punishment, they are elements of an aggravated crime, and the State must include in the indictment any aggravating factors which it intends to prove at the sentencing phase of the trial where those factors are related to the commission of the crime.

At the outset, the Court notes that the maximum penalty for capital murder under Mississippi law is death. *See* Miss. Code Ann. § 99-19-101(1); *see also Moffett v. State*, 49 So. 3d 1073, 1115 (Miss. 2010 ("As the death penalty is not beyond the statutory maximum for [the defendant's charge of capital murder], reliance on *Apprendi* and *Ring* is misplaced."). Additionally, the Supreme Court has held that the Fifth Amendment right to an indictment is not applicable to the states. *See , e.g., McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020, 3035 n.13 (2010) (noting that the "Fifth Amendment's grand jury indictment requirement" is not applicable to the states); *Albright v. Oliver,* 510 U.S. 266, 272 (1994); *Branzburg v. Hayes*, 408 U.S. 665, 687-88 n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"). *Apprendi* itself noted that "the Fifth Amendment right to 'presentment or indictment by a Grand Jury" has never been incorporated against the states. *Apprendi*, 530 U.S. at 477 n.3. Furthermore, "there is no

clearly established federal law that requires that each aggravating circumstances on which the

state intends to rely to pursue the death penalty must be named in the indictment." *Mitchell v.*

*Epps*, No. 1:04cv865-LG (S.D. Miss. 2010), 2010 WL 1141126 at ** 36-37 (S.D. Miss. March

19, 2010); *Brawner v. Epps*, No. 2:07cv16-MPM, 2010 WL 383734 at *22 (N.D. Miss. January

27, 2010); *Stevens v. Epps*, No. 2:04cv118-KS, 2008 WL 4283528 at *25 (S.D. Miss. September

15, 2008). Accordingly, the decision by the state court rejecting the of a defective indictment

does not warrant federal habeas relief, and relief on this claim is denied.

### IV. "Avoiding Arrest" Aggravator

At Loden's sentencing hearing, the trial judge found as an aggravating circumstance that

Loden committed murder for the purpose of avoiding or preventing his lawful arrest. Loden

argues that the aggravator is invalid, as he drove home after the crime and parked his van in plain

sight. He notes that he left the victim's body in his van, left a videotape in the van implicating

himself in the crime, and carved "I'm sorry" into his chest upon waking up the next morning and

discovering what he had done. He maintains that the finding of the "avoiding arrest" aggravator

rested solely upon his single, tentative statement to investigators that he must have committed the

killing to avoid tarnishing his image as the perfect Marine, and that it was error to consider this

aggravating circumstance.

Loden's challenge to the "avoiding arrest" aggravator was found barred on direct appeal

for Loden's failure to object to it at trial. *See, e.g., Loden I*, 971 So. 2d at 565-67.

Notwithstanding the bar, the court considered the claim on its merits, noting that the "avoiding

arrest" aggravator is only appropriately supported where "there is evidence from which it may be

reasonably inferred that a substantial reason for the killing was to conceal the identity of the

killer or . . . to 'cover their tracks' *so as to avoid apprehension and eventual arrest by authorities*[.]" *Id*. at 566 (citation omitted) (emphasis in original). Under this construction, the court continued, the aggravator is properly submitted to the jury if evidence exists "from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing." *Id*. at 566-57 (citation omitted). It also noted that a freshly dug grave was found by investigators during their search of Mrs. Loden's property. *Id*. at 567. The court found that, viewing the evidence in the light most favorable to the finding of the aggravating circumstance, "a rational trier of fact could find beyond a reasonable doubt that Loden killed Leesa in order to avoid apprehension and arrest." *Id.* In a footnote, the court concluded that, even if the aggravator was found in error, the statutorily mandated reweighing in Miss. Code Ann. 99-19-105(3)(d) and 5(b), would lead the court to "hold the error harmless and affirm the sentence of death because Loden presented no mitigating evidence." *Id.* at n.18.

On federal habeas review, Loden argues that no reasonable sentencer could have found the existence of this aggravator on the evidence adduced at trial, and that it should not have been considered, citing *Jackson v. Virginia*, 443 U.S. 307 (1979) and *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990). Respondents cite some eighteen cases for the proposition that this claim is barred from federal habeas review for Loden's failure to contemporaneously object to the aggravating circumstance at trial, and they argue that the procedural bar relied upon by the state is regularly applied to aggravating circumstances in similar cases. *See, e.g., Blue v. State*, 674 So. 2d 1184, 1215-16 (Miss. 1996) (finding claim procedurally barred despite defendant's argument that the court had a statutory obligation to consider the error). Respondents otherwise argue that there is

84

evidence to support the aggravator, and that the decision of the Mississippi Supreme Court is not unreasonable.

In order for the Mississippi Supreme Court's contemporaneous objection rule to be sufficiently "adequate" to bar Loden's claims, it must be strictly or regularly followed by the State courts and applied to the majority of similar claims. *See, e.g., Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012); *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001). The Court notes that, if it were to find this claim barred, its determination would exist merely as a matter of form, as the Mississippi Supreme Court was statutorily obligated to determine whether the evidence supported the judge's findings of the aggravating circumstances in this case. Therefore, the Court finds that the bar imposed by the State court is inadequate to bar federal habeas review of this claim. *See, e.g.*, Miss. Code Ann. § 99-19-105(3)(b); *Simmons v. State*, 805 So. 2d 452, 495-96 (Miss. 2001) ("The State argues that the procedural bar should apply. However, Miss. Code Ann. § 99-19-105(3)(b) states that this Court must consider the sufficiency of the evidence to support the aggravating circumstances."); *Manning v. State*, 735 So. 2d 323, 349 (Miss. 1999) ("However, because this Court is required by statute to review the sufficiency of the evidence supporting the jury's finding of aggravating circumstances, there can be no procedural bar here.").

Mississippi's "avoiding arrest" aggravator requires evidence from which it may reasonably be inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to cover their tracks so as to avoid apprehension and eventual arrest by the authorities. *See Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983); *Taylor v. State*, 672 So. 2d 1246, 1275 (Miss. 1996); *see also Gray v. Lucas*, 677 F.2d 1086, 1100 (5th Cir. 1982) (finding

the avoiding arrest circumstance satisfied when the defendant purposefully kills the victim of underlying felony to avoid or prevent arrest for that felony). The evidence is insufficient to support the finding of this aggravating circumstances only if, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution, no rational trier of fact could have found the existence of the aggravator based on the evidence presented at trial. *See, e.g., Lewis v. Jeffers*, 497 U.S. 764, 783 (1990); *Jackson v. Virginia*, 443 U.S. 307, 319, 324 (1979).

Loden argues that the record evidence shows that he killed Leesa Gray to avoid tarnishing his professional image, not because he wanted to avoid arrest. The Court finds no significant distinction between Loden's stated goal and the one inferred by the Mississippi Supreme Court. He killed Leesa so that she could not report the crime, he hid her body to avoid her from being discovered, and he dug a grave on his grandmother's property, presumably to prevent her body from being detected. The harm he self-inflicted after murdering Leesa does not support his claim, as he informed law enforcement officials after his arrest that he decided to slash his wrists and carve his chest when he saw a patrol car at the Loden farm. (*See* State's Tr. Ex. 4, "Vault" consolidated ex. vol.). This aggravator has been found supported on similar or fewer facts. *See, e.g., Gillett v. State*, 56 So. 3d 469, 506 (Miss. 2010) (finding evidence that the defendant took the bodies to Kansas sufficient to support avoiding-arrest aggravator); *Ross v. State*, 954 So. 2d 968, 1010 (Miss. 2007) (finding aggravator supported where the defendant knew the victim personally); *Edwards v. State*, 737 So. 2d 275, 312 (Miss. 1999) (finding the burning of the victim's vehicle sufficient evidence to support giving avoiding arrest aggravating circumstance to jury). A reasonable juror could conclude from the facts of this case that Loden committed

murder to avoid the victim's identification of him as her kidnapper and rapist and continued to cover up his crime after her death to avoid detection and arrest.

Furthermore, even assuming arguments that the submission of the aggravator was error, the Mississippi Supreme Court had the authority to reweigh the evidence pursuant to Miss. Code Ann. § 99-19-105(3)(d) and (5)(b) and find the error harmless.[39] *See, e.g., Simmons v. Epps*, 654 F.3d 526, 538-39 (5th Cir. 2011); *Clemons v. Mississippi*, 494 U.S. 738, 745, 753-54 (1990); *Stringer v. Black*, 503 U.S. 222, 229 (1992). The harmless error test found in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) governs the inquiry of whether an improperly submitted aggravating factor was nevertheless harmless. The *Brecht* test asks whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637. The Fifth Circuit has interpreted this to mean that relief is not warranted unless there is "more than a reasonable probability" that the erroneously admitted aggravator contributed to the imposition of the death sentence, and an error is harmless if "the sentence would have been the same had the unconstitutional aggravator never been submitted to the jury." *Simmons v. Epps*, 654 F.3d 526, 539 (5th Cir. 2011) (citations omitted).

Here, the trial court found that Loden actually killed, attempted to kill, intended that the

---

[39] Miss. Code Ann. § 99-19-105(3)(d) reads, in pertinent part: (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(5)(b) reads: The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to: (b) Reweigh the remaining aggravating circumstances against the mitigating circumstances should one or more of the aggravating circumstances be found to be invalid, and (i) affirm the sentence of death or (ii) hold the error in the sentence phase harmless error and affirm the sentence of death or (iii) remand the case for a new sentencing hearing[.]

killing take place, that he contemplated lethal force would be employed. (Trial Tr. vol. 7, 711). The court found that the following aggravators existed beyond a reasonable doubt: (1) that the offense was committed while Loden was engaged in the commission of the felony crimes of kidnapping, rape and sexual battery; (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) that the offense was especially heinous, atrocious, or cruel. (*Id*. at 711-12). The court considered the aggarvators and mitigators and found the aggravating circumstances to outweigh the mitigating circumstances and that the mitigating did not outweigh the aggravating. (*Id.* at 713-14).

The evidence showed that Loden kidnapped Leesa and drove her to a secluded spot where he repeatedly assaulted and raped her before he suffocated and strangled her to death. He dug a shallow grave in a secluded area on his grandmother's property, and he told law enforcement officers that he killed Leesa in order to avoid tarnishing his reputation. He did not present any evidence at trial to mitigate these facts. Therefore, the Court finds it was not unreasonable to conclude that the inclusion of this aggravator, even if it was admitted in error, was harmless. Loden is not entitled to relief on this claim.

### V. Felony-Murder Aggravator

At sentencing, the trial court found as an aggravating circumstance that Leesa's murder was committed while Loden "was engaged in the commission of the felony counts of kidnapping, rape[,] and sexual battery." (Trial Tr. vol. 7, 712).[40] Loden argues that use of the underlying felony as an aggravating circumstance fails to adequately distinguish death-eligible defendants

---

[40] As noted in the previous ground for relief, the court also found that the murder was committed for the purpose of avoiding or preventing a lawful arrest, and that the offense was especially heinous, atrocious, or cruel. (Trial Tr. vol. 7, 712-13).

from other murderers in light of *Apprendi* and *Ring*, discussed previously in section III, as those cases hold that aggravating circumstances in capital sentencing proceedings are "elements" of the offense for constitutional purposes. He also maintains that, because the felony-murder aggravator was based on the kidnapping, rape, and sexual battery counts in the indictment, for which Loden was separately convicted and sentenced, the consideration of the aggravator violated the Double Jeopardy Clause of the United States Constitution.

On direct appeal, Loden's claim that the underlying felony was also impermissibly charged as an aggravating circumstance was rejected on its merits by the Mississippi Supreme Court. *See Loden I*, 971 So. 2d at 567-69. The court found that its statutory capital sentencing scheme constitutionally narrowed the class of death-eligible defendants, and it otherwise noted that it had previously found "*Ring* and *Apprendi* inapplicable to Mississippi's capital murder sentencing scheme." *Id*. at 569. The court also found Loden's double jeopardy claim barred, as Loden had failed to raise the issue at trial. *Id.* at 568. Alternatively, the court found that Loden was charged with an underlying felony of kidnapping in the indictment, for which no separate charge was included, such that his argument was without merit. *Id*. at 570.

The Supreme Court has explained that "[t]o pass constitutional muster, a capital sentencing scheme "must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared with others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (citation omitted). This may occur by legislative function or by requiring that the jury find the presence of an aggravating circumstance. *Id.* at 246. The Mississippi statute narrows the class of capital defendants who are eligible for the death penalty by its definition of capital murder, *see* Miss.

Code Ann. § 97-3-19(2), and through the use of aggravating circumstances. *See* Miss. Code Ann. § 99-19-101. As Mississippi has, by statute, provided a narrowing function, "[t]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make [the] sentence constitutionally infirm." *Lowenfield*, 484 U.S. at 246; *Wingo v. Blackburn*, 783 F.2d 1046, 1051 (5th Cir. 1986); *Evans v. Thigpen*, 809 F.2d 239, 241 (5th Cir. 1987); *see also Holland v. Anderson*, 583 F.3d 267, 283-84 (5th Cir. 2009). Furthermore, in *Tuilaepa v. California*, 512 U.S. 967, 972 (1994), the Court held that "[t]he aggravating circumstances may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *See also Williams v. Taylor*, 529 U.S. 362, 393 n.16 (2000) (finding no prohibition in using underlying felony as aggravating circumstance). The decision rejecting this claim, therefore, does not warrant federal habeas relief.

Additionally, the Court finds that the Mississippi Supreme Court clearly and expressly found Loden's double jeopardy claim barred, and Loden's failure to comply with Mississippi's procedural rules bars federal habeas review of this claim. *See, e.g.. Coleman*, 550 U.S. at 729-30. The fact that it was addressed in the alternative does not vitiate the bar. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). The Court otherwise notes that the Supreme Court has held that the use of the underlying felony in aggravation at sentencing does not expose defendant to double jeopardy. *Schiro v. Farley*, 510 U.S. 222, 230 (1994); *see also United States v. Wittie*, 25 F.3d 250, 257 (5th Cir. 1994) (court finding it "well-settled that using prior crimes to 'enhance' a sentence does not impinge on double jeopardy, because defendants are not 'punished' for crimes so considered"). Loden's sentencing was not a second prosecution, nor a second punishment, for the same offense. Rather, his punishment was elevated based on the aggravating circumstances

found at sentencing.  Federal habeas relief on this claim is denied.

## VI.  Right to Fully Develop and Present Evidence

Loden maintains that he was denied the right to fully develop and present evidence in his case, citing his previous grounds for relief in support of this claim.  For the reasons already discussed by the Court, including Loden's valid plea and waiver of sentencing, along with his valid waiver of the presentation of mitigating circumstances, the Court finds that Loden has not demonstrated that he was denied the right to develop and present evidence in his case.  However, Loden otherwise makes a specific argument that defense counsel Daniels' destruction of Loden's case file denied Loden his due process right to fully develop evidence in his case.  The Mississippi Supreme Court found Daniels exercised "poor judgment" in destroying Loden's file while Loden was still pursuing post-conviction relief.  *Loden II*, 43 So. 3d at 400.  The court rejected the claim, however, due to Loden's failure to allege and support a showing of prejudice where "Loden had the originals of the very same material."  *Id.*

Loden maintains that nothing supports a conclusion that Johnstone's file contained copies of everything that had been in Daniels' file.  *See Loden*, 43 So. 3d at 400 (noting that Daniels stated there was duplication between the files, and that the items in his file were merely copies). Loden argues that the contents of the file cannot now be known, and that Daniels' statements about the contents of the file cannot be reliably trusted, "particularly where his conduct has violated Mississippi law and ethical obligations he owed to his former client."  (Pet. Memo at 124).  Loden maintains that the Court should presume that he was denied his right to fully present evidence in light of Daniels' actions, and it should find him entitled to an inference that the files were adverse to Daniels, citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1994) (finding

denial of due process may be shown where evidence "potentially useful" to defendant is destroyed by police in bad faith and "permanently lost").

Daniels destroyed the case file he maintained on Loden without consulting Loden or his post-conviction counsel. (Daniels Dep. at p. 48). The Court has little difficulty in agreeing that Daniels showed extremely poor judgment in destroying Loden's case file while Loden's post-conviction proceedings were ongoing. It also agrees that the timing is suspect, given that post-conviction counsel stated that he spoke with Daniels briefly in August 2008, and that Daniels indicated at that time "that he was done with this case and did not want to be involved with it." (Pet. Ex. 42, Aff. of Mark McDonald at ¶ 4). Daniels then destroyed the files in October 2008. (Daniels Dep. at pp. 47-48).

In his 2009 deposition testimony, Daniels testified that he kept the files in a box in his storage room for seven years and decided to destroy them to prevent the dissemination of "private and confidential information" in the event that his storage room was compromised in some way. (*Id.* at pp. 47-48). Looking through boxes of documents that Loden's counsel brought to the deposition, Daniels identified some of his "handwritten notes," even though he did not recognize the folders as his. (*Id.* at pp. 48-49). When asked whether there was anything in the boxes that did not come from him or his files, Daniels stated that it was impossible to say for certain, as there was "a good bit of duplication" between his and Johnstone's file. (*Id.* at p. 49). Johnstone also gave a deposition, and it is apparent from his testimony that he had, years prior, turned over his original files on Loden's case to the attorneys associated with Loden's direct appeal. (Johnstone Dep. at p. 8). Those files were in the room with Johnstone during his deposition, and they are presumably the same ones Daniels was asked to look through just before

he found copies of his handwritten notes.  (*See id.*).

Loden's claim is that the Court should infer bad faith by Daniels, and that it should presume that Daniels' case files contained information that would have altered the outcome of Loden's trial or post-conviction proceedings.  The Court finds that Loden's claim is not analogous to claims of police destruction of evidence in a case, as was the case in *Youngblood,* and there is no suggestion that potentially exonerating material was destroyed by Daniels.  *See Youngblood*, 488 U.S. at 57-58.  Neither has Loden pointed to any evidence potentially contained in the files that would have been "so critical to the defense as to make a criminal trial fundamentally unfair."  *Id*. at 57 (Stevens, J., concurring in the result).  Additionally, the Court notes that there is no indication that Daniels had been asked for a copy of his files on Loden at any point during Loden's direct appeal and refused to provide them, and there is no indication in the record that post-conviction counsel asked for a copy of the files in August 2008 and was refused.  *See, e.g., id.* at 56 n* ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.").

Even assuming, *arguendo*, Loden's claim of bad faith by Daniels, the mere absence of access to Daniels' files will not support Loden's due process claim, and there is no indication that Daniels' files would have contained potentially critical information that has otherwise gone undiscovered.  *See, e.g., United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997) (requiring that defendant seeking to establish a due process violation show bad faith by government officials; that the evidence is material in showing the defendant's innocence; and no alternate means of establishing same); *United States v. Jobson*, 102 F.3d 214, 219 (6th Cir. 1996) (holding

that mere speculation of potentially exculpatory value will not support due process claim).

Loden is not entitled to relief on this claim.

Similarly, to the extent that Loden claims ineffective assistance of counsel based on these facts, he fails to demonstrate prejudice under *Strickland* for the above-stated reasons. Conclusory allegations do not raise a constitutional issue in a habeas proceeding. *Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir. 1983). Habeas relief is not warranted on the basis of Daniels' destruction of his case file, either as a substantive due process claim or as a claim of ineffective assistance of counsel, and relief on this ground is denied.

## Certificate of Appealability

Under the AEDPA, Loden must obtain a certificate of appealability ("COA") before appealing this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Loden makes "a substantial showing of the denial of a constitutional right." 28 U.S. C. § 2253(c)(2). A petitioner makes such a showing "when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must additionally demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

This Court must issue or deny a COA upon its entry of an order adverse to the petitioner. *See* Rule 11 of the Rules Governing § 2254 Cases. The Court, resolving in Loden's favor any doubt as to whether a COA should issue, determines that he is entitled to a COA on his claims of

ineffective assistance of counsel.  Specifically, the Court finds that a COA should issue as to Loden's ineffective assistance of counsel claims regarding:  the development of mitigation evidence (Ground 1.A), the effect of his guilty plea and the waiver of jury sentencing (Ground 1.B), defense counsel's litigation of the case (Ground 1.C), the cumulative effect of trial counsel's performance (Ground 1.D), and the performance of appellate counsel (Ground 1.E). The Court determines that Loden has not demonstrated that reasonable jurists would debate its procedural and/or substantive rulings on the remaining claims.  Therefore, a certificate of appealability will issue only on the previously designated claim.

## Conclusion

For the reasons set forth above, Loden has not demonstrated that the denial of his State petition was contrary to, or involved an unreasonable application of, clearly established federal law, nor has the denial been shown to have been based on an unreasonable determination of facts in light of the evidence presented in the State court proceedings.  Accordingly, it is hereby **ORDERED** that:

1.  All federal habeas corpus relief requested by Loden is **DENIED**, and the instant petition shall be **DISMISSED** with prejudice.

2.  Loden's request for an evidentiary hearing is **DENIED**.

3.  All pending motions are **DISMISSED** as moot.

4.  Loden is **GRANTED** a COA on the following claims of ineffective assistance of counsel:  the development of mitigation evidence (Ground 1.A), Loden's guilty plea and the waiver of jury sentencing (Ground 1.B), defense counsel's litigation of the case (Ground 1.C), the cumulative effect of trial counsel's performance (Ground 1.D), and the performance of appellate counsel

(Ground 1.E).

5.  Loden is **DENIED** a COA on all remaining claims raised in the petition.

      **SO ORDERED**, **THIS** the 18th day of September, 2013.

   **/s/ Neal Biggers**
**NEAL B. BIGGERS, JR.**
**SENIOR U.S. DISTRICT JUDGE**
